# United States District Court
# Southern District of Texas

Case Number: ___OSCV 1847___

## ATTACHMENT

Description:

☐ State Court Record ☑ State Court Record Continued

☐ Administrative Record

☑ Document continued - Part __2__ of _____

☐ Exhibit to: _____
         number(s) / letter(s) _____

Other: _____

_____

_____

Cynthia and Wayne eventually retired to Cynthia's bedroom, leaving the children to watch television in the living room. (S.F.28 - 69-70). Tomika and Terrell fell asleep at opposite ends of the living room couch, while Chirissa slept on the love seat. (S.F.28 - 68-69; S.F.29 - 235). Cedric fell asleep on the living room floor. (S.F.28 - 69).

Wayne awoke shortly before 5:00 the following morning and was sitting on the edge of the bed when he heard a loud noise. (S.F.29 - 179). Terrell and Tomika also heard the noise, and realized that someone was kicking in the front door. (S.F.28 - 70-71, S.F.29 - 236). As Wayne ran into the living room to investigate, appellant entered the apartment, approached the love seat where nine-year-old Chirissa was sleeping, and shot her between the eyes. (S.F.28 - 65, 71; S.F.29 - 179, 238). Tomika fled to the spare bedroom and hid in the closet, while Wayne attempted to wrestle the gun away from appellant. (S.F.29 - 179, 237). However, Wayne quickly realized he could not overcome appellant, so he ran into the spare bedroom and dove through the second-story window. (S.F.29 - 182). Appellant leaned out of the window and shot at Wayne. Although Wayne was grazed by a bullet and suffered a sprained ankle and numerous cuts and abrasions, he escaped with no serious injuries. (S.F.30 - 372-73).

Appellant returned to the living room and approached his eight-year-old son, Terrell. He aimed the pistol between his son's eyes. However, as appellant pulled the trigger, Terrell quickly turned his head, causing the bullet to enter his left temple, exit behind his left ear, and lodge in his left shoulder. (S.F.30 -361).

2

her house, so she could run home without being detected. (S.F.32 - 77). Appellant also went to the restaurant where Crystal worked. He would order food, then sit and stare at her while he ate. (S.F.32 - 75). Once when the manager asked him to leave, appellant drove to the man's house and threw bricks at the residence. (S.F.32 - 75, 204-05). Crystal knew appellant kept a gun hidden under the dash of his car, and she had seen him threaten people with it. (S.F.32 -78-79). She also knew he was violent, and she was afraid of him. (S.F.32 - 79).

On October 25, 1984, Crystal's new boyfriend, Huey Washington, Jr. was visiting her at her parents' house. (S.F.32 - 72-73). There was a knock at the door around 7:00 p.m., and Crystal's mother answered. (S.F.32 - 59). It was appellant. He flew into a rage, screaming and lying that Crystal was pregnant with his child. (S.F.32 - 59, 73). Crystal's father went to the front door and demanded that appellant leave. (S.F.32 - 59, 73).

Huey left Crystal's house around 9:30 p.m. and drove about three miles to his parents' house. (S.F.32 - 63). He parked his car in the driveway and opened the door, then noticed appellant and appellant's brother Barry approaching him. (S.F.32 - 63). Both men were carrying guns. (S.F.32 - 64). Appellant ordered Huey out of the car. However, before Huey could step out, appellant opened fire. Huey sustained two bullet wounds to the chest, two to the left thigh, one to the right hand, and one or two to the elbow. (S.F.32 - 66).

Huey's younger brother Gregory heard the commotion outside and woke up their father, Huey Washington, Sr. (S.F.32 - 37-38, 47). When Gregory and Huey Sr. went to the front door, appellant turned

4

Eventually, charges of felony injury to a child were filed against appellant for wounds inflicted upon Terrell. (S.F.32 - 172-73). The officer investigating the case found deep red bruises on Terrell's back, abdomen, elbow, legs, buttocks, and face. (S.F.32 - 173-76). The charge ultimately was reduced to a misdemeanor, and appellant was convicted on September 11, 1990. (S.F.32 - 94).

———•———

## REPLY TO APPELLANT'S FIRST POINT OF ERROR

Appellant first claims the trial court erred by informing prospective jurors during voir dire that a conviction for capital murder automatically results in a life sentence. This complaint is based upon the following portion of the trial court's general remarks to the venire panel:

> Immediately upon being found guilty of the offense of capital murder, the defendant is going to receive a life sentence. That's automatic.

(S.F.9 - 44).

> I get this question in capital murder cases every time we pick a jury. Someone asks a very intelligent question, what's a life sentence. A life sentence in the context of a capital murder case means he does not receive the death penalty. That's what it means in the context of a capital murder case. He gets a life sentence the minute he is found guilty. That's automatic, that's automatic, and only if the State can prove beyond a reasonable doubt that the answer to issue number one should be yes and they prove that the answer to issue number two should be no, only then does the defendant receive the death penalty. If they cannot prove it, he has got that automatic life sentence he got the second he got found guilty. So, for the context of this trial, a life sentence means he does not receive the death penalty.

(S.F.9 - 48).

Moreover, appellant's claim is without merit. The trial court did not inform the venire of the effect of a jury's failure <u>to answer the special issues</u>. Rather, the court told the panel members about the effect <u>of a guilty verdict</u>. These remarks therefore are unlike those this Court has previously found to violate article 37.071. For example, in **Clark v. State**, 881 S.W.2d 682, 691-92 (Tex. Crim. App. 1994), this Court found that the prosecutor improperly informed the venire that "[e]ven one no answer could result in a life sentence." In **Sattiewhite**, 786 S.W.2d at 277-78, this Court held that the trial court erred by informing the jury that the failure to answer the special issues results in a "hung jury, a mistrial." The questions presented in **Clark** and **Sattiewhite** fall squarely within the prohibition of article 37.071, section 2(a), because the prospective jurors were informed of the effect of the failure to answer the special issues.

The State has not found a case extending the rule of section 2(a) to cases in which the trial court informed the jury of the effect of a guilty verdict, rather than the effect of its failure to reach a punishment decision. Indeed, such an extension should not be made. The plain language of article 37.071, section 2(a) prohibits the trial judge and the parties from informing "a juror or a prospective juror of the effect of a failure of a jury to agree on issues submitted under Subsection (c) or (e) of this article." The literal text of article 37.071, section 2(a) thus does not bar the trial judge from telling the jury the effect of a guilty verdict. <u>See</u> **Moore v. State**, 868 S.W.2d 787, 790 (Tex. Crim. App. 1993); **Hernandez v. State**, 861 S.W.2d 908, 909 (Tex. Crim. App. 1993); **State v. Muller**, 829 S.W.2d 805, 808 (Tex. Crim.

8

jurors must unanimously determine that the State proved the issue beyond a reasonable doubt. (T. 220). There was no correspondence from the jury, nor any other indication in the record, revealing that the jury was confused by the charge. Thus, the jury is presumed to have followed the court's charge without difficulty. Finally, a review of the remainder of the voir dire of this venire panel reveals that there was no further mention of an automatic life sentence. As in **Sattiewhite** and **Clark**, appellant was not harmed by the alleged error.

Appellant raises this complaint for the first time on appeal, and thus did not preserve the issue by making a timely and specific trial objection. Furthermore, appellant's claim is without merit, because the trial court's remarks are distinguishable from the statements prohibited by article 37.071, section 2(a). The comments thus were permissible. Yet, even if the comments were made in error, appellant was not harmed by the remarks. His first point of error therefore should be overruled.

———◆———

## REPLY TO APPELLANT'S SECOND AND SEVENTH POINTS OF ERROR

In two points of error, appellant claims the trial court erred by refusing to instruct the jury that appellant would have to serve a minimum of 35 years on a life sentence. Relying upon **Simmons v. South Carolina**, 114 S.Ct. 2187 (1994), he argues in his second point of error that the trial court violated the Due Process Clause of the United States Constitution by refusing to submit the requested charge. In his seventh point of error, appellant

10

rebut or explain. Appellant was not denied due process of law when the trial court refused to instruct the jury on parole. The trial court properly followed the Texas Constitutional commands in prohibiting parole from being considered by a capital jury.

**Smith**, slip op. at 21-22 (citations omitted).

As in **Smith**, no evidence or argument concerning appellant's parole eligibility was presented to the jury in this case. Consequently, the troubling aspects of **Simmons** are not present in this case, nor in any Texas capital murder trial where the legal due process safeguards have been followed. Because appellant received due process of law, there is no need to circumvent the mandate of the Texas Constitution. Accordingly, **Simmons** is inapplicable, and the trial court properly refused to instruct the jury on the issue of parole.

Moreover, this Court previously has rejected appellant's Eighth Amendment claim. In **Elliott v. State**, 858 S.W.2d 478, 489 (Tex. Crim. App. 1993), the appellant argued that the trial court's refusal to instruct the jury on the law of parole violated the Eighth Amendment of the United States Constitution. This Court rejected Elliott's contention. Relying upon **California v. Ramos**, 463 U.S. 992 (1983), this Court found that, while the federal constitution does not prohibit a parole charge, it does not require such a charge either. **Id.** at 489-90. Thus, a capital defendant's eligibility for parole does not raise a federal constitutional issue.

More recently, this Court followed **Elliot** when rejecting Smith's Eighth Amendment argument. **Smith**, slip op. at 23. "We note ... that the concept of parole eligibility 'bears no relationship to the nature of the offense or the character of the

12

protection than the United States Constitution; however, each argument must be developed independently of the other. **Elliott**, 858 S.W.2d at 487; **Muniz v. State**, 851 S.W.2d 238, 251 (Tex. Crim. App. 1993); **Heitman v. State**, 815 S.W.2d 681, 690-91 n.23 (Tex. Crim. App. 1991). Briefs claiming constitutional violations under the state and federal constitutions should provide argument, analysis, and authority supporting and explaining each separate claim of constitutional violation. **Arnold v. State**, 873 S.W.2d 27, 29 and 33 n.2 and n.4 (Tex. Crim. App. 1993), cert. denied, 115 S.Ct. 103 (1994); **McCambridge v. State**, 712 S.W.2d 499, 502 n.9 (Tex. Crim. App. 1986), cert. denied, 110 S.Ct. 1936 (1990). Because appellant has failed to meet these briefing requirements, he has presented nothing for review in his ninth point of error, and that claim should not be considered.

Appellant's eighth point of error, in which he alleges a Sixth Amendment violation, is without merit. In **King v. State**, 631 S.W.2d 486, 490 (Tex. Crim. App. 1982), this Court overruled appellant's contention that the trial court erred by refusing his request to voir dire the potential jurors on the length of time a capital murder convict must serve on a life sentence before becoming eligible for parole. The Fifth Circuit Court of Appeals later held in **King v. Lynaugh**, 850 F.2d 1055, 1060-61 (5th Cir. 1988), that voir dire on Texas parole law is not constitutionally required. The court wrote:

> We are further reluctant to require asymmetrical constitutional requirements for voir dire and the jury deliberations because of the Supreme Court's determination that a jury instruction on a capital defendant's eligibility for parole or commutation of sentence does not raise a constitutional issue.

a defendant's background character or the circumstances of the crime. **Penry v. Lynaugh**, 492 U.S. 302, 329 (1989); **Johnson v. Texas**, 113 S.Ct. 2658, 2667 (1993). In this case, the second special issue was that vehicle.

In **Barnes v. State**, 876 S.W.2d 316, 330 (Tex. Crim. App. 1994), this Court wrote:

> Neither this Court nor the Texas legislature has ever assigned a burden of proof on the issue of mitigating evidence. See Article 37.071. The Eighth and Fourteenth Amendments do not require that a burden be placed on the State. In a plurality opinion, the United States Supreme Court in **Walton v. Arizona** affirmatively declined to "adopt as a constitutional imperative a rule that would require the court to consider the mitigating circumstances claimed by a defendant unless the State negated them by a preponderance of the evidence." The plurality in **Walton** further held that it is not unconstitutional to place a burden on the defendant to establish sufficient mitigating circumstances by a preponderance of the evidence. Because neither legislation nor constitution places a burden of proof upon the State to negate the existence of mitigating evidence, we refuse to fault the trial court for failing to give the jury such an instruction.

**Id.**, quoting **Walton v. Arizona**, 497 U.S. 639, 649-51 (1990).

Because this Court already has rejected appellant's complaints, his fifth and sixth points of error should be overruled.

———•———

## REPLY TO APPELLANT'S TENTH AND ELEVENTH POINTS OF ERROR

In his final two points of error, appellant contends TEX. CODE CRIM. P. ANN. art. 37.071, § 2(a) (Vernon Supp. 1995) is unconstitutional, because it prohibits the trial court and the parties from informing the jury that even one "no" vote to the first special issue will result in a life sentence. Specifically, appellant complains of the portion of section 2(a) that forbids the



WORK COPY

NO. 71863

---

IN THE

COURT OF CRIMINAL APPEALS

FOR THE STATE OF TEXAS

---

GERALD C. ELDRIDGE
Appellant

VS.

THE STATE OF TEXAS

---

Appeal in Cause Number 9403201
In the 178th District Court
of Harris County, Texas

---

BRIEF FOR APPELLANT

---

HENRY K. ONCKEN
State Bar No. 15280000

ONCKEN & ONCKEN, P.C.
12907 Veterans Memorial Dr.
Houston, Texas   77014
(713) 893-4747

(On Appeal Only)

Attorney for Appellant
GERALD C. ELDRIDGE

[APPELLANT REQUESTS ORAL ARGUMENT]

## TABLE OF CONTENTS

|  | PAGE |
|---|---|
| Names of all Parties . . . . . . . . . . . . . . . . | i |
| Table of Contents . . . . . . . . . . . . . . . | ii |
| Index of Authorities . . . . . . . . . . . . . . . | iii,iv |
| Preliminary Statement . . . . . . . . . . . . . . | v,iv |
| Statement of Facts . . . . . . . . . . . . . . . . | vii,viii |
| Points of Error Presented . . . . . . . . . . . . | ix,x |
| Point of Error Number One . . . . . . . . . . . . | xi |
| Point of Error Number Two . . . . . . . . . . . . | xiv |
| Point of Error Number Three . . . . . . . . . . . | xxiv |
| Point of Error Number Four . . . . . . . . . . . . | xxiv |
| Point of Error Number Five . . . . . . . . . . . . | xxvii |
| Point of Error Number Six . . . . . . . . . . . . | xxvii |
| Point of Error Number Seven . . . . . . . . . . . | xxix |
| Point of Error Number Eight . . . . . . . . . . . | xxxvii |
| Point of Error Number Nine . . . . . . . . . . . . | xl |
| Point of Error Number Ten . . . . . . . . . . . . | xli |
| Point of Error Number Eleven . . . . . . . . . . . | xlvii |
| Prayer for Relief and Certificate of Service . . . . | xlviii |

Tex. Const., art. I, sec. 19. . . . . . . . . . . . . . . . . .45

V.T.C.A. Penal Code, §19.03(a)  . . . . . . . . . . . . . . .6

Vernon's Ann. C.C.P., Art. 37.071 §2(e) . . . . . . . . . . 25,26

Vernon's Ann. C.C.P., Art. 44.251 . . . . . . . . . . . . . .26

Vernon's Ann. C.C.P., Art. 37.071 . . . . . . . . . 28,29,40,45

Vernon's Ann. C.C.P. Art. 42.18 . . . . . . . . . . . . . . .33

Vernon's Ann. C.C.P., art. 37.071, §2(g). . . . . . . . . . 40,41

Vernon's Ann. C.C.P., Art. 37.071, §2(d)(2) . . . . . . . . 40,43

Vernon's Ann. C.C.P., Art. 37.071, §2(f)(2) . . . . . . . . . .43

Vernon's Ann. C.C.P., art. 37.071, §2(b). . . . . . . . . . . .40

Vernon's Ann. C.C.P., Art. 37.071, §2(a). . . . . . . . .13,41,45

1994. (T-257). On April 19, 1994 the jury affirmatively answered special issue number one. The jury then answered no to special issue number two, and appellant was thereafter sentenced to death by the court. (T-258).

On April 19, 1994 the undersigned counsel was appointed to represent the appellant on appeal. (T-258).

stairway outside of her friend's apartment. According to eyewitness Kenneth Weaver, appellant then shot Cynthia Bogany in the head as she lay begging for her life. Appellant then fled the scene, but subsequently turned himself into the police.

### POINT OF ERROR NUMBER SEVEN

THE TRIAL COURT ERRED IN FAILING TO INSTRUCT THE JURY CONCERNING THE PAROLE IMPLICATIONS OF A LIFE SENTENCE, THUS VIOLATING THE EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION.

### POINT OF ERROR NUMBER EIGHT

THE TRIAL COURT ERRED IN FAILING TO GRANT APPELLANT'S REQUEST TO VOIR DIRE POTENTIAL JURORS ON THE RAMIFICATIONS OF THE PAROLE LAW AND THE FACT THAT IF GIVEN A LIFE SENTENCE THAT APPELLANT WOULD HAVE TO SERVE A MINIMUM OF THIRTY-FIVE YEARS PRIOR TO BECOMING ELIGIBLE FOR PAROLE, THUS VIOLATING THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION.

### POINT OF ERROR NUMBER NINE

THE TRIAL COURT ERRED IN FAILING TO GRANT APPELLANT'S REQUEST TO VOIR DIRE POTENTIAL JURORS ON THE RAMIFICATIONS OF THE PAROLE LAW AND THE FACT THAT IF GIVEN A LIFE SENTENCE THAT APPELLANT WOULD HAVE TO SERVE A MINIMUM OF THIRTY-FIVE YEARS PRIOR TO BECOMING ELIGIBLE FOR PAROLE, THUS VIOLATING ARTICLE I SECTION TEN OF THE TEXAS CONSTITUTION.

### POINT OF ERROR NUMBER TEN

THE TRIAL COURT ERRED IN RENDERING JUDGMENT ASSESSING THE DEATH PENALTY AGAINST APPELLANT BECAUSE THE PUNISHMENT VERDICT OF THE JURY WAS RENDERED PURSUANT TO ARTICLE 37.071, §2(a) OF THE TEXAS CODE OF CRIMINAL PROCEDURE AND SAID ARTICLE IS UNCONSTITUTIONAL BECAUSE IT ALLOWS THE TRIAL COURT, THROUGH ITS INSTRUCTIONS, TO MISLEAD THE JURY REGARDING THE EFFECT OF A "NO" VOTE BY A SINGLE JUROR IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

### POINT OF ERROR NUMBER ELEVEN

THE TRIAL COURT ERRED IN RENDERING JUDGMENT ASSESSING THE DEATH PENALTY AGAINST APPELLANT BECAUSE THE PUNISHMENT VERDICT OF THE JURY WAS RENDERED PURSUANT TO ARTICLE 37.071, §2(A) OF THE TEXAS CODE OF CRIMINAL PROCEDURE AND SAID ARTICLE IS UNCONSTITUTIONAL BECAUSE IT ALLOWS THE TRIAL COURT, THROUGH ITS INSTRUCTIONS, TO MISLEAD THE JURY REGARDING THE EFFECT OF A "NO" VOTE BY A SINGLE JUROR IN VIOLATION OF ARTICLE I, SECTIONS TEN, NINETEEN, AND THIRTEEN OF THE TEXAS CONSTITUTION.

special issues submitted to it on the issue of punishment which violated **Vernon's Ann. C.C.P., Art. 37.071(2)(a)**. (R. X-106-107). The court denied the request. (R. X-107).

### Argument and Authority

**Vernon's Ann. C.C.P., Art. 37.071(2)(a)** provides, in part, that; "The court, the attorney representing the state, the defendant, or the defendant's counsel <u>may not</u> inform a juror or a prospective juror of the effect of a failure of a jury to agree on issues submitted under Subsection (c) (sic) or (e) of this article." The statute appears to be a mandatory prohibition against informing prospective jurors of the effect of such a failure in any manner.

Appellant submits that the court's statement to the venire was an indirect comment that in the event the jury was unable to answer the special issues submitted to it the result would be an automatic life sentence. Consequently, pursuant to the statute, the court should have quashed the panel when requested to do so by appellant. Instead, however, the court continued with the individual voir dire of the members of that panel, and in fact seated four jurors from that panel. They are: Robert Allen Carpenter (R. X-184), Jan Hogan Green (R. X-341), Clarence Pickens (R. XI-475), and Alba Purifoy (R. XII-769). Since four of the prospective jurors from the panel who were informed of the consequences of the jury's failure to agree on answers to the special issues were actually impaneled on the jury and heard the case against appellant, the error of the court should be determined to be reversible. Appellant should

## POINT OF ERROR NUMBER TWO

THE TRIAL COURT VIOLATED THE DUE PROCESS MANDATE OF **SIMMONS V. SOUTH CAROLINA**, AND THUS THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION, WHEN IT INSTRUCTED THE JURY TO ASSESS APPELLANT'S FUTURE DANGEROUSNESS WITHOUT CONSIDERING THE FACT THAT APPELLANT WOULD BE PAROLE INELIGIBLE FOR THIRTY-FIVE YEARS IF HE WAS SENTENCED TO LIFE IN PRISON AT THE PUNISHMENT STAGE OF THE PROCEEDINGS.

### Factual Background

Prior to the beginning of trial appellant filed a Motion to Voir Dire on Parole Law - 35 Year Minimum in which he stated that the jury had the right to know about the applicability of the parole laws to himself in answering the special issues submitted at the punishment stage of the trial. (T-169). This Motion was denied by the trial court. (T-171). At the same time the state filed a Motion in Limine requesting that the court order appellant not to mention the fact that appellant would be eligible for parole after serving 35 calendar years if sentenced to life imprisonment. (T-132). This Motion was granted by the court. (T-133). Consequently, appellant was precluded from mentioning the period of parole ineligibility applicable to him in front of the jury.

Subsequently, during the voir dire stage of the proceedings, in response to several questions from prospective jurors about what constituted a life sentence, the following colloquies occurred:

> Court: A life sentence in the context of a capital murder case means he does not receive the death penalty. That's what it means in the context of a capital murder case. He gets a life sentence the minute he is found guilty. That's automatic, that's automatic, and only if the State can prove beyond a reasonable doubt that the answer to issue number one should be yes and they prove that the answer to issue number two should be no, only then does the defendant receive the death penalty. If they cannot prove it, he has got that automatic life

sentence means this: It means he does not receive the death penalty, because we only have two punishments.

Ms. Crawford: At this time we reurge our objection under 37.071.

Court: All right, overruled. Means he does not receive the death penalty because we only have two punishments, so a life sentence means we don't think this guy should deserve the death penalty. That may not be an appropriate answer to your question.

Juror: It's not.

Court: But that's the answer.... (R. XXIV-2613).

During the voir dire, appellant again requested that the court allow him to inform the jury of the true meaning of life as it relates to capital murder cases because of all of the questions by prospective jurors on the matter. (R. XVIII-1585-1587). Again, the court denied the request. (R. XVIII-1587).

Finally, appellant submitted to the court for inclusion in its charge to the jury an instruction on the applicability of the parole laws to appellant, and the fact that if given a life sentence he would have to serve a minimum of thirty-five years in prison on a day to day basis before being considered for parole. (R. XXXIV-389);(T-207). The instruction was denied by the court. (R. XXXIV-389). At the same time appellant objected to the court's failure to include a reference in the parole paragraph that the jury was not to speculate as to whether parole applies to an individual serving a life sentence for the offense of capital murder. (R. XXXIV-388-389).[1] Thereafter, the court submitted a

---

[1] Appellant did not have to make any objection to the court's charge or request a different instruction to preserve his **Simmons** claim for appellate review because it would have been futile to

United States Constitution requires that the defendant be given an opportunity to inform the sentencing jury that he is parole ineligible, or parole ineligible for a particularly lengthy period of time. "In assessing future dangerousness, the actual duration of the defendant's prison sentence is indisputably relevant." **Simmons** at 2193. "Holding all other factors constant, it is entirely reasonable for a sentencing jury to view a defendant who is eligible for parole as a greater threat to society than a defendant who is not. Indeed, there may be no greater assurance of a defendant's future nondangerousness to the public than the fact that he never will be released on parole. The trial court's refusal to apprise the jury of information so crucial to its sentencing determination, particularly when the prosecution alluded to the defendant's future dangerousness in its argument to the jury, cannot be reconciled with our well-established precedents interpreting the Due Process Clause." **Id**. at 2194. (emphasis added).

There can be little doubt from the facts of this case that the jury could have reasonably concluded that appellant would someday be released from prison if he were given a life sentence by the jury. In the instant case, not only did the court's charge imply that parole was a "possibility" should appellant receive a life sentence, i.e. " you are not to consider or discuss any **possible** action..." (T-222)(emphasis added), but the prosecutor's argument to the jury also made it very clear that if given a life sentence appellant would someday be paroled, to wit;

> "The defense lawyers talked about Terrell and to think of Terrell. And sure, think about Terrell. This little boy

years. In that same discussion more than 75 percent of those surveyed indicated that if they were called upon to make a capital-sentencing decision as jurors, the amount of time the convicted murderer actually would have to spend in prison would be an "extremely important" or a "very important" factor in choosing between life and death. This conclusion is strengthened by additional research demonstrating that jurors often carry distorted perceptions of parole eligibility into the jury room, and that those misperceptions can "shift the balance" and result in the imposition of death. See Bowers, **Capital Punishment & Contemporary Values: People's Misgivings and the Court's Misperceptions**, 27 Law and Soc. Rev. 157 (1993) (summarizing recent survey data from Florida, Georgia, Nebraska, New York, and South Carolina, and concluding that "both citizen and juror grossly underestimate the time that will usually be served by murderers not sentenced to death"); Paduano & Stafford Smith, **Deadly Errors: Juror Misperceptions Concerning Parole in the Imposition of the Death Penalty**, 18 Col. Human Rights L. Rev. 211, 222 n.33 (1987) (randomly selected capital jury veniremen in Cobb County, Georgia, believed, on average, that "life sentence" meant imprisonment for 8.1 years), **id**. at 223-225 n.35 (summarizing results of county-wide survey in Georgia and of jury venire survey in Mississippi that both showed that estimates of anticipated "life sentence" duration averaged ten years or less); Hood, III, **The Meaning of "Life" for Virginia Jurors and Its Effect on Reliability in Capital Sentencing**, 75 Va. L. Rev. 1605, 1624 n.101 (1989) (median estimate

threat to society as a whole if he were to be confined to the penitentiary for the rest of his life or for a substantial portion of his life.

It is by no means an unrealistic stretch of the imagination that a sentencing jury is far more concerned about "free citizen" society than it is about "inmate" society in making a determination as to special issue number one. This was readily apparent by the voir dire questions of the jury panels in the present case. But, if in fact, a sentencing jury is to consider all aspects of society, both "free citizen" and "inmate" in making a determination of whether a capital defendant is a continuing threat to society as a whole, as it is bound to do under the law, then depriving that jury of the opportunity to consider all of the truthful information available on the question of a capital defendant's release back into "free citizen" society does not comport with principles of Due Process.

Since the prosecutor argued that the jury should consider appellant's threat to society as a whole, instead of limiting it to "inmate" society (R. XXXIV-438-439), in addition to the fact that appellant would someday be released from prison if given a life sentence, the jury should have been informed of the true meaning of a life sentence rather than left to speculate as to the actual amount of time appellant would be required to remain in prison before becoming eligible for parole. The same can be said with regard to the court's actual charge on parole to the jury as well. The charge (quoted above) actually informed the jury that parole

## POINT OF ERROR NUMBER THREE

VERNON'S ANN. C.C.P., ART. 37.071, §2(E) IS FACIALLY UNCONSTITUTIONAL UNDER THE EIGHT AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WHEN INTERPRETED IN CONJUNCTION WITH VERNON'S ANN. C.C.P. ART. 44.251(A).

## POINT OF ERROR NUMBER FOUR

THE TRIAL COURT'S INSTRUCTIONS ON THE SPECIAL ISSUE MANDATED BY VERNON'S ANN. C.C.P., ART. 37.071 §2(E) MAKES MEANINGFUL APPELLATE REVIEW OF THE SUFFICIENCY OF THE EVIDENCE SUPPORTING A NEGATIVE RESPONSE TO THAT SPECIAL ISSUE IMPOSSIBLE.

Because these two points of error raise similar issues, they will be briefed together.[2]

Amended **Vernon's Ann. C.C.P., Art. 37.071 §2(e)** is the statutory codification of the "Penry" special issue espoused in the case of <u>Penry v. Lynaugh</u>, 109 S.Ct. 2934 (1989). This issue is the pivotal issue in Texas capital cases for offenses committed on or after September 1, 1991, yet it does not specify the types of mitigating (or aggravating) factors relevant to a capital sentencing jury's deliberations during the punishment stage. Rather, the jury is simply asked to determine whether there is a "sufficient mitigating circumstance or circumstances" to warrant a life sentence rather than a death sentence.

Appellant submits that Texas' capital sentencing scheme is unconstitutional because it does not permit meaningful appellate review of the sufficiency of the evidence supporting a negative response to the §2(e) special issue as required by **Vernon's Ann.**

_____

[2] Appellant believes that this claim was adequately preserved at trial. (T-153) Trial court denying appellant's claim that Texas death penalty statute does not provide for "meaningful appellate review." Furthermore, because it concerns this Court's sufficiency review, it could properly be raised for the first time on appeal.

The Supreme Court has recognized that an appellate court is in a virtually impossible position to review a jury's consideration of mitigating and aggravating evidence without knowing which factors the jury in fact considered. **Sawyer v. Whitley**, 112 S.Ct. 2514, 2522-23 (1992). Consequently, the Texas capital sentencing statute is unconstitutional under the Eighth and Fourteenth Amendments to the United States Constitution, and since appellant's punishment was predicated upon such statute his conviction must be reversed.

burdens of proof" during capital sentencing phase cannot "lessen the State's burden ... to prove the existence of aggravating factors").

Art. 37.071 is also silent as to which party has the burden regarding the sufficiency of the mitigating circumstances which warrant the imposition of a life sentence. Must the defense prove beyond a reasonable doubt that there is a sufficient mitigating circumstance to warrant a life sentence? Must the defense prove same by clear and convincing evidence? Or, must the defense merely prove by a preponderance that the accused should not die? Or, does the State have the burden to disprove the sufficiency of the mitigating circumstances? The statute provides jurors with absolutely no guidance in answering these questions. Consequently, the capital sentencing scheme under which appellant was sentenced violates the Eighth Amendment principles announced by the Supreme Court in **Furman v. Georgia**, 408 U.S. 238 (1972).

Accordingly, appellant's conviction should be reversed and his case remanded for a new trial.

Amendment's prohibition against cruel and unusual punishment gives rise to a special need for reliability in the determination that death is the appropriate punishment in any capital case." **Johnson v. Mississippi**, 486 U.S. 578, 584 (1988). The withholding of information concerning a capital defendant's lengthy parole ineligibility from the jury which must assess whether he poses a "continuing threat to society" offends this principle. By denying the jury such information, the trial court impermissibly creates a needless and substantial risk that the jury will impose the death penalty simply to eliminate the possibility that the accused will be released on parole after a relatively brief incarceration.

This conclusion is strengthened by research demonstrating that jurors often carry distorted perceptions of parole eligibility into the jury room, and that those misperceptions can "shift the balance" and result in the imposition of death. **See** Bowers, **Capital Punishment & Contemporary Values: People's Misgivings and the Court's Misperceptions**, 27 Law and Soc. Rev. 157 (1993) (summarizing recent survey data from Florida, Georgia, Nebraska, New York, and South Carolina, and concluding that "both citizen and juror grossly underestimate the time that will usually be served by murderers not sentenced to death"); Paduano & Stafford Smith, **Deadly Errors: Juror Misperceptions Concerning Parole in the Imposition of the Death Penalty**, 18 Col. Human Rights L. Rev. 211, 222 n.33 (1987) (randomly selected capital jury veniremen in Cobb County, Georgia, believed, on average, that "life sentence" meant imprisonment for 8.1 years), **id**. at 223-225 n.35 (summarizing

a defendant shall live or die." .... That same need for heightened reliability also mandates recognition of a capital defendant's right to require instructions on the meaning of the legal terms used to describe the sentences (or sentencing recommendations) a jury is required to consider, in making the reasoned moral choice between sentencing alternatives. Thus, whenever there is a reasonable likelihood that a juror will misunderstand a sentencing term, a defendant may demand instruction on its meaning, and a death sentence following the refusal of such a request should be vacated as having been "arbitrarily or capriciously" and "wantonly and ... freakishly imposed." **Id.** at 2198. (Souter and Stevens, JJ., concurring). Justice Souter went on to conclude that "on matters of law, arguments of counsel do not effectively substitute for statements by the court.... Because juries in general are likely to misunderstand the meaning of the term 'life imprisonment' in a given context, the judge must tell the jury what the term means, when the defendant so requests." **Id.** at 2199.

By withholding information about parole eligibility found in **Vernon's Ann. C.C.P. Art. 42.18**, the Trial Court, in the instant case, permitted the jury to sentence appellant while laboring under an immediate fear resulting from a misperception that appellant would not serve a lengthy sentence should they decide to give him life in prison rather that death. It would defy logic to suppose that a jury entrusted with the determination of appellant's "future dangerousness" would be unaffected by the possibility of his being released at some point in the near future.

because without it the jury could not accurately assess the weight to be accorded appellant's mitigating evidence, the absence of an accurate instruction on parole eligibility violated the well-established Eighth Amendment requirement that a capital sentencing jury consider "any relevant circumstances that could cause it to decline to impose the death penalty... and any relevant information offered by the defendant." **McClesky v. Kemp**, 481 U.S. 279, 306 (1987).

This Eighth Amendment justification for vacating appellant's sentence does not depend on whether the fact of his lengthy sentence before parole eligibility is itself held to be a relevant mitigating factor. Rather, it is sufficient that the withholding of this vital information substantially impaired the jury's ability to assess the significance of other, indisputably relevant mitigating evidence. Although states may provide a framework for the jury's consideration of mitigating factors, **Franklin v. Lynaugh**, 487 U.S. 164, 179 (1988), there is no permissible state interest in constructing a framework which misleads the jury by minimizing the accused's case for life. Withholding the simple truth that appellant would have to serve at least thirty-five years in prison before even becoming eligible for release on parole did exactly that.

Just as compelling as the foregoing argument for the inclusion of parole instructions is the argument that the absence of said instructions also gives undue weight to the prosecution's evidence offered in the form of penitentiary papers and judgments which

remanded for a new trial.

a capital murder prosecution.

In its recent decision in the case of **Simmons v. South
Carolina**, 114 S.Ct. 2187 (1994), the Supreme Court of the United
States held that in assessing future dangerousness, the actual
duration of the defendant's prison sentence is indisputably
relevant. **Id.** at 2194.  Furthermore, in the case of **Skipper v.
South Carolina**, 106 S.Ct. 1669 (1986), the Supreme Court held that
when the prosecution relies on future dangerousness as
justification for imposition of the death penalty, due process
requires that the defendant be given an opportunity to present
evidence in rebuttal.  Both cases leave little room for doubt that
truthful and accurate information regarding the actual duration of
a capital defendant's parole ineligiblity is relevant in a capital
murder prosecution, especially considering the fact that in Texas
a capital defendant's future dangerousness is stautorily required
to be considered by the sentencing jury in determining the proper
sentence to be imposed.[5]

In his Motion, appellant stated four specific questions which
he wanted to discuss with prospective jurors concerning their views
on how parole ineligibility would affect their punishment
deliberations. (T-170).  These questions were not duplicious of any
subject matter previously discussed with the jury, nor do they
appear to encompass a subject which would have consumed an
inordinate amount of the court's time.  Armed with the responses of
the individual jurors on the subject of parole ineligibility,

---

[5] See Tex. Code Crim. Por. Art. 37.071 §2(b)(1).

xxxviii

## POINT OF ERROR NUMBER NINE

THE TRIAL COURT ERRED IN FAILING TO GRANT APPELLANT'S REQUEST TO VOIR DIRE POTENTIAL JURORS ON THE RAMIFICATIONS OF THE PAROLE LAW AND THE FACT THAT IF GIVEN A LIFE SENTENCE THAT APPELLANT WOULD HAVE TO SERVE A MINIMUM OF THIRTY-FIVE YEARS PRIOR TO BECOMING ELIGIBLE FOR PAROLE, THUS VIOLATING ARTICLE I SECTION TEN OF THE TEXAS CONSTITUTION.

### Factual Background

The discussion contained in Point of Error Eight at page 37 is specifically incorporated by reference herein.

### Argument and Authority

The argument advanced in Point of Error Eight at pages 37 through 39 is specifically incorporated by reference herein. However, the authority in support of the argument advanced in Point of Error Eight is replaced herein by the authority of the above referenced provisions of the Texas Constitution.

denied by the trial court. (T-156).

**Argument and Authority**

Vernon's Ann. C.C.P., art. 37.071, §2(g), provides that if a jury is unable to answer any issue submitted under section 2(b) or 2(e), the trial court shall sentence the defendant to life in the Institutional Division of the Texas Department of Corrections. This section precludes the imposition of a death sentence if even one "no" vote is cast, and requires the automatic imposition of a life sentence in such a case.

Vernon's Ann. C.C.P., art. 37.071, §2(d)(2) requires that the trial court charge the jury that it can not answer any issue submitted under **Vernon's** Ann. C.C.P., art. 37.071, §2(b) "yes" unless it agrees unanimously; <u>and can not answer any issue "no" unless 10 or more jurors agree.</u> (emphasis added). Likewise, section 2(f)(2) requires that the trial court charge the jury that it can not answer any issue submitted under section 2(e) "no" unless it agrees unanimously; <u>and can not answer the issue "yes" unless 10 or more jurors agree.</u> (emphasis added).

At the same time, **Vernon's** Ann. C.C.P., Art. 37.071, §2(a) provides that:

> The court, the attorney representing the state, the defendant, or the defendant's counsel may not inform a juror or a prospective juror of the effect of a failure of a jury to agree on issues submitted under Subsection (c)(sic) or (e) of this article.

Contrary to **Vernon's** Ann. C.C.P., Art. 37.071 §2(g) the instruction given in this case created the appearance of a need for a ten person majority before the jury could answer Special Issue

xlii

before death penalty dissenters could register their convictions, the court effectively mislead those dissenters and removed them from the deliberative process at the punishment hearing in violation of the Fourteenth Amendment. At best, the instructions in this case informed any pro-life juror that by continuing to vote his or her conscience he or she would force a mistrial, at worst, the instructions forced such jurors to conclude that their view of the evidence was irrelevant unless they persuaded nine other jurors to vote "no" as well. Thus, jurors in the majority were not only free to pressure any dissenter with these arguments, but were encouraged to do so by the court's instructions. This impermissibly denied appellant his right to a fair determination of punishment in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

Appellant anticipates that the State will rely upon this Court's decision in **Davis v. State**, 782 S.W.2d 211 (Tex.Crim.App. 1989) as authority for its position that this Court should overrule this point of error. However, appellant respectfully urges this Court to reevaluate its decision in **Davis**, for the following reasons.

In **Davis**, this Court cited the United States Supreme Court holding in **Caldwell**, supra, for the proposition that any information that is given the jury which may be interpreted by it as relieving its responsibility to determine the life or death of an accused is an invasion of the jury's fact finding function and improper. This Court also cited one Federal District appellate

juror who is part of that decision making process. Furthermore, informing the jury of the effect of a single "No" vote does not relieve "the jury" of its responsibility to decide between life and death as the **Davis** Court seems to assume by application of a comment from the **Caldwell** decision, but instead encourages the rational exchange of viewpoints on the evidence in a situation where a single juror may be struggling with his or her decision. What the holding in **Caldwell** seems to ignore is the oftentimes lengthy and tedious process of selecting jurors who can make a life and death decision based solely on the evidence rather than on his or her personal feelings about the death penalty, and that what you end up with are jurors who do not have the expectation that there will be some avenue available to them by which to avoid assessing the death penalty.

Because the Eighth and Fourteenth Amendments to the United State Constitution prohibit a punishment hearing in a capital murder trial at which each individual juror is precluded from exercising his or her own reasoned opinion, and because the version of Article 37.071 of the Texas Code of Criminal Procedure applicable in appellant's trial violates that prohibition it is unconstitutional. For these reasons reversible error is presented.

## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, for the foregoing reasons, appellant prays that this Honorable Court reverse the conviction and order the cause be remanded for a new trial.

Respectfully submitted

*Henry K. Oncken*

Henry K. Oncken
State Bar No. 15280000

Oncken & Oncken, P.C.
6810 FM 1960 West
Houston, Texas 77069
(713) 893-4747
Fax No. (713) 893-5265

Attorney for Appellant
GERALD C. ELDRIDGE

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Brief for Appellant has been furnished to Robert Huttash, State Prosecuting Attorney, P.O. Box 12405, Capital Station, Austin, Texas 78711 and Calvin Hartmann, Assistant District Attorney, 201 Fannin Street, Houston, Texas 77002, by United States certified mail with return receipt requested, on the 16th day of December, 1994.

*Henry K. Oncken*

Henry K. Oncken



# INDEX OF AUTHORITIES

**Cases**                                                                     **Page**

Andrade v. State,
    700 S.W.2d 585 (Tex. Crim. App. 1985),
    <u>cert. denied</u>, 106 S.Ct. 1524 (1986) . . . . . . . . . . 13

Arnold v. State,
    873 S.W.2d 27 (Tex. Crim. App. 1993),
    <u>cert. denied</u>, 115 S.Ct. 103 (1994) . . . . . . . . . 14, 18

Barnes v. State,
    876 S.W.2d 316 (Tex. Crim. App. 1994) . . . . . . . . . 17

Boykin v. State,
    818 S.W.2d 782 (Tex. Crim. App. 1991) . . . . . . . . . . 9

Burns v. State,
    761 S.W.2d 353 (Tex. Crim. app. 1988) . . . . . . . . . 16

California v. Ramos,
    463 U.S. 992 (1983) . . . . . . . . . . . . . . . 12

Clark v. State,
    881 S.W.2d 682 (Tex. Crim. App. 1994) . . . . . . . . 8, 9

Davis v. State,
    782 S.W.2d 211 (Tex. Crim. App. 1989) . . . . . . . . . 18

Draughon v. State,
    831 S.W.2d 331 (Tex. Crim. App. 1992) . . . . . . . . . 19

Elliott v. State,
    858 S.W.2d 478 (Tex. Crim. App. 1993) . . . . . . . 12, 14

Emery v. State,
    881 S.W.2d 702 (Tex. Crim. App. 1994) . . . . . . . . . 20

Hathorn v. State,
    848 S.W.2d 101 (Tex. Crim. App. 1992) . . . . . . . . . 19

Havard v. State,
    800 S.W.2d 195 (Tex. Crim. App. 1989) . . . . . . . . . 7

Heitman v. State,
    815 S.W.2d 681 (Tex. Crim. App. 1991) . . . . . . . . . 14

Hernandez v. State,
    861 S.W.2d 908 (Tex. Crim. App. 1993) . . . . . . . . . 8

Janecka v. State,
    823 S.W.2d 232 (Tex. Crim. App. 1992) . . . . . . . . . 7

**Cases, cont'd**          <u>Page</u>

**Sterling v. State,**
     830 S.W.2d 114 (Tex. Crim. App. 1992) . . . . . . . . . 18

**Vuong v. State,**
     830 S.W.2d 929 (Tex. Crim. App.),
     <u>cert. denied</u>, 113 S.Ct. 595 (1992) . . . . . . . . . . 15

**Walton v. Arizona,**
     497 U.S. 639 (1990) . . . . . . . . . . . . . . . . . 17


**Statutes**          <u>Page</u>

TEX. CODE CRIM. P. ANN. art. 37.071, § 2
     (Vernon Supp. 1995) . . . . . . . . . . . . 7, 15, 16, 17


**Rules**          <u>Page</u>

TEX. R. APP. P. 52 . . . . . . . . . . . . . . . . . . . . 7

TEX. R. APP. P. 74 . . . . . . . . . . . . . . . . . . . . 1

TEX. R. CRIM. EVID. 103 . . . . . . . . . . . . . . . . . . 7


**Miscellaneous**          <u>Page</u>

TEX. CONST. art. I, § 10 . . . . . . . . . . . . . . . . 13, 18

TEX. CONST. art. I, § 13 . . . . . . . . . . . . . . . . . 18

TEX. CONST. art. I, § 19 . . . . . . . . . . . . . . . . . 18

U.S. CONST. amend. VI . . . . . . . . . . . . . . . . . . 13

U.S. CONST. amend. VIII . . . . . . . . . . . . . . . 11, 12, 18

U.S. CONST. amend. XIV . . . . . . . . . . . . . . . . 10, 18

Cynthia and Wayne eventually retired to Cynthia's bedroom, leaving the children to watch television in the living room. (S.F.28 - 69-70). Tomika and Terrell fell asleep at opposite ends of the living room couch, while Chirissa slept on the love seat. (S.F.28 - 68-69; S.F.29 - 235). Cedric fell asleep on the living room floor. (S.F.28 - 69).

Wayne awoke shortly before 5:00 the following morning and was sitting on the edge of the bed when he heard a loud noise. (S.F.29 - 179). Terrell and Tomika also heard the noise, and realized that someone was kicking in the front door. (S.F.28 - 70-71, S.F.29 - 236). As Wayne ran into the living room to investigate, appellant entered the apartment, approached the love seat where nine-year-old Chirissa was sleeping, and shot her between the eyes. (S.F.28 - 65, 71; S.F.29 - 179, 238). Tomika fled to the spare bedroom and hid in the closet, while Wayne attempted to wrestle the gun away from appellant. (S.F.29 - 179, 237). However, Wayne quickly realized he could not overcome appellant, so he ran into the spare bedroom and dove through the second-story window. (S.F.29 - 182). Appellant leaned out of the window and shot at Wayne. Although Wayne was grazed by a bullet and suffered a sprained ankle and numerous cuts and abrasions, he escaped with no serious injuries. (S.F.30 - 372-73).

Appellant returned to the living room and approached his eight-year-old son, Terrell. He aimed the pistol between his son's eyes. However, as appellant pulled the trigger, Terrell quickly turned his head, causing the bullet to enter his left temple, exit behind his left ear, and lodge in his left shoulder. (S.F.30 -361).

2

her house, so she could run home without being detected. (S.F.32 - 77). Appellant also went to the restaurant where Crystal worked. He would order food, then sit and stare at her while he ate. (S.F.32 - 75). Once when the manager asked him to leave, appellant drove to the man's house and threw bricks at the residence. (S.F.32 - 75, 204-05). Crystal knew appellant kept a gun hidden under the dash of his car, and she had seen him threaten people with it. (S.F.32 -78-79). She also knew he was violent, and she was afraid of him. (S.F.32 - 79).

On October 25, 1984, Crystal's new boyfriend, Huey Washington, Jr. was visiting her at her parents' house. (S.F.32 - 72-73). There was a knock at the door around 7:00 p.m., and Crystal's mother answered. (S.F.32 - 59). It was appellant. He flew into a rage, screaming and lying that Crystal was pregnant with his child. (S.F.32 - 59, 73). Crystal's father went to the front door and demanded that appellant leave. (S.F.32 - 59, 73).

Huey left Crystal's house around 9:30 p.m. and drove about three miles to his parents' house. (S.F.32 - 63). He parked his car in the driveway and opened the door, then noticed appellant and appellant's brother Barry approaching him. (S.F.32 - 63). Both men were carrying guns. (S.F.32 - 64). Appellant ordered Huey out of the car. However, before Huey could step out, appellant opened fire. Huey sustained two bullet wounds to the chest, two to the left thigh, one to the right hand, and one or two to the elbow. (S.F.32 - 66).

Huey's younger brother Gregory heard the commotion outside and woke up their father, Huey Washington, Sr. (S.F.32 - 37-38, 47). When Gregory and Huey Sr. went to the front door, appellant turned

Eventually, charges of felony injury to a child were filed against appellant for wounds inflicted upon Terrell. (S.F.32 - 172-73). The officer investigating the case found deep red bruises on Terrell's back, abdomen, elbow, legs, buttocks, and face. (S.F.32 - 173-76). The charge ultimately was reduced to a misdemeanor, and appellant was convicted on September 11, 1990. (S.F.32 - 94).

---

## REPLY TO APPELLANT'S FIRST POINT OF ERROR

Appellant first claims the trial court erred by informing prospective jurors during voir dire that a conviction for capital murder automatically results in a life sentence. This complaint is based upon the following portion of the trial court's general remarks to the venire panel:

> Immediately upon being found guilty of the offense of capital murder, the defendant is going to receive a life sentence. That's automatic.

(S.F.9 - 44).

> I get this question in capital murder cases every time we pick a jury. Someone asks a very intelligent question, what's a life sentence. A life sentence in the context of a capital murder case means he does not receive the death penalty. That's what it means in the context of a capital murder case. He gets a life sentence the minute he is found guilty. That's automatic, that's automatic, and only if the State can prove beyond a reasonable doubt that the answer to issue number one should be yes and they prove that the answer to issue number two should be no, only then does the defendant receive the death penalty. If they cannot prove it, he has got that automatic life sentence he got the second he got found guilty. So, for the context of this trial, a life sentence means he does not receive the death penalty.

(S.F.9 - 48).

6