# United States District Court
# Southern District of Texas

Case Number: __OSCV1847__

## ATTACHMENT

Description:

☐ State Court Record   ☑ State Court Record Continued

☐ Administrative Record

☑ Document continued - Part __8__ of _____

☐ Exhibit to: _____
number(s) / letter(s) _____

Other: _____

_____

_____

CCRA No. **71863**

GERALD CORNELIUS ELDRIDGE
Appellant

No. _____

_____ Punishment _____

_____ County.

Offense _____

MOTION FOR

REHEARING IS _____ 19 ___

_____
JUSTICE

Trial Court _____
Trial Court No. _____
Trial Judge _____
Disposition _____
Date _____
Justice _____ P.C. _____ S _____
Panel _____ Quarter _____ En Banc _____
S/F Vol. 2-6
St. B. _____
Ap. B. _____
Supp. Tr. _____
Supp. B _____
Pro Se _____
On Pdr. _____
Pdr Filed _____
Response _____
Brief _____
S. Brief _____

13 SP78517

71863

TRIAL COURT NO. 9403201

APPELLATE COURT NO._____

IN THE COURT OF CRIMINAL APPEALS

OF THE STATE OF TEXAS

AT AUSTIN

_____

GERALD CORNELIUS ELDRIDGE,

                         Appellant,

VS.

THE STATE OF TEXAS,

                         Appellee.

_____

APPEAL FROM 178TH DISTRICT COURT OF HARRIS COUNTY,

TEXAS

Judge William T. Harmon  Presiding

_____

STATEMENT OF FACTS

VOLUME  6   OF  36   VOLUMES

March 2, 1994

Ida M. Garcia
Official Court Reporter
301 San Jacinto
Houston, Texas  77002

FILED IN
COURT OF CRIMINAL APPEALS

AUG 17 1994

Thomas Lowe, Clerk

379

1
2       INDEX
        VOLUME 6
3
        March 2, 1994
4
                    CONTESTED COMPETENCY HEARING
                                                    Page
5
                        STATE'S WITNESSES
6
    JEROME BROWN
7           Direct                                   381
            Cross                                    433
8           Redirect                                 450

9   A. R. ALLEN
            Direct                                   451
10          Cross                                    456

11  LUIS PENA
            Direct                                   463
12          Voir Dire                                472
            Direct, cont'd                           478
13          Voir Dire                                505
            Direct, cont'd                           509
14          Cross                                    526
            Redirect                                 550
15

JEROME BROWN
    Direct      381
    Cross       433
    Redirect    450

A. R. ALLEN
    Direct      451
    Cross       456

LUIS PENA
    Direct          463
    Voir Dire       472
    Direct, cont'd  478
    Voir Dire       505
    Direct, cont'd  509
    Cross           526
    Redirect        550

ALPHABETICAL INDEX

VOLUME 6

Page

ALLEN, A. R.
        Direct                          451
        Cross                           456

BROWN, JEROME
        Direct                          381
        Cross                           433
        Redirect                        450

PENA, LUIS
        Direct                          463
        Voir Dire                       472
        Direct, cont'd                  478
        Voir Dire                       505
        Direct, cont'd                  509
        Cross                           526
        Redirect                        550

CAUSE NO. 9403201

STATE OF TEXAS          IN THE 178TH DISTRICT COURT

VS.                              OF

GERALD CORNELIUS ELDRIDGE HARRIS COUNTY, TEXAS


A P P E A R A N C E S:

For the State:        Ms. Elsa Alcala
                      Mr. Don Smyth
                      Assistant District Attorneys
                      Harris County, Texas

For the Defendant:    Ms. Danice Crawford
                      Mr. Wayne Hill
                      Attorneys at Law
                      Houston, Texas


        BE IT REMEMBERED that upon this the
2nd day of March A.D. 1994, the above entitled
and numbered cause came on for continued
competency hearing before the Honorable William
T. Harmon, Judge of the 178th District Court of
Harris County, Texas, and a jury; and the State
appearing by counsel and the Defendant appearing
in person and by counsel, the following
proceedings were had, viz:

```
 1              THE COURT:  Both sides ready to

 2      proceed?

 3              MS. ALCALA:  Yes, sir.

 4              THE COURT:  You may call your next

 5      witness.

 6              MS. ALCALA:  Doctor Brown.

 7              THE COURT:  Doctor Brown, please raise

 8      your right hand.

 9              (Oath administered to witness Doctor

10      Brown by the court)

11                      JEROME BROWN

12      was called as a witness by the State and, having

13      been duly sworn, testified as follows:

14                      DIRECT EXAMINATION

15      BY MS. ALCALA:

16          Q.   Can you, please, state your name?

17          A.   Jerome Banks Brown.

18          Q.   Where do you work, sir?

19          A.   I am a mental health professional and

20      clinical psychologist.

21          Q.   Do you have a practice?

22          A.   Yes, I do.

23          Q.   What's the name of your practice?

24          A.   I'm in practice with a group of

25      associates called Brown Nelson Petzoid &
```

1    criminal defendants in the jail, how is it that
2    that comes about?
3         A.   Well, I'm a member of what they call
4    the Harris County Forensic Psychiatry Unit,
5    which is a county supported group of mental
6    health professionals, both psychiatrists and
7    psychologists, who examine criminal defendants
8    upon court order regarding their competency to
9    stand trial or their sanity at the time the
10   offense occurred.
11        Q.   How many of you all are in that group
12   that are chosen to see defendants at the jail?
13        A.   I think right now there are about six
14   of us that do the work.
15        Q.   Okay.  Can you name them?
16        A.   Yes.   There is Doctor Silverman,
17   Doctor Ubah, Doctor Jennings, Doctor Stone,
18   there was a Doctor Arfa until recently, and
19   myself.
20        Q.   And who picks those individuals to
21   form up this group of five or six people and see
22   people at the jail?
23        A.   They're hired by the Harris County
24   Mental Health and Mental Retardation Authority,
25   and the administration of that authority hire

the mental health professionals on contract.

Q.   Do they have any -- I am sorry -- do they have any qualifications or standards to decide who they're going to pick to do these types of psychiatric evaluations?

A.   Yes.   They must be licensed mental health professionals in the state in which they practice.   The psychiatrists I think have to be board certified.   The psychologists have to be licensed, have a background or experience or history in forensic psychology, which is courtroom testimony, courtroom examinations.

Q.   Who is the least experienced out of the six of y'all?

A.   Doctor Jenkins, probably.

Q.   And how long has he been in practice?

A.   He has been doing this work with the unit for about two years now.

Q.   Everybody else has been there longer than that?

A.   Yes.

Q.   So how does that work?  Who then tells you which inmate to go do a psychiatric evaluation on?

A.   Well, we do it, of course, on court

order, so the first thing we do is receive a
court order sent from the court of jurisdiction,
and the cases are assigned to the members of the
unit on a rotating basis; just as they come in,
they're assigned, we see them as they're
assigned to us.

Q.  So the judge appoints the individuals
who do that work for MHMRA to see a person at
the jail?

A.  Well, he will send it to the forensic
unit, then the rotation of the unit will
determine who exactly does the work.

Q.  So one of the five or six of y'all
would then see the person?

A.  That's right.

Q.  Okay.  Tell me a little bit about your
education and your background that enables you
to be a psychologist.

A.  Well, I have a bachelor's degree from
Rice University I received in 1963 in
psychology; then attended University of Houston
graduate school of psychology where I completed
master's in 1967, then a Ph.D. degree in
clinical psychology in 1969.  I served a two
year internship at the Houston V.A. Medical

Center in the psychiatry section, and for the
past twenty-five years have been practicing as a
licensed psychologist in the State of Texas.

Q.    What is forensic psychology?

A.    Forensic psychology is the application
of the profession of psychology to courtroom
matters or courtroom cases.

Q.    And is that what you do in fact in
your position with the MHMRA?

A.    That's right.

Q.    How long have you been doing what you
do for the MHMRA?

A.    About twenty-five years

Q.    Okay.   Interviewing defendants at the
jail?

A.    That's right.

Q.    All right.   And how many times, then,
or how many years have you been examining
defendants to decide the issue of competency?

A.    Twenty-five years.

Q.    All right.   Can you possibly tell us a
number of people that you have seen in the past
twenty-five years to decide whether they're
competent to stand trial?

A.    It would be about five to six thousand

defendants.

Q. Okay. Of those people, have you found that some of those people are incompetent to stand trial?

A. Oh, yes, there are many of them that are.

Q. And have you also found that some of them are competent to stand trial?

A. That's right.

Q. Did you in fact see a person by the name of Gerald Eldridge?

A. Yes.

Q. And where was that and when did you see him?

A. I first saw Mr. Eldridge on October 13th of '93.

Q. Did you see him again?

A. Yes, I did.

Q. And when was that?

A. That was on February 18th of this year.

Q. All right. Were you the psychologist who initially was assigned to Mr. Eldridge?

A. I don't think so. I think Doctor Silverman was the first one to see him.

Q. That was a random assignment?

1    A.    Yes.

2    Q.    We mentioned a little while ago board

3    certified.    Is there such a thing as board

4    certified psychologists?

5    A.    No, there is not.    There is not an

6    equivalent qualification for psychologists.    The

7    license usually allows them to practice in their

8    area of competence.

9    Q.    So only board certified psychiatrists?

10   A.    That's right.

11   Q.    But you referred to them as licensed;

12   is that right?

13   A.    Right.

14   Q.    And you said that you are licensed in

15   psychology?

16   A.    Yes.

17   Q.    What do you have to do to get licensed

18   in psychology?

19   A.    Well, you have to submit your academic

20   credentials and training credentials to the

21   Texas State Board of Examiners of Psychologists,

22   then you have to pass a written exam as well as

23   an oral exam.

24   Q.    When did you become licensed in

25   psychology?

1        A.    Well, the licensing law began in Texas
2    in 1971.  I was licensed at that time.
3        Q.    All right.  Do you know if Doctor
4    Silverman is licensed in psychology?
5        A.    Yes, I know he is.
6        Q.    We were talking about the fact that
7    you saw Mr. Eldridge at the jail.  If you
8    weren't the initial psychologist assigned to
9    him, how is it that you got involved in his
10   case?
11       A.    It's not unusual, it did happen in
12   this case that a second opinion was requested by
13   Doctor Silverman.
14       Q.    Why would a psychologist who is
15   deciding the issue of competency want a second
16   opinion?  Why would he himself ask for a second
17   opinion?
18       A.    Usually because the case provides some
19   kind of difficulty or special nature that the
20   assistance or opinion of another colleague would
21   be helpful to either the court or to the
22   psychologist making the referral.  If there is
23   any kind of question that might come up about
24   his competency at that time, a second opinion is
25   often requested.

Q.   Have you yourself asked for second opinions before?

A.   Yes, I have.

Q.   Did you give a second opinion in this case?

A.   Yes, I did.

Q.   Tell the jury what your opinion was, based on your evaluation of Mr. Eldridge when you saw him first in October.

A.   The opinion that I formulated after my contact with Mr. Eldridge in October was that he was malingering or feigning mental illness.

Q.   Then you told me you saw him again in February of '94. What is your opinion or your evaluation of Mr. Eldridge in February of 1994?

A.   I felt the same about him. I felt he was still trying to fake mental illness.

Q.   I want to break this down so that we don't get confused about what happened in one session versus what happened in another session. So I first want to talk to you about your October evaluation.

Did you make a report in that case?

A.   Yes, I did.

Q.   And do you have the report with you

right now?

A.    Yes, I do.

Q.    Okay.  And would you periodically be looking at the report to refresh your memory?

A.    Yes.  I think it's there on your desk right now.  You have it, but I did review it, yes.

Q.    Do you have your report with you or not?

A.    Not at this moment, no.

Q.    Okay.  All right.

A.    Let me check my case.  Here it is.  I have it in my briefcase.

Q.    Okay.  I'd gotten worried.

Let me first talk to you about when you saw him in October.  Give me the date first when you saw him in October.

A.    October 13th.

Q.    All right, 1993?

A.    Right.

Q.    Then you filed your report on what day?

A.    Probably four, five days later.

Q.    What date is on your report that you did your report?

A.    October 13th.  That's when I dictated

1    the report, right after I saw Mr. Eldridge.

2         Q.    Tell me about that session.  First,

3    generally what did you do in that session in

4    terms of what -- how long were you with him?

5         A.    Probably fifteen or twenty minutes.  I

6    need to point out this was not a usual

7    examination of this man.  He was behaving in a

8    very uncooperative way, so I was not able to

9    perform the usual kind of examination of a

10   defendant.

11        Q.    Okay.  So, in that time period, tell

12   me, generally speaking, what you did, then we'll

13   get into specifics after that.

14        A.    Well, the procedure that was followed

15   was more or less the same as is always

16   followed.  He was transferred from his jail tank

17   in the central jail building to the third floor

18   of the forensic psychiatric unit where we see

19   all defendants, and was placed in a holdover

20   cell there for awhile.  Then, when I came to see

21   him, or get him, he was taken from the holdover

22   cell by one of the psychiatric aids on the

23   floor, brought together with me around the

24   corner to an interview room, where we sat down,

25   and I would start talking at that point.  At

1  that point, though, things varied from the usual
2  evaluation from then on.
3     Q.  When he got into the room with you,
4  what was the first thing that happened?
5     A.  As I recall, he was fairly compliant
6  coming to the interview room.  Sat down and
7  began shaking his leg vigorously at that point.
8     Q.  Then what happened?
9     A.  I then asked him if he knew if the
10 evaluation was going to take place or if he knew
11 that he was going to be seeing a doctor.  He
12 didn't respond to this.  I then tried to give
13 him his warning.  In other words, I say warning,
14 it's a statement we make at the beginning of the
15 interview that the person can end the interview
16 at anytime, they can refuse to answer the
17 questions if they wish and that the purpose of
18 the evaluation was to determine if they're able
19 to participate in court and go ahead with the
20 court proceedings that will be taking place.  I
21 wasn't able to finish this because he started
22 moaning and putting his head in his hands and
23 rubbing his head very vigorously with his hands
24 at that point.
25     Q.  Can you show the jury what he was

393

1    doing?

2         A.    Well, kind of leaning over like this,

3    his hands doing like that.  He would then start

4    talking about don't let them kill me.  He would

5    cry, but there were no tears.  In other words,

6    he sobbed and things, but there were no tears

7    evident.  Then his leg stopped shaking as he was

8    doing this.  His leg didn't shake anymore after

9    that except on occasion when he would be sitting

10   still, then his leg would start shaking again,

11   then he'd stop after a couple of minutes.  He

12   continued like this pretty much through the time

13   I talked with him.  He wouldn't answer any

14   questions directly.  He said "I don't know" to

15   almost any question asked, even simple questions

16   such as when was his birthday, what's his full

17   name, where was he born, how far did he go in

18   school, what his home address was.  So he said

19   he didn't know any of this or did not respond

20   when I asked.

21        Q.    So he doesn't even known his own

22   name?

23        A.    Right.

24        Q.    What other information did you try to

25   get from him?

A. I asked him how long he had been in
jail, asked him whether or not he had an
attorney. He said he didn't know to these. He
would also spontaneously just say things, they
weren't answers to questions, would just start
making statements like they want to kill all the
blacks or they want to kill me, don't let them
kill me, then he said later that he wanted to
run away, he said mean lady burned a candle on
him, you know, fairly nonsensical kind of
arbitrary statements like this. After it became
evident that he wasn't going to answer questions
directly, that he wasn't going to cooperate,
that he would continue in these theatrical and
contrived behaviors, I determined that he was
uncooperative and unavailable for any reasonable
interviewing and I asked him to follow me back
to the holdover tank, at which point he refused
or did not move. Then it was necessary to call
in the psychiatric aids. They talked him into
coming with them, which he did, but then he
scuffled with the aids trying to put him back
into the holdover tank, and was given, was
subdued but had to be given a shot of a mild
tranquilizer in order to calm down. He had

1    worked himself up into some kind of I would say

2    emotional state that was very agitated and upset

3    by that time.

4         Q.   Okay.  Were you able to get any more

5    information from him other than I don't know to

6    every question?

7         A.   Not really, no.  He never answered a

8    question directly; all he would do would make

9    these statements, these peculiar statements.

10        Q.   All right.  Did you review any records

11   at that point before coming to your diagnosis

12   that you thought he was malingering?

13        A.   Yes, I did.

14        Q.   What records did you review?

15        A.   At that point, I reviewed the

16   treatment unit records, because he was already

17   on the treatment unit for observation at that

18   time, I think at Doctor Silverman's request.

19   And the treatment unit records pretty well

20   confirmed what I was feeling by then anyway,

21   which was that he was faking mental illness.

22        Q.   What did you find to be particularly

23   significant from the treatment records with

24   regard to malingering?

25        A.   Well, by October 13th of '93, he had

been seen by, you know, large number of forensic
unit staff, caseworkers; he'd been on the unit
for like six weeks in early 1993; he was there
again in October of '93, where he was seen by
other members of the forensic psychiatric unit
staff.  The opinions that I found in the records
were quite consistent.  There was never any
question on anyone's part who saw him, even the
psychiatric residents who were in training there
were of the impression that he was malingering.
So, again, among the treatment unit staff that I
had access to, including the notes, observations
written down by the doctors there on the unit,
it was very consistent.  In fact, it was
unanimous that he was faking, that he was not
really suffering from any severe mental illness.

          Q.   You talked about his presentation to
you.  I mean, I guess you would agree that what
you observed in your interviewing of him was
bizarre?

          A.   Yes.

          Q.   All right.  So why is it, then, that
you look at the bizarre behavior and that you
decide that it's malingering rather than looking
at that behavior in deciding that it is a

genuine mental illness of some kind?

A.   Well, like any other disorder,
disease, mental illness has certain specific
symptoms that lead to a diagnosis.  You know,
you have a,b,c,d symptoms that show that the
person has this particular mental illness.  Now,
in Mr. Eldridge's case, he didn't show those
symptoms.  He showed peculiar behaviors,
inappropriate behaviors, but he didn't show any
of the symptoms that could be lined up to say
this is characteristic of this mental illness,
therefore, my diagnosis is mental illness.  He
gave a scattered kind of presentation of
different kinds of crazy behaviors, none of
which fit into any known diagnostic category.
Second thing is that his behavior is
inconsistent.  He doesn't do the same thing over
and over again.  He does different things at
different times, which, again, is unusual, is
not typical of mental illness that we know and
would diagnose.  Most lay people don't
understand what mental illness really looks like
and what causes a diagnosis of mental illness to
be given, but they know a few things, they've
seen tv, movies, things like this, they know

1    enough to show a few little things here and
2    there, but they don't understand what the most
3    important symptoms are, they don't understand
4    what the critical symptoms are, they don't
5    understand that you have to be consistent in
6    these symptoms, that they just don't develop all
7    of a sudden.  All of these things went into the
8    evaluation of Mr. Eldridge; and he came up very,
9    very short.  He simply did not fit any
10   diagnostic category.
11        Q.   Okay.  So, to see if I understand you,
12   you base your opinion on two things -- one is
13   that the behavior was too extreme and too
14   different so that it didn't fit into any known
15   medical mental disorder?
16        A.   That's right.  His behavior was
17   theatrical, it was dramatic, it was excessive,
18   and it was inconsistent with any group or
19   cluster of symptoms that would lead to a
20   definite diagnosis of mental illness.
21        Q.   And, so, it would lead you to believe
22   that he was faking it because there's no such
23   thing as what he was acting like?
24        A.   That's right.  That's the only way to
25   explain his behavior.

399

1      Q.    Then the second thing I think you said

2   is that his behavior was inconsistent, that he

3   would change at different intervals.  Am I

4   understanding you correctly?

5      A.    Yes.

6      Q.    If somebody then asked you, well,

7   isn't it true that people with mental illness

8   sometimes have different symptoms?

9      A.    They do, yes.

10     Q.    How would you explain that, then, to

11  explain why you felt it was malingering rather

12  than somebody who has a mental illness but is

13  just exhibiting different symptoms at different

14  times?

15     A.    Well, because, even though he may have

16  some different symptoms, the core symptoms, the

17  critical symptoms, what the psychiatric

18  residents learn in medical school are the four

19  A's, for example.  They give you a diagnosis of

20  schizophrenia.  Those things have to be present

21  all the time.  They don't change much.  Now,

22  perhaps the contents sometimes will change of a

23  delusion, you know, one day you think that Mars

24  is, you know, sending x-rays through your brain,

25  next day the x-rays are coming from the C.I.A.,

1    you're going to have small, you know,

2    differences like that, but the fact that he is

3    exhibiting what we call thought insertion or

4    thought broadcasting, you see, would be

5    consistent, and Mr. Eldridge showed none of the

6    core or critical symptoms of severe mental

7    illness.

8        Q.    Is there anything else that you feel

9    would help explain to the jury your opinion back

10   in October of 1993 regarding why you thought it

11   was malingering?  Anything else in that report

12   that we haven't covered?

13       A.    Well, I mean, I think the report

14   speaks for itself, and, I mean, there is a list

15   I made of about twenty things here that would

16   indicate he was not really mentally ill.    I

17   might mention a couple just to emphasize what I

18   am saying.

19       Q.    You can mention all of them actually.

20       A.    First of all, his personal hygiene was

21   fine.   Okay, once again, one of the things you

22   very often see with the seriously mentally ill

23   are the breakdown in personal hygiene and their

24   ability to keep themselves neat.    They're

25   disheveled often, they smell bad because they

have not taken a shower. So, Mr. Eldridge was
fine in this respect. The leg shaking is
interesting. The leg shaking only really occurs
as a medication side effect. You rarely see
this kind of behavior without medication causing
it. It's part of what we call tardive
dyskinesia, which is a side effect of some of
the tranquilizers that are used for some of the
mentally ill people. Other thing is, of course,
they keep their leg shaking constantly because
it's not a voluntary thing, it's an agitation
caused by the medicine, so you have the leg
shaking constantly. Even the person looking at
it is kind of, you know, bothered by it. He
doesn't like it either but it keeps going.

Q. Let me stop you right there. Can you
show me with your leg for just a second what you
mean by leg shaking.

A. Well, kind of like this. It's hard to
do yourself voluntarily because your muscles
aren't being done that way by the medicine. I
don't have medicine in me that does this, but
it's kind of like a vigorous shaking.

Q. Like a jerking motion?

A. Yes.

1    Q.   Short jerking motion?

2    A.   Again, bad idea for Mr. Eldridge to

3    pick this particular symptom because it's very

4    hard to keep it up for fifteen or twenty minutes

5    at a time; also hard to keep it up in your jail

6    tank when you go back to your jail tank sitting

7    there with a bunch of other inmates, got to sit

8    there with your leg shaking twenty-four hours a

9    day.   That's pretty hard to do.

10   Q.   You told me at some point he was

11   prescribed Atavan.   Just for clarification,

12   would that sign or symptom, the leg shaking,

13   have anything to do with Atavan?

14   A.   No.

15   Q.   So that couldn't of caused it?

16   A.   He was given the Atavan after.

17   Q.   Was he ever prescribed any other drugs

18   beside Atavan?

19   A.   According to my review of the records,

20   he was never prescribed any type of psychiatric

21   medicine except that he received that one shot

22   to calm him down because he was agitated.

23   Q.   To your knowledge, he was never under

24   any kind of medication that would cause the leg

25   jerking?

1     A.    Not to my knowledge, no.

2     Q.    He didn't keep up the leg jerking, so

3     I guess it really wouldn't matter.

4     A.    Right.

5     Q.    What was the next sign that you can

6     point to to show that it's malingering rather

7     than some genuine mental illness.

8     A.    Well, one of the more creative and

9     dramatic symptoms that he showed, I think, is

10    the head scratching.  He started doing that when

11    I first brought him into the room.  He pretty

12    well kept it up throughout the contact with him;

13    he kept scratching his head so much he drew some

14    blood on the top of his head, wasn't bad, but

15    you could see some blood on the top of his

16    head.  It was noted, I think, one other time in

17    the treatment notes he did this one other time.

18    Again, this kind of behavior is what we call a

19    compulsive symptom.  This kind of behavior, if

20    it were truly a symptom or behavior, would be

21    happening repeatedly; it would be happening so

22    much that he'd have to be restrained or

23    something would have to be done with his hands

24    if he really had done that as part of the mental

25    illness.

1      Q.   Let me stop you right there.   He did

2    that in front of you one time; is that right?

3      A.   Right.

4      Q.   Okay.   Can you show the jury what you

5    mean when you talk about head scratching?

6      A.   Well, you know, his head is very close

7    shaven, he was essentially very close-cropped.

8    He had no hair really, it was all cut or shaved

9    back or something.   And he would just sit there

10   and just do like this, keep doing it until about

11   halfway through the interview you could see some

12   little specks of blood start coming out of his

13   scalp because he was rubbing so hard he was

14   scratching with his nails too.

15     Q.   So scratching with both hands

16   backwards and forward on top of his head?

17     A.   Yeah, uh-hum.

18     Q.   You said it happened one other time.

19   Do you know the date of the other incident?

20     A.   It was at the next time he was on the

21   treatment unit.   It was somewhere around maybe

22   December or so of '93 or January of '94.

23     Q.   About?

24     A.   Might be in my notes here.   I think

25   it's in Ms. Callahan's notes.   Yes, that was in

the note upon admission for the second

observation period, and that was in January of

'93.  Something like that, anyway.  The

admission note indicates that he was scratching

his head at that time.  But this behavior was

not repeated during the rest of the time he was

on the unit.

     Q.   So two times, to your knowledge?

     A.   Yeah.  I am sorry, it may have been in

October of '93 that he was admitted to the unit.

     Q.   Let me show you this note, see if it

helps you or not.  It may not.

     A.   Yeah, this is it.  This is what, ten,

13, of '93.

     Q.   So, to your knowledge, it happened 10,

13 of '93.  So when you saw him, which was 10--

     A.   13, same day.

     Q.   13.  So two times in one day?

     A.   Yes.

     Q.   He made his head bleed?

     A.   It was not noted as repeating itself

ever again.

     Q.   Why would that be significant?

     A.   Well, again, if this kind of behavior

is occurring and he is doing something that's

1     kind of repetitive and kind of damaging to

2     himself, you would see those behaviors occur on

3     a regular basis.

4          Q.    And you didn't?

5          A.    And they didn't happen, no.   Once

6     again, it's inconsistent.   He can demonstrate

7     the behavior once or twice but then he can't

8     keep it up.   In the true mentally ill person,

9     you would see those behaviors continually.

10         Q.    What else?   I think you told me about

11     three things.   Give me some of the things you

12     could point to.

13         A.    Well, another interesting

14     inconsistency is at one point he said don't let

15     them kill me, then later he said he wanted to

16     die, which again doesn't really happen.

17         Q.    Well, so, you're saying somebody with

18     genuine mental illness would be one or the

19     other?

20         A.    Yes.

21         Q.    Do you find people that have both or

22     not?

23         A.    Not in the same time period, no.

24         Q.    Not like within the half hour?

25         A.    No, you don't see that.

Q. What else can you point to?

A. He reported near the time of admission that he was hearing the voice of Willie. Again, that's in the treatment notes. He said nothing like this to me. It's also interesting that he had a struggle with psychiatric aids when they put him back into the holdover tank. Almost always, with the really mentally ill, people are rarely agitated or rarely combative. Sometimes they get that way because they don't want to leave the tank, they don't want to be brought out of the tank. In other words, they feel relatively safe at that particular moment. They don't want to come back and see me, I'm a stranger, they're suspicious of me, they don't want to have their safe place threatened, so they refuse to come out. The aids have to come in there and drag them out sometimes. But in Mr. Eldridge's case they had to drag him back in, so, once again, inconsistent.

Q. So he wanted to be with people I guess you would look at it?

A. Or at least he wanted to be in a place that he knew. I'm saying the genuinely mentally ill wouldn't want that.

1     Q.    Right.

2     A.    They don't like to be in strange

3  places or seeing strange people.  That makes

4  them feel threatened.  But in Mr. Eldridge's

5  case, he didn't want to be put back.

6     Q.    Is there anything else that you can

7  point to?

8     A.    Well, Mr. Eldridge has also around the

9  time I saw him and consistently refused

10  psychological testing.  This is another hallmark

11  of malingering, I would say.  It's rare that you

12  see mentally ill people who really don't want to

13  do the psychological testing.  Now, if they're

14  really paranoid, really suspicious, they would

15  sometimes refuse, but Mr. Eldridge does not

16  really exhibit any paranoid traits, at least in

17  terms of feeling that the staff or someone like

18  that was going to harm him or that the other

19  inmates around him were going to harm him, which

20  is what you typically see.  He would make

21  general statements about don't let them kill me,

22  things like that, but he never indicated that he

23  was threatened by any of the staff or any of the

24  other inmates, which again is inconsistent.  So,

25  anyway, the refusal of psychological testing is

often taken as an indication that they don't want to put themselves in position of having to do the test because, of course, they don't know how to look bad on a psychological test or what might be a bad response, and he consistently refused that throughout his stay on both times on the psychiatric unit.

Q. Are there any other things that you can point out at this time regarding signs that would lead you to believe that it's malingering?

A. That's pretty much everything for the October interview, yes.

Q. All right. I want to now then turn to the next visit, which is on February 18th of 1994. How is it that you got involved with this case again in February of '94?

A. Well, I think Doctor Silverman saw him again, I think actually the day before I saw him, and requested I think once again that I see him again as a follow up.

Q. When Doctor Silverman is asking you to give a second opinion, does he tell you his thoughts on the case? I mean, do y'all have a discussion about Mr. Eldridge?

A. No, we typically don't. We like to

1    form our own opinions.  Now, I did talk to him

2    after I saw Mr. Eldridge on October 13th.

3         Q.   But Silverman saw him first, I guess,

4    in October?

5         A.   Right.

6         Q.   Then you saw him.  And, so, your

7    testimony is that you two did not discuss why

8    Silverman was asking for a second opinion other

9    than he was asking for a second opinion; is that

10   a fair statement?

11        A.   That's a fair statement.

12        Q.   And is that because he doesn't want to

13   bias you to look for something or not look for

14   something?

15        A.   Right.  Start with a clean slate and

16   develop our own opinions independently of what

17   other psychologists think and then we come

18   together and discuss whatever our findings were.

19        Q.   Have there been times when you

20   disagreed with Doctor Silverman?

21        A.   It happens occasionally.

22        Q.   What about him disagreeing with you?

23        A.   Yes.  If that's the case, then next

24   step would be to see him together, person

25   together, see if we could resolve our

differences.

Q. So it's not like you felt you had to come to the same diagnosis as him?

A. No. It happens sometimes.

Q. Okay. So now we're talking about February of '94. And I guess at this point you both know that you both previously said he was a malingerer?

A. Yes.

Q. Tell me about that visit in February. What was the first thing that happened?

A. Well, this time I saw Mr. Eldridge in the holdover tank itself. In other words, I didn't bring him out to the interview room. I didn't know what to expect of his behavior, so I interviewed him actually in the day area of the jail tank itself, and where he had been there for a little while, I came into there, sat down at one of the metal tables that are actually welded to the floor, everything is stationary, then the aids brought him over, sat him down in front of me. And, so, the interview took place at that point.

Q. What was the first thing that happened? What did you do first or what did he

1    do first?

2          A.   Well, once again, told him who I was,

3    told him that I wanted to see him again, see if

4    he was feeling any better, and once again

5    started asking him about, you know, what's

6    happened to him or how has he been feeling since

7    I saw him the last time, and he said something

8    like, the bossman hit me, told me just to sign

9    the papers.  And, so, then we had a conversation

10   about who the bossman was.  He kept doing like

11   this, you know, trying to indicate a badge,

12   although for some reason I guess he couldn't say

13   the word badge, but he did that.  Then he said

14   he was tired, that he wanted to go home.  His

15   demeanor and composure was very different than

16   the first time I saw it.  There was no

17   agitation, no getting upset, no working himself

18   into a state, he just had kind of a depressed

19   look on his face, said he was tired, he wanted

20   to go home.  Although he wasn't cooperative with

21   me the second time, either.  He really didn't

22   answer any questions directly except to say what

23   he did about the bossman in response to my

24   question about how he was feeling.  On this

25   occasion, he also complained about they keep

moving me and moving me. When I asked why he
was here, he stated, "I go to court, I don't
make trouble." So this is the first statement
on Mr. Eldridge's part that he knows something
about a court, but it's also revealing that
supposedly before now, before that time, he
didn't know anything about anything. Certainly
didn't know anything about why he was in jail or
going to court. He then said something, "I'm
just tired, I'll do whatever they want me to
do." I asked him, "What do they want you to do,
what do you mean?" He says he is tired again,
he got up, he walked out.

    Q.    Okay. So how long did that visit
last?

    A.    Well, only lasted about five or ten
minutes.

    Q.    So he just walked out?

    A.    Right. And he was clearly irritable.
But, you know, I kind of sympathized at that
point with Mr. Eldridge because if I had been
doing all the work he had been doing to fool
everybody I'd be tired, too. But my
interpretation of that is he's getting tired of
the game but he was still playing. But, anyway,