# United States District Court
# Southern District of Texas

Case Number: __OScv1847__

## ATTACHMENT

Description:

☐ State Court Record     ☑ State Court Record Continued

☐ Administrative Record

☑ Document continued - Part __9__ of _____

☐ Exhibit to: _____
       number(s) / letter(s) _____

Other: _____

_____

_____

that's all the face-to-face interview time I had anyway, he walked out. Because he had been combative with the aids before, I didn't want to try to get him to come back and sit down.

Q. What about appearance? What did he look like when you saw him in February?

A. He had a little more hair, didn't have any evidence of any scratches on his head or anything like that, was neatly groomed, same as the first time.

Q. Dressed appropriately?

A. Yes.

Q. I mean clean?

A. Yes.

Q. Hair combed?

A. Hair combed, was kempt, yes.

Q. What did you have then beside your interview with him? Did you look at records?

A. Well, I reviewed quite a few records. Treatment records by this time were pretty thick, so I went through all of those, noted again that everyone had pretty much documented that he was really either malingering or he was fine. There is fairly long periods of time in the treatment notes where he is behaving

1    appropriately, he's not a management problem, he
2    is not giving anybody problems, he's not saying
3    anything strange, he is just kind of hanging
4    around, just there.
5         Q.   How do you interpret that, that he
6    goes from the extreme bizarre behavior to
7    normal?  I mean, just sitting there, not causing
8    a problem, not doing anything unusual?  How do
9    you explain that?
10        A.   Well, again, I think most of his
11   unusual behavior is saved for the doctors who
12   interview him, then rest of the time he is
13   pretty much kind of just behaving himself or at
14   least is quiet, doesn't do anything.  No one who
15   is really normal but who is trying to play
16   mentally ill could keep up the string of
17   symptoms that they're showing day after day
18   after day, month after month.
19        Q.   So did you see a general pattern, that
20   when he was just in his cell, without
21   psychiatrists or psychologists around, he wasn't
22   that much of a problem?
23        A.   That's right.
24        Q.   Generally speaking?
25        A.   Generally speaking, that's what the

notes reflect.

Q. But then, when the psychiatrists or psychologists came around, all of a sudden he has got this bizarre behavior?

A. Yes.

Q. How do you interpret that?

A. I interpret that as malingering. He is faking mental illness.

Q. Why do you say that?

A. Well, again, the only time that we see people who are faking in this situation is when they're trying to avoid prosecution for their crimes, and there is really no other reason that someone in the jail would try to appear mentally ill if they really weren't. There is no benefit to it. There is really no benefit to Mr. Eldridge doing it, but sometimes they get bad advice from what they call jailhouse lawyers, one of the inmates will say: Hey, if you fake it, the doctors will send you to a mental hospital or something, you know, you will get out of this. But that's not true, that's not the way it works. Even if he had been sent to a mental hospital, he would of just come back, had to stand trial eventually anyway, but, again,

they don't know about the law themselves, they

get bad advice, so they try it, it doesn't work,

but there is really no other reason for people

to do that. People, if you're really normal,

you don't want someone, for example, giving you

the psychiatric anti-psychotic medication. It's

not pleasant to take this medication. In

addition to the side effects, it's very

sedating, makes you sleep all the time, makes

you groggy, sluggish. No one likes that. It's

not a pleasant way to be. So there is really no

other reason for someone to try to fake mental

illness in the jail situation other than to try

to get out of their punishment.

Q. All right. Did you make notes about

the records as to what you found to be

particularly significant in your reaching your

diagnosis of malingering?

A. Yes, I did.

Q. Can you tell us about what you found

based on the MHMRA personnel records of the

defendant when they watched him, what was

significant about that in reaching your

diagnosis of malingering?

A. Well, again, I'd taken notes of

1  diagnoses and impressions from the different
2  doctors who had worked with Mr. Eldridge over
3  the past year, so.
4       Q.   I guess let's try to break it down a
5  little bit.  I'd like to just start with
6  October, if we can.  In October, what did you
7  find particularly noteworthy about his stay with
8  the MHMRA at the jail?
9       A.   In October, the jail treatment notes
10  -- okay, for example, after my October
11  evaluation, I talked with Mr. Pena, who is one
12  of the staff psychologists on the unit, and he
13  indicated that he thought that the defendant was
14  malingering and did not need any psychiatric
15  care.  Also talked to psychiatric nurse on the
16  unit, Ms. Callahan.  She indicated he was being
17  dramatic, theatrical, his symptoms were
18  contrived.  He, as she put it, he put on a real
19  show.  And she doesn't remember anytime it was
20  necessary to medicate him or that medication was
21  called for as part of his treatment.  She also
22  noted he did not scratch his head until it bled
23  during the previous admission to the unit in
24  January of '93.  So, once again, pretty much
25  everything I was getting from the treatment

staff, the treatment records at that time
indicated that he was faking this.

Q.   What did the records reflect for the
month of November?

A.   The next time I saw him, the records,
I've written number of notes that I reviewed in
my report, but he was released the first time
after observation in January or February of '93
with no diagnosis or as malingering, no
diagnosis of serious mental illness.  He has
been given diagnosis of adjustment disorder
sometimes, but that sometimes is given together
with malingering because there the doctor is
trying to say that a person is having an
adjustment problem to the jail, which is why
they are malingering.  The notes indicate, for
example, on October 6th of '93, no visual
hallucinations reported, depressed and tearful
at times.  October 27th, he was described as
vague reporting of symptoms, says he cannot
read.  October 13th, he was combative and
agitated on that day but he was also clear and
coherent, which is something you don't see.
October 21st, he was seen as no evidence of
psychotic behavior, selectively mute.  That day

he wasn't talking to anybody.

Q. But he talked before?

A. Yes. November 11th, he denied auditory, visual hallucination, he denied having hallucinations on that day. Then he said his brother visited him, which is implying he saw his brother come into his jail tank or area or something and he had a visit with him.

Q. What else did you notice about the November records?

A. November 23rd, he said that the woman in my head is burning candles. This is interesting because the time I saw him before he said something about a woman burning candles on me. In other words, at that time it sounded like he was talking about like a voodoo curse or something, you burn candles, you know, puts a curse on the person. But he'd forgotten what said originally, I guess. Then he said there was a woman in his head burning candles, making his head hurt, which is, again, you never see anything like that with mentally ill people. Then he starts talking, on November 29th he complained that his father was beating him, drugging him in the jail.

1      Q.    You said that in November that you
2    wrote that down?
3      A.    Yes.
4      Q.    Then in December what did you note?
5    December and January?
6      A.    He reported visual hallucination in
7    detail, reported symptoms not typical of an
8    individual with a psychotic disorder.  I think
9    this is the day he was supposedly seeing him and
10   his brother loading a truck.  I don't know where
11   he got that from.
12     Q.    Well, tell me about that, when you
13   have a hallucination, when people who have
14   mental illness describe how they have a
15   hallucination, what kind of visions they see.
16     A.    Well, different kinds of mental
17   illness have different kinds of hallucinations.
18   Hallucinations are sensory misperceptions of
19   something that is happening.  For example,
20   people with schizophrenia, a very serious mental
21   illness, typically hear voices, what we call an
22   auditory hallucination.  They hear voices.  But
23   they don't have -- they very rarely have visual
24   hallucination, very, very rare other than some
25   fleeting kind of shadows or vague things in the

periphery.  Visual hallucinations are usually
reserved for people who are the drug overdoser,
what we call delirium problems, problems
associated with drug abuse or drug
intoxication.  That seems to cause the visual
hallucinations.  So you don't see that with any
other kind of disorder.  So Mr. Eldridge, once
again, is seeing a lot of visual hallucinations,
like his brother, his father, he is loading a
truck.  But, you see, there's no -- this is
months and months and months after he had any
access to any street drugs, if he ever used them
at all, so no possible way he would have had any
kind of actual drug organic, that would cause
him drug hallucination.

    Q.  Is it like tv, you know, you see
clear-cut images like on tv?

    A.  No, no, it's not like that at all.

    Q.  So he is actively seeing him and his
brother loading a truck.  Does that sound like a
true hallucination?

    A.  No, that's not a hallucination.

    Q.  What about the fact he was saying he
was hearing things and seeing things, auditory
and visual hallucinations?

A. Well, at one point he reported auditory, visual and even tactile, in other words, skin feelings of some kind all at once, which, again, I have never seen in my whole life. I've never seen anything like that.

Q. Too much?

A. Too much.

Q. He went too far?

A. He went too far, too theatrical, too intense.

Q. And just doesn't exist?

A. And it is too inconsistent.

Q. Does it exist?

A. Well, again, he really again didn't demonstrate them to anyone, even psychiatric residents still in training that he was really seriously mentally ill.

Q. But in terms of auditory, visual, tactile all at the same time, does that exist?

A. I've never seen that happen. I don't think it exists. For example, tactile hallucination you almost never see except with maybe delirium tremors, which is alcohol withdrawal.

Q. But at this point, he'd been in the

jail how long?

A.    Months and months, maybe a year.

Q.    Is that it with regards to your February evaluation?  Anything else that you did besides your meeting with the defendant in the jail and reviewing the reports?

A.    Well, there is several other things, but, again, I documented these in my report.  I think I note the most salient and dramatic kind of instances, but there is a number of them.  Again, I think I pretty well covered that in my report.

Q.    Okay.  Let me ask you very briefly about the other doctors.  For example, on January 14th of 1993, how did Doctor Arfa diagnose him at the jail?

A.    He said no Axis I diagnosis.  In other words, Axis I is the category that is used for diagnosing a mental disorder.  And, in other words, he is saying there's no mental disorder that I could diagnose for the person.

Q.    Was there any medication prescribed at that time?

A.    He said medications are not prescribed or medications none.  In other words, none are

1    needed.

2         Q.   On January 25th of 1993, that's when

3    Doctor Silverman diagnosed malingering; is that

4    right?

5         A.   That's right.   That's Doctor

6    Silverman's first contact with the defendant, I

7    believe.

8         Q.   On February the 19th of 1993, how did

9    Doctor Osterman diagnose the defendant?

10         A.   He also says malingering.   He called

11    him an adjustment disorder with depressed mood,

12    affect tearful but in a forced manner,

13    medication needed, none, no forensic services

14    needed.   In other words, no psychiatric services

15    needed in the jail.

16         Q.   Tell me about the adjustment disorder

17    with depressed mood.   Would that affect your

18    diagnosis of malingering?

19         A.   No.   Like I said earlier, it sometimes

20    goes with diagnosis of malingering.   In other

21    words, the doctor is just trying to explain this

22    person is having some kind of problem adjusting

23    or accepting or dealing properly with the fact

24    that he is charged with a criminal offense.

25         Q.   Would the fact that somebody might

1  genuinely have, what is it, adjustment disorder

2  with depressed mood, would that mean that

3  they're incompetent to stand trial, that they

4  don't understand the legal proceedings or they

5  can't consult with their lawyer?

6       A.   No.   An adjustment disorder is a

7  milder or a less serious diagnosis of mental

8  disorder or mental problems.

9       Q.   Assuming you agree that he had

10  adjustment disorder with depressed mood, would

11  that lead you to believe that he is incompetent

12  to stand trial?

13       A.   No, that's not consistent with

14  diagnosis of incompetency.

15       Q.   So that he could be competent to stand

16  trial and have this adjustment disorder?

17       A.   We see that many times.

18       Q.   Is that, in fact, your opinion of Mr.

19  Eldridge?

20       A.   I believe so, yes.

21       Q.   On March the third of 1993, how did

22  Doctor Arfa diagnose him at that time?

23       A.   Doctor Arfa, this was his discharge

24  note or his discharge diagnosis was none or

25  malingering and that medications were none.

Q. And on March the 8th of 1993, how did Doctor Stone diagnose him at that time?

A. He was seen by Doctor Marvin Stone, who is the medical director of the psychiatric unit there in the jail, and his impression was also malingering. He gave an adjustment disorder. Felt no psychiatric treatment was needed at that time.

Q. Did he make any observation whether, what is it, his affect?

A. Yes. He did say his affect was overly dramatic, that he tended to work himself into a frenzy, so he was kind of working himself up, similar to what he did with me when I first saw him.

Q. All right. On September 30th, 1993, that's when Doctor Silverman saw him again, said he was malingering; is that right?

A. That's right.

Q. Then, on October 5th of 1993, Doctor Stokes gave what diagnosis?

A. Doctor Stokes felt like he was malingering, he said a mild adjustment disorder, not otherwise specified.

Q. Is that N.O.S.?

A. Yes. And also on that same day, Henry Ubah, which is, I think, is one of the caseworkers, mental health caseworkers entered a note: Possible mild adjustment disorder not otherwise specified, no evidence of mental illness, no services needed.

Q. What about, then you saw him on October 13th of '93; is that right?

A. Yes. I saw him on the last time. I am sorry, the first time in October of '93.

Q. Then, on January the 4th of 1994, Doctor Melissa Ferguson documented what in the records?

A. Doctor Ferguson said she highly suspected malingering, doesn't happen to be psychotic or suffering from an Axis I major depression.

Q. Then, on February the 8th, 1994, Doctor Robashkin gave what diagnosis?

A. Robashkin is one of the heads of the treatment teams there in the jail. He diagnosed him as malingering. Felt that he had no place on a psychiatric unit.

Q. Earlier this morning you and I got together and discussed this chart. Without

telling me the contents of this chart, can you just identify the chart and tell me whether that fairly and accurately, to the best of your knowledge, summarizes the different people who have seen the defendant on different dates and their diagnoses and impressions?

A. I believe it does, yes.

Q. All right. We marked State's Exhibits 6 and 5; is that right?

A. Right.

Q. So this is fair and accurate, to the best of your knowledge?

A. Yes.

Q. All right.

MS. ALCALA: At this time, I'd like to tender to defense counsel State's Exhibits 5 and 6, offer them into evidence.

MS. CRAWFORD: Your Honor, may we approach the bench?

THE COURT: Yes, ma'am.

(Off the record bench conference).

MS. ALCALA: Any objection?

MS. CRAWFORD: No objection.

THE COURT: Five and six will be admitted.

BY MS. ALCALA:

Q.   Sir, rather than repeating what we just talked about, do State's Exhibits 5 and 6, then, summarize what you just testified to there on the witness stand?

A.   Yes, they do.

Q.   That would be all the different doctors who have seen him and all of the different diagnoses that those people have given and the dates of that diagnosis?

A.   Yes.

Q.   Okay.  Sir, you said you made reports of your visits.  Did you bring those reports?

A.   Yes.

Q.   We marked those as State's Exhibits 7 and 8.

MS. ALCALA:   I'm going to tender to Defense Counsel State's Exhibits 7 and 8, offer them into evidence, with the same understanding as the previous ones, that we'll agree to certain omissions that the court has ruled inadmissible.

THE COURT:  Yes, ma'am.

MS. ALCALA:  Any objection with that understanding?

431

MS. CRAWFORD: No objection, Your Honor.

BY MS. ALCALA:

Q. Sir, would it be your practice to give somebody an anti-psychotic drug if you didn't know what was wrong with them?

A. That's really not a good idea. These drugs are very powerful. They have some very significant effects on people. Different drugs are used for different kinds of diagnoses, and giving the wrong drug to someone could possibly hurt them. Again, because of their rather powerful nature, I don't think I would recommend that. It's not something you experiment with.

Q. Sir, do you have an opinion, then, about whether Gerald Eldridge has the ability to assist his attorney with a reasonable degree of rational understanding?

A. If he decides to do so, I think he could voluntarily do this, yes.

Q. He has the ability if he chooses to do so?

A. That's right.

Q. And do you have an opinion about whether Mr. Eldridge has a rational as well as factual understanding of the legal proceedings against him?

A.    Yes.

Q.    The ability if he chooses to do so?

A.    I believe he would be able to do so,
yes.

MS. ALCALA:   I'll pass the witness.


CROSS EXAMINATION

BY MS. CRAWFORD:

Q.    Is it Doctor Brown?

A.    Yes.

Q.    Doctor Brown, my name is Denise
Crawford.  I believe we met in the past.  You
may or may not remember.

It's my understanding that you had the
opportunity on two occasions to visit with Mr.
Eldridge; is that correct?

A.    That's correct.

Q.    Okay.  The first time, I believe,
well, let me ask you where exactly was -- you
say it was an interview room?

A.    Yes.

Q.    That's in the forensic unit.  I mean
in the medical unit?

A.    On the psychiatric unit that's on the
third floor of the central jail building, 1301

Franklin.

Q. So that's not on the sixth floor?

A. No.

Q. Sixth floor is general population, so to speak?

A. I think it is, yes.

Q. So it's not the medical unit, medical floor?

A. As far as I know, it's not.

Q. And did you proceed with an order of the court at that time?

A. Yes.

Q. Okay. And was it in a room where you were given the opportunity to interview him without any barriers; is that correct?

A. Right.

Q. So, basically, as if you and I were talking, we may even be closer than that?

A. Yes.

Q. Certainly no barriers?

A. Right.

Q. Would you agree that at sometimes it's difficult to carry out your job when there are barriers between you and the patient?

A. Well, I certainly prefer not to, yes.

1      Q.   Okay.   And you indicated at that time

2   that Mr. Eldridge I think you said worked

3   himself into an agitated state; is that correct?

4      A.   Yes.

5      Q.   Now, I am a lay person, as I guess

6   most people here in this courtroom are.   You

7   indicated that you weren't able to detect any

8   specific diagnosis of mental illness.

9      A.   Right.

10     Q.   Doctor Brown, are you saying, that in

11  order for you to determine that an individual is

12  competent or incompetent, it's necessary for you

13  to form a conclusion or some form of conclusion

14  as to a specific mental illness before you can

15  render that opinion?

16     A.   No, I don't think it's actually

17  necessary to make a diagnosis.   Frankly, in my

18  reports, I rarely give a diagnosis like of a

19  psychiatric mental illness in the reports.   I

20  will say he is seriously mentally ill or

21  something like that, but I would not give a

22  diagnosis because that's not what the court is

23  asking for.

24     Q.   I understand, but in your mind have

25  you at least considered one or two possible

diagnoses or types of mental illness, then you decide, okay, I'm going to conclude that he is basically incompetent?

A. Yes. In other words, I would know what was making him incompetent, yes.

Q. So I guess that's my question. Did you have to know what is rendering him incompetent before you could say he or she is incompetent?

A. That's right.

Q. Now, you mentioned there are different forms of mental illness. I certainly would not presume to ask you to list all of them, but you did indicate some examples that indicated paranoid schizophrenia; is that correct?

A. Right.

Q. You also indicated one type of mental illness, I don't remember, maybe it was schizophrenia, that medical students learn that there are certain symptoms on which to base a diagnosis of possible schizophrenia; is that correct?

A. Yes.

Q. Now, with paranoia, for example, I'm just asking for understanding here, what would

1    be some of the symptoms present in a possible

2    paranoia type of situation?

3        A.    Well, the paranoia that is usually

4    reflected in paranoid schizophrenia is it's

5    usually a persecutory form.   In other words,

6    person believes there is some type of plot or

7    conspiracy or some type of evil force that is

8    after him and trying to harm him in some kind of

9    way.   And it's also what we call

10   self-preferential.   In other words, the person

11   believes this force is being used against him

12   because he has some kind of special ability,

13   power or some kind of special assignment, and

14   they're trying to keep him from doing it.   In

15   other words, you got to have both the

16   persecutorial quality to it, you also have to

17   have the self-preferential quality to it to be a

18   true paranoid schizophrenic delusion.

19       Q.    They're always willing to express

20   their feelings?

21       A.    No, not always.   Sometimes they

22   withhold a lot of their feelings and thoughts

23   from us because there is suspicious of us.

24       Q.    And I believe you indicated that the

25   problem that you have, it's been said, I guess,

in the reports that Mr. Eldridge basically produced too large an array of the problems or symptoms from too many different types of mental illnesses; is that correct?

A. Too dramatic, too many different kinds.

Q. Okay. Now, what about -- the paranoid schizophrenia, they go hand in hand but they can be considered separately; is that correct?

A. Paranoid schizophrenia is one of the classifications of schizophrenia. There are several forms of it.

Q. Okay. Now, what are some of the symptoms of schizophrenia, I guess?

A. Well, there is two ways to diagnose schizophrenia, and these are the kinds of things that are taught the residents and clinical psychology interns in medical school is what they call the four A's. The four A's meaning inappropriate affect, loose associations, autism and ambivalence.

Q. What is autism?

A. Autism is a focus of the patient inside of himself rather than outside of himself. In other words, usually people in the

1    normal world are focused outside of themselves,
2    they're checking what's going on around them,
3    relate to people around them in the appropriate
4    way. The schizophrenic turns inward, something
5    going on inside of his head that he is compelled
6    to focus and compel, pay attention to that more
7    than the world outside.
8         Q.    How is that manifested in the actions
9    of one?
10        A.    Well, it can be manifested several
11   ways. One of the most common ways is what we
12   call the smile or the laughter. In other words,
13   sometimes you'll be talking to a schizophrenic
14   and they'll laugh. You will say what are you
15   laughing about and, well, nothing, but you can
16   tell that they're either listening to or
17   thinking about something inside their heads and
18   they're laughing about it. Another form of -- I
19   am sorry, what was your question again?
20        Q.    You basically answered that.
21        A.    Okay.
22        Q.    And ambivalence, what is that?
23        A.    Well, ambivalence in this case refers
24   to inability to make a decision about anything
25   that's important. They want to do this, but

they want to do that, they don't know which to
do, they keep going back and forth between the
two.  Uncertain, unfocused, they get confused,
they don't know which thing they're suppose to
be doing, and they have to be directed or told
how to go about doing things, like do you want
to leave now?  They might say, well, I don't
know, I can't tell, I'm not sure, should I,
maybe I shouldn't, you know.  Then you say,
well, then I think it's time for you to leave.
Then you have to escort them out.

Q.  Is it your opinion that a person with
a true mental illness is not capable of, in
addition to that mental illness, being
manipulatory in other ways?  I mean, if you're
mentally ill, does that stop you from perhaps
possessing other characteristics that a normal
person might possess?

A.  No, the mentally ill person, let's say
the seriously mentally ill person is able to
some extent to relate to the world and behave
appropriately and respond to people.  For
example, if you go in the unit right now you
might see a dozen or so of them sitting in the
tank eating their dinner and they look okay

eating their dinner.

Q.   I guess what I'm asking is, I'll just ask it pointblank, would it be possible for a person with some form of mental illness to malinger additionally?

A.   I guess it's possible theoretically. I've just never seen it.  I've never heard of that happening.

Q.   Do you understand my question?  Let's say in a hypothetical situation a person shows symptoms of paranoia, they know they're in trouble; however, because they're like normal people, they know maybe, for example, charged with a crime, and they know, I believe you said most people like that want to try to get out of it so perhaps they feign, and then they add symptoms not really realizing that they don't have to do that.

A.   Yeah, it's possible to kind of make up a story like that or a scenario like that, but the truth is, that when a person is genuinely seriously mentally ill, what is going on with them is so compelling, it is so disturbing, it is so powerful that they simply don't have the energy and focus to pull off something that's

totally not like themselves. These people are
self-preoccupied, they're self-absorbed. They
can hardly hold on to, you know, their own
behavior from one time to the next, let alone
manufacture and create a whole new set of
symptoms. That's why you really just don't see
anything like that.

Q. Now one thing, Doctor Brown, you said
that I made note of. You found in the two
interviews you had with Mr. Eldridge that he was
neatly groomed?

A. Yes, he was.

Q. You did not detect any odor coming
from him?

A. No, not a bit.

Q. That his hair was kempt, his hair or
facial hair was intact?

A. Yes.

Q. Okay. You did indicate that the first
visit that you had, I am sorry, second visit you
had with Mr. Eldridge lasted from approximately
five to ten minutes; is that correct?

A. Yes.

Q. So, to be save, and I could be wrong,
but in the second interview you really didn't

get anything specific out of it because he was
not very cooperative; is that correct?

     A.   What I noted in my report is not very
much.

     Q.   Right, but you did have the benefit of
the medical records from the treatment team?

     A.   Right.

     Q.   And based on I guess your previous
experiences with Mr. Eldridge and the treatment
team's experiences, that's basically all you had
to go on; right?

     A.   That's right, that's all I had.

     Q.   Now, you did say in that one interview
something you found tremendously revealing were
his words, were his responses and acknowledgment
to the word court?

     A.   Right.

     Q.   In the previous interview, he didn't
know what specific court words.  He basically
said he didn't know to everything?

     A.   Yeah, he didn't know why he was in
jail, he didn't know why he was there, he didn't
know what he was accused of doing.

     Q.   And you consider that revealing in the
second interview?

A.   Yes.

Q.   But isn't it true, Doctor Brown, that in the first interview you considered that as one of the -- the failure of Mr. Eldridge to cooperate and to say what court meant or what lawyer meant or what judge meant indicated to you that he was malingering?

A.   Yes.

Q.   So, if he had gone into the second interview and maintained that position, you still would have considered it malingering?

A.   Well, the first time I saw him I would expect him, as almost anyone, even one who is mentally ill, to be able to say something about his life and be aware of some aspects of his life in kind of a reasonable way.  In other words, just because you're mentally ill doesn't mean you forget who you are, where you are, why you are.

Q.   That's what you did at the second interview, but did you consider that revealing as to the first interview?

A.   First interview revealing he didn't say anything about court, because this is so prominent for these people.  In other words,

here they are in jail. That's the whole reason
that they're there at this moment, they're not
there voluntarily, so really takes some really
serious problems before a person loses contact
with reality so much they don't even know
they're in jail and that jail is related to a
court charge.

Q.    I understand that.

A.    Now, the second time he is seen, this
man has been in jail for at least a year, to my
knowledge, you see.

Q.    Uh-hum?

A.    And he is saying something at this
point about going to court.

Q.    Well, by your own testimony, you would
expect even a person with a very serious mental
illness to have some knowledge of that.

A.    That's right.

Q.    So that would not be consistent, that
would not be inconsistent?

A.    Well, I think it's inconsistent that
he still does not reveal enough knowledge about
court.  In other words, he knows he's going to
court but, then, that's all you get out of him,
you know; he is not willing to tell you anything

else about what why he is there or anything.
You see, after a year in jail, all he can say is
something about that he went to court.  It's too
little, it's still too little.

Q.  Okay.  The leg shaking.  Nervous
people don't shake their leg?

A.  Nervous people do shake their leg.

Q.  I mean--

A.  But it's not in a vigorous and
dramatic way that he was shaking it, number one;
number two, they do it consistently.

Q.  And his referring to them, don't let
them kill me, them could be anybody; is that
correct?

A.  Right.

Q.  And isn't it possible that could be a
symptom of paranoia?

A.  If that was all I saw in him, it could
be, that's right.  Paranoias are afraid of being
killed sometimes.

Q.  So, basically, by your testimony, the
problem with diagnosing or concluding that Mr.
Eldridge is anything but a malingerer is the
fact, that although he may possess certain
symptoms for certain appropriate mental

illnesses, there are other things present which make it, in your opinion, inappropriate; is that correct?

A. Right.

Q. Also something that you said, Doctor Brown, you indicated that he didn't want to go back into the unit.

A. Right.

Q. That you found that unusual because most people don't want, at least, I guess with respect to paranoias, or any type -- was it specific mental illness?

A. Usually could be paranoias, could be other reasons.

Q. They don't like the people that they are not familiar with?

A. Right.

Q. Well, could it have been that he didn't want to go back into the room? You don't know what's going on in his mind; do you?

A. Well, I don't know what's going on in his mind. You know, again, I have a reasonable estimate about what is going on in his mind; but, of course, I don't really factually know what's going on in his mind.

Q. Your science is based on opinions of groups of studies done in the past. That's basically what it is; isn't that correct?

A. Well, even more succinctly, I think it's basically made on probabilities.

Q. And I wonder when do you think was the first diagnosis of paranoia made?

A. In the world you mean?

Q. Yes, in the world. How long ago?

A. Oh, gosh. Probably in the late 1800's.

Q. Does that suggest there weren't any paranoias before then?

A. Oh, no. No. The McNaughton rule itself took place in 1842, so there was awareness of mental illness at that time.

Q. So the problem is a psychiatrist or psychologist from 1842 would not have had the benefit of the studies made with respect to the paranoia that was established in the late 1800's?

A. Right. For example, again McNaughton was that the insane person at that time, they didn't call him paranoid in those days, they called him mentally ill or something like that,

but they didn't have that diagnosis at that
time.

Q. I guess what I'm saying, Doctor Brown,
you may consider it bizarre, but twenty-five or
fifty years from now if a Doctor Jones is able
to discern a certain type of mental illness and
Gerald Eldridge fits it like a glove, I guess
the sad thing about it is fifty years will have
passed and history would have already been made;
isn't that correct?

A. Well, in fifty years we may have some
scientific diagnosis that shows that, but I
really doubt it.

Q. Okay.

MS. CRAWFORD: I'll pass the witness,
Your Honor.

449

BY MS. ALCALA:

Q.   I missed your words, your last sentence.  What was your last sentence?

A.   I said that may happen in fifty years, there may be a diagnostic category that somehow combines all this large group of symptoms that we're seeing with Mr. Eldridge into one comprehensive single diagnosis, but I really doubt it.

Q.   Okay.  I just couldn't hear the words.  I don't have any further questions.

MS. CRAWFORD:  No more, Your Honor.

THE COURT:  May Doctor Brown be excused?

MS. CRAWFORD:  Yes, sir.

MS. ALCALA:  Yes, sir.

THE COURT:  Members of the jury, let's take a short recess.  If you will, please, step back into the jury room.  Let's take about a five minute break.

(State's Exhibit 9 marked for identification).

(Recess; after which, the jury enters the courtroom).

1          THE COURT:  You may call your next

2 witness.

3          MS. ALCALA:  Officer Adams.

4          THE COURT:  Deputy, raise your right

5 hand.

6                    A. R. ALLEN

7 was called as a witness by the State and, having

8 been duly sworn, testified as follows:

9                 DIRECT EXAMINATION

10 BY MS. ALCALA:

11      Q.   Can you, please, state your name?

12      A.   Deputy Angela Allen.

13      Q.   I'm sorry, I said Adams.  Where do you

14 work?

15      A.   I work commissary at 1301 Franklin,

16 the jail.

17      Q.   You are a deputy with the sheriff's

18 department?

19      A.   Yes.

20      Q.   What's a commissary?

21      A.   Commissary is a place where the

22 inmates can order, purchase items that they

23 can't get any other way.  We sell them things

24 like hygiene products, legal products, excess

25 food, junk food, cookies, things like that.

Q. You're a convenience store for the jail?

A. Kroger's.

Q. Okay. How do they pay for what they're getting from you?

A. They have what we call an inmate trust fund. They have to go through the bank, someone has to send them money by money order or bring it personally to the jail and put it onto what they call their books, which is their trust fund. That's how they purchase things is through their trust fund. They have, let's see, people put the money in, then they make an order, whoever can take it out for buying things, like commissary is allowed to take money out for their orders, medical department is allowed to take them out for their expenses and so on.

Q. How do you know who in fact is the person getting the items?

A. Okay, our system is, when they order, they have an order form they fill out, they put their name, spin number and they sign it. At this point, we fill the order through the computer, we take it up to their tank, their

location where they're housed, we ask for the
right thumb print and signature, and we check
their arm band to make sure that the spin number
on their paper matches the number on their arm
band.

Q.    I asked you to bring me some records
regarding an inmate by the name of Gerald
Eldridge; is that right?

A.    Yes.

Q.    I'll hand you what has been marked as
State's Exhibit No. 9.  Do you recognize those
documents?

A.    Yes, ma'am, I do.

Q.    Okay, are you the custodian of records
for those documents?

A.    Yes, ma'am, I am.

Q.    What are the documents just by title?

A.    These are, well, they're called the,
they're order forms.  Once they have been filled
out and entered into the computer, that's what
it looks like.  They're order forms.

Q.    Are those all of the records that the
commissary department has in regards to Gerald
Eldridge?

A.    Yes, ma'am, it is.

1     Q.    Is State's Exhibit No. 9 records that
2   are made in the regular course of business?
3     A.    Yes, they are.
4     Q.    Is State's Exhibit No. 9 records that
5   are kept in the regular course of business?
6     A.    Yes, they are.
7     Q.    And is that record, the entries in the
8   records, are they made at or near the time that
9   the records are made?
10    A.    Yes, they are.
11    Q.    And is State's Exhibit No. 9, the
12  entries made by or from people with knowledge of
13  the contents that they're putting in the
14  records?
15    A.    Yes, they are.
16    Q.    You're actually the custodian of those
17  records?
18    A.    These records, yes, I am.
19    Q.    Are you actually the person that
20  xeroxed those originals?
21    A.    I am.
22    Q.    Made copies?
23    A.    I am.
24    Q.    You remember that?
25    A.    I remember that.