# United States District Court
# Southern District of Texas

Case Number: __OSCV1847__

## ATTACHMENT

Description:

☐ State Court Record     ☑ State Court Record Continued

☐ Administrative Record

☑ Document continued - Part __10__ of _____

☐ Exhibit to: _____
         number(s) / letter(s) _____

Other: _____

_____

_____

1    Q.    Okay.

2          MS. ALCALA:    I'm going to tender to

3    Defense Counsel what I've previously showed them

4    an exhibit marked -- these are all of the

5    records.

6          Q.    Did you flip through them?

7          A.    Yes.

8          Q.    I'll staple them so we can keep them

9    together.    I think you gave them to me paper

10   clipped; right?

11         A.    Yes.

12         MS. ALCALA:    I'm going to tender to

13   Defense Counsel State's Exhibit No. 9, offer it

14   into evidence.    That would also be with the same

15   understanding as the other records, court's

16   previous ruling.

17         THE COURT:    Right.

18         MR. HILL:    No objection.

19         THE COURT:    Be admitted.

20   BY MS. ALCALA:

21         Q.    When did his money run out?

22         A.    His last purchase was January 31st.

23         Q.    Of 199--?

24         A.    1994.

25         Q.    So he hasn't bought anything since

January, 1994?

    A.   Our records show he has not bought anything.

    Q.   What is his current balance as of January 31, 1994?

    A.   Negative five dollars and seventy-six cents.

    Q.   So he doesn't have any money to buy anything?

    A.   He does not.

    MS. ALCALA:  I'll pass the witness.


CROSS EXAMINATION

BY MR. HILL:

    Q.   Is that negative of five dollars and seventy-five cents, or whatever it was, mean that he owes money to his commissary account?

    A.   He owes money to someone in the system.  It does not mean necessarily commissary.  If he does not have any money, we don't give him anything.

    Q.   Who could he owe the money to in the system if not to the commissary account?

    A.   To the medical department.

    Q.   Because people that are held in the

medical wing are required under the Harris

County sheriff's department rules to pay for

their own medication; correct?

    A.   Yes, they are.  To my knowledge, they

are.

    Q.   So if a person needs medication and

they're in the Harris County jail they have to

pay for it themselves out of their commissary

account?

    A.   This is an inmate trust fund.

    Q.   I am sorry.  They have to pay for it

out of their inmate trust fund?

    A.   Yes, they do.

    Q.   How often can they access their inmate

trust fund?  Are there special days of the week

where they can make requisitions or requests?

    A.   As far as commissary, there are.  They

can make one purchase a week.

    Q.   What about other needs that the person

has that while they're confined in the jail,

such as medical prescriptions?

    A.   I can't testify to that.  I mean, I

don't work for the medical department.

    Q.   Would the request for a debit to the

inmate's trust account be made through your

office?

     A.    No, they would not.   Would be made
through the bank.

     Q.    And the bank is physically located
somewhere within the jail?

     A.    Yes, sir.

     Q.    It's a computer terminal that tracks
it?

     A.    Yes.

     Q.    I am sorry, I didn't mean to
interrupt.   Go ahead and complete your answer.

     A.    They have different locations in the
jail.   Each jail has its own banking locations.

     Q.    Okay.   Now the records that have been
introduced into evidence in this case are
actually the computer generated records that
summarize the transactions; correct?

     A.    Summarize the transactions through
commissary.

     Q.    Right.   Actually there is like a
written slip of paper that a person has to fill
out before that particular document is
generated?

     A.    Yes, there is.

     Q.    What happens to those pieces of paper

1   after they're turned into the bank or to the

2   commissary person?

3       A.   The written pieces of paper that are

4   the actual order form?

5       Q.   Yes, ma'am.

6       A.   Is destroyed after certain amount of

7   time.

8       Q.   Okay.  Is that order form prepared in

9   the person's own handwriting, or could somebody

10  else make an order as long as the inmate signs

11  your particular form when they come to receive

12  the items?

13      A.   I suppose they could.  I can't say

14  that they do because I haven't actually

15  witnessed them do it.

16      Q.   Okay.  Now, are you actually the

17  individual in the jail that an inmate would come

18  to to, let's say, purchase an item?  We kind of

19  characterized it as convenient store.  Are you

20  the clerk of the convenience store?

21      A.   If I may explain how it works.

22      Q.   Right, please do.

23      A.   We send out two forms.  We send out a

24  price sheet of everything we have in the

25  commissary that gives an item number, a price

and a description of each item that we sell.
They are supplied with that, they are supplied
with an order form. On that order form, they
have to write the price of the item number, the
quantity, the description and the price of the
item, and I have to have that all added up by
their quantities, has to be in order as they see
it on their order form.

Q. Okay. And then that person brings it
to some store?

A. Then that person turns that form in to
a deputy, and we pick them up from the floors
the night before the order is suppose to be
filled. They fill these the night before.

Q. So the only time the actual individual
receiving the items depicted on State's Exhibit
No. 9 would appear in front of somebody is when
they're signing this original of that document
which is computer generated like a sales slip or
receipt; right?

A. That is true. They have to sign, they
have to show us their spin number, sign it,
print it.

Q. Now, who is it that is actually taking
the cup, a can of coke -- I don't know if you

1   have soda or anything like that?

2        A.   I understand.

3        Q.   But if this item were something that

4   the person was purchasing through their

5   commissary account, who would actually be the

6   person that makes the delivery of that item to

7   an inmate, another inmate or somebody on the

8   sheriff's staff?

9        A.   A deputy.   Somebody on the sheriff's

10  department staff.

11       Q.   Okay.   Not necessarily a uniformed

12  officer like you, you have people that wear

13  white shirts?

14       A.   That's correct.

15       Q.   Not the same type of sheriff's

16  department employee as you are; correct?

17       A.   Correct.

18       Q.   Are individuals that are mentally ill

19  or otherwise suffering from any kind of

20  psychiatric or psychological disorder denied

21  commissary?

22       A.   No, they're not.   There are certain

23  items that they can't have.

24       Q.   And essentially the list of items is

25  prepared by the sheriff's department.   There is

only so many items that an inmate can choose
from in the store, basically?

    A.   Correct.

    Q.   And, if they have sufficient funds in
their account to purchase those items, they're
allowed to do so?

    A.   They are, up to a certain limit.  We
have limits.

    Q.   What are the limits?

    A.   We have sixty-five dollar limit or
fourteen -- they have fourteen lines on their
order form.  They can order up to fourteen
lines, not over sixty-five dollars.

    Q.   So somebody could order twelve of one
thing on one line?

    A.   Right.  That's correct.

    Q.   Okay.

    MR. HILL:  Thank you.  I have no
further questions.

    MS. ALCALA:  No questions.

    THE COURT:  May she be excused?

    Thank you, deputy.  You're free to go.

    (State's Exhibit 10, State's Exhibit
11 marked for identification).

LUIS PENA

was called as a witness by the State and, having

been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. ALCALA:

Q.   Can you, please, tell me your name?

A.   My name is Luis Pena.

Q.   How do you spell your first name?

A.   L-u-i-s.

Q.   Pena, P-e-n-a?

A.   Yes.

Q.   Where do you work?

A.   I work at the Harris County jail.

Q.   What do you do there?

A.   I'm a psychologist for the Mental

Health, Mental Retardation Authority.

Q.   You are very soft-spoken.  It's going

to be hard for us to hear each other.

A.   Okay.

Q.   I'm sorry, where do you work?

A.   I work at the Harris County jail.

Q.   What do you do there?

A.   I am a psychologist for the Mental

Health Mental Retardation Authority.

Q.   So do you work for the jail or for the

MHMRA?

A. I work for MHMRA.

Q. Just so happens you are physically located at the jail?

A. That's my duty is to be there at the jail with the inmates.

Q. Tell me a little bit about your educational background, high school, college, education.

A. Went to Scarborough Senior High School, graduated from there, proceeded to attend the University of St. Thomas. I received my B.A. in psychology, then went to the University of Houston, received my master's in clinical psychology.

Q. And do you have any other background, I am sorry, you have a degree in psychology?

A. That's correct.

Q. From the University of St. Thomas?

A. Yes. My B.A.

Q. When did you get that?

A. I received it in 1985.

Q. I'm sorry, I really am having a hard time hearing you.

A. In 1985.

1      Q.    Since 1985, after you graduated from
2    school, where have you been working?
3      A.    I worked for four years at the West
4    Oaks psychiatric hospital, which is a private
5    psychiatric hospital.  I was counselor there.
6    Then I did a lot of contract work for different
7    psychologists.  Then, after I received my
8    master's degree, I became program director for
9    residential facility for mentally ill.  Did that
10   year and a half.  Then I started working for the
11   jail.
12     Q.    What kind of work did you do for that
13   private psychology clinic?
14     A.    I did group therapy and individual
15   therapy, under supervision.
16     Q.    Was it any particularized type of
17   therapy?
18     A.    This was reality based therapy.
19     Q.    You had different patients there?
20     A.    Yes, that's correct.
21     Q.    Did you do any internships?
22     A.    Yes, ma'am.
23     Q.    What kind of internship background do
24   you have?
25     A.    I did a year internship at the

1      Expressive Therapy Center working with all age
2      groups, children, adolescents, adults, married
3      couples, with different diagnoses, different
4      problems.
5           Q.    All right.  How long have you worked
6      for MHMRA?
7           A.    It will be two years in June.
8           Q.    And what kind of work do you do for
9      MHMRA?
10          A.    I do psychological assessments,
11     psychological assessments that lead to
12     diagnostic impressions, assisting a treatment
13     team, individual therapy, group therapy, crises
14     intervention.
15          Q.    Is it possible to move the microphone
16     at all?
17          A.    Okay.
18          Q.    I really am having a lot of trouble
19     hearing.
20                Has your full two years been at the
21     jail with MHMRA?
22          A.    Yes, it will be two years in June.
23          Q.    What do you do with MHMRA?  What's
24     your title, counselor, psychologist?
25          A.    Psychologist.

1    Q.    What do you do as a psychologist who
2    is assigned to the jail?
3        A.    I work on a treatment team; and when
4    people come down, they're assessed to see if
5    they are in need of psychiatric services.    If a
6    certain inmate is assigned to the team that I am
7    on, I interview the inmate on a weekly basis,
8    speak with them, have a one-to-one session with
9    them on a weekly basis.    I do group therapy with
10   other inmates that are in the psychiatric
11   program there.    I do psychological assessments,
12   administer assessments, do interpretation and
13   try to come up with a diagnostic impression to
14   assist the treatment team so we can better meet
15   the needs of the inmate.
16       Q.    What do you mean by team?    First, how
17   many teams are there?
18       A.    There are two teams.
19       Q.    Okay.    And who would be on a team?
20       A.    There is a psychiatrist on a team.    On
21   my team, there are two psychologists because we
22   have a bigger team.    Then there are three
23   caseworkers, an RN, two RN's.
24       Q.    Okay.    And by team, what does that
25   mean?    You talk about a person or a case or

what?

    A.   Yes.  We meet every Friday, and at this time we assess all the consumers or inmates that were assigned to our team, then we discuss them briefly, see how they're doing, what's going on with them.  If someone is in need of special treatment for that day, we bring them in, speak with them, talk with them, we make treatment team decisions, whether somebody should be, you know, moved around to a different cell, whether their medication might need to be increased, whether certain type of therapeutic intervention might work.  We also decide whether somebody, you know, might need special services somehow.

    Q.   Okay.  Do you know somebody by the name of Gerald Eldridge?

    A.   Yes, ma'am.

    Q.   Have you ever diagnosed people before?

    A.   Yes, I have given diagnostic impressions, yes.

    Q.   Is that what it's called, diagnostic impressions?

    A.   Yes.

1     Q.   How many different times have you
2 given a diagnostic impression?
3     A.   Hundreds of times.  I don't know how
4 many.  I wouldn't be able to say, but it has
5 been in the hundreds.
6     Q.   Was there a  time in your background
7 that that's all you did?
8     A.   Yes.
9     Q.   Tell me about that.
10     A.   When I initially started working for
11 the team, I worked for the screening team, and I
12 interviewed inmates that would be referred to
13 the psychiatric floor, and I would have to meet
14 with them and speak with them and do a mental
15 health status on them and decide whether they
16 were in need of psychiatric services.  I would
17 have to give them a diagnostic impression of
18 what I thought might be going on with them.  So,
19 that's what I did.
20     Q.   So how long did you do that?
21     A.   Did that for five to six months, maybe.
22     Q.   Okay.  So, for those five to six
23 months, if somebody was going to get admitted,
24 so to speak, into your jail MHMRA unit?
25     A.   Right.

1     Q.   They would have to go through you?

2     A.   Yes.

3     Q.   Then you would have to decide whether

4 they have mental illness or whether there is

5 nothing wrong with them?

6     A.   Well, when I was on screening, that's

7 all I did, I just made that decision to refer

8 them for further treatment. That's all I did.

9 I saw people all day, that's what I did.

10     Q.   Those were inmates that you were seeing?

11     A.   Yes, ma'am.

12     Q.   Were there some inmates that you

13 admitted into the psychiatric unit?

14     A.   There were inmates that I referred to

15 be admitted to the psychiatric unit, yes.

16     Q.   Were there some inmates that you made

17 the decision that did not need to be admitted

18 into the psychiatric unit?

19     A.   Yes, ma'am.

20     Q.   So you've done both decisions?

21     A.   Yes, ma'am.

22     Q.   All right. When did you first, just

23 so we can get a time period, when was the first

24 time that Mr. Gerald Eldridge became known to

25 you, the date?

A.    I'd have to look at my notes.

Q.    Okay, that's fine.  I know we're talking about a long time.

A.    January the 7th, 1993.

Q.    Okay.  And when was the last time that you saw Mr. Eldridge?

A.    January the 10th, 1994.

Q.    Okay.  So you've known him almost exactly a year?

A.    Yes, ma'am.

Q.    You had contact with him almost exactly a year, on again, off again?

A.    Yes, ma'am.

Q.    Prior to your coming in this room today, I asked you to look at a chart to see if that chart fairly and accurately summarized some of your visits with Mr. Eldridge.

A.    Yes, ma'am.

Q.    Did you look at those exhibits?

A.    Yes, ma'am.

Q.    Were they fair and accurate to document some of your visits with Mr. Eldridge?

A.    Yes, ma'am.

Q.    Let me show you what I've marked as State's Exhibits Nos. 10 and 11.  Are these the

sheets that you reviewed?

A.   Yes, ma'am.

Q.   Okay.   Are these sheets fair and accurate as a summary of your involvement with Mr. Eldridge from October the 7th of 1993 up until January the 10th of 1994?

A.   Yes, ma'am.

Q.   Okay?

MS. ALCALA:   At this time, I'd like to tender to Defense Counsel State's Exhibits Nos. 10 and 11.   Offer them into evidence.

MR. HILL:   Judge, may I take the witness on voir dire for a moment?

THE COURT:   Yes, sir.


VOIR DIRE EXAMINATION

BY MR. HILL:

Q.   Mr. Pena, my name is Wayne Hill.   I represent Gerald Eldridge.   I attempted to speak with you in the hallway earlier this afternoon?

A.   That's correct.

MS. ALCALA:   I object to the relevance.   It's outside the scope of this hearing.

THE COURT:   Overruled.

BY MR. HILL:

1      Q.   I attempted to speak with you this
2  afternoon about 3:15; correct?
3      A.   Yes, sir.
4      Q.   At that time you told me you wouldn't
5  speak to me unless this lady gave permission; is
6  that correct?
7      A.   No, sir.
8      Q.   You're telling me, that when I asked
9  you and I advised you that I was the attorney
10 for Gerald Eldridge, that I would like to speak
11 to you regarding your treatment of him?
12     A.   That's correct.
13     Q.   You did not indicate, that in the
14 absence of her consent, that you would not speak
15 to me?
16     A.   No, sir.
17          MS. ALCALA:   I object on the grounds
18 this is cross-examination, which he is entitled
19 to do at some point, but it's not voir dire.
20          THE COURT:   Sustained.
21 BY MR. HILL:
22     Q.   Are you familiar with the ethical
23 rules of the Texas Board of Examiners for
24 psychologists?
25          MS. ALCALA:   Judge, I object again on

473

the same grounds.   He is trying to cross examine
this witness.

          MR. HILL:   Goes to his qualifications
to testify.

          THE COURT:   I understand.   You have
voir dire.   Let's save this for cross
examination.

          MR. HILL:   What I am asking if he's
familiar with the board's rules about
psychological associates testifying in court.

          THE COURT:   What does that have to do
with relevancy of this document?

          MR. HILL:   If they're going to try to
offer his summary of his meetings, board rules
prohibits psychological associate testifying,
when a psychologist could come in and testify.
I'd like to see if he is familiar with that, if
in fact he is a psychological associate as
opposed to a psychologist.

          THE COURT:   Members of the jury, will
you, please, step back into the jury room.

          (Jury removed from the courtroom, and
the following proceedings  continued)

BY MR. HILL:

          Q.   Sir, you're a master's level

1    psychologist?

2         A.    Yes, sir.

3         Q.    You have a certificate from State of

4    Texas from the State Board of Psychologists

5    Examiners?

6         A.    No, sir, I do not.

7         Q.    Are you exempt from that statute?

8         A.    Yes, sir, I am.

9         Q.    And are you allowed to hold yourself

10   out as a psychologist?

11        A.    Yes, sir, I am.

12        Q.    Do you have private practice license?

13        A.    Not as a psychologist, no.

14        Q.    How does your ability to practice as a

15   psychologist differ from somebody that is a

16   Ph.D. psychologist?

17        A.    It differs in that there are some

18   agencies that are exempt.  State agencies, some

19   city agencies, school directs, nonprofit

20   organizations are exempt.  MHMRA is an exempt

21   agency.

22        Q.    Are you as qualified as a Ph.D. to

23   offer testimony in court?  In your opinion, are

24   you as qualified as a Ph.D. psychologist?

25        A.    Do I think I am as qualified to

testify in court for what?

    Q.   Regarding any particular case that you've been a member of the treatment team.

    A.   Yes, sir, if that's the case, I am.

    Q.   Okay.

    MR. HILL:  No further questions.

    THE COURT:  All right.  Ready for the jury.

    MS. ALCALA:  Is there an objection to the document or not?  Because I'd like to put it up.

    THE COURT:  Hold on a minute, Frank.

    Any objection?

    MS. CRAWFORD:  We haven't got to look at it yet.

    MR. HILL:  May I ask him a couple of questions with regard to the document?

    THE COURT:  Yes, sir.

BY MR. HILL:

    Q.   Mr. Pena, is there another page?  Your summary here seems to pick up in October 7th of '93.  You indicated that you had met with Mr. Eldridge back on January 7th of '93.

    A.   Yes, sir, that's when he was first admitted to the psychiatric hospital.

1        Q.    Well, is part of this summary
2    missing?  It picks up on October 7th of '93,
3    nine months later.
4        A.    Those notes are from his last
5    admission.
6        Q.    So are there any notes from his
7    admission in January?
8        A.    That I have, yes.
9        MS. ALCALA:  You got them all there.
10   If you want to give me ten minutes, I'll write
11   January, too.  It will hurt you more, but if you
12   want it, I'll be glad to do it.
13       MS. CRAWFORD:  We just want to see
14   them.
15       MR. HILL:  Depends on whether you want
16   to offer it.
17       MS. ALCALA:  I'll do it if you want to
18   give me ten minutes.
19       MS. CRAWFORD:  We just want to see
20   them, Elsa.
21       MS. ALCALA:  All right.  He has got
22   them.  In fact, I'll put the dates up there.
23   Let me get them.
24           (Off the record).
25       MS. ALCALA:  Are State's Exhibits 10

477

and 11 admitted?

MR. HILL: No, Your Honor.

THE COURT: They'll be admitted.

(The jury enters the courtroom)

DIRECT EXAMINATION

(Continued)

BY MS. ALCALA:

Q. Sir, what I want to do is go through your different visits with Mr. Eldridge and ask you what it is that you observed when you would see Mr. Eldridge. Where did these visits take place?

A. Most of them took place in the dorm.

Q. And you would go to him or he would come to you?

A. I would go to him.

Q. Were there other people around when you would visit him?

A. Yes, ma'am, sometimes there were.

Q. Who else would be around?

A. The other inmates and other staff members.

Q. Okay. I want to first talk to you -- I think you said that the first time you saw him was on January the 7th of 1993. Did you take

notes of your visits with Mr. Eldridge?

A.    Sometimes I did.

Q.    What is the purpose in making notes about the visits?

A.    Just to remember if a specific thing that I thought was important to his, you know, his diagnosis as well as us being able to, you know, provide services to him.

Q.    Can you pull the microphone up?  I know I keep bugging you about it, but I'm really having a lot of trouble hearing.

A.    All right.

Q.    Just to clear up something about your licensing.  You never testified that you were licensed; is that right?

A.    That's correct.

Q.    Okay.  Are you licensed?

A.    No, ma'am.

Q.    What do you have to do to get licensed?

A.    Well, to be licensed, you have to have a Ph.D. to be licensed as a psychologist, but MHMRA is an exempt agency.

Q.    So, if you work for MHMRA, you don't have to be a Ph.D.?

1       A.   That's correct.

2       Q.   To do your particular job?

3       A.   That's correct.

4       Q.   Like other people do, to do their

5 particular job?

6       A.   If you want to do contract work with

7 them, basically.  That's basically private

8 practice.

9       Q.   Like Doctor Silverman and Doctor Brown?

10      A.   That's correct.

11      Q.   Are you going to work on your Ph.D.?

12      A.   I haven't decided on that yet.

13      Q.   So you haven't made that decision yet?

14      A.   That's correct.

15      Q.   Do you feel that you're qualified to

16 do your job?

17      A.   Yes, ma'am.

18      Q.   And does your job description require

19 that you be licensed?

20      A.   No, ma'am.

21      Q.   What is your job description?

22      A.   That I provide diagnostic assessment

23 and provide diagnostic impressions for a

24 treatment team to do individual therapy, group

25 therapy and crisis intervention.

Q. During the course of this year -- I think you talked about a team. Were there psychologists besides yourself assigned to the team?

A. At the time, the first two times that Gerald was on the unit, I was the only psychologist for that team. When he was there the third time, there was another psychologist, the latter part of that time.

Q. What about psychiatrists?

A. Well, one psychiatrist.

Q. The whole year, there was one psychiatrist?

A. Oh, no, no, ma'am. Not that worked with Gerald.

Q. Would be one psychiatrist but different people at different courses of time?

A. That's correct.

Q. Let me talk to you first about January the 27th of 1993. What was noteworthy about that particular visit?

A. That he presented himself to be paranoid, when earlier the staff members that were there had shared with me that he did not appear that way earlier when they had spoken to

1  him. Only when I came in and the psychiatrist

2  and rest of the treatment team. But the

3  residential specialties like the guards

4  basically and the nurses had shared with me

5  that's not what they observed with him earlier.

6      Q.   How was he acting paranoid with you?

7      A.   He was looking around, he wasn't

8  saying he was paranoid, just basically looking

9  around, he didn't want to come out of his cell,

10  his dorm, he was saying, you know, well,

11  actually he wasn't saying anything, just looking

12  around. That's how he looked to be paranoid.

13      Q.   What about on January 8th of 1993?

14      A.   There was no presentation of that

15  behavior at all.

16      Q.   So he was paranoid on the 7th but not

17  paranoid on the 8th?

18      A.   That's correct.

19      Q.   Behavior wise?

20      A.   That's correct.

21      Q.   Did you notice anything about his

22  speech on the 7th that might have been different

23  from before?

24      A.   Yes, that he was stuttering on the

25  7th. There were days that he would stutter,

days he would not stutter.

Q. So he was inconsistent with his stuttering?

A. That's correct.

Q. On January 8th of 1993, how did you describe his behavior that day?

A. That he wasn't presenting the paranoid behavior. He was able to come out in the atrium despite that there were other inmates and other staff people in the atrium at the time, without any problems, he came out.

Q. Any other observations that you made about his behavior on the 8th of January?

A. That he became very tearful.

Q. I am sorry, pull the microphone up.

A. He became very tearful.

Q. Okay. Did the tears seem to be genuine or fake?

A. They appeared --

Q. Or could you tell?

A. At that time, I was still questioning. I really couldn't tell. I suspected that, I had suspicion, I didn't know if maybe it was psychosis or exaggerated symptoms.

483

Q. When was the next time that you saw him?

A. Next time I saw him was on January the 11th, 1993.

Q. What observations did you make at that time?

A. There was no stuttering. His only complaints were of having a headache, having stomach problems. There was no, you know, he was cooperative, no management problem. He also said that he speaks to his son and sees his son. He speaks and sees him. Sees him.

Q. Then was the next time you saw him on January 13th of 1993?

A. That's correct.

Q. And what happened at that visit?

A. I attempted to administer a psychological assessment to him.

Q. Okay. First are you trained to give psychological assessments?

A. Yes, ma'am.

Q. Tell me about your background and training in giving psychological assessments.

A. My training came from when I was at school, the University of Houston, and I

administered these tests to students, to
children, to people that volunteered to take
them. I had a professor who I was under her
supervision to do this. She basically was my
person who trained me.

Q. And she actually observed you giving
the tests?

A. Yes, ma'am. Sometimes she didn't.
Sometimes, not all the time, but sometimes she
was.

Q. Did you perform satisfactorily in her
eyes in giving your tests?

A. Yes.

Q. Did she grade you in your ability to
administer these tests to people?

A. Yes.

Q. What was the first test you tried to
give Mr. Eldridge?

A. The M.M.P.I. II.

Q. What is that?

A. It's Minnesota Multiphasic Personaltiy
Inventory, second edition.

Q. A second edition; okay.

A. It's an assessment containing five
hundred seventy items. They're statements that

pertain to an individual, help diagnostician provide services to them, tells them about what type of symptoms, what type of problems, what type of disorders somebody might have.

Q. Why were you trying to give him this test?

A. Because the treatment team wanted to know what was wrong with him, what was going on with him.

Q. At that point, did you have an idea in your mind about what was wrong with him?

A. It was still questionable. There was still, you know, it was between maybe a psychotic disorder and malingering.

Q. So you weren't sure at that point?

A. Weren't sure at that point.

Q. And how is it that a test could help you get sure?

A. Well, this particular assessment tells us whether somebody is experiencing psychotic symptoms, depression, anxiety. Also lets us know whether this might be exaggerating their symptoms.

Q. What happened when you tried to give him the test?

A. When I tried to give him the test, he
he said he couldn't read.

Q. Can you give that test to somebody
that cannot read?

A. No, ma'am.

Q. Did you take him at face value when he
said that he could not read?

A. I was suspicious.

Q. Why were you suspicious?

A. Because, when I had spoken with him in
the past, his thought processes were clear,
organized. He didn't give me the impression
that he was somebody who might not be
functioning at a level that where they can take
this assessment. This assessment is given at
eighth grade level.

Q. So, seems bright enough to be at an
eighth grade level?

A. Yes, ma'am.

Q. So did you try something else when he
told you he could not read?

A. Yes.

Q. What did you do?

A. I tried the Bender-Gestalt, which is
an assessment to rule out whether somebody has

an organic disorder, which is something that
comes, you know, from a car accident or
basically head injuries, car accidents. And
it's a visual test that they just draw circles
or lines, and, you know, you can tell whether
somebody has a disorder that was caused from an
external force just by their coordination. And
it doesn't require any reading, just requires
somebody being able to see and draw the items.
He completed the first item, then he said that
he needed his glasses, that he couldn't
continue. And he completed that first item on
the second attempt without any distortion all.

    Q.    First, are you trained to give that
test?

    A.    Yes, ma'am.

    Q.    And is it the same type of training
that you got to do the M.M.P.I.?

    A.    Yes, ma'am.

    Q.    Secondly, you said that he actually
did the first what is it a figure of that test?

    A.    Yes, ma'am.

    Q.    All right. And he could see well
enough to do that?

    A.    Yes, ma'am.

1    Q.    But then, when you tried to give him

2    the second figure, he couldn't see?

3    A.    He said he needed his glasses.

4    Q.    So then what did you do?

5    A.    So I attempted to administer an oral

6    assessment, which he doesn't need to know how to

7    read, doesn't need to have good eyesight, just

8    needs to answer yes or no.

9    Q.    So what happened?

10   A.    He became -- just said he couldn't

11   answer, that he needed to talk to his brother

12   Barry, that Barry knew all the good answers,

13   that he could not give me a direct yes or no to

14   my questions.

15   Q.    At that point, what did you do?

16   A.    At that point, I couldn't go further

17   as far as assessing him, as far as trying to

18   administer him some type of psychological

19   assessment.

20   Q.    So you didn't complete any of the test

21   on him?

22   A.    That's correct.

23   Q.    Was the next time you saw him was

24   January 14th of 1993?  No, actually, was he

25   discharged on January 14th, 1993, from the

psychiatric unit?

A. Yes, he was.

Q. So you did not see him that day?

A. That's correct.

Q. Okay. Do you know when he was admitted into the psychiatric unit?

A. This particular time?

Q. Right.

A. Was January, well, I saw him on the 7th, so it was either on the 7th or shortly before that.

Q. Maybe the evening of the 6th?

A. The evening or two days at the most before.

Q. So he was in there from the 7th of January to the 14th of January?

A. That's correct.

Q. He was discharged?

A. That's correct.

Q. Do you know what diagnosis he was discharged with?

A. I believe it was malingering.

Q. Okay. When was the next time that you saw Mr. Eldridge?

A. On February the 26th, 1993.

1      Q.    All right.  Was that a re-admission
2  into the psychiatric unit?
3      A.    Yes, it was.
4      Q.    Do you know the date of that admission
5  into the psychiatric unit?
6      A.    No.  No.
7      Q.    Okay.  Do you want to look at the
8  records to see if it was shortly--
9      A.    I know it was shortly before I saw
10 him.  Can I see the records?  Well, actually it
11 might be here.
12     Q.    Just go through it, see if you can see
13 it.
14     A.    I'm looking for the physician's
15 admission note.
16     Q.    If you can't find it, that's all
17 right.
18     A.    No.
19     Q.    Takes too much time to look through
20 it, okay.  We'll not worry about it.  All
21 right.  But you saw him February 26th, 1993?
22     A.    That's correct.
23     Q.    Is it the same team?  Like if they got
24 discharged, then re-admitted, would he go back
25 to you?

1      A.   Yes.

2      Q.   Or would he go to another team?

3      A.   He would go back to the team that he

4  left when he went to the general population.

5      Q.   So, if you saw him on the 26th, you

6  would have been the person to see him?

7      A.   That's correct.  Yeah.

8      Q.   Okay.  What happened on the 26th?

9  What did you notice?

10     A.   He was very vague, he didn't give

11 clear, direct answers, stutter-like speech, and,

12 again, the residential specialists reported

13 there was no management problem at that time.

14 And earlier, before that, he was moved back to a

15 certain tank because of a physical altercation

16 with another consumer.

17     Q.   Consumer is another word for inmate?

18     A.   Yes.

19     Q.   Or patient, I guess, to you?

20     A.   Yes.

21     Q.   When was the next time that you saw

22 him?

23     A.   On March the 2nd, 1993.

24     Q.   What happened at that time?

25     A.   He was very clear, his thought

processes were organized, they were goal
directed, he was able to share with me some of
his childhood experiences, and I was able to
complete his case formulation basic.

Q. What do you mean complete case
formulation?

A. Basic social history, I was able to do
that. He was cooperative, his thoughts were
very clear. I was able to do that.

Q. And then when was the next time that
you saw him?

A. Next time I saw him was October the
6th of 1993.

Q. And what happened at that time?

A. I'm sorry, October 7th.

Q. Okay, I am sorry, we just jumped.

A. He was discharged again to the general
population, remained in general population until
October.

Q. So he went in about February the 26th?

A. That's correct.

Q. He was discharged March the third,
1993?

A. Yes. Somewhere along in there.

Q. About a week, I guess. A little less

than a week?

    A.    That's correct.

    Q.    Do you know what diagnosis he was
discharged with?

    A.    Malingering.

    Q.    So now he has been discharged twice
with malingering from the psychiatric unit.
When he is discharged from that unit, do you
yourself make that decision?

    A.    No, it's a decision of the treatment
team, the psychiatrists, myself, the
caseworkers, the R.N.'s and the residential
specialists.

    Q.    So, back on the first discharge, do
you know what other people were on the team at
that time?

    A.    Yes, I do.

    Q.    Who was that?

    A.    The first time, it was Doctor Arfa,
Clarence Geralds, I believe it was Joyce
Dempsey, two caseworkers and the R.N., I think
it was Ms. Callahan, I believe.

    Q.    Okay.  And, for example, Doctor Arfa,
does he just rely on what you write down, or
does he do his own visits with the defendant?