# United States District Court
# Southern District of Texas

## Case Number: OSCV 1847

## ATTACHMENT

Description:

☐ State Court Record        ☑ State Court Record Continued

☐ Administrative Record

☑ Document continued - Part __11__ of _____

☐ Exhibit to: _____
                number(s) / letter(s) _____

Other: _____

_____

_____

1      A.    He does his own visits with him also.

2      Q.    So it's not like you are the only

3 person that's seeing him?

4      A.    That's right.

5      Q.    What about the other people on the

6 treatment team, are they seeing him too?

7      A.    Yes, ma'am.

8      Q.    What you do, you get together and

9 compare what you saw with what Dr. Arfa saw,

10 what the nurses saw with what the other person

11 saw?

12      A.    Yes.

13      Q.    So if you saw one thing, they saw

14 something else, you talk about them?

15      A.    Yes.

16      Q.    Why do you all use a team instead of

17 just Doctor Arfa?

18      A.    Just gives us a better opportunity to

19 provide a more accurate diagnosis as well as be

20 more specific on what a consumer needs as far as

21 treatment.

22      Q.    You said how many people were on each

23 team?

24      A.    At that time, there is the

25 psychiatrists, two caseworkers, a psychologist,

and R.N. and residential specialist who comes in occasionally.

Q. Five to six people on the team?

A. Yes.

Q. So, five heads are better than one?

A. That's correct.

Q. All right. Now, let's talk about March the third, that discharge. Who was on the team when that discharge diagnosis was made?

A. Was still Doctor Arfa.

Q. Doctor Arfa. Okay. Does the same thing hold true that, let's say Doctor Arfa would have his own visits with Mr. Eldridge?

A. Yes.

Q. Then a nurse would go in and see Mr. Eldridge?

A. Yes.

Q. And the other people on the team would go in and see Mr. Eldridge?

A. Yes.

Q. Were the five people together with Mr. Eldridge, or would they each have independant visits with Mr. Eldridge?

A. There were sometimes when we were all together, sometimes where they had individual

1   visits with him.

2        Q.   Let me turn your attention now to

3   October, which is I think the first date we have

4   there on those diagrams.

5        A.   Uh-hum.

6        Q.   And what I want to do is just go

7   through the dates the way we've gone through the

8   January and I think it was February dates of

9    '93.   When was the first time in October that

10  you saw Mr. Eldridge?

11       A.   October the 7th of 1993.

12       Q.   All right.  And what was that visit

13  like?

14       A.   His symptoms were still very vague.

15  His appearance, he was kept in appearance,

16  wasn't anything that -- didn't appear to be

17  disheveled or anything, appeared to taking care

18  of his hygiene.   I asked him about taking the

19  MMPI II again, he says he couldn't read.  So

20  that was basically it.

21       Q.   Up on that chart we have:   Vague

22  symptoms, he said he couldn't read, you

23  suspected malingering?

24       A.   Yes, ma'am.

25       Q.   Did you write that down in the

documents?

A.    Yes, ma'am.

Q.    And that you couldn't do the M.M.P.I. because he said he couldn't read?

A.    That's correct.

Q.    Why did you suspect malingering at that point?

A.    Again, this is history on the unit after meeting with him, his inconsistent symptoms, also noticing that the only time he would present these symptoms was when he was in front of me or with the treatment team.  When he'd go back in the cell, he would be sitting down just like you are; but, when he was with me or the treatment team, he would present symptoms that appeared to be of a psychotic nature.

Q.    Can you pull the microphone up just a little bit?

A.    Yeah.

Q.    All right.  So why do you think that that's a sign of malingering that somebody is acting out.  Is that your terminology, acting out when they're with mental health people but they're pretty calm when they're not?

A.    Well, it's exaggerated symptoms.

Presenting symptoms that aren't really there. But people who are mentally ill, they're consistent in their symptoms. I mean, they're crazy with me but they're also crazy when they go back in their cell. They continue to be dishevelled or, you know, disruptive or hallucinating. That was stopped when he wasn't in front of me or in front of the treatment team. There were times when I'd walk into the cell to visit other consumers, I would see him sitting on his bed, lying down, and he was fine. And, then, he wasn't that way when he was with me or with the treatment team.

Q. When you saw him on October the 7th of '93, was he stuttering? That first time in October of '93?

A. No.

Q. So that went away?

A. Yes.

Q. Was he acting paranoid?

A. No, ma'am.

Q. That went away?

A. Yes, ma'am.

Q. Was he talking about seeing his son?

A. No, ma'am.

1        Q.    That went away; is that right?

2        A.    That's right.

3        Q.    How is it that you determined that he

4    couldn't see or he couldn't do the M.M.P.I. on

5    October 7th of 1993?

6        A.    Well, that's just what he told me,

7    that he couldn't do it because he couldn't read.

8        Q.    I'm sorry?

9        A.    He told me he couldn't do it because

10   he couldn't read, so that's just what I got

11   down.

12       Q.    The next date that we see there on the

13   board is October the 14th of 1993.

14       A.    Yes.

15       Q.    And there the summary says he was

16   agitated, yelling, he had acting out behavior,

17   there is no evidence of psychosis, you

18   recommended GP.    What is GP?

19       A.    General population.

20       Q.    What do you mean by -- describe to me,

21   when you use the words agitated, yelling and

22   acting out behavior, tell me the details of the

23   conduct.

24       A.    All right.    Well, acting out behavior

25   is anybody can act out.    Somebody can get upset

and hit somebody, somebody can get upset and
yell at somebody, use profane words. There is a
difference between acting out behavior when
someone is agitated and psychotic behavior,
which could be delusional behavior, paranoid
behavior, so on.

Q. Okay. You said there was no evidence
of psychosis. What would be evidence of
psychosis?

A. Evidence of psychosis would be that he
wasn't goal directed or his thought processes
weren't connected but he was yelling, he was
yelling at staff, he was agitated, he was goal
directed in his thought process as he was doing
that.

Q. So it seemed like he knew what he was
talking about?

A. That's correct.

Q. You try to see if what they're saying
makes sense?

A. That's correct.

Q. Although he was yelling, what he was
yelling made sense?

A. That's correct.

Q. The next time you saw him I think on

the board is October the 21st, 1993; is that
right?

A.    October the 21st, yes.

Q.    There you say again no psychotic
behavior, that he was selectively mute and
groomed and kept in appearance; is that right?

A.    Yes.

Q.    Why do you use the word selectively
mute?

A.    Selectively mute is when someone
chooses to be that way.

Q.    He had the ability to talk?

A.    Yes.  Or when somebody, when I ask
them a question, and they might have been
talking before, but if I ask them a specific
question, they don't say anything.  They don't
say anything when asked a question.

Q.    And he had the ability to talk based
on your past experience?

A.    That's correct.

Q.    He just was not talking?

A.    That's correct.

Q.    The next date on the board, these are
about week intervals.  You were seeing him about
once a week?

1    A.    Yes, ma'am.

2    Q.    Were other people seeing him on
3    different days?

4    A.    Yes.

5    Q.    You each were assigned a day, I guess?

6    A.    We're not assigned.    Basically when we
7    can do it on the week, the specific week.    We
8    are not assigned days, we do it as we have time.

9    Q.    October the 28th, 1993.    Again, no
10   psychotic behavior.    But then you say
11   exaggerative bizarre behavior; what do you mean
12   by that?

13   A.    That he is exaggerating bizarre
14   behavior.

15   Q.    What's the difference between that and
16   psychotic behavior?

17   A.    Bizarre behavior I guess would be
18   behavior that's not, that isn't just like
19   somebody who is organized and put together, is
20   in control, but behavior that is just different,
21   very exaggerated in what he would do.    His
22   behavior was more like a performance than
23   somebody who has, you know, a legitimate
24   disorder, mental disorder.

25   Q.    Can you give me an example of what you

meant by that?

A. Yes. There's several times when he would do a lot of crying. Again, that would disappear when he would go back to his dorm. The suspicious looking around, just like he was afraid of people. I know one specific time he was presenting that, and within that same hour he was calling for a parole visit and he was able to walk through the hallway with other inmates, other staff persons without any problem at all, and I observed that.

MS. CRAWFORD: Excuse me, Your Honor. May I approach the bench?

THE COURT: Yes, ma'am.

(Off the record bench conference held at this time).

THE COURT: Members of the jury, would y'all please step back into the jury room for just a few moments.

(The jury is removed from the courtroom).

MR. HILL: Judge, the witness just mentioned that in the course of discussing a treatment plan or discussing things with Mr. Eldridge that at one point he requested a -- I'm

1  not sure what his exact phraseology was -- a
2  parole visit or parole hearing?  Maybe I could
3  get the witness to recite because I don't have
4  the exact phraseology.
5      A.  He was told that there was -- he was
6  told that there was a--
7          THE COURT:  You can go ahead, use the
8  microphone.
9      A.  That he had a parole visit.
10              VOIR DIRE EXAMINATION
11  BY MR. HILL:
12      Q.  Of course this is a point in time when
13  you're still of the belief that he was
14  malingering; correct?
15      A.  That's correct.
16      Q.  So you felt as though at the time that
17  you were telling him that he had a parole visit?
18      A.  Oh, no, I didn't tell him that.
19      Q.  Who told?
20      A.  He was told that by the residential
21  specialist.
22      Q.  Okay.
23          MR. HILL:  Why, in light of the
24  precautions that we have taken previously to
25  avoid mentioning the type of case that Mr.

Eldridge is charged with, the fact that we have attempted to avoid the reference of any prior convictions, at this point the witness has essentially let the cat out of the bag by mentioning that he was on some sort of parole so they would know at this point that he had been previously convicted, although they don't know of what type of offense. And, as a result of that, we feel that the comment made in the presence of this jury will violate our client's rights. And I have several bases for that. Like to read them into the record if I may. I believe it's a violation of the fifth, sixth, eighth, and fourteenth amendments to the United States Constitution as well as Art. 1, Sec. 10, 13, 15, 19 of the Texas Constitution.

Once again, we're going to urge that the court discharge the jury, declare a mistrial because we don't believe that any instructions that the court could give at this point in time could cure the error that has been caused as a result of this witness' recital of the fact that the defendant was receiving a parole visitor or parole hearing. To ask the court to instruct the jury to disregard it only compounds the

|    |                                                                 |
|----|-----------------------------------------------------------------|
| 1  | problem.  We would object to the recitation by                  |
| 2  | this witness of the word parole, parole hearing,                |
| 3  | or whatever other reference he made, move the                   |
| 4  | court for mistrial at this time.                                |
| 5  | THE COURT:  Denied.  Ready for the                              |
| 6  | jury.                                                           |
| 7  | MS. ALCALA:  Only thing I was going to                          |
| 8  | say really I had trouble hearing that he even                   |
| 9  | said parole.  I'm not entirely sure.                            |
| 10 | THE COURT:  I heard it.                                         |
| 11 | MS. ALCALA:  I don't know if said                               |
| 12 | parole or Perot.                                                |
| 13 | THE COURT:  All right, well, he is not                          |
| 14 | asking for instructions to disregard.  I just                   |
| 15 | deny the motion for mistrial.                                   |
| 16 | MR. SMYTH:  He said Ross Perot.                                 |
| 17 | MS. ALCALA:  Another thing, really,                             |
| 18 | there might be some type of hearing in a mental                 |
| 19 | health situation or something like that.  I'm                   |
| 20 | not sure that necessarily had to do with prior                  |
| 21 | conviction or some other type of parole.                        |
| 22 | MR. HILL:  To clear up the record,                              |
| 23 | judge, we'll ask the court to go ahead and give                 |
| 24 | an admonishment or instruction to disregard any                 |
| 25 | prior statement that the witness made.  And then                |

I would ask, in the event that the court should admonish the jury accordingly, since the jury is out right now, not to compound the problem further, I would then move for mistrial again at that time.

THE COURT: All right, I will not require you to move for mistrial again. I'll instruct the jury to disregard the last statement by the witness.

MR. HILL: Understanding if the court does in fact instruct them as you have indicated, that immediately following that I would be lodging or requesting a motion for mistrial.

THE COURT: I won't require you to do that in front of the jury.

MS. ALCALA: Luis, nothing about prior trips to the pen, parole, current charge, victims, nothing.

THE WITNESS: Okay.

MS. ALCALA: If you think it might hurt me, don't say it. I mean, even if you're questionable about it, don't say it. If it's borderline, don't say it.

THE WITNESS: Okay, I understand.

1      MS. ALCALA:   We just have to be very
2   careful.
3      MR. SMYTH:   Nothing about Ross Perot
4   again.
5      (Jury present and testimony continued
6   as follows).
7      THE COURT:   Members of the jury, I'll
8   instruct you all to disregard the last statement
9   by the witness.
10      You may proceed.
11   BY MS. ALCALA:
12      Q.   Sir, I think we were talking about
13   October 28th; is that right?
14      A.   That's correct.
15      Q.   Just to speed this up a little bit,
16   let's go on to November the 4th of 1993.   There
17   you say he was not psychotic but presenting
18   symptoms for secondary gain.   What kind of
19   symptoms was he presenting?
20      A.   Well, first he said that he was not
21   hearing or seeing things, then he stated that he
22   had a visit with his brother, that he had been
23   to his brother's house, telling me that he was
24   basically seeing things and hearing things after
25   he just told me that he wasn't.

Q.   Did you ask him to describe that hallucination?

A.   This particular hallucination I didn't ask him to describe.

Q.   Okay.  Let's go to December 2nd, 1993.  You said he is making poor attempt to exaggerate psychopathology, then mentioned something about difficult childhood.  Tell me about that visit.

A.   This is when?  December 2nd?

Q.   December 2nd, 1993.

A.   Again, he verbalized having a difficult childhood and being the youngest and having other brothers and being picked on. Again I felt it was a poor attempt to exaggerate the symptoms.

Q.   Why did you find it peculiar, if you did, that he could remember things about having a troubled childhood but couldn't remember other information?

A.   Well, if somebody has an intact memory, usually they're, especially relating to things of the past, are usually able to remember not just one of them but particular events.  I know that he at one time couldn't remember, or

510

he had told me he couldn't remember who his
father was, and when I asked him if he had any
brothers he said yes and he told me their
names.  And I just found that to be questionable
for somebody who can't remember their father but
they're able to remember their brothers and the
names of their brothers.

Q.  What is the term selective memory?

A.  Selective memory is remembering only
those things that someone chooses to remember,
which is different from selectively mute.

Q.  Did he have selective memory?

A.  I think he did, yes.  I think he chose
to remember those things that he wanted us to
know about.

Q.  So he could tell you about a difficult
childhood but couldn't tell you when he was
born?

A.  Right.

Q.  Or his brothers' names or?

A.  No, he did know his brothers' names.

Q.  But not his father's name?

A.  Yes.

Q.  Let's go to the next sheet, which is
December the 8th.  There you say that he is

exaggerating the symptoms and that he is

manipulative, and then you talk about having an

auditory and visual hallucination as you

talked.

     A.   That's correct.

     Q.   First, did you ask him if he was

having hallucinations?

     A.   Yes.

     Q.   Would you always ask him if he was

having hallucinations or had been having

hallucinations?

     A.   Most of the time, I would.

     Q.   So, if it's not otherwise mentioned,

he wasn't having hallucinations?

     A.   That's correct.

     Q.   This particular time he was?

     A.   Yes.

     Q.   All right.  Did he tell you what his

hallucination was about?

     A.   Yes, he did.

     Q.   What did he tell you?

     A.   He told me that he was able --

     Q.   Pull up the microphone.

     A.   He told me he was able to see his

brother and him loading a truck and speaking to

his brother as he spoke to me and he was looking down at the floor, was almost like he was watching television, like he was watching this happen. I felt that, well, first of all, it's very rare, it's very rare for people to have auditory and visual hallucinations at the same time. The other is, that when someone is experiencing the auditory and visual hallucination at separate times or at the same time, they're very disorganized, in severe distress. And his thought processes were very organized, goal directed, able to answer my questions. When I asked him to describe this hallucination, he described it in detail, which, when someone is experiencing those type of hallucinations, they're usually extremely disorganized and severely distressed at that time.

Q. Was he describing his hallucinations in full sentences?

A. Yes, ma'am.

Q. And in detail?

A. Yes, ma'am.

Q. What did he tell you him and his brother were doing?

A. That he could see him and his brother loading a truck.

Q. Do you remember what he said they were loading it with?

A. No, but I remember asking him if he could tell me more. He was saying there was people around. I kept saying, "Well, tell me more." He said, "I can't, they're going too fast." I said, "Well, it's real important that I know these things." And, when I asked him to tell me more, I got the sense that he couldn't come up with things fast enough to tell me so he said he couldn't do it. But he was extremely goal directed. For somebody who is that psychotic to be able to be that goal directed and answer my questions and know where to go with them, that's something that I thought was very, as an example of how I thought he was exaggerating those symptoms.

Q. That didn't match, that he could talk with clear sentences but also have these hallucinations?

A. And he was sitting down in a chair and telling me. He was calm as he was telling me, he was not distressed.

Q. Like you and I are right now?

A. That's correct.

Q. When patients have these types of hallucinations, first, have you talked to patients that have had hallucinations?

A. Yes, ma'am.

Q. What's your experience with patients who do have hallucinations, or you believe are having real hallucinations?

A. People who are mentally ill, when they're having hallucinations they can tell you I'm hearing things or perhaps seeing things, and they can tell you that's what's going on. Most of them are not able to give a detailed account of how it's happening because it's too scary, it's too threatening. They can go on and say I need my medication, such and such medication, I need my Haldon or Haldol. Mr. Eldridge performed his symptoms, which is very typical of people who are malingering. He was never on any medication. And then these symptoms disappeared as soon as he would leave me. And people who are mentally ill and not on medication, they get worse, they don't get better, or they just don't stop, they need their medication.

1     Q.   Is an hallucination a clear vision
2 like tv or not?
3     A.   No, ma'am.  Most of the time they're
4 very vague hallucinations.
5     Q.   Like a fog?
6     A.   They're like a fog.
7     Q.   You wouldn't see like somebody loading
8 a truck?
9     A.   You would not see somebody loading a
10 truck.  You might see a ghost or something.
11     Q.   Okay.  So what would be an example of
12 a hallucination that a true psychotic patient has?
13     A.   I'm seeing ghosts, I'm seeing spirits,
14 I'm seeing clouds, I'm seeing visions.  They're
15 explained in those terms.
16     Q.   But not, you know --
17     A.   Not in that detail, no, ma'am.
18     Q.   And not so clear that two people are
19 actually physically doing things?
20     A.   That's correct.  Not able to be as
21 goal directed, you know, follow exactly what I'm
22 asking him, be able to answer appropriately and
23 also be sitting down the way he was sitting
24 down, explaining this to me.  It's too
25 confusing.  Most people who are that psychotic

1    would not be able to do that.

2         Q.    Okay.    Let me talk about December the

3    9th, 1993.    There you use the same words you

4    used before:    Dramatic, theatrical,

5    manipulative.    Pretty strong words.

6         A.    Yeah.

7         Q.    I guess you agree with that?

8         A.    Yeah.

9         Q.    Why do you choose such strong words

10   like those?

11        A.    Because that's the appearance that he

12   gave, that he was, it was a drama, it was more

13   of a performance than what I'm going through

14   right now, that he performed.    Some of them were

15    -- at that particular point, he even laughed

16   himself because it was almost funny for him.

17        Q.    What do you mean he laughed himself?

18        A.    He just sort of smiled as if to laugh

19   at himself while he was doing that.

20        Q.    Do you remember what he was doing?

21        A.    Yes, ma'am.

22        Q.    What was he doing?

23        A.    He came in, he said that he was having

24   stomach problems.    At that point he was sitting

25   down and he leaned over and he expelled gas and

he started to laugh.

Q. So he knew what he was doing?

A. Yes, ma'am.

Q. Then--

A. And he said, "You see?" I didn't say anything, I just continued to ask him to continue with his hallucinations, so.

Q. Okay. All right. So he said he was hallucinating at the time?

A. Uh-hum.

Q. Did he tell you at that time what he was seeing?

A. It's the same time when he was telling me about he and his brother loading a truck.

Q. They were still loading the same truck?

A. Yes, ma'am.

Q. So he was still visually as clear as he was the day before?

A. That's the same note. I had just made -- I made two notes. I made a note in the group therapy note and the note in my progress note, so it's the same incident.

Q. Okay. Let's talk about the next time, December 15th, 1993. There you say that he was vague and had no psychosis present. What does

1    that mean?  December 15th.

2         A.   I have this:  Appears to be no

3    psychosis.

4         Q.   Why would you write something like

5    that down?

6         A.   Because he responded to his name.  He

7    gave no specific symptoms, he was vague, but

8    otherwise he was maintaining, and he did not

9    appear to be psychotic.

10        Q.   What about on December the 29th, 1993,

11   what was he like then?

12        A.   December the 29th?  I had attempted

13   once again to administer the M.M.P.I. II, and he

14   told me that he needed his glasses, and that he

15   couldn't read.  I attempted to administer the

16   M.M.P.I. II by asking him the questions instead

17   of having him read them, and he would ask a

18   question almost with every statement that I

19   made, and it was impossible for me to complete

20   the assessment.  It's a five hundred seventy

21   item questionnaire, and usually you don't do

22   that, so it just became very difficult for me to

23   administer that many questions.

24        Q.   So you would ask him the question

25   orally because he said he couldn't see because

1   he didn't have glasses, he couldn't read?

2         A.    Yes, ma'am.

3         Q.    When you would ask the question

4   orally, what would he do?

5         A.    He would just ask another question.

6   An example that I documented was the very first

7   question, which is:  Do you enjoy reading

8   mechanics magazines?  He said, "Well, what does

9   mechanics mean?"  That type of thing.  So, with

10  every statement, there was a question, and it

11  just went on that way.  So at that point I

12  decided, after so many items that I had asked

13  him, repeatedly there was always a question

14  after the statement or question that I asked, I

15  decided just to discontinue the assessment.

16        Q.    So he was not going to be tested?

17        A.    That's correct.

18        Q.    All right.  Then we look to January

19  the 6th of 1994.  Same thing as before, but you

20  say he was hallucinating again as you spoke.

21  What was that hallucination about?

22        A.    He stated he could see demons flying.

23  He described the demons as being white, having

24  wings, flying around the room, snatching people.

25        Q.    Like tv?

1    A.   That's correct.

2    Q.   Was that typical of somebody who is

3   having a genuine hallucination, based on your

4   experience with people who are having

5   hallucinations?

6    A.   No, ma'am.

7    Q.   When he was describing the

8   hallucination to you, what was he like?

9    A.   He was very clear, he was organized,

10  his thought processes were goal directed, I

11  mean, he was going somewhere with them, wasn't

12  just loose and different concepts coming out, I

13  mean, he was organized in telling me what his

14  hallucinations were like.

15   Q.   Were you having a conversation like

16  we're having right now?

17   A.   Yes, ma'am.

18   Q.   What about, then, January 10, 1994?

19  What happened during that visit?

20   A.   He told me sometimes he sees a

21  werewolf chasing him.

22   Q.   What else did he say?

23   A.   He remained very vague about some of

24  his history.  He was able to remember emotional

25  and physical abuse of his father, and he reports

that his father would say to him that he would
never amount to anything, that he ran away
several times, had to be brought back by the
police.

Q. What about that? Was he able to give
you information about something like that, that
I guess, would help, might help him if somebody
believed he had been a child abuse victim? What
was unusual or peculiar about that?

A. Well, what was unusual about it was
that he wasn't able to remember certain --
because earlier I had asked him about his, just
his, in general, his history. I also asked him
about his criminal history. He became very
vague, but he was able to tell me about being
emotional and physically abused by his father
and also having run away several times, having
to be brought back by the police. And that day
he also reported feeling better.

Q. Did he, at that point, admit to you
that he knew who his mother was?

A. No, not that I see in here.

Q. I mean, was it selective memory in
that he could remember childhood problems but
couldn't remember, for example, his mother's

name, father's name, brother's name?

A.    I don't remember if I asked him about his mother.

Q.    But that was inconsistent with what he told you before?

A.    Yes.

Q.    Sir, let me ask you.  You said that Doctor Arfa was the one who, was the doctor that signed off on the discharge on January the 14th of '93 and on March the third of 1993; is that right?

A.    Yes, ma'am.

Q.    And Doctor Arfa no longer works for MHMRA; is that correct?

A.    That's correct.

Q.    Where does he work?

A.    He works for the Dallas jail.

Q.    He moved away?

A.    Yes.

Q.    Okay.  The person who discharged him, well, when was he discharged after January 10, 1994?

A.    I don't remember the date he was discharged.  I think it was sometime around the 14th.

1    Q.   Of January or February?

2    A.   I don't remember.  I don't have it

3    here.

4    Q.   What does your note reflect on January

5    the 10th as to where he was moved to?

6    A.   I don't have it in my notes.

7    Q.   Okay.  All right.  The last time,

8    though, that you had contact with him was

9    January 10th of 1994?

10   A.   Yes.

11   Q.   All right.  Who were the doctors who

12   were assigned to the team from January 7th of

13   '93 up until January the 10th of '94?

14   A.   It was Doctor Arfa; after Doctor Arfa,

15   it was Doctor Stokes, then from Doctor Stokes it

16   was Melissa Ferguson.  After Ferguson, it was

17   Doctor Robashkin.

18   Q.   And, again, same thing.  That

19   different people on the team would go in and see

20   him at different times?

21   A.   Yes.

22   Q.   Y'all would get together, compare

23   notes?

24   A.   Yes.

25   Q.   Make a joint decision?

524

1          A.   Yes, we would.

2          Q.   Have there been times that you came to

3    a different diagnosis than let's say the

4    psychiatrist on the team?

5          A.   Yes, ma'am.

6          Q.   And what would you all do to work that

7    out?

8          A.   Well, we would either observe the

9    inmate for a longer period of time, we would

10   administer certain assessments, we would

11   basically just try to come to some consensus as

12   to what might be going on with the inmate.

13         Q.   So you don't always agree with them;

14   they don't always agree with you?

15         A.   That's correct.

16              MS. ALCALA:  I'll pass the witness.

17              THE COURT:  Y'all approach the bench.

18              (Off the record bench conference held

19   at this time).

20              THE COURT:  Please proceed.

21

22

23

24

25

CROSS EXAMINATION

BY MR. HILL:

Q.  Mr. Pena, so that I understand
correctly, when there is disagreement among the
various members of the team, you still all come
to a consensus, anyway.

A.  Yes.

Q.  So you could have -- I don't want to
say rival factions, but have somebody saying
this, somebody saying that, y'all are going to
get together and agree on what you're going to
say?

A.  Eventually we try to come to a
consensus, yes.

Q.  So let me clarify some things, first
of all.  I did approach you in the hallway this
afternoon at approximately 3:15; correct?

A.  Yes.

Q.  I did identify myself as Wayne Hill,
one of the attorneys for Gerald Eldridge; correct?

A.  Yes.

Q.  You knew that Gerald Eldridge was the
individual that you were going to be testifying
about this afternoon?

A.  Yes, sir.

Q. And at that time, when I attempted to discuss with you your role as a potential witness, you indicated that you did not feel comfortable visiting further with me; correct?

A. Not in those words.

Q. Did you discuss Mr. Eldridge's case with me at that time?

A. No, sir.

Q. Did you indicate that you would like to visit with Ms. Aleala, the assistant district attorney prosecuting the case, before deciding whether you would talk to me other than in the courtroom?

A. That's not what I said to you, sir.

Q. All right. I'm asking you did you indicate, that in the absence of her giving you permission to talk to me, that you would not talk to me out in the hallway?

A. That's not what I said.

Q. Did you talk with me out in the hallway?

A. Yes, sir, I did.

Q. Did you talk to me about Gerald Eldridge when I started asking you about his case and how he had behaved while he was in the

jail?

     A.   Yes, sir.

     Q.   You did?

     A.   Yes, sir.

     Q.   What did you tell me?

     A.   You had asked me how long do people stay on the unit.

     Q.   How long people stay in the unit?

     A.   Yes, sir.

     Q.   I had gotten to the point of asking you how long Gerald Eldridge stayed on the unit?

     A.   Right.

     Q.   Kind of a general question?

     A.   General question.

     Q.   You responded to that question?

     A.   Yes.

     Q.   What else did you tell me?

     A.   You had asked me about if I had worked with Gerald Eldridge you said on daily basis or weekly basis.

     Q.   Correct.  Your response?

     A.   My response was on weekly basis.

     Q.   Then what was said?

     A.   Then you had asked me -- I don't remember the next question.

1     Q.   Okay.  Was it roughly at that point
2  that you indicated that you were a little uneasy
3  talking with me?
4     A.   I said I was uncomfortable, that I
5  didn't know whether I should be talking with you.
6     Q.   Okay.
7     A.   That's what I said.
8     Q.   What did you mention about talking
9  with Ms. Aleala?
10    A.   I said I was asked to be here by Elsa
11 and that I didn't know whether I was doing
12 something that I shouldn't be doing, that I
13 would answer any questions that you had in the
14 courtroom.
15    Q.   Okay.
16    A.   That's what I said.
17    Q.   Okay.  Also, let's back up a little
18 bit.  In terms of your qualification.
19    A.   Yes.
20    Q.   If you were in a private setting right
21 now, you would be, if you were in a
22 psychologist, a Ph.D. level psychologist's
23 office, you would be referred to as a
24 psychological associate; is that correct?
25    A.   No, sir.

1    Q.    All right.  Are you telling the jury

2   that a person that has a master's degree can

3   hold themselves out in a private setting, not in

4   an exempt setting as a psychologist or

5   psychological associate?

6        A.    No.

7        Q.    Which?

8        A.    You can't either one.  When you have a

9   master's degree, on the outside you cannot use

10  the words psychology or psychological,

11  psychological services, psychologist anywhere on

12  your card, in your statements or anything.

13       Q.    You can't hold yourself out to the

14  general public in a private setting as a

15  psychologist?

16       A.    That's correct.  I cannot.

17       Q.    Okay.  Yet, in the jail where you

18  work, that setting is exempt?

19       A.    Yes, sir.

20       Q.    From the licensing requirement that

21  would otherwise apply to private psychologists?

22       A.    Yes, sir.

23       Q.    So you don't have to meet the same

24  standards to hold yourself out as psychologist

25  if you work in the jail as you would if you were

in a private setting?

A.   That's correct.

Q.   So you come into court and hold yourself out, in fact, you have referred to yourself as a psychologist?

A.   That's correct.

Q.   Tell me, if you will, the first contact that you had with Gerald Eldridge was on January 7th of 1993; correct?

A.   Yes, sir.

Q.   Are you the first individual from the team that met with him?

A.   I don't know that.  I don't remember.

Q.   But you were the one that was basically going to conduct the assessment; is that a correct statement?

A.   Yes, sir.

Q.   Where does it go from the assessment portion to what is the next step after you had made your assessment?

A.   After I made my assessment, he would either stay on the unit and continue through, well, no, from there the treatment team decides on what to do with him -- he would either stay on the unit and receive services or he would go

1    to general population.

2         Q.    All right.    And tell me how long does

3    your assessment take?    In particular, how long

4    did your assessment of Gerald Eldridge take on

5    January 7 of 1993?

6         A.    My interview with him, I don't

7    remember how long that took.    I don't remember

8    how long that took.

9         Q.    Are the notes that you have been

10   referring to, which are summarized on the

11   exhibits introduced by the State, the only notes

12   that you would have taken?

13        A.    No, sir.

14        Q.    Did you have like rough notes that you

15   prepared?

16        A.    Yes.

17        Q.    What happens to those rough notes?

18        A.    I usually just put them away or --

19   they're my own personal notes, I'll tear them

20   up, throw them away.

21        Q.    Okay.    So then are there any lasting

22   records of the actual interview notes that you

23   conducted in this case?

24        A.    No, sir.

25        Q.    How about on any of the other dates

1   that you met with Gerald Eldridge?

2        A.   No, sir.

3        Q.   So what we have is a summarization of

4   what you engaged in with Mr. Eldridge on any of

5   the given dates that we're talking about?

6        A.   That's what you have.

7        Q.   You mentioned that when you -- let me

8   ask you this.  How long after you have a

9   meeting, whether it be an assessment or one of

10  these contacts that you have with the

11  individual, how long after that do you actually

12  prepare your summary or your report?

13       A.   Sometimes it's immediately after,

14  sometimes it's the next morning.

15       Q.   Okay.  So sometimes there could be a

16  lapse of time in between?

17       A.   Usually the very next morning.

18       Q.   Would there be more information on the

19  original notes than what are reflected on the

20  summary information that's on the report?

21       A.   Typically, no.

22       Q.   You mentioned that when you sit down

23  with an individual you said sometimes you did

24  take notes?

25       A.   Yes.

1        Q.    You recall saying that?

2        A.    Yes.

3        Q.    Are there other times you just sit

4    without pen or pencil in hand and notepad, that

5    you just converse with the individual?

6        A.    Yes, sir.

7        Q.    Is it your decision to determine what

8    is noteworthy and what is not noteworthy?

9        A.    Yes, sir.

10       Q.    So you can't tell me or the jury what

11   items, during this year of contact with Mr.

12   Eldridge, what was non-noteworthy; can you?

13       A.    I can't tell you what items were -- I

14   am sorry, could you repeat that?

15       Q.    Kind of like a double negative.  You

16   only put down what you thought was noteworthy;

17   right?

18       A.    I put down my clinical assessment on

19   the notes.

20       Q.    Okay.  Listen to my question; okay?

21   During direct examination, you stated that

22   things that you thought were important or

23   noteworthy you would write down; correct?

24       A.    Uh-hum.

25       Q.    So would that necessarily mean that