# United States District Court
# Southern District of Texas

Case Number: __OSCV 1847__

## ATTACHMENT

Description:

☐ State Court Record     ☑ State Court Record Continued

☐ Administrative Record

☑ Document continued - Part __12__ of _____

☐ Exhibit to: _____
         number(s) / letter(s) _____

Other: _____

_____

_____

1 things that you didn't think were important were

2 not written down?

3     A.   I might sometimes make a note where

4 something significant did not happen in my

5 interview with him.

6     Q.   My question is:  You didn't write down

7 everything that took place during each of the

8 contacts; right?

9     A.   Yes.

10     Q.   Your subjective decision as to what

11 was noteworthy to you is what was written down;

12 correct?

13     A.   I wrote down my clinical observations

14 of what happened during our interview.

15     Q.   Your observations?

16     A.   Yes, sir.

17     Q.   But not everything that took place?

18     A.   No, sir.

19     Q.   Okay.  At the time that you made your

20 first assessment, you don't know how long you

21 spent with Mr. Eldridge?

22     A.   No, sir, I don't remember.

23     Q.   Was it three hours?

24     A.   No, sir.

25     Q.   Was it one hour?

1          A.    No, sir.

2          Q.    Was it fifteen minutes?

3          A.    Was anywhere from fifteen to thirty

4     minutes.

5          Q.    During that fifteen to thirty minute

6     period while making this assessment, did you

7     have his school records?

8          A.    No, sir.

9          Q.    Did you have employment records?

10         A.    No, sir.

11         Q.    Had you had occasion to speak to any

12    family members?

13         A.    No, sir.

14         Q.    Did you have any history of any mental

15    illness that you were aware of?

16         A.    No.

17         Q.    Based upon your fifteen to thirty

18    minute assessment of Mr. Eldridge, you made an

19    assessment in that case?

20         A.    Well, according to my notes, I didn't

21    make any assessment; I wrote only observations.

22         Q.    Tell me what -- you talked about

23    impressions that you came up with.  Would you

24    please give me the phrase that you used?

25         A.    Diagnostic impressions.

Q. Diagnostic impressions. Now, that's different than a diagnosis; correct?

A. That's correct.

Q. Because you're not qualified to make a diagnosis; are you?

A. No, the diagnosis comes with the physician.

Q. Okay. So you're giving somebody else your impression of what you thought was important?

A. That's correct.

Q. Okay. And back on January 7th of 1993, I am sorry, what was your initial assessment of Mr. Eldridge on January 7 of 1993?

A. I observed him to be presenting himself to be paranoid, and he spoke in a low voice with stutter-like speech.

Q. All right. And what impressions did you make?

A. I did not make an impression at that time.

Q. All right. What about on January 8th of 1993?

A. What about it? What are you asking? What are you asking?

1      Q.   What were your diagnostic impressions
2    at that time?
3      A.   I did not get a diagnostic impression,
4    but I wrote that I questioned psychosis versus
5    malingering.
6      Q.   Okay.  So, within a twenty-four hour
7    period of talking to Mr. Eldridge, you are
8    narrowing your view to either a psychosis or
9    malingering?
10     A.   That's correct.
11     Q.   If you're narrowing it to psychosis or
12   malingering, obviously at that point you did not
13   necessarily believe that there was a psychosis;
14   correct?
15     A.   I wasn't sure at that time whether
16   there was a psychosis or if it was malingering.
17     Q.   Are there only two explanations for
18   the circumstances that he presented to you
19   during your assessment of him on January 7th?
20     A.   At that time -- psychosis is a broad
21   term.  I mean, I could use --
22     Q.   Let me just ask you to answer the
23   question.  Are there only two impressions that
24   you could have derived?
25     A.   No, sir.

Q. How many diagnostic impressions could you have come up with based on your fifteen to thirty minute assessment of Mr. Eldridge on January 7th of 1993?

A. There are many.

Q. How many?

A. I don't know how many. There is an entire book of them.

Q. Well, you know, I'm fishing for some kind of number. You're the person that has studied psychology, you got your master's degree. Are there one hundred?

A. I would say at least.

Q. Are there two hundred?

A. No, sir.

Q. Somewhere in between a hundred and two hundred?

A. No, sir. About a hundred, I think.

Q. A hundred different diagnostic impressions that a person can come up with based on an assessment?

A. Uh-hum.

Q. You narrowed it to two?

A. Yes.

Q. One of them being malingering?

1    A.    One of them being malingering.

2    Q.    When the prosecutor asked you about

3    the way he presented himself, and I'm not sure

4    at what point this was, but you talked a little

5    bit about tears?

6    A.    Uh-hum.

7    Q.    She asked whether they were real or

8    imagined.  Was he actually crying?

9    A.    No, he was actually crying.

10    Q.    Wasn't like he had splashed water on

11    his face?

12    A.    No, sir.

13    Q.    You were trying to determine from your

14    standpoint whether or not those tears came about

15    as a result of what?

16    A.    Well, I was curious to know why he was

17    so upset.

18    Q.    What was your diagnostic impression as

19    to why he was crying?

20    A.    I didn't make one at that time, I

21    don't think.

22    Q.    At what point did the treatment team

23    come to you or have contact with you and ask you

24    what was wrong with Gerald Eldridge?  At one

25    point you said the treatment team wanted to know

what was wrong with him. Is that the purpose of doing an assessment?

A. The purpose of me seeing him weekly is so that we can all come up with some consensus on what is wrong with him.

Q. Now, tell us, when he is brought into the psychiatric unit on January 7th of 1993, he is actually admitted to that unit?

A. Yes, sir. I don't know. It might have been earlier than the 7th. Maybe a day or two earlier.

Q. So may have been earlier, prior to your assessment of him?

A. Yes.

Q. How long did he physically stay? Until 14th of January. We're going to say at least minimum of seven days?

A. That's correct.

Q. During that period of time, how many contacts did you have with him?

A. I had four contacts with him.

Q. At anytime during those four contacts, the first being January 7th, the second being the 8th, when malingering is identified as one of your diagnostic impressions, from that point

forward, does your diagnostic impression ever change?

A. No.

Q. When is the first time you got together with other members of the team?

A. I believe on the 11th. That's when the doctor wrote his note.

Q. So some four, three to four days elapsed?

A. Uh-hum.

Q. How many people get together during the first team meeting?

A. The same amount of people for all the team meetings, anywhere from four to six people.

Q. How long does the team stay assembled? By that I mean are there like, is it the same team for two or three months at a time?

A. No, it's the same team until somebody leaves the position or goes somewhere else.

Q. How long were you a member of this particular team? Or are you still a member of that team?

A. I'm still a member. The team players have changed, but I'm still a member of this

team.

    Q.    You referred to yourselves as team players?

    A.    I mean, team people who participated in this team.

    Q.    Uh-huh.  Okay.  So who are the team players, if you will?

    A.    Team members are at this point Doctor Arfa.

    Q.    I thought Doctor Arfa was in Dallas?

    A.    I mean, Doctor Robashkin at this time.  It was Doctor Arfa.

    Q.    So he was a replacement?

    A.    Doctor Robashkin?

    Q.    For Doctor Arfa?

    A.    No, he was actually replacement for Doctor Ferguson.

    Q.    Which one?  Who is on first?

    A.    Doctor Arfa is first, Doctor Stokes is next, Doctor Ferguson is next and Doctor Robashkin is the physician who is on the team now.

    Q.    Is Doctor Silverman on the team anywhere?

    A.    Doctor Silverman is not on the team.

1          Q.    Okay.  Doctor Arfa is not on the team?

2          A.    No.

3          Q.    Doctor Ferguson is not on the team?

4          A.    No.

5          Q.    And is Doctor Ferguson in some other

6     jail facility?

7          A.    No, she is still at the Harris County

8     jail.

9          Q.    Different team?

10          A.    No, she is not on any team now.

11          Q.    She retired?

12          A.    No.

13          Q.    All right.  From the time of January

14     7th or 8th, when malingering is first assessed,

15     up through the last contact that you had and, as

16     far as you know, the last contact, excuse me,

17     anybody from the team had with Gerald Eldridge,

18     malingering is written all over it?

19          A.    Everybody suspected that his symptoms

20     were not genuine.

21          Q.    His history on the unit, if you will,

22     was well known to the members of the team;

23     right?

24          A.    We worked with him, yes.

25          Q.    So I guess the answer to my question

1  is yes, that his history on the unit was well

2  known to the members of the team?

3      A.   Yes.

4      Q.   So he was there for a seven day period

5  beginning of January of '93, then he comes back

6  in February and stays for approximately a five

7  or six day stay; right?

8      A.   Yes.

9      Q.   And how did he get re-admitted?  Who

10  re-admitted him?

11      A.   The second time or the first time?

12      Q.   Second time.

13      A.   Second time?  I believe it was through

14  a referral from the jail.  I'm not sure, though.

15      Q.   So the defendant doesn't just present

16  himself, say I want to check in?

17      A.   That's correct.

18      Q.   Physically he has got to be brought

19  there from somebody else that has made

20  observation of him; right?

21      A.   Yes, that's correct.

22      Q.   Somebody that is not in an environment

23  such as yours on the psychiatric wing where he

24  is being brought to, somebody sitting down

25  saying, well, now, this person is going to ask

1    you some questions or they're going to have some

2    kind of interaction with you?

3         A.    That's correct.  Most of the time it's

4    a deputy.

5         Q.    Help me understand.  The next time

6    that he is re-admitted to the psychiatric ward,

7    after he is discharged on March third of 1993,

8    when is he brought back again?

9         A.    In October of 1993.

10        Q.    October 7 of 1993?

11        A.    Yes.

12        Q.    Y'all still believe he is malingering

13   at that point?

14        A.    Yes.

15        Q.    How long does he stay there?

16        A.    He stays there until after January the

17   tenth of '94.  I don't know the specific date,

18   but that's the last time I saw him.

19        Q.    So you keep him there on the ward from

20   October, November, December, January?

21        A.    Yes.

22        Q.    At that point, he is put back in the

23   general population?

24        A.    Yes.

25        Q.    During that whole period of time, you

1  thought he was malingering?

2      A.    We were observing him.  The third time

3  he was brought down to the hospital, the only

4  purpose he was brought down was for observation

5  because there was still a question of whether

6  there was a psychotic disorder or malingering,

7  so we observed him from October through January

8  or February, whatever.

9      Q.    And the things that have been

10  established in your mind as far back as January

11  7th and 8th is malingering was high on the list

12  of diagnostic impressions, one of two; correct?

13      A.    Due to the behaviors he exhibited, yes.

14      Q.    And the only notes that you took, the

15  only notes that we heard about are all ones that

16  affirm your diagnostic impression that he was

17  malingering; correct?

18      A.    Yes.

19      Q.    And, in fact, by December 9 of 1993,

20  the phrases that you used to describe, or even

21  going back to December 8th of 1993, these are

22  your phrases, these are your words -- that he is

23  manipulative and deliberately exaggerating

24  symptoms.  Then on the 9th of December,

25  dramatic, theatrical, manipulative.  These are

1  your particular words trying to describe your

2  impressions of him.  These to me -- correct me

3  if I'm wrong -- they seem to be stronger

4  statements of your impression of his

5  malingering.

6        A.    Those are the words that the manuals

7  that we use to write our notes, those are the

8  words that the manuals use, yes, when somebody

9  with his history is on the unit, yes.

10        Q.    Why do y'all use the phrase consumer

11  for somebody on the psychiatric ward?

12        A.    That's a phrase that MHMRA has

13  required for us to use.

14        Q.    Okay.  You ever had a hallucination

15  yourself?

16        A.    No.

17        Q.    So would you have any idea, other than

18  what you read and literature that you read, as

19  to how actually somebody perceives a

20  hallucination?

21        A.    What's the question again?

22        Q.    Other than reading what other people

23  say a hallucination is like, you give some

24  pretty pointed testimony he was not having an

25  hallucination.

1    A.    That's correct.

2    Q.    That he was faking it.

3    A.    That's correct.

4    Q.    But you never had one yourself anymore

5    than I have, I think?

6    A.    No, sir.

7    Q.    Okay.  You have free access in and out

8    of the jail?

9    A.    Yes, sir.

10   Q.    You got your tag there that identifies

11   you as, what, a member of MHMRA that gives you

12   clearance through the jail?

13   A.    Yes, sir.

14   Q.    All team members have that?

15   A.    Yes, sir.

16   Q.    And your office is over in the jail?

17   A.    Yes, sir.

18   Q.    Are all the offices of the individuals

19   that are on the team over there in the jail?

20   A.    Yes, sir.

21         MR. HILL:  I pass the witness.

22

23

24

25

## REDIRECT EXAMINATION

BY MS. ALCALA:

Q. Tell me at what point, at what date, you decided he was malingering and that it was not psychosis.

A. I believe it was shortly before he was discharged the first time.

Q. Which was what date?

A. January the 14th, 1993.

Q. The day he was discharged?

A. Yes.

Q. And, up until that time, you'd seen him five times before? So you just didn't jump to this conclusion of malingering?

A. That's correct. Four times.

Q. Up to that time, you were at least willing to consider that in fact it was a true psychosis?

A. That's correct.

MS. ALCALA: No other questions.

MR. HILL: No further questions, Your Honor.

THE COURT: Thank you. You may step down.

Members of the jury, we'll go ahead

1   and stand in recess this afternoon, once again,

2   until 9:30 in the morning, when we'll resume

3   trial.  And I think, once again, we'll be able

4   to conclude the remainder of the testimony

5   tomorrow morning, have argument, hopefully,

6   before lunch time.  Please remember all the

7   admonishments of before.  Do not discuss the

8   case with friends or family or with each other

9   until the case has been concluded.  Meet once

10  again outside in the hallway down by room 734.

11  We'll be back down there, more likely than not,

12  tomorrow for the conclusion of the trial.  So

13  we'll see you all tomorrow morning.

14          (End of day's proceedings)

15

16

17

18

19

20

21

22

23

24

25

71863

TRIAL COURT NO. 9403201

APPELLATE COURT NO._____

IN THE COURT OF CRIMINAL APPEALS

OF THE STATE OF TEXAS

AT AUSTIN

_____

GERALD CORNELIUS ELDRIDGE,

Appellant

VS.

THE STATE OF TEXAS,

Appellee.

_____

APPEAL FROM 178TH DISTRICT COURT OF HARRIS COUNTY,

TEXAS

Judge William T. Harmon   Presiding

_____

STATEMENT OF FACTS

VOLUME  _5_  OF _36_  VOLUMES

March 2, 1994

Ida M. Garcia

Official Court Reporter

301 San Jacinto

Houston, Texas  77002

FILED IN
COURT OF CRIMINAL APPEALS

AUG 17 1994

Thomas Lowe, Clerk

241

1                          INDEX

2                        VOLUME 5

3      March 2, 1994

4              HEARING ON JURY MISCONDUCT
                                              <u>Page</u>
5        JOSEPH LICATA
             Direct                          246
6            Cross                            251
             Redirect                         260
7            Recross                          261
             Redirect                         262
8
         JUROR RICHARD BAKER
9            By the Court                     266
             By the Defense                   273
10           By the State                     280
             By the Defense                   284
11
         JUROR BOB JOHNSON
12           By the Defense                   287
             By the State                     298
13           By the Defense                   304

14       JUROR CHERYL WELFL
             By the Defense                   310
15           By the State                     318
             By the Defense                   321
16
         JUROR RUTH McNALLY
17           By the Defense                   325
             By the State                     332
18
         JUROR BOB JOHNSON
19           By the Defense                   337
             By the State                     341
20
         JUROR BUEL SHASTID
21           By the Defense                   349
             By the State                     364
22           By the Defense                   370

23       MOTION DENIED                        376

24

25

# ALPHABETICAL INDEX

## VOLUME 5

|  |  | Page |
|---|---|---|
| **BAKER, RICHARD** | | |
| | By the Court | 266 |
| | By the Defense | 273 |
| | By the State | 280 |
| | By the Defense | 284 |
| **JOHNSON, BOB** | | |
| | By the Defense | 287 |
| | By the State | 298 |
| | By the Defense | 304 |
| | By the Defense | 337 |
| | By the State | 341 |
| **LICATA, JOSEPH** | | |
| | Direct | 246 |
| | Cross | 251 |
| | Redirect | 260 |
| | Recross | 261 |
| | Redirect | 262 |
| **McNALLY, RUTH** | | |
| | By the Defense | 325 |
| | By the State | 332 |
| **SHASTID, BUEL** | | |
| | By the Defense | 349 |
| | By the State | 364 |
| | By the Defense | 370 |
| **WELFL, CHERYL** | | |
| | By the Defense | 310 |
| | By the State | 318 |
| | By the Defense | 321 |

1          CAUSE NO. 9403201

2     STATE OF TEXAS      IN THE 178TH DISTRICT COURT

3     VS.                         OF

4     GERALD CORNELIUS ELDRIDGE   HARRIS COUNTY, TEXAS

5

6     A P P E A R A N C E S:

7     For the State:        Ms. Elsa Alcala
                            Mr. Don Smyth
8                           Assistant District Attorneys
                            Harris County, Texas
9
      For the Defendant:    Ms. Denice Crawford
10                          Mr. Wayne Hill
                            Attorneys at Law
11                          Houston, Texas

12

13              BE IT REMEMBERED that upon this the

14    2nd day of March A.D. 1994, the above entitled

15    and numbered cause came on for trial before the

16    Honorable William T. Harmon, Judge of the 178th

17    District Court of Harris County, Texas; and the

18    State appearing by counsel and the Defendant

19    appearing in person and by counsel, the

20    following proceedings were had, viz:

21

22

23

24

25

(State's Exhibits Nos. 5, 6, 7 and 8 marked for identification).

MR. HILL: Judge, if it please the court, this morning, when I came to court to meet with Ms. Crawford, it was brought to my attention that Joseph Licata, an attorney licensed in the State of Texas, which I believe the court as well as the State knows Mr. Licata as a practicing criminal defense lawyer in Harris County, Texas, came and informed us that as he was going towards the coordinator's office in County Criminal Court at Law No. 14, which shares the hallway to this courtroom where we are presently having our incompetency trial, he overheard an individual talking about witnesses in competency type hearing where the Defense lawyers essentially hire, pay an individual to get a particular result, that they have a particular motive to testify favorably for the defense and that contra, that the State witnesses have no such motive, that they come in and just testify freely and honestly. Mr. Lacata indicated he then went into the coordinator's office in County Court No. 14 and upon exiting and coming back down the hallway

1    that individual was continuing to talk.

2              THE COURT: Hold on a minute.

3              MR. SMYTH: Let's put it under oath.

4    He can testify.

5              THE COURT: Yeah, rather than have

6    Wayne recite what Joe has told him, Don, your

7    preference is to go ahead and have Joe put under

8    oath, tell us what he knows?

9              MR. SMYTH: Sure.

10             MR. HILL: Because, Joe, there was

11   more than one person involved; there may have

12   been four or five.

13             THE COURT: Here is my problem.  I

14   don't have any reason to dispute what Wayne is

15   telling me if--.

16             MR. HILL: Judge, I was just trying to

17   outline for you.  I was intending to call Joe.

18             THE COURT: My point is why even.

19   Obviously there's not a necessity to call Joe.

20   I believe Wayne is telling me what Joe told him

21   this morning.

22             MR. HILL: To go one step further.

23             MR. SMYTH: Could I finish, please?

24             THE COURT: I'm just trying to cut

25   down what we got to hear.  If you want to let

1    Wayne's summarization of what Joe has said
2    suffice or not, hear from Joe.
3              MR. SMYTH:  We want it under oath.
4              THE COURT:  Let's do that.
5              MR. HILL:  I wasn't trying to
6    summarize for personal evidence.  I thought Mr.
7    Smyth wanted to know.
8              MR. SMYTH:  I got the drift.  I've
9    been around here about seventeen years.  I've
10   seen it before.
11             THE COURT:  Okay.  Joe, would you
12   please, raise your right hand.
13             (Oath administered to attorney Joe
14   Licata).
15             THE COURT:  Please be seated right up
16   here on the witness stand up here.
17
18
19
20
21
22
23
24
25

JOSEPH LICATA

was called as a witness by the Defense and,

having been duly sworn, testified as follows:

                     DIRECT EXAMINATION

BY MR. HILL:

        Q.   Would you, please, state your name for

the record?

        A.   Joseph Licata.

        Q.   How are you employed, Mr. Licata?

        A.   I am an attorney.

        Q.   Do you practice in Harris County,

Texas?

        A.   Yes, I do.

        Q.   Are you licensed by the State Bar of

Texas?

        A.   Yes.

        Q.   And how long have you been a

practicing lawyer in Texas?

        A.   Since '79.

        Q.   And are you licensed in any other

states?

        A.   Florida.

        Q.   All right.   Could you just briefly

tell us what your background is in the practice

of law?

1    A.    I do mostly criminal law, some

2    personal injury, former prosecutor in Florida.

3        Q.    All right.  Today is March 2nd, 1994;

4    is that correct?

5        A.    Yes.

6        Q.    Did you have an occasion to be on the

7    seventh floor of the Harris County Criminal

8    Courthouse located at 301 San Jacinto earlier

9    this morning?

10       A.    Yes.

11       Q.    Today's time is approximately twelve

12   minutes after ten a.m.; is that correct?

13       A.    Yes.

14       Q.    All right.  Approximately what time

15   were you up on the seventh floor of this

16   building this morning?

17       A.    I was up here several times this

18   morning.  I had a case set in Judge Barkley's

19   court, County Court 14, two or three times

20   between 8:20 and about 9:15.  I reset the case

21   prior to docket call, so I don't know what time

22   they called the docket.

23       Q.    Okay.  For purposes of the record,

24   County Criminal Court No. 14, is that located

25   near the courtroom that you're presently sitting

1    in, testifying in?

2        A.    Right across the hall.

3        Q.    And this is not the actual courtroom

4    for the 178th District Court that we're in right

5    now; is that correct?

6        A.    Yes.

7        Q.    This is commonly referred to as one of

8    the jury selection rooms for capital murder

9    cases?

10       A.    Yes.

11       Q.    And this is the one that is -- would

12   be to the extreme west-hand side of the two

13   particular rooms?

14       A.    I believe so.

15       Q.    All right.  Would you, please, relate

16   to the court what you observed or what you heard

17   this morning as you were proceeding to County

18   Criminal Court at Law No. 14.

19       A.    As I was exiting County Court 14,

20   going down the hallway to the coordinator's

21   office, I had to pass a bench in the hallway.

22   There were three, maybe four people seated on

23   the bench.  They were all wearing the purple

24   badges, jury badges.  One man in particular,

25   they were having a discussion, but one man in

particular was dominating the discussion. They
were talking about expert witnesses. He was
giving his opinion that expert witnesses that
were hired by the defense to come in and testify
were more inclined to say what they were paid to
say because if they didn't then they won't be
hired by defense attorneys; whereas, experts
that work for the State get paid the same no
matter what they say. That was the gist of what
he was saying to the other jurors sitting out
there.

Q. And did you state the other
individuals that you saw seated there were
likewise wearing purple badges?

A. Yes.

Q. All right. Did you have an occasion
to look closely at the badge to see if there was
a judge's name on that particular tag?

A. On the way out of the coordinator's
office back to the courtroom, they were still
having basically the same conversation about
testimony and witnesses, so I looked down at the
one gentleman who was doing most of the
talking. I didn't have my glasses on, I first
thought it said Judge Hearn, then upon closer

examination I discovered it was Judge Harmon's
badge. So then I went over to the 178th, which
is down the hall the other direction, and
inquired as to whose jury this was.

Q. And did you learn that it was the jury
that was impaneled to hear a contested
competency hearing in a capital murder case?

A. Yes. They had another jury over there
with white badges. I was inquiring as to
whether they were all wearing the same badges,
then I was informed there were two separate
hearings going on at the same time, that this
was a case being handled by Denice Crawford.

Q. Okay. And Ms. Crawford is the
attorney seated to my immediate right in this
courtroom at the present time?

A. Correct.

Q. Approximately how much time had
elapsed in between the time that you first made
the observation and heard this juror talking and
the second time that you came out and observed
that the conversation was still continuing?

A. Roughly, maybe ten minutes, probably
closer to five.

Q. Did it appear that there were as many

as twelve people there, that they were deliberating in the case, or could you tell?

A.   It sounded like a jury deliberation, but there was only three or maybe four people present.  I believe four.

MR. HILL:  I'll pass the witness. Thank you, Mr. Licata.

CROSS EXAMINATION

BY MR. SMYTH:

Q.   Mr. Licata, how long did you stand there and listen to these people's conversation?

A.   Just long enough to walk in and long enough to walk out.

Q.   Well, how long was it that you were standing there and you heard this conversation that you're talking about?

A.   A few seconds.

Q.   A few seconds in passing?

A.   Yes.

Q.   Did you stop and stare and look at them?

A.   Only on the way out when I was trying to see what the badge said.

Q.   Okay.  And how much total time do you think you overheard these people you claim are

jurors in this particular court in this case talking?

A. Long enough to walk the thirty or forty feet from the front of the courtroom to the coordinator's office, then the same distance back.

Q. Were they talking loud enough so you could hear them for this entire thirty or forty feet?

A. The one fella was talking loud where I could hear him if I was standing by the entrance of County Court 14, yes.

Q. How many other people were in the hall?

A. On the way out, I commented to another attorney, I can find out his name, and he heard them talking, but he was apparently, he didn't want to get involved. So his comment to me, "I keep my ears closed." But I made a comment to him, "I can't believe they were having that type of discussion." Sounded -- in fact, I told him it sounds like they're deliberating.

Q. Okay. You say the total time you heard them was a couple of seconds?

A. Several seconds. However long it

takes to walk thirty, forty feet.

Q. Well?

A. Fifteen, twenty seconds. I don't know if you're trying to pin it down.

Q. Fifteen, twenty seconds, maximum?

A. Right.

Q. Describe the people that were doing the talking.

A. The one gentleman that was doing most of the talking, I believe, as I was looking to see who the attorneys were handling the case, so I opened these two doors, is sitting facing the same direction that I am against that wall. He is wearing a shirt and slacks.

Q. Okay. What color shirt?

A. I believe a striped shirt. I'm not certain.

Q. What color striped shirt?

A. I'm not certain.

Q. What color slacks?

A. I don't know.

Q. Does he have a full head of hair? Is he bald-headed?

A. Full head of hair, I believe. I believe he is wearing glasses.

Q.    Does he have a beard, mustache?

        A.    I don't believe he does.

        Q.    Wearing a coat?

        A.    No.

        Q.    Okay.  You say he was the one doing
most of the talking?

        A.    Right.

        Q.    Was he a white male, an Asian male,
black male?

        A.    White male.

        Q.    What were the people that were
listening to him, the four people, what did they
look like?

        A.    He was talking to another white male
gentleman.

        Q.    What was this person wearing?

        A.    I don't remember.

        Q.    Don't have any idea?

        A.    No.

        Q.    Full head of hair?

        A.    No.  I was more concerned with what
they were saying, not writing down their
descriptions.

        Q.    Glasses?

        A.    The other gentleman didn't have

glasses. I believe the one that was doing the
talking had glasses. One he was talking to did
not.

Q. Wearing coat and tie?

A. I don't think that either one of the
two main people were that I noticed.

Q. Don't have any idea what he was
wearing?

A. No.

Q. How about the other, the third person
in this conversation who was present?

A. I don't remember. Could have been a
lady. I'm not certain. I think was one person
standing. I'm not even sure about that.

Q. Well, did they all four have jurors
badges on?

A. They all had juror badges, yes.

Q. What about the third person, don't
know whether it was a male or female. How about
the fourth person?

A. I don't recall. I believe there was a
fourth person, and he may have come after I was
walking out, so he may not have been present
when I walked in. I believe there was one
person standing, three people seated on the

bench.

Q. Fourth person is a male?

A. I believe so.

Q. You say I believe so. You assume he's a male?

A. I believe so.

Q. You're not sure?

A. No.

Q. Could have been a female?

A. Yes.

Q. Can you tell us anything about the second person? White male, black male?

A. I can't tell you the descriptions. If you want me to describe the badges they were wearing, I can describe the badges. Purple badges. Like I said, I didn't have my glasses on. I noticed they were all wearing the badges. The combination of what they were saying, the fact they were wearing jury badges is what got my attention.

Q. Purple badges like Ms. Alcala's shirt?

A. No. Kind of violet.

Q. Violet?

A. Violet purple.

Q. But this one guy doing all the

talking, sum and substance is you think he was,
did you think he was saying, he was commenting
somebody might have a motivation to testify one
way or another based on whether who paid their
bills?

A.    The sum and substance is that it
seemed more appropriate to me walking by that
that's the kind of conversation you would have
deliberating in a jury room and not have while
you're an active juror on a case.

Q.    Okay.

A.    That's what caught my attention.

Q.    Did they talk about whether or not any
particular defendant was competent or
incompetent?

A.    Not that I recall.  They basically
were talking about the fact that expert
witnesses hired by the defense would be more
inclined to say what they're paid to say versus
the State's experts.  I didn't even know they
were talking about doctors.  He kept referring
to experts.

Q.    Okay.  That was all they said?

A.    That's all I heard.

Q.    Bottom line is that an expert witness

1    paid by a defense would be more inclined to
2    favor the defense than an expert witness who is
3    paid by the State or who worked for the State
4    and whatever; is that what you're saying?
5         A.   I believe what he said was that a
6    person that's paid by the defense, if they
7    didn't say what the defense wanted them to say,
8    would not be hired by other defense.
9         Q.   That's what he said?
10        A.   Yes.
11        Q.   What did the rest of them say?  What
12   did the second guy say?
13        A.   They weren't talking as loud as he
14   was.  They were discussing, but basically he was
15   doing, there was one particular fellow that was
16   doing most of the talking.
17        Q.   This guy doing most of the talking,
18   what did the number two person say to him?
19        A.   He was talking at a tone, you know,
20   just discussion.  I didn't hear what he said.
21        Q.   So you couldn't say what number two
22   said.  You don't know whether he said the sky is
23   blue or let's not talk about this or whatever?
24        A.   That's pretty accurate.
25        Q.   How about the number three person?

1     A.    Same.

2     Q.    Male or female?

3     A.    Just heard the one guy.

4     Q.    You just heard the one guy?

5     A.    Right.

6     Q.    You really didn't hear the others

7 agreeing or disagreeing?

8     A.    No.

9     Q.    You don't know whether the others

10 said, hey, we can't talk about this or not?

11     A.    No.

12     Q.    You don't know whether the others

13 said, hey, man, this is not the time or place or

14 whether they were talking about the Rockets'

15 victory last night?

16     A.    I don't know whether they said that,

17 but certainly had plenty of time to say that if

18 the judge hadn't instructed them to do so.  So I

19 would assume that the other people, whatever

20 they were saying, weren't saying that because,

21 like I said, he talked for several minutes.

22     Q.    Okay.  But I mean you can't say --

23     A.    I can't say what the other people were

24 saying.

25     Q.    All you can say is what one person was

1  saying?

2       A.    What one fella was saying.

3       Q.    You can't say they engaged in any kind

4  of conversation or were agreeing with him or

5  disagreeing or telling him you need to be quiet?

6       A.    They were engaged in conversation, but

7  their tone of voice was such that I couldn't

8  tell what they were saying.

9       Q.    They could have been talking about

10  anything, the weather or whatever?

11       A.    Correct.

12       Q.    Okay.

13       MR. SMYTH:  I have nothing further,

14  Your Honor.  Thank you.

15

16                REDIRECT EXAMINATION

17  BY MR. HILL:

18       Q.    Mr. Licata, after your initial

19  observation and hearing of this conversation,

20  obviously you went and did something else, then

21  came back out and there was still some

22  discussion going on; is that correct?

23       A.    Yes.

24       Q.    So there was a lapse of time in

25  between the first time you heard something and