# United States District Court
# Southern District of Texas

Case Number: __OSCV1847__

## ATTACHMENT

Description:

☐ State Court Record  ☑ State Court Record Continued

☐ Administrative Record

☑ Document continued - Part __13__ of _____

☐ Exhibit to: _____
number(s) / letter(s) _____

Other: _____

_____

_____

the second time you heard something?

    A.   Correct.

    Q.   Thank you.  No further questions.

## RECROSS EXAMINATION

BY MR. SMYTH:

    Q.   Second time you heard something, I take it, same, several seconds?

    A.   No.

    Q.   Was the total amount of time you overheard this one speaker talking twenty seconds on both occasions?

    A.   Approximately the first time and then maybe twenty seconds or thirty seconds the second time.

    Q.   So less than a minute.  During this entire minute that you were listening in on these folks' conversation, you only heard one person talking and nobody else?

    A.   Right.

    Q.   Okay.

    MR. SMYTH: I have nothing further, judge.

REDIRECT EXAMINATION

BY MR. HILL:

Q.   Mr. Licata, do you think you'd be able to identify the individual if he were brought into the courtroom and you had an opportunity to look at them?

A.   I believe so.

MR. HILL:   No further questions.

MR. SMYTH:   Nothing.

THE COURT:   May he be excused?

MR. HILL:   If we could hold him for just a moment, judge, because we would like to have the court bring the jurors in one at a time and make an inquiry of them as to whether or not they had any such conversations, if they were making any comments in the courtroom so as not to prejudice the others with that.

THE COURT:   Do you all have an idea which juror it is?  Can you all not tell from your juror list which juror it is?

MR. HILL:   No, judge.  I really -- I have a good idea, but just from the description he has given there are several that fit that description.  I don't want to say.

THE COURT:   You have a good idea?

262

MR. HILL: I have a good idea, but I don't know what his name is.

THE COURT: You can't figure what his name is?

MR. HILL: I have a doubt. Maybe three juror.

MR. LICATA: It was the first four jurors that the bailiff let in.

MR. HILL: But the point is there were others that listened; regardless whether they said anything. Deliberation is not only talking but listening. So I think everybody needs to be brought in.

THE COURT: Let's target the first juror. You have an idea what jurors he is talking about?

MR. HILL: Is it the guy with kind of reddish hair?

MR. SMYTH: I object to suggesting that. He can't identify. He's got some kind, allegedly has on a striped shirt, maybe.

THE COURT: I think that Joe knows who he is talking about.

MR. SMYTH: Well.

THE COURT: You'll know him again if

you see him again?

THE WITNESS: I'm sure. He was the taller of the people that was sitting out there at the time.

MR. SMYTH: I thought he was standing.

THE WITNESS: Sitting. The one that was doing the talking was sitting.

THE BAILIFF: So, you want me to get somebody?

MR. HILL: They're back there talking. You can hear, talking about have to pay their lawyers.

MR. SMYTH: Pay the lawyers. Most folks pay their lawyers.

THE WITNESS: Judge, I was trying to find out who the attorneys were, what was going on. I looked in that room to see if he was in that courtroom. He was sitting facing that way, the gentleman.

THE COURT: I want you to step there and look in that room and then take a look around and come back and tell me if you can identify the person.

THE BAILIFF: You want me to go with him?

THE COURT: He can step into that
door, just through that door right there.

THE WITNESS: I think it's the guy
with the beard and he is wearing a coat. There
is another gentleman.

THE COURT: Hold on a minute. We're
on or off the record? Are we on the record or
off the record? You think it's the guy with the
beard?

MR. HILL: It's that real slight,
almost imperceptible beard.

MR. SMYTH: In all fairness, let him
bring all of them and start inquiring who he
wants to finger.

THE WITNESS: Judge, I overheard the
conversation. I didn't want to get in the
middle of it.

THE COURT: You understand what Wayne
wants to do?

THE WITNESS: I don't want Don to get
mad at me. He sounds like he is mad.

MR. SMYTH: I'm representing the
interest of the State, you know.

THE WITNESS: I think it's in your
best interest that a jury not deliberate in the

hallway, so I wanted to tell. I wanted to bring
to the court's attention.

THE COURT: Wait, Joe. Nobody likes
it when anybody is out there doing that. I
don't like it, Don don't like it, Wayne doesn't
like it, Denice don't like it. I guarantee we
appreciate you came forward now.

THE WITNESS: I can't see a doorknob
without my glasses on, and I said I didn't have
my glasses on, and I know the badges were
purple, and I leaned over, and whoever the
gentleman was --

THE COURT: I understand that. Hold
on a minute. Ask the guy with the beard and
coat to come in.

MR. HILL: Should we have Joe step
out?

THE COURT: No, just sit right back
there, Joe. I suggest I'll make the inquiry.

MR. SMYTH: Oh, that's fine with me.

MR. HILL: Yes, sir.

(Juror Richard Baker enters the
courtroom).

THE COURT: Tell me what your name is.

THE JUROR: Richard Baker.

THE COURT: Mr. Baker, it has been brought to my attention there were some jurors having a conversation out in the hallway this morning talking about the psychiatrists and whether or not their testimony was influenced by who paid them, all that kind of business.

THE JUROR: Not that I am aware of.

THE COURT: Not that you are aware of?

THE JUROR: Paying of them, yes, we discussed it, yes.

THE COURT: We who?

THE JUROR: Several of us.

THE COURT: Were you doing most of the talking or was somebody else doing most of the talking?

THE JUROR: We were all doing.

THE COURT: How many?

THE JUROR: There was four or five of us.

THE COURT: Four or five of you?

THE JUROR: Uh-hum.

THE COURT: There was not one person talking more than another person?

THE JUROR: I don't think so. It was a general discussion.

1          THE COURT:  Okay.  Why don't you do me

2     a favor.  Why don't you have a seat out in this

3     hallway.

4          THE JUROR:  Okay.

5          THE COURT:  Yeah, have a seat out in

6     this hallway, please.

7          (The juror leaves the courtroom).

8          THE COURT:  Was he the main one, Joe?

9          THE WITNESS:  Judge, I believe so.  I

10    believe he was the gentleman that was sitting

11    there doing most of the talking but, again, I'm

12    not a hundred percent sure because, you know, I

13    wasn't thinking of doing anything.  I wasn't

14    thinking it was important at the time to get

15    physical description of what everybody was

16    wearing.

17         THE COURT:  I got the impression from

18    what you were saying you felt one of the persons

19    was doing most of the talking.

20         THE WITNESS:  I believe he was one of

21    the persons.  He was in the few doing most of

22    the talking.

23         THE COURT:  Okay.  Do you think you're

24    going to be able to identify anybody else that

25    he was talking with?

THE WITNESS: Judge, as far

description of people, I got maybe a general

idea.

THE COURT: You know, I mean, when

they walk in here, be able to recognize them?

THE WITNESS: Possibly. There is one

fella that is maybe younger, blondish kind of

hair.

THE COURT: Yes.

THE WITNESS: I think he was maybe the

second guy.

THE COURT: Okay. Wayne?

MR. HILL: Yes, sir.

THE COURT: What do you want to do?

MR. HILL: Well, judge, I think we'd

like to bring the jurors in individually so that

you could ask them.

THE COURT: All twelve?

MR. HILL: Well, I mean, I think maybe

we have two now.

THE COURT: We have one now.

MR. HILL: No, I am sorry, I am

referring to the second gentleman that Joe has

indicated may have had the blonde hair. But,

yeah, right now, Mr. Baker. I don't know that

we really have had the gist of what Mr. Baker

was discussing or what they were discussing,

but, I mean, I'm concerned about the taint

that's occurring, and ultimately if the court is

convinced that there has been that type of

misconduct that requires a granting of a

mistrial, that we'll probably be moving for a

mistrial.

THE COURT: Well, so, my point is, how

do you want to do it? Do you want to do it one

by one? I feel like this juror can probably

tell us who the other jurors were who were

participants in the conversation. We can talk

to them individually, we can talk to the group

of the jurors as a group.

MR. HILL: I would prefer, if the

court is going to permit Mr. Baker to basically

identify the other individuals that he was

conversing with, to have him explain that to the

court, then have each of those individuals

brought in individually.

THE COURT: My problem is I'll bet Mr.

Baker doesn't even know their names.

MR. HILL: Maybe he'll have the same

difficulty that Mr. Licata has in terms of

identifying who these individuals are.

THE COURT: Oh, I think he knows which ones they were. My problem is how do we summon them into the courtroom without making them all--

MR. SMYTH: Judge, if they are going to make a motion, if they are big enough to complain, stand up and take the medicine. If the jury is tainted, has to be scrapped, start over, then so be it, but let's don't do something on supposition and I thinks and maybes and twenty seconds and stuff like that. Let's do it on the record so we do it right.

MR. HILL: I think we are doing it correctly; we are doing it on the record; it's not just supposition. Mr. Licata came in and related what he overheard.

THE COURT: I don't have any problem. All right, Freddy, ask Mr. Baker to come in.

(Juror Baker enters the courtroom).

THE COURT: Mr. Baker, I need to talk to everyone who participated in the conversation this morning out in the hallway.

THE JUROR: Okay.

THE COURT: I know you probably don't

know their names.

THE JUROR: Well, there is Bob Johnson. Can't remember who was sitting there. It was, you know, not an important conversation, it was just general things.

THE COURT: All right. Does each side want to go ahead and talk to Mr. Baker now?

MR. HILL: Judge, I'd like to.

THE COURT: Mr. Baker, this is what I want to do now. What I want to do is put you under oath.

THE JUROR: Yes, sir.

THE COURT: Put you on the stand so we can find out what exactly you all talked about this morning.

THE JUROR: Okay.

THE COURT: Raise your right hand.

(Oath administered to juror Baker at this time).

THE COURT: Let me assure you, Mr. Baker, that I want you to be absolutely candid with us. Nothing that may have happened out in the hallway this morning will subject anybody to getting in trouble.

A.     Uh-hum.

THE COURT: Okay. I mean, no one is going to get in trouble over this; okay?

MR. SMYTH: I would ask Mr. Licata be excused, at least leave the courtroom.

THE COURT: You want him excused for good?

MR. SMYTH: No, sir, not excused for good, just outside the presence of the jury.

MR. HILL: May I proceed?

EXAMINATION

BY MR. HILL:

Q. Mr. Baker, I am Wayne Hill. Along with Ms. Crawford, we're attorneys for the defense that are representing Mr. Eldridge.

First of all, I'd like to ask you, sir, were you seated in the hallway just outside of this courtroom this morning?

A. Yes, I was.

Q. Okay. And could you tell the court how many individuals that are on the jury currently impaneled in this case were with you?

A. I think three others.

Q. Were they all men?

A. No, there was two men and a woman. I remember the woman because she rode up on the

elevator with me.

Q. Okay. And approximately how long did you sit there or stand there and have a general conversation with these individuals?

A. Twenty, twenty-five minutes.

Q. And could you tell us in your own words what the content of that discussion was, especially as it relates to what you may have been saying?

A. It's hard to think about because it was a general discussion about a lot of subjects. We did happen to mention how many more witnesses were going to be called, because we commented when y'all came up here last night she held up three fingers, she held up four fingers, we were trying to decide if there were any more psychologists or psychiatrists.

Q. Okay. Did you discuss the relative merits of a witness being called by the defense and paid by the defense as opposed to witnesses called by the State, expert witnesses?

A. I don't think the fact of who paid them is a matter we discussed, what they said.

Q. Okay. What do you recall the testimony or the discussion being in terms of

what witnesses were talking about or what they
had actually said during the trial?

   A.   It's hard to remember because, like I
said, it was just a conversation.  We were not
deeply involved in discussing the trial per se.

   Q.   But you were discussing the testimony
that had been?

   A.   Yes.

   Q.   Had been presented?

   A.   Yes.

   Q.   And, at that time, were the other
remaining members of the jury in your presence
or were they elsewhere?

   A.   They were, like I said, there were
only about four of us out there.

   Q.   So the other eight people who make up
the twelve person jury were not present?

   A.   During that conversation, yes.

   Q.   Was there a subsequent conversation
that took place in the presence of the other
eight people?

   A.   We all sat in there, we discussed it.
We did not remember instructions from the judge
that we could not discuss it amongst ourselves.
The instructions we all remembered was to not to

discuss it with our family and friends. We were
not aware we could not discuss it among
ourselves.

Q. Okay. So, at that point in time, when
you were having these discussions, you felt it
was okay?

A. Yes. If we had known we were doing
something wrong, we would not have done it.

Q. Do you recall anybody in the group
initially making any comment about the
likelihood that a witness that was called by the
defense and had been paid would likely render a
favorable opinion?

A. No.

Q. For the defense?

A. No, no.

Q. Can you unequivocally state that that
didn't occur, or you just cannot recall whether
that statement was made?

A. To the best of my knowledge, that
statement was never made.

Q. All right. Can you recall what
statements were made?

A. Like I say, it was just general
discussion of how we felt the testimony went.

The one hour viewing the patient versus the three hours and this type of thing.

Q. Okay. Was there a general consensus that had been developed among the four people?

A. No. No, that's something we already found out, we don't have a consenses.

Q. So what about when the discussions terminated out in the hallway and then you were brought back into the anteroom here by the bailiff, all twelve people were assembled at that point as far as you know?

A. I'll say ten of us were there because one of the ladies, it was very close to nine o'clock when she showed up, or 9:15.

Q. Okay. So a discussion, a subsequent or a second discussion of the evidence of the case transpired at that point?

A. Yes.

Q. Again not all twelve people were present?

A. Correct.

Q. Can you tell us whether or not there was any difference in the discussion that took place in this room versus what took place out in the hallway?

1          A.    Not really.    It's, again, it's a
2    general discussion of the case, how we felt
3    about the way it was presented.
4          Q.    Okay.    Were there any comments that
5    stood out in your memory in terms of how the
6    evidence was presented other than the fact that
7    the one hour of observation versus--
8          A.    Right, that's basically it.    We don't
9    have a consensus of opinion.    We still have not
10   formed a opinion.    That's one thing we all
11   agreed on, that we have not formed an opinion.
12         Q.    Okay.    Was there any effort at
13   basically taking like a straw poll, if you will?
14         A.    No.
15         Q.    Like how many think one way or the
16   other?
17         A.    No, we have not done that at all.
18         Q.    You named a gentleman by the name of
19   Bob Johnson.    I assume that just in the course
20   of being impaneled you kind of get to know some
21   of the people?
22         A.    Well, you know, the thing is, Bob
23   Johnson is the fact try the representative for
24   Krause Hines (phonetically), and I am an
25   electrician, I use his product.

Q.   Okay.

A.   That's basically the reason I remember him.

Q.   Okay.   So at least we know he was one of the gentlemen sitting with you?

A.   Right.   The other one is the male school teacher, he was there.

Q.   Would you be able to show the bailiff which gentleman that is?

A.   Oh, yes.

Q.   Okay.   And then the other one was a female?

A.   Right.   It's the, I think her hair is red.   The elderly lady with the red hair.   I think that's what color her hair is.   She rode up on the elevator with me.

Q.   You would likewise be able to identify her for the bailiff to bring up?

A.   Yes.

Q.   Was there anybody else, or at least in the discussion that took place in the hallway?

A.   Yes, that's the only ones that were out there.

Q.   And at the time that those discussions were taking place, the evidence had not been

1    completed in the case; correct?

2        A.    Right.

3        Q.    And neither the defense or the State

4    had made any final arguments to you at that

5    point?

6        A.    Correct.

7        Q.    And the individual that was in court

8    earlier, yesterday morning seated at counsel

9    table with us, the defendant, Gerald Eldridge,

10   he was not present when any of that was taking

11   place?

12       A.    No.

13             MR. HILL:    I'll pass the witness, Your

14   Honor.

15   BY MR. SMYTH:

16       Q.    You discussed the testimony of the

17   individual experts in the case?

18       A.    Not necessarily the testimony.    What

19   they said, no, I don't think we did that.    I

20   just think we discussed the general overview.

21       Q.    Just general concept of experts who

22   testify?

23       A.    Yes.

24       Q.    Whether or not they're believable and

25   things like that?

A.   Uh-hum.

Q.   Did you reach an opinion on -- you haven't gotten the charge in this case.  Did you reach any kind of an opinion as to what the verdict should be?

A.   No.

Q.   Okay.

A.   As I said, then when all of us were in there, we don't have a consensus.  None of us have a true opinion yet as to it.

Q.   And this first conversation, you stated four folks were sitting around there. What time did this occur?

A.   Between quarter to nine and 9:15.

Q.   Quarter to nine, so quarter to nine, 9:15 is when you folks--

A.   Right.

Q.   What time did you arrive here?

A.   I was downstairs about 8:30.

Q.   Okay.  But you didn't come up until quarter of nine?

A.   Well, that's when we got into this discussion.  We discussed a lot of things out there.

Q.   You haven't formed an opinion on this

case to be decided one way or another; is that correct?

A. No, no, I haven't.

Q. I think it was brought out but not directly. Do you recall any -- the judge giving you any admonishments at anytime about not to be discussing this case until you got the charge?

A. In fact, we were in there talking about it awhile ago. The bailiff said something to us about it, about discussing it. We said we did not remember the judge telling us we could not discuss it among ourselves. We remembered him telling us last night not to discuss it with our families.

Q. Okay. Would this discussion that you had with the three other jurors at first, then I guess the ten others, once you were placed in this room outside, would that have any effect on how you voted in this case?

A. Not me, no, because I have not decided anything yet.

Q. Did anybody, had anybody decided anything?

A. Not that I know of.

Q. So nobody had an opinion I think the

1  guy is competent or I think the guy is

2  incompetent?

3      A.   No, nothing has been said about that.

4  Like I say, we had the general discussion about

5  everything that's been said, but as far as

6  anyone venturing their opinion, I don't think

7  anyone had.

8      Q.   Okay.  So, as far you know, you don't

9  recall anybody saying they'd come to a

10  conclusion one way or another?

11      A.   No.

12      Q.   Would you be able to set aside

13  anything that you heard during this conversation

14  and not take it into any deliberations that

15  might eventually occur in the case and then

16  return your verdict based on what all the facts

17  were after you get the charge?

18      A.   Absolutely.  Because I do not feel

19  that anything we said out there in any way

20  prejudiced anyone of us.

21      Q.   Okay.  Could you promise the court as

22  well as the defense attorneys in this case as

23  well as the State that you would from this point

24  on certainly not discuss anything about this

25  case?

1    A.    Absolutely.  Like I said, if we
2    remembered the judge telling us not to discuss
3    it, we would not have.
4        Q.    Certainly not discuss it until you get
5    the charge?
6        A.    That's correct.
7        Q.    Also, would you -- I don't know how
8    many of your fellow jurors we may end up talking
9    to, but could you also promise us, I'm sure the
10   judge will probably admonish you, not to say
11   anything to them about what has gone on inside
12   this room outside of their presence?
13       A.    Absolutely.
14       Q.    Okay.
15            MR. SMYTH:  I have nothing further.
16   Thank you, sir.
17   BY MR. HILL:
18       Q.    Let me ask you something.  I think my
19   question may have had too many facts in one
20   question that I asked you before.  Was there a
21   discussion about the experts as you sat out in
22   the hallway?
23       A.    Well, not specifically them.  The fact
24   that we said that, you know, the difference
25   between the one hour and the three hour, the

amount of testimony that was given. But as far
as what was said, no.

Q. Was there any discussion about the
credibility of a witness?

A. No.

Q. Of a witness that would work in the
jail for the forensic unit versus a witness that
would testify in behalf of the defense?

A. No. We did not discuss the Defense
side. You know. Per se we did not say anything
about, you know, the lawyer, I mean psychiatrist
for the State or the Defense.

Q. Okay. When you say per se, what does
that mean?

A. Not specifically.

Q. Okay. Well, how about generally?

A. Generally we discussed the testimony.

Q. Okay. And in that context of
discussing the testimony, what was said?

A. To show you how important it was, I
really do not remember. I mean, we just
discussed a lot of things out there, just like
we've been sitting in there discussing politics,
lawyers.

THE COURT: In that order?

```
 1        A.    More or less, yes, sir, Your Honor, we
 2   did.  And how to cure the health care needs of
 3   the country, you know.  We had a lot of
 4   discussions.
 5        Q.    Okay.  Thank you, sir.  I appreciate
 6   it.
 7             MR. SMYTH:  Nothing further, Your
 8   Honor.  Thank you, Mr. Baker.
 9             THE COURT:  Mr. Baker, have a seat out
10   in this hallway.
11             Off the record.
12             (Off the record)
13             (Juror Bob Johnson enters the
14   courtroom).
15             THE COURT:  Come on up, Mr. Johnson.
16   Let me advise you you've done nothing wrong,
17   that you're not in trouble, but it has been
18   brought to our attention that some jurors were
19   discussing the trial this morning on the bench
20   outside, and we're making an inquiry simply into
21   what was said; okay?
22        A.    Sure.
23             THE COURT:  We got to put you on the
24   witness stand, I want to put you under oath.
25             (Oath administered to juror Bob
```

Johnson).

THE COURT: Once again, you've done nothing wrong, so be candid, just let us know what the conversations were about. I'll let these lawyers ask all those questions.

MR. HILL: Thank you, judge.

EXAMINATION

BY MR. HILL:

Q. Mr. Johnson, my name is Wayne Hill. Denice Crawford, we both represent Mr. Eldridge.

A. Uh-huh.

Q. Could you, please, tell me, just for purposes of the record, you're a juror in this cause, State of Texas versus Gerald Eldridge?

A. Yes, sir.

Q. All right. And you are currently seated along with eleven other Harris County citizens as a juror in this case; correct?

A. Yes, sir.

Q. You have not been given a court's charge, a written document detailing what the law is as it relates to this case yet; have you?

A. No, sir.

Q.   All right.   And the evidence is not
closed.   By that I mean the State has not stood
up by one of its representatives and said the
State rests.   And we, likewise, have not
completed the trial; correct?

A.   That's correct, right.

Q.   No final arguments have occurred in
this case?

A.   No, sir.

Q.   All right.   Directing your attention
to earlier this morning, March 2nd, 1994, did
you have an occasion to be in the hallway
outside of this small courtroom where we
currently are sitting?

A.   Yes, sir.

Q.   And were you in the presence of some
of the other jurors at that time?

A.   Yes, sir.

Q.   Do you know the names of the jurors
that you were with, sir?

A.   No, I don't.   I know their occupation,
one of the gentlemen's occupation.

Q.   Okay.   Well, start with the one that
you know the occupation of.

A.   He is a school teacher, he has

glasses, he sat right at the end, because he was
standing up every time that we had to call a
witness yesterday, but I don't know his name.

Q. You'd be able to identify him, obviously?

A. Yes.

Q. Tell the bailiff who he is?

A. Yes.

Q. Okay. And the other individuals, please?

A. The other gentleman who you just
called in here a few moments ago.

Q. He was previously identified as Mr.
Baker. Does that ring a bell at all?

A. I don't know any of the other jurors'
names.

Q. Okay.

A. But, yeah, the other gentleman who
came in here who had the glasses with the gray
hair, tall gentleman, he was there. Another
school teacher, I don't know her name, but I
could identify her as well, and another
gentleman, there is one other gentleman.

Q. In any event, sir, would you be able
to accompany the bailiff and basically say these
are the other individuals that we are referring
to?

1      A.   Yes, sir.

2      Q.   So the court could ask them to come in

3 and talk?

4      A.   Yes, sir.

5      Q.   Would you, please, tell the court what

6 the basic conversation was that was taking place

7 out in the hallway earlier this morning?

8      A.   Sure.  Well, basically, we were just

9 discussing the witnesses brought up,

10 specifically the credibility of the witnesses.

11     Q.   Okay.  What about the credibility of

12 the witnesses?  How did that factor into the

13 discussion?

14     A.   Well, I think what really had

15 transpired was that we were just talking about

16 the witnesses that had been brought forth

17 before, whether or not we thought the one was

18 more or less credible, talking about their

19 testimony.

20     Q.   Okay.

21     A.   Certain things about their background.

22     Q.   Do you recall if you were an active

23 participant in that, or was there one individual

24 that seemeed to be doing most of the talking

25 during the course of that discussion?

A.   I couldn't say, quite honestly.   I
mean, I know I had input.

Q.   In fairness to you, let us hear what
your input was.

A.   I did bring up one point that I
thought was interesting, was the fact that one
of the witnesses had heard three cases in three
years, where the other witness had heard roughly
fifteen hundred cases in ten to twelve years.
That was something that I did bring up.

Q.   Okay.   Did that, was there a further
discussion of which witness it was or which side
had called the witness that had only appeared in
three cases in three years?

A.   I'm not sure if I follow.

Q.   Okay, which witness was it that you
were referring to, just for purposes of the
record.

A.   Sure.   The first witness who had been
the first psychologist that was, I believe,
representing or you had called your witness.

Q.   That would be Doctor Richard Austin,
if you've forgotten his name.

A.   Yes, that's correct.

Q.   He was identified in the conversation

1     as a defense witness or defense expert?

2     A.   I'm not sure if that was actually

3     brought up. I think it was more or less it was

4     more casual, it was more or less talking about

5     one of the witnesses brought up. I don't think

6     there was any conversation whether or not that

7     witness was for the defense. I may be incorrect

8     on that, but I don't believe it was brought up

9     in that context.

10     Q.   Was there any discussion about the

11     relative credibility of witnesses called by the

12     State versus witnesses called by the defense, in

13     the likelihood that a witness is called by the

14     defense would likely testify favorably to the

15     defense?

16     A.   Again, I'm not sure I completely

17     understand your question.

18     Q.   Was there a discussion of defense

19     witnesses, first of all, being paid for their

20     testimony?

21     A.   I don't recall any discussion like

22     that.

23     Q.   Okay. Was there a discussion

24     generally about the defense witnesses or defense

25     experts?

A.   Well, there was discussion about that one witness in particular.

Q.   And can you be any more particular in terms of what was said?

A.   That doctor, again, I don't recall his name, but the first doctor who came up who is your witness.

Q.   Uh-hum.  What was said about his credibility?  You said you talked generally about the credibility of the witnesses.

A.   Again it was more or less a discussion as to, in my discussion was made or the comment that I made was that one witness had come up and one of the things that was brought up during the examination was that one of the witnesses had said that he had heard three times or three cases within the last three years, where the other witness had made a statement during the examination of hearing roughly fifteen hundred cases in the last ten to twelve years.

Q.   Did that have, does that have an impact on you at the current time in terms of the credibility of those two witnesses and the relative merits of what they say?

A.   Yeah, I would say so.

1        Q.    Have you, being candid with the judge?

2        A.    Sure.

3        Q.    Have you already formed an opinion?

4        A.    No.

5        Q.    In terms of which expert is more

6  credible?

7        A.    No, quite honestly, I have not.

8        Q.    Okay.  Now, we've talked generally or

9  specifically about what you had said; correct?

10       A.    Correct.

11       Q.    Do you recall any other jurors making

12  any comments?

13       A.    One comment that was made, and I don't

14  know who made this comment, was the fact of one

15  of the witnesses had interviewed the defendant

16  for about an hour where the other witness during

17  the examination had interviewed the witness on

18  three separate occasions for a total of roughly

19  three hours.  That did come up.  I could not

20  tell you who brought that up, but that was a

21  conversation that was brought forth.

22       Q.    Okay.  At the time that you were

23  having these discussions in the hallway, there

24  were only four of the jurors present?

25       A.    I believe.  I may be incorrect on

that, but there was no more than five for sure,
and I believe it was four. There may have been
a fifth.

Q. Were you basically discussing the
evidence at that time that had been presented to
you up to that point?

A. Yes, but we were discussing other
things that had nothing to do with the case.

Q. All right. At some point, were you
then ushered into an anteroom or waiting room
inside this courtroom?

A. Yes. We were not ushered, what
happened, the bailiff opened, unlocked the
door. We were waiting for the door to be
opened.

Q. Could you tell whether or not for sure
all twelve jurors were sitting in the waiting
room when the door was first opened up?

A. We were the first one in there, so
there was nobody else in the room.

Q. Were the discussions of a continuing
nature as other jurors entered the room?

A. I don't believe so. No, sir.

Q. Was there any discussion, for that
matter, in the waiting room, once more than just

the first five were sitting there?

A. There were discussions about the case, but they were more along the lines of curiosity as to how long the case would go, more witnesses. There was speculation amongst everybody as to further witnesses, where they would be coming from, what type of testimony they would have.

Q. Okay.

A. And, again, I may be incorrect on, but I don't believe there was really a discussion per se among all twelve as to the credibility or merits of the testimony that had been brought up in the previous two days.

Q. Okay. But was there a discussion generally, it may not have been all twelve, but there was some number of people that were sitting and discussing the case prior to the judge giving you a written charge or the evidence all being presented to you?

A. Again, could you repeat the question?

Q. Yes. The discussions took place prior to the charge being given to you and before all the evidence was presented to you?

A. The discussions and questions that I

just talked about, yes.

Q. Was there a general consensus that was developed by the jurors that were present as to the outcome of the case?

A. No.

Q. Was there any effort, I guess, for lack of a better phrase, taking a straw poll or a straw vote?

A. No, sir.

Q. Were you able to discern what the other jurors' beliefs or feelings were based upon your conversations with them?

A. I could say this. I would, based on some of the comments that came out, such as what I just brought up, I would have a feeling that I would, I feel I would know more as to what that individual might be leaning towards as to whether or not that individual was definitive one way or the other, no.

Q. But there were general discussions of issues that you were going to be called upon to resolve, that being the competency of the defendant?

A. Well, there was more discussions, again, about the two witnesses in question that

I brought up before.

Q.   The other witness, by the way, for purpose of the record, was a witness called by the State of Texas, the one that you said interviewed fifteen people or dealt with fifteen people or fifteen hundred cases in a ten to twelve year period?

A.   Yes, sir.

Q.   Do you recall the name of that individual?

A.   I know he was a doctor with private firm with glasses.

Q.   Would it be Doctor Silverman?

A.   Yes.

MR. HILL:   I have no further questions.   Thank you, sir.

BY MR. SMYTH:

Q.   Let me make sure I understand, the record is clear.   You folks discussed the experts' testimony?

A.   Correct.

Q.   To some extent?

A.   To some extent, yes.

Q.   While you were out in the hall.   At no time, either out in the hall or in the anteroom

where you only discussed wonder what in the
world is coming today type testimony, you didn't
take a vote?

A.   Correct.

Q.   On whether or not the defendant is
competent or incompetent, you didn't take a
straw poll on whether the defendant is competent
or incompetent?

A.   That's correct.

Q.   Nobody expressed their opinion one way
or the other whether the defendant is competent
or incompetent?

A.   That's correct.

Q.   Best you think you might be able to
say they might be leaning one way or the other,
but since nobody has taken a vote, nobody
expressed their opinion, you really don't know
how they're leaning?

A.   That's correct.

Q.   You yourself have not formed an
opinion one way or another?

A.   That's correct.

Q.   Or how you would vote in this case?

A.   That's correct.

Q.   And you don't have a slightest idea

1    what the eventual outcome of this case would be?

2        A.    No, I don't.

3        Q.    Nobody else expressed their opinion as

4    to how the case should be resolved at this

5    point; is that correct?

6        A.    No, I'm sorry --

7        Q.    No one said I think the guy is

8    competent or I think the guy is incompetent?

9        A.    No.

10       Q.    The ultimate issue that this jury is

11   going to be asked to make?

12       A.    Nobody has come out and made a

13   statement to my knowledge that has been anything

14   like that.

15       Q.    Okay.  Did you hear, I'm not saying it

16   happened--

17       A.    Right.

18       Q.    But do you recall whether or not the

19   judge gave admonishments yesterday about

20   discussing the case among yourselves?

21       A.    No, I did not.

22       Q.    Do you recall whether or not the judge

23   gave some admonishments about discussing the

24   case with friends, neighbors, relatives,

25   co-workers, things like that?