# United States District Court
# Southern District of Texas

Case Number: __OScv1847__

## ATTACHMENT

Description:

☐ State Court Record    ☑ State Court Record Continued

☐ Administrative Record

☑ Document continued - Part 14 of _____

☐ Exhibit to: _____
           number(s) / letter(s) _____

Other: _____

_____

_____

1          A.    Yes, I do.

2          Q.    What did the judge say?  Do you

3    recall?

4          A.    Basically in so many words the judge

5    asked us at the end of the testimony yesterday

6    to not discuss this with our friends, family,

7    other home members.

8          Q.    Would the discussions that you've had

9    on, you know, whatever you want to call

10   credibility, qualifications or experience of

11   these alleged expert witnesses in general and

12   the specific things that they did in this case,

13   would that have an effect on, the discussions

14   that you've had, would that have an effect on

15   how you reach a decision in this case?

16         A.    I'm sorry, I lost you.

17         Q.    Okay.  The case is not over.  You say

18   you have not made up your mind?

19         A.    That's correct.

20         Q.    Would these discussions that you may

21   have had with three or four other people, would

22   that have an effect on how you eventually decide

23   this case?

24         A.    Eventually, yes.

25         Q.    Okay, could you explain that to me?

A.    Well, I would say that talking about
the credibility of the witnesses that we had out
in the hallway, those were some of the points
that I think would be brought up eventually
during our final deliberations, and I think we
probably -- I think some of those same points
that were brought up in the hallway would have
been brought up during the final deliberations.
Whether or not those facts would actually affect
the outcome, I don't know.
        Q.    Well, I guess what I'm saying, I think
the bottom line of the question is probably have
you made up your mind yet?
        A.    No.
        Q.    Obviously, if you talk about
credibility, that's something that's going to be
talked about at the end of the case, once you
got the evidence, all the evidence, once you got
the court charge altogether.  I'd be amazed if
you didn't.  I'd also be amazed if jurors didn't
discuss, well, this particular witness had --
        MR. HILL:  Could we limit to question
and answer, not trying--
        MR. SMYTH:  Oh, hey, hey, hey, hey.
        MR. HILL:  Instead of what Mr. Smyth

                                                    302

1    would like to be amazed by.

2              THE COURT:   Let's move along.

3    BY MR. SMYTH:

4         Q.   You haven't made up your mind at this

5    point?

6         A.   That's correct.

7         Q.   Okay.   Nobody, as far as you know, has

8    made up their mind either?

9         A.   That's correct.

10        Q.   The type of things that were discussed

11   out there would be the type of things you expect

12   to be discussed again; is that correct?

13        A.   That's correct.

14        Q.   But at this point they haven't

15   influenced you; is that correct?

16        A.   That's correct.

17        Q.   Can you set aside anything that you

18   talked about in this discussion with three or

19   four of the folks and wait until you hear all

20   the evidence that the judge gives you, the

21   charge, to hold your deliberations?

22        A.   Yes.

23        Q.   And just make your decision based upon

24   what the result of the deliberations are once

25   you get the case, once you get the court's

1    charge?

2         A.   Yes.

3         Q.   Okay.   Could you promise not to

4    discuss this case any further?

5         A.   Yes.

6         Q.   Until you get all evidence, get the

7    charge?

8         A.   Yes.

9         Q.   Could you also promise all of us that

10   you won't discuss what went on inside this room?

11        A.   Yes.

12        Q.   Do you think the conversation that we

13   had as well as the conversation you had with the

14   Defense attorneys is going to have any effect on

15   how you would determine this case?

16        A.   No.

17             MR. SMYTH:   Nothing further, Your

18   Honor.

19   BY MR. HILL:

20        Q.   Mr. Johnson, what type of comments, if

21   any, were made regarding a witness' motive for

22   testifying the way they do in either the

23   abbreviated conversation that took place in the

24   hallway or when you came into the waiting area

25   and several more people joined the group?   Were

there some comments made regarding basically a
person's bias or motive in testifying a
particular way in a case?

A.     I wouldn't -- I'm not a hundred
percent sure what you're asking again.

Q.     Well, do you recall any comments being
made in your presence, either by you or others?

A.     Right.

Q.     That, well, you know, it stands to
reason that an individual paid by the defense
would basically parrot or give whatever
testimony the defense wants in a case?

A.     I don't recall a conversation like
that, no.

Q.     Do you recall any comments like that,
not necessarily a conversation?

A.     No, quite honestly, I don't.

Q.     Was there any discussions about the
State witnesses not having any reason to lie?

A.     No, I don't recall any comment like
that, either.

Q.     Tell me, and I don't mean to be unfair
in asking this question, how is it that you're
going to be able to basically whitewash your
mind or wash out from your memory conversations

1    that took place in the hallway initially,

2    additional conversations that took place in the

3    waiting room once you're given the actual case?

4         A.    I'm not saying I will be able to

5    whitewash my mind.

6         Q.    And I want to withdraw the word

7    whitewash.    That was not what I meant to say.

8    You know, just cleanse your brain of what it was

9    that you discussed in those two meetings.

10        A.    My opinion is that the things that

11   were discussed out in the hallway were the same

12   types of things that will be discussed during

13   the deliberations; therefore, I think they are

14   relevant as to whether or not my mind will be

15   cleansed or that will bias my opinion towards

16   future witnesses, I don't feel.

17        Q.    Have you already reached some

18   conclusions, though, based on what you heard

19   thus far?

20        A.    I have leanings, but I have not made a

21   conclusion.

22        Q.    Were those leanings helped or hindered

23   by the conversations that you had in the

24   hallway, then again in the waiting room?

25        A.    I don't really think they truly had an

effect.

Q. Okay. Thank you, sir. Appreciate it.

MR. SMYTH: No further questions, Your Honor. Thank you very much, Mr. Johnson.

THE COURT: Do me a favor, have a seat out in this hallway and, obviously, don't talk to Mr. Baker about this.

MR. HILL: Judge, if it please the court, could we ask Mr. Johnson to accompany the bailiff just long enough to perhaps tell the bailiff which of the other individuals were there?

THE COURT: Well, let's do this. One of them is a school teacher. We can identify the school teacher off the slip, that's female school teacher.

MR. SMYTH: Really, female school teacher and the guy that has page boy haircut.

THE COURT: You know, Freddy, the guy with the blonde hair.

THE BAILIFF: Lady with blonde hair?

THE COURT: Fall in back.

THE WITNESS: There is a male school teacher who was sitting -- there was two --

THE COURT: Female school teacher.

1    THE JUROR: Female school teacher.

2 There is the male school teacher, but, I don't

3 know, I think he was there early this morning.

4 Then there was also a gentleman with short hair

5 in the front, fairly long in the back with

6 glasses.

7    THE COURT: You know which one that

8 is?

9    MR. HILL: One of the gentlemen I

10 believe.

11    THE COURT: Names have not been

12 brought up.

13    MR. SMYTH: Here's a teacher. It's

14 male. Then there is a Cheryl, female.

15    THE BAILIFF: Teacher?

16    THE CLERK: Uh-hum. That's it. Those

17 are the only two teachers.

18    THE COURT: There was only two

19 teachers that I am aware of.

20    THE COURT: Ask Cheryl to come in

21 please, Freddy. Stand by the door. If Cheryl

22 was her, just nod to me.

23    THE JUROR: (Nods).

24    THE COURT: Tell me your name.

25    THE JUROR: Welfl.

1          THE COURT:   Ms. Welf, you have done
2    nothing wrong to get you in trouble, okay.
3          THE JUROR:   Thanks.
4          THE COURT:   So relax.   However, we do
5    have to talk to you this morning about the
6    conversations that were held before we started
7    trial.
8          THE JUROR:   Okay.
9          THE COURT:   That's what we're doing.
10         THE JUROR:   Okay.
11         THE COURT:   In order to do that, I got
12   to put you under oath.
13         (Oath administered to juror).
14         THE COURT:   When these lawyers ask you
15   the questions, you cannot get in trouble, no
16   problem, but we got to know what you talked
17   about.   So I will let them ask you.
18         Mr. Hill, Mr. Smyth.   All right.
19
20
21
22
23
24
25

EXAMINATION

BY MR. HILL:

Q. Good morning, ma'am. How are you?

A. Okay.

Q. I'd like to ask you some questions. First of all, you remember the twelve person jury that has been seated and has been listening to evidence in the State of Texas versus Gerald Eldridge; correct?

A. Right.

Q. And we're currently in a kind of a make shift courtroom on the seventh floor of the criminal courthouse where we've been taking the testimony.

A. Right.

Q. Do you recall being a part of a group of jurors, not the whole twelve people but a group of jurors that sat out in the hallway outside of this courtroom earlier this morning?

A. Almost as soon as I got here, we came into this room.

Q. Okay. Was there a group of people, though?

A. There were about four of us out there.

Q. All right. And could you tell us do

1    you know the identity by name or description of

2    any of the other individuals?

3         A.    The first gentleman that you brought

4    in here, he was sitting out there, and I think

5    the second gentleman that you brought in was

6    sitting out there.  And I don't know their

7    names.

8         Q.    Okay.  Did you ride up on the elevator

9    with one of them?

10        A.    No, I came up by myself.

11        Q.    Okay.  All right.  Could you tell us,

12   just tell the judge, the content of any, first

13   of all, any comments that you made with the

14   other group of jurors out in the hallway before

15   coming into the waiting area this morning to the

16   waiting room.

17        A.    Out here?

18        Q.    Yes, ma'am?

19        A.    Nothing was said that I remember

20   because I just came in and we went right into

21   here.  But when I was here, somebody said

22   something about what he had, the offense that he

23   had committed, and I said, well, if you really

24   wanted to know you could go to the library and

25   look at the newspaper from January, 1993.

1        Q.   Right.

2        A.   I didn't say I had, and I haven't,

3   it's not that important to me, but if we really

4   wanted to know, because the person that

5   testified yesterday he said that the gentleman

6   had called him two weeks after the crime.

7        Q.   Right.

8        A.   So we knew when the crime was

9   committed.

10       Q.   Sure.

11       A.   So I just said, well, if you really

12   wanted to know you could go to the library and

13   use newspapers and look it up, but none of us

14   that I know of have done that.

15       Q.   Do you know which gentleman or was

16   there a woman that made that particular comment

17   about the type of crime that the person was

18   charged with?

19       A.   Oh, gosh, I'd be lying if I said.

20       Q.   But it was one of the jurors?

21       A.   That said, you know, I don't even know

22   how it all came up, and I made that comment, to

23   be really honest.  I don't want to say who said

24   what.  I just really don't remember.  I just

25   remember what I said.

Q. Let's back up. Whoever said what they said, was that person a juror in this case?

A. Yes. We were all jurors sitting in there.

Q. What was said?

A. Golly, let's see. Something again to the effect of what he had done, and I don't remember who said it, what the gentleman had done, and I just right away said that, well, if you really wanted to know you could go to the library and look it up.

Q. The individual that said I sure wish I knew what this man did or is charged with doing, how did it come up?

A. I don't remember. I think we all have a curiosity as to what crime he has committed, and I think that it came up like that, but none of us know what it is, and I might of said something I've seen his name in the newspaper, I cannot remember what it was for because I do remember his name, but I don't have any earthly idea what it was for.

Q. Okay.

A. You know.

Q. You made a comment, and I want you to

1 be honest with us because this is very important

2 for the judge to be hearing this. Like he said,

3 nobody gets in trouble.

4     A. Right.

5     Q. This is the essence of these

6 proceedings is to be open and candid with us.

7 You made the comment about what offense he

8 committed.

9     A. Right.

10     Q. Or what he did. I mean, in your mind

11 is it a foregone conclusion that the defendant

12 actually did commit an offense, we're just here

13 to determine whether he should be standing trial

14 because of his mental state right now?

15     A. No. I think that all of us have said,

16 well, we haven't heard all the evidence, you

17 know. We talked about that. We haven't heard

18 all the evidence, and we have all said that

19 would it be us that was trying to decide if we

20 were competent or not we would want that jury to

21 listen to everything that they had to say.

22 That's what we said. And, you know, I can't

23 tell you everything that's been said. You might

24 of heard that. And I was probably laughing when

25 I said that. And it's not that we take it

callously or anything like that, because we do
want to try to hear the information and give him
the fairest shake that we can because if I'm
ever in that position I would want that done for
me

Q.   Okay.

A.   And I think that's how, you know, big
majority of us feel.  Not everybody talks as
much as, there is four or five of us that talk
more than the others.  That's the feeling that
we all have expressed.

Q.   So I take it that you really don't
recall there being much of anything said in your
presence out in the hallway?

A.   No.  I wasn't there maybe thirty
seconds before.

Q.   Was anything said?

A.   No.

Q.   Let's clarify that.

A.   No.

Q.   Was there another woman standing there
at the time, do you know?

A.   I think there was another lady juror
out there with us.

Q.   Okay.  All right.  Once you came into

1    the waiting area outside the courtroom here that

2    the bailiff unlocked the door, you all proceeded

3    in, could you say whether or not the entire

4    twelve people were in there all at the same

5    time?

6        A.    They weren't.

7        Q.    And was there discussions had, excuse

8    me, in your presence, about the various

9    witnesses that had been called to testify up to

10   the present time?

11       A.    The only thing that we talked about

12   was his crime, what that one witness had said

13   about he called him two weeks after he committed

14   the crime.   That was the only witness we

15   discussed.

16       Q.    Was there any discussion at all in

17   your presence that you recall about credibility

18   of witnesses in general?

19       A.    No.

20       Q.    Any discussion about why a witness

21   would testify in a particular way?   In other

22   words, that they would have a motive to testify

23   favorably to the side that called them?

24       A.    No.

25       Q.    Was there any discussion about payment

of the witnesses or the witnesses receiving

compensation for their testimony?

    A.    No.

    Q.    How long were you inside the waiting

area here before the judge brought you in here

this morning?

    A.    I got here about nine, or ten after

nine.

    Q.    By your watch, what do you have?

    A.    I have 11:20, about two hours.

    Q.    And during that two hour period of

time, have there been discussions about the

case?

    A.    The only thing we said was what we did

about if we really wanted to know.  Nothing has

been discussed about whether he is or is not

incompetent this morning, that it's just been

discussed about if we wanted to really find out

what crime he supposedly committed.  That's all

that has been discussed in my presence this

morning.

    Q.    All right.  So is it fair to say that

there are different groups of people talking

among themselves, not necessarily as an entire

group?  In other words, how are people relating

1  to one another out there?  Is everybody just

2  like kind of having a chance to say something,

3  everybody else quit listening, or if are you

4  maybe talking to the person immediately to your

5  left or right, somebody else maybe having a

6  conversation across the room?

7      A.    Well, I think we pretty much talk in a

8  group pretty much, not at all times.  I haven't

9  really kept track of what everybody is doing.

10      Q.    Okay.  I'll pass the witness.  Thank

11  you, ma'am.

12  BY MR. SMYTH:

13      Q.    Let me just ask you couple of

14  questions.  How do you pronounce your name?

15      A.    Welfl.

16      Q.    Welfl.  Ms. Welfl, I am Don Smyth.  I

17  am one of the prosecutors in this case.

18      Would it be fair to say you have no

19  opinion on whether this defendant is competent

20  or incompetent at this point?

21      A.    No, no.

22      Q.    It would also be fair to say you

23  haven't expressed an opinion to others as to

24  whether or not you feel he is competent or

25  incompetent?

A.    Not that I remember.

         Q.    Okay.  You recall whether or not the
judge gave any admonishments to you folks about
not to discuss the facts of this case until you
got all the evidence and you got the charge,
you're all in a body together?

         A.    All we remember him saying, because we
really feel bad that this is happening, is all
we remember him saying is don't discuss it with
your family.  And that's why we did because we
figured eventually we're going to be able to
discuss it anyways; is that right?

         Q.    Well, if you're a juror I suspect
that's going to be what you're going to get.

         A.    Sometimes when you have a question you
might say, well, did you hear the same thing I
heard, that this or that or this happened or
that happened, and they may say, yeah, that's
what I heard or, no, I didn't hear.

         Q.    Any discussion you had at this point,
would that affect your verdict?

         A.    Absolutely not.  We haven't even heard
all the testimony yet.

         Q.    Could you set aside any discussion
that you've been a part of or heard of regarding

this case and not do any deliberations until you

        actually get the case, that is, all the evidence

        is in, you have the court's charge on the case?

        A.    Absolutely.

        Q.    Okay.    Would anything that you've

        heard in this case you think affect whatever

        verdict you eventually reach?

        A.    No.

        Q.    Could you also promise not to discuss

        this case further?

        A.    Absolutely.    Absolutely.

        Q.    Okay.    Also promise not to discuss

        anything that you've heard inside this room with

        your fellow jurors, because I mean they may be

        really curious -- what did they ask you.    Could

        you not do that?

        A.    Yes, yes.

        Q.    And you don't have any opinion at this

        point one way or another how you'd vote?

        A.    No.

        Q.    Nobody expressed their opinion how

        they'd vote?

        A.    No.

        Q.    So you have not decided?

        A.    No.

1      Q.   One way or another.  Not six want

2   stick, six want spray?

3      A.   No.

4           MR. SMYTH:  I've no further questions,

5   Your Honor.

6   BY MR. HILL:

7      Q.   I want to ask you did all twelve say

8   they wanted spray?  I never heard that

9   particular analogy before.

10          You just made one comment about people

11  were just generally asking a question or saying

12  they were discussing what they heard.  Did you

13  hear the same thing, or did you hear it the same

14  way they did?

15     A.   Uh-hum.

16     Q.   Do you have any specifics on that?

17     A.   No.  I thought that you might ask

18  me -- I can't give you any specifics, nothing.

19  You know, we're just still listening, deciding,

20  we don't have all the facts.  There is just not

21  any way you could in all good conscience say

22  that you know he is, yes, this or, yes, that, as

23  far as I'm concerned.

24     Q.   All right.  Thank you.

25     A.   I'm sorry that we created this

1     problem.

     2             THE COURT:  Hold on.  Hold on.

     3             Anything else?

     4             MR. SMYTH:  No further questions.

     5             THE COURT:  Do me a favor.  Have a

     6     seat out in the hallway if you would.

     7             THE COURT:  Wayne, Denice, anybody

     8     else?

     9             MR. HILL:  I'd like to get the

    10     teacher.

    11             MS. CRAWFORD:  The female.  Obviously

    12     the person he rode on the elevator with.  He

    13     said he rode on the elevator with someone who

    14     sat with him the whole time.

    15             MR. SMYTH:  She may not remember being

    16     on the elevator.

    17             MS. CRAWFORD:  She said she came after

    18     nine.

    19             MR. SMYTH:  Whatever.

    20             THE COURT:  That's fishing.

    21             MS. CRAWFORD:  That's not fishing.  I

    22     don't think you could characterize her as older.

    23             THE COURT:  Let me know what you want

    24     to do.

    25             MS. CRAWFORD:  We need to find out who

that woman is.

        THE COURT:  How do we do that?  Let's get that next juror in.  How do we get that?

        MS. CRAWFORD:  Do we call male teacher?

        THE COURT:  Call Mr. Johnson.

        MS. CRAWFORD:  Mr. Johnson is not male teacher.

        MR. HILL:  He already testified.

        MS. CRAWFORD:  He just pointed out.

        THE COURT:  Would you ask Mr. Johnson to point out.  Now do you want Johnson or Baker to do it?

        MR. HILL:  Mr. Baker, I guess.

        MS. CRAWFORD:  We need the first gentleman.  He said he rode on the elevator with an older woman.

        THE COURT:  Would you ask Mr. Baker to come in.

        (Juror Baker enters the courtroom).

        THE COURT:  Do me a favor.  Step in the doorway with Freddy and point out for Freddy the female juror that you think was sitting on the bench with you.

        MR. SMYTH:  Maybe just describe a

| | |
|---|---|
| 1 | piece of clothing she's wearing. |
| 2 | MR. HILL:  Instead of pointing like |
| 3 | that's her. |
| 4 | THE COURT:  Just step back in. |
| 5 | THE JUROR:  She was sitting next to |
| 6 | this wall with female school teacher. |
| 7 | THE COURT:  Mr. Baker, do me a favor. |
| 8 | THE JUROR:  Not the white-haired |
| 9 | lady. |
| 10 | THE COURT:  Mr. Baker, stand in that |
| 11 | doorway.  Mr. Baker, if it's her, just nod, step |
| 12 | outside. |
| 13 | (Juror McNally enters the courtroom). |
| 14 | (Juror Baker nodded at this time). |
| 15 | THE COURT:  Ma'am, how are you doing? |
| 16 | THE JUROR:  Fine. |
| 17 | THE COURT:  You've done nothing wrong. |
| 18 | THE JUROR:  I didn't think I had. |
| 19 | THE COURT:  Well, you haven't, but we |
| 20 | need to find out what you all talked about out |
| 21 | in the hallway this morning. |
| 22 | THE JUROR:  Out there in that |
| 23 | hallway? |
| 24 | THE COURT:  Yeah.  So let me tell you |
| 25 | what I'm going to do.  I'll put you under oath |

as a witness. These lawyers, I'm going to let them do it, they just want to find out what you all talked about. You've done nothing wrong, you're in no trouble, we just need for you to be honest, candid about what you all talked about.

(Oath administered to juror).

THE COURT: Be seated right up here.

EXAMINATION

BY MR. HILL:

Q. Ms. McNally, I am Wayne Hill. How you doing today?

A. Fine.

Q. I'll keep my questions as brief as possible. First of all, you're a member of the jury in this case, State of Texas versus Gerald Eldridge?

A. Yes.

Q. And the testimony is still continuing. We had a break in the action from yesterday's testimony until this morning.

A. Uh-hum.

Q. Do you recall sitting out in the hallway, outside this small courtroom, and conversing with some of the other members of the jury?

1          A.    Yes.    Four of us were out there.

2          Q.    Okay.    Just tell us in your own words

3     what was being said.

4          A.    Okay.    They were talking about, one

5     gentleman said, I don't know their names, I

6     don't know any of their names, one gentleman

7     said that he wanted, he thought we should hear

8     something about the letter that his mother

9     wrote, and let me think.    One of them said, no,

10    I'm not sure they didn't say that until they got

11    in here.    One gentleman said something about he

12    would like to know what the man did, what the

13    crime was he did.    I really don't remember much

14    of anything else.    I really don't because I

15    wasn't really paying attention to them.

16         Q.    Okay.    Did you have any comments that

17    you made, either in the hallway or in the

18    waiting area?

19         A.    I said one thing.    I said, yeah, I'd

20    like to know what the letter said that his

21    mother wrote.    I believe that was the only thing

22    I mentioned.

23         Q.    Okay.    Was there any discussion among

24    the people, either when it was only four of you

25    in this hallway or when there were more of you

in the waiting area here, regarding the relative
weight the different witnesses that had
testified? You know, who's more believable, who
has more credibility, anything like that?

    A.    Yes, somebody did say something about
that. They were discussing that. I'm trying to
think now what they said.

    Q.    Okay.

    A.    One gentleman said he thought one guy
was more believable than the other guy.

    Q.    Okay. Did he identify which guy he
was talking about?

    A.    Yeah, he said the first gentleman, the
first doctor was not as believable as the second
doctor.

    Q.    Did he indicate why he felt that way?

    A.    No. Huh-uh. They were just talking
back and forth.

    Q.    In the course of talking back and
forth, what type of discussion was taking place
regarding that first witness?

    A.    Not really very much. It was just
they thought they believed the second doctor
more than they believed the first doctor.

    Q.    You say they. There obviously was

more than one person?

    A.   Yeah, two gentlemen talking mostly.

    Q.   Did they appear to be in agreement with one another in what they were talking about?

    A.   Nobody really said whether they agreed or not, they were just conversing. Nobody really made it a statement that they thought one was, you know, that they made up their mind.

    Q.   Do you recall any comments about what a juror could expect a particular witness to testify about? By that I mean was there any comments made about, well, we can expect the defense expert, quote, unquote, to testify a certain way because they've been paid by the defense?

    A.   Oh, no.

    Q.   Or they've been paid by the court or anything?

    A.   No, I never heard that, huh-uh.

    Q.   Okay.

    A.   No. Basically I thought they were just talking in general.

    Q.   All right.

    A.   Hashing the idea out.

1    Q.   All right.  Was there a  continuation
2  of that discussion once you all went into the
3  anteroom?
4    A.   Well, a lot more people came in, and
5  they started talking about a whole bunch of
6  stuff.  They did mention the letter again.
7  Somebody mentioned the letter again, they would
8  like to know what was in the letter.  Somebody
9  said something about evidence, you know, we were
10 wondering what we would get as evidence.
11   Q.   Okay.  So you all were generally --
12   A.   And nobody really knew what they were
13 going to get as evidence.
14   Q.   Were you all generally having a
15 discussion about the evidence you had heard?
16   A.   No.
17   Q.   What testimony was already given?
18   A.   Most of us didn't bother to join in.
19   Q.   Really?
20   A.   Yeah.  It was really about four people
21 that were doing most of the talking.
22   Q.   So you weren't an active participant
23 then with the others?
24   A.   No.
25   Q.   Like preliminary deliberations?

1    A.   No.

2    Q.   What time is it by your watch right

3  now?

4    A.   It's twenty minutes to twelve.

5    Q.   Okay.  We're still in the morning

6  session, it's not noon yet?

7    A.   No.

8    Q.   How long have you been here at the

9  courthouse and either sitting on the bench with

10  the other people or in this outside room?

11    A.   Okay, I believe I came upstairs at

12  about ten minutes to nine.  I think it was about

13  ten minutes to nine that I came upstairs.

14    Q.   So you are going on maybe two and a

15  half hours of being here?

16    A.   Uh-hum, yeah.

17    Q.   When you first got here two and a half

18  or more hours ago was when you went to the bench

19  outside there?

20    A.   Yeah, uh-hum.  I think there was three

21  of us.  No, it was four of us at that time.

22    Q.   You just came into the courtroom and

23  the judge just gave you the instructions that

24  obviously you hadn't done anything wrong or

25  anything?

A.    Uh-hum.

         Q.    He wanted to hear what, if anything,
you had to say.  How long do you think you've
been in the courtroom here?

         A.    Oh, no more than five minutes.

         Q.    Okay.  Relatively short period of
time?

         A.    Uh-hum, yeah.

         Q.    Were any instructions given to you
prior to coming into this room that you're not
to be talking about the case?

         A.    You mean today?

         Q.    Yes, ma'am?

         A.    No, huh-uh, no.

         Q.    So from the time you came in here, you
knew that other people had been summoned in one
at a time?

         A.    Yes.

         Q.    Did anybody come out and tell you that
you were not to be discussing the case in any
way?

         A.    Not that I heard.

         Q.    Okay.

         A.    No.  I didn't hear anybody say that.

         Q.    Okay.  Thank you.  I have no further

questions.

         A.    Yes, sir.

BY MR. SMYTH:

         Q.    Ms. McNally, I am Don Smyth.  I'm with
the district attorney's office.

               Have you formed an opinion as to which
way you'd vote on this case at this point?

         A.    No, I sure haven't.

         Q.    You obviously haven't heard all the
testimony?

         A.    No.

         Q.    Haven't received the judge's charge
telling you what the law is?

         A.    No.

         Q.    Has anybody told you that they formed
an opinion that they're going to vote one way or
another?

         A.    No, they sure haven't.

         Q.    Nobody has expressed that one way or
another?

         A.    No, sure haven't.  In fact, nobody
tried to tell anybody else how to vote.

         Q.    Okay.

         A.    Nobody said a word about that.

         Q.    You didn't take any kind of straw

1    poll; did you?

2        A.    No.

3        Q.    Among yourselves to see how anybody

4    was leaning or what the count might be at this

5    point?

6        A.    Oh, no, huh-uh.

7        Q.    Do you recall the judge admonishing

8    you yesterday about not to be talking with your

9    friends, relatives, co-workers?

10       A.    Yes, that's right.

11       Q.    Do you recall whether or not the judge

12   at anytime told you not to be talking among

13   yourselves about this case?

14       A.    Not that I remember.

15       Q.    Okay.   Would this discussion that you

16   heard, either you may have said a few things or

17   mainly you just sat and listened, would that

18   have any effect on the way you think you'd vote?

19       A.    No.   I tend to make up my own mind

20   about things.

21       Q.    Could you set aside anything you heard

22   so far outside the discussion among the people,

23   whether it was three or four people in the hall

24   or?

25       A.    Uh-hum.

1      Q.    Or ten or eleven in this anteroom, and

2 make your decision based on what you hear in

3 this courtroom, you know, after you get all the

4 evidence, after you get the charge, after you

5 deliberate?

6      A.    No, I want to wait, because like we

7 said yesterday, we have more witnesses to hear.

8      Q.    Okay.   Could you promise the judge

9 that you would, and the attorneys in this case,

10 that you would not participate in any

11 discussions about what this case, how it ought

12 to be determined until you hear all the

13 evidence, get the court's charge?

14      A.    Oh, no, I won't say a word, nothing.

15      Q.    Could you also promise all of us that

16 you won't say anything to any of the other

17 people that haven't been in here, then the ones

18 that have been in here and gone out about what

19 was asked of you in this room?

20      A.    No, I won't say a word.

21      Q.    Just conversation between us.   If we

22 wanted everybody to hear, we'd have them all in

23 here listening.

24      A.    That's right.   No, I won't say

25 anything.

1     Q.   So, it'd be fair to say, as far as you

2    know, nobody has made up their mind in this case

3    one way or another?

4     A.   Not that I could discern.  I did not

5    hear anybody actually say they would go one way

6    or the other.

7         MR. SMYTH:  I've no further questions,

8    Your Honor.

9         MR. HILL:  I have no further questions

10   judge.

11        Thank you, ma'am.

12        THE COURT:  Ma'am, if you would step

13   outside, have a seat.

14     A.   This little door here?

15        THE COURT:  Yes.

16     A.   Okay.

17        (Off the record).

18        THE COURT:  Have Mr. Johnson come in.

19        Do you think you know which one it

20   is?

21        THE BAILIFF:  No, sir, I do not.

22        (Off the record).

23        THE COURT:  Come on up, please, sir.

24        THE JUROR:  I am the next contestant

25   on the Price Is Right?

1          THE COURT: You've done nothing

2  wrong. You're not in trouble at all.

3          THE JUROR: Well, I feel like I'm in

4  trouble.

5          THE COURT: That's why I'm telling

6  you, you're not in trouble, you've done nothing

7  wrong; however, we need to talk to you about

8  what was discussed outside the courtroom this

9  morning. Okay, before we do that, I need to put

10  you under oath as a witness. Please raise your

11  right hand.

12          (Oath administered to juror at this

13  time).

14          THE COURT: Answer truthfully,

15  candidly. No problem. You're not in trouble,

16  cannot get in trouble. Okay. Anyway, have a

17  seat up here. I'm going to let these lawyers

18  ask you some questions so we can find out what

19  happened this morning.

20

21

22

23

24

25

EXAMINATION

BY MR. HILL:

Q. Good morning, sir. My name is Wayne Hill. I'm one of the attorneys for Mr. Eldridge. You're a juror in this case?

A. Yes, sir.

Q. And you've been a juror along with the other eleven individuals that were sworn in yesterday to serve on the jury; is that correct?

A. That's correct, sir.

Q. Have you been present at all times when the testimony has been presented to the jury?

A. Yes, sir.

Q. All right. Approximately what time did you arrive up here this morning to come in, in your service as a juror?

A. 9:15, 9:20.

Q. Okay. And where did you go when you first arrived here?

A. To the room behind the courtroom.

Q. Okay. Was there ever a point in time when you were outside in the hallway with any of the other jurors?

A. No, I was inside the whole time, I think.

Q.   So, as soon you walked up, you walked right into that waiting room?

A.   Yes.   There was nobody in the hall when I got here, everybody was inside.

Q.   Okay.   Once you went inside the waiting area, is what we call it, the room where there are like maroon colored chairs and stuff for jurors to sit, did you have an occasion to engage in any conversations regarding the case?

A.   There was some discussion about the things that we had heard.

Q.   Could you share with the court what those discussions were?

A.   I don't know any particulars that were discussed.   I mean, I don't remember.   Some of the things I remember we had discussed maybe what certain witnesses had said.   I don't even remember any particulars.

Q.   Okay.   Do you recall what type witnesses you were discussing?   Would they have been expert witnesses versus a citizen?

A.   We had discussed, part of what was said or asked was if after the defense rests, if they could call any more witnesses.   One thing was said the young black gentleman that

testified yesterday, I don't, I don't remember exactly.

Q.   What was the gist of the comment, if you recall?

A.   At this time, it escapes me.  I don't really know exactly what was said.  I don't think what was said was based about anything in particular, maybe just about what was said.  It escapes me at this time.  I don't know.

Q.   You've been here for about two and a half hours today; is that a fair estimate of time?

A.   Yes, sir.

Q.   Do you recall anything in particular that you discussed out in the waiting area with the other jurors?

A.   Well, after everybody started coming in here, one by one, we discussed whether it was wrong to have any discussion between us.  We were all fairly sure that the judge here had said do not discuss anything with your family or friends, and it was said out there that none of us had done that.

Q.   Right.

A.   We were all a little unsure about what

1 or if anything we had said, you know, between
2 ourselves, you know, might cause any damage to
3 the case or whatever, but nothing.  Any
4 particular conversations had has not made an
5 impression so that I am recalling what was said.
6     Q.    Do you feel like, once you're finally
7 put in a position of deliberating the outcome of
8 the case, whether it be today or tomorrow, I
9 don't know, but do you feel that you will be
10 able to sufficiently recall what took place in
11 that waiting room?  Are you going to be able to
12 remember at that point when you're deliberating?
13     A.    I think, when it comes time for
14 deliberation, we'll be able to actually, I think
15 what was said out there may be said very
16 carefully or whatever as to not to try to impose
17 any opinions or anything like that, maybe just
18 some particular things that witnesses may have
19 said, but if I recall correctly there was
20 nothing said to, at least in my mind nothing
21 said to, I don't know, to put an opinion in or
22 say this is the way I feel or this is what this
23 made me feel like.  It was more or less, you
24 know, I can't recall exactly what was said, but
25 my opinion from what I remember, what I think I