# United States District Court
# Southern District of Texas

Case Number: __05cv1847__

## ATTACHMENT

Description:

☐ State Court Record     ☑ State Court Record Continued

☐ Administrative Record

☑ Document continued - Part __15__ of _____

☐ Exhibit to: _____

         number(s) / letter(s) _____

Other: _____

_____

_____

remember, is there was nothing said, you know,
well, I think he is or he isn't, that type of
conversation. And I think after we get final
place to deliberate we'll be able to discuss
specifics and, you know, and whatever little bit
was discussed or it will all be re-discussed in
a more open environment so we can fully come to
a conclusion as to what this case is about.

Q.  Okay.  Just kind of an uncomfortable
situation for you to be put in a spot like this,
I understand.

A.  I understand.

Q.  That's why this court asked you to
come in and just be candid, recite if you
recall.  If you don't recall, that's fine too.
We're not here to pick on you.

A.  I understand.

Q.  Thank you, sir.  Appreciate your help.
BY MR. SMYTH:

Q.  Just a couple of questions, sir.  I am
Don Smyth.  I am an assistant district
attorney.  I am sure you don't remember that
from two days ago.

Let me make sure so I understand.  You
have not formed an opinion as to how you would

vote on this case one way or another?

     A.     Absolutely not.

     Q.     Obviously you haven't heard all the
evidence.

     A.     That's correct.

     Q.     You have not got the judge's charge so
you don't know the law that applies to the facts
that you have heard?

     A.     That's correct.  One of the things I
do remember specific was we were wondering if we
were going to get a chance to ask the judge
exactly what was expected of us and how we were
to be able to come to a conclusion as one
specific I remember.

     Q.     And you will learn that you'll get a
piece of paper that gives you all that
information.  That's one reason you're not
suppose to be discussing anything because you
don't know what law applies anyhow.  So the
judge is going to give you the court's charge
that has all the law and procedure you're to
follow in that.  Since you haven't formed an
opinion one way or another on how you'd vote in
this case, I assume you haven't expressed any
opinion to anybody about I'm going to vote this

1    way or I'm going to vote that way?

     2         A.    That's correct.

     3         Q.    Anybody expressed an opinion that

     4    they've reached a conclusion one way or another?

     5         A.    I don't think any specific opinions

     6    were discussed, no.

     7         Q.    Have you guys taken a straw poll?

     8         A.    No.

     9         Q.    How many people thinks this way or how

    10    many think that way?

    11         A.    Absolutely not.

    12         Q.    Taken any kind of votes or anything

    13    like that?

    14         A.    Absolutely not.

    15         Q.    I think you indicated that the only

    16    admonishment you recall hearing was judge asked

    17    you not to discuss this with family or friends?

    18         A.    That's correct.

    19         Q.    You don't recall hearing any other

    20    admonishment from the court -- I'm not

    21    suggesting that the court did -- that you're not

    22    to discuss it among yourselves until after you

    23    get all the evidence, get the court's charge.

    24    You don't recall that?

    25         A.    Right.   I remember last night before

we left the judge said he needed to make pretty
clear that we were not to discuss this with
family or friends because we had not heard all
the evidence and that the evidence presented was
not complete also.

Q.    Okay.  Would any discussion that's
been had up to this point, would that have any
effect on whatever the verdict you might
eventually render?

A.    Absolutely not.

Q.    Could you set aside anything that you
heard in the way of a discussion about this case
or about any witnesses or about anybody's desire
to hear a particular piece of evidence until you
get all of the evidence in, until you get the
court's charge, then talk about?

A.    Can you repeat the first part of
that?

Q.    Could you set aside any discussion you
heard so far?

A.    No, I could not.

Q.    Set aside and not consider whatever
has been said out there, also whatever has been
said in this room, could you set that aside,
render your verdict solely based upon the

1  evidence you get in this case, the court's

2  charge as to what the law is?

3      A.   Absolutely.

4      Q.   After you deliberate with all your

5  fellow jurors, once you receive the case?

6      A.   Absolutely, because I do not feel that

7  anything was said out there that would ever

8  interject any opinions either way.

9      Q.   Okay.   Could you promise the judge as

10  well as the attorneys for Mr. Eldridge that you

11  won't discuss anything about this case from this

12  point on?

13      A.   I can guarantee it.

14      Q.   Okay.   Also, would you also promise

15  all of us that you won't discuss amongst the

16  other jurors what happened to you inside this

17  room, what questions were asked you, what

18  answers you gave?

19      A.   Guarantee it.

20      Q.   Because, obviously, that has nothing

21  to do with how this case is decided.   Could you

22  put aside anything that's happened to this point

23  in the trial, especially being called in here,

24  kind of put on the hot seat, not let that affect

25  the way you vote in this case?

1          A.    Absolutely.

2          Q.    Okay.  I have no further questions,

3     judge.

4               MR. HILL:  I've no questions.  Thank

5     you, sir.

6               THE COURT:  Do me a favor, have a seat

7     out in the hallway.

8               MS. CRAWFORD:  Judge, to clear things

9     up, the second gentleman who I believe Mr.

10    Johnson indicated that one of the persons

11    outside was the gentleman, he said this to all

12    of us, was the gentleman who is seated in the

13    last chair, who stands because the witnesses

14    can't get by.

15              THE COURT:  Do you know who that is?

16              MS. CRAWFORD:  I know who he was.  I

17    said he was not there because he was not there.

18              THE COURT:  Go look again.

19              MR. SMYTH:  Didn't Mr. Johnson point

20    this guy out to the bailiff?  Did he say this is

21    the guy I'm talking about?

22              MS. CRAWFORD:  Then as Mr. Johnson was

23    leaving.

24              MR. SMYTH:  Just want to make sure

25    Freddy brought in the person that Mr. Johnson

said it was the guy in the striped shirt. So whatever.

MS. CRAWFORD: Can we have Mr. Johnson say if this was the man also? As he was leaving, I said was that the man he was referring to at that time, he said no.

THE COURT: Ask Mr. Johnson back in, please.

(Juror Johnson enters the courtroom).

THE COURT: Mr. Johnson, let me ask you a question. You now see who is out in the hallway.

THE JUROR: Yes.

THE COURT: Do you feel like we talked to everybody who was present during this conversation, or is there anybody else?

THE JUROR: There was one other gentleman.

THE COURT: Okay. Freddy, do you know which one that is?

THE BAILIFF: No, sir.

THE COURT: Once again, Mr. Johnson, go to the door.

THE JUROR: Sure.

THE COURT: Hate to put this burden on

```
 1   you, go to the doorway, see what he is wearing,
 2   come tell Freddy so we can talk to him, too.
 3              THE JUROR:  He's wearing a blue
 4   striped shirt with horn-rimmed glasses.  He is
 5   standing back there.
 6              THE COURT:  Let's quit for lunch after
 7   this.
 8              Come on up.  Tell me your name.
 9              THE JUROR:  It's Buel Shastid.  It's
10   B-u-e-l and S-h-a-s like Shasta Cola with
11   t-i-d.
12              THE COURT:  Mr. Shastid, you've done
13   nothing wrong, you're not in trouble.  Okay?
14              THE JUROR:  Okay.
15              THE COURT:  But we do need to talk to
16   you about conversation held outside the
17   courtroom this morning.
18              THE JUROR:  Yes, sir.
19              THE COURT:  That's what we want to
20   do.  So I want to put you under oath.
21              (Oath administered to juror Shastid).
22              THE COURT:  If you can come up and
23   have a seat on the witness stand.
24
25
```

EXAMINATION

BY MR. HILL:

Q.   Good morning sir.  How you doing?

A.   All right.

Q.   I'm Wayne Hill.  I don't know if you recall from a couple of days ago.

Just so that the record is clear, you're one of the jurors in this case?  And you have sat and listened to the testimony up to the point of March 2nd, 1994; correct?

A.   Yes, sir.

Q.   All right.  And approximately what time did you arrive here this morning to resume your service as a juror in this case?

A.   I didn't have any watch on, but I think I got here right about maybe five minutes after nine, maybe five minutes before nine.  It wasn't exactly 9:00 because I was rushing to make a phone call.

Q.   I assure you the judge isn't going to criticize you for being a few minutes too  early or too late because we're all busy in the morning trying to get things done.

When you first arrived here, did you meet in the hallway that's immediately outside

1  this courtroom area near some benches?

2       A.   As I came in, first I walked down

3  here, there was nobody waiting on the bench, I

4  tried the door, door was locked.  This door was

5  locked.  So I went to the restroom, then I came

6  back and sat down.

7       Q.   Okay.

8       A.   I was by myself when I sat down.  And

9  then the guy, I think juror number eighteen, the

10 blonde hair guy, I don't know his name, either,

11 he came in, he sat down.  Let's see.  Then came

12 the first guy that you all called in.

13      Q.   Okay.  So there was roughly three,

14 maybe four people?  Was there a female?

15      A.   We started out with three, then little

16 by little the other jurors started coming in,

17 and then another bailiff besides our bailiff

18 came in, unlocked the door, then we came inside.

19      Q.   Okay.  Let's talk first about what

20 took place outside in the hallway.  That's what

21 the judge was initially asking you about.  What

22 conversations were taking place out there?

23      A.   When we were out there in the hall, we

24 were, let's see, there was one guy, there was

25 one guy on the jury there that, first of all,

let me tell you.  We misunderstood that we
couldn't talk about it among ourselves.  I just
thought we couldn't talk about it to relatives
or friends.

    Q.    That's all right.

    A.    So when we were talking about it when
we were in that, way over there in that jury
room over there, when we were talking about it
over there, what we were really doing was just
exploring our thoughts on it, like we were
wondering if maybe, he was wondering if maybe
the prosecuting, not prosecuting but the guy
that worked for the mental health mental
retardation unit, we couldn't remember if he had
actually said that he was going, that he was
going to look for what do you call it when
somebody is faking it?

    Q.    Malingering?

    A.    If he had actually said I'm going to
check this guy out, look for malingering.  We
were trying to remember if he actually said
that.  I told him, well, it would be in the
transcript of the thing, and I said we thought
that what he had said was that he thought he had
seen evidence of malingering but he didn't know

1  for sure so he was going to try and get a second

2  opinion on it, and then it was really just kind

3  of a comparison and contrast between the two

4  doctors that were actually up here. And we were

5  talking about the first doctor. We were trying

6  to determine if he had ever given an answer, you

7  know, a definite answer one way or the other

8  about whether he thought the guy was incompetent

9  or not, and we were trying to remember if he had

10  ever used that term malingering or not.

11      Q.   Okay.

12      A.   And we were really trying to

13  remember -- we were really kind of talking over

14  what we'd really seen and heard trying to figure

15  out what we'd seen.

16      Q.   Was there a  give and take among the

17  various jurors when that was going on where

18  everybody was actively participating and you

19  talking about?

20      A.   As it tends to be, the three men were

21  talking. The ladies were sitting not talking,

22  you know, because a lot of times it's just men

23  are talking, the ladies won't talk.

24      Q.   Now, let me clarify for one minute.

25  You were talking about the other jury room, you

1  pointed -- obviously we have no point of

2  reference here.  Are you talking about something

3  that you were talking about today, or is this

4  yesterday afternoon that you were referring to?

5      A.    Yesterday afternoon one of the jurors

6  had brought up the idea, the concept that the

7  psychologist that was, that for the mental

8  health and mental retardation had maybe had a

9  biased observation.  You remember the

10  psychologist himself brought that up, that you

11  could have a biased observation if you go in

12  looking for something.

13      Q.    Right.

14      A.    And he was of the opinion that the

15  psychologist was biased in his observation and,

16  furthermore, that the other doctors over there

17  at the unit and nurses and everybody over there

18  was biased, and we were of the opinion that they

19  wouldn't have any reason for being biased

20  because their idea was to make sure everybody

21  got a fair trial and as opposed to either being

22  innocent or not innocent.

23      Q.    Okay.  Well, carrying forward to this

24  morning, when you were out on the bench, did you

25  pick up with that same type of conversation or

1    discussion regarding basically what I would

2    guess called the credibility of the experts?

3        A.   Well, when the guy came back in, we

4    were trying, we were trying, we were talking

5    over how this idea of the preponderance of the

6    evidence, and we knew that in regular criminal

7    cases that if the Defense has a benefit of what

8    you call it, shadow of doubt, you know, if there

9    is doubt about it you're suppose to assume that

10   a defendant is innocent.

11       Q.   Sure.  Right.

12       A.   We had the instruction at the very

13   first that we're suppose to assume that the guy

14   is competent unless proven to be incompetent by

15   not the Defense but the -- I don't know exactly

16   how you call it in this case, and we were just

17   wondering if maybe that other guy didn't have

18   that concept down because it seemed like he was,

19   I don't know exactly how to put it, but it

20   seemed like he just really thought all the

21   testimony that came from the mental health and

22   mental retardation was just worthless testimony,

23   and we were of the opinion that the testimony on

24   both sides was not worthless, that, you know, it

25   all had to be considered.

1          Q.    Okay.   Was that discussion taking

2     place -- I know it's difficult because we're

3     kind of segmented or fragmented when all these

4     conversations were taking place?

5          A.    Well, he brought it up at first.

6          Q.    Go ahead.

7          A.    Do you remember that, I am sorry to

8     address the bailiff, but I don't remember that

9     furtherest jury room we went to when we were

10    waiting yesterday.  We went to so many of them,

11    you know.  But when we were sitting over there I

12    think maybe it could have been after lunch.

13         Q.    Okay.  Let me ask the questions so the

14    record is, because he has not been sworn in to

15    testify yet.

16         A.    I'm trying to get location.

17         Q.    You were in the courthouse, it's

18    before the judge instructed you as to whether or

19    not you were suppose to deliberate at all;

20    correct?

21         A.    The judge, no, we hadn't had a direct

22    thing from the judge saying to deliberate, no,

23    sir.

24         Q.    Or to say not to deliberate, for that

25    matter?

A. As we understood, we didn't know that we couldn't talk among ourselves as long as we didn't talk to our families or friends.

Q. All right. When was it that you recall Judge Harmon giving you instructions you couldn't talk to friends and family?

A. Well, in the first place, we had heard it almost -- I'm trying to think -- that we had heard about that on the day when we were picked as a jury.

Q. Okay.

A. I was trying to remember if we had heard it from the bailiff or if we heard it from a judge, you know. I can't say for sure if we heard from the bailiff or if we heard it from the judge or if we heard it from one of the attorneys, but we heard it from somebody.

Q. But clearly in your mind you didn't feel, you didn't have any reason to think that you were doing anything at all improper in discussing the evidence that you had heard up until the point in time that people started being brought in this morning, being questioned?

A. Well, we thought that as long we didn't discuss it with our friends and family,

that everything was all right. And we were kind
of proud ourselves for not discussing with our
friends and family. When we were patting
ourself on the back, then people started being
called back in, we thought, oh, boy, we thought
we were doing right.

Q. And as far as you knew you were doing
right?

A. Yes.

Q. There's no blame here, okay?

A. Yes, sir.

Q. And I think that's real important
because as a juror you're coming down here,
you're doing your civic duty making sure you and
the eleven others make a decision in this case
correct?

A. Yes.

Q. Not about what you read in the
newspaper and criticism about as it might be
about the jury system, you're the one hearing
all the evidence.

A. Yes, sir.

Q. Okay. Can you be as candid as you can
with me. I've got thick skin. I am not going
to get hurt in the least bit.

A.    Yes, sir.

Q.    For you to tell me if there were any comments made either outside here this morning or maybe in the room or at anytime regarding the fact that, you know, that a witness has a motive to either lie or to testify in a certain way?

A.    I think the statement that you heard, and I think I was the one that made it, was that when we were thinking about that idea of the bias either from the mental health and mental retardation or bias from the Defense psychologist, that it seemed like, that if one of them had a bias, there again, referring to what that one juror was saying, that he thought that the mental health and mental retardation guy was biased and all those other people were biased too, that we thought, well, if anybody was going to be biased it seemed it be more likely somebody who was hired for one certain thing as opposed to somebody that was on a contract.

Q.    Okay.  And was that same statement or content of that discussed in the hallway this morning?

A.    I made that statement in the hall this

morning.

Q. You did?

A. I did.

Q. Tell Judge Harmon as best you can recall, I don't want to paraphrase, I'll attempt to, but tell me if I got it wrong.

A. Okay.

Q. I mean, would it have been something like, well, you know, defense expert is going to testify the way the defense wants them to?

A. If I remember the context of it, you might have heard the end of the sentence because I think that it would have been prefaced by if one of them was going to it would be the defense because then the defense might be able to get other spot contracts, but I said that somebody who is already on a contract, you know, and gets I didn't say assigned cases, what did he say, they were assigned cases randomly. I didn't state all of that because we already had that information, but I said as far as somebody on a contract who is going to have the same amount of work no matter how the testimony turns out.

Q. Okay. And that statement was made in the hallway this morning prior to coming into

1    court here today on March the 2nd, 1994?

2        A.    Yes, sir.

3        Q.    Okay.

4        A.    And I also stated, it seems like, I

5    didn't say, I didn't state it as a fact, and

6    everybody knows that, as far as I know everybody

7    knows that what we were talking about was to

8    stay as impartial as we possibly could all the

9    way through, so we really have wanted to be

10   impartial from the very first.

11       Q.    Would you agree or disagree with me

12   that at various times up until right now, when

13   we're in court, just one on one talking, with

14   the judge here, that the jury either in small

15   groups of less than twelve or all twelve

16   together have sat and discussed the evidence in

17   the case?

18       A.    Yes.

19       Q.    Has there been any kind of give and

20   take or discussion or argument, let's say heated

21   discussions regarding the evidence?

22       A.    The only one that even came close was

23   this idea of whether or not the mental health

24   and retardation guy would have been, would have

25   been biased.    And you have to know that we never

did say that the defense psychologist was
biased.  What we were doing was we were using an
analogy, saying that if, you know, why would he
be biased or the other one be biased.  If one
was going to be biased, it seemed would be
somebody on spot contract as opposed to period
contract.

Q.    Just for my reference, what do you
mean spot contract as opposed to continuing one?

A.    Like defense hired psychologist to go
and interview a client just for an hour, I would
say that would be like a job, you know, that
time.  Y'all wouldn't have him on contract to do
that for y'all all the time because you do
client by client, whereas the prosecution is an
ongoing thing, they're always here, so they have
people going over to the Harris County jail and
they get their information from the data that
they get from the mental unit over there, and
from the doctors, that the consultants, the way
we understood it, the consultants, whichever
doctor it happened to be, would be the
consultant that would testify, if they had
whichever client they had that they happened to
get randomly.

Q. Tell us your honest feelings about whether you formed an opinion at this point as to the verdict that you would personally return. I am not asking you to tell me what it is, but if you have reached a point in hearing the evidence that you have already formed an opinion.

A. Well, based on the testimony that I already got, yes. But that's another thing that we also said, that we were not going to allow ourselves to make a definite decision one way or the other, that since it was going to be on a preponderance of the evidence. You have to remember that most of the conversation was trying to convince the other ones that you better not make up your mind ahead of time because we won't put up with your making up your mind ahead of time because we're not letting ourselves make up our mind ahead of time, that sort of thing. So if the thing was done right away, I think I would of had a vote one way or another. Yes, I would be leaning one way or the other.

Q. Okay.

A. Because you said not to say.

1      Q.   Right.  I don't want you to tell us.

2      A.   But I'm still open to other evidence

3 and other discussion, and we know the trial was

4 not over, so we were definitely, as far as I

5 know, nobody on the jury said that I'm going to

6 vote this way or the other.

7      Q.   Did you get the impression, though,

8 that most, if not all, the people have already

9 kind of settled into having an opinion as to the

10 outcome of the case?

11     A.   It seems to me the ones that already

12 have that already have an in stone attitude

13 about which way they would vote is kind of a

14 lifestyle thing that they would have went that

15 way one way or the other.

16     Q.   Really?

17     A.   But being a school teacher, I have

18 learned to be an objective observer; and, so,

19 natural you're going to have an opinion one way

20 or the other, but I don't let my opinions

21 through the empirical evidence.  And, so, I want

22 to hear all the evidence.  And you remember on

23 the first day while y'all asked why I was

24 smiling.  The reason I was smiling was because

25 it seemed like this is the way to find out if a

1    client is not right in the mind, seems to me, as
2    opposed to doing it when it comes to the trial
3    for, you know, guilty or innocent.  Find out if
4    they need treatment, see if they should have
5    stood trial in the first place.  And I was
6    smiling because I had never heard of this before
7    and this sounded like the way to do it.
8         Q.   Right.
9         A.   So from the very first, man, this is
10   something good, this is something I'm going to
11   be involved in.
12        Q.   Maybe we should of asked you to
13   explain to the rest of the people that were
14   sitting there because there were a lot of people
15   that didn't get it.
16        A.   Yes, sir.
17        Q.   Okay, just one minute, judge.
18             MR. HILL:  I'll pass the witness.
19   Thank you, sir.
20   BY MR. SMYTH:
21        Q.   Just a couple of questions, sir.  Mr.
22   Shastid, my name is Don Smyth.  I am an
23   assistant district attorney here in Harris
24   County, Texas.  And I just want to make sure I'm
25   clear on a couple of points.

First of all, you understand you
haven't received all the evidence, don't know
what the law that's going to tell you how you
should vote or how you should apply that
evidence hasn't been given to you yet.

A.    Yes, I do.

Q.    So the case is not over?

A.    No, sir.

Q.    Would it be fair to say you have not
formed an opinion, since the case is not over,
you don't have it yet, you have not formed an
opinion one way or the other?

A.    No, sir.

Q.    You're open I think you said to
hearing any other evidence that may come in?

A.    I'm open and bound and determined to
be open.

Q.    You have not expressed your opinion to
anybody else; have you?  Since you don't have
the opinion, you have not expressed it to
anybody?

A.    If anything, all I did was restated
evidence that was already given.

Q.    Has anybody else, as far as you know,
expressed an opinion they're going to vote one

1 | way or another say at this point?

2 | A. Nobody has come right out and said I

3 | am going to vote one way or another.

4 | Q. You have not taken a straw poll?

5 | A. No way, no, sir, because that was one

6 | of the things that we saying, we want to hear

7 | all the evidence, we will not let ourselves go

8 | one way or the other. In fact, that's why we

9 | jumped on that one guy that thought the mental

10 | health and retardation guy was biased looking

11 | for malingering, you know, because it sounded

12 | like he was making up his mind ahead of time.

13 | That's why we jumped on him.

14 | Q. You have not taken any kind of vote

15 | this morning?

16 | A. No way.

17 | Q. And did you indicate the only

18 | admonishment that you recall was at some point

19 | in time somebody told you not to talk to your

20 | friends and family about the case?

21 | A. That's right. And I also will say

22 | that when we went to lunch over there, bailiff

23 | said not to talk about the case at all.

24 | Q. Bailiff told you that?

25 | A. The bailiff said that, but I thought

1    that was because we were at lunch.

2         Q.   Because you're in a public place or

3    something?

4         A.   Right.

5         Q.   As far as the court, you don't recall

6    the judge, I'm not saying he did, but you don't

7    recall the judge telling you not to discuss the

8    case among yourselves at this point?

9         A.   I do not recall the judge saying that,

10   and I'm not saying that he didn't say it, I am

11   just saying I don't recall it.

12        Q.   Okay.  Would any of the discussions

13   that you heard so far have any effect upon what

14   verdict you eventually reach once you get all

15   the evidence, have the law?

16        A.   I don't think it would.  Just to give

17   you an example of the type of people that are on

18   the jury, one of the men out there and I were

19   arguing about whether it should be health care

20   plan or not.  He said no matter what you say,

21   you're not going to change my mind into thinking

22   there should be a health plan.  Well, you don't

23   worry about me saying anything because you're

24   not going to change your mind, and I'm not

25   either.  So, no, sir.  I honestly believe that

nobody has gone any way except from the evidence.

Q. So nobody. You're not aware of any opinions of what their position is?

A. If opinion involves a decision, no, sir.

Q. Okay. That's what we're talking about.

A. Because you have the sub opinions before you make final opinion, before you make your decision.

Q. I'm talking final.

A. No final opinion, no, sir.

Q. I'm talking opinion on ultimate decision that's going to be decided.

A. No, sir.

Q. No opinion expressed?

A. No, sir. Anytime somebody was leaning that way, we would straighten them out, remind them the judge said that it was preponderance of evidence and that you don't make a decision until you heard all the evidence.

Q. Okay. Could you set aside anything that you may have heard in discussions at this point and base whatever final ultimate decision

you make solely upon all of the evidence, once
you get the charge from the judge, once the jury
has deliberated in the case?

A.   Yes, sir.

Q.   Could you promise us not to discuss
this case any further among your fellow jurors
or your friends and family?

A.   Yes, sir.

Q.   Could you put aside what has happened
in this jury room -- you're one of several that
have been called in here, not let that influence
any opinion that you may ultimately reach on the
ultimate issue in this case?

A.   Yes, sir, especially since it was
along the same lines to make sure it was
impartial decision like we've been so deadset
on.

Q.   Okay.

A.   You know, one thing that the bailiff
overheard us talking about in the jury room over
there, we weren't talking about this case, we
were talking about the Branch Davidian type
thing.  The reason it came up is because I saw
the attorney that was David Koresh's attorney in
the building, that's what we were talking about

when the bailiff stuck his head in there. He
admonished us not to talk about our case.

Q. That's the only restriction. You can
talk about all kinds of things. Not like you
can sit there like twelve bumps on a log and say
nothing, stare at each other. You're just not
to suppose to discuss this case until you have
all the evidence and you have the law that
applies to the case. Can you promise us that
you will do that?

A. Absolutely.

MR. SMYTH: I have no further
questions.

BY MR. HILL:

Q. Two questions, Mr. Shastid. Do you
recall there was any evidence from any source
that said that Doctor Austin, the first witness
to testify, was in fact hired by the defense?

A. That was an assumption on my part.

Q. All right.

A. And I apologize if it was erroneous.

Q. No, I'm just asking specifically
whether or not you heard anything to that
effect.

Number two, has anybody concluded that

1    a doctor, in this case Doctor Austin, was hired

2    by the defense to give a specific finding of

3    incompetency?

4         A.   No, sir.  In fact, I'm not

5    paraphrasing my statement at all when I say that

6    we never said that he had a bias and we never

7    said that the prosecution, the prosecution, the

8    mental health and retardation guy had one,

9    either.  What we were saying was that they were

10   doing their job impartially like we were.  That

11   was the flow of the conversation.  And anytime

12   somebody said, well, such and such is on that

13   side, no, he is not.  You know.  Then we would

14   use that, you know, back and forth.  If one was

15   going to be it, the other one was, and, you

16   know, it was an assumption on my part that he

17   was hired by the defense.

18        Q.   Okay.

19        A.   That was not just, you know,  my

20   opinion.  Everybody shook their head when I said

21   that, but we said if he was hired by the defense

22   and wanted to be hired in other cases then he

23   might do it, but nobody ever said that he did do

24   it, just like no one would go along with the

25   idea that the prosecution had witnesses that

1  made up their mind before they ever got in
2  there.
3       Q.   When you say that if he had gotten
4  hired by the defense in this case that he might
5  do it, might give a finding of incompetency,
6  what, so he could be hired in future cases?
7       A.   We thought if the likelihood of one
8  way or another, it would be more likely would be
9  one working on defense case by case than someone
10 working on the contract for the State in an
11 ongoing period of time.  But no one ever said
12 that they would.  We just said that guy had said
13 that the one for the mental health and
14 retardation was biased.
15      Q.   Okay.
16      A.   It was only used as an analogy to say
17 that he wasn't biased.
18      Q.   Thank you.
19           MS. SMYTH:  I have nothing further,
20 Your Honor.  Thank you.
21           THE COURT:  Thank you.  Do me a
22 favor.  Just have seat outside in the hallway.
23      A.   Yes, sir.
24           MR. HILL:  May I have moment so I can
25 talk to Denice?

372

1   THE COURT: Let's stay off the record.

2   (Off the record).

3   THE COURT: Let's go on the record.

4   MR. HILL: Judge, based on the

5   testimony that has been adduced this morning,

6   starting with Mr. Licata then through several

7   other witnesses, that in varying degrees denied

8   that this conversation or that the comments that

9   Mr. Licata overheard took place in the hallway,

10  finally Mr. Shastid comes in, he admits that he

11  had made those type of statements. Now, in the

12  context of whether we have a specific verbatim

13  comment from Mr. Licata versus what Mr. Shastid

14  says validates basically what Mr. Licata

15  overheard first thing this morning. We had

16  testimony here in varying degrees that the jury

17  has at least engaged in partial and preliminary

18  deliberations beginning yesterday, on March 1,

19  1994, prior to the time that the court

20  admonished the jury before leaving yesterday

21  afternoon that they should not communicate with

22  anybody regarding the case, they engaged in

23  those discussions at least partially with four

24  or five people in the hallway this morning, then

25  again continuing with less than twelve people in

the waiting area or the waiting room of this
courtroom, then subsequently with all twelve
people.  Again, they have not been given the
jury charge, they have not heard all the
evidence, the testimony is not closed in the
case, the court did not give an admonishment.
Once jurors were brought in one by one so that
deliberation at least in part with less than
twelve people were continuing while we were
conducting this hearing this morning, I think
that the sum and substance of all of the
testimony is that the jury has been engaging in
the type of the conduct, albeit in an innocent
manner from their perspective, in the type of
conduct that should only come after all of the
evidence is in, the testimony is closed, final
arguments are given, the charge is submitted to
them, so that they can deliberate as a group,
all twelve at one time, we feel that it is
necessary to ask the jury to, I am sorry, the
court to discharge the jury, declare a mistrial
in this hearing on the basis that Art. 1.04,
1.05, 1.051, 1.09, 1.13, 1.14 of the Code of
Criminal procedure as well as Art. 1.15 of the
Code of Criminal Procedure have been violated.

And that, additionally, Art. 35.23, 36.14,
36.16, 36.18 and 36.21' of the Texas Code of
Criminal Procedure have been violated, and that
the U.S. Constitutional amendments number five,
six, eight and fourteen have been violated, and
that the Texas Constitution, Art. 1, Sec. 10,
13, 15, 19 have been violated and that this
defendant's substantial rights have been
prejudiced by the proceedings as they have been
conducted up to this point in time and,
therefore, we would respectfully request that
the court discharge this jury as impaneled and
declare a mistrial.

THE COURT: I want the record to
reflect that the court has observed the
witnesses testify. Court is of the absolute
opinion, that other than comments made by
certain individual jurors about their feelings
as to the credibility of certain witnesses, that
none of those statements were made in an attempt
to influence the opinion of any other jurors,
that they're nothing more than personal
comments. The court is also of the opinion that
the comments were not made in the context of any
kind of deliberations by those groups of jurors

to determine the outcome of this case. The court is absolutely convinced that each of those jurors was aware at the time, still aware, that the jurors cannot reach a decision until after they've heard all the evidence. And the court is also convinced that all those jurors can set aside the discussions that were made outside the presence of the -- outside the courtroom and make their decision based solely upon what they heard testified to from the witness stand and not allow any comments made by any other jurors to influence their decision whatsoever.

Now, let me take a quick look at those sections, especially the 35 and 36.

(Off the record).

THE COURT: Motion for mistrial is denied. The court has reviewed all of those sections, but the Defense motion for mistrial is denied.

(All jurors brought in at this time before the court).

THE COURT: I know everyone knows we talked to some of you this morning and have not talked to others. And I want to let everyone know that no one has done anything wrong. The

only person that did anything wrong is me.  I
made a mistake.  I take full responsibility for
it.  I should have instructed you all yesterday
that -- and I'm very well aware that I told you
all last night not to talk to your friends or
family about the case, I should have included
instructions not to discuss the case amongst
yourselves until the trial is over.  That is
something I generally do at various phases
during the trial because when that usually
occurs is lunch time.  At any rate, that's
neither here nor there.  At any rate, I assume
responsibility.  However, we're now going to get
back on track, all right.  The people we talked
to this morning aren't going to talk about what
we talked about in here, so don't ask them about
it.  They've been told not to talk about it, so
I'm telling the rest of you all not to ask them
about it.  So let's get back on track.  We're
going to finish the trial this afternoon.  We
should still be able to get the trial concluded
today.  And let's focus on what you all heard
from the witness stand yesterday, focus on what
you will hear from the witness stand today.  I'm
going to read to you all the charge when that is

1    concluded, give you all the law in Texas that
2    pertains to how you all need to make your
3    decision, give you all some instructions, and
4    make your decision.  So it's twelve thirty,
5    we're going to break for lunch.  As soon as
6    Freddy is ready, he'll take you all to lunch.
7    We'll be in recess until 1:30.
8                (Recess for lunch).

71863

TRIAL COURT NO. 9403201

APPELLATE COURT NO._____

IN THE COURT OF CRIMINAL APPEALS

OF THE STATE OF TEXAS

AT AUSTIN

_____

GERALD CORNELIUS ELDRIDGE,

                    Appellant

VS.

THE STATE OF TEXAS,

                    Appellee.

_____

APPEAL FROM 178TH DISTRICT COURT OF HARRIS COUNTY,

TEXAS

Judge William T. Harmon  Presiding

_____


STATEMENT OF FACTS

VOLUME 4 OF 36 VOLUMES

March 1, 1994


Ida M. Garcia

Official Court Reporter

301 San Jacinto

Houston, Texas  77002

FILED IN
COURT OF CRIMINAL APPEALS
AUG 17 1994
Thomas Lowe, Clerk

1

INDEX

VOLUME 4

March 1, 1994

CONTESTED COMPETENCY HEARING

Page

DEFENSE WITNESSES

RICHARD B. AUSTIN, JR.
        Direct                          6
        Jury removed                    12
        Jury returned                   21
        Direct, cont'd                  22
        Cross                           39
        Lunch recess                    98
        Cross, cont'd                   99
        Redirect                        111

DEFENSE RESTS                           119

STATE'S WITNESSES

EDWARD G. SILVERMAN
        Direct                          120
        Cross                           184
        Redirect                        208

STEVE DEMENT
        Direct                          210
        Cross                           222

DARRELL OBEY
        Direct                          223
        Cross                           229

JOHN SCOTT
        Direct                          233