# United States District Court
# Southern District of Texas

Case Number: $\underline{\text{05cv1847}}$

## ATTACHMENT

Description:

☐ State Court Record     ☑ State Court Record Continued

☐ Administrative Record

☑ Document continued - Part 16 of _____

☐ Exhibit to: _____
        number(s) / letter(s) _____

Other: _____

_____

_____

ALPHABETICAL INDEX

VOLUME 4

Page

AUSTIN, JR., RICHARD B.
        Direct                            6
        Jury removed                     12
        Jury returned                    21
        Direct, cont'd                   22
        Cross                            39
        Lunch recess                     98
        Cross, cont'd                    99
        Redirect                        111

DEMENT, STEVE
        Direct                          210
        Cross                           222

OBEY, DARRELL
        Direct                          223
        Cross                           229

SCOTT, JOHN
        Direct                          233

SILVERMAN, EDWARD G.
        Direct                          120
        Cross                           184
        Redirect                        208

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1    EXHIBIT INDEX OF CONTESTED COMPETENCY ISSUE

2

3    EXHIBIT NO.        MKD.        IDENT.      OFFRD.      ADM

4

5                      VOLUME 4

6
     STATE'S 1         208         208         208         209
7    Dr. Silverman's Report

8    STATE'S 2         208         208         208         209
     Dr. Silverman's Report
9
     STATE'S 3         208         208         208         209
10   Dr. Silverman's Report

11   STATE'S 4         213         213         213         216
     Defendant's Employment Record
12
                      VOLUME 6
13
     STATE'S 5         429         430         430         430
14   Large summary chart

15   STATE'S 6         429         430         430         430
     Large summary chart
16
     STATE'S 7         431         431         431         432
17   Dr. Brown's Report

18   STATE'S 8         431         431         431         432
     Dr. Brown's Report
19
     STATE'S 9         450         453         455         455
20   Commissary Record

21   STATE'S 10        471         472         472         478
     Large paper summary
22
     STATE'S 11        471         472         472         478
23   Large paper summary

24

25

# EXHIBIT INDEX OF CONTESTED COMPETENCY ISSUE

## VOLUME 7

| EXHIBIT NO. | MKD. | IDENT. | OFFRD. | ADM. |
|---|---|---|---|---|
| DEFENSE 1<br>Dr. Austin's Report | 599 | 599 | 600 | 605 |
| DEFENSE 2<br>Letter from defendant's mother | 599 | 599 | 600 | – |

CAUSE NO. 9403201

STATE OF TEXAS     IN THE 178TH DISTRICT COURT

VS.                       OF

GERALD CORNELIUS ELDRIDGE  HARRIS COUNTY, TEXAS

A P P E A R A N C E S:

For the State:     Ms. Ela Alcala
                     Mr. Don Smyth
                     Assistant District Attorneys
                     Harris County, Texas

For the Defendant:  Ms. Danice Crawford
                     Mr. Wayne Hill
                     Attorneys at Law
                     Houston, Texas

       BE IT REMEMBERED that upon this the
1st day of March A.D. 1994, the above entitled
and numbered cause came on for contested
competency hearing before the Honorable William
T. Harmon, Judge of the 178th District Court of
Harris County, Texas, and a jury; and the State
appearing by counsel and the Defendant appearing
in person and by counsel, the following
proceedings were had, viz:

MS. CRAWFORD: At this time, if it
please the court, Your Honor, just for the
purpose of the record, yesterday, Mr. Hill, on
behalf of the defendant, had raised a specific
objection to a specific juror, and we wanted to
place this on the record before the entire jury
has been sworn in with respect to our objection
to the panel as a whole. Initially we had not
objected but that was before Ms. Nguyen had
expressed her concerns regarding her language
deficiencies. At any rate, Your Honor, again,
basically, it's the same objection that Mr. Hill
raised. We object to the panel with respect to
juror Ms. Nguyen under Art. 35.16, basically
Sec. No. 11, her inability to serve as a
competent juror because of her inability to read
or write the English language.

THE COURT: Overruled. Juror will be
seated. Ready for the jury.

(Jury enters the courtroom).

THE COURT: Good morning.

Why don't you have a seat, doctor.

Obviously, this is totally inadequate,
in my opinion, as a facility to serve as a
courtroom. We've done our very best to try to

```
1   find a real courtroom with a jury box, with a
2   witness stand that has a microphone, as this one
3   does not.  All these witnesses are going to be
4   advised by me to please keep their voices up;
5   however, due to the proximity of these
6   witnesses, I don't think anybody should have any
7   difficulty hearing what they have to say.  This
8   is one of the reasons why we need a new
9   courthouse, just not enough space every day to
10  conduct everything that needs to be going on.  I
11  am sorry I made you all wait; but, obviously,
12  I've done everything I could to try to avoid
13  this from having to happen, and it was
14  unavoidable, so we're going to go ahead and get
15  started.  We're continuing to look for a
16  courtroom that does have a real jury box where
17  you all will not have to sit in such close
18  proximity and a real jury room that you all can
19  use; however, since this trial really is not
20  going to last that long, we're going to go ahead
21  and get started today.  As soon as those
22  accommodations become available, we may move.
23  At any rate, appreciate your understanding.
24          If you all will please rise, raise
25  your right hands, my clerk will now administer
```

1  to you all the oath of a jury.

2           (Oath administered to all jurors by

3  the clerk).

4           THE COURT:  Please be seated.

5           Ms. Crawford, do you wish to make an

6  opening statement?

7           MS. CRAWFORD:  No, Your Honor, we

8  waive our right to make an opening statement.

9           THE COURT:  Call your first witness.

10           MS. CRAWFORD:  If it please the court,

11  we call Dr. Richard Austin.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1
2   was called as a witness by the Defense and,
3   having been duly sworn, testified as follows:
4                   DIRECT EXAMINATION
5   BY MS. CRAWFORD:
6       Q.   Sir, would you, please, state your
7   name for the purpose of the record many?
8       A.   Doctor Richard B. Austin, Jr.
9       Q.   And, Doctor Austin, are you a resident
10  of the Harris County area?
11      A.   Yes, I am.
12      Q.   And what is your profession, sir?
13      A.   I'm a clinical psychologist, licensed
14  in the State of Texas.
15      Q.   Would you briefly give your
16  credentials and qualifications that enable you
17  to be titled a clinical psychologist?
18      A.   Yes.  I received education and
19  training in a four-year program at University of
20  Texas in Austin, Texas, and a year in Southwest
21  Medical School in division of psychology,
22  completed my clinical internship, plus I served
23  in a community psychiatric clinic in Corpus,
24  received three years post-doctoral supervision.
25      Q.   And when was that, Doctor Austin?

1      A.   In the early 1960's was my

2 post-doctoral.  I completed my Ph.D. in 1960.

3      Q.  And, since that time, have you

4 practiced as a clinical psychologist?

5      A.   Yes, I have.

6      Q.   How many years have you maintained

7 that profession?

8      A.   Over thirty years.

9      Q.   And in your duties as a clinical

10 psychologist, what specifically do they entail?

11      A.   Diagnosis and treatment of mental and

12 emotional illnesses.

13      Q.  And do you have a particular type of

14 patient that you render your service on, or do

15 you generally --

16      A.   My training is with both children,

17 adolescents as well as adults, and I work

18 extensively with families.

19      Q.   Okay.  Doctor Austin, have you had the

20 opportunity to perform any forensic duties?

21      A.   Yes.

22      Q.   Backing up, what does that mean?

23      A.   Forensic duties has to do with

24 applying your psychological knowledge and

25 training to issues involving the court system,

litigation.

Q. And have those occasions been few or many?

A. They have been many for the last five years.

Q. And have you, based on those examinations, formed opinions as to the psychological status of patients?

A. Yes.

Q. And have those occasions been few or many?

A. Many.

MS. CRAWFORD: Your Honor, at this time, we ask that Doctor Austin be established as an expert in the area of psychology.

THE COURT: You may proceed.

MS. CRAWFORD: All right.

Q. Doctor Austin, at some point, did you receive or make contact with me?

A. Yes.

Q. And do you recall when that was?

A. It was approximately six months ago.

Q. And based on our communication, what happened?

A. You asked me to assess Gerald Eldridge.

1     Q.   And do you see Gerald Eldridge here in

2  the courtroom today?

3     A.   Yes.

4     Q.   Could you, sir, point him out,

5  identifying some article of clothing he is

6  wearing?

7     A.   He's directly to your right.

8     MS. CRAWFORD:  Your Honor, may the

9  record reflect that the witness has identified

10  the defendant?

11     THE COURT:  Yes, ma'am.

12     MS. CRAWFORD:  Thank you, sir.

13     Q.   What was it that I asked of you, sir?

14     A.   You asked me to conduct a

15  psychological evaluation of Mr. Eldridge.

16     Q.   Okay.  And in doing that,

17  specifically, what does the job entail?

18     A.   The job entails interviewing,

19  observations and psychological testing.

20     Q.   And ultimately were you able to

21  perform those duties on Mr. Eldridge?

22     A.   No, I was not able to perform all

23  those duties on Mr. Eldridge.

24     Q.   Okay.  Did you at least attempt to do

25  so?

1          A.   Yes, I did attempt to do that on

2     February 16th, 1994.

3          Q.   Where were you when you made that

4     attempt?

5          A.   It was in the Harris County jail.

6          Q.   All right.  What exactly did you do in

7     preparation leading up to the actual interview,

8     I guess, with the patient?

9          A.   Aside from a general history, I

10    attempted to put the patient at ease and

11    attempted to proceed with psychological testing

12    as well as interviewing.

13         Q.   And approximately how long or how much

14    time did you spend with the patient?

15         A.   I spent approximately an hour with the

16    patient altogether.

17         Q.   Did you have the opportunity to make

18    an observation prior to coming in direct contact

19    with the patient?

20         A.   No.

21         Q.   And the facility that you were at, I

22    believe you testified, was the jail; is that

23    correct?

24         A.   Yes.

25         Q.   Where exactly in the jail were you all?

1        A.    Harris County jail, which is
2    practically next door.
3        Q.    Okay.  Was it on a particular unit or
4    in a particular area?
5        A.    Yes.  It was like the sixth floor.
6        Q.    Okay.
7        A.    In a lock-up.
8        Q.    Okay.  Could you tell us, Doctor
9    Austin, how the patient was examined, what was
10   the process that you went through.
11       A.    Yes.  I observed the patient going
12   into the room in sort of a glass partition where
13   I could see his behavior, observed him probably
14   before he saw me.  Then I went into the room and
15   was able to attempt to converse with him at that
16   time.
17       Q.    Okay.  Let's start first with the
18   initial observations that you made when this
19   glass partition separated you all.  What did you
20   observe at that time?
21       A.    Patient's behavior happened to be one
22   where he was slumped over, he was mumbling to
23   himself inaudibly or, at least, seemed like he
24   was talking to himself before entering the room.
25       Q.    And after you entered into the room,

what did you discover?

    A.   My overall observation was the patient had trouble making eye contact with me in the sense of the ordinary contact one would make with somebody you are examining, even a disturbed patient.  That by his non-verbal behavior, his lack of eye contact, his body mannerisms, he appeared to be extremely detached or withdrawn.

    Q.   Were you able to partake in any conversation with the patient?

    A.   Only with great difficulty was I able to converse with him at all.  And I did not perceive he was able to--

        THE COURT:  Y'all hold on.

        MS. CRAWFORD:  Excuse me, Your Honor.

        THE COURT:  Members of the jury, do me a favor.  If you would just file out the door, have a seat out there in the hall, stand in the hallway.

        (The jury is removed from the courtroom).

        THE COURT:  Let the record reflect that Mr. Eldridge stood up and started walking around and is crying a little bit.  And I'm not

sure if the jury was aware of this, but I have
asked the jury to step outside in the hallway
while we resolve this situation.

Mr. Eldridge. Mr. Eldridge? All
right. I've called his name a couple of times.

THE WITNESS: He is not in good
contact. He is difficult to communicate with.
He is pretty decompensated.

THE DEFENDANT: It's too many people.
Too many people.

THE COURT: Too many people?

THE DEFENDANT: Too many people.

THE COURT: All right. Let me ask you
this. While this trial is going on, do you wish
to just remain in the holdover cell?

THE DEFENDANT: I don't know, I don't
know.

THE COURT: Mr. Eldridge.

THE DEFENDANT: I don't know.

THE COURT: Come here. Come here.

THE DEFENDANT: Don't put handcuffs on
me. Don't put handcuffs on me.

THE WITNESS: I would recommend that.

THE COURT: Mr. Eldridge?

THE WITNESS: I knew that was going to

```
 1   happen.  I told you.
 2              THE COURT:  Mr. Eldridge?
 3              MR. HILL:  Judge, if it please the
 4   court, I understand the court is attempting to
 5   make inquiry of Mr. Eldridge.  Given the history
 6   of psychological disorder that at least has been
 7   brought to our attention through Doctor Austin,
 8   and given the difficult task we have of trying
 9   to protect against any waiver of his fifth
10   amendment privilege, since he doesn't appear to
11   be competent to waive it himself, I'm going to
12   have to ask the court not to make any inquiry or
13   any questions of the defendant.  As he is in
14   open court, I don't want those to be perceived
15   as any type of admissions or any type of
16   statements that could be later used against him.
17              THE COURT:  All right.  Then I'll
18   allow you the choice to decide whether or not
19   Mr. Eldridge is going to remain in the courtroom
20   during the rest of the trial or to spend the
21   rest of the trial in the holdover.  Obviously I
22   can't allow Mr. Eldridge to be a distraction or
23   disrupt the proceedings, so if you're of the
24   opinion he can sit here at counsel table without
25   disrupting or distracting the jury, then we will
```

14

proceed. If you do not feel as though that will happen, then I'll instruct my process server to put him in the holdover while we continue the trial. Allow you to make the decision.

MR. HILL: Well, unfortunately, judge, I don't know if I'm in any better position to make that decision than the court is, given the outburst that Mr. Eldridge engaged in. Certainly would like him to be present for any proceedings where his legal rights are in jeopardy. I don't know. I don't know how to predict whether or not he's going to calm down or whether he is going to have another outburst. I just don't know. I would like the record to reflect he's mumbling as we stand in front of you not more than a foot away from me.

THE COURT: Well, I certainly wouldn't characterize what happened in front of the jury as being an outburst. He simply got up, started wandering toward the back of the room, and certainly said nothing in my opinion that was audible to the jury.

MR. HILL: He was making some sounds. I didn't mean to characterize the outburst by doing anything, just he stood up, started

1    walking around, making sounds, saying some words
2    that were inaudible to me.
3            THE COURT:  You don't want me to make
4    inquiry of your client as to whether or not he
5    feels he can sit through the remainder of this
6    proceeding without making an outburst or
7    distraction?
8            MR. HILL:  If the court perhaps can
9    instruct him.  As to whether or not he
10   understands, I don't know.  I don't want to turn
11   this into a potential fact-finding mission for
12   the State.  He's already been examined by the
13   State experts.  I'm just concerned about the
14   court making inquiry at this late stage.
15           THE COURT:  Mr. Eldridge, you've been
16   to court before; haven't you?
17           THE DEFENDANT:  If, if, if I'm right,
18   yes.
19           THE COURT:  All right.  Well, you've
20   been in front of a judge before; haven't you?
21           THE DEFENDANT:  I don't know.  I don't
22   know.  Michael takes care of me.  Michael, they
23   keep jumping on Michael.  I am tired of them
24   jumping on Michael.  I am tired, I am tired, I
25   am tired.  I don't know.

1 THE COURT: Okay. I want the record
2 to reflect that Mr. Eldridge is not responding
3 to my inquiry, so I'm going to go ahead and
4 order the bailiff now to put Mr. Eldridge back
5 in the holding cell, and we'll continue the
6 hearing without Mr. Eldridge being present.
7 MR. HILL: Judge, could the record
8 also reflect, that as you were making inquiry of
9 Mr. Eldridge, he was responding? He may not
10 have been responsive to what you were asking,
11 but he was saying something that was inaudible.
12 He wasn't standing there --
13 THE COURT: What he was saying was
14 audible but not certainly in response to my
15 question.
16 MR. HILL: But he wasn't standing
17 silent in front of you, he was saying something.
18 THE COURT: Right. Let's go ahead and
19 let's do this. Let's get some help. Let's get
20 some help. Let's get some help. Put him out in
21 the waiting room. I tell you what. As soon as
22 he -- Freddy, go to the waiting room. Why don't
23 you bring the jury in.
24 MR. HILL: Judge, we would lodge an
25 objection to any effort by the court to remove

1    Mr. Eldridge from the courtroom.  Would

2    constitute a denial of confrontation of the

3    witnesses ultimately that will be brought in to

4    testify against him.  We feel that this would be

5    a violation both under the fifth, sixth, eighth,

6    fourteen amendments to the U. S. Constitution,

7    as well as the applicable statutory provisions

8    of the Texas Constitution, Art. 1, Sec. 9, Sec.

9    10 and 15 and 19 and, therefore, we would object

10   to any effort by the court to remove Mr.

11   Eldridge from the courtroom at this time.

12           THE COURT:  I want the record to

13   reflect that it's apparent to the court that Mr.

14   Eldridge, for whatever reason, is not going to

15   be able to sit in this courtroom and observe and

16   be a participant in this proceeding without

17   distracting or disrupting the orderly

18   proceedings of the court.  He, for whatever

19   reason, did not respond to my inquiry as to

20   whether or not he wished to remain in the

21   courtroom while the proceedings continue.

22   Therefore, the court has ordered the bailiff to

23   remove Mr. Eldridge from the courtroom because

24   the court is convinced that there is no reason

25   to believe that Mr. Eldridge would be able to

1  sit here and not distract or disrupt the jury in
2  any way.  And the objection is overruled.
3          MR. SMYTH:  Judge, I'd like the record
4  to reflect that Mr. Eldridge sat quietly through
5  the entire jury process yesterday and didn't do
6  anything at all, just sat there and didn't make
7  any disruption.  It was not until the case
8  began, putting on live witnesses that he decided
9  to get up and perform for the jury.
10          THE COURT:  All right.
11          MR. HILL:  We would object to any
12  suggestion it was a performance, judge.  Whether
13  or not this man got up and started wandering
14  around was a performance, as the State would
15  believe, or was genuine, that's what the purpose
16  of this particular hearing is on the
17  competency.  If the State agreed with the
18  Defense, we wouldn't be having this competency
19  hearing.  But I would object to the State
20  characterizing it as a performance.  I don't
21  think there is any evidence to show that.
22          THE COURT:  Well, I think the record
23  can certainly reflect that we had a panel of
24  forty people in the courtroom yesterday, we voir
25  dired them for approximately three hours, that

the court did observe Mr. Eldridge, and during
the duration or that time period there was no
disruption or distraction. I guess this morning
the only thing that Mr. Eldridge has stated to
the court that could be interpreted as being a
response to an inquiry was some statement about
there being so many people or too many people in
the room. Obviously, the court is not passing
judgment at all on the competency of Mr.
Eldridge to understand this hearing or to
interpret his actions as being a reflection of
his competency. The court order is nothing more
than the court's opinion that Mr. Eldridge is
unable or unwilling to sit in this courtroom
without disrupting or distracting the jury.
Therefore, the court has ordered Mr. Eldridge to
be removed. If at anytime it is brought to the
court's attention that Mr. Eldridge is going to
be able to return to the courtroom and sit here
and not disrupt or distract the jury, the court
will bring Mr. Eldridge back into the courtroom.

MS. CRAWFORD: That was going to be my
inquiry, Your Honor. If at some point, he goes
back into the holdover and is maintaining some
level of composure, if the court will consider

allowing him to come back into the courtroom.

THE COURT: No problem. I also want each side to know, when we bring the jury in, I'm going to inform the jury that Mr. Eldridge is not present and that the court has ordered Mr. Eldridge to be removed from the courtroom because the court is not going to allow there to be any disruption or distraction from the trial. That's going to be it. And for them not to interpret -- well--

MS. CRAWFORD: Can you not just say anything?

THE COURT: I better just stop there. Yeah, you can go, bring them in.

(Jury enters the courtroom).

THE COURT: You all can be seated.

Members of the jury, Mr. Eldridge is not present in the courtroom. I have ordered Mr. Eldridge to be removed because it is my right to have this hearing to proceed without any disruption or distraction, so Mr. Eldridge has been removed on my order from the courtroom.

MR. HILL: Please note our objection again, Your Honor.

THE COURT: Yes, sir.

1          And, Ms. Crawford, you may continue.

2          MS. CRAWFORD:   Thank you, Your Honor.

3     BY MS. CRAWFORD:

4          Q.   I believe, Doctor Austin, you were

5     describing the process whereby Mr. Eldridge was

6     examined.

7          A.   Yes.   I was, for example, trying to

8     administer tests with Mr. Eldridge, and he was

9     not able to understand the directions well

10    enough for me to continue with standard testing

11    procedures, so I had to stop with that and,

12    instead, used other procedures as well as I

13    could, using certain mental status approaches

14    such as asking him to add two plus two and going

15    from there.

16         Q.   Stepping back a little bit, Doctor

17    Austin.   You indicated you have done this type

18    of work before, that is, the forensic side of

19    your business, and you had the opportunity to

20    examine patients with respect to criminal

21    allegations; is that correct?

22         A.   Yes.   Also particularly in family

23    law.

24         Q.   Okay.   And with respect to the

25    criminal cases that you had the occasion to work

1   on, work with, the patients, have you

2   represented, or should I say have you been

3   called upon to do your work exclusively for

4   State's witnesses or State's patients, or should

5   I say for the State, or have you exclusively

6   done your work at the request of the defense

7   counsel in those particular kind of cases?

8        A.   Close to even, perhaps a few more

9   times I've testified for the State than for the

10  defense.

11       Q.   All right.  So there is no question

12  here, you were asked by the defense in this case

13  to examine Mr. Eldridge; is that correct?

14       A.   Yes.

15       Q.   Okay.  Now, you indicated that you

16  were not able to perform or conduct any type of

17  psychological testing on Mr. Eldridge.  Could

18  you explain to the jury, first off, I guess,

19  what it was you were attempting to do and why

20  you fell short of that attempt?

21       A.   I was attempting to have both the

22  objective tests performed with Mr. Eldridge

23  where he would give specific answers where he

24  could get quantitative or numerical results,

25  plus, personality tests of just require the

patient to respond to questions, make a picture
story about pictures and so forth.  In addition,
I was attempting to get some idea of his
intellectual functioning, his orientation as to
space and time and his ability to compute
numbers was a measure of his concentration
ability as well as his skill as a way of getting
an assessment of his mental and emotional
status.

Q.  And during that proceeding, what did
you discover?

A.  That he had much difficulty
understanding communication.  He had a more
severe auditory comprehensive problem than
vision comprehensive problem in that he was
able, for example, to add simple numbers if he
could see them visually where he couldn't do
this in terms of giving an auditory response.
There was a breakdown with the auditory sensory
modality compared to visual sensory modality,
although I'm not sure whether he really
understood all of the vocabulary items.  One
word at a time is easier to comprehend than a
sentence, and he was able to complete or
understand the meaning of certain simple

vocabulary words up to the point of
approximately sixty IQ, indicating there was
some mental functioning there.  He could deal
with some simple words at that point.  But
essentially I was unable to complete a
psychological examination of the patient because
of my impression he was unable to understand
enough to complete the evaluations.  He was not
mentally competent enough to go through the
evaluation.

     Q.    Doctor Austin, you used the term or
the phrase auditory modality.  Could you perhaps
break that down and explain it for the jury so
that they perhaps have a better picture?

     A.    This means understanding what you
hear, not just hearing it.  It's the
comprehension, understanding what you hear
versus being able to show you understand what
you see.  It's a visual perception question.

     Q.    And, through your observations, are
you saying that in your opinion his ability to
understand what he hears, what he heard fell
short of his ability to understand what he sees
on paper?

     A.    Greater deterioration deficit using

1  auditory means of understanding, that is,

2  verbal, oral language means of understanding

3  versus the written word or the written number

4  ability to understand.

5      Q.   Based upon strictly your observation

6  of the patient, Mr. Eldridge in this case, were

7  you able to form any type of opinion?

8      A.   Yes.

9      Q.   And what was that opinion?

10     A.   A preliminary opinion is that his

11  associations were tangential and would be

12  considered loose associations in that they were

13  not relevant to the topic at hand.  His

14  emotional pattern would be described as

15  withdrawn or flat.  Flat is a word used with

16  persons that are seriously disturbed who don't

17  show on an ongoing basis in between being

18  agitated emotionally, almost a flatness, a

19  detachment, a withdrawn emotionality.  Thirdly,

20  his posture and his eye movements were somewhat

21  inappropriate and they lacked what you call

22  contact, that is, he was not making good mental

23  or emotional contact with me throughout the

24  examination, which is one way you measure the

25  severity of an emotional disturbance apart from

1    any test you give, your feeling of connectedness

2    with the patient or the extent the patient is

3    just not with it or with you or able to make an

4    understandable comprehensible contact with you

5    no matter how carefully you try to support the

6    patient as I did in this case.

7         Q.   And did you form any other opinions

8    from your observations?

9         A.   At that time, it was my opinion that

10   it was not possible to assess this patient and

11   determine from a professional point of view what

12   his diagnosis might or might not be.

13        Q.   Did you have an overall impression of

14   the status or state of Mr. Eldridge at the

15   conclusion of your observation of him?

16        A.   Yes, I did.

17        Q.   What was that, sir?

18        A.   It's my conclusion that his mental

19   state is such that he is not able to understand

20   the issues he is charged with or be able to

21   coherently, realistically communicate with his

22   attorney about the issues involved.

23        Q.   Was that the extent of your

24   examination of this particular patient?

25        A.   Essentially, yes.

1      Q.   Did you have the opportunity to make

2  notes or to read the patient's record when he

3  was in the jail, in the medical unit at the

4  jail?

5      A.   No, I did not.

6      Q.   Have you at any point since then had

7  the opportunity to read those records?

8      A.   Yes, I have.

9      Q.   And what are some of the items or

10 points that you observed through the records

11 that you read on Mr. Eldridge?

12     A.   Overall, the comments made by those

13 that observed him on the -- in the unit, at the

14 mental health unit, when he was there on two

15 different occasions, indicated he was not

16 accessible to psychological testing during that

17 stay.  I see no record of any psychological

18 tests being given to the patient or he was able

19 to be evaluated in terms of a complete

20 professional evaluation was one of my findings.

21     Q.   Were there any others that you were

22 able to make?

23     A.   Yes.  Overall there was substantial

24 data to support the position that he is

25 withdrawn, immature to the extent of a

1    decompensated position mentally, which was also

2    described by one of the physicians associates

3    that he was decompensated.

4         Q.   What does that mean, decompensation?

5         A.   Decompensation implies he has

6    regressed or gone back to a level of functioning

7    where he is not maintaining good contact with

8    reality.

9         Q.   When you say regressed, are you

10   implying, or does the term imply that at some

11   point he may have been at a higher level, it's

12   just that at the present time he is considered

13   regressed?

14        A.   That's the assumption I made in my

15   evaluation.  That was also the exact term used

16   in the medical reports by one of the physician

17   assistants, as well as numerous, maybe ten or

18   twelve instances of the patient suspected of

19   having delusional thoughts, talking to himself,

20   wanting to kill himself, and essentially

21   presenting psychotic symptomatology of

22   inappropriate affect or feelings.

23        Q.   You say psychotic symptomatology?

24        A.   Yes.

25        Q.   Again would you define that, please.

1          A.    This was used in MHMR service plan in

2    that he was observed as demonstrating delusions,

3    that is, talking about things that do not have

4    their root in reality, things that have a

5    reality to the patient but don't have a root in

6    actual reality.

7          Q.    What is MHMR, Doctor Austin?

8          A.    Mental Health, Mental Retardation

9    service plan.

10          Q.    Okay.   Is that a function that is part

11    of the system?

12          A.    As I understand it, yes.

13          Q.    Okay.   Doctor Austin, you had

14    mentioned that through your observations with

15    Mr. Eldridge the possibility of his IQ being

16    around the sixty range; is that correct?

17          A.    It's a possibility, yes.

18          Q.    Could you elaborate on that?   Explain

19    exactly what level that is.

20          A.    A person of IQ of sixty can learn to

21    read and write approximately third or fourth

22    possibly.   They can play simple table games.

23    They can do what a child can do between the age

24    of six and eight but are usually not capable of

25    understanding advanced comprehension.

1    Ordinarily that's representative of their true

2    intelligence.

3        Q.   Okay.  What were some of the other

4    comments from the record, or indications from

5    the records that you were able to observe?

6        A.   Simply that his behavior being quiet

7    and seclusive most of the time was consistent

8    with a person that has severe emotional and

9    mental problems.

10       Q.   Okay.  Let's back up a little bit,

11   Doctor Austin.  Could you distinguish for the

12   jury and for us, if you will, the difference

13   between the term competency and/or sanity?

14       A.   Yes.  Competency has to do with the

15   ability to comprehend and understand the issues

16   you need to deal with so you can deal with them

17   with at least a minimal level of understanding

18   what this is all about.  Sanity has to do with

19   the state of the patient as far as being

20   psychotic or not in terms of being out of

21   reality either at a given point in time or as an

22   ongoing chronic condition.  So they are two

23   separate issues.

24       Q.   And is it true that through your

25   evaluation and observations you limited your

1    issue to that of competency?

2         A.   Yes.

3         Q.   Were you able to go into any other

4    issues or specifically the issue of sanity?

5         A.   I don't feel there is enough data

6    present for me to reach any even beginning

7    conclusions about sanity or not.

8         Q.   Do you have any recommendations or

9    ideas that you feel would be appropriate to

10   enable the patient to become intact perhaps

11   where you could make a better study of the issue

12   of sanity with respect to this patient?

13        A.   Yes, I do.

14        Q.   And what would that be, sir?

15        A.   It's my opinion that a trial of

16   anti-psychotic medication such as Haldol or

17   Thorazine has a potential for rendering the

18   patient more accessible to a complete

19   psychological examination.

20        Q.   When you reviewed his record, were you

21   able to tell if there was any type of medication

22   that was prescribed and given to him?

23        A.   It was not clear.   It seems he was on

24   Atavan, which should be useful to reduce

25   anxieties.

1      Q.   How is that given?

2      A.   It's sometimes injected into the

3  muscular system.  If the patient is cooperative,

4  it's given orally.

5      Q.   Okay.  You have indicated that some

6  form of anti-psychotic medication such as

7  Thorazine might be appropriate.  How would you

8  recommend that this drug be given to him?

9      A.   In my opinion, to insure cooperation,

10 should be injected.

11     Q.   I understand.  Doctor Austin, are you

12 familiar with the term decompensation?

13     A.   Yes.

14     Q.   And I believe you indicated your

15 familiarity with that condition; is that

16 correct?

17     A.   Yes.

18     Q.   Could you specifically describe that

19 condition again?  Could you tell the jury

20 whether in fact it is consistent with your

21 evaluation and opinion with Mr. Eldridge?

22     A.   Yes.  Decompensation is a term that

23 indicates the patient cannot adequately

24 communicate in understandable ways with

25 significant people he is dealing with.  This is

1    what I observed in my examination of Mr.

2    Eldridge directly.

3         Q.    Also, Doctor Austin, are you familiar

4    with the term in your field of malingering?

5         A.    Yes, I am.

6         Q.    Is that a specific term that is used

7    in the diagnosis and observation of patients?

8         A.    Yes.

9         Q.    What does it mean?

10        A.    Malingering means the patient is

11   putting on an act to appear to be something that

12   he is not to serve his own interests.

13        Q.    And did you have the opportunity to

14   observe in the records any indications that

15   determined the possibility of malingering in Mr.

16   Eldridge?

17        A.    In reviewing the records, that was one

18   of the issues I tried to assess.

19        Q.    And were you able to tell, or what

20   would you think would be the possibility of Mr.

21   Eldridge I guess you say putting on an act with

22   respect to his conduct as you observed at this

23   time and in the records?

24        A.    Well, I can't deny that there is some

25   likelihood of malingering.    The overall data

1  from the medical records supported the stronger

2  likelihood that Mr. Eldridge is more severely

3  disturbed than putting on an act.

4  Q.  How would one who is in the profession

5  be able to detect the presence of malingering?

6  A.  There are indications based on the

7  fact the patient appears to be acting a part of

8  being sick when they are not, where they're not

9  consistent with your mental health data about

10  emotions, about mental patterns, thought

11  deteriorations, all the kinds of behaviors that

12  go into mental illness.  It's very difficult,

13  for example, to put on an act twenty-four hours

14  a day over a number of days and months unless

15  you have extremely high acting ability.

16  Q.  And did you try to observe Mr.

17  Eldridge for any of these characteristics?

18  A.  As a matter of course I am somewhat

19  cautious in assessing anyone involved in

20  litigation procedures because there is always a

21  possibility of faking in that regard.

22  Q.  Oh, yes, you used the phrase

23  tangential in your description of some of the

24  observations you made on Mr. Eldridge.  Can you

25  describe that for the jury, please?

A.    That's where a patient can't seem to
connect with the subject, wanders off in terms
of talking from his own self direction.   It's
not connected to the reality what you're talking
about.

Q.    Okay.   And you also indicated with
respect to his emotions he appeared flat and
detached.

A.    Yes.

Q.    Is that something that can be faked or
acted upon?

A.    It would be very difficult to fake
being emotionally flat.

Q.    Why do you say that, sir?

A.    Because it's an absence of emotion
rather than an emotion being faked.

Q.    With respect to the possibility or the
probability that this patient is genuinely in a
psychotic or psychosis behavior or that he is
malingering, do you have a conclusion or an
opinion?

A.    I can't make a definitive judgment
about his diagnosis, since he was unable to be
tested.   From the records, or from my own
assessment?

1          Q.    Yes, sir?

2          A.    I have an opinion based on all the

3     data available to me at this time.

4          Q.    Okay, what is that opinion?

5          A.    That it's more likely that the patient

6     is disturbed and mentally incompetent than the

7     likelihood that he is faking, acting and

8     malingering.

9          Q.    Could you in any case definitely say

10    that a person is or is not malingering?  Is that

11    a possibility in any type of case?

12         A.    I don't think it's possible to make

13    that conclusion and deny the possibility,

14    however remote, that the person is not

15    malingering.

16         Q.    Are you saying, Doctor Austin, or have

17    you made an opinion, that based on any type of

18    criminal responsibility or criminal conduct on

19    the part of the defendant in this case?

20         A.    None whatsoever.

21         Q.    And basically what are you discussing

22    or making your opinion an issue in respect to

23    what, sir?

24         A.    In relation to his mental competency

25    at this time.

37

1      Q.   So we're not talking about excusing

2  criminal responsibility of or defending the

3  criminal responsibility of the defendant in this

4  case; is that correct?

5      A.   None whatsoever.

6      Q.   And I believe you indicated that in

7  your opinion you can't even evaluate whether or

8  not Mr. Eldridge was sane at the time this

9  offense was committed; is that correct?

10     A.   That's correct.

11     Q.   Okay.  Approximately, you indicated

12  that in the records you observed at least two

13  stays in the mental ward or mental unit of the

14  jail; is that correct?

15     A.   Yes.

16     Q.   And do you recall how many months, or

17  did you make note of that, that he spent last

18  year in the jail?

19     A.   Although --

20     Q.   In the medical unit?

21     A.   Although I'm not sure of the exact

22  number of months, the records show he was there

23  approximately from one to three, '93, then back

24  in again approximately 10/93 from the notes at

25  that time.