# United States District Court
# Southern District of Texas

Case Number: __OSCV1847__

## ATTACHMENT

Description:

☐ State Court Record     ☑ State Court Record Continued

☐ Administrative Record

☑ Document continued - Part $17$ of _____

☐ Exhibit to: _____
         number(s) / letter(s) _____

Other: _____

_____

_____

1      Q.    Do you remember when he was or if he

2  has been discharged since October of '93?

3      A.    No.

4      Q.    Okay.  I pass the witness, Your

5  Honor.

6                CROSS EXAMINATION

7  BY MS. ALCALA:

8      Q.    I gave you those records last night;

9  isn't that right?

10      A.    Yes.

11      Q.    You and I never met.  My name is Elsa

12  Alcala.  This is Don Smyth.

13            Other than last night, when your

14  lawyers asked me for the records, that was the

15  first time you and I ever saw each other; is

16  that correct?

17      A.    Yes.

18      Q.    I guess you took those records home,

19  you had an opportunity to read them?

20      A.    Yes.

21      Q.    All right.  Isn't it more correct that

22  the records reflect that in fact this defendant

23  was released on February the 8th of 1994 from

24  the psychiatric ward; is that correct?

25      A.    Yes, I assume he was released.

1    Q.   Because he was not in the psychiatric

2  ward when you saw him.

3    A.   Yes.

4    Q.   Okay.  When you reviewed the records,

5  isn't it true that a Dr. Arfa saw the defendant,

6  Dr. Arfa, who works for MHMRA, saw the defendant

7  in the psychiatric ward at the jail, and Dr.

8  Arfa diagnosed him with malingering?

9    A.   Yes, I read that diagnosis.

10    Q.   And isn't it also true that Doctor

11  Robashkin, who is a doctor for MHMRA, saw the

12  defendant at the jail, and Doctor Robashkin

13  diagnosed him as malingering?

14    A.   I believe that comment is on the

15  records, too.

16    Q.   Isn't it also true that another

17  doctor, a third doctor by the name of Melissa

18  Ferguson, she saw the defendant at the jail, and

19  she also works for MHMRA, and she diagnosed the

20  defendant with malingering?

21    A.   I don't recall her diagnosis.

22    Q.   Let me show you the records, see if

23  that helps you.

24    A.   Yes.

25    Q.   Isn't it true that Doctor Ferguson

said she highly suspected malingering, doesn't

appear to be psychotic or suffering from an

Axis I major depression disorder; is that right?

    A.   Yes, I did read that.

    Q.   Would it surprise you to know she

would be willing to come in and testify he is in

fact malingering?

        MS. CRAWFORD:  I object to that.

Calls for speculation on the part of this

witness.

        THE COURT:  Overruled.  You may answer

the question.

    A.   No, I'm not surprised about that,

although I did notice in the notes, which I

hadn't seen, that he was highly abusive with the

team when he was examined, would not give the

information, the data.  That would be a basis

for conclusions.

    Q.   Fair enough.  We'll get into that in

just a minute, but right now I'm just trying to

see what doctors agree with you, what doctors

don't agree with you, if that's all right.

        So, Doctor Ferguson thought that he

was malingering?

    A.   Apparently, yes.

1        Q.    Okay.  And Doctor Stone, according to

2   those records, another doctor, in fact he runs

3   the MHMRA at the jail, he felt that he is

4   malingering?

5        A.    Yes.

6        Q.   Okay.  And Doctor Stokes, a fifth

7   doctor at MHMRA, diagnosed him as malingering?

8        A.    I don't remember the name, but I

9   probably saw the note.

10       Q.    Do you want to look at the records?

11       A.    No, I don't need to look at them.

12       Q.    What about a Doctor Ubah, he also saw

13   the defendant at the jail, MHMRA, and he

14   diagnosed him as malingering.

15       A.    I probably saw it, but I don't recall

16   the basis for that diagnosis.

17       Q.    Okay.  Well, actually, diagnosis was

18   possible mild adjustment disorder, N.O.S.; is

19   that right?

20       A.    Yes, that's what I am reading.

21       Q.    Okay.  What does N.O.S. mean?

22       A.    Actually it's sort of a provisional

23   diagnosis, it's not definitive or definite.

24       Q.    Means nothing?

25       A.    Could be, yes.

1    Q.   Doctor Osterman, another doctor with

2   MHMRA who saw him at the jail, also diagnosed

3   him as malingering; is that correct?

4    A.   I don't recall his evaluation.

5    Q.   Actually this is probably where it

6   says impression.  There.  If it will help you.

7   It's quicker.

8    A.   Yes, he does mention malingering on

9   this.

10   Q.   That's his diagnosis.  Diagnosis

11  impression:  Malingering, adjustment disorder,

12  depressed mood; right?

13   A.   Yes.

14   Q.   Okay.  Doctor Silverman, I guess

15  you're aware, has diagnosed him as a malingerer;

16  is that right?

17   A.   That's what I understand.

18   Q.   You're also aware that Doctor Brown

19  has also diagnosed him as a malingerer?

20   A.   Yes.

21   Q.   Luis Pena, another psychologist at

22  MHMRA, also diagnosed him as malingering; did

23  you know about that?

24   A.   No, I didn't know about that.

25   Q.   The last line on this page, dated

1/10/94, he suspected malingering; is that correct?

    A.    I think he did. Yes, I see it at the bottom. It was hard to read it because you had the page.

    Q.    Okay. It wouldn't surprise you, then, if Luis Pena were willing to come in today to testify that he in fact thinks that this defendant is malingering; is that correct?

    A.    No.

    Q.    You wouldn't be surprised by that?

    A.    No.

    Q.    So, overall, there are ten doctors or psychologists who have seen the defendant at the jail, and out of those people the only one who thinks that he has something other than malingering is yourself; is that right?

    A.    As far as I know, yes.

    Q.    I want to talk to you about your one interview with the defendant. Am I right about that, you had one interview?

    A.    That's correct.

    Q.    Okay. That was an hour long?

    A.    Yes.

    Q.    All right. And these people have

1    spent, you agree with me, days and weeks and

2    months looking at this defendant to be sure that

3    they were right about their diagnosis?

4         A.    I'm sure ample time to organize their

5    behavioral observations and make those records

6    of those behavioral observations.

7         Q.    Certainly more than an hour?

8         A.    Yes.

9         Q.    Okay.  Now, you didn't do any kind of

10   physical test to be able to tell this jury that

11   there is something wrong with his brain?

12        A.    No.

13        Q.    So, as far as you know, organically

14   his brain is the same as yours or mine?

15        A.    I'm making that assumption one way or

16   another from the language of data.

17        Q.    Well, you didn't test it?

18        A.    No.

19        Q.    You're not a physician?

20        A.    Correct.

21        Q.    Okay.  So your testimony would be,

22   that because of some personal or social or

23   interpersonal difficulty or maladjustment,

24   something has caused him to act peculiar?

25        A.    Regardless the cause or the

1    factors, the patient's behavior makes it not
2    possible to do a valid psychological evaluation
3    or to coherently communicate with him in a way
4    where he understands what's going on.
5         Q.   Okay.   The point is that whatever it
6    is, it's not physical, or at least you can't
7    testify that it is physical?
8         A.   I don't know whether it would be
9    physical or what.   I don't have opinion, in
10   absence of medical data supplied from the
11   record.
12        Q.   You don't know what may have caused
13   whatever he had?
14        A.   No indication from medical records of
15   any organic problem from the physical
16   examination, at least recorded in the medical
17   records, nor sufficient data from psychological
18   records as data base for concluding about a
19   mental illness, the presence or absence of it.
20        Q.   Okay.   Psychologists are not the only
21   people who treat people who have mental illness;
22   is that right?
23        A.   Yes.
24        Q.   Psychologists are the only ones?
25        A.   No, they are not.   There are other

disciplines.

Q.   Okay.   So there's psychiatrists and therapists and counselors and different people can see people with mental illness; is that right?

A.   Yes.

Q.   And that's different from a physician where, if somebody is physically ill, they can only go to a physician?

A.   That's essentially correct.

Q.   You don't perform surgery; is that right?

A.   No.

Q.   What is psychology, real briefly?

A.   Psychology is the science of basic human behavior and also basic science that is behind the practice of dealing with mental and emotional illness or any kind of form of human behavior, from school behavior to behavior at the work place to behavior involving emotional and mental problems.

Q.   What's your diagnosis of Mr. Eldridge?

A.   I don't have a mental health diagnosis because of the absence of adequate data to form a conclusion in that regard.

1          Q.    You don't know what's wrong with him?

2          A.    I don't know what his diagnosis is.

3    It's my impression that he is not mentally

4    competent to deal with the issues of either an

5    evaluation or deal with an issue where he could

6    communicate adequately with his attorneys or

7    other adults.

8          Q.    But you don't know what's wrong with

9    him?

10         A.    It would be speculation to say what's

11   wrong with him at this point.

12         Q.    So you don't even know if he has got a

13   mental illness or a mental disease?

14         A.    In the absence of the information from

15   the medical records which I surveyed and the

16   absence of psychological testing, a complete

17   psychiatric status report, I can't conclude one

18   way or the other.

19         Q.    Well, you mentioned the records a

20   couple of times, but I want to clarify something

21   real quickly.  Did you take any notes when you

22   were seeing him?

23         A.    Yes.

24         Q.    Did you bring the notes with you

25   today?

1      A.   Yes.

2      Q.   Can I please see them?

3      A.   Sure.

4      Q.   And you, in fact, made a report, you

5    have a doctor's handwriting, that's all there is

6    to it.  You, in fact, I can't read these.  You

7    in fact made a report that you gave to the

8    defense lawyers; is that right?

9      A.   Yes.

10     Q.   Let me hand you a copy of the report.

11   She gave it to me yesterday morning.  Just to

12   make sure that this is the report that you

13   filed.  Is this in fact your report?

14     A.   Yes.

15     Q.   Okay.  And that's one, two, three

16   pages long; is that right?

17     A.   Yes.

18     Q.   Okay.  I had an opportunity to read

19   this report.  When you made this -- when did you

20   make the report?

21     A.   February -- the report was probably

22   dictated I think the same day that I assessed

23   the patient, February 16th, 1994.

24     Q.   Okay.  And when you made that report,

25   you had not read any of the records regarding

Mr. Eldridge for his visits at the jail?

    A.   That's correct.

    Q.   Okay.  And had you talked to any of those ten doctors or psychologists who had been treating him for a number of months, or seeing him, rather.  Treating is probably not the right word, but seeing him over at the jail over a number of months?

    A.   No, I did not.

    Q.   Did you read the offense report in this case?  Before you made this report, did you read the offense report?

    A.   I don't recall whether that was among my records.

    Q.   Okay.  Did you review his high school records?

    A.   No.

    Q.   Did you review his work records?

    A.   No.

    Q.   Did you talk to any of the people who knew him, such as a friend of his that he grew up with, John Scott?

    A.   No.

    Q.   Did you talk to a friend of his who knew him, close friend, from I think it was '89

or '90 up until early '93?

    A.   No.

    Q.   By the name of Darrell Obey?

    A.   No.

    Q.   Okay.  Did you talk to -- let me see here, an old employer of his by the name of Steve Dement?

    A.   No.

    Q.   Okay.  Did you talk to Doctor Silverman?

    A.   No.

    Q.   Doctor Brown?

    A.   No.

    Q.   Luis Pena?

    A.   No.

    Q.   Doctor Robashkin?

    A.   No.

    Q.   Doctor Ferguson?

    A.   No.

    Q.   Any of his family, his mother, his brother or anybody else?

    A.   No, although I have a letter from his mother, Mattie Wade.

    Q.   Okay.  Can I see that?

    A.   Sure.

Q. But you did not personally speak with his mother?

A. No, I did not.

Q. So my understanding is that you formed, just to make this clear, your evaluation, your report that you made, in that report you diagnosed him as incompetent; right?

A. That's correct.

Q. Okay. And you made that diagnosis without the benefit of talking to any of those people that were available to you; is that right?

A. Yes.

Q. Would you agree with me that it would be more prudent to at least get all of the records on him from other mental health personnel, talk to friends who know him, have known him, maybe read the offense report, maybe do all of these other things before coming to a conclusion?

A. It's helpful to get all that information, although you have reliant behavior to reach conclusions.

Q. But certainly that would have been a better practice than just seeing him and jumping

1    to a conclusion of incompetent?

2        A.    Well, it's always helpful to get a lot

3    of information, background information,

4    especially if you're making a diagnosis.   One

5    can conclude, based on your immediate

6    information, whether or not the patient at that

7    time is functioning in a competent manner.

8        Q.    Right.   We'll talk about your

9    interview of him in just a minute, but at least

10   you would agree with me that there were many

11   other sources of information out there besides

12   the defendant that you chose not to use before

13   coming to your conclusion?

14       A.    Yes.

15       Q.    Okay.   Right now you've got, I guess,

16   some kind of psychology practice?

17       A.    Yes.

18       Q.    Okay.   And you treat people for what

19   kind of illnesses?

20       A.    A variety of illnesses.

21       Q.    Okay.   Those people are not charged

22   with crimes; are they?

23       A.    No.

24       Q.    Would you agree with me that a person

25   who is not charged with a crime has much less

1    motive to fake it than somebody who might have a

2    motive who is charged with a crime?

3         A.    Yes.

4         Q.    Okay.   Are you appointed by district

5    court judges to determine people's competency?

6         A.    No.

7         Q.    Okay.   So you would be hired privately

8    by the defense lawyers or the State; is that

9    right?

10        A.    I primarily am appointed in family law

11   to assess the mental status of adults and

12   children.

13        Q.    Okay.   But that's different from a

14   competency hearing before a criminal district

15   judge to decide the legal standard of

16   competency; is that right?

17        A.    Although the legal issues are

18   different, the psychological database is similar

19   and you're still dealing with the ability of the

20   patient to communicate effectively and deal with

21   reality and understand reality, so there are

22   similar variables in both cases.

23        Q.    But the bottom line is that district

24   court judges in criminal cases do not appoint

25   you as an expert for their cases; is that

1 right?

2     A.   That's correct.

3     Q.   You said that you in the past, let's

4 say, three years, how many times have you

5 decided that somebody was competent?

6     A.   I don't recall dealing with the

7 competency issue directly in the last three

8 years. Maybe in one or two cases, that's about

9 it.

10     Q.   Okay. And of those cases, how many

11 times in the last three years did you find they

12 were competent?

13     A.   In every case I found they were

14 competent except this one.

15     Q.   Okay. So two times they were

16 competent, one time they were incompetent?

17     A.   Yes.

18     Q.   Okay. And that's three times that

19 you've looked at the competency issue within the

20 last three years?

21     A.   Yes.

22     Q.   Okay. Are there differences in

23 examining a patient who comes to your office

24 seeking treatment versus somebody who is charged

25 with a crime?

A.    Yes.

Q.    And why is that?

A.    Patient coming to your office for treatment is voluntarily coming to you and, therefore, probably has a more positive attitude about the assessment.

Q.    Okay.  Are there any other reasons why somebody charged with a crime would be treated differently than somebody who is not charged with a crime?

A.    Actually, on the part of the psychologist, it shouldn't be any difference in the actual treatment of the patient, whether it's a prisoner or family law person or a patient, in terms of the way the psychologist treats the patient.

Q.    Well, I understand that's your position.  You're a psychologist, obviously you are not going to treat the patient differently.  My question has to deal with individual motive.  Wouldn't there be differences in motive for somebody who is just coming in to see you as a patient in your private practice versus somebody who is in the jail charged with a crime?

A.    Yes.  I assume that a patient who is

charged with a crime will try to give a better
impression to the psychologist or has more
vested interest giving a better impression than
somebody who is just coming as a patient.

Q.    Better impression meaning what?

A.    It could mean a number of different
things.

Q.    What?

A.    It could mean everything from that
they're innocent of a crime to that they weren't
responsible in whatever happened to them.    In
other words, that they weren't coherent or they
weren't rational in the process of committing
the crime.

Q.    All right.    So a possible motive for
somebody who you see in jail might be that they
don't want to be tried for a case?

A.    I would assume that nobody would want
to be tried for a case.

Q.    So that's a possible motive; right?

A.    Yes, I would assume that, right.

Q.    It's also a possible motive they might
try to convince you that they're too crazy to
stand trial.

A.    That's always a possibility.

1      Q.   Or that, if they did it, that they

2  didn't know what they were doing when they did it?

3      A.   That's always a possibility.

4      Q.   And that's different from patients who

5  you see in private who don't have those kinds of

6  motives?

7      A.   Generally, yes.

8      Q.   So you'd agree with me that a criminal

9  defendant certainly has a motive to lie?

10     A.   I would assume that a criminal

11  defendant would have a motive to falsify

12  whatever they do compared to a patient in

13  private practice.

14     Q.   They have a motive to lie?

15     A.   Yes.

16     Q.   To falsify.  I'm trying to stick to

17  the simple word, just lie, if we can.  All

18  right.

19        You talked about your interview with

20  the defendant.  Generally speaking, so we can

21  know a little bit about Mr. Eldridge, if Mr.

22  Eldridge wanted a glass of water, could he ask

23  for a glass of water?

24     A.   It's possibly he could, yes.

25     Q.   Well, the --

1     A.    Probably.

2     Q.    Are there records in there to show

3 that when he wanted headache medicine if he had

4 a headache he was able to ask the nurses for it?

5     A.    I would assume that he could.

6     Q.    Okay.  That he got I think it was

7 Mylanta because he was complaining of stomach

8 pains.  So he was able to articulate his needs

9 at least to the nursing staff; right?

10     A.    Yes.

11     Q.    And when he wanted to use the phone,

12 would it surprise you that he was able to use

13 the phone?

14     A.    No.

15     Q.    To make a collect call?

16     A.    No.

17     Q.    He could do that, or he couldn't do that?

18     A.    Even if somebody is decompensated,

19 there are periods where they're more lucid than

20 other times, so it's quite possible that during

21 times when he was more lucid, he could make a

22 long distance call.

23     Q.    So you would agree he could make a

24 telephone call collect?

25     A.    I would agree that if he was in a more

lucid state than some of the observations that I made with him in the evaluation session.

Q. You talked about the fact, that when you first went to see him, that you saw him over at the jail on the sixth floor?

A. Yes.

Q. Right? And he is not normally housed at that particular location that you did your examination in; is that right?

A. I don't know that information.

Q. Okay. Well, was it a cell for inmates or was it a different type of room?

A. No, it was a room with a glass in between yourself and the prisoner where you could talk clearly through that partition.

Q. Oh, I see. So you weren't even in the same room as him?

A. No.

Q. Was it at the visitation area at the jail, is that what you're talking about?

A. No, no.

Q. All right. But you're talking about you're sitting here in one area, then there is a glass?

A. Yes.

1    Q.    Then he is sitting on the other side
2    of the glass?
3        A.    Yes, that's correct.
4        Q.    So you were totally separated from him
5    by a piece of glass?
6        A.    Yes.
7        Q.    All right.  What kind of glass is
8    that?
9        A.    I really don't know.
10        Q.    Okay.  And you said that at one point,
11    well, I mean, is it a whole wall of glass or is
12    it just half a glass?
13        A.    No, it's a whole wall of glass.
14        Q.    Okay.  You said, that when you first
15    saw him, he was mumbling to himself?
16        A.    Yes.
17        Q.    Okay.  Where were you when that
18    occurred?
19        A.    I was getting ready to enter my part
20    of the room, he was already seated, and I could
21    see him through the glass partition.
22        Q.    All right.  The part of the room that
23    he was in, there was no bed there, was there?
24        A.    No.
25        Q.    So you could assume, then, he is not

normally in that particular room?

        A.    Yes.

        Q.    All right.  So that he was brought to
that room?

        A.    Yes.

        Q.    All right.  And, so, he knew that he
was there to see somebody.  Is that a fair
enough statement?  I mean, he was moved from his
cell to this visitation room?

        A.    Ordinarily I would assume that; but,
because of the level of comprehension he showed
with me, I'm not sure what he was thinking about
being in that room.

        Q.    Assume for the sake of argument that
he was faking it, just for about a minute, and
he was brought from his cell to an interview
room to see somebody.  If he was faking it, he
would know somebody was there to visit him.

        A.    If he was aware, he would know that,
yes.

        Q.    I am sorry, if he was aware, he would
know somebody was there.  So, assuming that he
was faking it, he would know somebody would be
coming in and looking through that window to see
if he was there?

A.    That's entirely possible.

Q.    Okay.  So, you don't know if, when he was mumbling, he in fact was expecting you to be there or wasn't expecting you to be there, assuming that he was faking it?

A.    No, I don't know.

Q.    Okay.  You said that he was mumbling but that you couldn't hear what he was saying.

A.    Correct.

Q.    Do you know what he was saying or do you not know what he was saying?

A.    I don't know.

Q.    Was he speaking out loud as if he was seeing somebody or just kind of moving his lips?

A.    He was speaking as if he was talking to himself.

Q.    Okay.  Have you done that before?

A.    Probably not out in public.

Q.    Well, he wasn't in public; was he?

A.    Well, it depends again on how he perceived what was going on in that situation.

Q.    But he was -- you agree with me he was not in public?

A.    In a sense, yes, except if you define public not being totally by yourself and you

expect one other person, then I would say there was a public dimension there.

Q. He was in a room by himself; right? And there was nobody else on the other side of the partition with him?

A. Correct.

Q. All right. So he was private, or as private as you're going to be at the Harris County jail.

A. Yes.

Q. Okay. How long did you observe him through the door?

A. I really don't know exactly how long. It was not a long time.

Q. Well, I mean, are we talking seconds or minutes or hours or what?

A. Oh, it could be two or three minutes.

Q. Minutes? Did you time yourself?

A. No.

Q. I mean, you'd agree with me, you have enough background in psychology, that sometimes people say it feels like three minutes but it's like seconds?

A. True.

Q. Okay. And you didn't time yourself to

1  know just how long?

2        A.    No.   I could have been wrong on the

3  time.

4        Q.    All right.   You also said that you

5  attempted to do testing on the defendant?

6        A.    Yes.

7        Q.    Okay.   What kinds of tests did you

8  want to do on him?

9        A.    I wanted to give him projective tests,

10  for one.

11        Q.    Do they have names?

12        A.    Yes.

13        Q.    What are the names?

14        A.    The Rorschach and the TAT.

15        Q.    Okay.   And from your review of the

16  records, at least two different times during his

17  stay at the jail they tried to give him tests;

18  isn't that right?

19        A.    I don't recall reading about attempts

20  to give him tests.

21        Q.    Okay.   Let me have you look at Luis

22  Pena's notes.   Hope I give you the right ones.

23        MS. CRAWFORD:   Excuse me, Your Honor.

24  Your Honor, may we approach for a minute?

25        THE COURT:   Yes, ma'am.

(Off the record bench conference)

BY MS. ALCALA:

Q. Would it surprise you to know that when they tried to give him the M.M.P.I. -- is that one that you tried to give him?

A. No, I didn't get that far.

Q. Okay, that he said he needed his glasses and couldn't see to do the test?

A. No.

Q. And then he said he couldn't read; he couldn't do it because he couldn't read?

A. Yes.

Q. Would that surprise you?

A. No.

Q. Would it surprise you then that Luis Pena then tried to give him the test verbally, but that he wouldn't respond to what Luis Pena was asking him? Would that surprise you?

A. No.

Q. And that when he asked him what mechanics meant, he said he didn't know what that meant?

A. No, I'm not surprised.

Q. Okay. And would it surprise you that Luis Pena said he appeared oppositional?

1       A.   No, that's often the feeling an
2  examiner gets when the patient, for whatever
3  reason, can't cooperate with you.
4       Q.   And that Luis Pena at that point says
5  there is no evidence of psychosis?
6       A.   Yes, because the patient wasn't giving
7  him any information that would indicate that he
8  was psychotic at that time.
9       Q.   That was on December 29, 1993.
10      A.   Yes.
11      Q.   So, that every time they tried to test
12 him, he had one excuse or another, whether it be
13 he couldn't see because he didn't have glasses
14 or he couldn't read or he couldn't hear and
15 didn't understand words and refused to be
16 tested.
17      A.   These are behaviors often classified
18 impotency.  The patient is unaware or not really
19 competent to do a job, so they make excuses.
20      Q.   And you weren't able to test him
21 either?
22      A.   No, I was not.
23      Q.   How did he refuse your testing?
24      A.   He didn't refuse directly.  He was
25 cooperative to the extent I think he could be

1    cooperative.  He was unable to comprehend the

2    instructions and make enough contact with the

3    examiner so that there could be adequate

4    communication to deal with the issues so he

5    could be examined.

6         Q.    What was he doing or saying that led

7    you to believe that he couldn't be tested?

8         A.    He was unable to understand the

9    instructions that were given him, he was unable

10   to stay focused long enough to be able to

11   connect with an instruction given so he could

12   respond from his mind, which means he

13   comprehends what you say long enough to be able

14   to understand what you were saying to get it

15   through his head and then be able to, thirdly,

16   perform in a coherent, competent manner.  He was

17   unable to do this with attempts made over the

18   approximately an hour of time with many

19   different types of approaches to the patient.

20        Q.    I guess I understand what you're

21   telling me, but this is what I'm trying to find

22   out from you, what did he do?  Those obviously

23   weren't his words, right, what you just told me?

24        A.    No.

25        Q.    Okay.  What I'm trying to find out is,

when you tried to give him this test, is the
test in writing or oral or what?

A. I couldn't go as far as written test
because it was very apparent, with experience in
working with disturbed people, that they could
not get off the ground to get to a written test
like the M.M.P.I., they could not begin to
understand a Rorschach instruction. He could
barely understand the very rudimentary things
such as what's two plus two, what's three plus
three and some very basic, simple vocabulary
words. It was very difficult for him to give a
coherent idea of who his family members were or
where he was, what year it was, what place it
was, who his attorney was. He was unable, after
careful examination, to give that kind of
information. If you don't get that information,
you can't go beyond to a legitimate
psychological, psychiatric evaluation of the
patient.

Q. Okay. But I guess what you haven't
told me, what I'm trying to find out, is how did
he refuse the testing? What did he do? Did he
say I don't want to do it? Did he not respond?

A. I'm trying to help you and I'm trying

1  to answer your question, but there is the
2  assumption that he refused, and I do not believe
3  he refused to cooperate, I think he did try to
4  the best of his ability to the extent he was
5  competent to cooperate with his examiner
6  throughout the hour.  And I think his behaviors
7  were predominantly in the direction of a patient
8  that tried to cooperate but was incompetent to
9  carry out any part, even the simpliest part of
10  the examination procedures.
11       Q.   This test was in writing or oral?
12       A.   The tests were given orally, although
13  some were given in written form because he found
14  it easier to add two plus two when he could see
15  it written out than if he just heard it from me,
16  but this is just a very beginning of a mental
17  status examination.  The patient was not
18  coherent enough to go further with even a mental
19  status examination interview.
20       Q.   All right.  Maybe we can break it down
21  simple.  You spent an hour with him?
22       A.   Yes.
23       Q.   Okay.  First two or three minutes you
24  say you look through a window; right?
25       A.   Yes.

Q.   What happened next?

A.   Then I attempted to begin an interview with the patient, and --

Q.   Tell me about that interview.  What did you do in the interview?  What did you say, what did he say?

A.   I tried to explain to him who I was.

Q.   Okay.

A.   That I was a psychologist assigned to assess him, I knew his attorney, and we really didn't really successfully get beyond that point because he really couldn't understand who I was, what my role was.

Q.   Let me stop you right there.  What did he do or say to make you think that he didn't understand?

A.   It was a combination of what he said and didn't say by content.  He didn't show any verbal content recognition that he understood my message.  What he did say was somewhat irrelevant to the subject.

Q.   What?

A.   His verbal, nonverbal behavior also, because that's part of the response, is his behavior, not just what he says, what he doesn't

1    say, was inappropriate to the discussion.  He

2    seemed to be unable to be able to make verbal

3    contact, he seemed to be lost in his own

4    thoughts by his mannerisms, by his lack of eye

5    contact, by the sometimes mutterings that were

6    tangential to the issue.

7         Q.   So he wasn't responding to what you

8    were saying?

9         A.   He was responding but he wasn't

10   responding in a coherent manner.

11        Q.   Can you give me an example?

12        A.   Beyond what I just finished giving

13   you, there were other examples where he didn't

14   know what year it was, what the date was, what

15   the charges were against him, who his attorney

16   was, and so forth.  There were numerous examples.

17        Q.   All right.  So he claimed he didn't

18   know who you were?

19        A.   My impression was he didn't understand

20   who I was.

21        Q.   He claimed he didn't know who his

22   lawyer was?

23        A.   He didn't verbalize a specific

24   message, content-wise, to say he didn't know who

25   I was.  That was my impression from lack of

communication, understandable that is from his part.

Q.  He didn't know what year it was?

A.  No.

Q.  What other questions did you ask him that he didn't know?

A.  Simple questions about what psychological evaluation is.  He didn't seem to understand.

Q.  That's not how you asked it; is it?

A.  No.

Q.  What question did you ask him?

A.  I really don't recall the exact content of what I asked him.

Q.  What other questions did you ask him?

A.  Questions to see if he could understand just simple, everyday information such as the month of the year, how to add two plus two; and when there was a breakdown in that area, I simply tried to spend sometime with him to relax him to the extent he could be more at ease with me, talk about anything that was comfortable to him, such as his family and his brothers, so there was some discussion in that area as well.

Q.    Okay.  Did he know who his family was?

          A.    He claimed to have three brothers,

Michael, Anthony and David that took care of

him, so he was more comfortable in talking about

the family issues.

          Q.    Did he mention his brother Barry?

          A.    No.

          Q.    Did he know who his mother was?

          A.    I don't know.  I don't have comment on

that.  I assume that he did, but I don't really

have evidence from what he said.

          Q.    You didn't ask him that?

          A.    No.

          Q.    Okay.  Did he know what city he was in?

          A.    I didn't ask him what city he was in.

          Q.    Did you ask him if he knew the name of

his lawyer?

          A.    Yes.

          Q.    Did he know the name of his lawyer?

          A.    No.

          Q.    Did you ask him about whether he has

ever had mental illness or treatment before?

          A.    No.  That was too advanced for him to

really comprehend during that session.

          Q.    When you testified during direct you

74

basically said three things led you to your
conclusion that he was incompetent to stand
trial.  That his association was not relevant to
the topic; is that right?

    A.    That's one of the bits of behavior.

    Q.    The flat affect and that you didn't
feel connected with him.  Are those the three
things you mentioned?

    A.    That and the entire flow of the
session where he really couldn't comprehend
communication adequately enough to show a
competent mental state.

    Q.    You would agree with me, with regards
to your first prong, that the association was
not relevant to the topic, you would at least
agree with me that somebody could intentionally
be nonresponsive?

    A.    It's always possible.

    Q.    Well, so you would agree with me that
it's possible for someone to be intentionally
nonresponsive?

    A.    Yes, it's possible to pull that off.

    Q.    So if you ask me a question, you know,
where were you born, and I said the sun is pink,
I could intentionally be nonresponsive.

1          A.    Yes.

2          Q.    And that would be one of the prongs

3    that you would use to decide whether somebody is

4    incompetent?

5          A.    Yes.

6          Q.    And I could choose to intentionally be

7    nonresponsive or I could, without control, be

8    intentionally nonresponsive.

9          A.    It's possible, yes.

10         Q.    Your next prong was that you felt that

11   he had a flat -- is it affect?  That's the word

12   you all use?

13         A.    Yes.

14         Q.    In that he had no emotion or was

15   withdrawn.

16         A.    Yes.

17         Q.    If I wanted to appear as though I had

18   no emotion or withdrawn, I could sit here and

19   look down and not respond to anything; right?

20         A.    It's possible, right.

21         Q.    And my doing so would meet your

22   definition of having a flat affect in having no

23   emotion and being withdrawn?

24         A.    No, the flat affect is when you do

25   express yourself but your emotion doesn't have

any animation to it, it's very flat in the way
it comes across.

Q. And somebody couldn't do something
like that if they wanted to, doctor?

A. It's possible if they have very good
acting skill to carry it on over an hour.

Q. Sure, particularly if they had
practice over the last year?

A. It's always possible.

Q. So you would agree with me that
somebody could intentionally appear to be
withdrawn and have no emotion and have those
skills to try to appear as though they have no
interaction?

A. It's possible.

Q. You also used as your third prong that
he had -- that based on his posture and eye
movement, that you didn't feel connected with
him?

A. It was a detached, withdrawn demeanor
or appearance, yes.

Q. All right. Same thing. I mean, if
I've been sitting in the jail for one year
practicing, I could know how to avoid eye contact.

A. It's possible.

1    Q.    I mean, if I wanted to sit here and
2    not look at you, avoid eye contact, you might
3    feel withdrawn from me.
4         A.    It's possible.
5         Q.    And I might be faking it or it might
6    be for real; right?
7         A.    Yes.
8         Q.    Okay.  So, your three prongs, you
9    would agree with me, all could be faked by
10   somebody who wanted to fake it?
11        A.    It's always possible.
12        Q.    If they wanted to.  And that you don't
13   necessarily know as a psychologist whether
14   that's somebody who is doing a great job of
15   faking it or somebody who genuinely has a mental
16   problem.
17        A.    There is always a possibility of being
18   fooled.
19        Q.    But you'd agree with me that your
20   three prongs all could be faked by somebody who
21   wanted to fake it?
22        A.    In the sense that there is always that
23   possibility, yes.
24        Q.    So they could be?
25        A.    Yes.