IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| GERALD CORNELIUS ELDRIDGE | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-05-1847 |
| | § | |
| NATHANIEL QUARTERMAN, Director, | § | |
| Texas Department of Criminal | § | |
| Justice-Correctional Institutions Division, | § | |
| | § | |
| Respondent. | § | |

## MEMORANDUM AND ORDER

Gerald Cornelius Eldridge, a Texas death-row inmate, has filed a motion for a habeas corpus writ under 28 U.S.C. § 2254. The motion is based on Eldridge's claim that under *Atkins v. Virginia*, 536 U.S. 304 (2002), he cannot be executed because he is mentally retarded.

Eldridge does not dispute the facts relating to the capital murder for which he was convicted. Eldridge does not assert that he is innocent of the crime. He does not assert that he was incompetent to be tried or that the conviction violated his constitutional or federal rights. The only issue is whether he cannot be executed because the Eighth Amendment bars the execution of a mentally retarded defendant.

The respondent, Nathaniel Quarterman, Director of the Texas Department of Criminal Justice ("TDCJ")-Correctional Institutions Division, moved for summary judgment, asserting that the evidence fails to support Eldridge's claim. Both sides filed extensive briefs and exhibits, including grades and standardized test records from Eldridge's school years, records of standardized testing

1

performed by the prison system, and testing performed by experts retained for this litigation.  This court conducted a four-day evidentiary hearing at which Eldridge presented testimony from mental-health experts and from family members, friends, and others who know or have observed him.  The respondent presented similar testimony.

Having carefully considered the petition, the summary judgment motion, the state-court record, the parties' submissions, the evidence presented, and the applicable law, this court grants respondent's motion for summary judgment and denies Eldridge's petition for a writ of habeas corpus.  Final judgment is entered by separate order.  The reasons for this ruling are set out in detail below.

I.      **The Legal Standards**

   A.      **The Anti-Terrorism and Effective Death Penalty Act**

This petition is governed by the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), which became effective on April 24, 1996.  *See Lindh v. Murphy*, 521 U.S. 320, 335-36 (1997).  Under the AEDPA, federal habeas corpus relief based on claims that the state courts adjudicated on the merits cannot be granted unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); *Kitchens v. Johnson*, 190 F.3d 698, 700 (5th Cir. 1999).

For questions of law or mixed questions of law and fact adjudicated on the merits in state court, a federal court may grant relief under the "contrary to" clause only if "'the state court arrives at a conclusion opposite to that reached by . . . [the Supreme Court] on a question of law or if the

2

state court decides a case differently than . . . [the Supreme Court] has on a set of materially indistinguishable facts.'" *Dowthitt v. Johnson*, 230 F.3d 733, 740-41 (5th Cir. 2000), *cert. denied*, 532 U.S. 915 (2001) (quoting *Williams v. Taylor*, 529 U.S. 362, 406 (2000)).   A federal court applying this standard must decide "what was the decision of the state courts with regard to the questions" at issue and "whether there is any established federal law, as explicated by the Supreme Court, with which the state court decision conflicts."   *Hoover v. Johnson*, 193 F.3d 366, 368 (5th Cir. 1999).

The "unreasonable application" standard permits federal habeas relief only if a state-court decision "identifies the correct governing legal rule from [the Supreme Court] cases but unreasonably applies  it to the facts  of the particular state prisoner's case" or "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not  apply or unreasonably refuses to extend that principle to a new context where it should apply."   *Williams*, 529 U.S. at 406.   A federal court's "focus on the 'unreasonable application' test under Section 2254(d) should be on the ultimate legal conclusion that the state court reached and not on whether the state court considered and discussed every angle of the evidence." *Neal v. Puckett*, 239 F.3d 683, 696 (5th Cir. 2001), *aff'd*, 286 F.3d 230 (5th Cir. 2002) (en banc), *cert. denied sub nom. Neal v. Epps*, 537 U.S. 1104 (2003).   The solitary inquiry for a federal court under the "unreasonable application" prong becomes "whether the state court's determination is 'at least minimally consistent with the facts and circumstances of the case.'"   *Id.* (quoting *Hennon v. Cooper*, 109 F.3d 330, 335 (7th Cir. 1997)); *see also Gardner v. Johnson*, 247 F.3d 551, 560 (5th Cir. 2001) ("Even though we cannot reverse a decision merely because we would reach a different outcome, we must reverse when we conclude that the state court decision applies the correct legal

rule to a given set of facts in a manner that is so patently incorrect as to be 'unreasonable.'").  The

AEDPA precludes federal habeas relief on factual issues unless the state court's adjudication of the

merits was based on an unreasonable determination of the facts in light of the evidence presented

in the state court proceeding.  *See* 28 U.S.C. § 2254 (d)(2); *Hill v. Johnson*, 210 F.3d 481, 485 (5th

Cir. 2000), *cert. denied*, 532 U.S. 1039 (2001).  The state court's factual determinations are

presumed correct unless rebutted by "clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *see*

*also Jackson v. Anderson*, 112 F.3d 823, 824-25 (5th Cir. 1997), *cert. denied*, 522 U.S. 1119 (1998).

### B.    The Summary Judgment Standard

"As a general principle, Rule 56 of the Federal Rules of Civil Procedure, relating to summary

judgment, applies with equal force in the context of habeas corpus cases."  *Clark v. Johnson*, 202

F.3d 760, 764 (5th Cir.), *cert. denied*, 531 U.S. 831 (2000).  A district court considering a summary

judgment motion must construe the facts in the case in the light most favorable to the nonmoving

party.  *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986) (The "evidence of the nonmovant

is to be believed, and all justifiable inferences are to be drawn in his favor").  In a section 2254 case

in which the state court has resolved a prisoner's factual allegations, however, those factual findings

are presumed correct unless the prisoner rebuts that presumption by clear and convincing evidence.

28 U.S.C. § 2254(e)(1); *see Marshall v. Lonberger*, 459 U.S. 422, 432 (1983); *Sumner v. Mata*, 449

U.S. 539, 547 (1981).  This court is bound by the state courts' factual determinations unless Eldridge

rebuts the presumption of correctness or shows that an exception applies.

### C.    The *Atkins* Standard

The petitioner in *Atkins* was convicted of abduction, armed robbery, and capital murder and

sentenced to death.  The evidence established that Atkins and an accomplice, armed with a

semiautomatic handgun, abducted their victim, robbed him of the money he had on his person, drove

him to an ATM where their withdrawal of cash from his account was recorded by security cameras,

and took the victim to an isolated area where they shot him eight times, killing him. Atkins and his

accomplice gave largely consistent testimony at trial, differing only on the question of who shot the

victim; each defendant accused the other of being the shooter. During the penalty phase, a

psychologist testified that Atkins had a full-scale IQ of 59, making him mildly mentally retarded.

The conclusion was based on interviews with Atkins's family members and deputies at the jail

where Atkins was incarcerated, Atkins's own statements to the police, and the witness's

administration of the Wechsler Adult Intelligence Scales test (WAIS-III). The jury sentenced Atkins

to death, but the Virginia Supreme Court ordered a new sentencing hearing based on a flaw in the

verdict form. At the new sentencing hearing, the same psychologist testified for Atkins. This time,

however, the State presented a rebuttal witness who testified that Atkins had at least average

intelligence, was not mentally retarded, and has antisocial personality disorder. The jury again

sentenced Atkins to death. A divided Virginia Supreme Court affirmed, rejecting Atkins's claim

that his retardation made his execution unconstitutional.

The Supreme Court of the United States reversed, holding that a State may not execute a

mentally retarded offender. The Court, noting "the evolving standards of decency that mark the

progress of a maturing society," *Trop v. Dulles*, 356 U.S. 86, 100-01 (1958), concluded that death

is an excessive punishment for mentally retarded offenders. The Court emphasized a national trend

against executing retarded offenders based on state legislative enactments, a trend indicative of

widespread concern about the relative moral culpability of mentally retarded offenders and whether

the penological purposes of the death penalty are served by imposing it on mentally retarded

offenders. *Id.* at 313-17.  The Court noted, however, that it is difficult to identify those capital offenders who are, in fact, mentally retarded.  "To the extent there is serious disagreement about the execution of mentally retarded offenders, it is in determining which offenders are in fact retarded." *Atkins*, 536 U.S. at 317.  The Court declined to adopt a definition of mental retardation, leaving that task to the States.  *Id.*  The Court remanded the case to the Virginia Supreme Court for additional proceedings in light of the Court's decision.  *Id.* at 322.  On remand, the Virginia Supreme Court remanded the case to the trial court for a hearing on the issue of whether Atkins was mentally retarded.  *Atkins v. Commonwealth*, 266 Va. 73, 581 S.E.2d 514 (Va. 2003).

Since the Court decided *Atkins*, a large number of cases involving similar claims have been decided.  There are 55 Fifth Circuit *Atkins* cases reported in the Federal Reporter and Federal Appendix and 120 *Atkins* cases from Texas state courts or federal courts within the Fifth Circuit.  These cases recognize generally applicable standards, which both sides agree govern this case.  The cases demonstrate that applying these standards requires fact-specific analysis in each case, examining evidence such as the petitioner's school records, employment history, test scores, and relationships.

*Atkins* does not mandate that a state adopt any particular clinical definition of mental retardation.  As the Fifth Circuit has noted,

> [a]lthough the [*Atkins*] Court did refer to the clinical definitions of mental retardation promulgated by the AAMR [American Association On Mental Retardation] and the American Psychiatric Association ("APA"), it did not dictate that the approach and the analysis of the State inquiry must track the AAMR or the APA exactly.

*Clark v. Quarterman*, 457 F.3d 441, 445 (5th Cir. 2006).  The Texas legislature has not adopted a definition of mental retardation, but the Texas Court of Criminal Appeals has identified standards

6

by which to evaluate *Atkins* claims.  These standards blend elements of the AAMR and APA and with the Texas Persons With Mental Retardation Act ("PMRA"), TEX. HEALTH & SAFETY CODE ANN., § 591.003(13).  *See Ex Parte Briseno*, 135 S.W.3d 1, 7 (Tex. Crim. App. 2004).  The AAMR standard ("AAMR") defines mental retardation as: (1) significantly subaverage general intellectual functioning; (2) related limitations in two or more of the following adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work; and (3) onset before the age of eighteen.  R. Luckasson, *et al.*, *Mental Retardation: Definition, Classification, and Systems of Supports* (9th ed. 1992).  The Texas PMRA standard is "significantly subaverage general intellectual functioning that is concurrent with deficits in adaptive behavior and originates during the developmental period." TEX. HEALTH & SAFETY CODE ANN., § 591.003(13).

The common elements of these standards are that a mental retardation diagnosis requires: (1) significantly subaverage intellectual functioning; (2) deficits in adaptive functioning; and (3) onset before age 18.  *See Ex Parte Briseno*, 135 S.W.3d 1, 7 (Tex. Crim. App. 2004).  The AAMR defines significantly subaverage intellectual functioning as "an IQ of about 70 or below (approximately 2 standard deviations below the mean)."  *Briseno*, 135 S.W.3d at 7 n.24.  Under the DSM-IV, an IQ of 75 or below satisfies the first element, allowing for a five point margin of error due to "variations in test performance, examiner's behavior, or other undetermined factors."  DSM-IV at 57.  The PMRA defines "adaptive behavior" as "the effectiveness with or degree to which a person meets the standards of personal independence and social responsibility expected of the person's age and cultural group."  TEX. HEALTH & SAFETY CODE ANN., § 591.003(1).  The developmental period referred to in the PMRA means before age 18.  *Briseno*, 135 S.W.3d at 7.

II.     **Background**

In April 1994, Eldridge was convicted of capital murder and sentenced to death for killing Cynthia Bogany and her nine year-old daughter, Chirissa. Cynthia Bogany was Eldridge's former girlfriend and the mother of his son, Terrell.

The evidence established that at about 5:00 a.m. on January 4, 1993, Eldridge went to Cynthia Bogany's apartment. He kicked in the door and shot Chirissa between the eyes at point-blank range, killing her instantly. Eldridge then shot at Wayne Dotson, who was also in the apartment. Dotson was wounded but survived. Eldridge also shot his son, Terrell, at close range. Terrell, then seven years old, was wounded but survived. Eldridge chased Cynthia, who had fled the apartment. Eldridge caught Cynthia when she tripped and fell on stairs outside a neighbor's apartment. Despite Cynthia's pleas for her life, Eldridge shot her twice in the head, killing her instantly. *See Eldridge v. State*, 940 S.W.2d 646, 649 (Tex.Crim.App. 1996). Eldridge was 28 years old.

The Texas Court of Criminal Appeals affirmed Eldridge's conviction and sentence. *Id.* On March 30, 1998, Eldridge filed an application for a writ of habeas corpus in state court. On March 30, 1998, Eldridge filed his initial state habeas corpus application. That application was pending when the Supreme Court of the United States decided *Atkins*. On June 20, 2003, while his first habeas application was still pending, Eldridge filed a second state habeas corpus petition, raising an *Atkins* claim. To meet the requirement of specific factual pleadings established by the Texas Court of Criminal Appeals for successive habeas applications raising *Atkins* claims, *see*, *e.g.*, *Ex Parte Rivera*, No. 27065-02, 2003 WL 21752841 (Tex. Crim. App. Jul. 25, 2003) at *2, *cert. denied sub nom. Rivera v. Texas*, 539 U.S. 978 (2003), Eldridge also filed a report by a psychologist, Dr.

8

Richard B. Austin.  This psychologist had evaluated Eldridge for competency and sanity before his

trial.  Although he did not evaluate Eldridge for mental retardation, Dr. Austin's report noted:

> [a]n estimate of his intelligence, based on the Wechsler Adult
> Intelligence Scale (WAIS-R), would arrive at an IQ of approximately
> 61, which is retarded, and in the lower five (5%) percent of the
> population.  It is not likely that his IQ has at any time been above the
> retarded level.

Dr. Austin's report also stated that Eldridge exhibited signs of "a serious auditory perception

problem which  makes it difficult for him to process sounds" and that Eldridge had stated that he

could not read or write, which "appeared to be true by observation."

The Texas Court of Criminal Appeals denied Eldridge's initial habeas application on

February 9, 2005.  *Ex Parte Eldridge*, No.60,478-02 (Tex. Crim. App. Feb, 9, 2005).  On the same

day, the Court of Criminal Appeals dismissed Eldridge's second application as an abuse of the writ.

*Ex Parte Eldridge*, No. 60,478-01 (Tex. Crim. App. Feb. 9, 2005).

Eldridge filed a skeletal petition for a writ of habeas corpus in this court on May 23, 2005

and filed an amended petition on May 26, 2006.  The amended petition raises only one claim for

relief: that the Eighth Amendment prohibits Eldridge's execution because he is mentally retarded.

When this court held the evidentiary hearing, Eldridge was 43 years old.

## III.    The Record

Eldridge lived in his mother's home until he was about 19 years old.  He graduated from high

school in 1982 and played football for most of his high school years.   He passed a written

examination to become a pipe fitter's apprentice, completed five semesters of the classroom portion

of the apprenticeship program, and worked in construction jobs.  In 1985, when Eldridge was 21

years old, he was convicted of attempted murder and served two years in prison.  After his release,

he lived with his mother, then with his brother, and then with his girlfriend.  In 1990, Eldridge was convicted of reckless injury to his son, Terrell, and again went to prison.  2 EH at 365-68, 32 Tr. at 91-95.[1]  He was released in 1992.  In 1993, he was arrested for the murders of Bogany and her daughter, convicted, and sentenced to death.

During the hearing in this court, Eldridge's counsel presented evidence about his childhood, education, work history, and social history designed to show that, despite some indications of functioning within a "normal" range, Eldridge is retarded and, under *Atkins*, cannot be executed. The respondent cross-examined Eldridge's witnesses and presented evidence showing that despite a substandard education, a difficult childhood, and difficulties in academic performance, particularly in reading, Eldridge did not have significantly subaverage intellectual functioning, did not have limits in two or more areas of adaptive skills, and had not shown such signs before (or after) the age of 18.  This evidence is examined below.

A.      **The Testimony of Family and Friends**

1.      *Mattie Wade*

Eldridge's mother, Mattie Wade, testified about her pregnancy with Eldridge, the home life she provided, and her observations about him as a child.  Mattie Wade testified that she took Librium while she was pregnant with Eldridge and while she nursed him.  2 EH at 350.  Mattie Wade had been married five times.  One marriage was annulled and the other four ended in divorce. There was a significant incidence of domestic violence in these marriages.  Wade's marriage to Eldridge's father was particularly violent. 2 EH at  348.  During his childhood, Eldridge witnessed

---

[1]

"EH" refers to the transcript of the evidentiary hearing conducted by this court from June 25 to June 28, 2007. "Tr." refers to the transcript of Eldridge's trial.

frequent fights between Mattie Wade and her husbands, including Eldridge's father.  Mattie Wade also used physical punishment against her children.

Mattie Wade set goals for her children.  She insisted that Eldridge do his school work and household chores.  2 EH at 357-58, 382, 3 EH at 687-88.  Wade testified that when Eldridge was in elementary school, she tried to have the school hold him back, because he had poor grades.  2 EH at 351-52.  The school did not hold him back but did provide help for him. Wade insisted that Eldridge graduate from high school, which he did.  2 EH at 352-53, 358, 372-74.

During the time Eldridge lived with his mother, she did the grocery shopping for the family. Eldridge's mother testified that she would not allow Eldridge to use the microwave oven because he once burned something, but she also testified that she forbade Eldridge's brother Barry from using the microwave as well.  *Id.* at 361-62.  Eldridge  mowed the lawn and fixed things around the house.  *See* 1 EH at 217.  Eldridge played chess with his brother Barry.  2 EH at 379-80.

2.    *Barry Eldridge*

Barry Eldridge testified at length on his brother's behalf.   He testified that his brother was unable to read; that he helped Eldridge with homework; and that Eldridge otherwise could not have passed his classes in school.

Barry Eldridge testified that their older brother taught Eldridge to do minor auto repairs.  2 EH at 389-90.  Although the parties disputed the difficulty of the repairs that Eldridge could do, the evidence was undisputed that he did auto repairs.  *See*, *e.g.*, 2 EH at 360-61, 389.  Barry Eldridge also testified that his brother got a driver's license and passed the exam to join the pipe fitters' union only because Barry took the written part of the driver's license test and the written test to join the union for his brother.  *See* 2 EH at 394, 404.

11

When Eldridge left high school and lived for a period with his brother Barry in an apartment, he slept on the floor because there was little furniture.  Barry testified that Eldridge needed help paying bills, did not understand the deductions on his paycheck, and did not make important decisions on his own.  2 EH at 400-01.

Barry testified that Eldridge had only a few friends, did not easily trust other people, and thought other people were out to get him.  2 EH at 402-03.  Barry described his brother as a "follower" with poor self-esteem.  Barry Eldridge acknowledged that his brother did have some friends, including girlfriends, in school.

Barry Eldrige testified that despite his awareness of his brother's limits, he did not believe that Gerald Eldridge is mentally retarded.  2 EH at 419.

   *3.     Ronnie Morgan*

Ronnie Morgan graduated from Yates High School one year ahead of Gerald Eldridge. Morgan tutored Eldridge in math and history during high school. 2 EH at 483-84.  Morgan testified that Eldridge could read, although he had difficulty with longer words and retaining new words.  He also had trouble working fractions.  2 EH at 490-91, 505-06.

   *4.     Hubert Hardeman*

Hubert Hardeman went to school with Gerald Eldridge and grew up in Eldridge's neighborhood.  Hardeman tutored Eldridge in elementary school.  Hardeman testified that Eldridge knew how to read and write and that he read newspapers.  Hardeman described Eldridge as someone who liked to be in control of a situation and who responded to perceived slights or threats with violence.  Hardeman described Eldridge as self-confident in school and a leader among his peers until he suffered a knee injury that ended his high school football career.

Hardeman testified that after Eldridge graduated from high school and was working, he had

a bank account and deposited his paychecks into that account.  3 EH at 733-54.  Hardeman  testified

that Eldridge was able to handle money; he could make purchases and knew how to get the proper

change.  He was also very good at working on  cars.  Hardeman testified that Eldridge was able to

keep his room at home clean and perform household chores.

**B.**     **The Evidence as to Eldridge's Grades, Tests, and Academic Performance**

*1.*     *Elementary School*

Eldridge's elementary school grades are not in the record.  In second grade, Eldridge tested

in the 46th percentile on the Peabody Picture Vocabulary Test ("PPVT"), which is within "normal"

range.  His mental age was one month behind his chronological age.  3 EH at 656-57, 666.

One of Eldridge's elementary school teachers, Donna Lawson, used him as a peer tutor for

kindergarteners when he was in the third grade.  Ms. Lawson also stated in an interview that her

testing of Eldridge in second grade did not indicate mental retardation.

School officials evaluated Eldridge for speech problems.  Neither the general nor special

educators who dealt with Eldridge indicated a belief that he was mentally retarded.  3 EH at 666-68.

*2.*     *Middle School*

In seventh and ninth grades, Eldridge received a C or better in 21 of his 30 courses.  In eighth

grade, most of Eldridge's grades were Ds.[2]  He tested in the fifth percentile in reading and the sixth

---

[2]

In seventh grade, Eldridge earned a C in both semesters of English, an A in his first semester of math and a D in the second semester, a B in both semesters of history, a B in Science 7A, a C in a course identified on the transcript as "RWS", a D in speech, a C in a course identified as "CC Orien", and an A in both semesters of physical education. In eighth grade, he received a D in both semesters of English, math, history, and science, a C in industrial arts, an F in a course identified as "H M 8A", and an A in both semesters of physical education.  In ninth grade, he received an F in English 1A and Ds in English 1B and 1C, a C in Math 1A, a B in Math 1C, and a B in Algebra 1B, Ds in courses identified as "W H" 1A and 1B, and a C in W H 1C, Cs in general woodworking 1 and 1B and a B in general woodworking 1C, and As in four physical education courses.  *See* Resp. Exh 1 at HISD 003-004.

percentile overall on the Tests of Academic Proficiency ("TAP").  *See* Resp. Exh. 1 at HISD 004.

        *3.*     *High School*

In high school, Eldridge was tracked for vocational training but was not in special education

classes.  2 EH at 528-30, 551-52.  Eldridge's grades rebounded in tenth grade and included a grade

of C or better in 10 of 12 classes.[3]  In eleventh grade, his grades included several As and Bs in

classes including reading lab and algebra.[4]  These were the years he played football.  In his senior

year, he hurt his knee and had to stop the sport.  While he was playing football, Eldridge intended

to apply to college.  Eldridge took the ACT, a standardized college entrance test.  He ranked in the

lowest percentile in reading and in the sixth percentile overall.  Eldridge graduated from high school

in about the 70th percentile of his high school class.

Judith Zinsser chaired the reading department at Yates High School while Eldridge attended

school there.  2 EH at 517-18, 536.  She testified that the Yates student body as a whole performed

very poorly on standardized tests, including reading scores in the tenth percentile compared to

nationwide results.  One year, 900 out of approximately 1,100 Yates students scored at a fourth to

fifth grade reading level.  2 EH at 533.  Zinsser testified "that the bulk of our students at Yates High

School were . . . barely literate."  2 EH at 545-46.  She acknowledged that this made it difficult to

identify mentally retarded students.  "[N]ormally, [mentally retarded students] stick out like a sore

thumb because of their reading handicap, but reading handicaps were commonplace [at Yates]."  2

---

[3]

        Eldridge received Bs in both semesters of Reading Lab and both semesters of woodworking, B- in courses
identified as "AE FM 2A" and 2B, Cs in both semesters of biology, and As in both semesters of physical education.  He
received an F and a D in English.  *See* Pet. Exh. 6.

[4]

        Eldridge received Bs in both semesters of Reading Lab, Algebra 1B, and metal shop 2B, and As in metal shop
1A and both semesters of physical education.  He also received Cs in both semesters of English, Algebra 1A and " A
H" 1A and 1B.  He received no grade lower than a C in eleventh grade.  *See* Pet. Exh. 6.

14

EH at 551.

The record also contained evidence that Eldridge performed reasonably well in his high school algebra class.  Dr. Richard Hughes, an educational psychologist, reviewed an interview with Ms. Wan-Ling Woodbury, Eldridge's high school algebra teacher, and concluded that she held her students accountable.  The class required working out math problems on the blackboard.  Eldridge was not assisted by his brother Barry or a friend in working out such problems in the classroom.  Ms. Woodbury stated that Eldridge could not be mentally retarded and do as well as he did in the algebra class.

C.     The Evidence as to Eldridge's Work History

1.     *The Pipe Fitters Exam*

Eldridge took and, on the third try, passed the written test to obtain entrance to the pipe fitters union as an apprentice.  Steve DeMent, the training coordinator for the pipe fitters union, testified that applicants often fail the test on their first try.  1 EH at 17.  The record contains the tests Eldridge failed, the test he passed, and the scratch paper from both.  The exam includes math problems involving fractions, decimals, and square roots, and converting degrees into fractions.  Eldridge received a 60 on each of his first two attempts and a 76 on his third attempt.  *See* Resp.  Exh. 32 at PFAT A-009-11, 014; Resp. Exh. 33.  An extensive amount of testimony focused on whether Barry Eldridge took the passing test for his brother.  The credible evidence shows that Gerald Eldridge took all three tests, the ones he failed and the one he passed, and that his brother did not take the passing test.  Barry Eldridge's testimony that he took the written test that achieved a passing score for his brother is not credible.

Steve DeMent testified that the union test is taken in a locked room.  Barry Eldridge could

not have entered the room without a key.  DeMent flatly stated "that wouldn't happen," 1 EH at 17-20, and Barry Eldridge did not testify that he had a key to the room.  *See* 2 EH at 404.

Barry Eldridge identified the scratch paper from the test he took to join the union himself. 2 EH at 443.  A comparison of that scratch paper and the scratch paper from Gerald Eldridge's exams demonstrates that the two men approached the math problems very differently.  *Compare* Resp. Exh. 32 PFAT-B 012, and 015, with Resp. Exh. 70.  Moreover, a comparison of the scratch paper from Gerald Eldridge's two failing exams and from his passing exam reveals that the person doing the work on all three exams took the same mental and visual approaches to the problems.  For example, all three of the scratch papers accompanying Gerald Eldridge's exams contain a drawing of a circle divided into segments with degree markings on the circle.  Barry Eldridge's scratch paper does not.  Barry Eldridge also acknowledged that there were different answers to the same questions on the test he took and the one he claimed he took for Eldridge, and differences in the approaches taken to the math problems as reflected on the scratch paper from the two tests.

Mark Smith, a handwriting analyst and certified fraud examiner, reviewed Eldridge's pipe fitters union tests and Barry Eldridge's test.  Smith concluded that they were not written by the same person. 3 EH at 624-38.  Smith also compared several documents, including Eldridge's pipe fitters exams, to known samples of Eldridge's writing, including letters he wrote from prison, and concluded that it is highly probable that the exams are in Eldridge's handwriting.  3 EH at 633-34.

The credible evidence shows that Eldridge himself completed all three pipe fitters union tests, failing the first two and passing the third, and worked the problems on the scratch sheets provided.  The credible evidence shows that Eldridge had the ability to read the test questions and to answer them, including the math problems.

16

### 2.    Eldridge's Work Experience

Steve DeMent of the pipe fitters union testified that, in addition to passing the test, applicants must go through an interview with the union's Apprentice Committee.  1 EH at 20.  Once accepted to the program, newly admitted members undergo a five-year apprenticeship, which includes taking classes.  Eldridge successfully completed his six-month probationary period and passed his first semester classes.  It took him two tries to pass his second semester  classes before going on to pass his third through fifth semesters.  1 EH at 22.

Eldridge eventually requested and received a leave of absence from the pipe fitters program. He did not fail out of the program and he was not asked to leave.  He continued to work on union jobs as a pipe fitter's helper construction sites after he left the apprenticeship program.

After Eldridge became a member of the pipe fitters union, he received good performance reviews, worked over 40 hours per week at times,  received regular pay raises and was, at one point, earning about four times the minimum wage.  The job of pipe fitter's helper involved using tools and instruments, including meters to measure airflow.  1 EH at 32.  Eldridge received good reviews for his work.  Eldridge was occasionally laid off or had periods without work, but the reasons were a reduction in force or the end of a project, not problems with his job performance or an inability to keep a job.  Barry Eldridge testified that Eldridge received pay increases as he gained seniority, but no promotions.

### D.    The Evidence as to Eldridge's Relationships

After high school, Eldridge had several girlfriends.  These included Nekietha Carmouch, Resp. Exh. 62; Crystal Franklin, who dated Eldridge from 1983-1984, *see* 32 Tr. at 71, and Cynthia Bogany, his common-law wife, with whom he had a son, Terrell, *see, e.g.*, Resp. Exh. 41 at 006-007.

LaTonya Bogany, Cynthia Bogany's niece, stated that while Eldridge was involved with Cynthia Bogan, he would help his ex-wife's daughter with her homework.  1 EH at 127; Resp. Exh. 63 at 4. Evidence in the record also showed that Eldridge would do household repairs, help purchase furniture, and help with grocery shopping.  Resp. Exh. 63 at 5-11.

  E.  **The Evidence as to Eldridge's Behavior in Custody**

  Eldridge was tried in 1985 and convicted of attempted murder, serving two years.  He was tried again in 1990 and convicted of reckless injury to a child, again serving two years.  The record contains letters Eldridge wrote to the Board of Pardons and Paroles and prison officials on his own behalf during these prison sentences.  The letters are in Eldridge's handwriting and are well-written and articulate.  They correct errors in the board's records and argue legal points, including the relative significance of misdemeanor and felony convictions on parole eligibility and the amount of time he was required to serve for a parole violation.  The letters argue that his release would pose no threat to the public.  *See* Resp. Exh. 8 at BPP 038, 120, 146, 149.  Eldridge also wrote to the trial court after his first conviction, clearly and logically laying out an argument that his sentence was excessive.  The letter identifies alleged misrepresentations made to him by his counsel and weaknesses in the State's evidence.  Resp. Exh. 6 at 104-05.

  After his arrest in 1993 on the capital murder charge, Eldridge played chess and read the Bible while in pretrial detention.

  The record includes oral statements Eldridge made in court during his capital murder trial. He articulately expressed concerns about the quality of his legal representation in his capital murder trial (referring to ineffective assistance of counsel at one point) and aspects of the criminal justice system he found objectionable.  He complained that his counsel were not following his instructions,

that the prosecution tampered with witnesses, and that his counsel performed inadequately during jury selection.  He objected to the trial court allowing certain personal information about witnesses to be divulged, expressing concerns for the safety of the witnesses.  27 Tr. at 9-12, 16-35; 28 Tr. at 12-13, 117-21; 29 Tr. at 295-97, 346-49; 30 Tr. at 352-56, 428-32; 31 Tr. at 503-05; 32 Tr. at 3-34; 33 Tr. at 99-101.

The record also includes letters written in the same handwriting as that on other documents clearly written by Eldridge.  The letters are clear and articulate.  Several Bibles, a Koran, and legal materials were also found in Eldridge's prison cell.  Eldridge also had a book with the names and addresses of foreign penpals, several of whom deposited money into Eldridge's prison trust account.  In prison, Eldridge also studied and passed the math section of the GED test.  3 EH at 677-78.

### F.    The Evidence as to the Intelligence Tests Administered After Eldridge's Arrest

As discussed below, the expert witnesses reached their conclusions about Eldridge's IQ by administering and interpreting tests.  These included the Wechsler Adult Intelligence Scale, third edition ("WAIS-III"), a test to measure an adult's intellectual ability;[5] the Wide Range Achievement Test ("WRAT")-3 and -4, tests to measure reading, spelling and arithmetic in subjects ages 5-75 (WRAT-3)[6], and reading, spelling, and math computation in subjects age 5-94 (WRAT-4);[7] Green's

---

[5]

This description is taken from the website of the publisher of the WAIS-III.  *See* http://harcourtassessment.com/haiweb/cultures/en-us/productdetail.htm?pid=015-8980-727.

[6]

*See* http://www3.parinc.com/products/product.aspx?Productid=WRAT3 (website of Psychological Assessment Resources, Inc., the publisher of the WRAT-3).

[7]

*See* http://www3.parinc.com/products/product.aspx?Productid=WRAT4 (website of Psychological Assessment Resources, Inc., the publisher of the WRAT-4).

Word Memory Test ("WMT"), a test of effort;[8] and the Non-Verbal Medical Symptom Validity Test ("NV-MSVT"), a test for other impairments, such as dementia, and for malingering, which could skew the results of the intelligence tests.[9] *See* Resp. Exh. 41 at 001-002; 3 EH at 796.  The test results are set out below.

- WAIS-R, administered by Dr. Gilhousen, a supervisor of psychiatric services at the TDCJ unit, where Eldridge was sent in 1994.  Eldridge scored a full-scale IQ of 112.

- WRAT-4, administered by Dr. Allen, expert for the State.  Eldridge scored first-grade equivalents for word reading and spelling, fifth-grade equivalent for sentence comprehension, and third-grade equivalent for math computation.

- WAIS-III, administered by Dr. Allen.  Eldridge scored a verbal IQ of 72, a performance IQ of 104, and a full-scale IQ of 84.  These results place Eldridge in the 2nd percentile for verbal IQ, the 61st percentile for performance IQ, and the 14th percentile for full-scale IQ.  Resp. Exh. 41 at 004.

- WAIS-III, administered by the defense expert, Dr. Patricia Averill.  Eldridge obtained a verbal IQ score of 64, a performance score of 87, and a full scale IQ of 72.  These scores placed Eldridge in the 1st, 19th, and 3rd percentiles, respectively. *See* Pet. Exh. 1 at 6.

- WRAT-3, administered by Dr. Averill.  Eldridge scored first-grade equivalents for reading and spelling, and a fifth-grade equivalent for arithmetic.  *Id.* at 8.

---

[8]

*See* Resp. Exh. 41 at 005.

[9]

*Id.*

- NV-MSVT administered by Dr. Allen. Eldridge "passed," meaning, according to Dr. Allen's report, that there were no discrepancies between the easy and hard items. Eldridge showed no signs of dementia. Eldridge failed the WMT. Resp. Exh. 41 at 004. Dr. Allen explained that the NV-MSVT seems easier to the person taking the tests, even though there is no difference in the demands the two tests place on memory.

Both Dr. Averill, the defense expert, and Dr. Allen, the State's expert, noted significant subtest scatter, meaning significant disparities in the scores Eldridge achieved on the various subtests and between the IQ tests administered by Dr. Allen and those administered by Dr. Averill. Dr. Allen opined that this is indicative of poor effort because neurological or other limits on cognitive ability generally result in poor results across subtests. By contrast, Eldridge did consistently better in math than in reading. Even if the IQ tests are affected by poor effort, however, the scores do represent a floor. That is, Eldridge's IQ might be higher than his scores indicate, but could not be lower. 4 EH at 947-48; Resp. Exh. 41 at 009.

### G. The Expert Testimony

#### 1. Dr. Russell Austin

Eldridge submitted evidence both to this court and to the Texas Court of Criminal Appeals that psychologist Dr. Russell Austin, who examined Eldridge in 1994 to evaluate his competency to stand trial for capital murder, had estimated Eldridge's IQ as 61. This estimate was based on Dr. Austin's brief observations and interactions with Eldridge, not on testing, detailed examination, or analysis of his background and history. *See* Resp. Exh. 2 at 025-026

#### 2. Dr. Walter Quijano

Another psychologist, Dr. Walter Quijano, attempted to administer an IQ test to Eldridge in 2002 in connection with his state habeas corpus proceeding. At that time, Eldridge had been convicted of capital murder and was on death row. Dr. Quijano was unable to administer the test because of Eldridge's mental state. Dr. Quijano noted specific delusional behaviors during the interview and concluded that Eldridge might be paranoid schizophrenic. Dr. Quijano nonetheless concluded that Eldridge has "mildly mentally retarded intellectual functioning." Am. Pet. at Exh. E. The basis for this conclusion, and the extent of retardation that Dr. Quijano believed to be present, are not clear.

3.     *Dr. Patricia Averill*

Eldridge primarily relies on Dr. Patricia Averill, who testified as a defense expert in the evidentiary hearing in federal court. Dr. Averill concluded that Eldridge has a full-scale IQ of 72, with a verbal IQ of 64 and a performance IQ of 87, with significant variation across subtests. As explained below, her analysis is unreliable, she relied on incomplete and incorrect information, and her conclusions are not supported by the evidence.

Dr. Averill reviewed Eldridge's school records and spoke to his brother Barry and to one of his high school teachers. Dr. Averill also administered two IQ tests: the WAIS-III and the WRAT-3. She saw no evidence that Eldridge deliberately attempted to do poorly on these tests. However, she did not attempt to determine the effort he expended and did not use any of the known and available tests for lack of effort or malingering. Dr. Averill was unfamiliar with scholarship and research on testing for lack of effort or for malingering. 1 EH. at 54, 2 EH at 338-39. Dr. Averill did not consider any alternative besides mental retardation to explain what she observed or believed about Eldridge's test scores, academic history, work history, or social history.

22

Dr. Averill dismissed the higher IQ test scores obtained by Dr. Allen, Dr. Michael Gilhousen, a prison psychologist, and Dr. Richard Hughes, an educational psychologist.  Dr. Averill claimed that Dr. Allen's scores were invalid because he prompted Eldridge to answer questions and continued testing after the test instructions required Dr. Allen to stop.  She was also puzzled by a significant differences in the picture-completion subtests.  She explained the difference by noting that Dr. Allen said that Eldridge pointed to some of the answers during his administration of the test, but did not do so during Dr. Averill's administration.  *See* 1 EH at 69-70.

Dr. Averill testified that she believed Dr. Gilhousen's results on the WAIS-R were invalid because he used a short-form test and did not retain his raw data.  She also testified that Dr. Hughes's results were invalid because he looked only at certain records, but not at standardized test scores, and did not interview school personnel.  On cross-examination, however, Dr. Averill acknowledged serious flaws in her own testing and in her review of the tests performed by others. She conceded that she did not attempt a differential diagnosis to rule out other possible causes of the symptoms she observed.  She admitted that low IQ scores could also be caused by dementia, substance  abuse, psychotic disorders, behavioral disorders, or poor motivation.  Dr. Averill also conceded that Eldridge's history showed repeated and significant psychotic behaviors and that there is a high correlation between antisocial personality disorder and capital murder.  She acknowledged that she had not been aware of significant information about Eldridge's childhood, work history, and social history, which were inconsistent with her conclusion of mental retardation.  She did not know, for example, that childhood friends and family members did not believe Eldridge was retarded.  She was unaware that people who knew him in high school had seen him reading, working on cars, and playing football.  She was unaware of the nature of his work and had incorrectly assumed that he

23

worked infrequently because he could not hold a job.  Dr. Averill also conceded that the evidence

of the letters and other documents that Eldridge wrote and the reading materials found in his cell,

were inconsistent with a diagnosis of mental retardation.  Dr. Averill acknowledged that the records

she had reviewed did not include many of the records in evidence, and that she did not consider

Eldridge's areas of strength in reaching her conclusions.

Dr. Averill conceded that Eldridge's poor academic performance and poor performance on

the fact-based portions of the IQ tests were consistent with a poor education.  She admitted that the

WAIS-III manual states that a low score is not necessarily indicative of a low IQ but could result

from cultural, physical, or psychological issues.  Dr. Averill also acknowledged that at least 12

different mental health professionals have interacted with Eldridge during his years of incarceration

and concluded that his intelligence is at least average.

Dr. Averill lacked the expertise and experience to express a reliable opinion as to whether

Eldridge is retarded.  She did not do the necessary work to analyze his test results or the results of

the tests performed on him by others to reach a reliable conclusion.  The respondent, by contrast,

presented expert witnesses whose work was based on relevant experience, a fuller consideration of

the record information, and a more thorough and rigorous analysis of that information.

### 4.      Dr. Michael Gilhousen

Dr. Michael Gilhousen was the supervisor of psychiatric services at the TDCJ's Ellis Unit,

which housed death-row inmates when Eldridge arrived in 1994.[10]  3 EH at 575-76.  The psychiatric

staff screens newly arrived death-row inmates.  Gilhousen's staff administered the short-form

WAIS-R IQ test because Eldridge indicated that he was illiterate.  3 EH at 583-84.  The short-form

---

[10]

Death row is now housed in the Polunsky Unit in Livingston, Texas.

test covered only vocabulary and block design and was used only to rule out, not establish, mental retardation. Based on the test, the staff concluded that Eldridge had a full-scale IQ of 112. Dr. Gilhousen admitted that the WAIS-R is outdated and no longer used but insisted that it was a valid diagnostic tool when administered to Eldridge. Dr. Gilhousen acknowledged that the short-form test had limits. The WAIS-R short form has .94 reliability. 3 EH at 585-86. The 95% confidence interval for Eldridge's IQ, based on this test, is 105-119, and the 99% confidence interval is 103-121. Dr. Gilhousen acknowledged that some professional literature concludes that the short-form WAIS-R inflates IQ scores. He described the inflation as about three points, although others are less certain as to the extent. Dr. Gilhousen also acknowledged evidence that minorities score artificially low. 3 EH at 596-97, 616-17. He concluded, however, that even taking these potential inaccuracies into account, Eldridge's score does not show mental retardation. If Eldridge had scored close to the mentally retarded range, the staff would have administered a longer-form test to arrive at a more precise score; Eldridge's score did not require another test.

Dr. Gilhousen testified that he is aware of Eldridge's scores on the PPVT in elementary school which, as noted above, were within the normal range. He is also aware that, while Eldridge received speech therapy in school, he was not classified as a special education student or as mentally retarded, and distinguished between being mentally retarded and having a learning disability. *Id.* at 606-16.

### 5.    *Dr. Richard Hughes*

Dr. Richard Hughes is a clinical psychologist with experience in educational settings. He opined that Eldridge's elementary, junior high school, and high school grades were not consistent with mental retardation and that a substandard education combined with a clear deficit in auditory

processing was a more likely explanation for Eldridge's poor scores on certain tests and the pattern of doing better on arithmetic and math tests and classes than on reading tests and classes. Dr. Hughes rejected relying on Eldridge's poor ACT score as evidence of mental retardation. The ACT is intended for college-bound students. Eldridge's poor score – at the bottom of the national averages – is consistent with a poor education and a marginal reading ability. The fact that Eldridge scored so poorly in relation to others taking the test is not necessarily evidence of mental retardation because the comparison is to a relatively intelligent and well-educated group.

Mental retardation is not an acquired condition, but "a condition that will have manifested itself developmentally typically from birth forward." 3 EH at 667. According to Dr. Hughes, had Eldridge been mentally retarded, there would have been a greater disparity between Eldridge's chronological and mental ages at a very early age. In second grade, Eldridge tested in the 46th percentile on the PPVT, which is within the normal range. His mental age was only one month behind his chronological age. Dr. Hughes noted that the PPVT has a moderate to high correlation with other kinds of IQ tests, although he acknowledged that he would use it only to rule out mental retardation, not to make a diagnosis of mental retardation. In eleventh grade, Eldridge's test scores indicated an IQ in the low 80s. Eldridge's extremely low standardized test scores in 12th grade coincided with the end of Eldridge's football career and hopes for college and were, in Dr. Hughes's opinion, indicative of lack of effort. Dr. Hughes also noted that, due to the generally poor reading skills of the student body at Yates High School, teachers often read aloud to their English classes instead of requiring the students to read. Because Eldridge has problems with auditory processing, this created an additional barrier to learning.

In Dr. Hughes's opinion, Eldridge is not mentally retarded. Dr. Hughes relied on the grades

Eldridge received, over time and from different teachers, and all his test scores, as a better indication of Eldridge's actual intelligence than any single grade or test score.  Only Eldridge's 12th grade test scores were so low as to indicate mental retardation.  Those scores are inconsistent with his earlier scores and grades and with later IQ tests administered in the prison and in connection with this *Atkins* challenge.  The fact that Eldridge passed the math section of the GED test during his incarceration is not consistent with a diagnosis of mental retardation.

Dr. Hughes testified that Eldridge's poor academic performance and poor test performance in reading and spelling were consistent with a learning disability.  Dr. Hughes concluded that Eldridge has problems with auditory processing – processing information obtained through hearing – that is consistent with grades and test scores that show greater difficulty in reading than in arithmetic and math.  A retarded person would have more consistent deficits across subject areas. Even taking into account the problems with Yates High School, it would be difficult for a mentally retarded person to graduate in the seventieth  percentile of his high school class, meaning that seventy percent of his classmates ranked lower.  Only two to three percent of the general population is mentally retarded.  3EH at 645-78.

Dr. Hughes acknowledged that Eldridge had academic deficits, particularly in reading, but concluded that these were consistent with a poor education, a chaotic home environment during his childhood, and an auditory processing deficit, but not mental retardation.  3 EH at 686 - 689.

### 6. *Dr. Thomas Allen*

Dr. Thomas Allen, a forensic psychologist, testified as an expert for the State.  Dr. Allen applied well-established tests of malingering and concluded that Eldridge was deliberately exerting no effort on the tests.  Among the specific factors Dr. Allen cited as evidence of malingering were:

Eldridge's motive to achieve a low score; his claim that he did not understand the word "parole," even though he was previously on parole and wrote a letter using the word; and the fact that Eldridge scored lower on a word-memory test than every test group other than elderly patients with advanced dementia and sophisticated volunteers. Eldridge incorrectly stated his age, claimed not to know where he grew up, and incorrectly answered or refused to answer arithmetic problems that were less difficult than problems he answered correctly on the pipe fitters exams (including the exams he failed). Dr. Allen testified that Eldridge claimed he was unable to identify the number that came after 19 in a three number sequence, yet was able to reduce fractions to the lowest common denominator on the pipe fitters tests. The word-memory test is not difficult and is a good measure of effort. The test groups scoring higher than Eldridge included children with fetal-alcohol syndrome, children aged seven to nine years, children with an average IQ of 64, and mildly mentally retarded adults. Dr. Allen also noted sharp discrepancies between Eldridge's performance on the math portion of the WRAT-4 and his performance on the pipe fitters exams (not merely the one he had passed, but all three exams).

Dr. Allen noted that other mental health professionals have suspected Eldridge of malingering. Reports of psychological evaluations from Eldridge's detention before his capital murder trial also express concerns that Eldridge was feigning symptoms of mental illness. *See* Resp. Exh. 2.

Dr. Allen also reviewed witness interviews and Eldridge's records. He noted that elementary school special education staff evaluated Eldridge as having speech and auditory processing problems, but not as mentally retarded. The speech teacher at Yates used Eldridge as a peer tutor, unlikely if Eldridge was mentally retarded. Based on his own testing and review of information

from those who knew Eldridge, Dr. Allen concluded that Eldridge has a full-scale IQ of 83 and is not mentally retarded.  3 EH at 791-4 EH at 875.

IV.     **Findings and Conclusions**

The record evidence as to Eldridge's academic, work, and social history is examined in light of the standards established to determine whether an *Atkins* claim is valid.  As analyzed below, the record does not show that Eldridge has significantly subaverage general intellectual functioning, related limitations in two or more adaptive skill areas, including communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work, or that there was an onset before age eighteen.

A.     **Substandard Intelligence**

The credible evidence shows that Eldridge does not have significantly subaverage general intellectual functioning.  His academic record and test scores exhibit a pattern that, according to the credible evidence, results from a combination of poor education and learning disabilities, specifically in auditory processing.  But despite a poor education and learning deficits, Eldridge managed to obtain grades of C or better in the majority of his classes and did consistently better in arithmetic and math classes and tests than in classes and tests that were focused on reading. Although the evidence showed that Eldridge had help from his brother and others in reading and homework, the evidence also showed that Eldridge could read and that he was able to perform in classes that required independent performance, without help from others.  Eldridge took classes for those with academic difficulties but not in the available special-education classes.  Eldridge graduated in the seventieth percentile of his public high-school class.  Despite evidence that many of those who graduated with Eldridge were poorly educated and could not read well, that does not

mean that they were likely to have significantly substandard intelligence.  As Dr. Hughes explained, only two to three percent of the population is mentally retarded.  The incidence of mental retardation at Yates High School would have to be some 23-35 times that of the general population for a mentally retarded person to rank higher academically than 69 percent of his classmates.  Such an assumption is not supported by the evidence.

Eldridge's claim that he is mentally retarded is further undercut by the credible evidence that he took the pipe fitters exam three times and passed it once.  This exam included math problems requiring Eldridge to add, subtract, multiply, and divide fractions and decimals and determine the square roots of numbers.  The evidence also shows that Eldridge performed adequately in his job as a pipe fitter's assistant and in the academic portion of the pipe fitters apprenticeship program. The evidence as to his written communications, including letters to the parole board and to his "penpals,"  and his oral statements in court during his capital murder trial, show that Eldridge has considerably greater verbal ability than his test scores, particularly the tests he took in connection with this *Atkins* hearing, would suggest.

Eldridge's IQ test results are consistent with a finding that he does not have substandard intelligence.  Only Dr. Averill's IQ tests showed that Eldridge had a full-scale IQ so low as to place him in the retarded range.  Dr. Averill's analysis and conclusions are not reliable.  She failed to consider or test for the possibility of malingering or lack of effort.  She failed to consider explanations or possibilities other than mental retardation for the test results she obtained.  *See*, *e.g.*, 1 EH at 88-99.  Dr. Averill admitted that she relied only on limited information about Eldridge's background.  Before testing Eldridge, she reviewed no school or work records, prior IQ scores, or psychological evaluations.  She did not interview Eldridge's family and friends before the test.  It

was only after testing Eldridge that Dr. Averill interviewed Barry Eldridge and Judith Zinsser. 1 EH at 45-46, 81-83, 2 EH at 322-23. She did not know significant facts about his background that were inconsistent with the assumptions she made about how he performed in school, how he fared in the work place, and how he related to others, in reaching her conclusion that he was retarded.

The evidence as to the results of the numerous tests administered also demonstrates that Eldridge is not mentally retarded. The short-form IQ test administered to Eldridge in prison may have inflated his actual IQ. But for Eldridge to have an IQ in the mildly retarded range, that test would have had to inflate his score by approximately 50 percent, from an actual range of 70-75 to the tested score of 112. The record does not contain evidence that the short-form test has that kind of inflationary impact. Moreover, the evidence showed that these tests inflate IQ scores in part because they overemphasize areas in which Eldridge performed relatively poorly. 3 EH at 620. The credible evidence as to Eldridge's intelligence establishes that his IQ is not at least two standard deviations below the mean.

### B.  Deficits In Adaptive Functioning

The evidence does not show a significant deficit in adaptive functioning consistent with mental retardation. Each area of adaptive functioning is examined below.

#### 1.  *Academic Functioning*

Much of the evidence supporting Dr. Averill's conclusion that Eldridge has a deficit in academic functioning is discussed above in connection with the analysis of the grades, standardized tests, and IQ tests. As noted, Eldridge was a poor student, although he did better in arithmetic and math classes. But there is little evidence that his academic performance is a result of mental retardation rather than a poor education, learning deficits, and a chaotic home environment. While

Eldridge makes repeated claims that he survived in academic settings only by having others help him with his homework, the evidence establishes, for example, that Eldridge did well in algebra classes in high school in which he had to work problems at the blackboard during class, without help, and that he took and passed the pipe fitters exam, which required math on about a sixth-grade level. He was not in special education classes, was not held back to repeat a grade, and graduated from high school in the seventieth percentile of his class. Before he hurt his knee, he intended to go on to college. While there is clear evidence that Eldridge was generally a poor student and in particular a poor reader, that does not equate to evidence of retardation. The testimony showed that the overwhelming majority of students at Yates High School were poor readers.

Dr. Averill did not consider much of the evidence showing that Eldridge was capable of more academic work than her testimony indicated. She did acknowledge some evidence of his capability, such as the evidence that Eldridge helped his ex-wife's daughter with her homework and the evidence that he filed a written grievance with the State Bar of Texas that used high-level vocabulary. She speculated, but cited no evidence, that he received help with the grievance. Dr. Averill also acknowledged the evidence that Eldridge played chess with his brother and played chess and read the Bible while in pretrial detention. She admitted that chess requires strategic planning but dismissed the significance of the evidence because she did not know if Eldridge ever won. Confronted with letters written by Eldridge during his incarceration, Dr. Averill could only speculate that he had received extensive help writing them and had essentially copied what others wrote. She also acknowledged evidence that Eldridge had several Bibles in his prison cell, but speculated that he did not understand much of what he read or that he read a translation written at a fifth- or sixth-grade level (although no such translation was in the cell). She dismissed evidence that Eldridge

keeps legal materials in his cell by concluding that he either does not read them or does not understand them.  In short, Dr. Averill was either unaware of, or discounted, evidence that was inconsistent with the conclusions she had reached.

The evidence establishes that Eldridge had academic deficits, particularly in reading.  Even in reading, however, Eldridge's scores were not consistent with mental retardation, with the exception of his twelfth-grade reading score on the ACT exam.  But Eldridge's other grades improved in the twelfth grade; he received six As, five Bs, and one C.  The fact that Eldridge did well in some classes, particularly math, and did relatively well in math and arithmetic tests, is inconsistent with mental retardation.  Dr. Hughes found that Eldridge's grades in school were not consistent with mental retardation and instead were consistent with poor education, learning deficits in auditory processing, and the effects of Eldridge's dysfunctional home life.  *See* 3 EH at 669-72; Resp. Exh. 1 at HISD 004.  Dr. Hughes also noted that Eldridge's three pipe fitters exams, the fact that he completed five semesters of the classroom section of the apprenticeship program, and the fact that he passed the math section of the GED test while in prison, are not consistent with mental retardation.  This evidence supports the conclusion that Eldridge is not mentally retarded.

### 2.    *Work*

Dr. Averill opined that Eldridge has a significant deficit in the area of work, primarily based on the fact that his employment history showed periods when he was not working.  1 EH at 121, 179-80.  Dr. Averill recanted this opinion, however, when confronted with evidence that the type of work Eldridge did was transitory in nature.  As a pipe fitter's helper, Eldridge would be hired for specific construction projects.  When a project ended, his job ended, and he would then be hired for a different project.  2 EH at 458.  When Eldridge was laid off, the layoffs were not performance

33

related but were due to a project ending or a reduction in force.  The credible evidence showed that Eldridge was regularly employed, received good performance reviews, worked over forty hours per week at times, received regular pay raises and was, at one point, earning about four times the minimum wage.

On redirect, Dr. Averill recanted her recantation.  She based her renewed conclusion that Eldridge did not succeed in the area of work on an assumption that Eldridge had required help to take the exam to get into the pipe fitters union.  She assumed that Barry Eldridge took the pipe fitter's exam for his brother.  That assumption is not supported by credible evidence.  To the contrary, the credible evidence shows that Eldridge took and passed the test necessary to get into the pipe fitters union.   After he passed the test, Eldridge successfully completed his six-month probationary period and five semesters of the program, though it did take him two tries to pass his second-semester classes.  1 EH at 21-22.  Eldridge eventually requested and received a leave of absence from the program.  He did not fail the program and he was not asked to leave.

The evidence demonstrates that Eldridge performed reasonably well at his job.  He moved successfully through the pipe fitter's apprenticeship program until he voluntarily left, and he advanced in his employment.  The evidence does not support Dr. Averill's conclusion that Eldridge had a significant deficit in the area of work.

### 3.   Social Functioning

Dr. Averill opined that Eldridge has a deficit in social functioning based in part on information that he was bullied as a child and lacked friends.  The evidence shows that Eldridge did have friends during his school years, although not many.  Barry Eldridge testified at the hearing that Eldridge had only a few friends, did not easily trust other people, and thought other people were out

to get him.  2 EH at 402-03.  Barry Eldridge described his brother as a "follower" with poor self

esteem.  Hubert Hardeman, who attended high school with Eldridge, described him as self-confident

in school and a leader among his peers until he suffered the knee injury that ended his high school

football career.  Other witnesses also described Eldridge as having friends in school.  Evidence also

showed that Eldridge was socially confident in school until his knee injury.

The evidence showed that during high school and after, Eldridge also had girlfriends.  Dr.

Averill acknowledged that Eldridge had girlfriends in school and, after school, had relationships

with women, including a common-law wife.  Dr. Averill argued that the relationships have not gone

well, evidencing a deficit in social functioning.  Dr. Averill conceded, however, that breaking up

with girlfriends during high school or having a series of relationships with women is common and

not indicative of mental retardation.  1 EH at 247.  On cross-examination, Dr. Averill admitted that

many of Eldridge's behaviors towards women could also be attributable to conduct disorder or

antisocial personality disorder.  1 EH at 254-65.

Dr. Allen also testified as to Eldridge's ability to relate socially.  Dr. Allen listened to a tape

recording of messages Eldridge left on Cynthia Bogany's answering machine.  The messages were

socially appropriate.  Eldridge used words such as "appreciate" and "courtesy," stating that he

wanted to see his son and asking Bogany to "do him the courtesy" of returning his call.  Dr. Allen

testified that this level of communication was inconsistent with mental retardation.  Dr. Allen also

noted that since Eldridge has been in prison, he has "pen pals" from around the world who write him

letters and deposit money into his prison account, interactions that are inconsistent with mental

retardation.  4 EH at 882-89; Resp. Exh. 28.  Dr. Allen also noted that Eldridge's seeming inability

to resolve conflicts without resorting to violence more likely reflected conduct or antisocial

personality disorder rather than mental retardation.  Dr. Allen testified that most mentally retarded

people tend toward docility and any violent behavior tended to be more like a four year-old child

throwing a tantrum than extreme criminal violence.  He specifically observed that Eldridge's history

of violence is not the kind of impulsive lashing out one would expect from one with mental

retardation.  4 EH at 876-79.

The credible evidence did not show a deficit in social functioning consistent with mental

retardation.

### 4.    *Home Life*

Dr. Averill also concluded that Eldridge has a significant deficit in home living.  She based

this conclusion on evidence that Eldridge relied on others to do things for him, never lived by

himself, slept on the floor when he shared an apartment with his brother, did not cook, and did only

very basic grocery shopping for himself.  1 EH at 78-79, 119-20, 204-05.  Dr. Averill conceded,

however, that the evidence showed that Eldridge was able to cash his paychecks, share expenses

when he lived with girlfriends, go grocery shopping, and do some household chores.  Dr. Averill

acknowledged evidence showing that Eldridge went shopping for furniture, electronics, and towels

for the home he shared with a girlfriend, but dismissed the evidence because she was not convinced

that Eldridge actually made the choices and  purchases by himself.  She also acknowledged that

Cynthia Bogany's niece stated that Eldridge would cook for the family, including backyard

barbecues, and make other contributions to home life.  Dr. Averill also based her conclusion, in part,

on her belief that Eldridge never had a bank account.  That assumption was contradicted by

Eldridge's boyhood friend Hubert Hardeman, who testified that Eldridge did have a bank account.

*Compare* 1 EH at 78 (Averill testimony) with 3 EH at 751 (Hardeman testimony).  Dr. Averill relied

on assumptions that were not supported by the evidence.

The testimony showed that Eldridge lived not only with his mother and brother, but also with his common-law wife.  He had a job as a pipe fitter's helper.  There were times when he had a bank account.  He could handle money.  He could contribute to the functioning of a home, in ways ranging from grocery shopping to minor home repairs to some cooking.  He drove a car and knew how to repair cars.  Eldridge was able to handle money and manage other basic tasks of everyday home living.  Although Barry Eldridge testified that his brother needed help paying bills, did not understand the deductions on his paycheck, and did not make important decisions on his own, the testimony on these points was conflicting, and credible evidence showed that when Gerald Eldridge lived away from his brother and mother, he did more things independently.  And Barry Eldridge testified that even though his brother relied on him for help in different ways, he was not mentally retarded.  2 EH at 401-403, 419.

The evidence does not establish that Eldridge has  a significant deficit in home living.

### C.      Onset Before Age Eighteen

The evidence shows that Eldridge does not have significantly subaverage intellectual functioning or significant deficits in adaptive functioning.  It necessarily follows that such symptoms did not manifest before Eldridge turned 18 years old.

## V.      The *Atkins* Standard Is Not Met

The evidence in this case falls far short of the evidence that has been held to show mental retardation that precluded the death penalty on Eighth Amendment grounds.  In *Atkins*, the petitioner's expert witness testified that the petitioner had a full-scale IQ of 59.  *Atkins*, 536 U.S. at 309 n.5.  The only expert opinion rebutting the conclusion that the petitioner was retarded was

37

offered by an expert witness who did not administer an IQ test.  *Id.* at n.6 and accompanying text.
The only quantifiable evidence in *Atkins* demonstrated that the petitioner's intelligence was well
below the cutoff – and outside the margin of error– for mental retardation.

The Fifth Circuit cases applying *Atkins* that have found an Eighth Amendment bar to
imposing the death penalty also present facts that are simply not present in this record.  In *Woods
v. Quarterman*, 493 F.3d 580 (5th Cir. 2007), the expert for the petitioner concluded that he had a
full-scale IQ of 68 and suffered from significant deficits in the areas of functional academics and
work.  The State countered these conclusions with evidence that the petitioner scored between 78
and 86 on previously administered IQ tests, including a short-form test administered by the Texas
Department of Criminal Justice.   The State also presented evidence that the petitioner had
successfully worked as a short-order cook to rebut his claim of a significant deficit in the area of
work.  *Id.* at 585-86.  The Texas courts rejected the petitioner's claim of mental retardation, and the
United States Court of Appeals for the Fifth Circuit agreed.  *Id.* at 586.

The evidence as to Eldridge's mental capacity and functional deficits is far different from
the evidence in *Atkins* but similar to the evidence in *Woods*.  Unlike the defendant in *Atkins*,
Eldridge has no test results that place his IQ clearly in the mentally retarded range.  Like the
defendant in *Woods*, Eldridge relies on tests conducted by his retained expert that places him in the
borderline range (though Eldridge tested higher than the petitioner in *Woods*).  In both *Woods* and
in the present case, the score on which the petitioners' expert relied was contradicted by other test
scores, including scores obtained before *Atkins* was decided.  Like the petitioner in *Woods*, and
unlike the petitioner in *Atkins*, Eldridge had a reasonably successful work history.  The evidence as
to Eldridge's employment provides more support for the finding that he is not mentally retarded

38

because the evidence includes the three tests he took to become a pipe fitter's helper, which demonstrated some ability to calculate decimals and fractions, he completed five semesters of classroom work, he finished a six-month probationary period, and he worked regularly for three years. *See* Resp. Exh. 32 at 019 (Apprenticeship agreement signed by Eldridge and dated August 16, 1982) and *id.* at 031 (letter from pipe fitters union dated June 14, 1985, granting Eldridge a leave of absence). After his incarceration, and before *Atkins* issued, Eldridge completed GED classes. 3 EH at 677-78.

Eldridge's case for mental retardation is far weaker than was the evidence as to the petitioner in the *Atkins* case itself. Eldridge appears to have fewer indicia of substandard intellectual capacity and deficits in functioning than the petitioner in *Woods*, who was found by state and federal courts not to be mentally retarded. Eldridge fails to carry his burden of proving that he is mentally retarded under *Atkins* and the standard adopted by the Texas Court of Criminal Appeals.

**VI.     Conclusion**

Eldridge is not entitled to relief on his *Atkins* claim. There is ample evidence in the record to show that Eldridge is not mentally retarded. He graduated from high school, became a pipe fitter's apprentice, worked consistently, earned enough to support himself, and lived independently. The evidence as to Eldridge's intellectual functioning, academic functioning, work history, and social relationships, do not support a finding of mental retardation. The primary evidence introduced in support of Eldridge's claim is the testimony of his expert witness, Dr. Averill. Dr. Averill's conclusions were not reliable. She did not take into account significant evidence contradicting her conclusions on IQ and adaptive functioning and did not examine either alternative explanations for Eldridge's behavior or his incentives to perform poorly on the tests she

administered.

Eldridge does not request a certificate of appealability ("COA"), but this court may determine whether one should issue. *See Alexander v. Johnson*, 211 F.3d 895, 898(5th Cir. 2000) ("It is perfectly lawful for district court's [sic] to deny COA *sua sponte*. The statute does not require that a petitioner move for a COA; it merely states that an appeal may not be taken without a certificate of appealability having been issued."). A petitioner may obtain a COA either from the district court or an appellate court, but an appellate court will not consider a petitioner's request for a COA until the district court has denied such a request. *See Whitehead v. Johnson*, 157 F.3d 384, 388 (5th Cir. 1988); *see also Hill v. Johnson*, 114 F.3d 78, 82 (5th Cir. 1997) ("[T]he district court should continue to review COA requests before the court of appeals does."). "A plain reading of the AEDPA compels the conclusion that COAs are granted on an issue-by-issue basis, thereby limiting appellate review to those issues alone." *Lackey v. Johnson*, 116 F.3d 149, 151 (5th Cir. 1997).

A COA may issue only if the petitioner has made a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see also United States v. Kimler*, 150 F.3d 429, 431 (5th Cir. 1998). A petitioner "makes a substantial showing when he demonstrates that his application involves issues that are debatable among jurists of reason, that another court could resolve the issues differently, or that the issues are suitable enough to deserve encouragement to proceed further." *Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir.), *cert. denied*, 531 U.S. 966 (2000). The Supreme Court has stated that

> Where a district court has rejected the constitutional claims on the
> merits, the showing required to satisfy § 2253(c) is straightforward:
> The petitioner must demonstrate that reasonable jurists would find
> the district court's assessment of the constitutional claims debatable

or wrong.

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  "The nature of the penalty in a capital case is a 'proper consideration in determining whether to issue a [COA], but the severity of the penalty does not in itself suffice to warrant the automatic issuing of a certificate.'" *Washington v. Johnson*, 90 F.3d 945, 949 (5th Cir. 1996) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 (1983)), *cert. denied*, 520 U.S. 1122 (1997).

This court has carefully considered Eldridge's claim.  While the issue Eldridge raises is clearly important and deserving of the closest scrutiny, the claim is foreclosed by clear and binding precedent.  Eldridge has failed to make a "substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).

## VII.    Order

Respondent Nathaniel Quarterman's Motion For Summary Judgment (Docket Entry 12) is granted.  Petitioner Gerald Cornelius Eldridge's Amended Petition For Writ of Habeas Corpus (Docket Entry 11) is dismissed with prejudice.  A certificate of appealability is not issued.

SIGNED on March 13, 2008, at Houston, Texas.

Lee H. Rosenthal
United States District Judge

41