1           UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF TEXAS
2               HOUSTON DIVISION

3  GERALD CORNELIUS ELDRIDGE        .  C.A. NO. H-05-1847
                                    .  HOUSTON, TEXAS
4  VS.                              .
                                    .  APRIL 16, 2012
5  RICK THALER                      .  8:30 A.M. to 6:38 P.M.

6

7                       DAY 1 of 3
           TRANSCRIPT of EVIDENTIARY HEARING
8        BEFORE THE HONORABLE LEE H. ROSENTHAL
              UNITED STATES DISTRICT JUDGE

9

10

   APPEARANCES:
11

   FOR PETITIONER GERALD
12 CORNELIUS ELDRIDGE:              MR. LEE H. WILSON
                                    Attorney at Law
13                                  P.O. Box 52447
                                    Houston, Texas   77052-2411
14

                                    MS. LAURA WARRENE FERRY
15                                  Texas Defender Service
                                    510 S Congress Avenue
16                                  Suite 304
                                    Austin, Texas   78704
17

                                    MR. GREGORY W. WIERCIOCH
18                                  Texas Defender Service
                                    430 Jersey Street
19                                  San Francisco, CA   94114

20

21 THIS TRANSCRIPT HAS BEEN FURNISHED AT PUBLIC EXPENSE UNDER THE
   CRIMINAL JUSTICE ACT AND MAY BE USED ONLY AS AUTHORIZED BY
22 COURT ORDER.  UNAUTHORIZED REPRODUCTION WILL RESULT IN AN
   ASSESSMENT AGAINST COUNSEL FOR THE COST OF AN ORIGINAL AND ONE
23 COPY AT THE OFFICIAL RATE.  General Order 94-15, United States
   District Court, Southern District of Texas.
24

   Proceedings recorded by mechanical stenography, transcript
25 produced by computer-aided transcription.

1                              <u>APPEARANCES CONTINUED</u>

2

3    FOR RESPONDENT RICK THALER:        MS. GEORGETTE P. ODEN
                                         MR. JOSEPH P. CORCORAN
                                         MR. STEPHEN M. HOFFMAN
4                                        Office of the Attorney
                                            General
5                                        P.O. Box 12548
                                         Austin, Texas  78711-2548
6

7    ALSO PRESENT:                       MR. GERALD CORNELIUS ELDRIDGE
                                         DR. MICHAEL A. ROMAN
8                                        DR. THOMAS ALLEN

9

10   OFFICIAL COURT REPORTER:           MS. KATHY L. METZGER
                                         U.S. Courthouse
11                                       515 Rusk
                                         Room 8004
12                                       Houston, Texas  77002
                                         713-250-5208
13

14

15

16

17

18

19

20

21

22

23

24

25

1                                    <u>INDEX</u>

2                                                                    PAGE

3  <u>PETITIONER'S WITNESSES</u>

4  Pradan A. Nathan
     Direct Examination by Ms. Ferry                     11
5     Cross-examination by Mr. Corcoran                   48
      Redirect Examination by Ms. Ferry                  110
6     Recross-examination by Mr. Corcoran                123
      Further Redirect Examination by Ms. Ferry          129
7
8  Michael A. Roman
     Direct Examination by Ms. Ferry                     133

9

10

11

12

13                             *   *   *

14

15

16

17

18

19

20

21

22

23

24

25

1                          P R O C E E D I N G S

2              *THE COURT:*  Good morning.  Please be seated.  Go ahead

3    and state your appearances.

4              *MS. ODEN:*  Georgette Oden.

5              *MR. CORCORAN:*  Joseph Corcoran, Your Honor.

6              *MR. HOFFMAN:*  Steve Hoffman

7              *THE COURT:*  All right.

8              *MR. WILSON:*  Lee Wilson for Mr. Eldridge.

9              *MR. WIERCIOCH:*  Greg Wiercioch for Mr. Eldridge and

10   Laura Ferry for Mr. Eldridge.

11             *THE COURT:*  All right.  Thank you very much.  Do the

12   parties want to invoke the Rule?

13             *MS. FERRY:*  Yes, I would, Your Honor.

14             *THE COURT:*  All right.

15             *MS. FERRY:*  I'm sorry.  With the exception we don't

16   have any objection to our expert or the respondent's expert

17   staying.

18             *THE COURT:*  That was my next question.  Is that

19   acceptable to both sides?

20             *MS. ODEN:*  That's fine, Your Honor.

21             *THE COURT:*  All right.  All those who will testify as

22   expert or fact witnesses, please stand and raise your right

23   hand.

24        *(Witnesses sworn.)*

25             *THE COURT:*  All right.  If are there only experts who

1    are going to testify present in the courtroom, then nobody else
2    needs to leave.
3         MS. FERRY:  Our only fact witness is in the hall, Your
4    Honor.
5         THE COURT:  Very good.  Thank you.
6              All right.  Do the parties want to make an
7    opening statement?
8         MS. FERRY:  The petitioner does.  And I also have just
9    a couple of housekeeping matters that I'd like to address with
10   the Court.
11        THE COURT:  All right.  The exhibits that have been
12   identified as subject to the stipulation and not objected to
13   are admitted.  And those are -- for the record, let's make sure
14   we have that out here.  I thought I had it.  Oh, here it is.
15   One through 8 and 13 of the petitioner's exhibits and
16   Respondent's 1 to 19, 21 to 38, 40 to 51, 55 to 60, and 62 to
17   64 are admitted.
18        MS. FERRY:  And, Your Honor, I spoke with Ms. Oden
19   this morning.  We would also like to add to the stipulation the
20   additional -- a number of additional exhibits that were filed.
21        THE COURT:  Good.
22        MS. FERRY:  4A and 8A for petitioner's and then
23   respondent's --
24        MS. ODEN:  65, 66, and 67.
25        THE COURT:  They're all admitted.

1          *MS. FERRY:*  And, Your Honor, along those lines, at
2    this time I would also move for admission of Petitioner's
3    Exhibit 14, which is accompanied by a business record
4    affidavit, as well as summary exhibits, Petitioner's 9, 9A, 10,
5    11, and 12.  I understand that Ms. Oden's objection to 9, 9A,
6    10, 11, and 12 is on foundation grounds.  And because the
7    underlying documents at this point are now all in evidence, I
8    would request that the Court admit those under Federal Rule of
9    Evidence 1006 just as the -- oh, I'm sorry.
10         *THE COURT:*  Go ahead.
11         *MS. FERRY:*  Just as the Atkins exhibit, the Court
12   admitted respondent's summary Exhibit 75A because all the
13   underlying documents are in evidence.
14         *THE COURT:*  Any objection?
15         *MS. ODEN:*  No, Your Honor.
16         *THE COURT:*  All right.  They're admitted.  Do you want
17   to repeat the numbers?
18         *MS. FERRY:*  Yes, Your Honor.  Exhibits 9, 9A, 10, 11,
19   and 12 --
20         *THE COURT:*  Very good.
21         *MS. FERRY:*  -- are the summary exhibits, and Exhibit
22   14 is the document accompanied by a business records affidavit.
23         *THE COURT:*  All right.  Thank you.
24         *MS. FERRY:*  And, Your Honor, the final housekeeping
25   matter, I wanted to alert the Court that Mr. Wiercioch would

1  like to make some ex parte representations to the Court

2  regarding the funding issue that we have been litigating.

3         *THE COURT:*  We can do that at the conclusion.  I want

4  to make sure we get everything else done.

5         *MS. FERRY:*  Very well, Your Honor.

6         *THE COURT:*  And if it's repetitive of what's already

7  been filed in writing, I don't need to hear it again.  It's

8  already part of the record.

9         *MS. FERRY:*  Well, we actually have some additional

10 representations that we would like to make.

11        *THE COURT:*  All right.  We can do it at the end of the

12 hearing.  Let's get all of the evidence in place first.

13        *MS. FERRY:*  And I don't want to belabor this.  There's

14 a specific reason that we would like not to do it at the very

15 end of the hearing, but I would suggest either at the end of

16 the day today or if we could stop ten minutes early for lunch.

17        *THE COURT:*  I've scheduled hearings at lunch.  I've

18 scheduled hearings at 5:00.  We're starting at 8:30.  We've got

19 a pretty tight schedule.  So, let's try to comply with that and

20 get as much done as we can.  Obviously we'll work as late as we

21 need to get this done.

22        *MS. FERRY:*  I understand.

23        *THE COURT:*  All right.  Let's proceed.

24        *MS. FERRY:*  Thank you, Your Honor.

25              During the course of this hearing, petitioner

1  will prove by a preponderance of the evidence that Mr. Eldridge

2  is incompetent to be executed by showing, first, that he

3  suffers from a severe mental illness.  That that mental illness

4  precludes him from accurately interfacing with reality and that

5  those conditions prevent him from attaining a rational

6  understanding of his conviction and his impending execution.

7           First, Your Honor, the evidence will be that

8  Mr. Eldridge suffers from schizophrenia, a severe psychotic

9  disorder.  And for evidence of this, the Court need look no

10 further than the TDCJ mental health records, which show that

11 Mr. Eldridge has been treated for psychosis by the State's own

12 mental health professionals at TDCJ since November of 2009,

13 including significantly during a six-month period of close

14 observations and inpatient treatment at the Jester IV unit and

15 the prescription of powerful antipsychotic medications.

16           Now, in addition to that documentary evidence,

17 the Court will also hear from Dr. Pradan Nathan, Mr. Eldridge's

18 treating psychiatrist at the Polunsky unit from November of

19 2009 through August of 2011, who will tell the Court that he

20 didn't have any question in his mind that Mr. Eldridge was

21 suffering from psychosis.

22           And it bears noting, Your Honor, that the

23 evidence will be that the antipsychotic medications with which

24 Mr. Eldridge is being treated, up to and including the present,

25 do not cure a person of mental illness, that they simply help

1   to alleviate the symptoms, meaning that they cannot form the

2   basis of a finding that Mr. Eldridge is board competent.

3            Second, Your Honor, there will be ample evidence

4   that Mr. Eldridge's schizophrenia prevents him from accurately

5   interfacing with reality.  And here, again, the Court can

6   look to the TDCJ mental health records, which document

7   Mr. Eldridge's psychosis and his delusions, including his

8   longstanding delusion that the guards at the Polunsky unit have

9   been trying to poison him.  A delusion that is documented in

10  the record as far back as 2001 and that resulted in

11  Mr. Eldridge at one point losing 60 pounds in just over a year.

12           Those records, likewise, document Mr. Eldridge's

13  delusional belief that he leads a parallel life in the free

14  world, leaving the prison to go to work with his brother and

15  spending time with his wife and eight children.

16           The Court will also hear from our expert,

17  Dr. Michael Roman, who's a neuropsychologist, about

18  Mr. Eldridge's belief that the victims of his capital murder

19  are alive and well.  Now, as the Court will learn, that

20  particular delusion is not recorded in the TDC mental health

21  records.  But as I mentioned a moment ago, the Court will hear

22  from Dr. Nathan, who will testify that as a part of his

23  treatment at TDCJ, he didn't ask Mr. Eldridge about the facts

24  of his capital murder.

25           Third, Dr. Roman will explain how Mr. Eldridge's

1   psychosis prevents him from attaining a rational understanding.

2   And it's important to note here, Your Honor, there will be no

3   dispute during this hearing that Mr. Eldridge does have some

4   bare factual awareness of his situation.   There will be no

5   dispute, for instance, that Mr. Eldridge is aware that there's

6   a court case, that he has a lawyer named Lee Wilson, that his

7   side has a doctor, that the State has a doctor.   But the

8   evidence will be that his severe mental illness, his

9   schizophrenia prevents him from attaining a rational

10  understanding because his deep-seated profoundly paranoid

11  belief that his victims are alive, that he leads this parallel

12  life, prevent him from making the necessary rational

13  connections.

14          And the arguments of the State and their expert,

15  Your Honor, to the contrary will be unpersuasive.   Because the

16  State's expert is the only mental health professional who has

17  evaluated Mr. Eldridge since November of 2009 to document

18  concerns about malingering.   Because the measures of feigning

19  that were administered to Mr. Eldridge simply don't show the

20  definitive evidence of malingering that Dr. Allen claims.   And

21  because Dr. Allen's reliance on conclusions of malingering

22  reached over a decade ago is simply not sound.

23          And at the conclusion of this hearing, Your

24  Honor, we'll ask the Court to find Mr. Eldridge incompetent and

25  ineligible for execution.

Nathan - Direct by Ms. Perry

1        *THE COURT:*  Thank you.  Go ahead.

2        *MS. FERRY:*  And at this time we'll call Pradan Nathan,

3   Your Honor.

4        *THE COURT:*  All right.  Does the State want to defer

5   its opening until your case?

6        *MS. ODEN:*  Yes, Your Honor.

7        *THE COURT:*  All right.  That's fine.  Go ahead.

8   Please come forward, sir, this way.  This way, please.  If you

9   will pause right there, sir, and raise your right hand to be

10  sworn.

11       *(Pradan Nathan, petitioner's witness, sworn.)*

12       *THE COURT:*  All right.  Please be seated.  Keep your

13  voice up, please, and speak directly into the microphone.

14       *THE WITNESS:*  Yes.

15       *THE COURT:*  Thank you, sir.

16       *MS. FERRY:*  Is the Court ready?

17       *THE COURT:*  Yes, please.

18                          **DIRECT EXAMINATION**

19  BY MS. FERRY

20  *Q.*  Can you please introduce yourself to the Court, sir?

21  *A.*  I'm Pradan A. Nathan, a psychiatrist.

22  *Q.*  And could you spell your first name, please.

23  *A.*  P, as in Peter, R, as in Ruby, A, as in apple, D, as in

24  David, A as in apple, N as in Nancy.  Nathan.

25  *Q.*  Okay.  Dr. Nathan, could you tell us where you worked from

Nathan - Direct by Ms. Perry

1  November of 2009 until August of 2011?

2  A.  I worked as a staff psychiatrist for the University of

3  Texas Medical Branch, working in the Texas Criminal Justice

4  System.

5          THE COURT:  Give me the dates again.

6          MS. FERRY:  November of 2000 -- I'm sorry.  Yes,

7  November of 2009 till August of 2011.

8          THE COURT:  Thank you.

9  BY MS. FERRY

10  Q.  Now, Dr. Nathan, are those the -- is that the grand total

11  of the time that you were employed by UTMB?

12  A.  I have been employed by TDCJ and subsequently by UTMB when

13  they took over managed care for the past 19 years.

14  Q.  And specifically during the period of time that I asked you

15  about, November of 2009 till August of 2011, did you provide

16  psychiatric services to the inmates at the Polunsky unit?

17  A.  Yes, I did.

18  Q.  And could you briefly tell us what specific positions

19  you've held at UTMB over the years?

20  A.  I started as a staff psychiatrist in TDCJ in 1992.

21  Subsequently I became a regional psychiatrist.  And then I

22  became the clinical director for Jester IV Psychiatric

23  Hospital.  I came back as the associate division director for

24  TDCJ Health Services and subsequently went back to being a

25  staff psychiatrist and did telemedicine.  And subsequently I

Nathan - Direct by Ms. Perry

1  was the interim mental health director for UTMB managed care;

2  and subsequent to that, I continued as a telemedicine

3  psychiatrist.

4  Q.  And you've mentioned telemedicine.  What does that mean?

5  A.  I see patients with the help of telemedicine equipment at

6  different prisons in TDCJ.

7  Q.  And the telemedicine equipment, is that like a video link?

8  A.  Yes, it has video link.  It has connections to the

9  electronic medical records.  And they have secure networks

10  throughout the prison system.

11  Q.  And why did you leave UTMB in August of 2011?

12  A.  I retired.

13  Q.  And what advance degrees do you hold, Dr. Nathan?

14  A.  I started as a -- I did my basic medical training in India

15  at the Madurai University Medical College.  Subsequently I did

16  a residency in psychiatry in the National Institute in

17  Bangalore, India.  I came over to the United States and did a

18  second residency in psychiatry at Texas Research Institute of

19  Mental Sciences.  Subsequent to that I did a fellowship in

20  forensic psychiatry with the University Hospitals with Dr.

21  Phillip Resnick.

22  Q.  And you've mentioned Dr. Resnick.  What is Dr. Phillip

23  Resnick's specialty?

24  A.  His specialty is detection of malingering.

25  Q.  And is that the issue that your fellowship focused on?

Nathan - Direct by Ms. Perry

1  A.  The fellowship focuses on entire spectrum of forensic

2  psychiatry, which includes a civil side as well as a criminal

3  side.

4  Q.  Now, between completing your education and going to work at

5  UTMB, did you work in other forensic psychiatric settings?

6  A.  I have worked as a staff psychiatrist in Cuyahoga County

7  Psychiatric Clinic.  I have done forensic evaluations for the

8  Kerville State Hospital system.  I've done forensic evaluations

9  in TDCJ.

10  Q.  And you mentioned that you spent a total of 19 years at

11  UTMB.  How many years of forensic psychiatric experience did

12  you have before beginning your work at UTMB?

13  A.  About eight years, approximately.

14  Q.  Now, Dr. Nathan, during your employment as a psychiatrist

15  at UTMB, did you treat someone named Gerald Eldridge?

16  A.  Yes, I did.

17  Q.  And did you treat Mr. Eldridge during those dates I

18  mentioned earlier, November of 2009 to August of 2011?

19  A.  Without looking at the records, that sounds about right.

20  Q.  Now, in preparation for your testimony today, did you

21  review Mr. Eldridge's mental health records from that period of

22  time?

23  A.  The records which you sent to me, I have reviewed those.

24  Q.  And did you also review records from Mr. Eldridge's 2001

25  admission to the Jester IV unit?

Nathan - Direct by Ms. Perry

1  A.  Yes, I did.

2  Q.  Now, Dr. Nathan, I would like you to turn with me in that

3  white notebook there to petitioner's exhibit -- Petitioner's

4  Exhibit 8.

5  A.  Page No. 8?

6  Q.  To the Tab 8.

7  A.  Tab 8.  Okay.

8  Q.  And we'll be talking about a number of these records.

9  A.  Okay.  Yes, ma'am.

10  Q.  And before we talk specifically about any of these

11  particular pages, I want to ask you generally, when your

12  electronic signature appears in these records, does that always

13  mean that you personally evaluated Mr. Eldridge?

14  A.  Not necessarily.  Some of those electronic signatures mean

15  that I personally evaluated the patient.  Some of those

16  electronic signatures mean that I acknowledge somebody sending

17  me an e-mail about that patient's mental condition.

18  Q.  And when someone sent you an e-mail, would those people be

19  mental health staff there at the prison?

20  A.  Yes, they were.

21  Q.  Now, during your treatment of Mr. Eldridge, did you

22  conduct -- did you conduct evaluations of Mr. Eldridge?

23  A.  Yes, I did.

24  Q.  And am I correct that those were conducted through that

25  telemed link that we discussed earlier?

Nathan - Direct by Ms. Perry

1   A.  Yes, I did.

2   Q.  Now, if you would turn with me, please, to pages 5 through

3   10 of Exhibit 8.

4   A.  Okay.

5   Q.  And here on page 5, a record dated November 20th, 2009,

6   could you tell us, is that the record of your first evaluation

7   of Mr. Eldridge?

8   A.  That is correct.

9   Q.  And tell us, if you would, what you did to prepare for that

10  initial evaluation, please.

11  A.  I was asked to evaluate Mr. Eldridge at the request of the

12  mental health director.  So, I reviewed the records for a

13  period of approximately an hour to hour and a half.  And then I

14  evaluated Mr. Eldridge in person -- or through the telemedicine

15  equipment.

16  Q.  And the record review that you completed, did that include

17  the records of the 2001 admission to Jester IV that we spoke

18  about just a moment ago?

19  A.  Yes, ma'am.

20  Q.  And how is it that Mr. Eldridge -- I want to ask you this:

21  Did Mr. Eldridge himself make a request that you evaluate him

22  in November of 2009?

23  A.  No.

24  Q.  How is it that Mr. Eldridge -- how is it that you came to

25  evaluate Mr. Eldridge?

Nathan - Direct by Ms. Perry

1  A.  I was asked to evaluate Mr. Eldridge at the -- by the

2  director of mental health.  Apparently the defense team was

3  concerned about his mental health status, and so I evaluated

4  him.

5  Q.  And did the fact that the director of mental health ask you

6  to evaluate Mr. Eldridge, did that have any impact on your

7  preparation for that evaluation and the evaluation itself?

8  A.  Yes, it does.  When your supervisor asks you to evaluate

9  somebody, you try to do as thorough a job as possible.

10  Q.  Now, look with me here on page 6, if you would.  Let me

11  zoom --

12  A.  Okay.

13        THE COURT:  Can you repeat the exhibit number for the

14  record?

15        MS. FERRY:  Oh, yes.  Page 6 of Petitioner's Exhibit

16  8.

17        THE COURT:  Thank you.

18        MS. FERRY:  And it will be helpful, Your Honor, all of

19  the page numbers that we will be looking at with Dr. Nathan

20  will be from Petitioner's Exhibit 8.

21        THE COURT:  Got it.  Thank you.

22  BY MS. FERRY

23  Q.  And, so, Dr. Nathan, here -- is page 6 where you recorded

24  the information that you got from Mr. Eldridge during that

25  first evaluation?

Nathan - Direct by Ms. Perry

1    A.  Some of the information there is what I obtained from

2    Mr. Eldridge.  Some of the information is what I obtained from

3    the medical records.  So, I cut and pasted some of those

4    information, so that it will be easy for me to review the

5    records.

6    Q.  And is that -- the information that you cut and pasted, is

7    that this final paragraph that is dated 2006?

8    A.  No, it's -- yes, it starts with 12, 2006 and goes all the

9    way to 2009.

10   Q.  Here on page 7?

11   A.  On page 7.

12   Q.  Okay.  Now, the information in the paragraphs above 12,

13   2006, under the heading "Psychiatric Medical Social History,"

14   that's information that you got from Mr. Eldridge during your

15   evaluation; is that correct?

16   A.  Both from the records as well as I asked him in person.

17   Q.  Okay.  Now, let me ask you this:  The information that's

18   recorded here that you got from Mr. Eldridge, for instance,

19   this line, when asked how he -- it's difficult to read this.

20   So, the next -- at the end of that sentence, he says that he

21   goes to work with his brothers in the chemical plant.  Did

22   Mr. Eldridge volunteer that information to you, or did you have

23   to ask him specific questions to elicit information during that

24   evaluation?

25   A.  The question which I asked was, how does he keep himself

Nathan - Direct by Ms. Perry

1  occupied throughout the day in the death row.  His answer was

2  that he goes to work with his brothers in the morning and comes

3  back to the cell in the afternoon.

4  Q.  And as a general matter, did you have to ask Mr. Eldridge

5  specific questions or was he volunteering information to you

6  during that evaluation?

7  A.  You had to ask specific questions to get any information

8  from Mr. Eldridge.

9  Q.  And did you find that fact significant?

10  A.  I was of the impression that he was not a good historian.

11  He is not forthcoming with all of the information unless we ask

12  it in specific detail.

13  Q.  And, Dr. Nathan, your description of Mr. Eldridge of being

14  not forthcoming, was that typical of your interactions with

15  Mr. Eldridge over the period of time that you treated him or

16  not?

17  A.  It was pretty much consistent throughout the period of

18  time.

19  Q.  And let me ask you this:  At any point during your

20  treatment of Mr. Eldridge, did you ever ask him specific

21  questions about the facts of his underlying conviction?

22  A.  No, I did not.

23  Q.  And did Mr. Eldridge ever volunteer information about his

24  capital murder charge to you?

25  A.  No, he did not.

Nathan - Direct by Ms. Perry

1   Q.  Now, look with me here at page 7 of that same record.  In
2   addition to the information that you got from Mr. Eldridge,
3   were you struck by any aspects of Mr. Eldridge's affect or his
4   thought process during that evaluation?
5   A.  I was -- I noted that he had looseness of association.  His
6   thoughts were not connected.  At times he rambled and there was
7   no logical progression of thought.  I also noted that his
8   emotional reaction was blunted, meaning the intensity of the --
9   and the range of emotions was not like someone else who -- in
10  the similar circumstances.
11  Q.  And you use the phrase "looseness of association."  Could
12  you tell us what that phrase means?
13  A.  Generally when persons talk, there is a connection between
14  one thought to another.  If due to mental illness one thought
15  does not connect to another thought at all and the -- and it
16  becomes illogical incoherent talk, then it's considered to be
17  gross looseness of association.
18  Q.  And did you find those observations that you made about his
19  thought process, about his affect, did you find those to be
20  significant?
21  A.  Yes, I did.
22  Q.  And why is that?
23  A.  Looseness of association is one mental symptom which is not
24  very suggestive of malingering mental illness.
25  Q.  Now, in addition to the information you gathered from

Nathan - Direct by Ms. Perry

1  Mr. Eldridge and the observations that you made, were you

2  concerned about any information you learned about

3  Mr. Eldridge's weight during your chart review?

4  *A.*  Yes, I was.  He weighed 139 pounds.  He was 5 feet

5  10 inches tall.  He should have approximately weighed somewhere

6  between 175 to 190 pounds.

7  *Q.*  Now, looking with me here at page 9 of the exhibit, did you

8  make a provisional diagnosis of Mr. Eldridge during that

9  initial evaluation?

10  *A.*  Yes.  I gave a provisional diagnosis.  Rule out

11  schizophrenia undifferentiated type or rule out dementia with

12  psychotic features due to pernicious anemia.

13          *THE COURT:*  Can you repeat those last two sentences,

14  please.

15          *THE WITNESS:*  Sure, ma'am.

16  *A.*  I gave a provisional diagnosis of rule out schizophrenia

17  undifferentiated type or rule out dementia with psychotic

18  features due to pernicious anemia.

19  BY MS. FERRY

20  *Q.*  And why did you make that particular provisional diagnosis?

21  *A.*  Based on the medical records, I knew that Mr. Eldridge had

22  been treated at hospital Galveston for pernicious anemia and

23  what was described as subacute combined degeneration with

24  Vitamin B-12 injections.  All that I knew when I evaluated him

25  was, he was losing touch with reality.  He was expressing, on

Nathan - Direct by Ms. Perry

1  questioning, that he was hearing the voices of his brothers.
2  He was under the delusions that the officers were poisoning his
3  food, so he stopped eating food.  He had lost a lot of weight.
4                 So, there is some evidence to suggest that he has
5  lost touch with reality, but I do not know at that stage
6  whether it was due to the pernicious anemia causing all the
7  psychosis or is it schizophrenic process causing the psychosis.
8  Q.  And I want to ask you about two phrases you use there.  You
9  talked about pernicious anemia.  If you could just briefly tell
10 us what pernicious anemia is.
11 A.  Pernicious anemia is a condition which Vitamin B-12 is not
12 absorbed through the stomach as happens with the rest of us.
13 And if he is not supplied either the parental or sublingual
14 Vitamin B-12, his brain cells will get altered, will start to
15 degenerate.  More often than not, the spinal column shows more
16 of the changes.  But I didn't have enough evidence on the
17 medical records to suggest that that's what was happening.
18 Q.  And you also mentioned subacute combined degeneration.
19 Could you tell us what is that, please?
20 A.  Subacute combined degeneration is a condition where due to
21 the Vitamin B-12 deficiency, the cells start degenerating and
22 you start developing so many neurological symptoms.  But it was
23 mentioned in the medical records from Galveston.  I have not
24 evaluated him for subacute combined degeneration.
25 Q.  And you say it was mentioned in the medical records.  Had

Nathan - Direct by Ms. Perry

1    Mr. Eldridge been firmly diagnosed with subacute combined

2    degeneration?

3    A.   I am not sure about that.

4    Q.   Now, after your interview -- after your evaluation of

5    Mr. Eldridge on November 20th, 2009, what actions did you take?

6    A.   I decided that he needs to be evaluated and treated in an

7    inpatient setting.  I was concerned that if I ordered the

8    medications, he may not take it.  He may not understand the

9    relevance of it.  He may throw away the medications.  And,

10   hence, I wanted him to be transferred to Jester IV for

11   evaluation and treatment.

12   Q.   And is Jester IV the unit at TDCJ where inpatient mental

13   health treatment is provided?

14   A.   Especially for death row patients.

15   Q.   And could you -- I believe you mentioned earlier that at

16   one point you were the medical director for the Jester IV unit;

17   is that right?

18   A.   Yes.  Yes, I was.

19   Q.   So, could you tell us how close do the mental health staff

20   of the Jester IV unit observe the inmates who are there for

21   inpatient treatment?  How closely is that observation carried

22   out?

23   A.   It is a lot more -- the observations take place in Jester

24   IV.  Initially when a patient gets to Jester IV, he's evaluated

25   by the nursing staff when they arrive at Jester IV.

Nathan - Direct by Ms. Perry

1    Subsequently they're evaluated by the psychologist.  They're

2    evaluated by the psychiatrist.  They're evaluated by nurses on

3    a regular basis.  They have more frequent observations by

4    correctional officers who work as medication aides there and

5    they are also observed by medication aides who give

6    medications.

7    Q.  Now, Dr. Nathan, are there a limited number of beds at

8    Jester IV or can any inmate -- can any inmate be sent over to

9    Jester IV for inpatient treatment?

10   A.  Like every other place, we have limitations of beds.  And

11   we try to evaluate on an outpatient basis whether somebody

12   needs to be in an inpatient treatment facility.  Patients with

13   suicidal thinking or due to grossly psychotic behavior or

14   assaulting -- grossly assaulting behavior will be transferred

15   on a priority basis.  Patients who are calmer, quieter, who can

16   be evaluated on an outpatient basis, we'll make an attempt to

17   evaluate that person on an outpatient basis.

18   Q.  Now, was Mr. Eldridge, in fact, transferred to the Jester

19   IV unit for inpatient treatment?

20   A.  Yes, he was.

21   Q.  And did you have contact with Mr. Eldridge during the six

22   months that he was at Jester IV?

23   A.  No, I did not.

24   Q.  And is that typical or atypical?

25   A.  It is fairly typical, because we all have our caseloads to

Nathan - Direct by Ms. Perry

1  take care of.  We don't try to see what other doctors are

2  doing.

3  Q.  Now, once Mr. Eldridge returned from the Jester IV unit,

4  did you resume your treatment of him?

5  A.  Yes, I did.

6  Q.  Dr. Nathan, I would like to talk to you now about the

7  medications that you prescribed for Mr. Eldridge.  And before

8  Mr. Eldridge was transferred to the Jester IV unit, did you

9  prescribe any medications to him?

10  A.  No, I did not.

11  Q.  And turn with me now to page 154 of Petitioner's Exhibit 8.

12          THE COURT:  What were the dates he was at Jester IV

13  again?

14          MS. FERRY:  Your Honor, he was admitted to Jester IV

15  on November -- there was a lag between his reference and his

16  actual arrival at Jester IV.  He arrived at Jester IV on

17  November 24th of 2009, which is at Petitioner's Exhibit 8, page

18  19, and he returned to the Polunsky unit on June 3rd, 2010,

19  which is at Petitioner's Exhibit 8, page 155.

20          THE COURT:  Thank you.

21  BY MS. FERRY

22  Q.  So, Dr. Nathan, look with me, if you would, please, at page

23  154 of Petitioner's Exhibit 8.

24          THE COURT:  1-5-4?

25          MS. FERRY:  1-5-4, yes, Your Honor.

Nathan - Direct by Ms. Perry

1           *THE COURT:* Got it.  Thank you.

2    BY MS. FERRY

3    *Q.*  And here at the top, I would like you to go through with me

4    the medications that Mr. Eldridge was on when he returned from

5    Jester IV on June 3rd of 2010.  Would you please just go

6    through these medications, tell us what each of them is and

7    what each of them is for?

8    *A.*  Diphenhydramine, 50 milligrams twice a day, that is for the

9    side effects of medication risperidone.

10   *Q.*  And let me ask you, Dr. Nathan, is that -- is that

11   Benadryl?

12   *A.*  Yes, ma'am.

13   *Q.*  Thank you.

14   *A.*  He was on ferrous sulfate, two tablets twice a day.

15   Apparently they thought that he also had iron deficiency

16   anemia.

17           Fluoxetine is Prozac, one capsule in the morning.

18   They considered that he was probably depressed.

19           Acetaminophen, that's Tylenol generic.  And he

20   was given two tablets three times a day.  He must have been

21   complaining about some body pain.

22           Risperidone 3 milligrams twice a day, that's a

23   medicine for psychosis.

24   *Q.*  And now turn with me, if you would, to page 180 of that

25   same exhibit.  Now, am I correct that this is a record that on

Nathan - Direct by Ms. Perry

1  August 10th, 2010, you made a change to Mr. Eldridge's

2  prescriptions?

3  A.  That is correct.

4  Q.  And could you please tell us the change you made on that

5  date?

6  A.  I stopped the Benadryl and started him on Benztropine,

7  which is a more stronger medication for Parkinson's side

8  effects.  He had developed some abnormal shaking; and on

9  examination, he had mild parkinsonian tremors of both hands.

10 And, hence, I increased the dose of anticholinergic medication.

11            THE COURT:  Is that a side effect of the --

12            THE WITNESS:  Of the risperidone, ma'am.

13 BY MS. FERRY

14 Q.  And, Dr. Nathan, Benztropine, which is the name here, is

15 that medicine also known as Cogentin?

16 A.  Yes, ma'am.

17 Q.  Okay.  Now, if you would turn with me to page 194 and tell

18 us about the medication change that you made on September 10th

19 of 2010.

20 A.  I stopped the risperidone and started him on progressively

21 increasing doses of a medicine called Thorazine and increased

22 the dose of Cogentin.

23 Q.  And why did you take Mr. Eldridge off risperidone and begin

24 him on a course of Thorazine?

25 A.  He was continuing to hear voices.  A social worker had

Nathan - Direct by Ms. Perry

1   informed me that he was restless and pacing at nighttime.  When

2   asked about it, he said that he was not sleeping.  Thorazine

3   has a side effect of producing sleep.  So, most of the

4   medications were ordered at nighttime.   In the prison system,

5   we cannot order sleep medications.

6   Q.  And if you would look with me two pages back, to page 192

7   of that exhibit.  At that time -- at the time that you made

8   that medication change, were there also concerns about

9   Mr. Eldridge's hygiene?

10   A.  The psychologist had reported that he had a mild body odor.

11   Of course, you cannot smell that through the telemedicine

12   equipment.

13   Q.  Right.

14   A.  And there's a psychologist and psychology staff are staying

15   with the patient when I'm seeing the patient.  So, if there is

16   something unusual, they will report that to me.

17   Q.  And, Dr. Nathan, you mentioned that when you started

18   Mr. Eldridge on Thorazine, you started him on a gradually

19   increasing dosage.   Is that what's known as titrating a

20   medication?

21   A.  That is correct.

22   Q.  And why do you titrate the Thorazine prescription as you

23   did?

24   A.  These medicines have serious side effects.  If you titrate

25   them gradually, they are less likely to cause adverse side

Nathan - Direct by Ms. Perry

1  effects.  Mr. Eldridge is already suspicious with people

2  poisoning him.  So, if he developed any side effects, he'll

3  start saying that I'm poisoning him also.

4  Q.  Okay.  Now, look with me here on page 226, and tell us

5  about the medication change you made on February 1st of 2011,

6  please.

7  A.  I increased the dose of Thorazine to from 300 milligrams to

8  400 milligrams and increased the dose of Prozac to

9  40 milligrams instead of 20 milligrams.

10  Q.  And why did you make those changes, Dr. Nathan?

11        THE COURT:  On what page is this?

12        MS. FERRY:  We're here on page 226.

13        THE COURT:  Okay.  Thank you.

14        MS. FERRY:  And I believe Dr. Nathan will be referring

15  back to page 224.

16        THE COURT:  All right.  That was the one I needed.

17  Thanks.

18  A.  He continued to express thoughts that he was -- that his

19  brothers were talking to him continuously.  On inquiry he said

20  that he was working during the morning in pipefitting.  He did

21  not know the month, the day, or the date.  He knew the year is

22  2011.  And he seemed to be perplexed that he keeps on getting

23  back to death row.  It appeared that he was not cognizant of

24  the fact that he has been in death row for a long time.  And I

25  considered that a psychosis which was not well controlled, so I

Nathan - Direct by Ms. Perry

1  increased the dose of medication.

2  BY MS. FERRY

3  Q.  And I presume that those are the reasons that you made the

4  change to his Thorazine; is that right?

5  A.  That is correct.

6  Q.  And why did you make the change to his Prozac prescription?

7  A.  When I evaluated his mood, he appeared to be mildly

8  depressed, but he does not usually answer questions precisely.

9  So, his affect was still flat.  Sometimes depression can cause

10  flattening of the affect also.  So, I increased the dose of

11  Prozac in case he was having flattening of affect due to

12  depression and that will be corrected.  Now, flattening of

13  affect can also be caused by schizophrenic process, but you

14  won't know.

15          THE COURT:  So, you increased both the Prozac and the

16  Thorazine at the same time?

17              THE WITNESS:  Yes, Your Honor.

18              THE COURT:  All right.

19  BY MS. FERRY

20  Q.  And, Dr. Nathan, now turning to page 233, tell us about the

21  change in his medication that you made on February 21st of

22  2011, please.

23  A.  I increased the dose of Thorazine to a total of

24  500 milligrams per day and stopped the Prozac 40 milligrams and

25  reduced the dose to 20 milligrams.  I did this in response to

Nathan - Direct by Ms. Perry

1   the social workers sending me an e-mail that he was not

2   sleeping and that he was continuing to hear voices and he was

3   also complaining of hesitancy in urine, which is a side effect

4   of Cogentin.  So, I stopped the Cogentin and placed him back on

5   Benadryl.  He had not had hesitancy of urine on Benadryl.

6   *Q.*  And you mentioned a note that had been e-mailed to you from

7   the social workers.  Is that note found here on page 232?

8   *A.*  That is correct.

9   *Q.*  Okay.  Now, let's turn to page 253 of the exhibit, please.

10  And tell us why you increased Mr. Eldridge's Thorazine

11  prescription on June 10th of 2011.  Well, actually, first, tell

12  us by how much you increased his Thorazine prescription,

13  please.

14  *A.*  I increased his prescription initially with a hundred

15  milligrams in the morning and subsequently it was increased to

16  200 milligrams in the morning, to make a final dose of

17  600 milligrams per day of Thorazine.

18  *Q.*  And looking with me here on page 250, Dr. Nathan, please

19  tell the Court why you made that -- excuse me -- why you

20  increased the dosage of Thorazine, please.

21  *A.*  He said that he was not eating well.  When asked for the

22  reason, he did not want to give particulars in front of

23  security.  He had expressed delusions that the security was

24  poisoning his food in the past.  So, I asked him directly

25  whether he thought that something was in his food, and he

Nathan - Direct by Ms. Perry

1  said -- indicated it was.  And he said that the morning

2  medication was not helpful enough, and that's why I increased

3  the dose of medicine in the morning.

4  Q.  And were there also at that time concerns about his

5  hygiene, Dr. Nathan, looking at page 250?

6  A.  He had been skipping the showers and not following the

7  direction of security in terms of taking showers.

8  Q.  And, now, let's turn to page 265, please, and tell us about

9  the medication change you made on July 29th of 2011.

10  A.  He was complaining that he was not doing well.  He wanted

11  his medications changed.  He was still expressing some

12  suspicions that something was put in his food.  There was also

13  a concern because the offender thought that his dirty urine

14  analysis was due to the medication.  And he said that he was

15  constantly checking his food to make sure that nothing is put

16  in his food like street drugs.  So, I changed the medication

17  from Thorazine to Navane and progressively increased the doses

18  of Navane.  Thiothixene is the generic name.

19  Q.  Thiothixene is Navane?

20  A.  Yes, ma'am.

21  Q.  Okay.  And why did you again titrate the new prescription

22  of Navane?

23  A.  So that he will not have severe side effects and he would

24  begin to get suspicions with the treating providers also and he

25  will stop taking his medication.

Nathan - Direct by Ms. Perry

1  *Q.*  And then if you would look with me on page 273 and could

2  you explain to us the change you made to Mr. Eldridge's Navane

3  dosage on August --

4  　　　　　*THE COURT:*  Can I ask a question first?

5  　　　　　*MS. FERRY:*  Sure.  Sorry.

6  　　　　　*THE COURT:*  When he reported a suspicion of having

7  street drugs --

8  　　　　　*THE WITNESS:*  Yes, ma'am.

9  　　　　　*THE COURT:*  -- was that related to his dirty UA

10  sample?

11  　　　　　*THE WITNESS:*  Apparently, ma'am.  But I was not

12  informed directly by TDCJ.

13  　　　　　*THE COURT:*  Okay.  Thank you.

14  BY MS. FERRY

15  *Q.*  So, Dr. Nathan, here on page 273, explain to us what change

16  you made to Mr. Eldridge's dosage on August 18th, 2011?

17  *A.*  He was on 20 milligrams in the evening.  I increased the

18  dose to 15 milligrams twice a day for a total dose of 30

19  milligrams per day.

20  *Q.*  And that was a change to Mr. Eldridge's Navane

21  prescription?

22  *A.*  Yes, ma'am.

23  *Q.*  Which was an antipsychotic?

24  *A.*  It's an antipsychotic medication.

25  *Q.*  And looking with me on page -- well, actually let me just

Nathan - Direct by Ms. Perry

1  ask you.  Why did you make that change that you did?

2  A.  There was an e-mail sent to me and --

3  Q.  Is that on pages 269 through 270, Dr. Nathan?

4  A.  That is correct.  And he had expressed to the social worker

5  that he felt that someone was putting something in his food.

6  And then when he was talking to the social worker, he was

7  staring as he was talking to the social worker; and, hence, I

8  increased the dose of medication.

9  Q.  And I apologize.  I said the wrong page number earlier.  Is

10 that 268 through 270; is that right, Dr. Nathan?

11 A.  Yes, ma'am.  That was the e-mail which was sent from the

12 social worker.  And my notes responding to that is on page 272

13 and 273.

14 Q.  And, Dr. Nathan, is that the last change that you made to

15 Mr. Eldridge's medication before you retired from TDCJ?

16 A.  That is correct.

17 Q.  Now, Dr. Nathan, I note that at various points in this

18 record -- for instance, let's look here at page -- page 280 of

19 the exhibit.  There are -- excuse me, not 280.  Let's look at

20 page 274.  Here we go, page 274.  Down at the bottom of the

21 page and at various points throughout this exhibit, there are

22 notations about Mr. Eldridge's medication compliance.  How are

23 medication compliance rates generated for these medical

24 records?

25 A.  When the medication aides pass the medications to the

Nathan - Direct by Ms. Perry

1  patients, they probe it into the electronic medical records.

2  So, depending upon how often they probe when the medication was

3  taken, then the computer generates a percentage of how often he

4  takes the medication.

5  Q.  And when you say there's a probe, I mean, do you mean

6  there's a computer screen and they hit a button?

7  A.  Hit a button.

8  Q.  Okay.  And based on your years of experience in working at

9  TDCJ, can you tell us whether the compliance medication -- the

10  compliance medication rates in a person's medical records are

11  always accurate, sometimes accurate?

12  A.  Sometimes they are very accurate; sometimes they are not.

13  But I was given the impression from the people on -- who are

14  making the rounds, that those staff on the grounds were doing a

15  very good job, thorough job and so I tended to believe their

16  statements.

17  Q.  And, Dr. Nathan, is there a procedure for noting if an

18  inmate begins to refuse his medication and is not compliant?

19  A.  Yes.  When a patient refuses to take his medications, the

20  medication aides have to generate a different sheet of paper

21  saying refusal of treatment and it has to be filed in the

22  electronic medical records.

23  Q.  And are there any notations to that effect in

24  Mr. Eldridge's records?

25  A.  Not to the best of my knowledge.

Nathan - Direct by Ms. Perry

1   Q.  Now, Dr. Nathan, in discussing the psychotropic -- the

2   antipsychotic medication that you prescribed to Mr. Eldridge,

3   you mentioned at one point Mr. Eldridge having difficulty

4   sleeping.  Was Mr. Eldridge ever prescribed an antipsychotic

5   primarily for sleep issues?

6   A.  No.

7   Q.  And at any point in time during your treatment of

8   Mr. Eldridge, did Mr. Eldridge ever ask for medication?

9   A.  Except when he wanted the medication to be changed, because

10  he was concerned that his medication was causing a positive

11  urine analysis for street drugs.

12  Q.  And did that fact, the fact that Mr. Eldridge wasn't asking

13  for medication to be prescribed, did that strike you as

14  significant?

15  A.  Yes, it did.

16  Q.  And why is that?

17  A.  Generally patients who are malingering mental illness want

18  medications for various purposes.

19  Q.  Now, Dr. Nathan, do antipsychotic medications of the

20  type -- well, actually in general, do antipsychotic

21  medications, do those cure a person of mental illness?

22  A.  No, they do not.

23  Q.  And do the antipsychotic medications that you prescribed to

24  Mr. Eldridge, were those capable of curing him?

25  A.  No, they're not.

Nathan - Direct by Ms. Perry

1  Q.  Now, looking through these records, after Mr. Eldridge was

2  started on antipsychotics, it appears that for some time he

3  would report some relief from his symptoms and then he would

4  report an uptick in symptoms again.  Is there a term of art for

5  that sort of pattern?

6  A.  They have used terms like waxing and waning, relapse and

7  remission for those kind of phenomena.

8          THE COURT:  Is there a tolerance built up to the

9  drugs?

10          THE WITNESS:  It can build up a tolerance also, Your

11  Honor.

12          THE COURT:  So, it takes more to accomplish the same,

13  not curative, but --

14          THE WITNESS:  Control symptoms.

15          THE COURT:  -- symptom relieving control?

16          THE WITNESS:  Yes, ma'am.

17          THE COURT:  Okay.

18  BY MS. FERRY

19  Q.  And, Dr. Nathan, you just discussed the tolerance buildup.

20  Are there any other reasons that that waxing and waning occurs?

21  A.  It could be part of his mental illness itself.

22  Schizophrenia can do that.  And other psychoses can also do the

23  same thing.

24  Q.  Now, turn with me back to page 262, and I want to ask you

25  about this record that we have already discussed earlier, but

Nathan - Direct by Ms. Perry

1   I want to ask you specifically about this report that

2   Mr. Eldridge had a dirty UA.  And that's stands for "urine

3   analysis"; is that right?

4   A.  Yes, ma'am.

5   Q.  Now, during all those months that you were treating

6   Mr. Eldridge, did you have any concerns that Mr. Eldridge's

7   psychosis was drug induced?

8   A.  I did not.

9   Q.  And why is that?

10  A.  Because he appeared to show the same symptoms in Jester IV

11  also.  It is kind of hard for me to imagine that he was getting

12  the street drugs in Jester IV and with close supervision also.

13  I can to some extent conceive that it's possible to get street

14  drugs in Polunsky, but I cannot imagine that happening in both

15  Jester IV and in Polunsky and presenting with the same

16  symptoms.

17  Q.  And let me ask you this:  For drug-induced psychosis to be

18  possible to explain Mr. Eldridge's symptoms, what sort of

19  access would Mr. Eldridge have had to have had to street drugs

20  for these type of symptoms that are documented in the records?

21          THE COURT:  You're talking about the symptoms of

22  mental illness, not about simply the positive sample, correct?

23          MS. FERRY:  That's right, Your Honor.

24          THE COURT:  All right.

25          MS. FERRY:  But to explain --

Nathan - Direct by Ms. Perry

1          *THE COURT:*  Can I ask the backup question then --

2          *MS. FERRY:*  Sure.

3          *THE COURT:*  -- or the predicate question?  How do you

4    explain the positive samples?

5          *THE WITNESS:*  I do not know the answer to that.

6          *THE COURT:*  Just a mystery?

7          *THE WITNESS:*  First, they did not show me what was the

8    positive result.

9          *THE COURT:*  All right.

10          *THE WITNESS:*  Second, I do not -- some of these

11   medications can cause false positive.

12          *THE COURT:*  I guess that was my question.

13          *THE WITNESS:*  Yes, ma'am.

14          *THE COURT:*  Was he taking medications of a type and of

15   a dose that can cause positive urine samples for street drugs?

16          *THE WITNESS:*  It can, Your Honor.

17          *THE COURT:*  All right.  So, that's the explanation?

18          *THE WITNESS:*  That was my concern, that it possibly

19   could be due to that.

20          *THE COURT:*  That that is a possible explanation?

21          *THE WITNESS:*  That's a possible explanation.  It is

22   also possible that he got some street drugs in the prison.

23          *THE COURT:*  Right.

24          *THE WITNESS:*  But not on a consistent basis for that

25   length of time.  That would mean that he has unlimited access

Nathan - Direct by Ms. Perry

1   to street drugs, which is very hard for me to imagine in a very

2   secure environment like Polunsky unit.

3        THE COURT:  So, based on your knowledge of the prison

4   system, it's more logical for you to conclude that this was a

5   side effect of the antipsychotic medications he was taking?

6        THE WITNESS:  That is how I assumed, Your Honor.

7        THE COURT:  All right.  And what medications

8   specifically has a documented link to false positives for tests

9   for cocaine, which I gather was the drug?

10        THE WITNESS:  Zoloft was not ordered for him.  Prozac

11   was.  This is a field which is still evolving.  We have not

12   really well documented what does and what kind of tests are

13   used and how they are specifically different from some other

14   things.  That's not my area of specialty.  So, I just assumed

15   that if this is causing a problem, let me change the

16   medication.

17        THE COURT:  All right.  So, there's no documented link

18   with Prozac?

19        THE WITNESS:  Not yet, ma'am.

20        THE COURT:  All right.  Go ahead, please.

21   BY MS. FERRY

22   Q.  So, Dr. Nathan, I think you already touched on this, but

23   just to ensure that the record is clear, if a person is

24   suffering the symptoms of drug-induced psychosis, is that -- is

25   drug-induced psychosis linked to either direct intoxication or

Nathan - Direct by Ms. Perry

1   withdrawal?

2   A.   Yes, they are.

3   Q.   And how long do the symptoms of drug-induced psychosis

4   last?

5   A.   Depending upon what substance is induced.  If it is

6   marijuana, it can happen up to two weeks.  Cocaine generally

7   between three to four days.  PCP maybe five to seven days.

8   Q.   So, am I correct, then, that for a drug-induced psychosis

9   to explain the symptoms of psychosis documented in

10  Mr. Eldridge's records, he would have had to have near constant

11  access to street drugs?

12  A.   That is correct.

13  Q.   Okay.  Now, let me ask you this, Dr. Nathan:  Am I correct

14  that during all the time you were treating Mr. Eldridge and you

15  were making your Axis I through IV diagnoses, that you never

16  diagnosed Mr. Eldridge with antisocial personality disorder?

17  A.   Yes, I did not.  That was not the focus of treatment.  I

18  assumed that everybody in TDCJ has antisocial traits or

19  antisocial personality disorder.  I generally want to know what

20  else do they have other than antisocial personality disorder.

21  Q.   And would a diagnosis of antisocial personality disorder,

22  would that explain any of the symptoms of Mr. Eldridge's

23  psychosis?

24  A.   It will not.

25  Q.   Now, Dr. Nathan, over the course of your career in forensic

Nathan - Direct by Ms. Perry

1  psychology and at TDCJ in particular, have you encountered

2  patients who you believed to be malingering?

3  A.  Yes, I have.

4  Q.  And during your time as a psychiatrist at TDCJ, have you

5  used the DSM-IV-TR V code for malingering?

6  A.  Yes, I have.

7  Q.  Dr. Nathan, were you concerned that Mr. Eldridge was

8  malingering?

9  A.  No, I was not.

10 Q.  Tell us why not.

11 A.  His symptoms had been present for a period of seven months.

12 Looseness of association was documented in 2001.  Subsequently

13 he refused his Vitamin B-12 injections, did not want any

14 follow-up.  Malingerers usually want to bring attention to

15 themselves.  They do not seclude.  They do not refuse any care

16 or follow-up.  And he had lost nearly 50 pounds of weight, with

17 bad personal grooming, and he was weighing 139 pounds.

18              And when I saw him, he was demonstrating

19 looseness of association, which is a rare symptom, which is

20 never almost present with malingering.  Voices -- patients --

21 malingerers complain about voices.  Malingerers may complain

22 that they're being poisoned.  But if they're complaining about

23 being poisoned, that does not generally reflect about loss of

24 weight.  They will be usually well nourished in spite of their

25 complaints of being poisoned.  For all these reasons, I did not

Nathan - Direct by Ms. Perry

1  think that he was demonstrating evidence for malingering.

2  Q.  And let me ask you about something else along those lines,

3  Dr. Nathan.  If you will turn with me to page 217 of this

4  exhibit.

5        THE COURT:  Does anemia cause weight loss?

6        THE WITNESS:  Anemia can cause weight loss, ma'am.

7        THE COURT:  So, if anemia can cause weight loss, how

8  do you separate the effects of anemia from the absence of

9  weight gain that you use in part to rule out malingering, given

10  the complaints of poisoning the food, which can be associated

11  with malingering, as I understood you just to say?

12        THE WITNESS:  Yes, Your Honor.  When I looked at the

13  records, he had complained that he was being poisoned with the

14  Vitamin B-12 injections.  At that time his weight apparently

15  was normal.  And after, subsequently he expressed this belief

16  that he was being poisoned with B-12 injections, he refused the

17  medications.  So, I assumed because of the delusion, he stopped

18  the B-12 shots.  And that was finally relating to weight loss.

19  As you said, the Vitamin B-12 deficiency itself can cause

20  weight loss also, but it will not cause looseness of

21  association.

22        THE COURT:  So, the weight loss really -- you can't

23  make the separation.  Instead you rely on the looseness of

24  association primarily?

25        THE WITNESS:  I generally looked at -- I looked at it

Nathan - Direct by Ms. Perry

1   in the totality of the context rather than specific symptoms

2   alone.

3           THE COURT:  All right.  Thank you.

4           THE WITNESS:  Yes, ma'am.

5   BY MS. FERRY

6   Q.  And, Dr. Nathan, when I directed you to page 217, I appear

7   to have the wrong page number written down here.  So, let me

8   just ask you, do you recall in the record receiving a record

9   that the mailroom had intercepted a letter that Mr. Eldridge

10  sent stating that he was considering suicide?

11  A.  That was in the records in Jester IV records.

12  Q.  Okay.  Yes, in the Jester IV records.  And did you review

13  that record when Mr. Eldridge came back to the Polunsky unit?

14  A.  I recall reviewing those records.

15  Q.  And did Mr. Eldridge report suicidal ideation to mental

16  health staff during his period of treatment?

17  A.  No, he did not.

18  Q.  Did you find it significant that Mr. Eldridge didn't report

19  suicidal ideation to mental health staff but yet wrote in this

20  piece of personal correspondence that he was considering

21  suicide?

22  A.  Malingerers generally like to bring attention to their

23  suicidal thoughts to the mental health staff.  They want some

24  attention, something to be done.  That he did not express it

25  did not raise the index of suspicion for malingering.  On the

Nathan - Direct by Ms. Perry

1  contrary, I took his symptoms to be more genuine.

2  Q.  Now, Dr. Nathan, we discussed earlier that --

3         MS. FERRY:  And if I could have just a moment, Your

4  Honor.  I brought the wrong folder with me.

5         THE COURT:  All right.

6  BY MS. FERRY

7  Q.  We discussed earlier that during your initial chart review,

8  when you first started treating Mr. Eldridge, you examined the

9  2001 records for Mr. Eldridge's admission to Jester IV; is that

10 right?

11 A.  That is correct.

12        MS. FERRY:  And those are found, for the Court, at

13 State's Tab 23, pages 6 through 7, 18 through 22, and 32

14 through 34.  And, Your Honor, I'm going to put the relevant

15 pages up on the Elmo.

16        THE COURT:  All right.

17 BY MS. FERRY

18 Q.  Dr. Nathan, I'll just leave these here.

19 A.  Yeah.

20 Q.  So, Dr. Nathan, I would like to first direct your attention

21 to State's Tab 23, page 7.  Do you recognition this as the

22 report completed by Dr. Joseph?

23 A.  That is correct.

24 Q.  And I would like to ask you, did anything that you read on

25 this page of Dr. Joseph's report seem significant to you when

Nathan - Direct by Ms. Perry

1  you were conducting that chart review?

2  A.  Yes.  He documented that the thought process was positive

3  for looseness of association and that he administered some

4  auditory hallucinations.  He appeared to be guarded and

5  suspicious.

6  Q.  And why did that looseness of association seem especially

7  significant?

8  A.  As I mentioned before, that is an unusual feature of

9  malingering.  Malingerers do not usually exhibit looseness of

10  association.

11  Q.  And, Dr. Nathan, because you reviewed these records, you're

12  aware that ultimately Dr. Joseph and Dr. Woodrick both

13  concluded that Mr. Eldridge was malingering in 2001; is that

14  right?

15  A.  That was the signature in the discharge summary of that

16  note.

17  Q.  And let me direct you to page 32, which is the discharge

18  record from 2001 for Jester IV.  And I would like to ask you,

19  in reviewing this record and these Jester IV reports, does

20  anything in those documents cause you to second-guess your

21  conclusion that Mr. Eldridge was not malingering when you

22  treated him?

23  A.  Joseph is a senior clinician.  He has been at the system

24  for a long time.  I have personally supervised him as the

25  director in Jester IV.  He was a staff psychiatrist.  He's

Nathan - Direct by Ms. Perry

1   unlikely to make a diagnosis of looseness of association unless
2   it was fairly prominent.
3   Q.  And what about Dr. Woodrick's -- actually let me put a
4   different page here on the overhead.  What about Mr. Woodrick's
5   conclusion here on page 33 of State's Tab 23, that Mr. Eldridge
6   was attempting to feign multiple personality disorder?  Why
7   does that not raise red flags as far as malingering during the
8   time of your treatment of Mr. Eldridge?
9   A.  First and foremost, this was in 2001.  I am seeing him
10  nearly ten years later.  Second, his presentation was not
11  clear-cut, you know, for Dr. Woodrick to kind of say
12  specifically this guy is malingering.  Because he did express
13  some things about auditory hallucinations and that his food was
14  being poisoned.  But Mr. Eldridge is not also really expressing
15  completely all the symptoms, and that was my understanding of
16  this one.  Without discussing with Dr. Woodrick why he did
17  this, I cannot answer that question completely.
18  Q.  Okay.  Now, we talked a minute ago about the waxing and
19  waning of symptoms that Mr. Eldridge demonstrated while on
20  antipsychotic medication.  Did that waxing and waning raise red
21  flags for you as far as malingering?
22  A.  Generally malingerers keep up their symptom complaints till
23  they get some attention.  They don't wax and wane necessarily.
24  Q.  And, Dr. Nathan, let me ask you this:  Did any of
25  Mr. Eldridge's symptoms during the period of time that you

Nathan - Cross by Mr. Corcoran

1 treated him, did any of those raise red flags for you as far as

2 malingering?

3 A.  It did not.

4       MS. FERRY:  That's all I have at this point, Your

5 Honor.

6       THE COURT:  All right.  Thank you.

7           Cross?

8       MR. CORCORAN:  Thank you, Your Honor.

9                  **CROSS-EXAMINATION**

10 BY MR. CORCORAN

11 Q.  Let met start over here.  My name is Joe Corcoran.  And we

12 talked on the telephone --

13 A.  Yes, sir.

14 Q.  -- is that right?

15           And where are you presently employed?

16 A.  I'm with Tri-County Mental Health Services.  I work as the

17 crises stabilization psychiatrist.

18 Q.  I would like to start by asking if you can explain the

19 difference between clinical and forensic psychiatry.

20 A.  In forensic psychiatry, they're especially evaluating in

21 the legal context.  They want to rule out malingering.  They

22 want to ask more questions in terms of details.  When somebody

23 says something about voices, one would want to ask about how

24 often they have heard it, what exactly do you hear, if they

25 hear it from outside the head, inside the head.  All those

Nathan - Cross by Mr. Corcoran

1   questions will be asked.

2                   In a clinical setting, our job is to find out

3   does this person have an overwhelming impression of mental

4   illness and if this mental illness, is this treated with

5   medication or therapy.  So, we are not having the same level of

6   scrutiny for forensic evaluation as when we do a clinical

7   evaluation.

8           MR. CORCORAN:  Your Honor, may I approach the witness?

9   I have a -- this is not an exhibit.  It's something that I want

10  to discuss with the witness.  I'll put up on the --

11          THE COURT:  Yes.  Neither side need ask permission to

12  approach the witness.

13          MR. CORCORAN:  Okay.  Would Your Honor like a copy?

14          THE COURT:  Yes.  Thank you.

15          MR. CORCORAN:  Thank you.

16          THE COURT:  And you've tendered this to opposing

17  counsel?

18          MR. CORCORAN:  Yes, I'm doing it right now.

19          THE COURT:  All right.  Thank you.

20  BY MR. CORCORAN

21  Q.  Now, if you read on here, this basically -- make sure we

22  see here.  It's titled "Clinical Evaluator versus Forensic

23  Evaluator."  What I want to ask you, if you agree or disagree

24  with the various distinctions here.  So, question one, who is

25  the client?  Okay.  If you read with me, in a clinical

Nathan - Cross by Mr. Corcoran

1  environment, it's actually the mental health practitioner; and

2  in the forensic, it's the attorney.  Is that -- would you agree

3  with that, that the client --

4  A.  The client is the -- you mean the mental health --

5  Q.  The patient?

6  A.  -- the client?

7  Q.  Yes.

8  A.  Yes.

9  Q.  And the attorney in the forensic context is the client for

10  the purposes of the forensic psychiatrist?  Would you agree

11  with that?

12  A.  Along with -- obviously they have to evaluate the patient

13  of the client also.

14  Q.  For a judge or a lawyer?

15  A.  Yes.

16  Q.  Okay.  The privilege of the person being evaluated, in the

17  clinical environment it's the therapist/patient privilege; is

18  that correct?

19  A.  Correct.

20  Q.  Would you agree with that?

21  A.  Uh-huh.

22  Q.  And in the forensic environment, it's the attorney/client

23  and the attorney work product privilege; is that correct?

24  Would you agree with that?

25  A.  That is correct.

Nathan - Cross by Mr. Corcoran

1   *Q.*  Okay.  Number three is the cognitive set of the evaluator.

2   Now, this says that in a clinical environment that set is

3   supportive, accepting, and empathetic -- or empathic, excuse

4   me.  And in the forensic environment, neutral, objective, and

5   detached.

6                    Would you agree or disagree with that?

7   *A.*  Generally speaking, that is correct.

8   *Q.*  Okay.  Areas of expertise of the evaluator -- and obviously

9   this can cross, but in the clinical environment, it's content

10  area, plus therapeutic techniques; and in the forensic

11  environment, it is content area, plus psychological evaluation

12  standards.

13  *A.*  That is correct.

14  *Q.*  Can you explain a little bit to the Court about what

15  therapeutic techniques versus psychological evaluation

16  standards, what that is getting at, more or less?

17  *A.*  Even in a therapeutic treatment facility, you may be asking

18  questions, but not as much in detail.  And in a forensic

19  environment, sometimes we may want to include psychological

20  tests, court history, part social history from the past,

21  criminal history --

22  *Q.*  Okay.

23  *A.*  -- all those things and detail drug history and what else

24  have they done in the past.  All those things --

25  *Q.*  Is available?

Nathan - Cross by Mr. Corcoran

1  A.  -- will be easily available.

2  Q.  Okay.  The structure of the evaluation process, number

3  six -- actually I think I'm at number five.  Standards for

4  hypothesis testing.  Clinical, diagnostic criteria for the

5  purpose of therapy.  And in the forensic, it's psycho-legal

6  criteria for purpose of legal adjudication.  Now, do you agree

7  with that?

8  A.  That is correct.

9  Q.  Number six, the structure of the evaluation process.  In

10  the clinical environment, it's client structured and relatively

11  less structured.  Whereas in the forensic, it is evaluator

12  structured and relatively more structured.

13  A.  That is correct.

14  Q.  That is self-explanatory.  Okay.

15              And number seven, completeness of the evaluation.

16  In the clinical, mostly based on information from the person

17  being evaluated.  In the forensic, much more complete and

18  includes checking of accuracy from other sources?

19  A.  That is correct.

20  Q.  That is correct.

21              Number eight, the nature of the evaluation

22  process.  In the clinical, it says it's rarely adversarial.  In

23  the forensic, it is frequently adversarial.  Is that fair?

24  A.  That's correct.

25  Q.  Number nine -- excuse me.  Number ten -- or number nine,

Nathan - Cross by Mr. Corcoran

1  advocacy of the evaluator.  In the clinical, advocate for the

2  person.  In the forensic, advocate for the issues or results of

3  the evaluation.  And you can --

4  A.  In private practice you would say advocate for the person.

5  Q.  Gotcha.

6  A.  In the prison population, we are evaluating, see, does this

7  person show evidence of mental illness and is this going to be

8  treated.

9  Q.  Okay.

10  A.  We don't necessarily advocate for anything.

11  Q.  Okay.  Understood.  And, finally, the product of the

12  outcome of the evaluation.  The clinical, it's aide and benefit

13  to the individual; and the forensic, it's aide or benefit to

14  the legal process.  Would you agree with that?

15  A.  That is correct.

16  Q.  Okay.  And you said, just to make sure I took my notes

17  down, that you met and/or treated Mr. Eldridge roughly between

18  November 2009 and August 2011?  I think that was --

19  A.  That approximately sounds right.

20  Q.  Okay.  And at all times relevant to that time frame, you

21  were functioning as a clinical psychiatrist; is that correct?

22  A.  That is correct.

23  Q.  So, you were on the left side of that chart?  You were not

24  functioning as a forensic --

25  A.  I was not functioning as a forensic psychiatrist evaluating

Nathan - Cross by Mr. Corcoran

1   him.

2   Q.  Okay.  Have you ever been asked to be provide a forensic

3   evaluation of Mr. Eldridge?

4   A.  No.

5   Q.  Have you read either Dr. Allen's report, forensic report or

6   Dr. Roman's forensic report?

7   A.  I have not.

8   Q.  Okay.  Can you explain to me what a telemed link is?  Is it

9   that what it sounds like?

10  A.  We have monitors and those are connected through wires to

11  other monitors and a camera in the prison system and we have a

12  camera on our side.  So, they can see us through the camera and

13  we can see them through the camera.

14  Q.  Now, I understand in the correctional context there may be

15  no better way to do it, but would you agree that you might have

16  a better perspective if you were face-to-face in that

17  environment?

18  A.  For a forensic evaluation, maybe.  For a clinical

19  evaluation, this is adequate.

20  Q.  Okay.  What is malingering?  Is it -- can you go through

21  that again?

22  A.  Malingering is generally described as a person producing a

23  set of symptoms or complaints which will help them to avoid

24  adverse consequences either due to a job duty or a legal

25  context, like in this current situation, or to avoid -- get

Nathan - Cross by Mr. Corcoran

1  medications for sleep or for whatever purposes.

2  *Q.*  Okay.  And I think what you testified earlier under the

3  DSM-IV-TR, the malingering definition there, would you agree

4  that it lists four factors, I believe, that -- I think it

5  says -- and I can grab it -- that strongly -- any combination

6  of these four factors strongly suggest the possibility of

7  malingering?

8  *A.*  I would like for them to put up so we can --

9  *Q.*  Okay.  Let me get that.

10  *A.*  -- discuss that.

11          *THE COURT:*  Can I ask the question while you're doing

12  that?

13          *MR. CORCORAN:*  Sure, you bet.

14          *THE WITNESS:*  Yes, Your Honor.

15          *THE COURT:*  When you -- back to the question of the

16  telemed --

17          *THE WITNESS:*  Yes, Your Honor.

18          *THE COURT:*  -- the telemed facilities, how frequently

19  did you have the opportunity to see Mr. Eldridge in person?

20          *THE WITNESS:*  I have not seen him in person at all --

21          *THE COURT:*  Okay.

22          *THE WITNESS:*  -- Your Honor.  The only time he was

23  seen in person was in Jester IV.

24          *THE COURT:*  All right.  Thank you.

25          *THE WITNESS:*  Yes, ma'am.

Nathan - Cross by Mr. Corcoran

1  BY MR. CORCORAN

2  Q.  Well, it's not going to work terribly well.  Maybe I can

3  adjust it.   There we go.

4            Okay.  So, this is -- well, let me show you.

5  This is the DSM-IV-TR.  Is that the most recent --

6  A.  That is correct.

7  Q.  -- I guess, final version?

8            Okay.  And V 65.2, obviously it defines in a

9  similar way to what you just said in the first paragraph.  And

10 if you would read with me the second paragraph, "Malingering

11 should be strongly suspected if any combination of the

12 following is noted."  One is medicolegal context of

13 presentation.  The example here is the person is referred by an

14 attorney for examination.  Two is a marked discrepancy between

15 the person's claimed stress or disability and the objective

16 findings.  Three is a lack of cooperation during the diagnostic

17 evaluation and in complying with the prescribed treatment

18 regimen.  And, four, is the presence of an antisocial

19 personality disorder.

20            Now, would you agree that at least two of these,

21 and probably more, strongly suggest malingering?

22 A.  Almost every patient when we evaluate in the prison system,

23 we have to rule out to some extent whether this person is

24 malingering.

25 Q.  Understood.

Nathan - Cross by Mr. Corcoran

1   A.  And, so, in this context when somebody is presented with

2   looseness of association, severe weight loss, even though the

3   other contexts are all present, one has to go with whatever the

4   objective finding is.  He lost a lot of weight.  He expresses

5   delusions that he is being poisoned.  He has looseness of

6   association.

7               The voices, anybody can produce voices, but his

8   perplexity and seeming inability to reconcile that he's in a

9   prison, but he's saying that he's going out to work and was

10  oblivious to the contradiction, that, in my opinion, was more

11  suggestive of mental illness than malingering.

12              Malingerers generally will not make such a

13  blatant statement.  They usually make a statement which is

14  partially believable.

15  Q.  Okay.  Let me ask you this:  I thought you testified, and

16  correct me if I'm wrong, that you found no red flags for

17  malingering.  And I'm asking if in light of this definition,

18  whether you want to correct your testimony.  Aren't these red

19  flags for malingering?

20  A.  When I say red flags for malingering, it would be bizarre

21  symptoms, which is impossible in the context or they are

22  talking about something which will bring direct attention to

23  them --

24  Q.  Okay.

25  A.  -- or they are expecting something immediately.  Those are

Nathan - Cross by Mr. Corcoran

1  the red flags.

2  Q.  Okay.

3  A.  This is in the context of these are the times when you will

4  suspect malingering, and I suspect malingering on every patient

5  whom I see.

6  Q.  So, you did suspect malingering in --

7  A.  Every patient you have to wonder is this person

8  malingering.

9  Q.  Okay.  That's -- let me move forward.

10           Now, you may not have had this available to you,

11  but do you know or understand that Mr. Eldridge has been

12  diagnosed as an Axis II, as an antisocial personality disorder?

13  Have you been made aware of that?  Do you understand that?  Was

14  it part of your process when you --

15  A.  As I said earlier, every person in TDCJ has either an

16  antisocial personality disorder or antisocial personality.

17  Q.  Okay.  So, you approach the patient with more or less an

18  assumption --

19  A.  With the same assumption, that everybody there is

20  antisocial.

21  Q.  Is there a difference between malingering and malingered

22  psychosis?  Is it just a different version, or what does that

23  mean?

24  A.  Malingering could include complaints like that they are

25  either depressed or psychosis.

Nathan - Cross by Mr. Corcoran

1  *Q.*  Okay.

2  *A.*  Psychosis is the most commonly malingered mental symptom to

3  achieve what patients want.  They usually talk about hearing

4  voices, seeing visions.

5  *Q.*  Okay.  And I want to --

6           *THE COURT:*  Can I ask a question here?

7           *MR. CORCORAN:*  You bet.  Sorry, Your Honor.  Yes.

8           *THE COURT:*  Do you approach every patient you saw at

9  TDC -- or did you approach them as, I guess, equally affected

10  by antisocial personality disorder?

11           *THE WITNESS:*  Almost every person, yes, ma'am.

12           *THE COURT:*  Okay.  So, you didn't make any

13  distinctions within that category?  You just assumed that

14  everyone had --

15           *THE WITNESS:*  I did not make a distinction between

16  antisocial -- full-blown antisocial personality disorder versus

17  antisocial traits.  In antisocial personality disorder, you

18  have to have symptoms suggestive of these traits happening from

19  childhood onwards, such as delinquency, truancy, substance

20  abuse, gross opposition to authority, and all this kind of

21  stuff.  But generally, I think, prisoners who have been there

22  for a long enough time have generally all these things.  Many

23  of them are positive of this.

24           *THE COURT:*  Did you research any of those aspects of

25  Mr. Eldridge's history to determine whether they were present

Nathan - Cross by Mr. Corcoran

1  in his case --

2          THE WITNESS:  No, ma'am, I did not.

3          THE COURT:  -- or in what degree?

4          THE WITNESS:  No, ma'am, I did not.

5          THE COURT:  Thank you.

6          THE WITNESS:  The reason I did not evaluate is because

7  it won't change the treatment in any way.

8          THE COURT:  I understand.

9  BY MR. CORCORAN

10 Q.  Well, maybe to follow up on that, so your treatment as a

11 clinician -- what do you mean, it won't change the treatment

12 that somebody --

13 A.  There is no known treatment for antisocial personality

14 disorder or traits.

15 Q.  But the --

16 A.  It cannot be changed by medication.

17 Q.  Is it fair to say that some of the manifestations of that

18 personality disorder could be confused by or mapped on to

19 certainly kinds of psychosis?  Is that the reason?

20 A.  It's a reasonable assumption.

21 Q.  Okay.  Now, I want to understand how far back -- what, in

22 terms of records, TDCJ records, you could see -- you testified

23 that you went back, I think, to 2001?

24 A.  The only records of 2001, which are the electronic medical

25 records, are the psychiatric evaluations.  The other records

Nathan - Cross by Mr. Corcoran

1  are what they said -- the other people's evaluations, what

2  medicines were given or not given, none of them have been

3  put -- converted to the electronic --

4  Q.  When did that start, though?  Is it 2004 or 2005?

5  A.  I think it was subsequently to that.

6  Q.  Okay.  So, in 2001 the final evaluations were actually

7  electronic?  They were available, the final psychiatric

8  evaluations in this report in 2001?

9  A.  I think those were put into the electronic medical records,

10  but all the other records, what the social workers or

11  psychologists saw, all those things, are not there.

12  Q.  Okay.  So, you would agree, though, that many criminal

13  defendants have a motivation to malinger, to feign mental

14  illness?

15  A.  I do agree with that.

16  Q.  Okay.  And would you agree that malingered psychosis should

17  be ruled out where there is a significant reason to feign from

18  the diagnostic --

19  A.  From my clinical vantage point, yes.  If I thought it was

20  malingered psychosis, I won't treat them with medications.

21  Q.  But do you differential diagnose when malingered factors or

22  these criteria pop up, are you constantly checking against that

23  potential diagnosis in your practice?

24  A.  I have.  If there's overwhelming evidence this person is

25  constantly malingering, they are behaving a certain way in the

Nathan - Cross by Mr. Corcoran

1  unit, certain way with the treatment professionals, eventually

2  those facts will come out and then I will revise the diagnosis

3  and change my treatment.

4  *Q.*  So, that inconsistency is an important factor, then, in

5  terms of --

6  *A.*  That is correct.

7  *Q.*  Okay.  And were there any significant external reasons that

8  Mr. Eldridge had to malinger in this case?

9  *A.*  I would assume he's on death row, there will be all kinds

10 of reasons why he would want to malinger illness.

11 *Q.*  Would he want to malinger in order to avoid the death

12 penalty?

13 *A.*  That is a possibility.

14 *Q.*  Okay.  And would you -- how do you rate that?  I understand

15 that some inmates malinger in Jester IV because it's air

16 conditioned.  And how would you rate the desire not to be

17 executed versus the desire to have air conditioning?  Is that a

18 greater reason to malinger?

19 *A.*  I would presume that is a greater reason to malinger.

20 *Q.*  Okay.  Would you agree that malingerers are more likely to

21 call out, to tell people about their symptoms than are true

22 schizophrenics or psychotics?

23 *A.*  That is correct.

24 *Q.*  And, so, the flip side is that, is it true that

25 schizophrenics are reluctant, they don't necessarily

Nathan - Cross by Mr. Corcoran

1  volunteer -- they might, but they generally do not; is that
2  fair?
3  A.  That is correct.
4  Q.  Okay.  And we've already said -- so, internal and external
5  consistencies or contradictions in the presentation of a
6  patient, that is something that is a red flag for a -- for
7  malingering?
8  A.  When it is available -- that information is available --
9  Q.  Okay.
10 A.  -- yes, it will be.
11 Q.  And might this include reporting variable or inconsistent
12 symptoms -- the presentation of symptoms close in time?
13 A.  In his case he did not present inconsistent symptoms at a
14 short stretch of time.  The symptoms were the same.
15 Q.  Okay.  Would you agree that malingerers present atypical
16 hallucinations and delusions?
17 A.  That is correct.
18 Q.  Do have examples of an atypical hallucination or a delusion
19 that would suggest malingering?
20 A.  In this case I did not see any evidence of any atypical
21 hallucinations.  The only auditory hallucinations he was
22 consistently expressing was hearing his brothers talk to him,
23 put him down, his mother screaming at him, and that was the
24 same symptoms which he expressed to me.
25 Q.  Did you see, though, evidence in the record that he

Nathan - Cross by Mr. Corcoran

1  presented -- in the electronic records, that he presented with
2  auditory, visual, and tactile hallucinations, he suggested?
3  A.  Can you show -- the tactile, auditory hallucinations, I do
4  not know.  But one time it was mentioned that he had seen
5  spaceships.
6  Q.  Right.
7  A.  And that was not expressed to me either in the beginning or
8  in the --
9  Q.  I'll get back to that.  But would you agree hypothetically
10  that if a patient presented with those three, that that would
11  be an atypical hallucination?
12  A.  Can you repeat the question?
13  Q.  Yeah.  Would you hypothetically agree that if a patient
14  presented oral, visual, and tactile hallucinations at the same
15  time, some event, that that would be an atypical hallucination?
16  A.  Without having a clear-cut example, it's possible is all I
17  can say.
18  Q.  Okay.  What is the difference between a hallucination and a
19  delusion?
20  A.  Hallucination is a perceptual abnormality, which is a
21  perception which others cannot perceive due to either vision or
22  hearing or sensation or movement.  A delusion is a thinking
23  disorder of content of thought, where they have a fixed false
24  belief.
25  Q.  Okay.  And can you explain or -- and define at the same

Nathan - Cross by Mr. Corcoran

1   time for the Court the difference between the so-called

2   positive symptoms of psychosis and the negative symptoms of

3   psychosis?

4   A.   The positive symptoms of psychosis would be auditory

5   hallucinations, delusions, and also looseness of association.

6              The negative symptoms of psychosis schizophrenia

7   would be flattening of affect or alogia, where the person is

8   not able to even think clearly, or avolition, where the patient

9   is sitting down and vegetating and not moving and not doing

10  anything in a goal-directed manner.

11  Q.   So, would you agree, then, a positive symptom appears to

12  reflect an excess and distortion of a normal function, it's an

13  excess of, and that a negative symptom is a diminution or loss

14  of normal function?

15  A.   Overall that could be described that way.

16  Q.   Okay.  More or less.

17  A.   Yes.

18  Q.   Okay.  Would that you agree that malingerers are less

19  likely to present negative symptoms or signs of psychosis?

20  A.   That is correct.

21  Q.   And, so, they would be less likely to have relatedness,

22  blunted affect, digressive speech, peculiar thinking?  They're

23  less likely in general to present?

24  A.   That's correct.

25  Q.   And why is that, or why does the science suggest that to be

Nathan - Cross by Mr. Corcoran

1   the case?

2   A.  Among the symptoms which can be malingered, probably

3   flattening of affect would be the closest.  If the person

4   doesn't react emotionally with the intensity or in the range of

5   affect, that could be -- not necessarily expressed, but alogia,

6   where they have absolute poverty of thought and avolition,

7   where they do not goal-directed moments and they're sitting

8   down vegetating, those are harder to malinger.

9   Q.  Understood.  And is it easier just to pronounce a delusion

10  or hallucination?

11  A.  Yes.

12  Q.  Anybody could say that?

13  A.  Yes.

14  Q.  Let me ask you this:  Would you agree that someone could

15  voluntarily -- or excuse me.  I wrote this down here --

16  volitionally opt not to be forthcoming?  Because I think you

17  testified that somebody who is not forthcoming may be a sign or

18  suggestion of an actual mental illness?

19  A.  It could be.

20  Q.  So, somebody could just opt to be not forthcoming?

21  A.  That is correct.

22  Q.  Would you agree that malingerers sometimes present with

23  symptoms that do not easily fit into existing diagnostic

24  criteria?

25  A.  That is possible.

Nathan - Cross by Mr. Corcoran

1   Q.  And that includes the old atypical psychosis and now the

2   psychosis NOS, those are -- doesn't mean you're malingering,

3   but those are the kinds of things that a malingerer might end

4   up in as a diagnostic --

5   A.  It is very possible.

6   Q.  Okay.  So, just to go through -- and I want to kind of

7   capture the things that I think we've agreed upon, some

8   combination and not necessarily one or two, and I want to see

9   if you agree that these might suggest a flag for at least to

10  rule out malingering.  No past history of mental illness,

11  unusual beliefs, that kind of stuff, presence of atypical

12  delusions -- and we haven't defined that necessarily.  And

13  that's a "yes"?

14  A.  Yes.

15  Q.  Okay.  Rational alternative motives?

16  A.  Yes.

17  Q.  Yes.  Carrying out unusual behaviors in the presence of

18  claimed delusions.  So, a disconnect between the delusion and

19  the behavior.  Is that possible?

20  A.  In this case there was no disconnect.

21  Q.  Understood.

22  A.  He believed that he was being poisoned.  He was not eating.

23  Q.  Okay.  Okay.  Well, let me get to that -- well, let me

24  finish this.  Marked contradictions in stories,

25  inconsistencies.  Would you agree --

Nathan - Cross by Mr. Corcoran

1  A.  If there's obvious contradiction, I would suspect that.

2  Q.  Okay.  Symptoms that fit into no known diagnostic category.

3  We've talked about that; is that correct?

4  A.  That is correct.

5  Q.  Behavior that is not consistent with alleged delusions.

6  That's a similar sort of -- possibly that could be something?

7  A.  That could be possibly.

8  Q.  Okay.  Absence of residual signs of schizophrenia.  Other

9  signs of schizophrenia, is that possible that you would --

10  A.  In this case, of course, he had poor grooming and he would

11  refuse to go there, so --

12  Q.  Gotcha.

13  A.  -- I would suspect to see having some residual --

14  Q.  But what about other signs that you check off against?  So,

15  grooming versus goal-oriented thinking?  So, he could have some

16  and not others.  Is that just a judgment call for you in terms

17  of --

18  A.  Unless I knew clearly that he was saying, I'm not going to

19  take a shower because then they'll think of me as more mentally

20  ill, if I had evidence of that, then that would be different.

21  Q.  Okay.  And you never suspected that Mr. Eldridge was

22  malingering?  Is that your testimony?

23  A.  You always suspect malingering in every case, as I said, in

24  the prison system, because all these context will always be

25  there.  I did not have overwhelming evidence to suggest that

Nathan - Cross by Mr. Corcoran

1  this was definite malingering.

2  Q.  In Mr. Eldridge's case, is it fair to say that there was no

3  differential diagnosis for malingering or a rule out

4  malingering in any of your reports?

5  A.  I did not document that rule out malingering, but I always

6  have in the back of my mind if some other information comes

7  about which would suggest malingering, then I would strongly

8  start documenting it.

9  Q.  Without getting into TDCJ policies or the facts of the

10  case, would you agree that in correctional settings, that there

11  may be some pressure to avoid using the term "malingering" in a

12  diagnostic clinical function?

13  A.  It has not been so lately in TDCJ.

14  Q.  Has it ever been that way in TDCJ?

15  A.  It has been in the past, where there was --

16  Q.  Okay.  Why was that pressure put on doctors?

17  A.  Because of the fear that doctors would overdiagnose

18  malingering and not treat people and evaluate them.

19  Q.  And is that because people with mental disorders may also

20  exaggerate?

21  A.  Exaggerate, that is correct.

22  Q.  Okay.  So, somebody -- it's not all or nothing?

23  A.  It is not.

24  Q.  Somebody may have something you believe, but you may not

25  believe everything that they suggest?

Nathan - Cross by Mr. Corcoran

1  *A.*  The hardest cases are those who have some mental problems

2  and are malingering.

3  *Q.*  Gotcha.

4        *THE COURT:*  When in the past was that an attitude that

5  you were aware of?

6        *THE WITNESS:*  Of where they did not want to diagnose

7  malingering?

8        *THE COURT:*  Yes, sir.

9        *THE WITNESS:*  Approximately seven, eight years ago,

10  ma'am.

11        *THE COURT:*  Okay.

12  BY MR. CORCORAN

13  *Q.*  Would you agree that clinicians, in your context, you don't

14  always benefit from all of the records or information that a

15  forensic examination would have?

16  *A.*  That is correct.

17  *Q.*  So, you would agree with me that you can't be faulted for

18  not having necessarily information that I'm going to go through

19  with you, you might not have had that?

20  *A.*  I didn't have access to all of the information which others

21  would have had.  I would have requested it if I was doing a

22  forensic evaluation.

23  *Q.*  Sure.  And when you began treating him, you didn't have

24  access to the original trial records --

25  *A.*  No, I did not.

Nathan - Cross by Mr. Corcoran

1   *Q.*  -- I presume.

2               And prior to 2001, I think that was the date,

3   that you had no access to medical or legal records related to

4   his competence or malingering prior to 2001?

5   *A.*  I did not.

6   *Q.*  Okay.  Are you aware of any?  Has anybody shown you any?

7   *A.*  No.

8   *Q.*  Okay.  Did you use any formal assessment devices, tests

9   when you initially interacted, when you --

10  *A.*  No, I did not use any formal structured interview, if

11  that's what you're asking me.

12  *Q.*  Okay.  And you would agree that the forensic approach to

13  detecting malingering is different than the clinical

14  approach --

15  *A.*  Yes, that is correct.

16  *Q.*  -- by definition?

17               And would you agree, I think you testified

18  implicitly to this earlier, that one in your profession uses

19  documents prepared by other professionals in make diagnoses

20  today?  So, you would read older records to help -- it helps

21  you make a conclusion about treatment?

22  *A.*  In a forensic evaluation.

23  *Q.*  Okay.  What I would like to do is -- now, these have

24  been --

25               *MR. CORCORAN:*  These are exhibits that are in

Nathan - Cross by Mr. Corcoran

1  evidence, Your Honor.

2  BY MR. CORCORAN

3  Q.  And what I'm about to show you --

4         THE COURT:  Can you give the exhibit number and page?

5         MR. CORCORAN:  Oh, I apologize.  It is exhibit -- it's

6  from Tab 56, and it is page 151.  It will say "jail psych 151"

7  at the top right.

8  BY MR. CORCORAN

9  Q.  Now, this -- would you agree with me, what this is is

10 essentially a forensic psychiatric survey and it's got a date

11 here on the left 1-7-1993.  And if you would read with me, this

12 is a forensic evaluation of Mr. Eldridge after he had been

13 arrested in the Houston criminal justice system.  And it says,

14 "He has been complaining" -- I'm reading here at this line

15 here, "He has been complaining with the nursing staff as we

16 approached.  He is reported to have shown no paranoia or

17 nervousness, is walking in jail -- crowded jail hallway.  Did

18 remarkably well just before we came to visit and speaking gave

19 no evidence of psychosis or bizarre behavior."

20         Would you agree that it says that?

21 A.  That's what is written, yeah.

22 Q.  Okay.  And the reason I ask this is that the -- if you had

23 time, would it help you to make a clinical diagnosis to follow

24 around an inmate and see that inmate in their normal

25 environment versus when you interview them?  If that was the

Nathan - Cross by Mr. Corcoran

1  perfect world, would that be a better way to do the diagnostic

2  function?

3  A.  It will definitely give more information when you are

4  seeing the person in their natural environment.

5  Q.  Okay.  Okay.

6         MR. CORCORAN:  So, now we're, again, at Tab 56, Your

7  Honor, page 152.

8  BY MR. CORCORAN

9  Q.  I believe it's the other side of this page.  And here they

10  refer to something called a "consumer."  Is that a term -- I

11  guess that they mean they're referring to Mr. Eldridge.  Is

12  that fair?  "Consumer went" --

13  A.  Yeah, in --

14  Q.  I'm sorry.

15  A.  -- Harris County Jail probably.

16  Q.  Okay.  "Consumer went back to his room when others entered

17  the dorm as if to be paranoid.  Consumer spoke in a very low

18  voice and stutter-like speech.  RS, who assisted in earlier

19  interview with consumer, reported that consumer gave clear and

20  direct answers."

21         And then we'll jump down to this highlighted

22  portion.  "No evidence of paranoid behavior today.  Remained in

23  atrium today during continuation of the interview despite

24  others being in atrium.  Consumer did become tearful at times

25  when talking about his mother and wanting to go home.  Consumer

Nathan - Cross by Mr. Corcoran

1  did not answer questions directly.  He gave one-word responses
2  that did not pertain to the question.  Writer questionings
3  psychosis versus malingering.  Consumer's behavior did not
4  appear genuine."
5  *A.*  For some strange reason, this didn't scroll up or
6  something.
7  *Q.*  Oh, I apologize.  I'll focus on that.
8  *A.*  Okay.
9  *Q.*  You can also follow along, I believe, if you want -- if you
10  want to read it up there, I can get you the manual.  You have a
11  courtesy copy next to you.
12  *A.*  This is okay.  If you can just move it, that will be fine.
13  *Q.*  Okay.
14  *A.*  Okay.
15  *Q.*  Okay.
16      *MR. CORCORAN:*  And I'm going to move through these
17  quickly, Your Honor.  Tab 56, page 150.
18  BY MR. CORCORAN
19  *Q.*  All right.  Let me see if I can do this right this time.
20          So, this says -- at the top it says, "No evidence
21  of stuttering today.  Chief complaints include headache and
22  stomach problems."
23          Let me stop there.  Did Mr. Eldridge often
24  complain about headaches and stomach problems in the electronic
25  records in TDCJ?  Do you remember seeing those or did he

Nathan - Cross by Mr. Corcoran

1  complain about headaches often?

2  A.  He was sent back with Tylenol on a routine basis, so

3  suspected that he had some complaints of headache.  He did not

4  talk about those or stomach problems with me, because of the

5  dichotomy of services.

6  Q.  Okay.

7  A.  He might have complained about it to the medical services,

8  but I did -- I wasn't aware of that.

9  Q.  All right.  The highlighted portion, "The consumer did

10 verbalize that he speaks to and sees his son.  Consumer was

11 cooperative to management problems.  Still does not answer

12 questions directly.  Continues to be vague.  Poor historian.

13 Symptoms of ATT equals vague, not real hallucinations.  No

14 management problem.  Stuttering stops when he asks for

15 something.  Not cooperative.  Low evidence of Axis I illness."

16          So, we agree that it says that?

17 A.  Yeah, that's symptoms of auditory hallucinations, AH.

18 Q.  Gotcha.  Thank you.

19 A.  Thank you.

20 Q.  And, again, on Tab 56, page 149 -- see if I can -- this

21 says, "Patient began hanging --

22          MS. ODEN:  Banging.

23 BY MR. CORCORAN

24 Q.  "-- banging on cell."

25          MR. CORCORAN:  Maybe you should do this.

Nathan - Cross by Mr. Corcoran

1  BY MR. CORCORAN

2  *Q.*  This is -- continues to show fearfulness and mild

3  impairment, no psychotic or bizarre symptoms."

4          This does not appear to match up with my notes.

5  Oh, I'm sorry.  At the bottom, it says, "Attempted to give" --

6  if you can see that.  I apologize.

7          It says, "Attempted to gives the SIRS oral

8  assessment.  Consumer unable to answer simple direct questions.

9  Stated we need to ask Barry."

10          Does he refer to "Barry" a lot in the electronic

11  TDCJ records from 2004 forward?

12  *A.*  Yes, he does.

13  *Q.*  Was Barry one of the multiple personalities that he

14  presented with in 2001?

15  *A.*  Barry was one of the voices he heard.  I did not get

16  impression that he was talking about multiple personalities.

17  *Q.*  I understand.

18  *A.*  All that I assumed was, he was talking about hearing

19  voices.

20  *Q.*  Understood.  Okay.  So, we'll go to pages 74, same tab.

21  This says in reference to Mr. Eldridge, Deputy something --

22  inmate is having mood swings.  Maybe irritability.  Crying.

23  Goal oriented.  Speech coherent.  Inmate says his son was

24  calling.  And then this final thing appears to say, "Inmate

25  claims he has to lie --"

Nathan - Cross by Mr. Corcoran

1  A.  Die.

2  Q.  "-- or die."  Would you agree it says that?

3  A.  That's what is written.

4  Q.  Okay.  Okay.  So, we're going to go still Tab 56, 73.  I

5  believe it should be the other side.  The impression here

6  saying, "Malingering.  Depressive mood.  Fairly well-groomed.

7  28-year-old black male.  Sat hunched over in chair, hand on

8  forehead.  TP tangential."

9                 What does that mean?

10 A.  Thought process is tangential.

11 Q.  So, they're saying that this person said that he perceived

12 tangential thought processes?

13 A.  That is correct.  The difference between tangential

14 thinking and looseness of association per se is in looseness of

15 association, they may come back to a similar thing, thought

16 process.  Whereas in tangential thinking, they don't come back

17 to the previous thought process at all.

18 Q.  And yet the impression here is that he's malingering, by

19 this doctor, here at the top; is that accurate, the impression?

20 A.  Give me one minute to read this, because you are

21 mentioning -- tangential thinking and malingering don't go

22 together generally, but let me see what they are writing.

23                 Okay.  That is written as malingering.  Rule out

24 adjustment disorder, yes.  However, these are all in '93

25 though.

Nathan - Cross by Mr. Corcoran

1  *Q.*  Okay.  I understand.

2  *A.*  Okay.

3  *Q.*  Can you give some specific examples of what you call loose

4  associations with Mr. Eldridge?

5  *A.*  Offhand I cannot.

6  *Q.*  You cannot.

7        Okay.  I'm now looking at Tab 56, page 130.

8  "Consumer was scared and paranoid during the intake.  Consumer

9  says he sees things that fly.  Consumer says this flying thing

10 keeps people from going to heaven.  Consumer says he can stop

11 this flying thing by dying.  Consumer says the flying thing is

12 big and has big wings.  The flying thing is brown and has a

13 little red in it.  Consumer don't know his name until he looks

14 at his armband.  Consumer cannot read or write."

15       Would you agree that that's an atypical

16 hallucination?

17 *A.*  That sounds very atypical.

18 *Q.*  Would that be a red flag for malingering?

19 *A.*  If I had read that before, it would be.

20 *Q.*  Okay.  Would this -- if you had known this, would it have

21 changed anything about how you --

22 *A.*  I might have gone more in detail about what he was talking

23 about hearing voices.

24 *Q.*  Okay.  That's fair.  Would it surprise you to know that he

25 made a similar themed -- he suggested the existence of a

Nathan - Cross by Mr. Corcoran

1  similar themed hallucination to Dr. Allen during Dr. Allen's
2  report very recently?
3  A.  I have not read Dr. Allen's report.
4  Q.  If you knew that before you initiated treatment in 2009 --
5  so, let's hypothecate that description, the same theme 20 years
6  later was made, would that cause you to maybe question again
7  whether or not there was malingering here?
8  A.  We are hypothesizing that --
9  Q.  Hypothesizing --
10  A.  -- I've seen Dr. Allen's report.  I'm hypothesizing --
11  Q.  Before --
12  A.  -- before the evaluation.  And depending upon what I see in
13  that, yeah, it might have changed how I perceive it.
14  Q.  Okay.  Okay.  We'll just jump to 56, page 177.  So, this
15  says, Move clear -- move something today.  Cooperative.  TPs
16  were organized and goal directed.  And there's a DX here at the
17  bottom, is that fair, malingering?  So, does DX mean a final
18  diagnosis?
19  A.  Diagnosis, yes.
20  Q.  So, he's been diagnosed here as malingering, and this is,
21  again, in 1993; is that correct?
22  A.  That is what the records indicate.
23  Q.  Well, let me ask you this, you -- we're going to get into
24  this with another witness.  There have been -- if I told you
25  there were ten psychologists, psychiatrists in the time frame

Nathan - Cross by Mr. Corcoran

1   of the trial in 1993 who all concluded that he was malingering,

2   would that have -- the sheer number have any affect on the way

3   you approached him clinically in 2009?

4   A.   Yeah, when you have ten evaluations saying malingering,

5   that will have an effect on how we evaluate and --

6   Q.   That will --

7   A.   -- the more detail we go into it.

8   Q.   Okay.  So, but if the details -- and I'm trying to speed

9   this along and I'm going to talk to my co-counsel about maybe

10  doing this with a later witness, but if the details were

11  different but some of the themes were the same, repeated

12  references to Barry and Michael in different contexts,

13  repeatedly or similar hallucinations about leaving the walls or

14  leaving the prison and you had ten examiners -- he was not

15  medicated -- concluding that he -- testifying in a competency

16  hearing that he was malingering, that might have some effect,

17  would it not?

18  A.   It depends upon what I find about the description of the

19  voices --

20  Q.   Okay.  Okay.

21  A.   -- and in detail and about what they are talking about --

22  Q.   Okay.

23  A.   -- yes, it could.

24  Q.   Okay.  What we'll do is go through -- all right.  Here's an

25  example, Tab 55, and maybe this will help.

Nathan - Cross by Mr. Corcoran

1          *MR. CORCORAN:*  I apologize, Your Honor.

2   BY MR. CORCORAN

3   *Q.*  This is a particularly long exchange that I would like to

4   show you.  Okay.  This is a competency evaluation.  It's dated

5   October 27th, 1993, from a Dr. Silverman.

6          *THE COURT:*  Exhibit number again?

7          *MR. CORCORAN:*  I apologize, Your Honor.  It is 55, Tab

8   55, and I'm looking at pages 14 through 16.

9   BY MR. CORCORAN

10  *Q.*  And basically we'll start here with paragraph --

11  "Mr. Eldridge stated that he was born in Nebraska.  When asked

12  about his mother and father, he began crying and eventually

13  stated, 'I don't want to talk about them.'  He acknowledged

14  that he has brothers and sisters and indicated he does not know

15  how many brothers and sisters he has.

16          "When asked about school, he stated, 'It's hard

17  for me to talk to people I don't know.  It's hard.  It's

18  hard.'"

19          Let me ask you to stop there.  Do evasive answers

20  to questions, "I don't know," "I don't remember," in the

21  abstract, not necessarily in this case, is that a sign of

22  malingering possibly?

23  *A.*  It would raise an index of suspicion about malingering.

24  *Q.*  Okay.  It does.  Okay.

25          Mr. Eldridge stated that he had never been

Nathan - Cross by Mr. Corcoran

1   married.  Hold on.  Where is -- here we go.  I apologize.

2                   When asked what he is currently charged with --

3   if we can move this down, up here -- Mr. Eldridge stated that

4   they say I did some bad stuff.  He stated that he's accused of

5   hurting his little girl, Chirrsa, and her mother, Cynthia.

6   When asked if either of them were badly hurt, he stated, "I

7   don't know.  People won't even talk to me."

8                   When asked if he's accused of killing anyone,

9   Mr. Eldridge stated, "She say Cynthia, but that ain't true,

10  because I talk to Cynthia."

11                  Would you agree -- I'll stop there.  Would you

12  agree that he has in more recent times suggested that he has

13  seen and talked to Cynthia in very recent times in TDCJ?

14  A.  I am not aware of that.

15  Q.  Okay.  You're not aware of that.  So, you haven't seen that

16  in reports?

17  A.  I haven't.

18  Q.  Okay.  "He went on to state that Cynthia comes to see him

19  every now and then in his cell."  And I'm going to stop there.

20  Would you describe that as a delusion or as a hallucination, if

21  somebody is coming to see him in his cell every day?  The

22  Cynthia, by the way, is the decedent.

23  A.  It would be both a delusion as well as a hallucination.

24  Q.  Okay.

25  A.  But it's a delusion based upon a hallucination --

Nathan - Cross by Mr. Corcoran

1  Q.  Okay.

2  A.  -- if it is -- the veracity is true.

3  Q.  And, again, you were not aware of whether these kinds of

4  assertions were made to clinicians in TDCJ about Cynthia?

5  A.  I'm not aware.

6  Q.  Okay.  He went on to state that -- I'm sorry.  I'll

7  continue.  "He stated that she sometimes brings his daughter

8  and sometimes by herself.  When asked if Cynthia is dead, he

9  stated, 'It's not true.'  Upon further discussion, Mr. Eldridge

10  provided detailed information regarding his relationship with

11  Cynthia and other events and circumstances that occurred prior

12  to his arrest."

13          Page 16 -- so I'm now going to page 16, if I can

14  find it.  In conclusion -- oh, here we go.  Let's go up one

15  thing.  Let's make sure it's there.  The first thing it says,

16  "He was described as alert and exhibiting no psychotic

17  symptoms.  He was discharged from the treatment unit with no

18  evidence of Axis I disorder, no evidence of a treatable mental

19  illness, and an Axis II diagnosis of antisocial personality

20  disorder.

21          "In conclusion, the results of this evaluation

22  indicate that Mr. Eldridge is malingering.  He continues to

23  feign symptoms of mental illness in an effort to avoid criminal

24  prosecution and responsibility for his criminal behavior.

25  Although he may have learned from my earlier evaluation to make

Nathan - Cross by Mr. Corcoran

1  his clinical presentation less dramatic and more believable,

2  his presentation is still not consistent with any known mental

3  disorder.  What was most striking during this current interview

4  was his ability to communicate in a very clear, coherent,

5  articulate, and appropriate manner when providing information

6  to the examiner that he thought might be self-serving."

7           Now, there's a few things in this paragraph that

8  I would like to talk about.  The -- well, the last issue.  If

9  somebody is goal oriented -- what does goal oriented mean

10 first?  Can you explain just briefly?

11 A.  If they want to present in such a way that achieves a

12 certain goal in their mind.

13 Q.  Okay.  If somebody is goal oriented about explaining their

14 hallucination or delusion, is that a red flag?  Is that

15 something to watch out for?

16 A.  Yes.

17 Q.  And that appears to be what this examiner said happened; is

18 that correct?

19 A.  That is correct.

20 Q.  What about this issue with Mr. Eldridge apparently becoming

21 better at presenting less dramatic feigned mental illness?  Is

22 that something that you sometimes see in malingerers?

23 A.  Yes, we do.

24 Q.  Okay.  And this information here -- well, let me take a

25 step back.  If you accept hypothetically, because we're not

1  going to get into at this point whether or not he made these

2  statements about seeing the decedent in his cell, et cetera, if

3  you assume that those are in the medical records, TDCJ medical

4  records, and you saw this with similar themed feigned delusions

5  or at least a conclusion by this man, would that have caused

6  you to reconsider or reevaluate your decision about

7  malingering?

8  *A.*  It will, except for the fact that he is also on injection

9  B-12.  And because sometimes dementia caused due to pernicious

10  anemia can also present like this.

11  *Q.*  Okay.  Let me ask you something about that.  And it does

12  appear in some of your electronically signed medical records

13  that you do "NO" -- and what does NO stand for --

14  *A.*  NOS?

15  *Q.*  -- I'm sorry, RO?

16  *A.*  Rule out.

17  *Q.*  Rule out.  You do occasionally refer to anemic conditions.

18  So, you are looking at -- does that mean you're looking at

19  both?

20  *A.*  Correct.

21  *Q.*  Okay.  So, you're prescribing psychotic medication but also

22  looking to see if that's the cause?

23  *A.*  Correct.

24  *Q.*  Okay.  Okay.  Still I'm going to go back to -- actually I

25  don't know if I'm going -- yes, this is Tab 56 and it's --

Nathan - Cross by Mr. Corcoran

1      THE COURT:  How much longer do you think you'll be on

2  cross?

3      MR. CORCORAN:  Well, I hope to get through two or

4  three more of these and then I want to go to one other section.

5  So, probably 90 minutes tops, maybe less.

6      THE COURT:  90 more minutes?

7      MR. CORCORAN:  90 more minutes.

8      THE COURT:  All right.  We'll take a 15-minute break.

9      MR. CORCORAN:  Okay.  Thank you, Your Honor.

10      THE COURT:  Thank you.

11      THE WITNESS:  Thank you, Your Honor.

12      (Recess from 10:36 a.m. to 10:51 a.m.)

13      THE COURT:  Go ahead and take the stand, please, sir.

14          Go ahead.

15                  **CROSS-EXAMINATION CONTINUED**

16  BY MR. CORCORAN

17  Q.  This is from Tab 56, just like page 155, and if you would

18  read with me, "Patient appears dysphoric, claiming to know

19  nothing about court, crime, et cetera, but wants to leave the

20  jail.  Didn't discern any psychotic features and had no

21  complaints.  Will transfer."  And then it says, "There is no

22  evidence of mental illness.  Patient is a known malingerer and

23  has no place on the psyche unit.  Discharge to the general

24  population."

25                  Did I read that accurately?

Nathan - Cross by Mr. Corcoran

1  A.  That's what the records say.

2  Q.  Okay.  This is page 156, Tab 56, dated 1-6-19 -- looks like

3  '94.  Starting here, "Thought processes were organized, clear,

4  and goal directed.  Consumer reported symptoms are not typical

5  of someone who is psychotic."

6          And then he says something, "verbalized feeling

7  better."  This is a couple of days later.  "Also stated that he

8  sometimes sees a werewolf chasing him.  Still very vague about

9  his history and criminal history, yet remembers emotional and

10  physical abuse by father.  Still suspects consumer is a

11  malingerer."

12          Is that correct?

13  A.  That is what it says.

14  Q.  This is page 157 of Tab 56.  "Seen today for weekly

15  session.  Consumer states that he doesn't know where he came

16  from, who his parents are, or who he is."

17          Now, can I stop there for a second?  Is that a

18  red flag of malingering?

19  A.  That would suggest malingering.

20  Q.  Okay.  Continuing, "He was able to name some of his

21  brothers.  Respondent" -- something -- "the only thing he can

22  remember is much violence.  When asked to describe or explain

23  what he means, he responded, 'I don't know.'  Stated that he is

24  actively hallucinating as we spoke."

25          Let me stop it there.  Is that an atypical

Nathan - Cross by Mr. Corcoran

1  hallucination that is a red flag for malingering?

2  A.  That is a red flag.

3  Q.  Continuing, "Could see demon flying.  Described demons as

4  being white, having wings, and flying around the room snatching

5  people.  Also said he could see himself on a tower falling.

6  Reported actively hearing his brother speak to him."

7                 And let me stop there.  He routinely has reported

8  in the 2009 to 2011 period actively his brother speaking to

9  him; is that correct?

10 A.  That is my understanding.

11 Q.  Okay.  Continuing, "Reported being able to have

12 simultaneous visual hallucinations as he spoke to me."

13 A.  Can you scroll it up a little bit.

14 Q.  Oh, I apologize.  Please remind me if I make that mistake.

15 A.  Okay.

16 Q.  "Reported being able to have simultaneous visual

17 hallucinations as he spoke to me.  States he does not know he

18 is in jail."

19                 And I'm ending it there.  Has he reported in the

20 2009 to 2011 period in the TDCJ records that he didn't know he

21 was in prison?

22 A.  That is correct.

23 Q.  Okay.  This is page 158 of Tab 56.  It seems to say, "Just

24 anxious, feel better," that's in quotes.  "Otherwise, he is

25 very vague about complaints.  Won't answer when asked if he

Nathan - Cross by Mr. Corcoran

1  sees or hears things.  Becomes verbally abusive to team as

2  interview progresses."

3                Let me stop there.  Is that a sign of malingering

4  when one becomes verbally abusive or challenges the clinicians

5  in this context?

6  A.  That would be suggestive of malingering.

7  Q.  Okay.  "No symptoms of psychotic process or content.  No

8  neuro" -- I don't know if you can read that word --

9  A.  Neurovegetative symptoms and signs.

10 Q.  Okay.  I'm sorry.  Go ahead.  What does it say?

11 A.  No neurovegetative symptoms and signs of depression.

12 Q.  Okay.  Maybe you can continue reading it.

13 A.  Oh.  "Impression:  Highly suspect malingering.  Does not

14 appear to be psychotic or suffering from Axis I."

15 Q.  And --

16 A.  And I guess they also include supposedly a comma and major

17 depressive disorder.

18 Q.  Okay.  Let's go to this.  This is Tab 56, jail psych page

19 164.  Maybe you can read it.

20 A.  "Able to describe in detail his reported visual

21 hallucinations.  Visual hallucinations were in action."

22 Q.  Can I stop you there?  What does that mean "in action"?

23 A.  I do not know.  I'm assuming that he means that he was

24 actively hallucinating at that time when he was seeing him.

25 Q.  Okay.

Nathan - Cross by Mr. Corcoran

1   A.  But that's an assumption on my part.

2   Q.  Can you continue?

3   A.  "Seeing his brother loading and unloading a truck.

4   Consumer also reported himself helping brother load truck.

5   Reported symptoms are not typical of individuals with a

6   psychotic disorder but someone who is making an attempt to

7   manipulate, deliberately exaggerate symptoms."

8   Q.  Okay.  And that ends there.  Would you -- are you aware of

9   in the 2009 to 2011 TDCJ medical records, that he has often

10  stated that he is loading a truck with his brother when he's

11  outside the prison walls?

12  A.  I'm not aware of that particular symptom, but I am aware

13  that he said that he was going out working with his brothers --

14  Q.  Okay.

15  A.  -- doing pipefitting.

16  Q.  Okay.  Understood.  Okay.  This is the competency hearing.

17  What tab is this?

18       MS. ODEN:  57.

19  BY MR. CORCORAN

20  Q.  Tab 57.  And it has a Bates number of 274.  And lines 8

21  through 25, this is Dr. Silverman answering a question.  He was

22  one of the forensic psychiatrists or psychologists that

23  examined him.  He says, "Well, Mr. Eldridge has also -- has

24  also around the time I saw him consistently refused

25  psychological testing.  This is another hallmark of

Nathan - Cross by Mr. Corcoran

1  malingering, I would say.  It's rare to see mentally ill people
2  who really don't want to do the psychological testing.  Now, if
3  they're really paranoid, really suspicious, they would
4  sometimes refuse, but Mr. Eldridge does not really exhibit any
5  paranoid traits, at least in terms of feeling that the staff or
6  someone like that was going to harm him or that the other
7  inmates around him were going to harm him, which is what you
8  typically see.  He would make general statements about don't
9  let them kill me, things like that, but he never indicated that
10  he was threatened by any of the staff or any of the other
11  inmates, which is again inconsistent."
12          And would you agree that consistency, again, is a
13  feature in terms of the displayed characters or symptoms --
14  inconsistency is a sign of malingering?
15  A.  It's suggestive of malingering.
16  Q.  If -- let me take a step back.  Could a patient -- could a
17  malingerer who was aware of this testimony choose to display
18  the symptoms that this testimony suggests were missing as part
19  of the malingering diagnosis?
20          Let me say it this way:  This suggests that the
21  failure to have paranoid delusions about the guards was a sign
22  that there wasn't actually a psychosis, which more strongly
23  supported the conclusion that he was malingering; is that
24  accurate?
25  A.  Can you repeat the question?

Nathan - Cross by Mr. Corcoran

1  *Q.*  Maybe I can read it to you.  It seems to suggest that

2  Mr. Eldridge did not have paranoid traits in conjunction with

3  the other claimed symptoms, and it describes the feeling that

4  the staff or someone like that was going to harm him or that

5  other inmates were going to harm him.  That's used as an

6  example of a paranoid state, that if -- the lack of that

7  symptom made malingering much more easy to diagnose.  Is that a

8  fair interpretation?

9  *A.*  At this point in time, when I saw Mr. Eldridge --

10  *Q.*  Right.

11  *A.*  -- he did say that the security officers were poisoning

12  him.

13  *Q.*  Understood.  Could he have learned from this -- could a

14  malingerer hypothetically have learned from this testimony to

15  present with that symptom in order to avoid a diagnosis of

16  malingering?

17  *A.*  Hypothetically it is possible.

18  *Q.*  It is possible.

19  *A.*  But I cannot say in this case.

20  *Q.*  Sure.  Understood.  This is Tab 23, page 256, and I just

21  bring this up to clarify.

22      *MS. ODEN:*  There's the zoom button.

23  BY MR. CORCORAN

24  *Q.*  There we go.  Reading at the "S" here, this is -- the date

25  is -- let me actually put that here.  The date is April 7th,

Nathan - Cross by Mr. Corcoran

1  2010; is that correct?

2  A.  That is correct.

3  Q.  And this is a form, a TDCJ form, something --

4  A.  Correct.

5  Q.  -- that you-all use?

6  A.  Yes.

7  Q.  Okay.  And starting at S, it says, "I don't --" this is a

8  quote apparently?

9  A.  If you move up to the top, I can say which unit and who

10  wrote it.  It's Jester IV notes.  Okay.

11  Q.  Okay.  So, this appears to say, "I don't know why I'm here.

12  How did I get back here?  I was just sitting at the table with

13  my wife when they came and got me."

14                    That's in quotes; is that correct?

15  A.  Correct.

16  Q.  Is that consistent --

17             THE COURT:  And the date again?

18             MR. CORCORAN:  Excuse me.  The date is April 7th 2010,

19  Your Honor.

20             THE COURT:  Thank you.

21  BY MR. CORCORAN

22  Q.  The fact that's in quotes suggests that that's a paraphrase

23  of what Mr. Eldridge said to the examiner?

24  A.  That is the idea.

25  Q.  Okay.  "The patient maintains that he was somehow pulled

Nathan - Cross by Mr. Corcoran

1  from one setting to another.  He is spending time writing a pen

2  pal and asked for help with spelling.  He wants to know what to

3  tell her about why he is here and what is being done for him."

4           Would you agree that that is an atypical

5  hallucination?

6  A.  It's inconsistent generally with psychosis.

7  Q.  It is?

8  A.  If that is what you're asking.

9  Q.  So, when you hear a patient say that, what do you -- and

10  this is Mr. Eldridge, what would you conclude?

11  A.  Based on this one, the index of suspicion of malingering

12  will go up.

13  Q.  Would go up.  Okay.  And why is that?

14  A.  Because if he is not aware of why he's here, that means it

15  says that his orientation and understanding of the place

16  context is somewhat distorted and he's writing a pen pal

17  asking -- telling them what is going on here, that indicates he

18  knows where here is.

19  Q.  Understood.

20  A.  However, in the later portion, you're stopping eating

21  because they were putting food in the -- poison in the food,

22  that is contradictory to the earlier statement.

23  Q.  Understood.  The dosage of Thorazine that you, I guess,

24  subscribed -- or prescribed to Mr. Eldridge, how would you

25  characterize the clinical range in terms of its power?

Nathan - Cross by Mr. Corcoran

1    A.  It's fairly high doses.

2    Q.  Fairly high.  What's the highest dosage that you have ever

3    ramped up to?

4    A.  A thousand milligrams.

5    Q.  What is the time frame, let's say, in the lower dosages

6    that you gave Mr. Eldridge, what is the time frame in which you

7    would expect a therapeutic effect?

8    A.  It can take anywhere from two to four weeks.

9    Q.  Two to four weeks.  So, if there is a change to

10   Thorazine -- let's speak hypothetically initially -- a change

11   to Thorazine and within two days there is a report that the

12   symptoms have completely gone away, would it be fair to assume,

13   hypothetically, that it was not the Thorazine that caused the

14   positive symptoms to diminish?

15   A.  At least there will be a strong suspicion that this is not

16   due to the medication.

17   Q.  Okay.  If -- and I'm not prepared here to go beyond a

18   hypothesis here, but if the records indicated that Mr. Eldridge

19   often displayed very quick and rapid turnarounds after changes

20   in Thorazine dosage -- and by that I mean the symptoms quickly

21   dropped -- what would that suggest to you, hypothetically?

22   A.  That probably we are not dealing with a genuine

23   schizophrenia.

24   Q.  Okay.  When you respond to e-mail, I think you testified at

25   one point that -- well, explain how that works.  An e-mail from

Nathan - Cross by Mr. Corcoran

1  who, cell side, how does that --

2  A.  The psychology department does routine rounds.  I mean,

3  there are several category of people who go and do rounds in

4  the death row.  One is the nursing, who will do regularly

5  rounds to see whether anybody is suffering from anything and

6  they'll report it to the psychology department.

7           The psychology department also sends their social

8  worker to do rounds I think every -- twice a week or something.

9  And if they notice something, then they'll call a psychologist

10  to go and do the rounds and see this particular person.  And

11  when they both think that something is wrong or even if the

12  social worker thinks, as in this case, they will send an e-mail

13  and say, Dr. Nathan, we are noticing this kind of abnormality,

14  side effects, or deterioration, whatever they're seeing, and

15  then I might adjust the medication based on what they're

16  reporting.

17  Q.  When you testified about loose associations, do you

18  remember, because I don't know, whether the loose associations

19  you're referring to in Mr. Eldridge were communicated to you

20  through that kind of e-mail?  Was it that?

21  A.  The looseness association was a diagnosis I made when I saw

22  him on telemedicine.

23  Q.  When you saw him.  Okay.

24          MR. CORCORAN:  I am going to Tab 23, Your Honor, page

25  170.

Nathan - Cross by Mr. Corcoran

1      *THE COURT:*  Thank you.

2    BY MR. CORCORAN

3    *Q.*  Can you describe what this?

4    *A.*  It's a progress note from Jester IV on November the 30th,

5    2009.

6          *THE COURT:*  Tab 23?

7          *MR. CORCORAN:*  Tab 23, Your Honor, page 170.

8          *THE COURT:*  Okay.  Thank you.

9    BY MR. CORCORAN

10    *Q.*  Okay.  So, can you read it?  It says under the progress

11    update, it says, "Not doing too good.  My family don't listen

12    to me."

13    *A.*  That is what it says.

14    *Q.*  How would you characterize -- what is he saying there?

15    *A.*  When he says "not doing too good," that shows some

16    self-awareness about what is going on with him.

17    *Q.*  Okay.  What about, "My family don't listen to me"?

18    *A.*  I don't have a particular inference out of me --

19    *Q.*  Okay.

20    *A.*  -- but from what you have said so far or implied, his

21    family were the victim, so.

22    *Q.*  Okay.  Could it mean the family, the voices, that part of

23    his family?

24    *A.*  It's possible.

25    *Q.*  Possible.  The reason I ask is that if we look at the

Nathan - Cross by Mr. Corcoran

1  orientation, can you explain what this information means here?

2  A.  Yes.  He says that he's oriented to person, place, and

3  situation, which means he's aware of where he is at and whom he

4  is talking to and the situation under which he is being

5  evaluated.

6  Q.  So, would you characterize that as a relatively positive --

7  is he doing well in this table?

8  A.  Yes and no, because they also say thought process is

9  illogical.  And hallucinations, reports seeing his relatives in

10  the cell.

11  Q.  Okay.

12  A.  So, there are factors which says he's oriented.  There are

13  also factors that says he's hearing things.  Can you show me

14  who is signing this so we'll have an idea?

15  Q.  Oh, absolutely.  Hold on.  Page 171.  It is -- it looks

16  like --

17  A.  Okay.  Psychologist.  Okay.  Janet.

18  Q.  But as I understand what you're saying here, is he's having

19  hallucinations.  He's seeing his relatives in the cell, and yet

20  he's oriented.  He's calm.  His appearance is good.  His

21  insight, I guess, is limited.  His speech is clear and

22  coherent.  Unremarkable motor problems.

23  A.  And they assess thought process is illogical.

24  Q.  Is illogical, sure.  But would you typically -- a

25  schizophrenic that reports seeing and hearing his relatives, I

Nathan - Cross by Mr. Corcoran

1  guess just a moment ago, is it typical that this person does so

2  well otherwise?  They're so organized?

3  *A.*  It is not common.

4  *Q.*  It is not common, is it?

5  *A.*  No.

6  *Q.*  Would that suggest at least a red flag in terms of

7  malingering?

8  *A.*  From what you have said so far and shown me so far, it is

9  beginning to make more of a suspicion.

10  *Q.*  Okay.  And then we're on page -- or Tab 23, page 174.  And

11  where am I looking here?  Okay.  So, this is -- can you -- I

12  guess, is this the first page?  Can you tell me what this is?

13  *A.*  Oh, this is the psychosocial evaluation when he was

14  admitted.

15  *Q.*  Okay.  And the date, December 1st, 2009?

16  *A.*  That is what it looks like.

17  *Q.*  Okay.  So, reading from -- in the mental status portion,

18  "He was ambulatory with a normal gait and posture.  He was

19  dressed in a paper gown and remains on B-1 pod.  His grooming

20  and hygiene were questionable.  He refused to shower this

21  morning.  Ability for self-care was adequate.  He came

22  voluntarily to the interview.  He was cooperative with the

23  interview process.  His attitude toward the interviewer was

24  polite.  Rapport was adequately established and maintained.

25  Motor behavior was unremarkable.  Eye contact was poor.  Speech

Nathan - Cross by Mr. Corcoran

1   was clear, coherent, and overproductive.  Mood was depressed.

2   Affect was mood congruent.  The patient reported his appetite

3   as, "I try to eat."  He complained of sleep disturbances.  He

4   denied --" I'm skipping here.  "He denied any self-mutilating

5   or self-suicidal ideation.

6           "The patient --" I'm skipping here to, if we can

7   see it, "The patient was future oriented.  Be glad when the

8   Lord comes back and everybody finds out what's going on.

9   Thought processes, as evidenced by speech, were circumstantial,

10  tangential, and paranoid.  Thought content consisted of topics

11  relevant to interview situation and his flights of ideas with

12  paranoid themes.  He complained of auditory hallucinations,

13  which consisted of people attacking me, coming up to my door

14  and there's nobody there."

15          Let me stop there.  Do you interpret people

16  attacking me as a tactile, audio and visual hallucination?

17  A.  The description is not clear whether it's his thought

18  process or whether it was a hallucination.

19  Q.  What does that say when the hallucination and the delusion

20  are difficult to understand?  Does it say anything to you in

21  terms of the difficulty you have as a clinician understanding

22  what he's saying?

23  A.  It could mean several things.  It could mean that he has

24  brain damage, so he's not able to express it.  It could mean

25  that he's malingering, so he's not giving any details.

Nathan - Cross by Mr. Corcoran

1   *Q.* But there's no evidence of brain damage, is there, sir?

2   *A.* So far I haven't seen anything.

3   *Q.* Okay.

4   *A.* Other than that he was treated for B-12 deficiency and

5   pernicious anemia.

6   *Q.* Understood.  And I'm skipping here to, "He complained of

7   visual hallucinations of spaceships of which, he said, 'I know

8   it's real.  We don't come from this world."

9            "The patient was alert, oriented times four to

10  person, place, time, and situation.  He was able to sustain

11  attention during the interview.  Immediate memory was intact.

12  Recent and remote memory were both limited.  The patient's

13  intellectual functioning appeared to be in the average range."

14           Is there a disconnect or an inconsistency with

15  his capacity to be oriented and what he's explaining is

16  happening?

17  *A.* There is a disconnect here.

18  *Q.* Would you expect a schizophrenic, who actually interacted

19  potentially tactically with these -- tactilely with these

20  hallucinations, a short time before this interview to be able

21  to orient in this way and cooperate in such an interview?  Is

22  that common?

23  *A.* Orientation is a different process and perception is a

24  different process.  Now, the orientation can affect the

25  perception, but sometimes it may not affect, because

Nathan - Cross by Mr. Corcoran

1  hallucinations do not necessarily impair orientation.

2      *THE COURT:*  So, where is the disconnect that you

3  described?

4      *THE WITNESS:*  The disconnect here, Your Honor, is

5  where, on one hand, he's having several so-called hallucinating

6  experiences of people attacking him, nobody there, but at the

7  same time where he is completely oriented and they say that

8  he's also tangential and paranoid.  If it was -- if they

9  said -- when you say "tangential," that means there's some

10  looseness of association.  And, so, that's where to me it is

11  not all going in one direction.  If it was -- if it is no

12  looseness of association, that he's completely intact and he is

13  describing all of these hallucinations, I would say he's

14  probably psychotic.  This is a little bit on both sides.

15      *THE COURT:*  Okay.

16  BY MR. CORCORAN

17  *Q.*  I am now -- same tab, and I keep forgetting, Tab 23, page

18  203.  I just wanted to quickly point out --

19      *THE COURT:*  I'm sorry.  What page?

20      *MR. CORCORAN:*  Page 203.

21      *THE COURT:*  203.

22      *MS. ODEN:*  Show the top of the page.

23      *MR. CORCORAN:*  I'm sorry.  Yes.  Well, there's nothing

24  on the top of the page.  I could show the page before.

25      *THE COURT:*  202?

Nathan - Cross by Mr. Corcoran

1      MR. CORCORAN:  Actually let me do that so we can

2  figure out what this is.

3  BY MR. CORCORAN

4  Q.  Okay.  So, this is page 201, which is the part of the same

5  report.  Can you tell me what this is?

6  A.  Follow-up psychiatric evaluation on December 16th, 2009.

7  Now, the previous evaluation which you showed was a copy of the

8  psychologist.  This one you are talking about is a

9  psychiatrist.  Either they cut and pasted that evaluation --

10 that psychological evaluation into these notes.

11 Q.  Okay.

12 A.  This is part of it.

13 Q.  Okay.  Then back to page 203, I'm reading right here.

14 Unfortunately, it looks like it's partly cut off.  I think it

15 says, "I am doing all right.  I am hearing voices of all of

16 you.  You are all discussing to set me up, so that I go off and

17 officers will write me a few more cases that are disciplinary.

18 In addition, I believe all of you are thinking that I am

19 playing games."

20      And let me stop there.  That is a red flag for

21 malingering, is it not?

22 A.  In the context of what you have said so far.

23 Q.  It is?

24 A.  It is.

25 Q.  Because he is essentially fearful or accusing the

Nathan - Cross by Mr. Corcoran

1  clinicians of not believing him?

2  A.  That is correct.  When somebody is suspicious, they are

3  looking at others and when they are saying that you're all

4  playing -- you think that I am playing games, shows some

5  evidence that I'm aware of what you're doing and that does not

6  make it that delusional.  He's aware of what other people are

7  perceiving.

8  Q.  Okay.

9         MR. CORCORAN:  And I think I've got one or two more,

10 Your Honor.

11 BY MR. CORCORAN

12 Q.  Page 214 of Tab 23.  And I'm going to first show page 212,

13 because I believe this is the first page of that report.  What

14 are we looking at here?  Oops.  Sorry.

15 A.  This is the psychiatric evaluation by probably -- I'm

16 assuming that Dr. Patel did it.

17 Q.  Okay.

18 A.  Yes, if I see the signature, I can know who it is.

19         THE COURT:  And the date of it, December 2009?

20         THE WITNESS:  December 23, 2009, that's right, yes.

21         THE COURT:  All right.  Thank you.

22 BY MR. CORCORAN

23 Q.  Okay.  And actually I'm looking at the wrong one.  I

24 apologize.  We're going to go to 233.  Okay.  Page 233.  And I

25 will show you the first page of the report -- this is page 231,

Nathan - Cross by Mr. Corcoran

1  if you can maybe explain what that is.

2  A.  It's a follow-up psychiatric evaluation.  I don't know by

3  who though.  At the bottom of the page or at the end of these

4  notes, it will show who signed it.

5  Q.  Okay.  If we look at page 233 --

6  A.  Okay.

7  Q.  -- it looks like he is saying that he is not doing well.

8  "I am still hearing the voices of my brother, Michael.  I also

9  hear voices of three other unfamiliar males.  These voices

10  aren't telling me to speak or not to speak with my family.

11  They talk about bad things happening to my family.  They want

12  me to fight with my brother, Michael, and I do not know why.  I

13  hear these voices all the time as they are attacking me."

14          And I'll stop there.  Any idea -- is he

15  suggesting that they're physically attacking him?  Do we know

16  what that is?

17  A.  There's no evidence to suggest that they're physically

18  attacking.  It will be a verbal attack.

19  Q.  Okay.  "I eat my meals.  I sleep well.  I take my

20  medications.  I do not have any side effects.  I do not want to

21  hurt others or myself.  I went to see the dentist for a

22  toothache."

23          And then I'll point you down here.  I think it

24  says, "Security staff report:  This patient has maintained in

25  his ADLs, showers, ate his offered meals, and follows given

Nathan - Cross by Mr. Corcoran

1  directions."

2           Hypothetically speaking, if somebody has

3  apparently four voices that are -- I don't know if they're

4  inside or outside of his head talking to him, that that is a

5  pretty serious psychiatric condition, is it not?

6  A.  It would suggest that he's actively psychotic.  And it

7  would be hard for him to maintain all the ADLs and showers.

8  Q.  It would be?

9  A.  It would be.

10  Q.  So, that is inconsistent with -- the staff report is

11  inconsistent with the voices?

12  A.  It does not -- one does not go with the other one.  It

13  contradicts each other.

14  Q.  Okay.  Then if we go down to this table here and I would

15  like to just go through it, what is this table, this mental

16  status table?

17  A.  Mental status.

18  Q.  Okay.  It talks about orientation was intact to person,

19  place, time, and situation.  His appearance was appropriate.

20  His hygiene was well-kept.  Psychomotor was not increased or

21  decreased.  Behavior was cooperative.  Eye contact was good.

22  Speech was spontaneous.  And what does NL mean?  Spontaneous

23  NL?

24  A.  Oh, normal range.

25  Q.  Okay.  Normal range, rate, and volume.  Mood was euthymic.

Nathan - Cross by Mr. Corcoran

1  Does that mean positive?

2  A.  Within normal levels.

3  Q.  Okay.  Affect was normal range and intensity, stable --

4  A.  No, what he's saying -- this is the side which is showing

5  what it should be, and he's dysphoric, meaning feeling a little

6  depressed.

7  Q.  Okay.  So, he's a little depressed there.  I apologize.

8          The affect was constricted; is that right?

9  A.  That is what's marked.

10  Q.  The sensorium was clear.  And here the thought process was

11  listed as coherent, logical, and goal directed.  The thought

12  content was appropriate.

13  A.  That is correct.

14  Q.  Hallucinations, obviously, auditory.  Delusions, suspicious

15  and paranoid.  And then no suicidal or homicidal ideations.

16  Judgment -- and I'm not sure what this last thing is, but they

17  were both improving --

18  A.  Insight.

19  Q.  -- insight were improving.  Is there a disconnect, sir,

20  between -- an inconsistency between the way he presents to this

21  examiner and what he says is happening?

22  A.  There is a disconnect.

23  Q.  It's inconsistent?

24  A.  It is.

25  Q.  And it supports a theory of malingering, does it not?

Nathan - Cross by Mr. Corcoran

1   *A.  It raises a suspicion.*

2   *Q.  A suspicion?*

3   *A.  For me to say this is malingering, I should have evaluated*

4   *him, said this and I saw this, then I can make a diagnosis.*

5   *Q.  I understand.*

6   *A.  Otherwise, all that I can say is suspect.*

7   *Q.  I'm not asking you to change.  I'm just trying to figure*

8   *out if it would change -- well, it would change your approach,*

9   *that's all.*

10  *A.  Okay.*

11  *Q.  Okay.*

12          *MR. CORCORAN:*  Hold on one second, Your Honor, please.

13  *A.  One caveat though.  He was on medications at this time,*

14  *also.*

15  *Q.  Understood.  But you're not sure -- you cannot testify*

16  *today within a reasonable level of scientific certainty that he*

17  *was taking his medication, can you?*

18  *A.  I cannot.*

19  *Q.  And explain again how it is that the medication is*

20  *distributed.  Just to the cell door; is that right?*

21  *A.  That is correct.*

22  *Q.  Could he flush the medication down the toilet?*

23  *A.  If somebody was not -- if the medication aide dropped it*

24  *and left it there and then moved on to the next person rather*

25  *than making sure that he swallowed it, it can happen; or if*

Nathan - Cross by Mr. Corcoran

1  they cheek it and spit it out, it can happen.

2  Q.  So, within a reasonable range of scientific certainty, you

3  can't say that the medication was the reason that these

4  symptoms were or were not happening?

5  A.  I cannot say that, no.

6  Q.  All right.

7          MR. CORCORAN:  Your Honor, I would only ask that

8  exhibit -- the hearing exhibit that has the list, I would like

9  to introduce it for Court.  It had the list of the difference

10  between --

11          THE COURT:  Of clinical and forensic?

12          MR. CORCORAN:  -- clinical -- if there's no objection.

13          MS. FERRY:  I don't object to that.

14          MR. CORCORAN:  I think he confirmed most of it.

15          THE COURT:  Okay.  How are you marking it?

16          MR. CORCORAN:  Respondent's exhibit -- is it --

17          MS. ODEN:  68.

18          MR. CORCORAN:  68, Your Honor.

19          THE COURT:  68 is admitted without objection.

20          MR. CORCORAN:  And --

21          THE COURT:  Are you passing the witness?

22          MR. CORCORAN:  I think I'm passing the witness.  Yes,

23  I am, Your Honor.

24          THE COURT:  All right.  Redirect?

25          MS. FERRY:  If I could have two minutes, Your Honor, I

Nathan - Redirect by Ms. Ferry

1 | can be more efficient.

2 |         *THE COURT:*  All right.

3 |         *MS. FERRY:*  Thank you, Your Honor.

4 |                     **REDIRECT EXAMINATION**

5 | BY MS. FERRY

6 | *Q.*  Now, Dr. Nathan, at the beginning of your cross-examination

7 | you were asked questions about the DSM-IV-TR and the V code for

8 | malingering.  Let me ask you this:  When you began treating

9 | Mr. Eldridge, you were obviously aware that he was a death row

10 | inmate; is that right?

11 | *A.*  Yes, I was.

12 | *Q.*  And I assume that meant that during the entire course of

13 | your treatment you were aware that he could have an external

14 | incentive to feign; is that right?

15 | *A.*  That is always a possibility.

16 | *Q.*  And you testified you're particularly aware of it with

17 | inmates at TDCJ, right?

18 | *A.*  Yes, I did.

19 | *Q.*  Now, you also talked -- discussed pressure to avoid --

20 | within TDCJ and UTMB, to avoid the malingering label, right?

21 | *A.*  It was there earlier on, but currently there's no pressure

22 | to diagnose malingering or not to diagnose malingering.

23 | *Q.*  And just to make sure I am clear, that pressure not to

24 | diagnose malingering, that was not present during the course of

25 | Mr. Eldridge's treatment?

Nathan - Redirect by Ms. Ferry

1  *A.* No, it was not.

2  *Q.* And, Dr. Nathan, tell us why that pressure not to

3  diagnose -- not to make a conclusion of malingering, tell us

4  why that pressure existed.

5  *A.* If I understand your question correctly, there was a

6  penchant for people to diagnose people with malingering and

7  some of them were schizophrenics and they were deteriorating

8  and then either they attempted suicide or they were repeatedly

9  hospitalized with the duration in functioning.  And to avoid

10 that, that was why the edict was that you should not diagnose

11 with malingering.

12 *Q.* And am I correct, then, that when you talk about that

13 penchant to diagnose malingering, do I take it, then, that

14 mental health staff at the jail were then overdiagnosing

15 malingering because of the fact that folks were at the jail?

16 *A.* I'm assuming you're talking about the prison system?

17 *Q.* Yes.  I'm sorry.  I was saying "jail," but I meant at TDCJ.

18 *A.* There is also a penchant when somebody is saying something,

19 that it could be due to malingering.

20 *Q.* Now, Dr. Nathan, you were also asked about whether you

21 conducted a face-to-face in-person evaluation of Mr. Eldridge.

22 And you said, no, you conducted all of your evaluations through

23 the telemed link, correct?

24 *A.* That is correct.

25 *Q.* Am I correct that every social worker at the Polunsky unit

Nathan - Redirect by Ms. Ferry

 1  who sent you a note conducted a face-to-face interview with

 2  Mr. Eldridge?

 3  A.  The social worker and the psychologists, they all conducted

 4  face-to-face evaluations.

 5  Q.  All of the mental health case workers at the Polunsky unit

 6  were face-to-face?

 7  A.  That is correct.

 8  Q.  And am I correct that every single mental health staff

 9  member at the Jester IV unit who evaluated Mr. Eldridge and

10  created a record, that every one of those people saw

11  Mr. Eldridge face-to-face?

12  A.  That is correct.

13  Q.  Now, I want to ask you a question about what's now been

14  admitted as Respondent's Exhibit 68, and specifically I want to

15  ask you here about No. 9, advocacy of the evaluator.  And when

16  you were asked about clinical advocacy of the evaluator, that

17  in a clinical setting one advocates for the person; and as I

18  understand it, your testimony was that that would not

19  accurately describe your role as the treating psychiatrist at

20  the Polunsky unit; is that right?

21  A.  That is correct.

22  Q.  And explain to us why it was not your role at the Polunsky

23  unit to advocate for Mr. Eldridge?

24  A.  This is generally applicable to private practice or other

25  situations where the treating person gets to identify a lot

Nathan - Redirect by Ms. Ferry

1  with the person and starts advocating for their position.  In

2  the prison system, it is more impersonal --

3  Q.  It's more -- I'm sorry?

4  A.  Impersonal.

5  Q.  Impersonal.

6  A.  -- and they've already been convicted of a crime.  And, so,

7  some of the mental complaints do not exactly ring true with the

8  treating person, also.  So, usually, unless they are really

9  connected to them on a regular basis -- I've seen him barely

10  four times in my entire nine months, and that's not enough of a

11  personal contact to advocate for a person.

12  Q.  And, so, do I understand, then, that your testimony is

13  that you had -- you had an impersonal relationship with

14  Mr. Eldridge; is that right?

15  A.  That's correct.

16  Q.  You were not personally invested in seeing that he was

17  diagnosed with a mental disorder and that he was treated with

18  antipsychotic medication; is that right?

19  A.  My clinical opinion said that he needed to be treated, but

20  if somebody denied that, I won't get my feelings hurt, if

21  that's what you're asking.

22  Q.  Yes, that is what I'm asking.

23          Now, you also testified about symptoms of mental

24  illness that are more or less difficult to malinger.  And as I

25  understand your testimony, looseness of association is a

Nathan - Redirect by Ms. Ferry

1   positive symptom of mental illness; is that right?

2   A.  That is correct.

3   Q.  And am I correct that looseness of association -- that it's

4   your testimony that looseness of association is one of the most

5   difficult symptoms to malinger?

6           THE COURT:  By "to malinger," do you mean to fake?

7           MS. FERRY:  To feign, yes, yes.

8           THE COURT:  All right.

9   A.  Yes.

10  BY MS. FERRY

11  Q.  To feign.  And to be clear, you personally found evidence

12  that Mr. Eldridge exhibited looseness of association?

13  A.  That was my opinion when I saw him initially.

14  Q.  And am I also correct that other mental health staff

15  documented during the period that Mr. Eldridge was being

16  treated at TDCJ, also documented looseness of association?

17  A.  I saw documentation to that effect.

18  Q.  Now, you also testified that as a general matter, the

19  negative symptoms of schizophrenia are also difficult to feign;

20  is that right?

21  A.  Among those, the three major negative symptoms are alogia,

22  amotivation, and flattening of affect.  Flattening of affect is

23  generally surmised, because they are not reacting.

24  Q.  Is generally what, I'm sorry?

25  A.  They are not reacting to the circumstance, not connecting

Nathan - Redirect by Ms. Ferry

1   with you, not expressing their emotions in an appropriate

2   manner.

3           THE COURT:  Is that hard to feign?

4           THE WITNESS:  It is -- it is more easily

5   misunderstood, a possibility, because if they don't react, then

6   that could be due to several reasons.  It is rather unusual for

7   somebody to be completely connected with someone through a

8   telemedicine equipment, also.  So, if the patient doesn't

9   connect, then I'm going see it as affective blunting.  But it's

10  possible that it is because of the circumstance.  However, it

11  is also possible that that person has lost their connectivity,

12  an affective connectivity.

13  BY MS. FERRY

14  Q.  Has lost -- I'm sorry, I just missed the last word.

15  A.  Has lost the connectivity emotionally and not able to

16  express.

17  Q.  Okay.

18          THE COURT:  Hang on one second.  I don't think I got

19  an answer to my question.

20          THE WITNESS:  Yes, Your Honor.

21          THE COURT:  You said that flat affect can be a result

22  of the fact that you are remotely communicating?

23          THE WITNESS:  Yes, ma'am.

24          THE COURT:  It can also be an absence of connecting --

25          THE WITNESS:  Yes, ma'am.

Nathan - Redirect by Ms. Ferry

1          *THE COURT:*  -- or reacting?  Is it -- on the scale

2     that you've described generally, is it harder or easier to

3     feign than, say, looseness of association?

4          *THE WITNESS:*  If the person withholds their

5     information, withholds being connected, that's easily -- I have

6     seen other prisoners act like that, not necessarily feign, but

7     they don't connect with their examiner.  But that necessarily

8     is not a symptom which I'll give high weightage in terms of

9     mental illness, but the looseness of association, I give high

10    weightage.

11    BY MS. FERRY

12    *Q.*  You give high what, I'm sorry?

13    *A.*  Weighting, high weighting.

14    *Q.*  High weighting.  Okay.

15    *A.*  Yes.

16    *Q.*  Now I want to you ask some of the pretrial --

17         *THE COURT:*  Can I interrupt first and let me ask one

18    other question --

19         *THE WITNESS:*  Yes, Your Honor.

20         *THE COURT:*  -- and then I'll give you both a chance to

21    follow up.

22              Some of the questions on cross-examination

23    portrayed a very long history of what was diagnosed or

24    described as malingering.

25         *THE WITNESS:*  Yes, Your Honor.

Nathan - Redirect by Ms. Ferry

1          *THE COURT:*  What is the -- what does the literature

2    show about the long-term effects of malingering in a context

3    such as death row, that is, is there any evidence in the

4    literature that the malingering itself becomes hard for the

5    person to leave behind or to turn off at will, that it becomes

6    a habit of behavior and thought so that the line between the

7    malingered behavior and the real behavior itself becomes

8    blurred and harder to separate both for the observer and for

9    the individual?  Does that make sense as a question?

10         *THE WITNESS:*  Yes, ma'am.  Yes, Your Honor, it does.

11   I'm just thinking of whether we have any literature or whether

12   I'm aware of it.  I'm not aware of any literature, but it is

13   possible if somebody has reacted in a particular manner for so

14   long, that they cannot go beyond the role of how they have

15   portrayed it in the past.

16         *THE COURT:*  Does that mean it's not malingering?

17         *THE WITNESS:*  Not necessarily.  It could mean that

18   they are maintaining the same story as it were.

19         *THE COURT:*  Even if it's started out as malingering?

20         *THE WITNESS:*  Even if it started out as malingering.

21   The other scenario is that the person has malingering as well

22   as a mental illness.

23         *THE COURT:*  So, they can coexist?

24         *THE WITNESS:*  They coexist.

25         *THE COURT:*  And is that something that you've seen

Nathan - Redirect by Ms. Ferry

1  before in the prison context?

2      *THE WITNESS:*  Yes, ma'am.  And they are -- to give an

3  example, they are obviously clinically depressed, but they're

4  talking about hearing voices, which is bizarre, it's atypical,

5  but they know something is wrong, but if they say, "I'm

6  depressed," they may think that you won't treat the depression.

7  So, they're malingering some other mental illness and then you

8  have to figure out what is going on.

9      *THE COURT:*  If there are legal proceedings imminent

10  that would have consequences that are rationally viewed as

11  quite negative for the individual, is that another set of

12  circumstances that can be associated with a combination of

13  malingering and other symptoms?

14      *THE WITNESS:*  It is quite possible.  Even a mentally

15  ill person is aware of some things.

16      *THE COURT:*  Go ahead.

17  BY MS. FERRY

18  *Q.*  And, Dr. Nathan, I want to ask you a couple of follow-up

19  questions about that exchange you just had with Judge

20  Rosenthal.  And the first is, you gave the example of how

21  malingering and genuine mental illness can coexist, because a

22  person could be depressed but could be feigning symptoms of

23  schizophrenia, right?

24        But is it also possible, Dr. Nathan, that a

25  person could, in fact, be schizophrenic but could be

Nathan - Redirect by Ms. Ferry

1   exaggerating symptoms, which would qualify as feigning?

2   A.  Yes, it's possible.

3   Q.  Okay.  And let me ask you this:  Does the

4   literature support the statement, "Once a malingerer, always a

5   malingerer"?  In other words, is it appropriate to say that

6   because a person malingered in one situation in the past, that

7   a tag of malingering should apply to that person for all

8   circumstances in the future?  Would that be appropriate?

9   A.  In the prison system at least we have to evaluate each

10  circumstance as a person and see whether there's any evidence

11  of malingering or mental illness at each cross section of time.

12  It is not appropriate to say that somebody is diagnosed as

13  malingering and they'll always be considered as malingering.

14  They could develop new symptoms.  Something else may happen.

15  Q.  And let me ask you this:  Is one reason that is the case,

16  what you just said, you have to evaluate each individual time,

17  because of what I just mentioned, that a person could say 16

18  years in the past have exhibited some genuine signs of

19  psychosis, feigned, exaggerated symptoms, and at a point in the

20  future exhibit genuine symptoms of psychosis?  That scenario is

21  possible, correct?

22  A.  Can you repeat the question again?

23  Q.  Okay.  So, let's take a hypothetical.

24  A.  You're not talking about him?  You're talking about a

25  hypothetical situation?

Nathan - Redirect by Ms. Ferry

1   *Q.*  Right, we're talking about a hypothetical.  Let's say that

2   a person -- a criminal defendant, pretrial, is exhibiting some

3   symptoms of psychosis, but at the same time exaggerates his

4   symptoms.  So, he is, in fact, feigning symptoms of mental

5   illness.  Okay?

6   *A.*  That is correct.

7   *Q.*  And let's say at 16 years in the future that person -- that

8   same person exhibits signs of psychosis, that he reports

9   auditory hallucinations, that he reports paranoia delusions, et

10  cetera.  It's completely possible that that person who was

11  found to have been feigning in the past could at the present be

12  demonstrating genuine symptoms of psychosis, correct?

13  *A.*  That is possible.

14  *Q.*  Now, let me just ask you a few questions about some of the

15  older records that you were asked about on cross-examination.

16  You were shown some pretrial records documenting that

17  Mr. Eldridge said -- when asked very basic questions, that

18  Mr. Eldridge's response was, "I don't know.  I don't know,"

19  even to questions like, who are your parents and who he is.

20  Did Mr. Eldridge in these 2009 or 2011 TDCJ records, did he

21  respond to questions by saying, "I don't know.  I don't know.

22  I don't know"?

23  *A.*  Well, some of those questions we did not ask either, so.

24  *Q.*  Right.  But when Mr. Eldridge was asked questions, is it

25  documented that his response was, "Oh, I don't know the answers

Nathan - Redirect by Ms. Ferry

1   to any of the questions you're asking me"?

2   A.   That is not the overall impression that I got, that he was

3   saying, "I don't know."

4   Q.   And you were also asked about a pretrial record showing

5   that Mr. Eldridge when he was asked questions became verbally

6   abusive with the treatment staff.   Is that documented in the

7   2009 and 2011 TDCJ records?

8   A.   I did not see any evidence of it.

9   Q.   And let me also ask you this:   You were shown -- you were

10  shown some of the 2009, 2011 TDCJ records, including a number

11  of records from the Jester IV unit on cross-examination.   Do

12  you recall that obviously, correct?

13  A.   Yes, I do.

14  Q.   Now, those records where you said, you know, I do see here

15  how there could be a disconnect, those are records generated

16  during Mr. Eldridge's six-month period of inpatient treatment,

17  correct?

18  A.   That is correct.

19  Q.   When he was being closely observed face-to-face with mental

20  health staff, right?

21  A.   That is correct.

22  Q.   And none of those Jester IV records document concerns about

23  malingering; is that right?

24  A.   I did not see any suggestion to that.

25  Q.   There was never any record -- it was never documented in

Nathan - Redirect by Ms. Ferry

1   any of those records the treatment staff said, you know what,

2   maybe we should stop giving him his antipsychotic medication,

3   correct?

4   A.   That is correct.

5   Q.   And that's never documented in any of his records from the

6   Polunsky unit either, correct?

7   A.   That is correct.

8   Q.   Now, let me ask you this, Dr. Nathan, as a general matter,

9   both at Jester IV and at the Polunsky unit, is the prescription

10   of antipsychotic medications, is that taken seriously?

11   A.   Yes, it is.

12   Q.   In other words, are antipsychotic medications given out

13   if -- are antipsychotic medications prescribed if there are

14   concerns about a patient being -- about an inmate malingering?

15   A.   No, they are not.

16   Q.   What sort of -- what sort of level of certainty do you and

17   the other staff psychiatrists have to have about the

18   genuineness of a patient's reported symptoms before you

19   prescribe antipsychotic medications?

20   A.   In legal terms, at least a high probability.

21   Q.   And let me ask you this:  You were asked some questions

22   about whether you can say with certainty that Mr. Eldridge

23   was, in fact, taking his medication.  Is it ever documented in

24   Mr. Eldridge's TDCJ's records that he was seen flushing his

25   medication down the toilet?

Nathan - Recross by Mr. Corcoran

1  *A.*  No, it is not.

2  *Q.*  Is it ever documented that he was seen giving his

3  medication to another inmate?

4  *A.*  No, it is not.

5  *Q.*  Is it ever documented that the mental health staff even had

6  a suspicion that he was not taking his medication?

7  *A.*  No, it is not documented as such.

8       *MS. FERRY:*  If I could have just one moment, Your

9  Honor?

10       *THE COURT:*  Certainly.

11       *MS. FERRY:*  That's all I have right now, Your Honor.

12       *THE COURT:*  All right.

13       *MR. CORCORAN:*  Very briefly, Your Honor.

14                    **RECROSS-EXAMINATION**

15  BY MR. CORCORAN

16  *Q.*  If the records, the TDCJ records from 19 -- or 2009 to 2011

17  show that his medical compliance was 80 percent, wouldn't that

18  reflect that he was not taking his medications?

19  *A.*  80 percent?

20  *Q.*  At 80 percent.

21  *A.*  It would show that he is taking it 80 percent of the time.

22  *Q.*  80 percent.  So, he is not compliant then, is he?

23  *A.*  He is not compliant 20 percent of the time.

24  *Q.*  Okay.

25  *A.*  Or is it not proved 20 percent of the time.

Nathan - Recross by Mr. Corcoran

1  *Q.*  Understood.  But if they do show that, then he is not

2  compliant, at least that much; is that correct?

3  *A.*  For TDCJ purposes, 80 percent is considered as compliant to

4  medication.

5  *Q.*  But he's not taking all of his medications?

6  *A.*  He is not taking it 20 percent of the time, yes.

7  *Q.*  Okay.  You were asked a hypothetical about a circumstance

8  in which an inmate might have some legitimate mental illness

9  and a concern for malingering and the desire to treat the

10  underlying mental illness and not necessarily worry so much

11  about the feigned part of the presentation.  Hypothetically

12  speaking, if an individual on death row you believe has an

13  underlying mental illness but is feigning two facts, one, that

14  they're not in the prison, during the day they go off someplace

15  and go to work and feigning whether or not they believe the

16  victim is in the cell with them and they interact and drink

17  coffee or do whatever with this person, so that they're

18  malingering those two issues, what does it say about the

19  rational thought process of that patient, that they know to

20  feign those two issues?  Does it say anything?

21       *MS. FERRY:*  Your Honor, I object to that question,

22  because it goes to the ultimate issue for which Dr. Nathan, as

23  he's testified, has not conducted an evaluation -- a forensic

24  evaluation of competence.

25       *THE COURT:*  I think he can answer this question.  I'm

Nathan - Recross by Mr. Corcoran

1  a little unclear why it is different from a lot of the other

2  questions that have been asked of this witness.

3  BY MR. CORCORAN

4  Q.  Do you remember the question?

5  A.  Would you repeat it.

6  Q.  Essentially the notion is if you have somebody with

7  underlying mental issues that you believe, hypothetically

8  speaking, are malingering, this is a death row inmate,

9  malingering on whether or not they're in the prison and working

10  someplace else, on the one hand, that delusion or hallucination

11  and, on the other hand, whether the victim, is their delusion

12  or hallucination, may be in the cell, so you don't believe

13  those two particular presentations, does it say anything about

14  the rationality of the decision to feign those two issues with

15  respect to that death row inmate?

16  A.  You're talking about a hypothetical situation?

17  Q.  Hypothetically.

18  A.  Well, somebody could have mental illness and still have

19  certain rational capacity, if that is what you're asking.

20  Q.  Right.  And would it be rational for a person on death row,

21  hypothetically speaking, to feign those two issues, even though

22  they might have an underlying mental illness?

23  A.  It is a possibility, yes.

24  Q.  And if they're doing it because they know that they gain a

25  benefit, doesn't that show they're rational, at least with

Nathan - Recross by Mr. Corcoran

1   respect to those two prongs?

2   A.   In the hypothetical, if they're feigning it to gain an

3   advantage, that would show rational thinking.

4   Q.   It would, wouldn't it?

5   A.   It's hypothetical thinking, but one can't apply it to this

6   person.

7   Q.   Understood.   If someone is -- in terms of the question

8   about the 20-year-old symptoms, the determinations of

9   malingering, if the themes about some of the symptoms are

10  similar over time, maybe they present a little different but

11  the same individuals, whether it's a voice or multiple

12  personality, if that connection is there, doesn't that make --

13  I think you've testified, make it a little more relevant for a

14  present evaluation?

15  A.   It would.

16  Q.   It would, wouldn't it?

17              If somebody -- how long do you typically spend

18  tele -- is it tele --

19  A.   Telemedicine.

20  Q.   -- telemedicine with an inmate, not necessarily

21  Mr. Eldridge, but with an inmate like Mr. Eldridge?

22  A.   I think with Mr. Eldridge, I spent something, like, 35, 40

23  minutes on the first evaluation.

24  Q.   Okay.   Would you agree that in terms of loose association,

25  that it may be easier to feign loose association for shorter

Nathan - Recross by Mr. Corcoran

1  periods than it would be for much longer periods?

2  A.  Yes, it would.  I mean, if you -- a typical forensic

3  evaluation could take up to four hours, four or five hours.

4  Q.  Okay.  But in the prison system, you don't necessarily have

5  that --

6  A.  Ours is a treating orientation and not a forensic

7  evaluation.

8  Q.  And getting back, it's not up to that question that

9  directed to the difference in terms of your ability to work for

10  the client.  That's not an ethical issue for you.  That's a

11  systemic problem with, I guess, TDCJ.  If you could spend more

12  time to advocate for the inmate, you would; is that correct?

13  A.  If we could, but we don't have usually the time.  We have

14  long -- a lot of caseload and we have a lot of people to see.

15  Q.  With respect to the -- I think there was a suggestion that

16  the "I don't know" was more common 20 years ago, that statement

17  at the beginning, with Mr. Eldridge to an interviewer, let's

18  say, versus in the clinical notes, the recent clinical notes,

19  would you agree that those notes reflect him often saying, "My

20  memory is bad"?  Is that a repeated refrain in the cell side

21  interviews, let's say, where he will tell an examiner, that my

22  memory is bad.  I have poor memory, or don't you know?

23  A.  I'm not aware of him saying that.  If you can show me the

24  note, then I can figure --

25  Q.  Okay.  Let me ask you hypothetically.  If the records did

Nathan - Recross by Mr. Corcoran

1  demonstrate that he often initiated cell side interviews by
2  saying, "My memory is bad," isn't that a lot like saying, "I
3  don't know"?
4  A.  Usually people with genuine memory loss are not aware that
5  they've lost their memory.
6  Q.  Say that again, I'm sorry.
7  A.  People with genuine memory loss, are not aware that they
8  have memory disturbance.
9  Q.  Understood.  The other line of questioning had to do with
10 the J4, Jester IV clinical diagnoses and with respect to, I
11 guess, there's no malingering diagnosis in those documents that
12 we were discussing earlier.  But I think I heard you testify
13 that there were signs, there were red flags that supported a
14 potential at least inquiry into the malingering diagnosis at
15 Jester IV.  Didn't you testify to that?
16 A.  There were some inconsistencies in what they were saying,
17 that the patient was well-oriented and saying that patient was
18 oriented, at the same time they were saying his circumstantial
19 and tangential and saying that -- there was one other thing
20 which I'm not able to remember.
21 Q.  Right.
22 A.  If you put up that note, I can show you or --
23 Q.  Which one was it?
24 A.  That was the psychological evaluation done by Ms. Janet
25 Ditsky.

Nathan - Further Redirect by Ms. Ferry

1   *Q.*  Okay.

2   *A.*  But there were some inconsistencies, if that's what you're

3   asking.

4   *Q.*  Right.  Understood.  But there were inconsistencies that

5   would raise red flags?

6   *A.*  Would raise some red flags.

7   *Q.*  I think that may be --

8           *MR. CORCORAN:*  I think that's it, Your Honor.

9           *THE COURT:*  All right.  Anything further?

10          *MS. FERRY:*  Just very, very briefly.

11          *THE COURT:*  All right.

12                  **FURTHER REDIRECT EXAMINATION**

13  BY MS. FERRY

14  *Q.*  Dr. Nathan, you were just asked about whether it would be

15  relatively easy to feign looseness of association over a 35- to

16  40-minute evaluation, clinical evaluation versus over a 4-hour

17  forensic evaluation.  I want to ask you about another question

18  about how easy it is to feign sometimes over a long period of

19  time.  When inmates -- let me ask you this -- and I just can't

20  recall.  Did any of the pretrial records that you were shown

21  during your cross-examination, did any of those involve --

22  *A.*  Ms. Ferry, there was a hypothetical question, as I

23  understood it.

24  *Q.*  Oh, no, I understand just now.  My question was on the

25  first section of cross.  Were you shown any records indicating

Nathan - Further Redirect by Ms. Ferry

1  that Mr. Eldridge was referred for inpatient observation at the

2  Harris County Jail?  I just can't recall if you were shown

3  those.

4  A.  I did not see anything about being referred anywhere.  I

5  don't recall it.

6  Q.  All right.  Well, then let me ask you just as a general

7  matter, is it difficult to feign psychosis during a six-month

8  period of inpatient observation?

9  A.  It is very difficult to feign that.

10  Q.  It's very difficult.  And is it difficult to feign --

11  consistently feign symptoms of psychosis during a

12  two-and-a-half-year period of treatment?

13  A.  It will be difficult to feign over a period of two and a

14  half years.

15  Q.  And let me just ask you one other question.  You were just

16  asked about whether reports of memory being bad would be

17  suspicious.  As a general matter, are there some

18  neuropsychological deficits that typically accompany

19  schizophrenia?

20  A.  It can happen with schizophrenia as well as pernicious

21  anemia.

22  Q.  And is one of those deficiencies in the area of memory?

23  A.  Yes.

24        MS. FERRY:  That's all I have, Your Honor.

25        THE COURT:  Thank you.  May this witness be excused?

1              *MS. FERRY:*  Yes, Your Honor.

2              *MR. CORCORAN:*  Yes, Your Honor.

3              *THE COURT:*  All right.  Thank you, sir.  You're free

4    to leave.

5              *THE WITNESS:*  Thank you, ma'am.

6              *THE COURT:*  Who will your next witness be?

7              *MS. FERRY:*  Dr. Roman, Your Honor.

8              *THE COURT:*  All right.  It's now 12:00.  Is this -- I

9    mean, what makes more sense in terms of the schedule?  Should

10   we break for lunch now, resume at 1:00 o'clock?

11             *MS. FERRY:*  I think that would make the most sense,

12   Your Honor.  I would imagine that Dr. Roman will take most, if

13   not all, of the afternoon for direct.

14             *THE COURT:*  All right.  Okay.  And then we have a full

15   day tomorrow, I assume?

16             *MS. FERRY:*  Actually we will be resting after

17   Dr. Roman.

18             *THE COURT:*  Okay.

19             *MS. FERRY:*  I believe the Court received our advisory

20   about Dr. Estes.

21             *THE COURT:*  Yes.  All right.  So, is it safe to assume

22   that we will conclude all of the evidence at the end of the day

23   tomorrow?

24             *MS. ODEN:*  I would imagine so, Your Honor, at least

25   evidence for their case.

1          THE COURT:  I'm asking -- my question was all of the
2     evidence.
3          MS. ODEN:  Oh, no, not in the remotest possibility,
4     Your Honor.  We may not even be done on Wednesday.
5          THE COURT:  Then we're going to have to reschedule,
6     because we have some conflicts at the end of the week.
7          MS. ODEN:  Okay.
8          THE COURT:  Okay.  So, look at your calendars and
9     we'll talk about how to do that as soon as you come back.  All
10    right.
11         MS. ODEN:  May I ask, Your Honor, is it the situation
12    that --
13         THE COURT:  Thursday and Friday are unavailable.
14         MS. ODEN:  Thursday and Friday?
15         THE COURT:  Yes, ma'am.
16         MS. ODEN:  Great.  Thank you.
17         THE COURT:  All right.  Thank you.
18       (Lunch recess from 12:01 p.m. to 1:00 p.m.)
19         THE COURT:  All right.  Your next witness?
20         MS. FERRY:  Call Dr. Roman, Your Honor.
21         THE COURT:  Have him come on up.
22         THE WITNESS:  Good afternoon, Your Honor.
23         THE COURT:  You were previously sworn, I believe?
24         THE WITNESS:  Yes.
25         THE COURT:  Go ahead, please.

Roman - Direct by Ms. Ferry

1      *(Michael A. Roman, petitioner's witness, previously sworn.)*

2                          **DIRECT EXAMINATION**

3    BY MS. FERRY

4    *Q.*  Will you please state your name for the record?

5    *A.*  Michael Roman.

6    *Q.*  And what is your profession, Dr. Roman?

7    *A.*  I'm a clinical psychologist, with a specialty in

8    neuropsychology.

9    *Q.*  And is this your CV at Petitioner's Exhibit 3?

10   *A.*  It is.

11   *Q.*  Is that an accurate summary of your education, training,

12   and experience?

13   *A.*  It is.

14   *Q.*  Now, Dr. Roman, you have a Ph.D. in clinical psychology; is

15   that correct?

16   *A.*  That is correct.

17   *Q.*  And if you could just very briefly summarize your

18   postdoctoral education for us.

19   *A.*  Sure.  So, after getting my Ph.D., I did a postdoctoral

20   fellowship in neuropsychology, with a specialization in

21   pediatric neuropsychological at the Medical College of

22   Wisconsin.  Following that I began in private practice, and

23   more recently I have completed a two-year postdoctoral

24   certification in clinical psychopharmacology.

25   *Q.*  Now, Dr. Roman, you said a moment ago that you're a

Roman - Direct by Ms. Ferry

1  neuropsychologist.  Explain to us what exactly that means.
2  A.  Neuropsychologists are involved in looking at functional
3  aspects of behavior.  We typically are involved in looking at a
4  wide range of things relating to neurological injury and
5  functional capacity, but one of the things that makes
6  neuropsychology different than most other branches of clinical
7  psychology is that we specialize in looking at aspects of
8  things like memory and attention and higher level learning and
9  other cognitive processes.
10 Q.  And as a neuropsychologist, what is your experience -- your
11 experience with administering and scoring neuropsychological
12 measures?
13 A.  My experience is pretty extensive.  I don't know if you
14 want me to trace that or --
15 Q.  Why don't I ask you this:  How many neuropsychological
16 evaluations would you estimate you've conducted over the years?
17 A.  Two, perhaps 3,000.
18 Q.  And I understand that you draw a distinction between
19 evaluations and assessments.
20 A.  I do.
21 Q.  Would you explain what that distinction is?
22 A.  The terms can certainly be used interchangeably, but when I
23 think about it, virtually every individual we see, every
24 patient we see, one evaluates.  An evaluation might not involve
25 more than a detailed interview in some cases, or it might

Roman - Direct by Ms. Ferry

1  involve some questionnaires.  I think about an assessment as a
2  more involved process.  It's not unusual for a
3  neuropsychological evaluation to take anywhere from 4 to 12
4  hours to complete.  So, I make that distinction.
5  Q.  Now, Dr. Roman, are their aspects of your training and your
6  experience as a neuropsychologist that make you particularly
7  well suited to address the question of competence for
8  execution?
9  A.  I certainly think so.
10 Q.  And could you tell us -- tell us why.
11 A.  The issue behind competence for execution, as I understand
12 it, deals with the idea of a rational understanding.  And in
13 order to look at aspects of higher level cognitive functioning
14 and to rule out other potential factors that could potentially
15 be considerations within that question, I think a knowledge of
16 neurology, functional cognitive abilities, and the other things
17 that are within the domain of neuropsychology are most
18 appropriately suited for examining those things.
19 Q.  Now, Dr. Roman, do you hold any licenses?
20 A.  I do.
21 Q.  How are you licensed?
22 A.  I am licensed as a psychologist in the state of Texas, and
23 I also hold a license as an LSSP, a licensed specialist in
24 school psychology in the state of Texas.
25 Q.  And are you a member of any professional organizations?

Roman - Direct by Ms. Ferry

1  A.  I am.  I am actively a member of the American Psychological

2  Association and a member of Division 40, which is the

3  neuropsychological subsection.  I've held some other

4  memberships, but I don't participate in them actively.

5  Q.  Now, Dr. Roman, how do you currently spend the majority of

6  your professional time?

7  A.  The majority of my time is spent in direct patient

8  services.  In some cases it's traditional psychotherapy.  In

9  many cases it's consultation or assessment services.  I deal

10  with a wide variety of patients.  Approximately half my

11  practice is adult and half my practice is child and adolescent.

12  I have a very wide-ranging clientele in my practice.

13       THE COURT:  Is this the first case in which you've

14  opined on these issues?

15       THE WITNESS:  It is not.

16       THE COURT:  How many have you done before?

17       THE WITNESS:  In terms of competency to be executed,

18  Your Honor, one other case.

19       THE COURT:  All right.  And what was the name of that

20  case?

21       THE WITNESS:  It was Jeffery Lee Wood was the

22  plaintiff -- was the petitioner in that case.

23       THE COURT:  All right.  Was there a written opinion?

24       THE WITNESS:  There was a written opinion, yes, ma'am.

25       THE COURT:  Thank you.  Was it in this district?

Roman - Direct by Ms. Ferry

1          *MS. FERRY:*  It was in the Western District, Your

2     Honor.

3          *THE COURT:*  All right.  Thank you.  How high up did it

4     go?

5          *MS. FERRY:*  I understand that it's being appealed to

6     the Fifth Circuit currently.

7          *THE COURT:*  So, it's currently on appeal?

8          *MS. FERRY:*  Yes, Your Honor.

9          *THE COURT:*  Okay.  Thank you.

10    BY MS. FERRY

11    *Q.*  And, Dr. Roman, in addition to the one prior competency for

12    execution evaluation you conducted, I understand that you've

13    previously conducted evaluations to determine competency to

14    stand trial; is that correct?

15    *A.*  Yes, I have.

16    *Q.*  And have you also done forensic work in a civil context as

17    well?

18    *A.*  I have.

19    *Q.*  Now, Dr. Roman, has forensic work been a major part of your

20    practice in recent years?

21    *A.*  It is not.  It's a portion of my practice, but it's not the

22    most significant portion of what I do.

23    *Q.*  And why is that?

24    *A.*  A couple of reasons.  A lot of my prior experience with

25    forensics was due to an office location in the Hill Country

Roman - Direct by Ms. Ferry

1  where I saw a lot of people connected with the juvenile justice

2  system.  I've since closed that office, so I don't see as many.

3  Neuropsychologists are relatively rare.  I may be the last man

4  standing who sees kids in the San Antonio area.  So, we get

5  lots of referrals from lots of different subgroups, and I don't

6  do as much forensic work.

7  Q.  And, Dr. Roman, have you previously been qualified to

8  provide expert testimony in both state and federal courts?

9  A.  Yes, I have.

10  Q.  Now, Dr. Roman, you're being paid for your work in this

11  case, correct?

12  A.  I certainly hope so.

13  Q.  And what is the hourly rate that you're charging in this

14  case?

15  A.  $150 per hour.

16  Q.  What's the hourly rate that you typically charge for

17  forensic work -- and let me ask you this, for forensic work in

18  a civil context?

19  A.  I charge $300 per hour.

20  Q.  And, Dr. Roman, how much funding has been approved by the

21  Court for your work over the entire life of the Eldridge case?

22  A.  I'm not sure that I know the answer, but I believe the

23  answer is $18,000.

24  Q.  Does $19,000 sound right?

25  A.  That sounds like that could certainly be accurate.

Roman - Direct by Ms. Ferry

1  Q.  Now, Dr. Roman, you were present for Dr. Nathan's testimony
2  this morning, correct?
3  A.  Yes, I was.
4  Q.  And am I correct that you do not have -- well, let me ask
5  you this way:  If this hearing should last for an entire four
6  full days, will you have sufficient funding to be present for
7  four full days of this hearing?
8  A.  Not based on the amount that's been currently allocated.
9  Q.  And let me ask you -- oh, actually if I can just have a
10  moment.
11          Now, Dr. Roman, Petitioner's Exhibit 4 and 4A,
12  those list all the records that you've reviewed for this case;
13  is that correct?
14  A.  Obviously it's hard for me to say whether everything is on
15  there.  Those would be reflected in the two reports that I
16  wrote, but it does look like an accurate list, yes.
17  Q.  And in addition to reviewing all of those documents -- oh,
18  let me ask you this, 4A, those are some additional documents
19  that you reviewed in the week prior to this hearing; is that
20  correct?
21  A.  Now, you said 4A -- oh, I see.
22  Q.  The final page of exhibit --
23  A.  Okay.
24  Q.  -- Exhibit 4; is that right?
25  A.  Yes, ma'am, that's correct.

Roman - Direct by Ms. Ferry

1   *Q.* Now, in addition to reviewing those documents, you've

2   conducted evaluations of Mr. Eldridge, correct?

3   *A.* Yes, I have.

4   *Q.* And did those evaluations consist of administering

5   psychological instruments to Mr. Eldridge and conducting three

6   separate clinical interviews?

7   *A.* Yes, that's correct.  The second one was administering

8   psychological tests.  The other two were exclusively interview

9   based.

10  *Q.* And are the notes you took during those interviews and the

11  raw data that you compiled, are those found at Petitioner's

12  Exhibit 5?

13  *A.* Yes, they are.

14  *Q.* And are Petitioner's Exhibits 1 and 2 the reports that you

15  wrote as a result of your record review and your evaluations of

16  Mr. Eldridge?

17  *A.* Yes, they are.

18  *Q.* Dr. Roman, let's talk about the standard that you've

19  applied in your evaluations.  Is the standard of competence for

20  execution, is that a judicial creation or is that a

21  psychological standard?

22  *A.* It is a judicial definition.

23  *Q.* And I see -- well, let me ask you this:  You're not a

24  lawyer, correct?

25  *A.* I'm not a lawyer.

Roman - Direct by Ms. Ferry

1  *Q.*  And I see at the top of Petitioner's Exhibit 4, that one of

2  the documents you reviewed was the motion for stay of execution

3  and supplement with exhibits; is that right?

4  *A.*  That is correct.

5  *Q.*  And I assume that you read the pages of that amended

6  petition that discuss the Supreme Court cases of *Ford v.*

7  *Wainwright* and *Panetti v. Quarterman*; is that right?

8  *A.*  That's correct.

9  *Q.*  But am I correct that you have not read those opinions

10  themselves?

11  *A.*  I believe that I've read some portions of those opinions,

12  but I indeed have not read the full opinions.

13  *Q.*  Now, am I correct that the standard you applied in coming

14  to your conclusion that Mr. Eldridge is not competent for

15  execution is found here at page 1 of Petitioner's Exhibit 1,

16  that's your initial report, this first highlighted paragraph,

17  "Mr. Eldridge's attorneys argue that Mr. Eldridge lacks a

18  rational understanding of the reason for his conviction and

19  execution because his mental condition precludes him from

20  accurately perceiving, interpreting, and/or responding

21  appropriately to the world around him"; is that right?

22  *A.*  That is correct.

23  *Q.*  And that standard gave rise to the three questions you've

24  listed here in the next paragraph.  No. 1, does Mr. Eldridge

25  demonstrate evidence of a diagnoseable mental illness; No. 2,

Roman - Direct by Ms. Ferry

1   if such a mental illness exists, does it preclude him from

2   accurately interfacing with reality; and, No. 3, if an

3   impairment in reality testing exists, does it preclude him from

4   having a rational understanding of the reason for his

5   conviction and execution in a manner that would suggest he is

6   incompetent to be executed.

7                Are those the questions that guided your

8   evaluation of Mr. Eldridge?

9   A.   Yes, they did.

10  Q.   Now, does the standard for competence -- for incompetence

11  for execution, does it have a temporal component?

12  A.   Insofar as the question has to do with whether the

13  individual is competent at a given point in time, yes, I

14  believe that would constitute a temporal component.

15  Q.   And is the standard for incompetence concerned with

16  present -- present rational understanding?

17  A.   That is my understanding, it is present rational

18  understanding.

19  Q.   Now, let's talk for a moment about what the standard for

20  incompetent for execution doesn't require.  Does Mr. Eldridge

21  have to be continually psychotic to be incompetent?

22  A.   No, he doesn't.

23  Q.   And can a person have some basic factual awareness of his

24  situation and still be incompetent for execution?

25  A.   It is my belief and understanding that that's the case.

Roman - Direct by Ms. Ferry

1   Q.  And, Dr. Roman, at this point I don't want to get into the
2   facets of Mr. Eldridge's factual understanding, but without
3   getting into the particulars, does Mr. Eldridge, in fact,
4   demonstrate some factual awareness of his situation?
5   A.  Yes, I believe it's clear he does.
6   Q.  Now, let's turn to the first of the three questions and the
7   standard you applied, the question of whether Mr. Eldridge has
8   diagnoseable mental illness.  Based on your reports, it's my
9   understanding that you agree with the TDCJ mental health staff
10  who have diagnosed Mr. Eldridge with schizophrenia, correct?
11  A.  I do agree with that.
12  Q.  And where are the diagnostic criteria for schizophrenia
13  found?
14  A.  Well, the ones that most people will accept as the current
15  state of affairs in schizophrenic diagnosis is in the
16  Diagnostic and Statistical Manual of Mental Disorders, Fourth
17  Edition, TR.
18  Q.  And I assume that you can consider the DSM-IV-TR a reliable
19  authority for determining those diagnostic criteria; is that
20  right?
21  A.  Yes, I do.
22  Q.  And, Dr. Roman, I'm putting here on the overhead page 312
23  of the DSM-IV-TR.  And can you tell me, the blowup there on the
24  easel, is that a copy of the diagnostic criteria from page 312,
25  the diagnostic criteria for schizophrenia?

Roman - Direct by Ms. Ferry

1  *A.*  It is.

2  *Q.*  And are those -- well, actually let me ask you this:  I

3  would like you to define some of the terms in these diagnostic

4  criteria for us.  Define the term negative symptoms, please.

5  *A.*  Negative symptoms are those characteristic symptoms that

6  involve a reduction of symptom functioning.  There are three

7  basic classes of symptoms that are described.  They can have

8  different manifestations.  One is flattened affect.  A person

9  shows less range of emotional responsiveness.

10                Another is alogia.  This deals with the idea

11  typically manifest through language, that a person's thinking

12  and thought processes are slowed.  It's hard to know what a

13  person is thinking unless they verbalize the thoughts that are

14  in their head.

15                And the third is avolition, which deals with the

16  idea that a person is very slowed in their motivations and

17  physical activities.  Initiation of behavior can be a difficult

18  thing to achieve and maintain.

19  *Q.*  And are there also symptoms known as positive symptoms?

20  *A.*  Yes, there are.

21  *Q.*  And could you give us some examples of positive symptoms?

22  *A.*  Examples of positive symptoms?

23  *Q.*  Well, I guess the better question is, explain what positive

24  symptoms are.  What does that refer to?

25  *A.*  Positive symptoms deal with characteristic symptoms that

Roman - Direct by Ms. Ferry

1  are in excess of what one would normally see.  So, they involve

2  things like thought processes that are unusual and bizarre,

3  which are referred to as delusions.  I say "bizarre," but

4  that's probably not the best use of the term.  Delusions are a

5  fixed false belief that persists over time despite reasonable

6  evidence to the contrary.

7            There are also hallucinations, which is an

8  activation of some sensory modality in the absence of anything

9  real that would actually activate that modality.  The most

10 typical are visual and auditory hallucinations.

11           In addition, individuals often show disorganized

12 behavior and/or disorganized thought patterns, again, typically

13 manifested by what they say, since we can't really know what

14 they're thinking in their head at the time.

15 Q.  And, Dr. Roman, I would like you to explain for us the

16 difference between delusions -- excuse me -- and

17 hallucinations, and as an example, I want you to tell us -- I

18 understand that you classify Mr. Eldridge's belief that he

19 leaves the prison to go to work as a delusion and not a

20 hallucination; is that right?

21 A.  That is absolutely correct.

22 Q.  And explain to us why that is.

23 A.  So, a hallucination involves some particular sensory

24 modality.  We typically talk about visual, auditory, and

25 tactile hallucinatory phenomenon.  And it basically involves

Roman - Direct by Ms. Ferry

1   some type of activation of something that one sees, hears, or
2   feels or senses, for that matter, in the absence of there
3   actually being any stimulus to trigger that.  If you see
4   somebody visiting you but nobody else sees them, that would be
5   a hallucination.

6           A belief does not necessarily require that
7   somebody actually sees something.  They may report things that
8   would lead you to believe that they have knowledge of things or
9   that they engage in certain behaviors, but it appears to be
10  something that occurs completely within their mind.  There is
11  no specific evidence to suggest that they have physically seen,
12  physically heard, or physically touched this individual.  They
13  report it more as a memory than as an experience.
14  Q.  And, so, could you speak specifically to why the delusion
15  that Mr. Eldridge leaves -- why his belief that he leaves the
16  prison, why is that more probably classified as a delusion
17  rather than a hallucination?
18  A.  This gets potentially complicated, because there are some
19  neurological misidentification symptoms -- syndromes where such
20  bizarre things could occur, but they are really not at play
21  here.  In order for that to be a hallucination, he would have
22  to essentially have to imagine that while remaining within the
23  confines of death row and within his pod, that he is actually
24  observing these things to happen, that these people -- and he
25  does make some reference to this, but specifically within the

Roman - Direct by Ms. Ferry

1  idea of leaving the prison, that somehow the prison has
2  transformed itself to his home or to his work environment.  It
3  would have to be a perceptual phenomenon, and it's absolutely
4  nonsensical to believe that that's what he's reporting or that
5  that's what he believes.
6  Q.  Now, I also want you to define for us here on the
7  diagnostic criteria for schizophrenia, A4 -- A3, excuse me, did
8  disorganized speech.  Explain to us what that is.
9  A.  A lot of this goes back to the idea of loose associations.
10  So, disorganized speech can occur in a number of different
11  ways, but it basically involves the idea that a person is
12  difficult to follow.  They may be somewhat more tangential,
13  getting off tasks as they talk.  At a more extreme level, they
14  may invent words that don't really exist.  They may speak in
15  incoherent, incomprehensible fashion.  Something that is
16  referred to as "word salad."  But we assume from the
17  disorganized speech that it represents some degree of
18  disorganization of the underlying thought processes.
19  Q.  And, finally, this term "grossly disorganized" or
20  "catatonic behavior," what does that refer to?
21  A.  Well, catatonic behavior is much more of a gross
22  restriction at its extreme form.  There are different types of
23  catatonia.  A person would be totally rigid and would be not
24  moving.  Interestingly this doesn't occur much anymore in
25  western society for whatever reasons.

Roman - Direct by Ms. Ferry

1              The grossly disorganized behavior is rather more

2    characteristic, and it could involve a number of things.   It

3    could involve purposeless, non-goal-directed behavior where one

4    is pacing.   It could involve a variety of nervous movements.

5    It could involve actions that seem bizarre and not directed at

6    any type of a goal-directed outcome.

7    Q.   And, Dr. Roman, what does the term "pathognomonic,"

8    p-a-t-h-o-g-n-o-m-i-c (sic), what does that term mean?

9    A.   I think there's another "o" in that actually.

10   Q.   Oh, I may have misspelled that.   So,

11   p-a-t-h-o-g-o-n-o-m-i-c (sic)?

12   A.   I believe that's right, if I caught all those letters.   It

13   comes from the Greek.   It is an index of a particular type of

14   pathological sign.   And when something is considered to be

15   pathognomonic, it basically means that that is a significantly

16   representational symptom of an underlying disorder.   Sometimes

17   the example is given that if one develops measles -- and I'm

18   sorry to say I forget what those lesions are called, but that

19   is pathognomonic.   If you have those, you have measles, you

20   need to look no further.

21   Q.   And is there a single symptom that is pathognomonic of

22   schizophrenia?

23   A.   There is no single symptom that is characteristic or

24   pathognomonic.

25   Q.   For instance, Dr. Roman, do all schizophrenics display

Roman - Direct by Ms. Ferry

1  prominent negative symptoms?

2  A.  No, they do not.

3  Q.  Now, why isn't it possible to identify a definitive set of

4  symptoms that all schizophrenics share?

5  A.  Well, I guess there could be a couple of reasons, but part

6  of that I think has to do with sheer frequency.  Schizophrenia

7  is a very rare condition to begin with.  We're looking at new

8  incidence rates of perhaps a half percent of the population per

9  year.  And given that we know that symptom presentations are

10 very heterogenous within schizophrenia, the number of things

11 that are listed on the chart and some of the other things that

12 you made reference to in your questions, when you start to

13 subdivide that already very small population, you get a

14 shrinking number of individuals in terms of just simply raw

15 numbers of people who are likely to show some particular

16 syndrome.  So, a relatively rare symptom occurring in an

17 individual who belongs to a relatively rare population becomes

18 a very difficult thing to identify as a solid representation.

19 Q.  Now, let me ask you this, Dr. Roman, I'm putting here page

20 17 of Dr. Allen's initial report, which is State's tab 50, I

21 believe.

22       MS. ODEN:  I think so.

23 A.  It may be 49, if I recall, but those numbers are vaguely

24 familiar.

25 Q.  And we can -- we'll figure that out, which --

Roman - Direct by Ms. Ferry

1        *MS. ODEN:*  Yes, it's 49.

2        *MS. FERRY:*  49.  Thank you.

3    BY MS. FERRY

4    *Q.*  So, page 17 of tab 49 from Dr. Allen's initial report,

5    where he references the typical four As of a psychotic thought

6    disorder:  Autism, ambivalence, associations, and affect.  Are

7    those four As among the diagnostic criteria for schizophrenia

8    in the DSM-IV-TR?

9    *A.*  Obviously some of the portions of those As are contained

10   within other sort of criteria, like the fact that there's an

11   affect of dementia, but, no, indeed, the four As are not part

12   of modern diagnostic for schizophrenia.

13   *Q.*  And does the phrase the four As or this grouping of four,

14   autism, ambivalence, associations, affect, does that appear

15   anywhere in the DSM-IV-TR's whole chapter on schizophrenia?

16   *A.*  I do not believe it does.

17   *Q.*  And you said a moment ago that it's not part of the

18   modern -- you made some reference to the modern diagnostic

19   criteria.  Do you know where this reference to the four As,

20   where that comes from?

21   *A.*  I do.

22   *Q.*  And could you tell us?

23   *A.*  Well, it's actually rather interesting.  It's attributed to

24   Bleuler, I believe it was 1908 in his initial writings.  And

25   there are many who have argued that this is not really the

Roman - Direct by Ms. Ferry

1   point that Bleuler was making.  So, some people who are big

2   Bleuler fans have suggested that he was never a big advocate of

3   the four As.  But classically this is what it comes from, a

4   criteria that's a little bit more than a hundred years old.

5   Q.  Now, we've been talking about how the symptoms of

6   schizophrenia can vary.  Are there nevertheless some

7   neuropsychological deficits that are pretty common with

8   schizophrenia?

9   A.  We're seeing more and more evidence of significant

10  neuropathological and neurocognitive deficits in schizophrenia,

11  yes, ma'am.

12  Q.  And let me ask you this:  Are those -- does the DSM-IV-TR

13  on page 305 state that deficits are evident across a range of

14  cognitive abilities, including memory, psychomotor abilities,

15  attention, and difficulty in changing response set?

16  A.  It does say that.

17  Q.  All right.  Now, I would like to talk with you about the

18  first diagnostic criterion for schizophrenia, which as we see

19  on this blowup over here, is two or more symptoms of delusions,

20  hallucinations, disorganized speech or behavior or negative

21  symptoms of at least a one-month period.  What did you consider

22  to be the most important sources of information for determining

23  that that criterion had been met?

24  A.  Clearly the records, mental health records and other prison

25  records that exist that would document observations, behaviors

Roman - Direct by Ms. Ferry

1  exhibited by Mr. Eldridge.

2  Q.  And just as a general matter, Dr. Roman, why have you paid

3  such close attention to those prison records in the reports

4  that you submitted to the Court?

5  A.  A couple of reasons.  Obviously even though I spent an

6  extensive number of hours with Mr. Eldridge, it is a drop in

7  the bucket compared to the amount of time that he's been

8  incarcerated and certainly doesn't necessarily give me as much

9  of a month's period in order to observe him.  These people see

10 him on a -- well, potentially on a day-to-day basis.  Obviously

11 they may not all see him every single day, but they certainly

12 see him much more regularly.  It definitely speaks to a

13 history.  It speaks to the question of whether it is consistent

14 or inconsistent, whether or not it shows the waxing and waning

15 pattern.  It's really the only reference we have other than

16 attempting to rely on an individual's own self-report for

17 looking at symptomatology.

18 Q.  And, Dr. Roman -- yes, Dr. Roman, are you -- excuse me.

19 Sorry.  Am I correct that the characteristic symptoms to

20 satisfy Criterion A that you concluded Mr. Eldridge has

21 exhibited are delusions, hallucinations, and negative symptoms?

22 A.  You are correct.  There are some other things in the record

23 that speak to other aspects, occasionally disorganized

24 behavior.  Obviously there was some testimony earlier regarding

25 loose associations.  But, yes, delusions and hallucinations,

Roman - Direct by Ms. Ferry

1  which is already two criteria and is sufficient for the
2  diagnosis, definitely are part of my conclusion.
3  Q.  So, let's -- excuse me.  Let's start with the delusions
4  that Mr. Eldridge has exhibited.  And the first delusion I
5  would like to discuss is his delusion related to his belief
6  that the victims of his capital murder are alive and that he
7  has contact with Cynthia Bogany.  And let me direct you to
8  State's tab 55, page 15, which is from Dr. Silverman's
9  October 27th, 1993, competency evaluation, and ask you to look
10 here at the highlighted paragraph on page 15 with me.
11             Is that the first documentation that you saw in
12 the record of Mr. Eldridge reporting that the victims of his
13 capital murder are alive?
14 A.  It is the first reference that I recall seeing, yes, the
15 earliest reference.
16 Q.  And looking at that same paragraph, does it appear that
17 Mr. Eldridge was reporting that belief in response to
18 Dr. Silverman specifically asking him about the facts of the
19 capital murder?
20 A.  It's a bit ambiguous, given that he quotes that, "They say
21 I did some bad stuff," and given my own experience with
22 Mr. Eldridge, I'm assuming, but can't know for sure, that his
23 response was based on a follow-up to the quote of, "I did some
24 bad stuff."  So, I do believe that he had asked directly about
25 that, but I can't know for certain.

Roman - Direct by Ms. Ferry

1  Q.  Now, do you recall seeing this belief, about the victims of

2  the capital murder being alive, do you recall seeing that

3  belief documented in his 2009 to 2011 TDCJ records?

4  A.  Well, partly.  I recall that there is some documentation

5  regarding Cynthia specifically.  To the best of my

6  understanding and recollection, until it occurred again within

7  Dr. Allen's report, I know of no other reference to Chirrsa

8  appearing anywhere else in the record, to the best of my

9  knowledge.  Certainly Cynthia and the specific statement that

10  she is alive appears in the record.

11  Q.  Now, let's talk about Mr. Eldridge's delusion related to

12  food, and that's -- Mr. Eldridge has a delusional belief that

13  guards have attempted to poison him over the years; is that

14  right?

15  A.  I don't know if he still has it, but he has had it.  It's

16  reflected in the record.

17  Q.  He's had it.  Okay.  So, if you will look at me at

18  Petitioner's Exhibit 10 and tell me how far back in the record

19  Mr. Eldridge's report that he thinks someone is putting

20  something in his food, how far back in the record does that

21  appear?

22  A.  My collection is 2001.  And as I look at this, this would

23  comport with that.  It suggests it was February 22nd of 2001.

24  I think I also reference it somewhere in my report.

25  Q.  And, Dr. Roman, is there evidence in the TDCJ records that

Roman - Direct by Ms. Ferry

1  Mr. Eldridge received disciplinary action for behavior related
2  to complaints that his food was being poisoned?
3  A.  There is evidence to that effect.
4  Q.  And is there evidence in the TDCJ records that his food
5  delusions had physical consequences for Mr. Eldridge?
6  A.  Even beyond the discipline, yes, I believe that there is
7  evidence that there were physical consequences.
8  Q.  And if you will look with me on page 6 of Petitioner's tab
9  10, is this -- let me ask you this:  This shows that in
10 February of 2001, which, as we just discussed, is the first --
11 the first time that Mr. Eldridge's food delusion appears in the
12 record, Mr. Eldridge weighed 220 pounds; is that right?
13 A.  That is what that says, yes.
14 Q.  And then if you will look down with me, down on November
15 20th, 2009, do you recognize that as the date that Mr. Eldridge
16 was first evaluated by Dr. Nathan, which immediately preceded
17 his admission to Jester IV?
18 A.  As you say that, yes, that comports with what I recall.  I
19 would not have recalled it of my own volition.  But
20 November 20th sounds like the correct date, yes.
21 Q.  And does this indicate that Mr. Eldridge at that point,
22 that his weight had dropped to 139 pounds?
23 A.  Yes, it does.
24 Q.  And moving back up this chart with me, does this show that
25 in December of 2001, a mere ten months after Mr. Eldridge

Roman - Direct by Ms. Ferry

1  weighed 220 pounds, his weight was down to 163.25 pounds?

2  A.  Yes, it does show that.

3  Q.  Now, let's talk about the issue of Mr. Eldridge's

4  pernicious anemia.  You're aware that Mr. Eldridge was

5  diagnosed with pernicious anemia following a hospitalization in

6  2006; is that right?

7  A.  Yes, I am aware of that.

8  Q.  And you were here when Dr. Nathan was explaining that

9  pernicious anemia is a -- result from a B-12 -- a Vitamin B-12

10  deficiency; is that correct?

11  A.  I do understand that to be true, and I did hear his

12  testimony, yes.

13  Q.  And could you tell us what are the possible causes that can

14  lead one to have this Vitamin B-12 deficiency?

15  A.  There are a couple of different causes for a B-12

16  deficiency.  One can have an inflammation of the gut.  It's

17  always absorbed through the gut.  And inflammation for some

18  people, irritable bowel disease, other such things, can affect

19  it.  One can have difficulty with B-12 absorption because of

20  chronic conditions like Celiac disease or Crohn's disease,

21  independent of whether you're have an active flare-up and

22  irritability at the time or not.

23          Metabolic errors, I believe it's intrinsic factor

24  that is responsible for binding cyanocobalamin, B-12, to the

25  hemoglobin molecule.  And as a function of this, it doesn't

Roman - Direct by Ms. Ferry

1   transport through the bloodstream if there's a deficit
2   intrinsic factor.   These are basically all malabsorption kind
3   of things.
4                There's also some evidence that if you've had a
5   portion of your gut dissected, that could be an issue.   And
6   inadequate dietary intake of B-12, which is only obtainable
7   through animal products, like meat and dairy, can also over a
8   chronic period of time, because B-12 is well stored and those
9   stores need to be depleted, but over a chronic period of time
10  can lead to a decreased availability of B-12.
11  Q.  Now, I understand -- you've read Dr. Allen's initial
12  report, as we discussed a moment ago, and are you familiar with
13  his dismissal of the idea that Mr. Eldridge's food delusion
14  could have caused Mr. Eldridge to stop eating and could
15  ultimately have lead to his B-12 deficiency?
16  A.  I have read his report, and I am familiar with his
17  contention of that.
18  Q.  And what's your response to that, Dr. Roman?
19  A.  Well, obviously he makes an argument that is plausible,
20  that it could be another factor, but I think that it seems a
21  little disingenuous to dismiss that out of hand.   It certainly
22  is one of the potential causal factors.   And, frankly, there is
23  no compelling evidence to suggest that he has an IF deficiency.
24  So, he certainly isn't missing a portion of his gut, based on
25  what I know in the medical records.

Roman - Direct by Ms. Ferry

1    *THE COURT:*  Has he been tested for any of the variety

2    of other underlying causes that you hypothesize?

3    *THE WITNESS:*  There were some records from the medical

4    hospitalization that I had reviewed briefly a long time ago and

5    as best I can recall, they did a pretty thorough work-up and

6    they didn't come up with anything other than an idiopathic

7    condition.

8    *THE COURT:*  Is there a recognized frequency of

9    incidents of idiopathic conditions?

10   *THE WITNESS:*  You know, I don't know the answer to

11   that.  I do know that as people get older, there is a greater

12   likelihood that they can develop pernicious anemia.  It's

13   relatively rare to have it from a very early age, although it

14   does occur in childhood, for example.  It's more common after

15   60, but I don't really know the answer to that, Your Honor.

16   *THE COURT:*  And how many -- what does the literature

17   show as to the frequency of incidents from inadequate diet

18   alone?

19   *THE WITNESS:*  I don't know the literature well enough.

20   I know the diagnostic literature, not that literature.

21   *THE COURT:*  Thank you.

22   BY MS. FERRY

23   *Q.*  Dr. Roman, let me ask you about another section of

24   Dr. Allen's report.  Again, we're on tab 49, here on page 20,

25   where Dr. Allen questions the veracity of Mr. Eldridge's food

Roman - Direct by Ms. Ferry

1  delusions, writing that, quote, "He certainly had an appetite
2  when admitted to the Jester IV unit and asked for more food
3  while making such claims, such claims of being poisoned."
4          And I want to talk to you about this statement in
5  Dr. Allen's report after we look through some of the pages of
6  Petitioner's Exhibit 8.  And, first, if you would look with me
7  here on Petitioner's -- page 51 of Petitioner's Exhibit 8,
8  which is -- the date is on the prior page.  This record is from
9  December 9th of 2009.  So, if you will look with me here at the
10 highlighted portion of page 51 of Exhibit 8, which states, "I
11 believe at the Polunsky unit, inmates paid officers to put some
12 stuff in my food.  I thought officers were putting Clorox or
13 bleach in my food for several years.  I do not know whether
14 these officers at Jester putting something in my food or not."
15          And now look with me here at page 86 of
16 Petitioner's Exhibit 8, which is a record dated January 5th of
17 2010, also from the Jester IV unit, the highlighted portions
18 which read, "The patient went on to complain that he is not
19 receiving his 5,000 calorie diet regularly."  And then skipping
20 down, "He discussed problems at his unit with officers putting
21 battery acid in his food and he accused them of, quote, 'trying
22 to make him kill himself.'"
23          And, finally, page 100 of Petitioner's Exhibit 8
24 from February 24th of 2010, also a Jester IV unit record, which
25 states -- the highlighted portion, "He takes it that officers

Roman - Direct by Ms. Ferry

1  here are deliberately leaving food off his plate in spite of

2  the fact that he gets 5,000-calorie diet and is pork-free."

3  A.  Could we see the exhibit just before that again --

4  Q.  Oh, sure.

5  A.  -- the battery acid exhibit.

6  Q.  This one?

7  A.  Yes.

8  Q.  Page 86.

9  A.  I'm not sure that I'm aware which unit he's referring to.

10  This was after his -- I'm not sure about the date on this one.

11  Q.  So, this is a record, you can see here at the top of the

12  page, from January 5th, 2010.

13  A.  Right, at Jester, I see.

14  Q.  He's being housed at the Jester IV unit.  And he's

15  referring to officers at his unit, with officers putting

16  battery acid in his food.

17  A.  I recall the document now, yes.

18  Q.  And having looked at those -- at those documents,

19  Dr. Roman, how would you respond to Dr. Allen's point that

20  Mr. Eldridge did indeed ask for additional food at Jester IV

21  despite having complained of being poisoned at the Polunsky

22  unit?

23  A.  I suspect he was hungry and given the fact that he hadn't

24  been eating the food at Polunsky, as I've understood his

25  delusion, he believed that it was specific to the -- it was

Roman - Direct by Ms. Ferry

1  more than just the guards.  There were some allegations about

2  particular prisoners and so forth.  But part of the issue is

3  that that was the unsafe environment.  I have no reason to

4  believe that the delusion would transfer to another

5  environment.

6  Q.  And, in fact, Dr. Roman, do these records -- specifically

7  looking with me at page 51 of Petitioner's Exhibit 8, does this

8  indicate that Mr. Eldridge -- that Mr. Eldridge -- does this

9  make clear that Mr. Eldridge is distinguishing between guards

10  at the Polunsky unit and guards at Jester IV, by saying, "I do

11  not know whether these officers at Jester are putting something

12  in my food or not"?

13  A.  Well, that statement certainly speaks to the distinction.

14  Q.  And let me ask this you:  Does that sort of distinction,

15  that sort of fine distinction by saying the guards at Polunsky

16  are poisoning me, the guards at Jester IV, while they're not

17  giving me my food and I have a complaint about that, but it

18  doesn't appear to me that they're poisoning me, is that sort of

19  distinction within a delusional belief system, is that typical

20  or atypical?

21  A.  Delusions can be highly variable, but the nature of

22  delusions is that they have to be specifically defined in terms

23  of who, what, when, where, why, and how.  And to the extent

24  that that's done, it actually makes a lot of sense consistent

25  with being a true delusion, that the where and the who would

Roman - Direct by Ms. Ferry

1  differ, such that in moving to another facility, that there

2  would be no reason for the delusion to transfer to that

3  facility.  I would be more suspicions if that same delusion --

4  if that same belief were to occur at both facilities.

5  Q.  And why is that?

6  A.  Because one of the biggest issues with it is that if it's a

7  delusion and it is circumscribed and it is well stated in terms

8  of who the bad actors are, what is being done, where these

9  things are being done, the specificity doesn't have to be

10  great, but it has to be specific --

11        THE COURT:  So, are you just saying it would have to

12  attach to specific guards in order for it --

13        THE WITNESS:  It would.  He has to have a theory of

14  who's doing it and why, exactly.

15        THE COURT:  It couldn't just be guards in general?

16        THE WITNESS:  No.  That would be way too vague in

17  order for it to be a true delusion.

18  BY MS. FERRY

19  Q.  Now, let's turn to Mr. Eldridge's delusion --

20        THE COURT:  The concept of true delusion is an

21  interesting --

22        THE WITNESS:  It is a funny phrase, yes.

23        THE COURT:  Like true rumor.

24  BY MS. FERRY

25  Q.  Let's turn to Mr. Eldridge's delusion related to leaving

Roman - Direct by Ms. Ferry

1  the prison.  And is it fair to say that Mr. Eldridge believes
2  that he leads a parallel life in the free world?
3  A.  That may be more our term than his certainly, but, yes,
4  this is how I think about it.
5  Q.  And am I correct that the components of that delusion are
6  his belief that he goes to work as a pipefitter with his
7  brother and his belief that he has a wife and eight children
8  with whom he spends time; is that right?
9  A.  Right.  And I actually believe it's nine children.  It's
10  eight with -- eight who we do not believe exist.
11       THE COURT:  And have never existed?
12       THE WITNESS:  As far as I understand have never
13  existed.
14       THE COURT:  Do you know that the -- whether or not, in
15  fact, he at some point in his life did go to work with his
16  brother for pipefitting?
17       THE WITNESS:  My understanding is that he did.
18       THE COURT:  So, part of it is based on --
19       THE WITNESS:  There is some reality.
20       THE COURT:  -- what he did in the past and part of it
21  you don't believe is based on what --
22       THE WITNESS:  I have seen no records to suggest that
23  he has any more than one child.
24       THE COURT:  And has ever had more than one child?
25       THE WITNESS:  And has ever had more than one child.

Roman - Direct by Ms. Ferry

1      *THE COURT:*  And have you looked for such records?

2      *THE WITNESS:*  I have what has been provided to me.

3   So, within the records that are available within his prison

4   record, including some records from things like high school and

5   so forth, the trial records, yes, I have looked through those.

6   BY MS. FERRY

7   *Q.*  Okay.  Now, you just discussed with the Court -- actually

8   you just discussed this with the Court, the information about

9   the particular job.  Now, is Mr. Eldridge's belief that he goes

10  to work -- let me show you a couple of pages in the TDCJ

11  records.  Page 6 of Petitioner's Exhibit 8, does this -- is

12  this one of the documents -- is one of the pages of records

13  that documents Mr. Eldridge's report that he leaves the prison

14  to go to work?

15  *A.*  Yes, I think this was presented a bit earlier.

16  *Q.*  And without putting the other pages of Petitioner's Exhibit

17  8 on the overhead, would you agree that there are other places

18  in the TDCJ record where Mr. Eldridge discusses with mental

19  health staff the fact that he leaves the prison to go to work?

20  *A.*  There are.  And I believe a number of those are also

21  referenced and documented within my reports.

22  *Q.*  Okay.  Now, I'd also like to ask you, looking at State's

23  Exhibit 29, page 93 through 94, which I'll put on the overhead

24  in just a moment --

25      *MR. CORCORAN:*  What were the pages again?

Roman - Direct by Ms. Ferry

1           MS. FERRY:   Pages 93 through 94 of State's Exhibit 29.

2    BY MS. FERRY

3    Q.   And, Dr. Roman, do you recognize this to be a page of

4    Mr. Eldridge's personal correspondence --

5    A.   I do.

6    Q.   -- from the jail?

7           And let me ask you to look with me here at the

8    bottom of page 93 and then over onto page 94.  "Things are

9    running through my head.  I do not know if I'm coming or going.

10   I'll tell you a little of what I see.  I talk to you and let

11   you see the nightmares.  See, I get up and go to work, then I

12   go home and have time with my family.  I do all kinds of

13   things.  I have a good life, and then the nightmares begin.  By

14   some kind of way I'm at here at TDCJ, Jester IV unit."

15          Is this an instance of Mr. Eldridge writing in

16   his personal correspondence about going to work?

17   A.   It certainly appears to be exactly that.

18   Q.   And without putting all the other instances on the

19   overhead, do you recall seeing some other instances in

20   Mr. Eldridge's personal correspondence where he discusses going

21   to work?

22   A.   I do.  It's difficult because so much of his correspondence

23   is redundant and he'll do the same thing to multiple people and

24   it's always hard to keep that straight, the exact same wording,

25   but, yes, there are other instances.

Roman - Direct by Ms. Ferry

1  Q.  And actually just on that note while we're discussing his

2  mail, is it accurate to describe Mr. Eldridge's personal

3  correspondence as in some ways resembling journal entries, in

4  the sense that a single letter will contain -- such as page 93

5  that we were just looking at, will contain multiple entries

6  dated, with dates spanning a week or even more?

7  A.  Right.  I don't know what his intent is, whether it's

8  intended to be a journal or not, but it does have that flavor

9  to it in terms of its format, yes.

10  Q.  And looking with me at page 112 of Petitioner's Exhibit 8,

11  which is the record dated February 7th, 2010, is this one of

12  the places in which the TDCJ records document Mr. Eldridge's

13  report that he spends time in the free world with his wife?

14  A.  Yes, it is.

15  Q.  And without putting all of those pages -- all the other

16  records here on the overhead, do you recall that there are

17  other places in the record where that same belief is reported

18  by Mr. Eldridge?

19  A.  There are other places in the record.

20  Q.  And let me ask you this:  Looking here with me on page 286

21  of Petitioner's Exhibit 8, which is a record from December 12th

22  of 2011, under social history, does it appear here that

23  Mr. Eldridge -- so, here Mr. Eldridge has reported he is

24  married.  He has eight children.  Does it appear to you that

25  Mr. Eldridge, in addition to reporting his specific belief that

Roman - Direct by Ms. Ferry

1  he leaves the prison to spend time with his wife and their

2  children, that he also reports just as a matter of course, "I

3  am married.  I have eight children"?

4  A.  There are references to that.  Certainly this is one of

5  them.  I don't think it happens very often, but, yes, it does

6  exist in the record.

7  Q.  Now, is Mr. Eldridge specific about the identity of this

8  wife and their children?  In other words, does he have specific

9  names?

10  A.  He's very specific, ages, all sorts of information.

11  Q.  And I'm putting up here on the overhead page 2 of

12  Petitioner's Exhibit 2, your supplemental report.  Is this

13  where you have listed the names and ages of the children that

14  Mr. Eldridge claims he has with a woman named Jennifer Lewis?

15  A.  Yes, it is.

16  Q.  And you mentioned earlier that -- you had said that

17  Mr. Eldridge claims to have nine children.  Is that ninth child

18  Terrell Bogany --

19  A.  It is.

20  Q.  -- who is the child -- and am I correct that there's no

21  question that Terrell Bogany is an actual child who exists in

22  Mr. Eldridge's life?

23  A.  Yes, he is a real person.

24  Q.  Oh, and let me ask you this, Dr. Roman:  Where you have

25  seen doctor -- excuse me, Mr. Eldridge report the specific

Roman - Direct by Ms. Ferry

1  names of those children, is he consistent in the names that he

2  reports?

3  A.  He's very consistent.  The one inconsistency is that there

4  have been certain things that will exclude Mike.  He mentions

5  Mike to me and I -- initially it's confusing, because he has a

6  Michael and then he mentions Mike.  And I know on two separate

7  occasions I had to clarify with him that those are different

8  people.  So, I think that's the one exception we get to

9  sometimes within the record, but he is very consistent about

10  who's older and their relative order and so forth, yes.

11  Q.  And let me ask you this:  That specific name Jennifer Lewis

12  and the names of those eight children all beginning with the M,

13  do those names -- those specific names, do those appear in

14  Mr. Eldridge's mental health TDCJ records since 2009?

15  A.  You know, I don't know about the specific names of the

16  children.  I know that -- well, you asked about the mental

17  health records.  I don't recall where he's volunteered those

18  names.

19  Q.  And let me ask you, does it seem suspicious to you that he

20  reports those particular names to you, that he reported them to

21  Dr. Roman, as evidenced by Dr. Roman's report?

22  A.  Dr. Allen.

23  Q.  I'm sorry?

24  A.  Dr. Allen.

25  Q.  Dr. Allen.

Roman - Direct by Ms. Ferry

1   A.  You said you would do that.  Yes.

2   Q.  Excuse me.  I'm sure I'll do it all day long.

3              Does it seem suspicious to you that Mr. Eldridge

4   is reporting those particular names to you and to Dr. Allen,

5   but that you don't recall seeing those particular names in the

6   TDCJ records?

7   A.  No, it doesn't seem suspicious at all.

8   Q.  And why is that?

9   A.  I think testimony to this effect has already been given,

10  but Mr. Eldridge is not exactly one to go on providing detail

11  unless asked in some specific way.

12  Q.  And let me put up here as well -- I want to put up some

13  more examples of Mr. Eldridge's personal correspondence,

14  starting with State's Exhibit 27, page 25 through 27.  First,

15  here, page 25.

16             THE COURT:  Exhibit 27?

17             MS. FERRY:  I'm sorry?

18             THE COURT:  State's 27?

19             MS. FERRY:  State's 27, yes, Your Honor.

20             THE COURT:  Pages?

21             MS. FERRY:  Pages 25 through 27, beginning with page

22  25.

23  BY MS. FERRY

24  Q.  Is this a page showing Mr. Eldridge's attempt to send a

25  piece of mail to Jennifer?

Roman - Direct by Ms. Ferry

1  *A.*  Yes, through his mother.  It's clearer in the body of the

2  letter than it is by the addressing, but, yes.

3  *Q.*  And let me also show you State's Exhibit 46, pages 260

4  through 263.  Is this another example of Mr. Eldridge

5  attempting to send a letter to Jennifer through his mother?

6  *A.*  Yes.

7  *Q.*  Now, I understand from your report that Mr. Eldridge told

8  you that he actually lives with Jennifer Lewis; is that right?

9  *A.*  Partially.

10 *Q.*  Okay.  Explain that for us.

11 *A.*  Well, when pressed on the details, and this is, in my

12 opinion, very consistent with delusional beliefs, the details

13 become more muddy.  He talks about the fact that because of

14 when he leaves for work, that he often lives with his brother

15 Barry and somebody named Darrell, who we think may be a real

16 person, but don't know for sure.  But then he will also talk

17 about how he lives with Jennifer.  So, it's clear that he sees

18 and visits Jennifer and that he has clothing there apparently,

19 but it's a little fuzzy on how often he actually lives there as

20 opposed to hanging with his brother and Darrell.

21 *Q.*  And does that fuzziness, is that suspicious, that his

22 report is fuzzy?

23 *A.*  It's not suspicious to me at all.

24 *Q.*  And why is that?

25 *A.*  These things don't really exist.  They're not true.  So,

Roman - Direct by Ms. Ferry

1   the difficulty that you run into is when you press somebody for

2   specific information and the absence of that information being

3   there, if they attempt to respond to your question, they have

4   no idea what to say, because there is no factual memory to pull

5   out in most cases.  So, the difficulty that ends up happening

6   is that they tend to confabulate these things.

7            With Mr. Eldridge, he very easily talks about

8   being in one environment.  When a contradiction is pointed out,

9   he looks at you, surprised that you found any contradiction

10  whatsoever, because both things that he just said are

11  completely true.  And he doesn't attempt to sort out those

12  facts in any way.

13  Q.  Well, let me ask you this:  If Mr. Eldridge truly believes

14  that he lives even part-time with his wife Jennifer Lewis, why

15  would he attempt to send her mail from the prison?

16  A.  It's a very good question.  I had asked him during the

17  interview why he stops by to see Jennifer if he lives with her,

18  and his response was to see how she's doing.  Like it was the

19  most ridiculous question I've ever asked anyone.  I have no

20  answer to that.  These are not things that he resolves, other

21  than the fact that he does seem to recognize that he does spend

22  some time in jail -- I'm sorry, in prison, incarcerated, times

23  during which he is not at home.

24  Q.  And is that sort of -- you said that when he's pressed for

25  details, he thinks that it's -- you know, why would you ask me

Roman - Direct by Ms. Ferry

1  that, but you also said that when he's pressed for details,

2  because these delusions are not actually true, that he has

3  difficulty giving you details about this story.

4  A.  Sure.

5  Q.  Are those two things inconsistent?

6  A.  I don't think they are.  It's not an uncommon phenomenon.

7  Most people can relate to the idea of having some vague memory

8  of something.  Giving information about those events when

9  pressed on a detail, they realize they should know but they

10  don't know, or they may supply a detail that sounds sensible

11  and they end up finding out that it wasn't true at all.  And I

12  could illustrate if that's of any utility.

13  Q.  Please.

14  A.  So, recently I saw a retired gentleman coming in simply for

15  depression, actually had evaluated him because of some concern

16  about potential early dementia, which he didn't have evidence

17  of.  And in meeting with him, he told a very poignant story

18  about his how his parents were not very supportive growing up

19  and talked about receiving a particular award one day in Scouts

20  and that his father was not there with him to receive the

21  award.

22          I thought nothing of it.  Saw him a couple of

23  weeks later, and he confessed me to me that he had been

24  cleaning out his closet, had come across a box of photographs,

25  and found a photograph of that event, a picture taken with his

Roman - Direct by Ms. Ferry

1   father standing there at his side.  Obviously he had a very

2   vivid memory of something that was very poignant, and his

3   factual recall was completely in error based on the information

4   he was able to uncover.  It's not an unusual phenomenon that

5   occurs.  So, when you apply it to something that isn't real,

6   the mind tends to make sense of that where there are gaps.

7   Q.  So, let me ask you this:  Does Mr. Eldridge demonstrate

8   confusion about how long he's been in prison?

9   A.  He's very confused about how long he's been in prison.

10  Q.  And in your opinion is there a connection between his

11  delusional life about -- his delusional belief about his life

12  in the free world and that confusion about how long he's been

13  incarcerated?

14  A.  I think they're related, yes.

15  Q.  And why do you believe that?

16  A.  Well, I certainly don't think it's a one-on-one

17  correspondence, that he subtracts years of prison time from the

18  amount of time he thinks he's in that real world, which it

19  isn't that kind of accounting by any means.  But he seems to be

20  relatively fuzzy because by nature of the psychotic process he

21  spends of his time involved in delusional thinking.  There's no

22  other way to put that.  He is not always fully in contact with

23  reality.  It's impossible to keep time.  Different phenomenon,

24  but in the same way if one were to daydream or zone off for a

25  period of time, the passage of time might not be clear to them.

Roman - Direct by Ms. Ferry

1   That's much more amplified by somebody who exhibits psychotic
2   symptoms.
3   Q.  And if you would look with me here on page 131 of
4   Petitioner's Exhibit 8, a record dated February 18th of 2010
5   from the Jester IV unit, the highlighted portion, he mentions
6   that he does not think he's been incarcerated for 20 years, but
7   that he has been at work going about his life.  When confronted
8   about this, he could not explain how he is able to function
9   with staff and other offenders when he is in this world.
10             Is this an example of the TDCJ record documenting
11  Mr. Eldridge's confusion?
12  A.  Yes, it does appear to be.
13  Q.  Now, in your supplemental report, which is at Petitioner's
14  Exhibit 2, you describe Mr. Eldridge's delusional belief about
15  his parallel life he leads as complex but consistent.  Is it
16  typical for people with schizophrenia to have such complex
17  delusions?
18  A.  Delusions can be simple or complex.  They can be bizarre.
19  They can be nonbizarre.  It really depends on the particular
20  nature of the delusion.  But it is not at all unheard of for
21  the delusions to be fairly involved.
22  Q.  And what's the significance of the fact that his delusions
23  have been consistent?
24  A.  Well, it seems to me that some of the particular details,
25  especially when pressed, are still fuzzy.  So, it does not have

Roman - Direct by Ms. Ferry

1  the feel of a rehearsed story.  The fact that there is a

2  consistent core suggests that he isn't attempting to try out

3  different ways of attempting to impress someone with

4  symptomatology.  It leads a greater degree of credence -- it's

5  impossible to know for certain, of course, but a greater degree

6  of credence to the fact that he really truly has this fixed

7  false belief that persists despite all evidence to the

8  contrary, which is the operational definition a delusion.

9         THE COURT:  Can I ask a question?

10        THE WITNESS:  Certainly.

11        THE COURT:  Looking at the last comment that was

12  pointed out on page 131 of Petitioner's Exhibit 8, when it was

13  pointed out to Mr. Eldridge that there is a disconnect between

14  the fact that he's reacting to and interacting with staff and

15  recounting his own --

16        THE WITNESS:  Right.

17        THE COURT:  -- and at the same time recounting that he

18  is at home or going to work, do you understand that when he

19  was -- when it was explained to him in this fashion, that he

20  was -- that there was this disconnect, that he understood the

21  inconsistency between his relationships with the staff and the

22  notion that he was going to work, spending time with the

23  family?

24        THE WITNESS:  Meaning, Your Honor, do I understand

25  that he saw it as inconsistent?  Is that what your question is?

Roman - Direct by Ms. Ferry

1       THE COURT:  That's one way of putting it.  I'm not
2  sure that's what I was asking, but that's a good question.
3       THE WITNESS:  Well, if I understand the question --
4  and I actually had a very direct interaction with him around
5  the exact same issue, in a more detailed way, if you would like
6  me to speak to that.
7       THE COURT:  If you could answer the --
8       THE WITNESS:  But my experience is that he's confused
9  about the discrepancy, that he recognizes that it doesn't fit.
10      THE COURT:  Okay.  So, he recognizes it as a
11  discrepancy?
12      THE WITNESS:  Yes, I think he hears that and he pauses
13  and it appears that he recognizes at some level they can't both
14  be true when pressed.
15      THE COURT:  Okay.
16      THE WITNESS:  He has a quizzical look on his face.
17  Obviously I don't know if he did with that specific interview,
18  but in my experience with him, he appears confused and puzzled.
19      THE COURT:  Do you draw any inference from the
20  recognition of it as a discrepancy?
21      THE WITNESS:  Well, the fact that when he is faced
22  with the fact that it is truly discrepant, that he acknowledges
23  the discrepancy but it doesn't ultimately change his belief, I
24  think is consistent with a delusion.  It's always hard to say
25  how somebody is going to respond to a particular thing, but as

Roman - Direct by Ms. Ferry

1   has been testified to, if he were to argue with you about that

2   or dismiss it out of hand, it seems like it would lend more

3   suspicion about whether he was feigning that symptomatology.

4   So, I have interpreted it to suggest that that he now realizes

5   that this -- what is sometimes called a double-bookkeeping

6   concept has run afoul of itself.

7           *THE COURT:*  All right.  Thank you.

8   BY MS. FERRY

9   *Q.*  Dr. Roman, I just want to ask you a few follow-up questions

10  about that.  The first is you just mentioned double

11  bookkeeping.  Tell us what that term means, if you would.

12  *A.*  Well, it's actually a very old term.  It goes all the way

13  back to Kraepelin and his concept of dementia praecox, even

14  before the term "schizophrenia" was created by Bleuler.  But

15  the basic issue with this is that a person has two separate

16  alternate realities.

17          And, you know, as I said what I just said, I

18  could be wrong.  It may have been Bleuler who came up with it.

19  I'm momentarily unsure about that.

20          But they have two separate realities in which

21  they exist, and they basically keep them as if a person kept

22  two sets of books, each book having a different set of figures,

23  each book represents a different reality system.  When you

24  bring those facts together, they clash, they don't exist, but

25  they handle the accounting in such a way that if you point out

Roman - Direct by Ms. Ferry

1   that the -- if you roll the numbers, the reality of the facts
2   don't exist, they're sort of dismissive of it.  They don't --
3   they don't have any way of being able to explain or resolve the
4   discrepancy between the two reality systems.  They may note it,
5   they may dismiss it offhand, but ultimately they have no way of
6   being able to resolve that discrepancy.
7   Q.  And you just said in response to Judge Rosenthal's
8   question, that you would find a reaction of -- if Mr. Eldridge
9   when pressed about these sort of discrepancies, if in response
10  to that, he either dismissed the discrepancy out of hand or if
11  he argued, no, what you're saying doesn't make any sense, that
12  you would find either of those two responses more indicative of
13  feigning.  Could you explain that?
14  A.  Well, dismissing out of hand is perhaps a difficult
15  construct.  It's hard to know how somebody would dismiss a
16  question out of hand.  I guess you could say, no, it's not a
17  discrepancy, but that would seem like a weird kind of response.
18  There are certainly times that he recognizes that something
19  doesn't fit.  There are times that he will look at you and
20  doesn't understand why you think that they don't fit.
21          But generally speaking, if a person is going to
22  be malingering a delusional state, it behooves them to sell a
23  particular story.  It behooves them to be able to answer the
24  discrepancies that come up or have some way of being able to
25  effectively sidetrack them.

Roman - Direct by Ms. Ferry

1  Q.  And you also mentioned a moment ago that you had an
2  interaction with Mr. Eldridge during your most recent interview
3  of him in December of 2011 in which you had this type of
4  interaction, where --
5  A.  Yes.
6  Q.  If you could just speak to that, please.
7  A.  He had again raised the fact that he travels out to the
8  free world.  And at one point I stopped and I said, You know,
9  that's surprising to me.  In waiting to get in here, I have to
10 go through security.  They make sure that I don't have anything
11 on me that I'm not supposed to have.  They make me take off my
12 shoes.  You know all these doors are locked.  We're locked in
13 here.  There are guards all over the place.  How is it that you
14 get in and out of the prison?"  He looks at me, he looks
15 puzzled for a minute, and he says, "I don't know.  I just do."
16        At some level -- of course, it's an assumption.
17 We can't ever know what somebody is thinking, but it seems to
18 me that he totally gets the fact that, yeah, it doesn't make
19 sense, that with all of these people going -- being around,
20 that he just waltzes out, but it is his reality.  It is the
21 other set of the books.  The facts are as they are.
22 Q.  And let me also ask you about this from your December 2011
23 evaluation of Mr. Eldridge.  Did you have an interaction with
24 Mr. Eldridge as the two of you -- after you had finished your
25 formal clinical interview -- your formal interview, rather, as

Roman - Direct by Ms. Ferry

1  you two were waiting for the guards that seemed particularly

2  significant to you regarding Mr. Eldridge's belief that he

3  leaves the prison?

4  A.  We did.  We waited some, I don't know, 10 or 15 minutes for

5  the guards to arrive to escort him from the room.  And while we

6  were waiting, we sat largely in silence and periodically a

7  comment would be made and he would talk about how he was

8  getting hungry or tired and I might say something.  And at one

9  point I stopped and I said, "You know, help me understand this.

10  I mean, I understand that you spend a lot of time in your room

11  and you talk about the fact you don't really read, you know,

12  you may listen to the radio a little bit, how do you -- I mean,

13  how do you do it?  How do you pass your time?  How do you keep

14  yourself busy?"

15          And he smiled and he said, "Well, I'm not always

16  here."  He pointed out -- I have the exact quote in my report,

17  but the idea that he goes back home, that he's working, as if

18  to suggest that he isn't fully incarcerated all the time.

19          THE COURT:  Let me ask you a question at this point.

20  My vague recollection and crude understanding of some of the

21  literature of people who are separated from their preferred

22  world for a very long time, prisoners of war, for example --

23          THE WITNESS:  Yes.

24          THE COURT:  -- is that one mechanism, coping mechanism

25  is to develop a very rich and consistent -- you can call it a

Roman - Direct by Ms. Ferry

1  daydream in a different context, fantasy life in a different
2  context, but you imagine a life that is far preferable to the
3  one you are, in fact, living.  And if you are isolated and in a
4  relatively unchanging environment that you don't want to be in,
5  that doesn't have any upside for you to look forward to, to the
6  contrary, that one reaction is not -- is to imagine yourself
7  elsewhere and to do so in a very detailed fashion.  At what
8  point does that stop being a very nice daydream and effective
9  coping mechanism and become delusion?

10        THE WITNESS:  Well, that's a great question.  That's
11  the 64,000-dollar question.

12        THE COURT:  I mean, why isn't this a sign of great
13  mental health, the ability to cope with an unpleasant present
14  by imagining a very different one and being able to spend your
15  time there instead of where you physically are, your imagined
16  time?

17        THE WITNESS:  Right.  I don't know for certain.  I
18  wish I could tell you that I was acquainted with there being
19  literature on this topic specifically.  But it is not my belief
20  that people who are doing that as more of a pleasant daydream
21  are inclined to share those details.  It's hard to imagine, as
22  you mentioned, a prisoner of war experience, with them sharing
23  with their captors that that's the idea.

24        THE COURT:  Perhaps not their captors but --

25        THE WITNESS:  But with other people?

Roman - Direct by Ms. Ferry

1        THE COURT:  Perhaps.  I don't know.  I'm asking you.

2        THE WITNESS:  Right.  Right.  I think that one of the

3   things that you talk about when there is that type of break

4   with reality, sometimes people talk about a dissociative

5   experience.  People will sometimes report this if they are

6   subjected to trauma.  You hear about people who are sexually

7   abused and they will describe being elsewhere as the event

8   happens.  And we do recognize it as a break with reality.  It

9   doesn't meet the criteria for schizophrenia because it doesn't

10  have all of those other dimensions.

11       THE COURT:  Or delusion.

12       THE WITNESS:  Or delusion, right.  So, in a sense it's

13  delusional because it's a fixed belief system, but it seems to

14  occur exclusively around those events or around that setting.

15  I mean, that certainly is a fair point.

16       THE COURT:  Is the difference that -- is a difference

17  that at some point or on some level the person having the

18  daydream recognizes it as that instead of having a fixed belief

19  in it as real?

20       THE WITNESS:  One of the big distinctions we make is

21  whether or not a person recognizes that it's real.  So, yes,

22  that's an appealing argument.  It's certainly a distinction I

23  would make.  I don't know what the literature would say about

24  that distinction specifically, but it is the clinical

25  distinction I would draw, do you have insight into the fact

Roman - Direct by Ms. Ferry

1   that it's not real.

2   　　　　THE COURT:  Does recognizing a discrepancy of the sort

3   that you've described, the prison's locked, you can't get in or

4   out, so this can't be happening, yes, I recognize that to be

5   true, is that a way of recognizing the lack of reality of what

6   he has described?

7   　　　　THE WITNESS:  It could be.  The distinction that I

8   would draw is whether that lack of reality, the recognition

9   that it can't be that way, whether it persists or not.  In a

10  lot of situations if you follow the rule or understand the

11  principle because I have just told you, it's not the same as

12  having your own independent understanding of something.  And

13  that's typically one of the distinctions that we draw in that

14  sort of dimension.

15  　　　　THE COURT:  Of course, you don't have any way of

16  reaching that conclusion other than what is --

17  　　　　THE WITNESS:  There's no way to get into his head,

18  exactly.  It's all our best guess on the data that we have and

19  our ability to review it, yes.

20  　　　　THE COURT:  All right.  Thank you.

21  　　　　　　　Go ahead, please.

22  BY MS. FERRY

23  Q.  All right.  So, Dr. Roman, I would like to talk to you

24  about some specific passages from Dr. Allen's initial report,

25  which is at tab 49, where he discusses Mr. Eldridge's reported

Roman - Direct by Ms. Ferry

1  delusions.  And, first, I would like to talk with you about

2  page 13 of State's tab 49, this first highlighted passage.

3              "Asked specifically if he ever had the feeling

4  his environment somehow changed or was different from how it

5  was before, he responded with, quote, 'Not that I know of,'

6  which would be an unexpected answer given his report of

7  thinking he is going to work, seeing Barry and other family and

8  being dragged back to prison."

9              What do you make of the argument there?

10 A.  Well, in the face of it, it's hard to take exception with

11 the argument that it would seem like it's an unexpected answer

12 given what he reports, but Mr. Eldridge actually does this

13 fairly often.  I think if he gets -- and I don't know the

14 dimension.  I'm inclined to say a lengthier or more complex

15 question, often he will respond with exactly those words.  He's

16 done it for me.  You can ask him if he's been depressed, he may

17 say, "Not that I know of."  If you ask him if he's sad, he may

18 come back and say something different about it.  So, I think

19 this is a simple idea of saying to him, "Well, you know, wait a

20 second.  I wonder about this," or going on with a related topic

21 and I suspect he would be more forthcoming.  This is probably

22 too open-ended for him.

23 Q.  And on that same page, down a couple of paragraphs, at

24 various places in his report, Dr. Allen distinguishes between

25 what he terms self-serving versus authentic delusions.  And one

Roman - Direct by Ms. Ferry

1  instance of that is here, in the third paragraph on page 13,

2  where he writes, "Authentic delusions are not self-serving,

3  which is characteristic of what the examinee is reporting and

4  how is reporting it."

5          What's your response to Dr. Allen's contention

6  that authentic delusions and self-serving delusions are

7  mutually exclusive?

8  A.  Well, I certainly wouldn't agree with that.  It's a

9  difficult thing in that many delusions may not be self-serving,

10 that is definitely true.  One may pay a price for them.  In

11 fact, I would argue that his guards poisoning the food delusion

12 was certainly not self-serving.  He lost a significant amount

13 of weight.  Even if one doesn't believe that pernicious anemia

14 was a by-product of that --

15          THE COURT:  I'm going interrupt you here, and I

16 apologize for that.  Is it -- could pernicious anemia even if

17 it wasn't caused by the mental health --

18          THE WITNESS:  Right.

19          THE COURT:  -- condition of Mr. Eldridge, could the

20 pernicious anemia have caused the weight loss --

21          THE WITNESS:  Yes.

22          THE COURT:  -- as a physical cause?

23          THE WITNESS:  Yes.

24          THE COURT:  Unrelated to the delusion and its effect

25 on eating?

Roman - Direct by Ms. Ferry

1      *THE WITNESS:* Well, and I think particularly when you

2  look at the fact that there are some other factors that could

3  potentially account for it, you know, irritable bowel, a number

4  of other potential things, absolutely there are factors that

5  could account for that.

6      *THE COURT:* Okay. I wanted to make sure that you

7  weren't discounting --

8      *THE WITNESS:* Sure.

9      *THE COURT:* -- only that you weren't selectively

10  discounting hypotheses.

11      *THE WITNESS:* Sure. So, I think that the issue that

12  you run into here is that there is nothing that I'm aware of in

13  the literature that says that in order for a delusion to be

14  authentic, that it cannot be self-serving. Probably the

15  majority of delusions that occur, if they're categorized to not

16  to be things that work out of your best interest, but I just

17  think that that's an inappropriate statement.

18  BY MS. FERRY

19  *Q.* And along these same lines, let's look at page 11, page 11

20  of that same exhibit, where Dr. Allen seems to question whether

21  Mr. Eldridge's delusions can be real, since -- this highlighted

22  portion -- he demonstrates no confusion about being in prison

23  nor made any complaints about being wrongfully held or

24  expressed any confusion or consternation about where he was.

25      And we spoke earlier about double-bookkeeping.

Roman - Direct by Ms. Ferry

 1  Would the phenomenon of double-bookkeeping explain what
 2  Dr. Allen has cited here as it can't possibly make any sense,
 3  "If he thought he left the prison and his victims were alive,
 4  he would be raising Cain every time he realized he was at
 5  TDCJ"?
 6  A.  Well, I think double-bookkeeping is one thing that could
 7  account for that, but we also recognize the fact that he is
 8  generally oriented -- certainly is oriented to place.  Time
 9  varies a little bit more for him.  But the reality is that if
10  he is in prison at the time, sometimes he's referred to it as a
11  hospital for me, but he certainly seems to know where he is at
12  that moment in time.
13  Q.  And I guess the question then is, assuming he is oriented
14  to place --
15  A.  Right.
16  Q.  -- and he realizes he's at the prison, why would he -- why
17  would he meekly accept I'm at prison, if he genuinely believes
18  that his victims are alive?
19  A.  Right.  You know, it's always so difficult take rational
20  thought and use that as a way of trying to understand an
21  irrational thought process, such as what occurs in
22  schizophrenia.  It's difficult to resolve all of those kinds of
23  things.  But, yes, I think the double-bookkeeping aspect of it
24  is a very reasonable way to look at it.  Again, they believe
25  the delusions are true.  They are fixed false beliefs

Roman - Direct by Ms. Ferry

1   independent of evidence to the contrary.  And the fact that he

2   knows that he is in prison should be evidence to the contrary,

3   but the very fact that it isn't is consistent with the

4   definition of a delusion.

5   Q.  Okay.  Let's look back now to page -- go back to page 13 of

6   that exhibit, where --

7        THE COURT:  Can I ask a question?  Why isn't it

8   equally plausible as an explanation of his lack of protest

9   about being incarcerated for murdering people that he is saying

10  he sees every day, that he, in fact, knows he's really not

11  seeing them every day?

12       THE WITNESS:  It's impossible to rule it out

13  definitively.  Is it equally plausible, I think you have to

14  look to the larger data set to try to make that resolution.

15  But it's a fair point that that is the more simple explanation,

16  based on simply this one fact.

17       THE COURT:  And how is -- and your argument then would

18  be that it is inconsistent with a larger or the larger data

19  set?

20       THE WITNESS:  That's exactly the case, yes, Your

21  Honor.  That would be my argument, yes.

22       THE COURT:  Dr. Allen would disagree?

23       THE WITNESS:  I know he would, very strongly.

24       THE COURT:  Go ahead, please.

25  BY MS. FERRY

Roman - Direct by Ms. Ferry

1  *Q.*  So, here on page 13 of Dr. Allen's report, the third

2  paragraph down where Dr. Allen is discussing Mr. Eldridge's

3  reported paranoia.  "For example, that he refused to eat

4  because his food was being poisoned, that, quote, 'guards,' end

5  quote, were hurting him in some fashion and that doctors were

6  lying to him, et cetera.  Authentic delusions are not

7  self-serving, which is characteristic of what the examinee is

8  reporting and how he is reporting it.  Such complaints are

9  incredibly common in a forensic population.  The history of the

10  defendant solidly establishes that he has antisocial

11  personality disorder and has been on death row for almost 20

12  years.  His life is governed by guards.  He is hostile, as are

13  many with such a personality disorder, and he lives in a world

14  of antisocial personalities with similar hostility and control

15  by guards."  And his final sentence, "His hostility and

16  purported paranoia is a function not only of his personality

17  disorder but is a justified and rational response to his

18  environment as well as being self-serving."

19          What do you make of the claim that Mr. Eldridge's

20  paranoid delusions are rational?

21  *A.*  I thought you were going to go on with the hostility

22  initially.  I'm not aware of him being hostile.  It's difficult

23  to argue that paranoia is rational.  I think that by definition

24  if they're really out to get you, it isn't paranoia.

25  *Q.*  Would you say that it is a rational belief to believe that

Roman - Direct by Ms. Ferry

1  guards at the prison are putting Clorox and human waste and
2  battery acid in your food?
3  A.  I think most people would argue that is not a rational
4  belief.
5  Q.  And look here with me at the bottom of -- at this final
6  paragraph on page 13, where Dr. Allen lists a slew of symptoms
7  that Mr. Eldridge didn't demonstrate during this March --
8  excuse me, during this May of 2011 evaluation that he
9  conducted.  Does the fact those symptoms were not evident
10 during this evaluation, does that seem suspicious to you?
11 A.  Not in the least.
12 Q.  And why is that?
13      THE COURT:  Before you answer this, let me just tell
14 you that we're going to break in about five minutes for just
15 about a 15-minute break.
16      MS. FERRY:  Okay.  Thank you.
17      THE COURT:  Go ahead.
18 A.  Two reasons.  One, if we look at the diagnostic criteria,
19 it certainly is not necessary that one have all five of the
20 characteristic symptoms.  Secondly, the nature of all mental
21 illness, certainly is true for schizophrenia, is that you're
22 not a hundred percent crazy a hundred percent of the time.
23 These disorders have waxing and waning patterns.  Some of these
24 things can be symptoms that he may rarely, if ever, exhibit.
25 Others of them are things that may occur at certain times in

Roman - Direct by Ms. Ferry

1   certain contexts.  Plus, we also have to understand that he's
2   being treated with antipsychotic medication, which has the
3   ability to improve his symptomatology.  So, there are a whole
4   host of reasons that at a given point in time he might not show
5   certain symptomatology.
6   Q.  And let me ask you to respond as well to these -- this
7   information on page 12 of State's Exhibit 49, where Dr. Roman
8   (sic) reports that Mr. Eldridge during his evaluation is
9   showing good calculation ability, showing normal speech, et
10   cetera.  And the same question, does that seem -- does the
11   report that Mr. Eldridge -- that this is reported in Dr.
12   Allen's report, does that seem suspicious, the normal speech,
13   the calculation ability, does that seem suspicious to you?
14   A.  It does not seem suspicious.  I would give essentially the
15   same answer I gave last time.
16   Q.  Okay.
17           MS. FERRY:  And, Your Honor, I can at this point start
18   on the next section, with hallucinations, whichever the Court
19   would prefer is fine about me.
20           THE COURT:  There's no magic stopping or starting
21   point.  Why don't you ask a few more questions and then we'll
22   break.
23           MS. FERRY:  Okay.
24   BY MS. FERRY
25   Q.  Okay.  So, Dr. Roman, let's move on to Mr. Eldridge's

Roman - Direct by Ms. Ferry

1  hallucinations, diagnostic criteria in A2 from the DSM-IV-TR.
2  And you mentioned sensory modalities.  The most common sensory
3  modalities for hallucination are auditory and visual, as you
4  just mentioned; is that right?
5  A.  And auditory is more common than visual.
6  Q.  And in what modalities does Mr. Eldridge report
7  experiencing hallucinations?
8  A.  I'm aware of him reporting auditory hallucinations, and I'm
9  aware of him reporting visual hallucinations.  There are
10  references to tactile hallucinations.  That phrase is used in
11  some of his medical record, but I'm not sure that I'm aware of
12  him reporting actual tactile hallucinations.  I can't think of
13  any independent examples of it from his report or the record at
14  this point.
15  Q.  So, you're saying that at various points other mental
16  health staff members have concluded this is a tactile
17  hallucination?
18  A.  They have said he's had tactile hallucinations.  I don't
19  recall them having said, Here's what I've seen.  This thing
20  that I've just reported is a tactile hallucination.  They have
21  declared that he has tactile hallucinations.
22  Q.  I see.  Can you give us some specific examples of
23  Mr. Eldridge's auditory -- audio hallucinations that appear
24  over the past two and a half years in TDCJ records?
25  A.  They range from him hearing voices and not necessarily have

Roman - Direct by Ms. Ferry

1  anything more specific than that, simply the fact that he's

2  heard voices, to him describing having conversations with

3  particular people, some of whom we know to be real people who

4  exist in the real world, to him having a certain degree of

5  commentary going on in his head.

6  Q.  And we touched on this earlier, but I want to ask you

7  specifically, particularly with the brief discussion we just

8  had about tactile hallucinations, why is Mr. Eldridge's belief,

9  specifically the one documented at page 131 of Petitioner's

10 Exhibit -- oh, that's the wrong page number.  So, let me ask

11 you:  His report that I was just sitting with my wife at the

12 table, I just got dragged back, why do you classify that as not

13 being a combination audio/visual and tactile hallucination?

14 A.  Again, I believe that it speaks to a belief system.  I have

15 no reason to believe that he is in a location, recognizes that

16 he's in that location, has seen his wife, has had this

17 conversation, and then some force has grabbed him and bodily

18 pulled him in such a way that he would feel it.  Those things

19 just don't exist.  No part of it makes sense.

20         What he's reporting is consistent with explaining

21 his delusion, that he was there and then he came back.  Is it

22 conceivable that he was having a hallucination of sitting there

23 with his wife and having a conversation and then the next thing

24 he knows he's back in the jail, well, I can't exclude that.  It

25 is possible that he was hallucinating having had some sort of a

Roman - Direct by Ms. Ferry

1    conversation, but that's not the way the story has been

2    reported.

3          *THE COURT:*  We'll take a 15-minute break now.   Thank

4    you very much.

5        *(Recess from 3:00 p.m. to 3:15 p.m.)*

6          *THE COURT:*  All right.   I think we're ready to resume.

7    Thank you.   Go ahead, please.

8                    **DIRECT EXAMINATION CONTINUED**

9    BY MS. FERRY

10   *Q.*  Now, Dr. Roman, during your most recent evaluation of

11   Mr. Eldridge in December, you asked Mr. Eldridge whether the

12   voices he hears are inside or outside of his head.   Why did you

13   ask him that question?

14   *A.*  It's a very good question.   I don't know why we ask that

15   question.   We usually do.   It doesn't seem to matter much,

16   because voices can be heard anywhere, but it's become one of

17   those very standard things that people frequently will ask when

18   auditory hallucinations occur.

19   *Q.*  And let me ask you this question:  Dr. Roman, are you

20   familiar with Richard Rogers' text *Clinical Assessment of*

21   *Malingering and Deception,* the third edition?

22   *A.*  I am.

23   *Q.*  And do you consider this text a reliable authority on the

24   assessment of a malingering and deception?

25   *A.*  I do.

Roman - Direct by Ms. Ferry

1  *Q.*  And when you just said that the literature indicates that
2  the answer doesn't particularly matter, if I could direct you
3  here to page 55 of this text.  Looking with me here, "The
4  location of hallucinations should not be used to determine
5  their genuineness," is this one example of the literature
6  supporting the conclusion that the location of voices doesn't
7  make a difference?
8  *A.*  Obviously that's a conclusion based on some studies that
9  are reported earlier in the paragraphs, yes, that's an example.
10  *Q.*  Okay.  Now, does the fact that Mr. Eldridge reports
11  experiencing hallucinations in different modalities, does that
12  raise red flags for you in terms of the possibility of
13  malingering?
14  *A.*  Meaning the fact that it's not a single modality, is that
15  how you mean that?
16  *Q.*  Right.  In terms of the fact that Mr. Eldridge has at times
17  reported audio hallucinations, at times he's reported visual
18  hallucinations, does the fact that he has reported
19  hallucinations in different sensory modalities --
20  *A.*  No --
21  *Q.*  -- is that suspicious?
22  *A.*  -- it is not suspicious.
23  *Q.*  And why do you say that?
24  *A.*  Because the literature suggests that it's quite common for
25  people to report more than one type of hallucination.

Roman - Direct by Ms. Ferry

1  *Q.* And what about the fact that Mr. Eldridge reports hearing
2  the voices of multiple people?
3  *A.* That's also not at all an unusual finding.
4  *Q.* Now, do you agree with Dr. Allen's assertion that the
5  content of Mr. Eldridge's auditory hallucinations -- excuse
6  me -- is uncharacteristic of schizophrenia because he hears
7  more than short phrases, perhaps single words?
8  *A.* No, I don't agree with that.
9  *Q.* And let me direct you to page 300 of the DSM-IV-TR, to this
10  sentence here.  "Certain types of auditory hallucinations,
11  i.e., two or more voices -- two or more voices conversing with
12  one another or voices maintaining a running commentary on the
13  person's thoughts or behavior have been considered to be
14  particularly characteristic of schizophrenia."
15           Did I read that correctly?
16  *A.* You did.
17  *Q.* And would it seem to be difficult for short phrases or
18  perhaps single words to maintain a running commentary on a
19  person's thoughts or behavior?
20  *A.* It would be impossible for that to constitute a running
21  commentary.
22  *Q.* Now, you've read Dr. Allen's report where he questions --
23  excuse me, where he concludes Mr. Eldridge reports his
24  delusions and hallucinations in a third-person fashion?
25  *A.* Yes.

Roman - Direct by Ms. Ferry

1   Q.  And what's your response -- well, first of all, what's your

2   response to that factual assertion, that Mr. Eldridge reports

3   in a third-person fashion?

4   A.  I don't believe that that's the case.  He does sometimes

5   speak in the third person, but I'm not aware that he's

6   reporting his hallucinations or delusions in a third-person

7   fashion.

8   Q.  And what do you make of the conclusion that -- well, let's

9   talk about an example of Mr. Eldridge reporting something in

10  third person.  Are you aware of Mr. Eldridge stating when asked

11  about his capital murder conviction, "They say I shot

12  somebody"?

13  A.  To my knowledge, that has always been the type of response

14  he's given to that question.

15  Q.  And why is that sort of statement, "They say I shot

16  somebody," why is that not -- why is that not suspicious?

17  A.  Well, I think there are two things.  One, again, him

18  putting it off on somebody else is fairly consistent with his

19  delusional belief that they're still alive.  But I guess the

20  second argument that can be made is this sort of old classic

21  definition of the four As, if you will, while not a current

22  diagnostic construct, he certainly is ambivalent, one of the

23  four As, about that characterization that he shot somebody.

24  So, I think it's consistent, the fact that he might use a third

25  person, for something that flies in the face of his delusional

Roman - Direct by Ms. Ferry

1  belief and that he would have some uncertainty and ambivalence
2  about that statement.
3  Q.  And just explain to us, if you would, why is that
4  statement, They say "I shot somebody," why is that an example
5  of ambivalence?
6  A.  Because he doesn't believe that he shot someone and yet he
7  is able to factually recognize that he is incarcerated because
8  he has been accused of having shot someone.
9  Q.  And let me direct you to page 20 of State's Exhibit 49,
10  where Dr. Allen concludes in his initial report that
11  Mr. Eldridge reports that he hears voices, quote, "all the
12  time," and Dr. Allen goes on to say, "Known schizophrenics
13  don't hallucinate all the time."
14             Do you take that to mean that Dr. Allen is
15  concluding that Mr. Eldridge reports that he continually hears
16  voices?
17  A.  It is how I took it.  Obviously I don't know for sure what
18  Dr. Allen means.  Indeed, schizophrenics do not hallucinate all
19  the time.
20  Q.  Let me ask you -- let me direct you to some other places in
21  Dr. Allen's report where the phrase "all the time" or the
22  phrase "always" is used.  First, here on page 7 of that same
23  State's Exhibit 49, "Mr. Eldridge notes he has contact with
24  family members, quote, 'all the time.'"
25             Later on the page, "He indicates he was, quote,

Roman - Direct by Ms. Ferry

1  'always getting whoopins,'" quote.  And, quote, "Mom and dad
2  were fightin' all the time," end quote.

3          And down further on page 8, "Despite that report
4  he indicates he was sent to the principal's office, quote, 'all
5  the time,' end quote, for classroom behaviors."

6          And now I want to direct your attention to your
7  own supplemental report, just Petitioner's Exhibit 2, page 8,
8  this third full paragraph here, where you've written, "Asked
9  about depression, he responded, 'I feel bad all the time.'
10  Asked directly if he is depressed all the time, he stated,
11  'No,' acknowledging that there are times that he does not feel
12  depressed."

13          And after looking at those passages in
14  Dr. Allen's report as well that passage in our own report,
15  Dr. Roman, what do you think of Dr. Allen's claim that
16  Mr. Eldridge was asserting that he literally continually hears
17  voices 24 hours a day, 7 days a week?
18  A.  Obviously I don't know if that's what Dr. Allen was
19  asserting.  I take Mr. Eldridge's use of the phrase "all the
20  time" to mean frequently rather than continually.  So, I think
21  if it was interpreted to be continually, I would argue that is
22  an erroneous conclusion, but I don't know whether that's what
23  Dr. Allen was intending to suggest.
24  Q.  Now, let me ask you this:  Can the amount of time that a
25  person spends alone affect the intensity of his or her

Roman - Direct by Ms. Ferry

1  hallucinations?

2  A.  Absolutely.

3  Q.  And what effects -- and what effect does spending a lot of

4  time alone have?

5  A.  There are a number of things that can make hallucinations

6  more frequent or potentially even more bizarre.  And being

7  alone, being isolated from human contact is another such thing

8  that can help to create not only more frequent but potentially

9  even more bizarre delusions -- I'm sorry, hallucinations.

10  Q.  And are you aware of how much Mr. Eldridge spends alone in

11  his cell as a death row inmate?

12  A.  My understanding is that it's typical to spend 22 to 23

13  hours alone in your cell.

14  Q.  And what about listening to the radio, can that have an

15  effect on the intensity of hallucinations?

16  A.  Interestingly there is evidence to suggest that listening

17  to the television or the radio, apparently particularly news

18  programs, can increase the frequency and complexity of

19  hallucinations.

20  Q.  And has Mr. Eldridge reported fondness for listening to any

21  particular radio program?

22  A.  Yes, he does.

23  Q.  And what program is that?

24  A.  The one I've heard him speak to most consistently is George

25  Noory's "Coast to Coast."

Roman - Direct by Ms. Ferry

1   *Q.*  And are you aware of what sort of program that is?

2   *A.*  I must say I am, yes.

3   *Q.*  And what sort of program is "Coast to Coast," what topics

4   does it deal with?

5   *A.*  Things I think a lot of people would call relatively more

6   supernatural or outlandish.  Conspiratorial things, sci-fi

7   things, UFO kinds of things, illuminati concepts, things that

8   are perhaps intriguing, but you're not going to find on the

9   front page of *The New York Times*.

10  *Q.*  Now, let me direct you to some additional pages of

11  Petitioner's Exhibit 8, starting with page 109, which is a

12  Jester IV record dated March 13, 2010, where Mr. Eldridge

13  reports, "I'm walking to help get rid of the voices."

14              And next I would like you to look from that same

15  exhibit, page 187, which is a record dated September 9th, 2010,

16  where Mr. Eldridge reports, "I asked to be put in rec so I

17  could walk to try to not hear what they are saying.  They are

18  inside my head."  And earlier the quote makes clear that what

19  they are saying, he reports that I am hearing voices.

20              And then page 192, September 10th of 2010,

21  reports he is beginning to pace.  And, finally, page 247 of the

22  same exhibit, dated June 8th, 2011, "Offender reports he paces

23  a lot when he hears voices, which he reports doing now."  Oh,

24  and I actually I lied, one more.  Page 308, dated March 8th,

25  2011, "Last time I heard voices was two days ago.  Voice told

Roman - Direct by Ms. Ferry

1  me to go with him and wanted to know what I was doing.  I try
2  to cope with voice by turning up my radio and try not to think
3  about it."
4            Based on those records, Dr. Roman, does it appear
5  to you that Mr. Eldridge has developed some coping mechanisms
6  when he hears voices?
7  A.  Some of those records that you showed would suggest that
8  that's the case or that he may see it that way.
9  Q.  And is it common for people with schizophrenia to do that,
10 to develop methods to deal their hallucinations?
11 A.  It is common.
12 Q.  And how typical are the two methods that are documented in
13 those records, pacing, turning up the radio, how common are
14 those as coping methods?
15 A.  There is evidence in the literature that activity, being
16 busy, is something that can help to decrease a person's
17 frequency and severity of hearing voices and auditory
18 hallucinations.  So, things like pacing I think are fairly
19 common.  I'm not sure about the radio thing per se.  But when
20 you add the fact that he's on a pod in death row and there's a
21 relatively more restrictive range of things he could do, he
22 can't go out and shoot baskets, I would think that that would
23 likely be potentially reasonable frequently occurring coping
24 mechanism for the environment.
25 Q.  Now, going back to the diagnostic criteria for

Roman - Direct by Ms. Ferry

1  schizophrenia, we've covered criteria A1, A2.  Let's turn now

2  to A3, disorganized speech.  Is there evidence in the record

3  that there are reports of disorganized speech or behavior?

4  A.  Yes, there is evidence.

5  Q.  Would you say that the evidence of disorganized speech is

6  as prominent as the delusions and hallucinations?

7  A.  Delusions and hallucinations are pretty prominent

8  phenomenon.  I wouldn't know whether they are reported more

9  frequently than delusions or hallucinations are, but they

10  certainly don't jump out at you as well as from the record as

11  the hallucinations and delusions do.

12  Q.  Now, let's turn to this last criterion, A5, negative

13  symptoms.  And you mentioned affective flattening, alogia, and

14  avolition as three characteristic negative symptoms, which are

15  also noted here in the DSM-IV-TR.  And let me ask you for the

16  run-of-the-mill patient, we're not talking about someone who's

17  on death row, for the run-of-the-mill patient who's living his

18  or her life in the world, which is more difficult to assess,

19  positive symptoms or negative symptoms?

20  A.  We're talking the run-of-the-mill schizophrenic patient?

21  Q.  The run-of-the-mill schizophrenic patient, yes.

22  A.  It's an interesting distinction.  Hands down the primary

23  symptoms are much easier to document and notice.  They're much

24  more obvious.  So, the negative symptoms can be more difficult

25  to identify and tag to schizophrenia.

Roman - Direct by Ms. Ferry

1  *Q.*  And let me direct you here to page 301 of the DSM-IV-TR,

2  which states, "Although common in schizophrenia, negative

3  symptoms are difficult to evaluate because they occur on a

4  continuum with normality, are relatively nonspecific, and may

5  be due to a variety of other factors, including positive

6  symptoms, medication side effects, depression, environmental

7  understimulation, or demoralization."

8           Do you agree with that as to the reason that it's

9  more difficult to assess negative symptoms?

10  *A.*  I do.  In fact, I think in my report under negative

11  symptoms, I list things like decreased energy, decreased

12  motivation.  Those are appropriately negative symptoms, but

13  certainly don't use the same language as the DSM and those are

14  things that many people report.

15  *Q.*  Now, does Mr. Eldridge's status as a death row inmate, does

16  that pose additional -- excuse me -- additional problems for

17  assessing negative symptomatology?

18  *A.*  Substantially so.

19  *Q.*  And if you could just briefly explain that.

20  *A.*  Well, there's a couple of different things that are

21  happening.  Obviously we have some periods where he's had some

22  inpatient observation and that certainly helps.  But through

23  the course of his normal day, he simply is not interacting with

24  people much.  There are no eyeballs on him to be able to really

25  look at these kinds of things.  Plus, some of the things that

Roman - Direct by Ms. Ferry

1  we would look at are difficult to find.  He doesn't have as
2  many options in his day-to-day routine to necessarily be
3  sleeping in or a whole host of things that might be obvious
4  symptomatology that might occur in the free world.
5          In addition, we don't have things like him being
6  involved in active hobbies, socialization activities,
7  occupational kinds of activities, notwithstanding his
8  delusional belief system to that effect.  So, it's more
9  difficult see obvious markers of a diminution, if I said that
10 correctly, of functioning than it is to see the excess of
11 abnormal functioning.
12 Q.  And let me ask you, using page 242 of Petitioner's Exhibit
13 8, which is a TDCJ mental health record dated April 15th, 2011,
14 which lists target problems, low energy level, flat affect, is
15 this an example of a record that despite those difficulties you
16 look to to find evidence of negative symptoms?
17 A.  Yes, it is.
18 Q.  And do you point to any other negative symptoms in your
19 report?  Specifically let me just ask you, did you point to
20 sleep as another potentially negative symptom?
21 A.  Obviously I would have to look at my report to see whether
22 I did or not.  It makes sense that I would have, but I would
23 have to look at my report to know.
24 Q.  Well, let me just direct you to Petitioner's Exhibit 2.
25 A.  Yes, I believe I have it on page 8.

Roman - Direct by Ms. Ferry

1   *Q.*  Yes.

2   *A.*  It starts on page 7.

3   *Q.*  Yes.  And what were your conclusions related to

4   Mr. Eldridge's sleep patterns?

5   *A.*  I'm still reading.  Oh, that Mr. Eldridge demonstrates

6   significant insomnia per his report, stated that he has trouble

7   with initial insomnia, which means falling asleep.  He

8   indicated that he has trouble falling asleep five to six days

9   per week.  When asked about how long it takes him to fall

10  asleep, he responded "a little while."  When pressed, he stated

11  "hours."

12          He claims that he doesn't really sleep.  This is

13  something that appears in a couple of different spots in the

14  record, as I recall.  He reported terminal insomnia once per

15  week, which is where you get up early and can't fall back to

16  sleep.  Indicated that he did not feel rested even on the one

17  or two days per week when he gets to sleep without difficulty.

18  *Q.*  And if you would actually keep that page of the record

19  there with you, because I want to look now to Diagnostic

20  Criterion B, the social, slash, occupational dysfunction.  Is

21  this another instance where Mr. Eldridge's status as a death

22  row inmate makes assessment difficult?

23  *A.*  Substantially so.

24  *Q.*  Did you nevertheless find that this criterion had been met?

25  *A.*  To the extent that we can extrapolate social and

Roman - Direct by Ms. Ferry

1  occupational factors in a death row inmate, yes, I did.

2  Q.  And tell us what you pointed to as evidence of this

3  criterion being met.

4  A.  Well, in fairness, we have some potential bleeding over of

5  criteria.  So that, for example, some of the things that we

6  see, like the fact that he's walking in circles in his cell or

7  refusing to shower except in certain showers are things that

8  potentially are indicative of Category A, which is grossly

9  disorganized behavior.

10                 The fact that he's saying mental health not

11  list -- his treatment focus -- I'm sorry, he's not saying, it

12  was a mental health note.  Has bizarre content of thought,

13  delusions of persecution, illogical form of thought and speech

14  and hallucinations.  So, that may speak to the idea that he's

15  having disorganized speech, the idea that the thought processes

16  are impaired.  But I am inferring from some of those things

17  that are said that he is having problems with aspects of his

18  day-to-day functioning even on the pod.

19  Q.  And let me direct you to page 24 of Petitioner's Exhibit 8,

20  a TDCJ record dated January 27th of 2004, which states,

21  "Offender is reportedly walking in circles in his cell,

22  refusing to shower except in certain showers and saying his

23  food is poisoned."  Would this be an example of one of the TDCJ

24  records that you relied on?

25  A.  It is.  In fact, I think I quoted that very phrase in my

Roman - Direct by Ms. Ferry

1  report.

2  Q.  Now, let's look at Criterion C, duration.  And why did you

3  find that -- well, actually first let me ask you, what is the

4  duration criterion for diagnosing schizophrenia?

5  A.  We require active symptoms occurring over at least a month

6  and we require a six-month period where there's prominent

7  evidence of symptoms of schizophrenia.

8  Q.  And why did you find that this criterion had been met in

9  Mr. Eldridge's case?

10  A.  I would have to look back at the actual starting dates and

11  so on.  If I recall correctly, his first treatment with

12  Risperidone was briefly sometime in 2006.  And as we sit here

13  having done that evaluation in November of 2011, we have a

14  something like five-and-a-half-year period over which a

15  substantial portion of the records and I think pretty

16  continuously going back to sometime in 2009 of him having

17  active symptoms of schizophrenia and indeed being diagnosed as

18  schizophrenic within the mental health records, certainly

19  exceeds the six-month-period required, based on my review of

20  the records.

21  Q.  And, Dr. Roman, let me ask you this:  Both with regard to

22  this criterion and other criteria, how do you respond to the

23  argument that you've handpicked TDCJ records?

24  A.  Well, we have two issues.  I mean, one is the data are --

25  we have the records that exist.  Those are the only records

Roman - Direct by Ms. Ferry

1  from which we can glean any information.  In going through the
2  records, I attempted to look at anything that made reference to
3  this.  The records from TDCJ are not always as complete as one
4  might like to see.  So, as a function of that, whenever there
5  was a statement that was significant regarding his mental
6  health functioning in this context, I attempted to cull that
7  out.  It's been a while since I wrote it, but I believe in the
8  first report I did include things that suggested that his
9  voices had stopped or that he had gotten better, as well as
10  indications of pathology.  So, frankly, I don't think I cherry
11  picked anything.  I think I was as thorough with the evaluation
12  and selection criteria as I could.  Might I have missed some
13  things?  Entirely possible I may have missed some references
14  either way, but at the time of the reports, based on what I
15  reviewed, I don't believe there's any cherry picking happening.
16  Q.  Now, let's move on to Diagnostic Criteria D and E.
17  Those -- well, D, E, and F.  Those are the exclusionary
18  criteria for schizophrenia, correct?
19  A.  Yes.
20  Q.  And why do you have to rule out other conditions before you
21  diagnose a person with schizophrenia?
22  A.  I'm tempted say because it's the DSM and they require you
23  to do that.  There are certain kinds of things that can have
24  sufficient overlap with the primary symptomatology, that it can
25  create an erroneous conclusion of a more severe disorder when

Roman - Direct by Ms. Ferry

1  indeed diagnosing an arguably less severe disorder might be
2  more appropriate.  So, if the symptoms are related to something
3  that is not as big a deal as the main diagnosis you're looking
4  at, you need to go with one of the exclusionary ones that you
5  couldn't exclude.  That's the rationale for it.
6  Q.  And let's start with criterion F.  If you could just
7  briefly tell us why that exclusionary criterion --
8  A.  Sure.
9  Q.  -- is met?
10 A.  Well, it's easier to do if I define the context of what a
11 pervasive developmental or autistic disorder is.
12 Q.  Please.
13 A.  So, most people have some at least passing familiarity with
14 the idea of autism, which includes as major symptoms
15 difficulties with the give and take of social interaction,
16 difficulties with affect of modulation of expression,
17 stereotypic interests, interest in parts of objects rather than
18 people.  These are individuals who are very withdrawn.
19              A pervasive developmental disorder lies on that
20 same continuum but is not as severe.  If one thinks about the
21 societal stereotype of the nerd, I mean, literally pocket
22 protector, "Big Bang Theory" kind of thing, those people could
23 be said to meet the criteria for pervasive developmental
24 disorder.  These are people who are sort of social misfits.
25 So, we want to make sure that the criteria that are suspecting

Roman - Direct by Ms. Ferry

1  are related to schizophrenia are not simply because the person

2  is not comfortable in a social environment as a function of

3  those disorders.

4  And there is no developmental history that

5  Mr. Eldridge has any of that, and these are developmental

6  disorders.  And there is no evidence to suggest that his

7  primary symptoms are better accounted for by those criteria.

8  Q.  And if you could go through the same explanation briefly

9  for Criterion D --

10  A.  Sure.

11  Q.  -- schizoaffective and mood disorder exclusion, why that

12  criterion has been met.

13  A.  So, schizoaffective disorder is usually more serious than a

14  mood disorder, but one of the things that they have in

15  common -- so, essentially we talk about two basic kinds of mood

16  disorders.  And obviously there can be more distinctions, but

17  we talk about a unipolar depressive disorder, like major

18  depressive disorder, and we talk about the concept of a bipolar

19  disorder, which has in addition to at least one episode of

20  major depression at least one episode of mania or hypomania.

21  And essentially what we're looking for in this

22  case is to make sure that the symptoms of withdrawal -- we

23  typically don't have delusions or hallucinations within a mood

24  disorder, although you can certainly see more severe things

25  like mood congruent hallucinations.  We simply want to make

Roman - Direct by Ms. Ferry

1  sure that it is simply because they're depressed or have

2  bipolar disorder.  But when you slide in a schizoaffective,

3  this is where the two get married together.  You're now looking

4  at somebody who has a major mood disorder, be it major

5  depressive or bipolar, who also manifests primary symptoms that

6  meet Criteria A of schizophrenia.

7              So, the idea here is that the mood disorder is

8  primary.  Schizophrenia is not primary.  The prognosis is

9  better.  These people typically have less severe symptomatology

10  typically.  So, it's important to be able to exclude that it

11  isn't this relatively more minor disorder.

12  Q.  And why did you conclude that exclusionary criterion had

13  been met in Mr. Eldridge's case?

14  A.  A number of reasons.  While there is some evidence of

15  discussions that he's depressed in the record, even dating back

16  to, I think, the first week after his arrest for the murders,

17  the reality is that it is not a prominent aspect of his record.

18  It's -- his current record, it's not even a prominent aspect of

19  what's happening.  While he's been treated with fluoxetine or

20  Prozac, as I think Dr. Nathan himself testified, that had more

21  to do with the fact that he was showing some negative symptoms

22  and Dr. Nathan thought that some of those might be related to

23  somewhat perhaps mild depression and that in treating the

24  depression, it could help to resolve.  That's not consistent

25  with a schizoaffective disorder.  It's way too minor.

Roman - Direct by Ms. Ferry

1  Q.  Okay.  Let's move to substance, the direct physical effects

2  of substance abuse.  Now, I take it you're aware that

3  Mr. Eldridge had -- was given a urine test on June 23rd, 2011,

4  and had what's referred to as a nonnegative result?

5  A.  I am aware of that.

6  Q.  And, Dr. Roman, are you a qualified to speak to the

7  accuracy of the MedTox Sure-Screen, which is the urinalysis

8  screen device that Mr. Eldridge was given?

9  A.  I am not, except insofar as I did the most basic of

10  research and understand that one of the criteria that makes

11  this a good measure is that it is capable of screening at lower

12  levels.  But beyond that, I have no knowledge or sophistication

13  to allow me speak to that measure.

14  Q.  And, well, actually -- okay.  So, let's just assume for the

15  sake of argument that that screening measure that was

16  administered to Mr. Eldridge, that it was, in fact, accurate

17  and that the reason that Mr. Eldridge had a nonnegative sample

18  is because Mr. Eldridge did, in fact, consume cocaine.  Now,

19  how long do the effects of substance-induced psychosis last

20  after ingestion of a drug like cocaine?

21  A.  They certainly vary depending on the substance, and I must

22  say that I would not have been able to answer that question.  I

23  would have suggested a matter of weeks.  I believe Dr. Nathan

24  gave testimony to suggest that it would be more like a matter

25  of days.  And I would certainly defer to his expertise in that

Roman - Direct by Ms. Ferry

1    over mine when it comes to a substance like cocaine.

2    Q.  And Dr. Nathan addressed this earlier.  Do you disagree

3    with his testimony that Mr. Eldridge would have had to have

4    essentially continuous access to street drugs for his

5    symptoms -- his reported symptoms of psychosis to be due to

6    substance abuse?

7    A.  I do not disagree with his testimony.  I think that's an

8    accurate appraisal.

9    Q.  And, Dr. Roman, is there any other evidence in the TDCJ

10   records that Mr. Eldridge has been disciplined for drug use at

11   any other point since he's been on death row?

12   A.  I saw no such evidence.

13   Q.  And is there any evidence in the TDCJ records that the

14   mental health staff believed his symptoms to be related to

15   substance abuse?

16   A.  I recall seeing no such record.

17   Q.  And while we're discussing this exclusionary criterion, let

18   me ask you this:  Have you reviewed the grievance paperwork

19   that Mr. Eldridge filed after that drug screen?

20   A.  I have, a number of times.

21   Q.  And for the Court's reference, I won't be pulling those up,

22   but that's State's Exhibit 44, pages 2 through 52.  And,

23   Dr. Roman, in your professional opinion, is that paperwork

24   significant in terms of the question of Mr. Eldridge's

25   competence for execution?

Roman - Direct by Ms. Ferry

1   *A.*  It's a somewhat broad question.  I don't think that that

2   paperwork is directly relevant other as a data point that one

3   might examine to speak to the question of his competency for

4   execution.

5   *Q.*  Well, let me ask you this:  Does it show -- would it be

6   appropriate to extrapolate from the existence of that paperwork

7   that clearly Mr. Eldridge understands cause and effect, he

8   knows if you get a dirty urine, there's going to be

9   consequences, and extrapolate from that that you can now argue

10  that Mr. Eldridge has a rational understanding of cause and

11  effect, crime and punishment?

12  *A.*  No, I don't think you can extrapolate that.  In fact, his

13  response did not suggest that he knew that there were going to

14  be consequences.  As I read the response, he was told that

15  consequences were being delivered and he was asking that that

16  be reversed.

17  *Q.*  Now, we have one final exclusionary criterion to discuss --

18  exclusionary condition to discuss, excuse me, the direct

19  physical effects of a general medical condition.  And I would

20  like to -- for you to pull up -- I believe you have there your

21  supplemental report --

22  *A.*  I do.

23  *Q.*  -- Petitioner's Exhibit 2.  And you discuss this particular

24  exclusionary criterion on page 10; is that correct?

25  *A.*  I believe that's correct.

Roman - Direct by Ms. Ferry

1  *Q.*  Now, you identify here three potential medical conditions
2  that need to be ruled out in Mr. Eldridge's case; is that
3  right?
4  *A.*  I guess it actually starts at the bottom of page 9.
5  *Q.*  Okay.  From page 9 to page 10.  And those conditions that
6  you discuss are dementia, pernicious anemia, and -- correct me
7  if I mispronounce this -- megaloblastic madness?
8  *A.*  No, I'm sure you pronounced that correctly.  I'm not seeing
9  it as I'm looking here.  But I'm sure you're right.
10 *Q.*  On page 10, the paragraph --
11 *A.*  Oh, see, I'm on page 9.  That's the difficulty, yes.
12         *THE COURT:*  What's the exhibit number again?
13         *MS. FERRY:*  Petitioner's Exhibit 2, Your Honor, the
14 supplemental report.
15         *THE COURT:*  Thank you.  That's his report.  Thank you.
16 *A.*  Yes, I see it.
17 *Q.*  Okay.  So, let's start with dementia.  And why did you
18 conclude that dementia could be ruled out as a cause of
19 Mr. Eldridge's symptoms?
20 *A.*  Well, having performed a neuropsychological evaluation,
21 neuropsychologists being particularly adept at evaluating
22 issues such as dementia, the fact that he showed no evidence of
23 dementia I think is pretty definitively conclusive.
24 *Q.*  Okay.  And here on what --
25         *THE COURT:*  What would you see if you were seeing

Roman - Direct by Ms. Ferry

1  evidence of dementia?  Excuse me.

2       *THE WITNESS:*  In a more common sense we talked about

3  dementia being an IQ hit.  There may be certain things that we

4  see that are affected.  We know that many people will respond

5  with memory problems and they may have some subtle things, but

6  in order to make a diagnosis of dementia, we want to see that

7  old learned information is affected.  Obviously it depends on

8  how far along they are in the process and there are some

9  different kinds of dementia presentations, but typically we

10  will see deficits in things like naming tests and language.

11       He had some of those things, but they were

12  consistent with some of his developmental history.  We will see

13  evidence that there is a drop from prior levels of functioning.

14  So, there are some pretty hard cognitive markers that we will

15  find of aphasic deficits, memory deficits, difficulties with

16  reasoning.

17       *THE COURT:*  All right.  Thank you.

18  BY MS. FERRY

19  *Q.*  And you just mentioned the term "aphasic deficits."  What

20  does that mean?

21  *A.*  Within medicine, people always have a fancy term to go with

22  just about anything you can imagine.  And aphasic deficit

23  refers to an acquired inability to do something with speech.

24  It may be to comprehend.  It may be to produce speech.  But in

25  aphasic deficit, we look at the fact that a person has evidence

Roman - Direct by Ms. Ferry

1  of an impairment in language function that has been acquired.

2  Q.  And let's move on to pernicious anemia.  And tell us why

3  you concluded that that medical condition could be excluded as

4  a cause of Mr. Eldridge's symptoms, which I believe you discuss

5  on page 10 of Petitioner's Exhibit 2?

6  A.  I suppose I should read this before I give that response.

7  But the thing that I'll tell you without reading it -- actually

8  I don't know if I said this or not, but he had symptoms before

9  he was diagnosed with pernicious anemia, at least ones that

10 appear in the record.  I didn't know him prior to that.  He's

11 had symptoms that have been manifest that he's reported that

12 have been contained in the record after his pernicious anemia

13 has been successfully resolved.  And while as you're going to

14 get to, I think, there is really no evidence to suggest that he

15 has suffered from any lasting effects of megaloblastic madness.

16 Q.  And before we get to that --

17 A.  Sure.

18 Q.  -- I want to ask you, after Mr. Eldridge was hospitalized

19 in 2006 for his pernicious anemia, did he begin receiving B-12

20 injections?

21 A.  Yes.  Of course, I don't remember the timeline well enough

22 to speak to with any significance, but, yes, he did begin

23 receiving B-12 injections.  I know there were some times that

24 he wouldn't take the injection and there were some complicated

25 things in the record with that, but, yes, he was put on

Roman - Direct by Ms. Ferry

1  injections fairly quickly.

2  Q.  And does Mr. Eldridge continue to receive B-12 injections

3  up to the present?

4  A.  You know, I don't know.  I don't believe he's taking

5  injections anymore, but I don't know whether he is or not.

6  Q.  Okay.  Well, let's move on to the megaloblastic madness.

7  A.  If I may, it is typical for pernicious anemia, for a person

8  to have to continue to take B-12, because certainly if there's

9  an underlying condition like an intrinsic factor deficit,

10 there's no reason to see that that would resolve.  But I don't

11 know whether he's still taking them or not.

12 Q.  Okay.  We can -- we'll discuss that -- we'll discuss that

13 later.  We can pull up some pages of the record.

14 A.  Fine.

15 Q.  So, let's go now to megaloblastic madness.  And tell us why

16 you found that exclusionary criterion?

17 A.  Well, really it goes back to the dementia argument.

18 Megaloblastic madness deals with the fact that an individual

19 will show some direct effects of anemia as a function of

20 brain-related changes.  Megaloblasts are large blood cells that

21 are basically purposeless because they don't contain hemoglobin

22 that are circulating through the circulatory system.  As I

23 think Dr. Nathan has already described, a person with

24 pernicious anemia runs the risk of having some cerebral effects

25 as a function of that.  So, many times when people present with

Roman - Direct by Ms. Ferry

1  this kind of deficit, they will show certain cognitive and
2  potentially psychiatric effects.
3          Most people are familiar with Korsakoff syndrome,
4  which happens with B-1 depletion disorders, like with chronic
5  alcoholics.  It's a very similar process in terms of the way
6  that it works with B-12, the kind of thing that can be reversed
7  as long as no structural damage has been done with thiamine
8  injections.  In this case one does it with cyanocobalamin
9  injections.
10 Q.  Now, Dr. Roman, what's significance do you attach to the
11 fact that TDCJ mental health staff have been treating
12 Mr. Eldridge with antipsychotic medication since November of
13 2009, in determining if the diagnostic criteria for
14 schizophrenia have been met?
15 A.  Well, obviously I take it to mean that the people who
16 presumably would know him best and have the best opportunity to
17 see him would also probably be the best equipped to delineate
18 the degree of skepticism versus the degree of legitimacy
19 believe that there was sufficient evidence to support not only
20 the diagnosis but the need to treat it.
21 Q.  And you mentioned earlier that Mr. Eldridge had a prior
22 course of antipsychotic medication at TDCJ back in 2006; is
23 that right?
24 A.  My recollection is he was started on perhaps 1 milligram of
25 Risperidone briefly.  I don't think it lasted more than a

Roman - Direct by Ms. Ferry

1  couple of weeks, is what I recall just off the top of my head.
2  There was very little documentation about what became of that.
3  Q.  And was that course of Risperidone that Mr. Eldridge was
4  briefly started on, was that given at the time that he was
5  at -- he was admitted to UTMB related to his pernicious anemia?
6  A.  I don't remember how to correlate those dates.  I'd have to
7  look back.  I don't remember what the pernicious anemia
8  treatment date was without looking at that record or the
9  report.
10  Q.  Okay.  Now, let me ask you this about Dr. Allen's report at
11  tab 49, page 10, where Dr. Allen writes -- and this report was
12  written at a time when Mr. Eldridge was still on Risperidone.
13  "Despite being on Risperidone, the examinee is showing variable
14  inconsistent symptom presentation."
15              And, first, would you agree with that
16  characterization of Mr. Eldridge's symptom presentation while
17  on medication?
18  A.  I think I would.  Again, what I have to compare it to are
19  notes that are within the record.  And the notes that exist
20  show a pattern of exacerbation of symptoms and remission of
21  symptoms, times where he reports the voices are better, times
22  where the voices seem to return.  So, I think that's probably a
23  reasonable categorization or characterization of his symptoms.
24  Q.  And would you describe that sort of waxing and waning of
25  symptoms, would you -- well, first of all, would you agree that

Roman - Direct by Ms. Ferry

1  the label "waxing and waning" applies to what you just

2  discussed as Mr. Eldridge's symptom presentation?

3  A.  Variable waxing and waning, I think that they're generally

4  synonymous.

5  Q.  And would you agree that that sort of waxing and waning is

6  typical of schizophrenics who are on medication?

7  A.  I have argued that it's typical of schizophrenics and

8  virtually every other diagnosable mental disorder to begin

9  with.  But when it comes to medication specifically, yes,

10  that's definitely true, and I believe Dr. Nathan also gave some

11  testimony to that effect.

12  Q.  Now, let's talk with some more specificity about the

13  argument contained in Dr. Nathan -- excuse me, Dr. Allen's

14  report that Mr. Eldridge is malingering.  And we can pull up

15  specific pages, if necessary.  But would you agree that as a

16  general matter Dr. Allen seems to rely on inconsistency of

17  presentation to argue that Mr. Eldridge is malingering?

18  A.  Obviously Dr. Allen relied on a number of different factors

19  in considering his conclusion, but, yes, it did seem to me that

20  this idea of an inconsistent presentation was a large part of

21  his argument.

22  Q.  And we discussed earlier this text, *Clinical Assessment of*

23  *Malingering and Deception*, and you testified that this is a

24  reliable authority, correct?

25  A.  That is correct.

Roman - Direct by Ms. Ferry

1  *Q.* And I want to read a statement from this book and ask

2  you --

3           *THE COURT:* What's the date of the book?

4           *MS. FERRY:* This is the third edition, Your Honor,

5  which was published --

6  *A.* 2010, I believe.

7           *MS. FERRY:* -- in 2008.

8           *THE COURT:* Thank you.

9  BY MS. FERRY

10 *Q.* So, I want to read this paragraph here on page 303,

11 starting here at the bottom of the left-hand column and ask you

12 if you agree with it, Dr. Roman.

13           "Some practitioners mistakenly assume that all

14 inconsistencies are evidence of malingering or manipulation.

15 They make two implicit assumptions.  One, examinees

16 deliberately distorted their presentations, but, two, they

17 were, quote, 'tripped up' in attempting to keep their, quote,

18 'stories' consistent.  These assumptions are completely

19 untenable.  First, inconsistencies can reflect the imprecision

20 of the assessment process.  Second, persons with mental

21 disorders often have poor insight, which leads to

22 inconsistencies.  Third, unimpaired individuals often show some

23 inconsistencies.  Fourth, the use of inconsistencies is an

24 ineffective detection strategy for feigning."

25           Do you agree with that statement?

Roman - Direct by Ms. Ferry

1   A.  I do agree with that statement.

2   Q.  Dr. Roman, from your review of Dr. Allen's --

3        THE COURT:  Can I ask a question before you leave

4   that?  Are you saying that inconsistencies -- even if

5   inconsistencies are not always indications of malingering, can

6   they sometimes be evidence of malingering?

7        THE WITNESS:  Certainly, Your Honor.

8        THE COURT:  Okay.  So, you're not reading that

9   statement -- or are you reading that statement to mean that you

10  can never rely on evidence of inconsistencies?

11       THE WITNESS:  I understand the statement to mean that

12  if you base your case on the existence of inconsistencies --

13       THE COURT:  And nothing else?

14       THE WITNESS:  Right.  That's an untenable conclusion

15  to draw.

16       THE COURT:  All right.

17  BY MS. FERRY

18  Q.  Now, from your review of Dr. Allen's reports, Dr. Roman,

19  what weight would you say he's given to Mr. Eldridge's most

20  recent TDCJ's records versus those from 2001 and even pretrial,

21  which is now nearly 20 years ago?

22  A.  Based on my review, it appeared to me that there was a

23  substantially greater degree of weight given to the old

24  records, relatively little discussed in terms of the new

25  records.

Roman - Direct by Ms. Ferry

1   Q.  And, Dr. Roman, tell us what weight you gave to those older

2   records, the entire 2001 Jester IV records as well as the

3   pretrial records?

4   A.  Given that there's more, I may have spent more time on them

5   as well.  I think the difficulty is that when you look at

6   records coming in, they should all be given equal weight.

7   There's no reason to have any prior assumption of malingering,

8   not malingering, schizophrenic, not schizophrenic.  So, all the

9   data matters.  But when you get to the issue that's before the

10  Court, the present data matter substantially more.

11  Q.  And why do you say that?

12  A.  Well, it has to do with the judicial standard, as I

13  understand it.  It has to do with his present level of

14  competency.  Competency of any type is always defined in terms

15  of competency to do what or competency for what purpose.  And

16  that always becomes a present day phenomenon.  In fact -- well,

17  that's probably irrelevant.

18  Q.  Okay.  Are you done then?

19  A.  I'm done.

20  Q.  Okay.  Let's talk about the feigning measures that you and

21  Dr. Allen administered.  And looking at your report, page 11 of

22  Petitioner's Exhibit 2, your supplemental report, could you

23  just summarize for us weaknesses that are inherent in any

24  objective measure of feigning?

25  A.  Well, it could be applied to any measure for that matter.

Roman - Direct by Ms. Ferry

1    I don't know if you're talking about things that I said

2    specifically in my report, or do you want me to talk about this

3    generally?

4    Q.  I would like for you to just explain this information

5    that's in your report.

6    A.  Okay.  So, one of the issues that comes with full measures

7    of malingering is that many times they will use what's called

8    an amplification strategy.  They may ask about a symptom that

9    is a -- and, again, there are several types.  So, I want to be

10   careful about my wording here.  But it may be a very normal

11   symptom that people would report.  You know, do you feel tired

12   in the morning.  Many people would say, oh, sometimes I do, and

13   they will amplify it by saying something like, do you feel

14   tired in the morning each and every day no matter how much

15   sleep you got.  Most people would not say yes to that.

16           The precision of the wording is something that

17   many malingering measures rely on to be able to make sure that

18   the symptom is reported at a level that just is not reasonable

19   for a normal person.  So, it really requires that the person

20   adequately interpret the language and basically be on the same

21   page as the person asking the question or the person designing

22   the measure.

23           Another issue that comes up with it is that,

24   independent of the issue of terminology, obviously that could

25   potentially be an issue, if one doesn't understand what a word

Roman - Direct by Ms. Ferry

1  means, that can certainly come into play.  But there are some

2  other response sets that can sometimes ensue.  I think you read

3  the example of asking Mr. Eldridge if he's depressed, and he

4  says, "All the time."  And then you say, "So, do you always

5  feel depressed?"  And he looks at you and says, "No, not

6  always."

7          When those types of questions are asked with a

8  malingering measure, you don't have the follow-up measure in

9  most of the follow-up question in most cases.  You ask that

10  first question and you move on, because it's an indication that

11  they have overreported it.  Who's going to report that they're

12  depressed all the time?  It's a crazy thing.  Nobody would

13  admit to that.  These are some of the difficulties that I think

14  are inherent in the malingering measures.  The wording becomes

15  very precise.

16  Q.  And am I correct, Dr. Roman, that you have particular

17  concerns about the potential effect of Mr. Eldridge's language

18  difficulties on his performance on measures with this type of

19  precise wording?

20  A.  I do, and I think I'm not alone in that.  I think that

21  other examiners over time have pointed to these being --

22  language being a weak area.  I'm not the first person to

23  document that.

24  Q.  And if I could just have you explain an example of

25  Mr. Eldridge's language difficulty.  You had an exchange with

Roman - Direct by Ms. Ferry

1   him in which it become apparent to you that Mr. Eldridge was

2   having difficulty with the difference between visions and

3   hallucinations.

4   A.  Right.

5   Q.  Could you just talk about that?

6   A.  Well, I have more in the report, but as I recall the

7   exchange, I had asked him about whether he had visions and he

8   said yes.  And he reported some things that I believe were

9   visual hallucinations.  These were things that he saw that I

10  believe were not there.  They were definitely perceptual

11  phenomenon.

12          When I came back later and asked him about visual

13  hallucinations, he seemed rather confused by that and didn't

14  quite know what I was talking about.  So, in my mind, it's an

15  example of the idea that when the question is asked in one way,

16  he'll give a response; when asked in another way, he can't

17  respond.  Now, I know that that seems like a red flag to some

18  people, because come on, he doesn't know what a visual

19  hallucination is?  Are you kidding me?  But he does give a

20  response to visions.  It doesn't make sense to me that he would

21  respond when asked in one way and would not be able to respond

22  asked a different way.  That speaks to a language-based

23  comprehension-type issue for me.

24  Q.  And why are you so convinced that Mr. Eldridge does have

25  language difficulties?

Roman - Direct by Ms. Ferry

1  A.  Well, we go back to the neuropsychological evaluation and
2  there are several things.  And, again, I am doing this from
3  memory, but I think it will work.  He did show deficits in
4  vocabulary, both on confrontation naming measures.  Literally
5  you show him a picture of something and you say, "What's this a
6  picture of?"  He has consistently scored poorly on measures of
7  vocabulary on things like the Wechsler Adult Intelligence
8  Scale.  Across a number of administrations, his score is in at
9  least the mildly deficit range.
10          He has had some problems with his ability to use
11  language in terms of simple verbal reasoning.  He has had
12  problems with being able to rapidly generate words, in a
13  measure we refer to as controlled oral word association.
14          Also, if you look at his records from school, the
15  grades that have been pretty consistently poor, with the
16  exception of some bizarre changes in his senior year and maybe
17  to some degree his junior year, he had always done better in
18  math and had generally had Ds in English language arts.  So, as
19  best as we can tell, I believe that there's been longstanding
20  evidence of language-based deficits.
21  Q.  And you referenced this before, but I want to ask you
22  specifically.  If you're faced with a situation like that, with
23  an examinee who has language difficulties and you're attempting
24  to get a feigning measure, why can't you just walk the examinee
25  through the question or ask follow-up questions or explain

Roman - Direct by Ms. Ferry

1  particular language that you think an examinee may be having
2  difficulty with?
3  A.  Well, you can ask follow-up questions.  Indeed, I
4  ultimately did that.  In fact, I would say that you're required
5  to.  But when you're initially administering it, there are two
6  reasons you can't do that.  One is integrity of the norms.  For
7  better or worse, a standardized measure has to be given by the
8  book, and that's simply how it is.  If you paraphrase or
9  reinterpret a question even on intellectual testing, it's not
10 specific to malingering, you have changed that question and you
11 can no longer use the norms.

12          There was some evidence on the early intelligence
13 test, the Wechsler for children.  It was normed using a red
14 pencil.  And if you gave them a regular No. 2 pencil, the norms
15 were different than if you gave them a red pencil.  I have no
16 idea why, but they were.  So, you can't do that for normative
17 reasons.

18          The second thing that comes into play is that in
19 some cases, again, as I said, the wording is very specific, and
20 in order to give it the way that it's supposed to be given,
21 forget the norms, just in terms of the administration, if you
22 don't give it that way, you haven't given the test the way the
23 test is supposed to be given and then you might as well not use
24 formal psychometric testing at all, go back to an interview
25 technique, because your measures are worthless.

Roman - Direct by Ms. Ferry

1  *Q.*  So, let's talk specifically now about the Structured
2  Interview of Reported Symptoms, 2 or the SIRS-2.  And looking
3  at page 115 of Petitioner's Exhibit 5, which is your raw -- or
4  the first of the two scoring sheets for administration of the
5  SIRS-2 --
6  *A.*  Yes.
7  *Q.*  -- could you briefly describe for us the structure of that
8  measure?
9  *A.*  Sure.  Let me -- I'll give you in a basic way, and if we
10  need more detail -- essentially there are a number of primary
11  scales.  You can see on the first, four primary scales.
12  They're looking at rare symptoms, unusual symptom combinations,
13  et cetera.  And basically we're asking how many of those four
14  are scoring within either a -- boy, it's hard to see there --
15  within a general, an indeterminate, a probable, or a definite
16  malingering range.  And then you get this -- so, you can see
17  over there, there's an MT index, which was 25 in this case.
18          There are four other primary scales that are
19  included afterward that you can see plotted as well.  Of those
20  eight scales, not including the MT index, which is a combined
21  score, Rogers states that you want to see either one of those
22  scales in the definite range or three of those scales in the
23  probable range in order for it to be considered clear signs of
24  feigning.  Of course, malingering is not something that one
25  uses in the literature and it's recommended clinicians not use

Roman - Direct by Ms. Ferry

1   it.

2           I don't know if you want me to go on from there.

3   Q.  That's good for right now.  Now, you made reference to

4   Rogers just a moment ago.  Was that a reference to Richard

5   Rogers who's the author of the SIRS-2?

6   A.  Yes, it's his measure and his book.

7   Q.  And that's what I was going to ask you.  He's also the

8   Richard Rogers who's the -- whose book we've been discussing,

9   *Clinical Assessment of Malingering and Deception*?

10  A.  That is correct.

11  Q.  Okay.  Now, this page that we're looking at here, page 115,

12  lists just abbreviations for the primary scales and the

13  supplementary scales.  Looking at page 29 of the SIRS-2 manual,

14  just tell me if I'm reading this accurately, what each of those

15  scales measures.

16          So, primary scale, RS, measures rare symptoms; SC

17  measures symptom combinations; IA is improbable or absurd

18  symptoms; BL is blatant symptoms; MT, as you indicated, is a

19  combined score, which is the modified total index; primary

20  scale SU is subtle symptoms; SEL is selectivity of symptoms;

21  SEV is severity of symptoms; RO is reported versus observed

22  symptoms.

23          Have I now gone through the primary scale?

24  A.  Yes.

25  Q.  And the supplementary scales, DA is direct appraisal of

1    honesty; DS is defensive symptoms; IF is improbable failure; OS

2    is overly specified symptoms; SS index is supplementary scale

3    index; and INC is inconsistency of symptoms.

4              And does that conclude the supplementary scales?

5    A.   That concludes the supplementary scales.

6    Q.   Now, before we get into Mr. Eldridge's specific score, I

7    want to -- I want you to walk us through the way this measure

8    is scored.   And you already mentioned here there's this chart

9    on the left on which you plot the results of the primary scores

10   and whether the scores fall into general, indeterminate,

11   probable or definite malingering, right?

12   A.   That's correct.

13   Q.   Now, here on page 116 of Petitioner's Exhibit 5, explain to

14   us what this page is that's entitled "SIRS-2 Decision Model."

15   What is this?

16   A.   So, this flow chart deals with the way that one makes a

17   determination in terms of the classification of response set.

18   And it starts with, as I suggested, the question of within the

19   primary scales, that large shaded triangle at the top, whether

20   three or more of those scales fell within the probable range or

21   whether one of them fell within the definite range, because

22   that's such an extreme report, that that's considered

23   sufficient for raising a red flag in and of itself.

24              If that's the case, if you move to the arrow to

25   the right and the RS total is greater than four, then you're

Roman - Direct by Ms. Ferry

1  going to declare that this is a feigning protocol.

2  Q.  And looking back at page 115, Mr. Eldridge had two primary

3  scales, a primary scale for rare symptoms and for blatant

4  symptoms in the probable range; is that right?

5  A.  That's correct, yes.

6  Q.  And then applying the decision model, Mr. Eldridge's -- the

7  decision model resulted in Mr. -- excuse me -- Mr. Eldridge

8  falling into the indeterminate evaluate category, right?

9  A.  Right.  Because when you drop down one triangle with one or

10  two probable primary scales, that second triangle right just

11  below it and you follow that over to the yes, the question

12  becomes the first four primary scales that are combined into

13  that MT index, what was the score.  And if the combination of

14  all four of them was in the range that he had -- I forget what

15  that score was.  You pulled it off again -- but if it's between

16  22 and 45, it falls into what Rogers calls the indeterminate

17  evaluate category.

18  Q.  And I'll put here page 115 again.  Mr. Eldridge's MT index

19  score was 25, correct?

20  A.  Yes, that's correct.

21  Q.  Now, do you have some concerns about the validity of those

22  scores, of Mr. Eldridge's scores on the SIRS-2?

23  A.  Yes.  The measure itself is certainly a highly valid

24  measure, but in terms of the validity or accuracy of the

25  scores, the language concerns that I've mentioned before are

Roman - Direct by Ms. Ferry

1   concerns that I have -- or the basis of my concern.

2   Q.  Okay.  So, let's now turn to the feigning measures that

3   Dr. Allen administered.

4   A.  Okay.

5   Q.  I would like to start with the test of memory malingering,

6   which is known as the TOMM.  Now, does the TOMM test for the

7   feigning of psychiatric symptoms?

8   A.  No.

9   Q.  What is the TOMM a test of?

10  A.  It is a measure of potential feigning for cognitive

11  symptoms, specifically memory-based symptoms.

12  Q.  Now, during your neuropsychological evaluation of

13  Mr. Eldridge, did you administer to Mr. Eldridge instruments

14  that assessed memory?

15  A.  Yes, I did.

16  Q.  And are those results documented on pages 9 and 10 of

17  Petitioner's Exhibit 1?

18  A.  Yes, they are.

19  Q.  And actually so you can look at both 9 and 10 at the same

20  time, it's probably best if you pull that up.

21  A.  It's the report.  Yes.

22  Q.  And, Dr. Roman, I don't want you to go through every single

23  one of the test results here on pages 9 and 10 --

24  A.  Right.

25  Q.  -- but if you could just give us an overall summary.

Roman - Direct by Ms. Ferry

1   A.   Sure.   I can do that very easily.

2   Q.   Okay.   That would be great.

3   A.   So, primarily he was given three different verbal memory

4   measures.   And on one of them, a list learning measure, he

5   showed some below average and significantly problematic

6   performances both with his ability to learn the list of words

7   and in his delayed recall.

8           He was then given two other measures.   One is the

9   measure of story recall.   I read a story.   He remembers -- or

10  he repeats back as much as he can.   We come back, a delay.

11          Another is what's called a paired associate

12  learning task, which is another type of list learning thing.

13  On both of those, he scored within the average range.

14          He also scored within the average range on some

15  measures of visual spatial memory.   He had some difficulty with

16  one of those measures at recall, but it's a really funky

17  measure that unfortunately -- if I can say funky -- which

18  unfortunately has been -- or it may be fortunately, has been

19  dropped from the recent revision of the Wechsler Memory Scale

20  because of some of the difficulties with it.   The point is that

21  he scored fine except for that delay.

22  Q.   Now, given Dr. Allen's conclusion's that Mr. Eldridge is

23  malingering, why is your neuropsychological testing of Mr. --

24  using measures that test memory, why is that significant?

25  A.   Well, presumably if one is going to malinger a memory

Roman - Direct by Ms. Ferry

1  deficit, one should attempt to be portraying a memory deficit.

2  And given that I did memory testing and he did not show any

3  consistent pattern of deficits on memory, real honest to

4  goodness memory testing, the idea that he might be malingering

5  in memory deficit seems to be irrelevant.

6  Q.  Now, let's talk about the Miller Forensic Assessment of

7  Symptoms Test or the M-FAST.  And am I correct that the M-FAST

8  is what's known as a screening device?

9  A.  It is known as a screening device.

10       THE COURT:  Can I back up for a second?  Why is it

11  irrelevant -- it being the test of memory deficits -- if at

12  various documented points in the record Mr. Eldridge responds

13  consistently to questions about what he remembers by saying, "I

14  don't remember" or, "I don't know"?

15       THE WITNESS:  Right.  I will frequently see patients

16  who report memory problems.  It's not an uncommon referral.

17  And as I frequently say to them, I believe them.  I believe

18  that they're suggesting that they have a memory problem.  The

19  question then becomes can I demonstrate that memory problem on

20  formal tests of memory, neuropsychological measures.

21            If I give those measures and the person does well

22  on those measures, as was generally the case for Mr. Eldridge,

23  I'm sure they still have instances of forgetting, which is what

24  they're remembering, but their memory is not impaired.  Now,

25  would that their memory was impaired on my measures, it might

Roman - Direct by Ms. Ferry

1  be reasonable to ask if those results were truly valid.   The
2  reporting memory impairment they say they have in their
3  day-to-day life, I give them some measures, they don't do well
4  on those measures at all.   Maybe that's not real.   Maybe those
5  results were feigned, at which point giving a measure like the
6  TOMM would make lots of sense.
7         THE COURT:   Well, wait, wait.   You lost me there.
8         THE WITNESS:   Okay.
9         THE COURT:   When you say they don't do well, do you
10  mean to say that they do show memory deficits?
11         THE WITNESS:   Memory deficits on formal memory
12  testing, yes.
13         THE COURT:   All right.   But if they do well, that is,
14  they don't have memory deficits but they are saying they do --
15         THE WITNESS:   Right.
16         THE COURT:   -- what inference do you draw from that?
17         THE WITNESS:   Well, there's a couple.   Part of it
18  speaks to the idea of how we look at the question of
19  malingering within the neuropsychological data set.   Basically
20  the idea that they're attempting to fake the results of the
21  actual measures that you're giving, which if they did well,
22  they're obviously, it would seem, not doing that.   They're
23  putting forth candid performance.   But in a more general level,
24  is the question if --
25         THE COURT:   Or they're faking.   They're just doing a

Roman - Direct by Ms. Ferry

1   bad job; that is, that they are reporting that they don't

2   remember --

3          *THE WITNESS:*  Right.

4          *THE COURT:*  -- but, in fact, objective measures of

5   memory show that they do in fact remember.

6          *THE WITNESS:*  Right.

7          *THE COURT:*  That's where you're losing me.

8          *THE WITNESS:*  Well, because I think that the thing

9   that you look at is when somebody reports a symptom or somebody

10  else has reported and they say, here's what's going on, I

11  believe the person has this deficit, as a neuropsychologist, I

12  would argue the next test is not let's see if they're

13  malingering.  The next test is let's evaluate their memory.

14         *THE COURT:*  Sure.  I'm not quarreling with that.  My

15  question --

16         *THE WITNESS:*  Right.

17         *THE COURT:*  -- is, if you have a person saying, in

18  response a question, do you remember X --

19         *THE WITNESS:*  Yes.

20         *THE COURT:*  -- or did X occur and the person says, "I

21  don't know" or, "I don't remember" and then you discover that,

22  in fact, there is no memory deficit, why isn't that a -- why

23  isn't the appropriate inference from that, that they are

24  falsely describing what, in fact, they do remember so it is not

25  irrelevant or --

Roman - Direct by Ms. Ferry

1          *THE WITNESS:*  I understand Your Honor's point.  I
2     don't dispute that point at all.  My point was that in giving a
3     formal measure --
4          *THE COURT:*  That's fine.
5          *THE WITNESS:*  -- of memory malingering, it seems
6     irrelevant given that we have direct measures of memory
7     malingering.  To make the inference based on your objective --
8          *THE COURT:*  As more objective as opposed to
9     subjective?
10         *THE WITNESS:*  Exactly.
11         *THE COURT:*  Well, I guess that's my point.  Because it
12    is objective, by your description, in any event, it is a more
13    reliable measure than self-reporting what you remember and if
14    the two are inconsistent, it can support an inference that the
15    self-reporting is not credible?
16         *THE WITNESS:*  I suppose it could, but it's extremely
17    difficult to explain why across a number of arguably more
18    difficult better normed, well-respected memory measures,
19    someone apparently responded candidly and then on some other
20    memory measure, they were easily tripped up.
21         *THE COURT:*  Relatively objective -- harder to lie your
22    way around, feign your way around, isn't that what it's
23    designed to be?
24         *THE WITNESS:*  Something like the TOMM?
25         *THE COURT:*  Yes, sir.  Isn't that what gives it

Roman - Direct by Ms. Ferry

1   testing reliability or credibility?

2          *THE WITNESS:*  In this case not so much.  With the TOMM

3   the issue is that it is so incredibly simple to pass, and I

4   think it's on that basis.  It's not that it is more creative in

5   the way that it could trip you up.

6          *THE COURT:*  I'm not suggesting it's creative or trying

7   to trip you up, but your term was objective --

8          *THE WITNESS:*  Right.

9          *THE COURT:*  -- as opposed to relying on the person's

10  subjective self-reporting.

11         *THE WITNESS:*  That is certainly true, yes, Your Honor.

12         *THE COURT:*  And what makes it objective, relatively?

13         *THE WITNESS:*  What makes the memory malingering

14  measure objective is what you're asking?

15         *THE COURT:*  Yes, sir -- or the memory deficit measure.

16         *THE WITNESS:*  I don't even know to respond with the

17  memory deficit measure.  It is a direct, well-accepted, no

18  doubt about it, valid construct of the issue of the

19  neurocognitive function of memory.

20         *THE COURT:*  I understand.  What is it about the way in

21  which the questions are framed that makes it such a reliable

22  time-tested construct?

23         *THE WITNESS:*  It isn't a matter of questions.  One is

24  actually being asked to learn and remember things.  One is

25  being read stories, asking to repeat those stories.

Roman - Direct by Ms. Ferry

1          THE COURT:  So, it's not about remembering what
2    happened to you?
3          THE WITNESS:  Right.
4          THE COURT:  It's about remembering what you were told
5    and being able to recount it?
6          THE WITNESS:  Exactly.
7          THE COURT:  All right.
8          THE WITNESS:  Acquiring and being able to repeat later
9    material you've heard or seen.
10          THE COURT:  How much -- okay.  That was the answer to
11    the question.
12          THE WITNESS:  Okay.
13          THE COURT:  Thank you.
14              Go ahead.
15    BY MS. FERRY
16    Q.  Let me ask just a follow-up question on that, Dr. Roman.
17    When the Court was asking you about how can you reconcile the
18    fact that someone -- not that someone, that Mr. Eldridge did
19    fine on these neuropsychological measures of memory that you
20    administered, yet he reports in his TDCJ records that
21    periodically he can't remember information that he's being
22    asked, is that sort of report -- well, actually let me ask you
23    this:  Are disturbances in the ability to recount personal
24    information, is that typical or atypical of schizophrenics?
25    A.  It's not at all unusual to have difficulties with episodic,

Roman - Direct by Ms. Ferry

1  which is what you're describing, or even semantic memory

2  structures within schizophrenia.

3  Q.  And so am I correct, then, that the discussion that you

4  were just having with the Court really boils down to a question

5  of the objective measures testing Mr. Eldridge's ability to be

6  told facts, for instance, and the deficit, that the deficit

7  measure that you were just discussing, of being told a story

8  and being able to parrot back that information versus in the

9  TDCJ records being able to recount personal history

10  information?

11  A.  Yes, that's correct.

12  Q.  Okay.

13  A.  And then, of course, there's the question of able or

14  willing, which, of course, is at the core of the question of

15  feigning, clearly, as Your Honor correctly points out.  The

16  issue becomes how does one resolve that discrepancy within the

17  data set.  But it's certainly the case that memory impairments

18  are among the cognitive deficits that can be seen with

19  schizophrenia.

20  Q.  Now, I can't remember if I actually started asking about

21  the Miller Forensic Assessment of Symptoms Test or the M-FAST.

22  A.  You did.

23  Q.  Okay.  And had I already asked whether that's a screening

24  device?

25  A.  You did.

Roman - Direct by Ms. Ferry

1  *Q.*  And is that a screening device?

2  *A.*  It is.

3  *Q.*  Okay.

4  *A.*  A 25-item screening device.

5  *Q.*  Okay.  Great.  We covered that.

6              And, Dr. Roman, according to the literature, is

7  it acceptable to use a screening device as definitive evidence

8  of feigning?

9  *A.*  No, it is not.

10  *Q.*  And what is the hallmark of a screening device in terms of

11  its concern about false negatives versus false positives?

12  *A.*  Well, generally speaking, screening devices, and certainly

13  the M-FAST in particular, is designed in such a way that it

14  maximizes the likelihood that you're going to find a positive

15  result.  So, in essence, while you will probably capture more

16  people who were feigning, you capture a larger group, some

17  might argue an unacceptably large group of people who are

18  believed to be feigning based on the test, but indeed are true

19  and honest responders.

20  *Q.*  And, so, would it be accurate to say that screening devices

21  aren't particularly concerned about false positives; they're

22  more interested in ensuring that you don't get false negatives?

23  *A.*  This is the leaning of a screening measure, yes.

24  *Q.*  Okay.  Now, I understand that you have some concerns about

25  the construction of the M-FAST.  When we're talking about an

Roman - Direct by Ms. Ferry

1   instrument like the M-FAST, what does the term "cut score"
2   mean?
3   A.  A cut score derives from the fact that we look at some
4   particular rank among the range of scores that can be achieved
5   and we say that a score above a particular score constitutes
6   impairment or failure or whatever the dimension is and the
7   score at or below that cut score is fine, that it is not
8   indicative.  It's a plus/minus, all or none phenomenon,
9   pass/fail.  Above the cut score or below, depending on the
10  dimension, with the M-FAST above, you fail.
11  Q.  And how many cut scores does the M-FAST have?
12  A.  One.
13  Q.  Is that problematic at all?
14  A.  Richard Rogers believes so, which is interesting given that
15  the author credits Richard Rogers with input in forming the
16  measure.
17  Q.  The author of the M-FAST?
18  A.  The author of the M-FAST.
19  Q.  And what is that's problematic about having a single cut
20  score on an instrument designed to detect psychiatric feigning?
21  A.  I'm certainly not the leading expert on malingering by any
22  means.  Richard Rogers has argued that it is important to have
23  an indeterminate category, that if you simply have the feigning
24  or honest responder categories, that you are missing this
25  entire middle range category.  And that's what happens with the

Roman - Direct by Ms. Ferry

1   cut score.  You have no way of looking at the people that fall

2   between.

3   Q.  Now, Dr. Roman, during your most recent December 2011

4   evaluation of Mr. Eldridge, did you do any further exploration

5   into Dr. Allen's M-FAST findings?

6   A.  I did.

7   Q.  And to describe what it is that you did in exploring those

8   findings in your supplemental report at Petitioner's Exhibit 2,

9   you use the term "limit testing approach"?

10  A.  Yes, I did.

11  Q.  Could you explain to us what a limit testing approach is

12  and specifically how you used the limit testing approach to

13  explore the M-FAST?

14  A.  Do you want both of those parts or just the second part of

15  that, what I did or what it is?

16  Q.  Both, please.

17  A.  Okay.  So, a limit testing approach has a long tradition in

18  assessment, and it basically deals with the idea of having a

19  pathological or -- pathological finding or a failed item and

20  then attempting to get more information about it.  So, at a

21  very simple level, if I were to ask you to assemble a puzzle

22  for me and there were time constraints on it and you don't get

23  it done in time, on a standardized measure, I now stop the

24  timer, you fail the item, and we move on.  And I must do it

25  that in order to preserve standardization.

Roman - Direct by Ms. Ferry

1              If I give you some additional time to see if you
2  can get it together with extra time or if I come back later and
3  readminister the puzzle, I can't give you points for it, but it
4  allows me to look at whether the process is broken.  So, is the
5  finding a real one, what can I make from the failure.
6              So, when applying that sort of approach to things
7  like the M-FAST, I wanted to guard against a couple of things.
8  I didn't want to be disingenuous in taking certain items out of
9  context and somehow purporting that this with a
10 readministration of a measure, because it certainly wasn't.
11 But by the same token, I wanted to be able to explore whether
12 those negative findings, some of which, frankly, seem to be at
13 odds with information I had received from Mr. Eldridge, some of
14 which I was concerned might be due to some of the language
15 concerns that I've raised, and I wanted to see if I could
16 elicit a similar and consistent response simply in asking him
17 some of those questions in the course of my interview.  And
18 that's what I mean by a limit testing approach.
19 Q.  And, so, just to make sure that the record is clear, the
20 limit testing approach that you applied in this instance was to
21 embed the content of particular questions on the M-FAST and the
22 SIMS into a structured clinical interview; is that accurate?
23 A.  It is accurate.
24 Q.  Now, Dr. Roman, if it's not appropriate to read a test
25 question on a measure of feigning and to walk an examinee

Roman - Direct by Ms. Ferry

 1  through that question, how is it appropriate to apply this
 2  limit testing approach?
 3  A.  One of the things that a screening measure will tell you
 4  and one of the things that the M-FAST certainly says is that if
 5  you find a problematic finding, you need to do further
 6  investigation.  There are a number of ways that one might
 7  attempt to investigate it further, but it seems to me that the
 8  idea of whether it is a reliable finding, whether if asked
 9  again you get the same thing, is of some relevance.  So,
10  there's always the difficulty of simply regiving the measure.
11  Practice effects and other things can be problematic in terms
12  of test, retest.
13          So, it is completely reasonable, indeed required,
14  to do some additional explanation of pathological findings.
15  The way in which one does that obviously can vary.  But I think
16  as long as we can keep it as close to the original data set as
17  possible without violating any procedural methodological or
18  technical parameters, the more justified our interrogation is.
19  Q.  And look with me at page 13 of petitioner's Exhibit 2, your
20  supplementary report.  Do you have that?
21  A.  I do.
22  Q.  Okay.  Great.
23          THE COURT:  Page 13?
24          MS. FERRY:  Page 13, Your Honor.
25          THE COURT:  Okay.  Thank you.

Roman - Direct by Ms. Ferry

1  BY MS. FERRY

2  *Q.*  In this middle section entitled "M-FAST" here and this --

3  let me zoom in here.  Okay.  And the second paragraph here

4  under M-FAST, you report that Mr. Eldridge -- for three of the

5  items that were endorsed by Mr. Eldridge during Dr. Allen's

6  evaluation, Mr. Eldridge did not endorse those items during

7  your limit testing approach evaluation; is that right?

8  *A.*  Yes, three of the extreme symptomatology items.

9  *Q.*  Okay.  And, Dr. Roman, let me ask you this:  Would it be

10  helpful as we discuss this limit testing approach to discuss

11  the specific questions that you asked Mr. Eldridge, or can we

12  just discuss it as a general matter?

13  *A.*  You know from prior discussions we've had, I always worry

14  about disclosing particular test items.  And I think it depends

15  on the degree of specificity you want to have or Your Honor

16  would like to have with regard to this conversation.  Obviously

17  it's easier to talk about the actual items, and I don't know

18  how to best balance that issue of test confidentiality with

19  information that's of utility to the Court.

20  *Q.*  Well, let's do this:  Why don't we talk about it as a

21  general matter and then if it's necessary, we'll discuss

22  specific test items.

23          So, Mr. Eldridge did not with you endorse three

24  extreme symptomatology items.  And you write here that one

25  item, 19, is equivocal given a story he has told many times

Roman - Direct by Ms. Ferry

1   about the origin of life on the planet.

2              And I do think it would be helpful here to

3   discuss that particular question.  So, I'm going show you

4   Petitioner's Exhibit 12, page 2.  All right.  Okay.  And it's

5   Question 19.  "Often I get the strange feeling that I'm from

6   another planet.  True or false?"

7   A.   True.

8   Q.   True.

9   A.   He responded true to that item, yes --

10  Q.   Okay.

11  A.   -- for Dr. Allen --

12  Q.   And he responded that way with both you and Dr. Allen; is

13  that right?

14  A.   I believe that's right.  I have to look back at my actual

15  interview notes, but, yes, that is what I recall as being the

16  answer.

17  Q.   Okay.  And then the final item that Mr. Eldridge did not

18  endorse with you, that he endorsed with Dr. Allen, is No. 6

19  from the unusual hallucination scale.  "I experience

20  hallucinations that last continually for days."  And his answer

21  with Dr. Allen was "true," but he did not reendorse that item

22  with you; is that right?

23  A.   That is correct.

24  Q.   Now, Dr. Roman, what's the significance of the fact that

25  Mr. Eldridge -- why is it significant that he's not endorsing

Roman - Direct by Ms. Ferry

1  the same items with Dr. Allen and with you?

2  A.  I guess there are multiple ways to respond to that.  The

3  reason that I'm concerned about it is that whenever we use a

4  measure, we assume that that measure has validity.  Validity is

5  determined in many ways, many of them psychometric.  We look at

6  whether it's a good predictor of the thing we're looking to

7  measure, whether it correlates with other measures that look at

8  the same kinds of things.  But there's also the question of in

9  the here and now, as I say I'm giving you this test of fill in

10  the blank, is that really what I'm testing.  So, in a situation

11  where an individual, such as this individual, has concerns

12  about language or about things that he may believe are

13  factually true and we're assuming that his problematic

14  endorsement is an indication that he is feigning, which

15  obviously has significant consequences, it's a problematic

16  assertion.  And I think that it is incumbent on us -- I'll go

17  further, I think that it would be argued by the Ethical Centers

18  of Profession, that it's incumbent upon us to make sure that we

19  have ruled out other explanations for those anomalous findings,

20  for those positive findings, if you will.

21  Q.  And let me also ask you this about your limit testing

22  approach:  When you built these items into your structured

23  clinical interview, I presume that the whole purpose of that

24  was that you were not asking him -- you know, you were not

25  asking him this question as it appears in the test booklet,

Roman - Direct by Ms. Ferry

1    "Mr. Eldridge, do you experience hallucinations that last

2    continually for days?"  Those were not the words that came out

3    of your mouth; is that correct?

4    A.  When appropriate I attempted to use the same wording, but

5    it was heavily embedded within a broader context.  And I'll be

6    happy to describe it for you if you would like.

7    Q.  Well, let me ask you this:  Was the point of your limit

8    testing approach -- one point of it, to determine whether

9    Mr. Eldridge was potentially having issues with a particular

10   language of a test question?

11   A.  In some cases it was.

12   Q.  And, so, with your limit testing approach, if you believed

13   that it was a language issue that was resulting in Mr. Eldridge

14   endorsing an item in a problematic direction, did you ask him

15   follow-up questions of a type that aren't permissible when

16   you're administering the measure with its strict norms?

17   A.  Again, I would have to look through, but in most cases I

18   believe what I did is I preserved the initial language.  And in

19   some cases he did not give the same response.  In the event

20   that he gave the same response, to the extent that I was

21   already concerned about language, I had built in the ability to

22   ask the questioning a short time later or by way of

23   clarification immediately, depending on the nature of the

24   question, with some revised wording.

25   Q.  Okay.

Roman - Direct by Ms. Ferry

1   *A.*  I simply wanted to get an idea of what kind of an

2   endorsement he would give in the event that the questions were

3   stated in such a way that I was pretty confident that he

4   understood what I was asking.  Now, and again, you know, we

5   have to be careful, because obviously one could fish until they

6   get the answer they want, but this is not the purpose.  If I

7   asked him a question and he looked at me and said, "Oh, you bet

8   ya," well, we stop there.  Obviously if that's what he told

9   Dr. Allen, that's what he just told me, there was no aspect

10   where he looked confused, he answered directly, that's fine.

11   Obviously he had the same response.  So, it was not a fishing

12   expedition.

13   *Q.*  Okay.  Let's discuss the structure --

14       *THE COURT:*  Before you do that, how much longer is

15   your direct?

16       *MS. FERRY:*  I have another -- I think I have probably

17   another half hour to go.

18       *THE COURT:*  Okay.  Here's what I would like to do:  I

19   have some 5:00 o'clock hearings.  I want to take those.  They

20   won't take long.  I want to finish the direct of this witness

21   tonight.  We'll start with the cross-examination tomorrow

22   morning at 10:00 o'clock.  I can't start before then.  And

23   we're going to get him finished before lunch, if at all

24   possible.  I have no idea how much cross we have.  It's

25   probably pretty extensive, and that may not work.  And then

Roman - Direct by Ms. Ferry

1  we'll talk about scheduling as soon as we can finish this

2  witness.

3         *MS. FERRY:*  Okay.

4         *THE COURT:*  This evening we'll talk about scheduling.

5         *MS. FERRY:*  Okay.

6         *THE COURT:*  All right.

7         *MS. FERRY:*  And may I leave these items here?

8         *THE COURT:*  You can leave everything there.

9              All right.  You can step down.

10        *THE WITNESS:*  Do you need this cleared, Your Honor,

11  for your --

12        *THE COURT:*  No.  No.  Thank you.

13             All right.  If you want to take Mr. Eldridge just

14  for a brief comfort break, that will be fine.  Bring him back

15  as soon as you can.

16    *(Recess from 4:58 p.m. to 5:35 p.m.)*

17        *THE COURT:*  All right.  Please be seated.  Thank you.

18  Go ahead, please.

19                  **DIRECT EXAMINATION CONTINUED**

20  BY MS. FERRY

21  *Q.*  So, Dr. Roman, we're now ready to turn to the final measure

22  of feigning we need to discuss, the Structured Inventory of

23  Malingered Symptomatology, or the SIMS.  And am I correct that

24  the SIMS has 75 true or false items?

25  *A.*  You are correct.

Roman - Direct by Ms. Ferry

1   Q.   And is the SIMS also a screening device?

2   A.   It is.

3   Q.   And how is the SIMS designed to be administered?

4   A.   It's meant to be given to an individual to read and respond

5   to the items by circling the response.

6   Q.   Now, does the SIMS test manual include minimum

7   qualifications that the examinee must possess to take the test?

8   A.   It does have some minimum qualifications.

9   Q.   And, particularly, are there qualifications about a reading

10  level that the examinee must possess?

11  A.   There are.

12  Q.   And what is that qualification?

13  A.   My recollection is that it's a fifth grade reading level.

14  Q.   Now, during your December evaluation of Mr. Eldridge, did

15  Mr. Eldridge talk to you about the testing that Dr. Allen

16  conducted?

17  A.   He did.

18  Q.   And before we get into the content of what Mr. Eldridge

19  told you, did you have, and do you now have, concerns about the

20  reliability of that information?

21  A.   About the information Mr. Eldridge shared with me regarding

22  that evaluation?

23  Q.   Yes.

24  A.   Sure, I have concerns about it.

25  Q.   And let me first ask you to tell us what Mr. Eldridge told

Roman - Direct by Ms. Ferry

1   you about Dr. Allen's administration of the SIMS.  And if it

2   would be helpful, that information is contained at page 12 --

3   A.  I do see it.

4   Q.  -- of Petitioner's Exhibit 2.

5   A.  I do see it.  May I read it?

6   Q.  Sure.

7   A.  "Mr. Eldridge reported to me during my last visit, that

8   Dr. Allen, although he did not remember his name, quote,

9   'marked the papers,' unquote, and did not have him fill out any

10  questionnaires or do any writing.  His report may not be

11  trustworthy given his difficulties judging time."

12                  There's some more there.  I don't know if you

13  want the rest of it or not.

14  Q.  And is that basically the summary of why you have concerns

15  about the reliability of that information, that Mr. Eldridge is

16  not always an accurate historian?

17  A.  Absolutely.  But by the same token, if, indeed, as I

18  believe was the case, if he was unable to read the SIMS and if,

19  indeed, it was read to him, it violates the normative standard.

20  Q.  Now, why would it -- why would that matter, if the test

21  administrator were reading precisely the question as it's

22  printed on the page?  Why would we care that it's being read

23  instead of the examinee reading it?

24  A.  Well, this goes back to the issue that we've already

25  addressed recently.  I have no idea why taking a particular

Roman - Direct by Ms. Ferry

1  subtest with a different colored pencil changes the normative
2  outcome, but it does.  The norms are designed to be a
3  particular way.  If the test publisher creates -- the test
4  author, I guess I should say, creates it.  The test is
5  published to follow certain standardized guidelines.  If one
6  uses those guidelines, the norms are valid.  They apply.  If
7  one doesn't, I can't tell you that the outcome would definitely
8  be different.  I have no way of knowing that for certain.  But
9  that's not how testing is done in my profession, not for
10 standardized measures.
11 Q.  Now, let me ask you this:  If Mr. Eldridge -- if the
12 information he reported to you was not accurate and, in fact,
13 Dr. Allen had followed the test norms and gave Mr. Eldridge the
14 booklet to read the questions to himself and circle his
15 answers, would that be problematic?
16 A.  Yes, it would.
17 Q.  And why is that?
18 A.  Again, to the extent possible, we attempt to base our
19 conclusions based on some data set.  And multiple evaluations
20 of over multiple years have gauged Mr. Eldridge's reading level
21 to be well below the fifth grade reading level.
22 Q.  Now, what does the term "psychometric validity" mean,
23 Dr. Roman?
24 A.  I guess we can use that term in a couple of different
25 contexts.  We talk about validity as a psychometric construct

Roman - Direct by Ms. Ferry

1  in terms of whether a test measures what it's supposed to test.

2  But in this context I think you're using that from what I had

3  said in the report.  Psychometric validity deals with the

4  question of whether the results that were obtained from that

5  test can be trusted based on the prerequirements necessary for

6  the person to take the test.

7  Q.  And whether Dr. Allen read the test items to Mr. Eldridge

8  or whether Mr. Eldridge was given the test booklet and read the

9  items himself, what's your opinion of the psychometric validity

10  of these SIMS results?

11  A.  On the face of it, because this isn't how the measure is

12  administered to someone with less than a fifth grade reading

13  level, which the manual specifies, or by reading and filling

14  out the items, it would invalidate the ability to use the norms

15  on the measure.

16  Q.  Now, did you also employ that limit testing approach that

17  we discussed with the M-FAST for the SIMS?

18  A.  I did.

19  Q.  And are the results of that limit testing approach here --

20  summarized here on page 13 of Respondent's Exhibit 2?

21  A.  They are.

22  Q.  And, so, it looks as if 17 items that he endorsed in a

23  problematic direction with Dr. Allen were not endorsed during

24  your limit testing clinical structured interview; is that

25  right?

Roman - Direct by Ms. Ferry

1  A.  I'm sorry, how many items?

2  Q.  17?

3  A.  Right.  Yes.

4  Q.  Four items that were reaffirmed in a problematic -- I mean,

5  four items were reaffirmed in a problematic direction, correct?

6  A.  Correct.

7  Q.  And you say that five -- skipping a sentence here, five

8  items resulted in ambiguous responses and it was unclear if he

9  was reaffirming his prior response?

10  A.  Correct.

11  Q.  And an additional six items were also reaffirmed but

12  appeared to be factually true; is that right?

13  A.  That is correct.

14  Q.  And let me ask you here, putting up Petitioner's Exhibit

15  12, page 4, are these the six items that Mr. Eldridge

16  reaffirmed in a problematic direction but you determined to be

17  factually true?

18  A.  Well, obviously I'd have to correlate that against the ones

19  that I listed, but assuming that you represent that those are

20  the number items I listed, yes.

21  Q.  Okay.

22  A.  Those all look like ones that made that list.

23  Q.  And what data set did you look at to determine that these

24  items were factually true?

25  A.  Multiple different data sets.  In some cases it was his own

Roman - Direct by Ms. Ferry

1   report.  In certain cases it was test data.  For example, I
2   have difficulty recognizing written and spoken words.  There is
3   test data to suggest that that's true.
4   Q.  And let me ask you this:  When you say based on his own
5   report, is that his own report as documented in his TDCJ mental
6   health records?
7   A.  In some cases it is.  So, for example, when he says, "I
8   have difficulty remembering today's date," that was my
9   experience and it's been documented in the TDCJ medical
10  records -- TDCJ medical records.
11  Q.  Okay.  And is that also the case with, "I have difficulty
12  remembering the day of the week"?
13  A.  Yes.
14  Q.  "And I do not seem to have the energy I used to have"?
15  A.  Yes.
16  Q.  Now, let me ask you this just as a general matter,
17  Dr. Roman about your limit testing approach.  Why isn't the
18  fact that Mr. Eldridge has given you and Dr. Allen different
19  responses, why isn't that problematic in its own right?  In
20  other words, why isn't that an indication that Mr. Eldridge is
21  just making all this up as he goes along and so that's why his
22  answers vary?
23  A.  Whenever we have a data set, the question becomes how we
24  interpret it.  Obviously one could look at that and one could
25  have a reason to draw that conclusion, that this is evidence of

Roman - Direct by Ms. Ferry

1  this inconsistency that people sometimes speak to.  However,

2  given some of the concerns about the psychometric validity of

3  the questions, given the fact that it is incumbent on an

4  examiner, especially because they're screening measures, to

5  further investigate the accuracy of the findings.  It seems to

6  me that it's not only completely valid, but it's ethically

7  incumbent on us to look into more detail.

8  Q.  Now, I want to also ask you about Mr. Eldridge's

9  performance on some of the other psychological instruments he's

10  been administered over the years, including during your

11  neuropsychological evaluation.  And did you find Mr. Eldridge's

12  performance on the neuropsychological instruments you

13  administered to him in May of 2010 significant in terms of the

14  question of malingering?

15  A.  I don't know if that question means significant for

16  malingering, or did I find that it was relevant to the question

17  of malingering.  I don't know how you mean that.

18  Q.  I mean do you believe that the data set that you gathered

19  after conducting -- after administering those instruments, that

20  it sheds light, one way or the other, on the question of

21  malingering?

22  A.  If we look at the cognitive portions of the

23  neuropsychological data set, I think that it sheds light on the

24  fact that it is unlikely that he is malingering cognitive

25  deficits.

Roman - Direct by Ms. Ferry

1  *Q.*  And I want to talk to you specifically about your IQ

2  testing, and I'm putting here on the screen -- sorry, let me

3  just zoom out -- the table that's in Petitioner's Exhibit 1,

4  your initial report, that begins on page 8 and goes over to the

5  top of page 9.

6  *A.*  Sorry about that.

7  *Q.*  Is that where you have listed the results of your IQ

8  testing in May of 2010 as compared to Dr. Allen's IQ testing in

9  May of 2007?

10  *A.*  Yes.

11  *Q.*  Okay.  It also lists Dr. Averill's, but I want to focus on

12  yours and Dr. Allen's.  Would you describe the results of those

13  two administrations of the WAIS-IV as similar or dissimilar?

14  *A.*  Highly similar.

15  *Q.*  Now, would you expect that kind of consistency -- oh, and

16  let me ask you this:  I see here that you gave -- you

17  administered that IQ test to Mr. Eldridge almost exactly three

18  years after Dr. Allen conducted his testing; is that right?

19  *A.*  That is correct.

20  *Q.*  Now, would you expect that kind of consistency of results

21  spread out three years apart if Mr. Eldridge were putting forth

22  poor effort?

23  *A.*  I would not.

24  *Q.*  And, Dr. Roman, what's your bottom line on the evidence

25  related to malingering?

Roman - Direct by Ms. Ferry

1   A.  Through the entire data set?

2   Q.  Yes.

3   A.  I believe that there is insufficient evidence to conclude

4   that this is a feigned presentation.  I believe the

5   preponderance of the evidence supports all of the tenets that

6   you laid out at the beginning of your direct examination.

7   Q.  Now, Dr. Roman, let's turn to the second question that you

8   set out here on page 1 of Petitioner's Exhibit 1, "If such a

9   mental illness exists, does it preclude him from accurately

10  interfacing with reality?"  And given our discussion of the

11  diagnostic criteria for schizophrenia, I presume that could be

12  a very long discussion and that we've already covered much of

13  that.

14          So, let me just see if I can speed this up and

15  ask you, is it your belief that Mr. Eldridge is -- your

16  professional opinion, rather, that some of the instances of the

17  way that Mr. Eldridge's mental illness precludes him from

18  accurately interfacing with reality include his belief that he

19  leads this parallel life in the free world, that his victims

20  are alive, and that he's -- and that guards at the Polunsky

21  unit have attempted to poison him for at least a decade, are

22  those instances of his mental illness preventing him from

23  accurately interfacing with reality?

24  A.  Yes.  In this case when we talk about interfacing, we

25  normally talk about sort of just navigating his interaction

Roman - Direct by Ms. Ferry

1   with reality.  All of those are examples, in my opinion, of him

2   not being in contact with or appreciating reality.

3   Q.  And let's turn now to the third question here, "If an

4   impairment in reality testing exists, does it preclude him from

5   having a rational understanding of the reason for his

6   conviction and execution in a manner that would suggest he's

7   incompetent to be executed?"

8              And I want to start by asking you about some of

9   the factual information that Mr. Eldridge is aware of.  And for

10  efficiency sake, I'm going to ask you about some particular

11  facts and you tell me if there's evidence that leads you to

12  conclude, in your professional opinion, that Mr. Eldridge has a

13  bare factual awareness of these facts.  Is Mr. Eldridge aware

14  that there's a court case going on concerning him?

15  A.  I don't know whether he understands it in an ongoing way,

16  but, indeed, as he comes to learn that a hearing is pending,

17  yes, he has that factual understanding -- factual awareness at

18  least.

19  Q.  And is he aware that he has an attorney named Lee Wilson?

20  A.  Yes, he is.

21  Q.  Is he aware that there's a doctor for his side and that

22  there's a doctor for the State of Texas?

23  A.  Yes, he is.

24  Q.  Is he aware that he spends at least part of his time at

25  TDCJ, at the Polunsky unit on death row?

Roman - Direct by Ms. Ferry

1  A.  With the possible exception of the death row part, which
2  was harder to elicit, yes, he does know he's in lock-up at
3  Polunsky.
4  Q.  And is he aware that he's in prison because he supposedly
5  shot and killed at least Cynthia Bogany?
6  A.  Yes.  When asked about that, he understands that this is
7  what he's accused of having done.
8  Q.  Well, does he understand it or is he factually aware?
9  A.  He will say to you that this is what they say is why he's
10 there.  He is aware that this is the allegation that has been
11 made.
12 Q.  And, Dr. Roman, am I correct that you're confident that
13 Mr. Eldridge has that factual awareness both based on your
14 evaluations of him as well as looking at his personal
15 correspondence that he sends out from the jail?
16 A.  And as well as looking at his medical record, yes.
17 Q.  Now, let's turn to the disconnect between those facts and
18 his rational understanding.  And I want to start by asking you
19 about the fact of his conviction.  When Mr. Eldridge -- and
20 let's be specific.  In your December of 2011 evaluation, when
21 you asked Mr. Eldridge about his trial and what happened there,
22 what was his response?
23 A.  When you say "let's be specific," it would be easier if I
24 could look at those notes, of course, but as I recall his
25 response, he was unable to give me information about or even to

Roman - Direct by Ms. Ferry

1  acknowledge that he distinctly recalled having had a trial.  He

2  seemed to have no specific recollection or information about

3  it.

4  Q.  Well, look here at page 14 of your report, which is

5  Petitioner's Exhibit 2.

6  A.  Okay.  And you are where?

7  Q.  The first full paragraph on page --

8  A.  Got it.

9  Q.  -- where you've written, "He agreed that he must have had a

10  trial after being accused of shooting Cynthia," in parentheses

11  and quote, "'Think I did' --"

12  A.  Right.

13  Q.  "-- but insisted he could not remember the trial or the

14  outcome"?

15  A.  I think that's pretty consistent with what I said, with the

16  exception of the beginning part, yes.

17  Q.  And then in the next sentence where you write that he

18  seemed confused but was able to agree that it made sense that

19  he was found guilty since he was in prison, why does the last

20  part of that second sentence, "but was able to agree that it

21  made sense that he was found guilty since he was in prison,"

22  why does that not show a rational understanding?

23  A.  I think there are two parts to it.  One, it's a very

24  passive acknowledgment of it.  The acknowledgment that

25  something makes sense does not necessarily suggest that

Roman - Direct by Ms. Ferry

1   somebody has understood it.  I think many people can relate to

2   examples where they have struggled to follow some directions or

3   instructions and they might acknowledge that they kind of get

4   it, but it doesn't mean that they can necessarily grasp it or

5   perform it.  I think it's that level understanding.

6   Q.  And let me ask you this:  When Mr. Eldridge is asked about

7   his criminal history as a general matter, does he spontaneously

8   refer to the capital murder charge?

9   A.  In all of the instance that is I've seen with him where

10  this has come up he seems to respond instead to the attempted

11  murder conviction that he had back in -- I want to say it was

12  '85, but I'm not sure about that date.

13  Q.  Now, we've discussed Mr. Eldridge's belief that he sees

14  Cynthia, one of the victims of the capital murder,

15  periodically.  During your interview -- during your evaluation

16  in May of 2010, did you show Mr. Eldridge some of the crime

17  scene photos from the capital murder?

18  A.  I did.

19  Q.  And what was his response when you asked if he would be

20  willing to look at those photographs?

21  A.  He said that he needed to see them.

22  Q.  And let me ask you this:  Were the photographs that you

23  showed him -- I know you showed him a number of photographs --

24  did those photographs include photographs of both Cynthia and

25  Chirrsa Bogany, photographs showing them dead and bloodied?

Roman - Direct by Ms. Ferry

1   A.  Yes, it did.

2   Q.  And what was his Mr. Eldridge's response to being shown the

3   photographs of Cynthia in that condition?

4   A.  When he saw the one of Cynthia and acknowledged that it was

5   her, it appeared that he was reflective and moved by it.  It

6   appeared as if he had shed a single tear and reached up to wipe

7   it away.

8   Q.  An what was his response to seeing the photographs of

9   Chirrsa in that condition?

10  A.  First, I asked if he was willing to see them, and he gave

11  the same response, that he needed to.  I was concerned about

12  getting him upset over the issue.  And he didn't comment.  He

13  looked at it, spent some time, passed it back, and said that he

14  didn't want to see any more.

15  Q.  And you mentioned when he was looking at the photograph of

16  Cynthia, that he appeared to shed a tear; is that right?

17          Did that emotion appear to you to be genuine?

18  A.  It did appear to be genuine.

19  Q.  And here on page 14 of your initial report where you were

20  describing that encounter at Petitioner's Exhibit 1, you've

21  written that after this encounter -- well, after showing

22  Mr. Eldridge the photographs, he wrote -- I mean, excuse me, he

23  said, "I keep thinking about Chirrsa.  So, it must be true.  I

24  must have did this"; is that correct?

25  A.  That is correct.

Roman - Direct by Ms. Ferry

1   Q.  Now, Dr. Roman, does that -- does Mr. Eldridge saying that,
2   does that reaction seem to you to be consistent with someone
3   who's malingering a delusion that his victims are alive, who's
4   feigning a delusion that his victims are alive?
5   A.  Obviously as you know from my report, I would argue that it
6   is not consistent with malingering.
7   Q.  And is there evidence in the TDCJ records that in the days
8   following that visit when you showed Mr. Eldridge those
9   photographs, that he was disturbed by them?
10  A.  Yes, there is.
11  Q.  Now, Mr. Eldridge noting to mental health staff that he was
12  shown -- that he was shown bad pictures and that they disturbed
13  him, does that seem consistent to you with someone who is
14  feigning a delusional belief that his victims are alive?
15  A.  That's harder for me to say.  I don't hear -- I don't see
16  that as something that would make me say it's consistent with
17  malingering by any means, but I'm not sure that I would sit
18  here and say clearly that's evidence that he's not malingering.
19  Q.  Now, based on your December of 2011 evaluation of
20  Mr. Eldridge, has the reality of what Mr. Eldridge saw in those
21  photographs, has that stayed with him?
22  A.  It does not appear that it has.
23  Q.  Now, Dr. Roman, is it suspicious that a person with
24  schizophrenia would see photographs like that, would be
25  disturbed by them, and then claim not to remember them --

Roman - Direct by Ms. Ferry

1   and actually let me back up and ask you a prior question.

2                   Looking at page 14 of your supplemental report at

3   Petitioner's Exhibit 2, am I correct that when you asked

4   Mr. Eldridge if he recalled the pictures you had shown him last

5   time, he stated that they were, quote, "bad pictures," but he

6   could not recall them other than the fact that they were

7   upsetting; is that accurate?

8   A.  That is accurate.

9   Q.  And, so, now to my question, is it suspicious that a person

10  with schizophrenia would be shown upsetting photographs like

11  that, would report to be disturbed by them in the days

12  following seeing them, and then claim to have no memory of the

13  photographs?

14  A.  Well, it's a difficult question, because, yes, I would say

15  that certainly for a normal person and for a person with

16  schizophrenia, it would be unusual for them not to remember,

17  have more of an impact from those photos.  However, it goes

18  directly to what I've declared to be his delusional belief

19  system.  And, again, if we go back to the issue of what is a

20  delusion, it is a fixed false belief that persists despite all

21  evidence to the contrary.

22                   One of the reasons that I wanted to show the

23  photos is because it's hard to imagine more direct evidence to

24  the contrary than a photograph of the victims in that state.

25  And he momentarily acknowledged that this was a bad scene that

Roman - Direct by Ms. Ferry

1  seemed to move him.  I believe that his responses, whether

2  predictable or not -- I had no idea how he would respond -- but

3  is consistent with the definition of a delusion.

4  Q.  And, Dr. Roman, as we've discussed, you've read all three

5  of Dr. Allen's reports?

6  A.  I have.

7  Q.  And, so, you've read Dr. Allen's description of how during

8  Dr. Allen's September 15th evaluation, Mr. Eldridge became

9  preoccupied with an ant and stopped responding to questions and

10  on December 23rd of 2011 refused the interview altogether?

11  A.  I have seen that, yes.

12  Q.  Okay.  Now, we've discussed the fact that doctor -- excuse

13  me, Mr. Eldridge has some factual awareness of the fact that

14  his side in his court case has a doctor and that the state has

15  a doctor.  Now, does the fact that Mr. Eldridge was apparently

16  less cooperative with Dr. Allen than with you, does that raise

17  red flags for you?

18  A.  It does not.

19  Q.  And why is that?

20  A.  It's difficult for me to know why he wasn't more

21  cooperative, because how do I speak to that interaction?

22  However, having said that, I took great precautions to maximize

23  the likelihood that Mr. Eldridge would cooperate with the

24  interview based on what I knew about his record, which is a

25  potential explanation for why he was more cooperative with me.

Roman - Direct by Ms. Ferry

1  *Q.*  And let me ask you to look with me --

2          *MS. FERRY:*  If I could have just a moment, Your Honor.

3  BY MS. FERRY

4  *Q.*  Okay.  So, I'm showing you here State's Exhibit 63, page

5  373, and is this another excerpt from Mr. Eldridge's personal

6  correspondence?

7  *A.*  It is.

8  *Q.*  Dated December 19th, 2011.  And I want to read this final

9  paragraph here on page 373 that goes over to the top of page

10  374.

11          "I was going to see a mental health doctor today,

12  but I can see it is the bad one who work for the state of

13  Texas.  I could not go through three or four hours of sitting

14  down talking to him again.  All he do is lie on me.  He talk

15  bad to me and about my family.  In so many words he be saiding

16  (sic) I do not need my family and my family do not care about

17  me."

18          Is there -- would you say that that excerpt of

19  Mr. Eldridge's jail mail shows that he -- that he has, as

20  evidenced by this excerpt, a fixation on Dr. Allen talking to

21  him about his family?

22  *A.*  Fixation is a strong word.  He certainly has that on his

23  radar in some fashion as an element, yes.

24  *Q.*  And you're aware that one of Mr. Eldridge's reported

25  delusions involves his belief that he hears voices of family

Roman - Direct by Ms. Ferry

1   members in his cell; is that right?

2   A.   That is in the record, yes.

3   Q.   And could doctor -- excuse me, could Mr. Eldridge's

4   belief -- is it possible that Mr. Eldridge's belief that

5   Dr. Allen talks bad about his family, is it possible that

6   that's related to their discussions of Mr. Eldridge's report of

7   those hallucinations?

8   A.   It's possible, sure.

9   Q.   And that Mr. Eldridge believes that Dr. Allen, for lack of

10  a more sophisticated phrase, is not particularly nice to him

11  during those evaluations, whether that's accurate or not?

12  A.   He does seem to have that belief based on his statements,

13  whether it's accurate or not.

14  Q.   Now, let's talk about another example.   In Mr. Eldridge's

15  correspondence, he refers to the fact that he's in TDCJ, that

16  he's on the Polunsky unit, and he even mentions death row in

17  his correspondence.   He refers to getting death row ad seg

18  paperwork.   He refers to the death row warden, et cetera.   Why

19  do those references -- why do those not show a rational

20  understanding of the fact that Mr. Eldridge is on death row and

21  therefore subject to execution?

22  A.   There are a couple of things that I think play into that.

23  One is this idea of the difference that you seem to be drawing

24  between an awareness and a rational understanding.   Does he

25  have an awareness of some of these things?   He does.   He

Roman - Direct by Ms. Ferry

1  seems -- and I think that they apply to him.  And I don't want
2  to overuse the concept, but I don't know how else to put it
3  succinctly.  It's rather like the double-bookkeeping concept
4  that we talked about, the idea that there's two alternative
5  reality systems.  He's able to interface with each, not always
6  resolve -- in fact, rarely resolve and not always, but
7  sometimes, recognize a discrepancy.

8          I've asked him about death row.  He seemed unsure
9  about that.  It appears from my examination of the record, that
10  on a number of accounts, including such things as his appeal of
11  the hearing regarding his nonnegative drug test, that he is
12  able to follow along with the procedural things that are
13  required.  He knows how to deal with the forms and other things
14  that are laid before him.  But it's like it doesn't click with
15  him that it applies to him at a personal level.  It's like
16  there's a disconnect between his sense of identity and who he
17  is and the environment in which he finds himself.

18          THE COURT:  How can you say that if he's filling out
19  forms that are clearly about him, like a grievance form?

20          THE WITNESS:  The reason I say that is because the
21  forms that he's filling out are very specific.  They're based
22  on recent events.  They're based on some of the complaints he
23  makes.  In some cases, of course, those complaints have been
24  delusional.  Like the things that he has argued about with
25  regard to the poisoning of his food, which certainly we don't

Roman - Direct by Ms. Ferry

1  believe has happened.  In other cases he may be very cogent --
2  well, if you read, it wasn't cogent at all, but a somewhat
3  rambling, agrammatical argument regarding the fact that he was
4  already taking medications that would give him a positive drug
5  test.
6         So, in the context of filling out a form, he
7  basically puts down stuff that he's been saying orally anyway.
8  I don't see that there's any evidence that he has done any of
9  this thing of his own accord without assistance.  He seems to
10 be following the procedures that are laid before him.  He seems
11 to be complaining and people within the system are saying,
12 "Okay.  Here's what you need to do to do something for that
13 complaint."
14      THE COURT:  I understand what you're saying, I think,
15 but what I'm not connecting the dots on is your conclusion that
16 he understands it, he gets it, he just doesn't get that it's
17 about him.  And I'm trying to figure out what it is in the
18 records you're pointing to as evidence of that distance that
19 you are imputing to him.
20      THE WITNESS:  Right.  Some portion of it is
21 speculative, I'll admit.  It's a way of attempting to determine
22 what it means based on the evidence that exists.  Some of it is
23 this idea that he is able to make direct statements about a
24 number of things within his record, but yet it doesn't always
25 comport with his behavior.

Roman - Direct by Ms. Ferry

1                The reality is there's a discrepancy that has

2     caused some people to believe that this is evidence that he's

3     feigning.   There is no question that aspects of discrepancy

4     exists within the record.   The question becomes are those

5     discrepancies consistent with feigning or are those

6     discrepancies consistent with some other process.

7                THE COURT:  In a different -- slightly different

8     context, you faulted the measures that were offered as being

9     either essentially black and white, with no middle ground.

10               THE WITNESS:  Well, I wasn't -- if I may, I wasn't

11    faulting the measures, Your Honor.   I was quoting the existing

12    standards within the published literature for those.

13               THE COURT:  That's fine.   It doesn't affect my point.

14    You have presented two alternatives, feigning or mentally ill.

15    Is there no room for something that would combine both?

16               THE WITNESS:  There is room.

17               THE COURT:  That is, he's malingering in part, but

18    there is some mental illness there as well, some elements of

19    schizophrenia, psychosis, whatever label --

20               THE WITNESS:  That is indeed a possibility.   And we

21    certainly know that those conditions can coexist and it is

22    entirely conceivable.   It's well demonstrated that normal

23    people with no mental illness going through the course of their

24    day-to-day life will do things that meet the standard for

25    certain types of deception for reasons that we consider to be

Roman - Direct by Ms. Ferry

1  totally socially appropriate and adaptive in circumstances.
2  The, honey, does this dress make me look fat, perhaps being a
3  reasonable example of something that can occur on a regular
4  basis.
5           As a function of that, sure, he could well be
6  giving an aspect of feigning, but I don't think that it
7  overrides the existence of his mental health issues.
8       THE COURT:  I'm not asking -- I guess what I'm asking
9  is whether within the sort of midrange of the possibility of --
10  I mean, if you imagine points on a continuum, with severely
11  schizophrenic on one end and malingering on the other end, in
12  between the two are points of combinations.
13      THE WITNESS:  I think that is probably correctly
14  stated, yes, Your Honor.
15      THE COURT:  And is that a recognized set of
16  conditions, that is, different points along that continuum?
17      THE WITNESS:  I think in that case it's more
18  consistent to talk about two different continuums that exist.
19  One being the feigning continuum and any rate at which he may
20  or may not be doing that.  The other being the schizophrenic
21  continuum.  And, indeed, they probably intersect.  They are
22  probably not parallel with each other.  That seems accurate.
23  But generally when we talk about that sort of continuum, we
24  talk about there being more of a polarity on the two ends, so
25  the idea of feigning versus not, schizophrenic versus not.

Roman - Direct by Ms. Ferry

1          Now, obviously if he's not schizophrenic, that's
2   an interaction point with the feigning, no question, but I
3   think Your Honor makes a very cogent point.
4          *THE COURT:*  All right.  Thank you.
5          Go ahead.
6   BY MS. FERRY
7   *Q.*  So, Dr. Roman, related to what we were talking about a
8   moment ago with TDCJ, the Polunsky unit, death row, and the
9   Court's question about but Mr. Eldridge is filling out these
10  forms for death row, does that relate back to the example you
11  gave earlier in your testimony, that Mr. Eldridge talks about
12  leaving the prison and you say to him, "That doesn't make any
13  sense.  For me to get into the prison, I have to take off my
14  shoes.  I have to go through the metal detector.  I have to go
15  through all these different locked doors.  How are you leaving
16  the prison?"  And as I recall, Mr. Eldridge's response was --
17  well, why don't you just remind us what his response was when
18  you two had that discussion?
19  *A.*  It's been a long day.  The response that comes to mind and
20  hopefully is accurate without looking, is, "I just do."
21  *Q.*  And that sort of response, not on one end arguing, not on
22  the other end saying, you know, what you're saying doesn't make
23  any sense -- well, I guess those are the same answers.  Why is
24  that sort of answer typical of how a person with schizophrenia
25  deals with sort of gaps in their paranoid delusional beliefs?

Roman - Direct by Ms. Ferry

1   A.  Perhaps one of the points that you raised earlier regarding

2   Dr. Allen's report is the best way to describe this.  I would

3   describe it in terms of there being some degree of what we call

4   disorganized speech, understanding it's really disorganized

5   thought.  I believe there is a reference within Dr. Allen's

6   report talking about his ambivalence.  The idea being that

7   there is some sort of a disconnect between reality as they

8   experience it and reality as it surrounds them.  And it's the

9   best explanation that I can give.

10              I don't have a good definitive answer for that.

11  But within the constructs that we apply to schizophrenia and

12  deficits and reality-based thinking, particularly since no one

13  can tap into their thought processes directly, I think that is

14  the best explanation of the construct as I understand it.

15  Q.  And, Dr. Roman, is it your professional opinion, based on

16  the records you've reviewed, the evaluations you've conducted

17  of Mr. Eldridge, that Mr. Eldridge does, in fact, suffer from

18  schizophrenia?

19  A.  Yes, that is my opinion.

20  Q.  And is it your opinion, again, based on the entire data

21  set, that that schizophrenia prevents Mr. Eldridge from

22  attaining a rational understanding as opposed to any basic

23  factual awareness that he may possess?

24  A.  Yes, that is my opinion.

25              MS. FERRY:  And that's all I have on direct, Your

1   Honor.

2       *THE COURT:*  All right.  Very good.  We'll do cross in

3   the morning.  Let's talk about scheduling.

4           You may step down, sir.  Thank you very much for

5   your patience.

6       *THE WITNESS:*  Thank you, Your Honor.

7       *THE COURT:*  Okay.  So, tomorrow we'll start at 10:00.

8   And I've got a luncheon engagement, be back from that, and then

9   we will finish out the afternoon.  As far as I know, that's not

10  an issue.  And I gather that we'll finish the defense -- we'll

11  finish the petitioner's evidence probably within that period;

12  is that right --

13      *MS. FERRY:*  Yes Your Honor.

14      *THE COURT:*  -- or at least by the following morning?

15      *MS. FERRY:*  I mean, I can't imagine that between

16  Ms. Oden's cross and redirect, that we would take up -- that we

17  would need more than tomorrow.  Maybe my expectations aren't

18  realistic, but that would be my --

19      *MS. ODEN:*  You said we were starting about at 10:00

20  and you had a lunch obligation.  I imagine we could be finished

21  tomorrow.  We might need to go to 6:00.

22      *THE COURT:*  That's fine.  6:00, you can tell is not a

23  problem, except for our saintly court reporter here, to whom we

24  owe some thanks.  So, that takes us to the respondent's case.

25      *MS. ODEN:*  We have two witnesses, Your Honor, and I'm

1   already planning questions that I can cut out of my

2   examinations.  I hope that we would be able to be finished on

3   Wednesday.

4           *THE COURT:*  I'm not sure, because of travel schedules

5   that I can't change.  I already tried to and it's not feasible.

6   So --

7           *MS. ODEN:*  We'll do our very best to make sure that

8   we're done on Wednesday.

9           *THE COURT:*  All right.  If we can't, because we're

10  going to end in the morning -- I mean, we can't go in the

11  afternoon, as it turns out.  So --

12          *MS. ODEN:*  Oh, we can't go to Wednesday afternoon?

13          *THE COURT:*  We cannot.

14          *MS. ODEN:*  Then we're not going to be finished.

15          *THE COURT:*  I didn't think so.  So, what -- let's look

16  at the calendars and get an additional day, day and a half to

17  both finish the evidence and argue.  And I am looking at -- do

18  you have your calendars handy?

19          *MS. ODEN:*  My phone is turned off, but I can take

20  notes.

21          *THE COURT:*  All right.

22          *MS. ODEN:*  Your Honor, I don't know if you're looking

23  at anything this soon, but I thought I will mention that I will

24  be out of state May 6th through the 15th.

25          *THE COURT:*  Oh, I'm looking at something sooner.

1         MS. ODEN:  Okay.

2         THE COURT:  How about April 30th?

3         MR. WILSON:  Pardon me, Your Honor.  Lee Wilson.  I

4    may have a trial on that day.

5         THE COURT:  Mr. Wilson --

6         MR. WILSON:  But if the Court schedules, we'll push --

7    they'll push back the state case.

8         MS. FERRY:  Your Honor, May 30th may --

9         THE COURT:  April 30th.

10        MS. FERRY:  April 30th, I'm sorry, I misspoke.  My

11   husband will be returning out of town that day, and I won't

12   have child care --

13        THE COURT:  See if you can make arrangements.

14        MS. FERRY:  -- to travel on Sunday.

15        THE COURT:  See if you can make arrangements.

16        MS. FERRY:  I --

17        THE COURT:  You've got some time to do that.

18        MS. FERRY:  I will do my best.

19        THE COURT:  I appreciate that.  I understand.  Look,

20   if you can't do it, we'll reschedule, but see if you can make

21   arrangements.

22        MR. WIERCIOCH:  And, Your Honor, I'll be coming from

23   San Francisco, so I'll have to make some plane arrangements.

24   I'm not sure how easy that will be, how expensive.

25        THE COURT:  Expense is probably our bigger issue

1  there.

2          MR. WIERCIOCH:  Right.

3          THE COURT:  What about May 1st and May -- let's see.

4  What if we did it the afternoon of the 30th, started at

5  1:00 o'clock?  That would give --

6          MS. ODEN:  Judge, I think we would need -- if we're

7  only going to have half a day on the first day, we would --

8  there would probably be enough for something running over into

9  the next day.

10          THE COURT:  That's what I'm talking about.

11          MS. ODEN:  Okay.

12          THE COURT:  Starting that afternoon, which might ease

13  your problems on that Sunday.  I don't know where you're coming

14  from.

15          MS. FERRY:  From Austin, Your Honor.

16          THE COURT:  Oh, that's easy.

17          MS. FERRY:  Yes, it would.  My issue is just I won't

18  be able to leave on Sunday evening.

19          THE COURT:  Oh, that's fine.  We can start later on

20  Monday so you can leave Monday.

21          MS. FERRY:  Yes.

22          THE COURT:  That's easy.

23          MS. FERRY:  I can drop my daughter at day care and

24  then --

25          THE COURT:  Oh, that's fine.  That's fine.  So, we

```
 1   could start Monday -- if that's the issue, then we can start
 2   Monday a little bit later, 10:00 o'clock in the morning.
 3            MS. FERRY:  Oh, well, her day -- without getting into
 4   all the particulars about day care, I can't drop her off -- the
 5   earliest that I could get here after dropping her off would be
 6   realistically --
 7            THE COURT:  Southwest Airlines.
 8            MS. FERRY:  I'm sorry?
 9            THE COURT:  Southwest Airlines.
10            MS. FERRY:  Oh, for flying.
11            THE COURT:  People do do it.
12            MS. FERRY:  They do.
13            THE COURT:  Yeah.
14            MS. FERRY:  But the issue would be lugging all of our
15   exhibits.
16            THE COURT:  You can leave them here.
17            MS. FERRY:  I'm sorry?
18            THE COURT:  You can leave them here.  If the expense
19   is an issue, what's the earliest you could get here reasonably?
20            MS. FERRY:  The earliest with dropping her off and
21   then getting to the airport --
22            THE COURT:  If you were driving.
23            MS. FERRY:  Oh, oh, driving, I'm sorry.  With driving,
24   I could be here by 11:00.
25            THE COURT:  That's fine.  That's easy.  That's fine.
```

1   We'll start at 11:00.  Does that work with your schedule on the
2   flying?

3          MR. WIERCIOCH:  Well, I'll check the ticket prices,
4   but I imagine it might be fairly expensive, but I can check.

5          THE COURT:  We're talking about two weeks' advance
6   purchase, roughly.  So, you'll see what you can do obviously.
7   All right.  I mean, you're going to have that travel expense
8   whenever we reschedule it, too, unless we did it 30 days out.

9          MR. WIERCIOCH:  That's correct.  But I flew out here.
10  I'm not scheduled to fly out until Friday, because I thought we
11  were going to finish this week.

12         THE COURT:  And I thought this was going to be shorter
13  than it was given the few number of witnesses that were listed,
14  so.  All right.  So, if we started at 11:00 o'clock on April 30
15  and try to finish May 2nd -- and it's reasonable to think we
16  could do that, I would assume.  If not, we could slop over --
17  I'm sorry, May 1st.  If not, we could slop over to the morning
18  of May 2nd.  That would give us completion insurance, if you
19  will.

20         MS. FERRY:  And, Your Honor, since we'll all be here
21  tomorrow morning and I wouldn't imagine it would make much of a
22  difference for Mr. Wiercioch checking flights, I will see the
23  if there's anything that I can do about being able to come
24  on the --

25         THE COURT:  You know, I wouldn't worry about it.  If

1  you can arrange -- as long as we can start --

2        *MS. FERRY:*  Sometime on the 30th.

3        *THE COURT:*  -- sometime reasonably early on the 30th

4  that we could get hours of testimony in, I think we'll be fine.

5        *MS. FERRY:*  Okay.

6        *THE COURT:*  So, you should not cause yourself stress

7  over that issue.

8              All right.  That takes care of that schedule.

9  The only other scheduling item is to make sure we have time for

10  Mr. Wiercioch to put into the record the points that he wanted

11  to make on an ex parte basis.  When do you want to do that?

12        *MR. WIERCIOCH:*  Whenever it's convenient for Your

13  Honor.

14        *THE COURT:*  How long will it take you?

15        *MR. WIERCIOCH:*  Five, ten minutes.

16        *THE COURT:*  Well, that's fine.  Why don't we excuse

17  the State and --

18        *MS. ODEN:*  Can we leave some of our things here?

19        *THE COURT:*  You can leave them all.

20              Can we excuse Dr. Roman at this point?

21        *MR. WIERCIOCH:*  Yes.

22        *THE COURT:*  I mean, I'm not ordering you to leave.

23  I'm suggesting that if you're -- if you would prefer to --

24        *THE WITNESS:*  I appreciate the opportunity, Your

25  Honor.  Thank you.

1      **THE COURT:** All right.  All right.  Thank you for your

2   patience on the scheduling issues.  They're always difficult to

3   arrange with this many moving parts.

4      **MS. FERRY:** And, Your Honor, I just missed when the

5   Court said what time will we be ending on Wednesday.

6      **THE COURT:** I'm not sure yet.  I'm trying to make

7   sure -- the latest possible, but it's not going to be as late

8   as I hoped.

9      **MS. FERRY:** I misunderstood.  I thought the Court

10   said and I just --

11      **THE COURT:** It will be, I think, around noon.  We'll

12   make up a little of that time by working, as we did today, a

13   little later in the evening and on Tuesday a little later.

14      **MS. ODEN:** Sorry.

15      **THE COURT:** You're fine.  See you at 10:00 o'clock in

16   the morning.

17      **MS. ODEN:** Thank you.

18      **THE COURT:** Thank you.

19      *(The petitioner's attorneys and parties left the*

20   *courtroom.)*

21      *(Ex parte part sealed, not transcribed.)*

22      *(Concluded at 6:38 p.m.)*

23                              * * *

24   I certify that the foregoing is a correct transcript from the

25   record of proceedings in the above-entitled cause, to the best

1  of my ability.

2

3  /s/ *Kathy L. Metzger*                              5-21-12
   Kathy L. Metzger                                    Date
4  Official Court Reporter