1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF TEXAS
2                         HOUSTON DIVISION

3   GERALD CORNELIUS ELDRIDGE        .  C.A. NO. H-05-1847
                                     .  HOUSTON, TEXAS
4   VS.                              .
                                     .  APRIL 17, 2012
5   RICK THALER                      .  10:00 A.M. to 7:00 P.M.

6

7                               DAY 2 of 3
                     TRANSCRIPT of EVIDENTIARY HEARING
8             BEFORE THE HONORABLE LEE H. ROSENTHAL
                     UNITED STATES DISTRICT JUDGE

9

10
    APPEARANCES:
11
    FOR PETITIONER GERALD
12  CORNELIUS ELDRIDGE:              MR. LEE H. WILSON
                                     Attorney at Law
13                                   P.O. Box 52447
                                     Houston, Texas   77052-2411
14
                                     MS. LAURA WARRENE FERRY
15                                   Texas Defender Service
                                     510 S Congress Avenue
16                                   Suite 304
                                     Austin, Texas   78704
17
                                     MR. GREGORY W. WIERCIOCH
18                                   Texas Defender Service
                                     430 Jersey Street
19                                   San Francisco, CA   94114

20

21  THIS TRANSCRIPT HAS BEEN FURNISHED AT PUBLIC EXPENSE UNDER THE
    CRIMINAL JUSTICE ACT AND MAY BE USED ONLY AS AUTHORIZED BY
22  COURT ORDER.   UNAUTHORIZED REPRODUCTION WILL RESULT IN AN
    ASSESSMENT AGAINST COUNSEL FOR THE COST OF AN ORIGINAL AND ONE
23  COPY AT THE OFFICIAL RATE.   General Order 94-15, United States
    District Court, Southern District of Texas.
24
    Proceedings recorded by mechanical stenography, transcript
25  produced by computer-aided transcription.

1                        APPEARANCES CONTINUED

2

FOR RESPONDENT RICK THALER:        MS. GEORGETTE P. ODEN
3                                  MR. JOSEPH P. CORCORAN
                                   MR. STEPHEN M. HOFFMAN
4                                  Office of the Attorney
                                      General
5                                  P.O. Box 12548
                                   Austin, Texas  78711-2548
6

7

ALSO PRESENT:                      MR. GERALD CORNELIUS ELDRIDGE
8                                  DR. THOMAS ALLEN

9

10   OFFICIAL COURT REPORTER:      MS. KATHY L. METZGER
                                   U.S. Courthouse
11                                 515 Rusk
                                   Room 8004
12                                 Houston, Texas  77002
                                   713-250-5208
13

14

15

16

17

18

19

20

21

22

23

24

25

1                              INDEX

2                                                              PAGE

3      PETITIONER'S WITNESSES

4      Michael A. Roman
         Cross-examination by Ms. Oden                         292
5

6

7

8

9                               *  *  *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                     P R O C E E D I N G S

2              *THE COURT:*  Please be seated.

3                     I think we're ready to proceed.  Go ahead and

4    take the stand, Dr. Roman.

5                     Ms. Oden, ready when you are.

6              *THE WITNESS:*  Good morning, Your Honor.

7         *(Michael A. Roman, petitioner's witness, previously sworn.)*

8                         **CROSS-EXAMINATION**

9    BY MS. ODEN

10   *Q.*  Good morning, Dr. Roman.

11   *A.*  Good morning.

12   *Q.*  Probably predictably, I would like to start talking to you

13   about your experience and your background.  Okay?  Your

14   education didn't start with but can be summarized with having a

15   predoctoral internship with your major rotations being in adult

16   and pediatric rehabilitation services, outpatient psychiatry,

17   and in a multidisciplinary pain clinic; is that right?

18   *A.*  As well as an eating disorders clinic, yes.

19   *Q.*  Okay.  Well, that was one of your minor rotations --

20   *A.*  It was.

21   *Q.*  -- which was I was going to get to next.

22   *A.*  Fine.

23   *Q.*  Your other minor rotations were comprehensive pain

24   management and general internal medicine?

25   *A.*  Correct.

1  *Q.* And your master's thesis was on the relationship between

2  emotionality and eating behavior?

3  *A.* There isn't a master's awarded within my doctoral program,

4  but, yes, the equivalency thesis was, that's correct.

5  *Q.* And your doctoral dis was on clinical assessment of memory

6  in children?

7  *A.* Correct.

8  *Q.* And your Ph.D. is in clinical psychology?

9  *A.* It is.

10  *Q.* And your postdoc fellowship was in pediatric

11  neuropsychology?

12  *A.* Adults as well, with a specialization in pediatrics, yes.

13  *Q.* And your postdoc certification is in psychopharmacology?

14  *A.* Yes.

15  *Q.* And you are a licensed specialist in school psychology?

16  *A.* That's correct.

17  *Q.* There's not that many of those, are there?

18  *A.* LSSPs?

19  *Q.* Right.

20  *A.* Tons of them.

21  *Q.* Tons of them.   In Texas?

22  *A.* Yes.

23  *Q.* There aren't only about 27?

24  *A.* LSSPs?

25  *Q.* LSSPs.

1    A.   No, ma'am.

2    Q.   Okay.   Your professional experience began in a Chicago

3    youth center?

4    A.   I believe that's correct, yes.

5    Q.   In 1984 or thereabouts?

6    A.   That sounds correct.

7    Q.   You were a clinical trainee for youth guidance the next

8    year?

9    A.   Yes.

10   Q.   And basically you had a clinical and neuropsychology focus

11   through 1987?

12   A.   Obviously without looking at the CV, it's harder to say,

13   but that sounds accurate, yes.

14   Q.   And if you put it on your CV, which is the only way I would

15   know this, then it's accurate?

16   A.   Absolutely.   Right.

17   Q.   Okay.   You were a staff psychologist at the Evaluation

18   Center for Learning?

19   A.   That's correct.

20   Q.   And you interned at the Department of Rehabilitation

21   Medicine?

22   A.   Yes, that's correct.

23   Q.   And you've taught pediatrics?

24   A.   I have, yes.

25   Q.   And you consulted in the pediatrics department as well?

1  A.  I have.

2  Q.  And basically from 1991 until now, you are a clinical

3  neuropsychologist and a clinical psychologist in private

4  practice?

5  A.  I've done some other things in that time, especially at the

6  beginning of it, but certainly pretty much full-time since

7  1994, that's been true, yes.

8  Q.  Okay.  So, what are the things you did at the beginning

9  that were different?

10  A.  There was some overlap with some of my teaching experience

11  and my work in the department of pediatrics as a faculty member

12  with my private practice, which I was doing part-time.

13  Q.  Okay.  And all of your teaching experience is either in the

14  fields of pediatrics or education or general psychology; is

15  that fair to say?

16  A.  Or neuropsychology, yes, ma'am.

17  Q.  Okay.  So, Doctor, what I'm putting up on the Elmo, is that

18  a list of your case history as a forensic expert for the last

19  four years?

20  A.  It is.

21       MS. ODEN:  Your Honor, I would like to introduce

22  Respondent's 69.

23       THE COURT:  Any objection?

24       MS. FERRY:  No objection.

25       THE COURT:  It's admitted.

1  BY MS. ODEN

2  Q.  So -- I guess I'll leave that up there.  Basically -- I'm

3  sorry.  Yesterday you said that you had done forensic work when

4  you had a hill country practice and your forensic work was a

5  lot of kids.  What kinds of forensic work with kids were you

6  doing?

7  A.  If I may, I think that I said that I did more active

8  ongoing forensic work when I had an office in the hill country.

9  But with regard to the work, a number of things.  I consulted

10  with a number of primarily juvenile probation departments in

11  several different counties.  I did a number of --

12  Q.  I'm sorry.  I don't mean to interrupt.  But while we're

13  talking about the juvenile probation departments, what kind of

14  forensic consulting did you do for the probation department?

15  A.  A number of things.  Primarily I performed psychological

16  evaluations for arrested or incarcerated juvenile offenders.

17  Q.  For what purpose?

18  A.  A number of different purposes.  In some cases it was to

19  rule out psychological factors for purposes of treatment.  In

20  some cases it was related to certification to stand trial as an

21  adult.  There are some cases where during that same period of

22  time, where I did some consultation primarily with appointed

23  defense attorneys on criminal cases.

24  Q.  And would that be in the line of insanity defenses,

25  competency to stand trial, what kind of consultation?

1  *A.*  Exactly those types of things.  In some cases I was asked

2  to review records or perform an interview, in other cases

3  evaluations.  Sometimes as generally as to look at potential

4  mitigating circumstances as the defense team was attempting to

5  move forward in the case.

6  *Q.*  And mitigating circumstances would be in a death penalty

7  case?

8  *A.*  They were usually pretty general in the way that they

9  phrase it, but, yes, these were either capital murder or murder

10  cases, yes.

11  *Q.*  And when you're talking about that time period, what is

12  that time period?

13  *A.*  I'm so bad at that.  Probably 1997, maybe 1996.  And I want

14  to say that I closed the hill country practice in 2006 maybe.

15  So, about an eight- to nine-year period, thereabouts.

16  *Q.*  And did you ever testify as an expert in either federal or

17  state court, for example, in a competency to stand trial in an

18  adult case?

19  *A.*  Yes.

20  *Q.*  How many times?

21  *A.*  I believe that I've only given testimony in court twice on

22  competency -- three times.

23  *Q.*  And we're talking about competency to stand trial as an

24  adult?

25  *A.*  No, more cases than that.  In terms of actual testimony in

1   court, perhaps four or five more cases than that, but they
2   didn't always require testimony in court.
3   Q.   And about how many cases total did you have to perform an
4   evaluation of whether someone was competent -- whether an adult
5   was competent to stand trial?
6   A.   Probably not more than three or four.
7   Q.   You just said you testified in four or five cases?
8   A.   Because you were talking about the idea, if I understood
9   the question correctly, about competency to stand trial as an
10  adult.
11  Q.   And I should have phrased it more clearly.  How many cases,
12  you said three or four, that you have evaluated an adult for
13  competency to stand trial?
14  A.   Right.  So, as I think about it, I believe that I have
15  testified in court three times on two separate cases.  There
16  have been a couple of other cases where I've been asked to look
17  at that question, but I have not been asked to testify in
18  court.
19  Q.   Okay.  And, so, if you know, how many cases have you
20  evaluated an adult to determine if they are competent to stand
21  trial?
22  A.   My belief, as I recall it, is that there have been three
23  such cases that come to mind for competency to stand trial.
24  Q.   Okay.  And of those three cases, you testified in two of
25  them?

1  A.  One of them two times, yes.

2  Q.  Okay.  And that would be the Jeffery Wood case?

3  A.  It is, as a matter of fact, yes.

4  Q.  So, you testified twice about his competency to stand

5  trial?

6  A.  That's correct.

7  Q.  And then you testified one more time about his competency

8  to be executed?

9  A.  No.  There were actually two competency trials.  The first

10  relief was granted, and he was found incompetent.  There was a

11  subsequent competency hearing.

12  Q.  Are we talking about competency to stand trial?

13  A.  Yes, ma'am, we are.

14  Q.  Okay.  So, you testified twice in Jeffery Wood about his

15  competency to stand trial?

16  A.  Yes, ma'am.

17  Q.  And then you testified a third time about his competency to

18  be executed?

19  A.  That is correct.

20  Q.  Okay.  So, leaving aside Mr. Wood's case, you've testified

21  one time about an adult's competency to stand trial?

22  A.  Yes.

23  Q.  Okay.  And now returning to the juvenile part of your

24  practice, when you evaluated a juvenile's competency to stand

25  trial as an adult --

1  A.  Yes.

2  Q.  -- that's an entirely different legal standard, isn't it?

3  A.  It is.

4  Q.  And it's not asking whether the juvenile is competent in

5  the same way that we ask if an adult is competent?  It's

6  talking about a juvenile's understanding of things on a more

7  adult level, isn't it?

8  A.  Essentially that's a correct phrasing, yes.

9  Q.  Okay.  So, within the last four years, the sum total of

10  your forensic experience is summarized in Respondent's Exhibit

11  69, this list; is that correct?

12  A.  Those are cases -- there have been a couple of cases where

13  I've been asked to perform some evaluations that have had some

14  legal significance, but they typically have been review kinds

15  of things.

16  Q.  So, this is not a correct representation of all of your

17  forensic work within the last four years?

18  A.  I think that this is a correct representation of everything

19  where I've been asked to do an evaluation or prepare some type

20  of report.

21  Q.  Okay.  So, in other cases you just looked at some records

22  and gave an off-the-cuff opinion, but did not write a report?

23  A.  It's more that I didn't necessarily have a legal role.

24  There were some cases where I performed an evaluation, somebody

25  was referred to me for clinical purposes.  So, there were

1   forensic aspects to the case, but I wasn't directly involved in
2   doing anything on the legal side of that.
3   Q.  In those cases you were performing your role strictly as a
4   clinician, a treating psychologist?
5   A.  A treating evaluating or consulting psychologist, yes,
6   ma'am.
7   Q.  Okay.  All right.  And those cases that are on this list
8   are basically in 2008, there was a civil suit of a child
9   against Memorial Hermann Medical Center?
10  A.  Correct.
11  Q.  Did you have to do a psychological evaluation of that
12  child?
13  A.  Ultimately not.
14  Q.  Okay.
15  A.  It was purely a record review.  They settled.
16  Q.  And in 2009, I assume this is a divorce case, a custody
17  battle of some sort?
18  A.  Essentially.  The divorce was long over, but it was a
19  custody-based issue, yes.
20  Q.  And we've already talked about, briefly, and I'm sure we'll
21  talk more again, about 2009, your involvement in Jeffery Wood's
22  case.
23  A.  Okay.
24  Q.  2010, this looks like a guardianship of a minor case?
25  A.  It's actually not a minor.  It was an individual who's an

1   adult --

2   Q.   Okay.

3   A.   -- but has been mentally retarded with evidence of an

4   autistic special disorder.

5   Q.   Okay.   And in 2011, it looks like a civil case, a lawsuit

6   by a child against a school in Puerto Rico?

7   A.   Essentially that's true, yes.

8   Q.   Okay.   Obviously in Mr. Wood's case, there was a question

9   as to whether or not he was malingering.   In any of these other

10  cases, was there a question about whether the person you

11  evaluated was malingering?

12  A.   The question of whether somebody is feigning or not is

13  implicit in virtually everything anybody does, but in a

14  specific way, no.

15  Q.   Did you -- I know that you said in that 2008 case, *Lingo*

16  *Chang*, that you didn't have to do an evaluation of an

17  individual.   It was just a records review.   But in the 2009

18  case, did you have to -- did you have to administer any

19  malingering tests --

20  A.   No.

21  Q.   -- or tests of effort?

22  A.   I did not.

23  Q.   Okay.   In Mr. Wood's case, did you administer any tests of

24  effort?

25  A.   No, I did not.

1  *Q.*  And in the guardianship case, the gentleman that was

2  retarded with an autistic disorder, did you administer any --

3  was there any concern about him malingering?

4  *A.*  No, there was not.

5  *Q.*  Okay.  And in the case of the 2011 case of the child suing

6  the school, was there any question of that child malingering?

7  *A.*  There was not.

8  *Q.*  Okay.  So, even though technically in a forensic sense you

9  consider malingering all the time, there are obviously forensic

10 cases where malingering is not an issue?

11 *A.*  There are forensic cases where malingering is not a central

12 issue to the case, yes.

13 *Q.*  Okay.  And most of your experience in the last four years

14 has been in cases where malingering was not an issue?

15 *A.*  That is correct.

16 *Q.*  Okay.  Who is your client in this case?

17 *A.*  My client in this case is the attorneys who represent

18 Mr. Eldridge.

19 *Q.*  Okay.  Have you ever worked in a mental hospital?

20 *A.*  I have.

21 *Q.*  And what mental hospital was that?

22 *A.*  It's been a number of years.  Charter Barclay in Chicago.

23 *Q.*  And how long did you work there?

24 *A.*  You know, I don't recall.  And I don't know for sure if

25 that's on my CV or not, but I believe it is.  Perhaps about a

1  year, perhaps not quite a year.

2  Q.  And do you remember when that was?  We can always look at

3  your CV.

4  A.  Right.  Approximately -- approximately 1984, '85.

5  Q.  And what were the majority of the patients that you saw?  I

6  assume you saw them in a clinical setting, a treatment setting?

7  A.  I did.  I did.

8  Q.  And what were the majority of the patients that you saw

9  there in this hospital for?

10  A.  It was pretty mixed.  There were a couple of different

11  floors, and in some cases these were adolescent offenders with

12  a host of behavioral or other more general issues.  There were

13  two locked units where there were primarily sometimes older

14  adolescent but primarily adult offenders -- I said offenders.

15  See, there we go -- inpatients, who were being treated for

16  schizophrenia and other psychotic disorders, major depressive

17  disorder, those types of things.

18  Q.  About how many adults do you think that you treated during

19  your year or less that had schizophrenia?

20  A.  Well, I want to be careful about the characterization of

21  treatment.  At that point I was still a graduate student.  So,

22  I don't want to mischaracterize that I was doing the treatment

23  of these individuals.  But within my role there in terms of

24  interfacing with them in a clinical capacity, I don't know,

25  perhaps a hundred or so.

1  *Q.*  Okay.  And, so, let me be clear, you were a graduate

2  student being supervised by someone who was already licensed

3  and you were not treating those patients; is that right?

4  *A.*  The role in which I served was what was called at the time,

5  and sometimes still is, a psych tech.  We provided basic

6  intervention services, basic assistance to the nursing staff,

7  in terms of spending time with patients, taking vitals,

8  charting, dealing with aspects of their treatment and

9  intervention plan that were not traditionally therapeutic.  So,

10  that was the basis of it.

11  *Q.*  So, what you're telling me is you weren't supervised by

12  licensed psychologists?

13  *A.*  No.

14  *Q.*  You were unsupervised?

15  *A.*  I wasn't operating in the role of a psychologist.

16  *Q.*  You were basically a tech, making sure they took their

17  pills, giving them someone to talk to, taking their vitals?

18  *A.*  That's a reasonable characterization, yes, ma'am.

19  *Q.*  Okay.  And you said you worked there for a year or maybe

20  slightly under a year?

21  *A.*  I think that's about right, yes, ma'am.

22  *Q.*  Maybe like a school year, like two semesters while you were

23  doing your graduate work?

24  *A.*  That's entirely possible yes, ma'am.

25  *Q.*  Okay.  Have you ever diagnosed a schizophrenic in the

1  forensic context?

2  A.  I'm not sure I quite understand that question.

3  Q.  Do you understand what I mean by diagnosing in the work

4  that you do?

5  A.  Of course I do.

6  Q.  And do you understand what I mean by a schizophrenic?

7  A.  Of course I do.

8  Q.  And do you understand what I mean by the forensic context?

9  A.  Perhaps not --

10  Q.  Okay.

11  A.  -- in light of my uncertainty about the question.  Perhaps

12  that's the breakdown.

13  Q.  Okay.  Well, then I'll put it this way:  Have you ever been

14  asked by an attorney or a court to evaluate an individual in a

15  legal context to determine what their mental health issues were

16  and decided that they were schizophrenic?

17  A.  The first part, yes; the second part, no, I don't believe I

18  have made a new diagnosis of schizophrenia in an individual for

19  which I performed a forensic evaluation.

20  Q.  And I don't mean whether it's new or you agreed with some

21  previous diagnosis.  I'm just saying in general have you

22  ever -- and, of course, you think Mr. Eldridge is

23  schizophrenic, so I'm leaving today's case out of this --

24  A.  I understand.

25  Q.  -- in your previous history, have you ever worked as a

1  forensic psychologist on a case and diagnosed someone as

2  schizophrenic?

3  *A.*  There have been some primarily going back to the juvenile

4  offender population, yes.

5  *Q.*  So, you diagnosed some juveniles with schizophrenia in a

6  forensic context?

7  *A.*  Or corroborated that it was an accurate diagnosis, yes.

8  *Q.*  And about how many of those, do you think?

9  *A.*  It would be a very small number.  It would probably be less

10  than five.

11  *Q.*  Okay.  And, again, that was when you were doing juvenile

12  work in what time period again?

13  *A.*  Again, approximately 1997 through perhaps 2005, 2006.

14  *Q.*  Okay.  And have you ever been to death row?

15  *A.*  Well, I have been to Polunsky.  I have not been on death

16  row.

17  *Q.*  Okay.  You've been in the interview room at Polunsky?

18  *A.*  I have.

19  *Q.*  Okay.  But you've not actually seen any of the pods or seen

20  the living environment?

21  *A.*  I have seen pictures and representations of it.  I have not

22  actually been physically viewing it with my own eyes, no.

23  *Q.*  Okay.  You said you conducted about two to 3,000

24  neuropsychological evaluations yesterday?

25  *A.*  Probably.  Probably that, maybe a little more.

1  Q.  Okay.

2  A.  Now, again, though, assessments.  In terms of evaluations,

3  it's probably seven to 8,000, but in terms of neuropsych

4  assessments, probably 2,500, 3,000.

5  Q.  Okay.  And of the ones that you conducted an assessment --

6  and I'm sorry for using the wrong word.  An assessment is the

7  more picky one, right?  It's the more detailed, the more

8  thorough?

9  A.  It is the way I would say it, yes, ma'am.

10  Q.  Okay.  So, of the neuropsych assessments you've done, how

11  many of those were on someone with schizophrenia?

12  A.  It's really hard to say.  Perhaps a hundred, but it's truly

13  just a guess.

14  Q.  Okay.  Fair enough.  And of all of your neuropsych

15  assessments, not just the ones on the schizophrenics, but all

16  2,500 to 3,000, how many of those assessments resulted in you

17  concluding that the individual was malingering?

18  A.  Again, I would have to guess, but I would say that number

19  probably is not greater than 50.

20  Q.  Fifty?  1-5?  Fifty, 5-0?

21  A.  5-0.  Where there has been a concern about feigning,

22  dissimulation, or overrepresentation of symptomatology.

23  Q.  So, as I looked at your publication list, I noted that

24  you've published in a whole lot of fields dealing with

25  children's issues and concentration issues.  I didn't see any

1  that dealt with forensic issues.  Would that be an accurate

2  statement?

3  A.  This is an accurate statement, yes, ma'am.

4  Q.  Or that dealt with people with antisocial personality

5  disorder?

6  A.  That is correct.

7  Q.  Or malingering?

8  A.  That is correct.

9  Q.  And schizophrenia or psychotic disorders in general?

10  A.  That is correct.

11  Q.  And I could probably speed this up by summarizing that none

12  of your conference presentations deal with forensic issues?

13  A.  I believe that's correct, yes.

14  Q.  Antisocial personality?

15  A.  Correct.

16  Q.  Malingering?

17  A.  Correct.

18  Q.  Or schizophrenia?

19  A.  Correct.

20  Q.  And none of your workshops or lectures deal with forensic

21  issues?

22  A.  Ones that I presented, you mean?

23  Q.  The ones that were on your CV, the workshops that you

24  presented or lectures.  There was a --

25  A.  Well, one of the reasons I ask is I used to have on my CV

1  workshops I've attended.  I don't recall whether I still have

2  that on my CV or not.  I have not presented workshops in those

3  areas; that is correct.

4  Q.  Okay.  Or antisocial personality?

5  A.  That is correct.

6  Q.  Or malingering?

7  A.  Correct.

8  Q.  Or schizophrenia?

9  A.  Correct.

10  Q.  Okay.  And none of your research grants dealt with those

11  four issues either?

12  A.  That is correct, yes, ma'am.

13  Q.  You stated yesterday that you're particularly well suited

14  for competency for execution evaluations, because you can rule

15  out neurological disorders?

16  A.  I believe I stated that it is my opinion that

17  neuropsychologists are particularly well suited.  The Court

18  will ultimately make the determination whether I am, I suspect.

19  Q.  Fair enough.  But that is because they can rule out

20  neurological disorders?

21  A.  I believe I said neurocognitive disorders.  I want to be

22  careful about that distinction, not being a physician.

23  Q.  And neurocognitive disorders, then, in your view, must be a

24  substantial component of what makes someone not competent for

25  execution; is that right?

1   *A.*  Again, we have to be careful, because there are diagnostic
2   entities that we call neurocognitive or neurobehavioral.  When
3   we talk about the diagnostic entity, there are cognitive
4   processes that I think are essential in making a determination
5   of whether somebody lacks rational understanding and,
6   therefore, competence.
7   *Q.*  So, I guess you would agree, then, that neurocognitive
8   disorders would be a big reason that someone would not be
9   competent for execution?
10  *A.*  Well, again, I think you just missed what I've said and
11  restated what you had said prior to that.  The minute you say a
12  neurocognitive disorder, you have assumed that a constellation
13  of symptoms has been found and a particular neurocognitive
14  disorder has been diagnosed.
15           What I'm suggesting is that there are aspects of
16  neurocognitive functioning or processes that might not rise to
17  the level of a true diagnosable neurocognitive disorder, and
18  those processes are important in understanding competence.
19  *Q.*  But you understand that the law in this case is that it has
20  to be not just a neurocognitive constellation of function, but
21  it has to be a psychotic disorder?
22  *A.*  I do understand that.
23  *Q.*  Okay.  So, whether a neuropsychologist is capable of ruling
24  out neurocognitive processes and investigating them, what
25  really has to be addressed is whether the person has a

1  psychotic disorder?

2  A.  And in being able to evaluate that and look at those

3  dimensions, aspects of cognitive functioning are important,

4  yes.

5  Q.  But you would agree with me that other mental health

6  professionals would be equally capable of evaluating someone's

7  rational understanding, their interface with the world, whether

8  or not they had a psychotic disorder, people like psychologists

9  or psychiatrists?

10  A.  I don't know how to respond to the question with the word

11  "equally."  I don't know how best to gauge that.  Would they be

12  competent to do so?  Of course, they would.  The issue of to

13  what extent it would be equal, greater, or less, short of

14  having a bias, I have no data on how to speak to that.

15  Q.  Nobody, whether they are a neuropsychologist or a

16  psychologist or a psychiatrist or a mind reader, can really

17  tell what's in another person's mind?

18  A.  That is absolutely true.

19  Q.  If my husband acts like he loves me and tells me that he

20  loves me, I assume that in his heart he feels like he loves me

21  and he thinks he loves me, but I don't have any way of knowing,

22  right?

23  A.  A neuropsychologist would say the heart has nothing to do

24  with that.  It pumps blood.  But, yes, the basic tenet of what

25  you said is accurate.

1    *Q.*  In fact, if he acted like he loved me and he told me he

2    loved me, it could be motivated by guilt or duty, obligation,

3    but I couldn't ever really know what was inside; is that right?

4    *A.*  That certainly sounds correct, yes.

5    *Q.*  And that's true for the Court, too?

6    *A.*  Yes.

7    *Q.*  If the Court cared whether my husband really loved me.

8    It's true for other questions that the Court has to address?

9    *A.*  Indeed, it is.

10   *Q.*  And, so, I would imagine you would agree that the Court and

11   you are fairly limited to looking at a person's actions and

12   their words and extrapolating from that what they really think

13   or believe or feel?

14   *A.*  Keeping in mind the fact that my profession and my license

15   suggests that we are more inclined to do that based on our

16   knowledge, experience, and data set than the general public

17   might, I wouldn't be so bold as to suggest whether the Court,

18   the final arbitrator, is more or less able to make those

19   distinctions.  But certainly with regard to my license, the

20   State of Texas and my profession says that we are better at

21   making those predictions than the general public would be.

22   *Q.*  But what I'm saying is you make those predictions based on

23   your data set, which comes from things like their actions and

24   their words.  You don't have a human lie detector or license?

25   *A.*  Indeed, I do not.

1  Q.  And you don't have x-ray vision into what language is going

2  on inside Mr. Eldridge's head?

3  A.  (Nods head.)

4  Q.  You're nodding, but you have to say out loud.

5  A.  I'm sorry.  I would probably need PET scan vision in order

6  to look at that, but, no, indeed, I do not have PET scan vision

7  either.

8  Q.  Okay.  A PET scan would tell you what he's thinking?

9  A.  It would allow the ability to look at activation of

10  functional areas, but, no, I'm just suggesting x-ray would not

11  do it for me, probably a PET scan wouldn't either.

12  Q.  What does the literature say is the most common reason that

13  someone is not competent for execution?

14  A.  The -- I'm sorry.  Repeat that one more time.

15  Q.  What does the psychological literature --

16  A.  Yes.

17  Q.  -- say is the most common reason someone would be

18  noncompetent for execution?

19  A.  I think ultimately because they don't have a rational

20  understanding because of the presence of a psychotic disorder.

21  Q.  Well, there's more than one psychotic disorder, right?

22  A.  Yes, there are.

23  Q.  So, I guess fill me in.  What literature have you been

24  reading about competency for execution?

25  A.  I'm not very familiar with the literature in competency for

1  execution per se.

2  Q.  What literature do you read when you're doing a competency

3  to stand trial evaluation?  What literature do you rely on

4  there?

5  A.  The things that I look at it in terms of that have more to

6  do with the question of understanding the feigning -- I keep

7  wanting to say malingering -- the feigning literature in terms

8  of what's been looked at in a forensic context.

9  Q.  And you don't like using the word "malingering" even though

10  it's in the DSM?

11  A.  Well, it's a very bad word in the DSM.  But the standard in

12  the profession is to use the word feigning.  Some of the

13  biggest authorities in the area suggest that malingering is not

14  the proper word to use.  I have no problem with it.  I'm simply

15  attempting to be appropriate in the accepted use of the word.

16  Q.  And the profession that you're referring to as far as

17  accepting that word would be the neuropsychological profession?

18  A.  No.  It would be the -- if one determines that there is a

19  separate forensic profession, it would be that profession.

20  It's people like Rogers, who have argued that the word

21  "malingering" is not an appropriate word to use.  That

22  "feigning" is a more appropriate word.

23  Q.  You mean that there's actual disagreement with the

24  psychological community in what is represented in the DSM?

25  A.  Certainly there is, without a question, especially for the

1   V codes, such as malingering.

2   Q.  So, I would like to talk a little bit about the definition

3   and the perspective that you employed in this case.  Your

4   report captures -- or I should say your reports, capture your

5   opinion as accurately as possible?

6   A.  Yes, ma'am.

7   Q.  And you were thorough and complete?

8   A.  I certainly hope so.

9   Q.  And you did your evaluation exactly as you state in your

10  report?  Of course, you had to leave things out for

11  confidentiality reasons, but what you say in your report is

12  accurate?

13  A.  Yes, it is.

14  Q.  And you didn't omit anything that influenced your judgment?

15  A.  I did not.

16  Q.  Would you agree that you apply the scientific method in

17  testing hypotheses, acquiring data, evaluating the data, and

18  deciding what the data tells you is the answer?

19  A.  The use of the scientific method in its normal meaning is a

20  little difficult to apply directly to the assessment process.

21  We look at things like control groups and repeat observations.

22  But if I understand the spirit of your question being that we

23  apply the objective standards of our science, of our

24  profession, I would answer in the affirmative.

25  Q.  You think it's important to consider all of the evidence?

1   *A.*   I do.

2   *Q.*   And would you agree that you start with -- I don't remember

3   the terminology you used yesterday, but I would think of it as

4   a null hypothesis?

5   *A.*   I think that's well stated, yes, ma'am.

6   *Q.*   If you agree with me on that, tell me what you mean by the

7   null hypothesis.

8   *A.*   So, scientifically when one does a research study and

9   attempts to determine whether something might be true, the idea

10  being, for example, that Drug A will improve symptomatology,

11  the null hypothesis states the opposite.   It's that there will

12  be no change in this drug.   So, within this context, the null

13  hypothesis would essentially be coming in and saying -- I mean,

14  it becomes a bit difficult, because if you walk in believing

15  this gentleman is malingering, to use that word, the null

16  hypothesis would be he's not.   And if you walk in believing he

17  is (sic) malingering, the null hypothesis would be he is.

18  *Q.*   Well, I want to make sure that I understand.   You are

19  approaching this case as a scientist would.   So, are you saying

20  you come in believing one thing or another from the start?

21  *A.*   Well, respectfully, I'm approaching this case as an

22  objective evaluator would.   I think, again, a scientist

23  requires more than N equals 1.   And even in research that's

24  done scientifically that is case studied based with N equals 1,

25  we need things like reversal designs.   There is no way of doing

1  a control group with a single individual.

2  Q.  Then perhaps I'm using scientifically or a scientist too

3  broadly.

4  A.  Perhaps.

5  Q.  What personal beliefs you have played no role in your

6  evaluation in this case; is that correct?

7  A.  I certainly believe that that is a correct statement.

8  Q.  So, leaving aside whether initially you think he's

9  malingering or you think he's not malingering at the start,

10  what was your null hypothesis when you started evaluating this

11  case?  What was the hypothesis that you're testing or trying to

12  establish?

13  A.  I'm better with that question.  The hypothesis that I'm

14  testing is that this individual may or may not be demonstrating

15  significant cognitive and psychological impairment.

16  Q.  How is that a hypothesis that you test?  That's not a

17  hypothesis.

18  A.  But it is.  It's a two-tail test.  It is absolutely

19  consistent with scientific hypotheses.

20  Q.  Okay.

21  A.  It's the difference between one- and two-tail testing.  It

22  is a perfectly scientific statement.

23  Q.  So, you are approaching this as a scientist?

24  A.  Well, I'm attempting to approach the reasoning that you're

25  laying out and be consistent with the question that you're

1  asking.

2  Q.  Okay.  Don't think about my question.

3  A.  Fine.

4  Q.  Just tell us how you approached this case.  Did you

5  approach this case with a two-tail hypothesis?

6  A.  No, I approached this case with an open mind, that I had no

7  idea what the facts were about this individual.

8  Q.  Sure.  And --

9  A.  But I start with a blank slate.

10  Q.  And, so, you don't have a hypothesis that you're testing in

11  this case?

12  A.  One always has certain things that they know they have to

13  look at.  So, there are some areas that we hypothesize would be

14  relevant but in terms of outcome or conclusion, no.

15  Q.  Okay.  So, we're not -- we're talking in circles, and I

16  don't want to use the word hypothesis in five different ways.

17  I think we both understand what the concept of a null

18  hypothesis is.  And what I'm trying to get at is, when you

19  start working on this case and you are acquiring data and

20  putting data out and seeing where the data leads you, if I

21  understand what you're saying correctly, you are saying that

22  you do not have a hypothesis to test.  You are neither saying

23  my hypothesis is he's not mentally, let me collect the data,

24  and see if that challenges the hypothesis or supports it, nor

25  are you saying, my hypothesis is he is mentally ill and I'm

1  going to test that against the data; is that correct?

2  A.  The difficulty I have with that is if we look at any

3  individual measure, a measure of memory, obviously in giving

4  it, we've asked both questions.  That's the whole reason we

5  chose it.  The one question is, he has a memory problem.  The

6  other question is, he does not have a memory problem.  This is

7  a two-tailed hypothesis, if you're going use that phrase.  So,

8  with anything that we collect, we ask the question of whether

9  the finding is significant or not.

10  Q.  So, the answer to my question was, that's right, I didn't

11  have either hypothesis as I was sorting through the data?

12  A.  I did not have a preconceived notion of what I expected to

13  find, hoped to find, or thought I might find.

14  Q.  Nor did you create in your mind a null hypothesis to test

15  the data against?

16  A.  I'm trying to avoid the circularity that was obviously

17  frustrating you.  When you --

18  Q.  It's a very -- I'm just asking what was in your mind.  I'm

19  not asking you to explain.  Just tell me --

20  A.  The word "hypothesis" is never in my mind --

21  Q.  Okay.

22  A.  -- as I am doing an investigation of a single individual.

23  Q.  Okay.  Mr. Eldridge's -- you quoted in your report that

24  Mr. Eldridge's attorneys argued that Eldridge has a mental

25  condition preventing him from accurately perceiving,

1  interpreting, and/or responding appropriately to the world.

2  Why did you say "and/or"?

3  A.  Because that was my understanding of the position that they

4  had made, that one or all of those things may be true.

5  Q.  If one of those things is true, is that enough to show that

6  Mr. Eldridge does not have a rational understanding?

7  A.  I don't believe that is enough.

8  Q.  Okay.  Is that enough to show that he does not have -- how

9  did you put it, an accurate interface with reality?

10  A.  Depending on which of them is true.  It is a possibility

11  that one of those could be enough.

12  Q.  Okay.  You also said that the central questions to be

13  resolved are whether Mr. Eldridge has evidence of a diagnosable

14  mental illness; if he does, does it preclude him from this

15  accurate reality interface; and if he has an impairment in

16  reality testing, does that preclude him from having a rational

17  understanding in a manner that would suggest he is incompetent.

18  Does that sound like your understanding of your job in this

19  case?

20  A.  That is what I wrote.  That is my understanding.

21  Q.  Okay.  So, I assume from the way you phrased that, that

22  somebody could have a rational understanding of the reason for

23  conviction and that they were going to be executed in a manner

24  that did not suggest he was incompetent to be executed?

25  A.  I'm not sure I process that question.  A person could have

1  a rational understanding --

2  Q.  What you said was that the third part of your job was to

3  assess if he has an impairment --

4  A.  Yes.

5  Q.  -- does it preclude him from rationally understanding the

6  link between crime and punishment in a manner that suggests he

7  is incompetent for execution?

8  A.  Yes.

9  Q.  So, that implies that there is a manner that would not

10  suggest incompetence; otherwise, it's just repetitive verbiage,

11  right?  I mean, if a rational understanding between the link is

12  enough to be incompetent, then it couldn't have a manner --

13  A.  I don't know how to follow the logical semantic argument.

14  What I will say is one could conceive of a situation where

15  there's not a rational link, but there is not the presence of a

16  severe psychotic disorder.  And as I understand the ruling of

17  the court in *Panetti*, that would not raise to the level of

18  incompetence.

19  Q.  Okay.  So, who told you that the definition, that

20  three-pronged does he have a mental illness, does it preclude

21  him from interfacing with reality, and if it does, does he have

22  a rational understanding, who gave you that definition?

23  A.  I don't think I would talk about that as a definition.

24  That is the process in which I used.

25  Q.  Who gave that you process?

1   *A.*   I gave me that process through many years of experience and

2   training.

3   *Q.*   But you haven't read *Panetti*?

4   *A.*   I have read portions of *Panetti*.

5   *Q.*   Okay.  So, many years of experience and training before

6   *Panetti* came out didn't tell you that, right, because the law

7   wasn't the law yet?

8   *A.*   I understand.

9   *Q.*   So, you're saying that you got your understanding of your

10  process in this case from the portions of *Panetti* that you

11  read?

12  *A.*   The basic tenets that I lay out, those three things, I

13  think are relevant issues that we would raise with any question

14  that we look through, is there a significant issue, does that

15  significant issue affect on a day-to-day life, does it rise to

16  the level that treatment or intervention or exculpatory data

17  would be significant?  So, I think it's a very appropriate

18  clinical process and appropriate way of reasoning.  Obviously I

19  stated that in response to what the defense team had suggested

20  to me was their argument.  So, that three-pronged approach, is

21  there something there, is it a practical significance, and does

22  it ultimately affect the question at hand, is a very logical

23  and appropriate way to take it from an assessment perspective.

24  *Q.*   What are the delusions that Mr. Eldridge has that are

25  relevant for the Court today?  If I understand correctly

1  there's basically four, from reading your first report:  That

2  Cynthia is alive -- would you agree with that as being one of

3  them?

4  A.  Yes, that is correct.

5  Q.  One of them is that Mr. Eldridge leaves the prison and has

6  a normal life?

7  A.  That's correct.

8  Q.  The third would be that the guards are out to get him?

9  A.  That has been the delusion, whether that continues or not,

10  but I haven't seen it as a separate delusion.  I have not

11  delineated the question of whether or not the guards are out to

12  get him.  I have expressed that specifically in relation to the

13  food poisoning issue, which may be the fourth thing on your

14  list.

15  Q.  No.  I was saying the guards out to get him as including

16  the food poisoning issue.

17  A.  It was more than the guards.  See, I don't look at it as

18  the guards out to get him.  I look it as the people are

19  poisoning my food delusion.  It wasn't just the guards that

20  were implicated in that delusion.

21  Q.  Okay.  So, his other complaints about the guards being out

22  to get him, harassing him, stopping his mail, banging on his

23  door, kicking his door, going through his property, stealing

24  his property, making his headphones not work, all that stuff is

25  not a delusion?

1   *A.*   It may be part of his delusional system, that is a
2   possibility.   The spirit of your question, as I understood it,
3   is what I was discussing as delusions within my report.
4   *Q.*   Agreed.
5   *A.*   If we argue that that's a delusional system and I did not
6   adequately consider or represent that, that is a possibility.
7   But what you just stated is not part of what I have argued as
8   part of his delusional system.
9   *Q.*   And what you believe his delusional system is, is limited
10   to his belief that the food is being poisoned?
11   *A.*   That is what I have represented, yes, ma'am.
12   *Q.*   Okay.   And it seemed like from your report, that there was
13   a fourth delusion and that was that human life has alien
14   origin?
15   *A.*   I haven't extracted that as a specific delusion.   I don't
16   think I've talked about it in that way.   He certainly has
17   expressed that belief.   I don't know if it's a fixed false
18   belief that is something that is resistant to input and
19   difficult to change.   I simply know that it's a belief that he
20   has that is outlandish.
21   *Q.*   So, you would or would not call that a delusion?
22   *A.*   I don't think it rises to the level of being a delusion.
23   *Q.*   So, we're talking about three delusions then?
24   *A.*   That is how I see it, yes, ma'am.
25   *Q.*   Okay.   During your testimony yesterday, you defined a

1  delusion as a fixed false belief despite reasonable evidence to

2  the contrary; is that right?

3  A.   There's a more specific definition within the DSM, but I

4  suspect that you accurately portray the paraphrasing that I

5  gave, yes.

6  Q.   Okay.   So, that is the definition that you applied in this

7  case?

8  A.   That is the definition I applied in this case.

9  Q.   Okay.

10 A.   There are other tenets to that definition.

11 Q.   So, I'm putting up here on the Elmo page 821 from the DSM.

12 Can you see that okay?

13 A.   Okay.

14 Q.   And it says, "A false belief -- Delusion:  A false belief

15 based on incorrect inference about external reality that is

16 firmly sustained despite what almost everyone else believes and

17 despite what constitutes incontrovertible and obvious proof or

18 evidence to the contrary.  The belief is not one ordinarily

19 accepted by other members of the person's culture or

20 subculture."

21           And then I highlighted in the wrong place.   It

22 is, "E.g. it is not an article of religious faith."

23           Is that the full definition that you applied in

24 this case?

25 A.   There is obviously yet more to that definition, but,

1    indeed, it is.

2    Q.  Okay.  So, you would agree with me that typically

3    schizophrenics have issues with working memory, not long-term

4    memory?

5    A.  Given some of the nerve pathological findings in

6    schizophrenia, that may well change over time, but, indeed,

7    they are far more likely to have problems with working memory

8    systems than with long-term memory, that is accurate.

9    Q.  And long-term memory would be things like knowing where you

10   grew up, your family, things that happened a long time ago?

11   A.  Those would be examples of long-term memory, yes, ma'am.

12   Q.  And short-term memory would be something like your phone

13   number that -- not your phone number, but if someone tells you,

14   hey, call me, and here's my phone number, that kind of, like,

15   short-term input?

16   A.  We make much more sophisticated distinctions within my

17   profession.  I don't know if you need me to speak to that or

18   not.

19   Q.  Would you agree with what I said?

20   A.  No, I would not.

21   Q.  Okay.  So, tell me what the more sophisticated definition

22   of working memory is?

23   A.  What you just described with a phone number would be a

24   working memory process.  Working memory and short-term memory

25   are not the same process.

1    Q.  Okay.  So, we're not talking -- when we're talking about

2    the kind of memory problems schizophrenics have, we're not

3    talking about short-term memory.  We're talking about working

4    memory?

5    A.  No, we may also be talking about short-term memory.

6    Q.  Okay.  So, do schizophrenics have problems with short-term

7    memory?

8    A.  They often do, yes, ma'am.

9    Q.  So, they have problems with short-term memory and with

10   working memory, but not so much with long-term memory?

11   A.  Certainly unless the disease process has progressed over a

12   long period of time, yes, that is an accurate statement.

13   Q.  Okay.  And your own testing indicates that Mr. Eldridge

14   does not have such a memory impairment; is that correct?

15   A.  I'm not sure what you mean by "such a memory impairment."

16   Q.  Long-term memory?  Did you test his long-term memory?

17   A.  We don't typically test long-term memory.  We don't have

18   the opportunity to come back weeks to months later and see if

19   somebody still remembers things.  We know that he is not good

20   at giving memory from things in the past.  The things that we

21   look at that are long-term memory, things like the information

22   subtest on the WAIS, we can't guarantee that a person knew it

23   in the first place.

24   Q.  So, the testing that you administered doesn't look at, for

25   example, things that you can verify about his past and asking

1  them?  It talks about it in a more experimental sense, like,

2  I'm going to tell him something and I can't come back in six

3  months and see if he remembers it?

4  A.  Right.  The psychometric measures certainly don't allow for

5  direct testing of long-term memory, but as you correctly point

6  to, there are things that one can look in the record that are

7  factual in nature and attempt to determine whether something

8  that we know he knew once, whether he still knows it or not.

9  Q.  And actually we can't really know whether he does remember

10  it or not.  All we can know is that he says he doesn't remember

11  it?

12  A.  That's absolutely accurate, yes, ma'am.

13  Q.  Would you agree with me that it is not common to be a

14  schizophrenic and only have hallucinations and delusions but

15  not display the disorganized thought and avolition and alogia,

16  the so-called negative symptoms?

17  A.  No, actually I would not agree with you and the literature

18  would not agree with you on that.

19  Q.  So, it's your position that it is common to have

20  schizophrenia with hallucinations and delusions but organized

21  thought, organized behavior?

22  A.  It is not typical that behavior and thought are organized.

23  There's a distinction in terms of -- again, all these things

24  lying in a continuum, there is a distinction about whether or

25  not -- if he can point to the board that was used yesterday --

1  whether it reaches the level of truly disorganized.  But,

2  indeed, it would be unusual for a person to have hallucinations

3  and delusions and to have organized thought and behavior.

4  That, I would agree with.

5  Q.  Okay.  Okay.  So, would you diagnose someone as

6  schizophrenic if the only things that they had in Category A

7  were hallucinations and delusions, but there was no evidence of

8  the other issues in Category A?  And I think what's up on the

9  board, if I'm not mistaken, is 301.  I could be wrong.

10            MS. FERRY:  312.

11            MS. ODEN:  I'm sorry.  312.  Thank you.

12  BY MS. ODEN

13  Q.  It's page 312 of the DSM.  Would you diagnose somebody if

14  they only had A1 and A2 and did not have A3, A4, or A5?

15  A.  Well, as you can see, according to the diagnostic criteria,

16  "an," but, indeed, I would not.

17  Q.  Okay.  And why would you not?

18  A.  Frankly, because I would find that highly suspicious.

19  Q.  Okay.  Highly suspicious of what?

20  A.  Of malingering or feigning.

21  Q.  Okay.  And for our purposes, malingering and feigning are

22  basically the same thing?

23  A.  They are.

24  Q.  Okay.

25  A.  And I'm happy to use malingering, if you would rather.

1   Q.   I would rather you use what you think is appropriate.

2   A.   Okay.

3   Q.   I am going to continue to say malingering.

4   A.   Sounds great.

5   Q.   Is it possible to be schizophrenic and to be competent to

6   be executed?

7   A.   Yes, it is.

8   Q.   How about hearing voices and being competent for execution?

9   A.   No problem with that.

10  Q.   How about having delusions of persecution and being

11  competent to stand --

12  A.   It is entirely possible you could still be competent.

13  Q.   Okay.  I'm going back to the DSM, page 299.  I would like

14  to read a section and talk about it.

15           "Although bizarre delusions are considered to be

16  especially characteristic of schizophrenia, bizarreness may be

17  difficult to judge, especially across different cultures.

18  Delusions are deemed bizarre if they are clearly implausible

19  and not understandable and do not derive from ordinary life

20  experiences.  An example of a bizarre delusion is a person's

21  belief that a stranger has removed his or her internal organs

22  and has replaced them with someone else's organs without

23  leaving any wounds or scars.  An example of a nonbizarre

24  delusion is a person's false belief that he or she is under

25  surveillance by the police."

1              Do you agree with that?

2  A.  I do agree with that.

3  Q.  Okay.  So, the three delusions that you find relevant for

4  the case today, the delusion that Cynthia is alive, under that

5  definition that I just read, would that be considered a bizarre

6  delusion or nonbizarre delusion?

7  A.  It's a nonbizarre delusion.

8  Q.  And that he leaves the prison, goes to work, has a family,

9  and a normal life, is that a bizarre or nonbizarre delusion?

10 A.  Many people have those other things.  It is a nonbizarre

11 delusion.

12 Q.  And his belief that the guards are putting poison in his

13 food, is that a bizarre or nonbizarre delusion?

14 A.  It would be plausible.  It is not bizarre.

15 Q.  Okay.  What's the difference -- what's the difference

16 between thought content and thought process?

17 A.  Keeping in mind that thought is always reflected in words,

18 because as you say, we can't read their mind, thought content

19 typically deals with the specifics of what's said.  Process has

20 more to do with the ebb and flow, the ability to get points

21 across, for example.  It probably taps more into the question

22 of the ability to reason or do inferential thinking, again,

23 based on the words that are used and what we can make of that.

24 Q.  Would you agree with me if I said -- and this is probably

25 not as sophisticated an explanation as I know you would be able

1   to provide, but just bear with me.  Would you agree with me if
2   I said that the reason schizophrenics usually display
3   disorganized speech is because they're attending to all this
4   crazy stuff going on in their head and it's hard to put things
5   together in the logical, goal directed, linear fashion that you
6   and I are hopefully trying to engage in right now?
7   A.   It's difficult because there's evidence of parietal lobe
8   dysfunction in schizophrenics as a group, and there may be some
9   direct neuroanatomical reasons that they're having problems
10  with language and language production.  But the statement that
11  you make is a plausible reason why that could be happening at
12  least sometimes for some schizophrenics.
13  Q.   So, there would be some schizophrenics that have basically
14  a brain -- an organic, something wrong in their brain that
15  prevents them from organizing their language, parietal lobe
16  dysfunction or whatever?
17  A.   Correct.
18  Q.   And some schizophrenics maybe don't have that yet?
19  A.   Right, that would be true, yes.
20  Q.   Okay.  And, so, some schizophrenics are neurologically
21  impaired and that's why they are the way they are; and some
22  haven't developed that far and so if they have disorganized
23  speech, it's because they're attending to crazy stuff in their
24  head?
25  A.   Well, we have to be careful, because if we presume, as the

1  literature is still attempting to ferret out, that there are

2  underlying neurochemical defects in schizophrenia, the very

3  manifestation of schizophrenia may be an abnormality of the

4  brain that is at a molecular level, one that we cannot see

5  based on imaging studies.  So, the fact of the matter is, yes,

6  we may not see the anatomical deficit until it's progressed

7  further, but it doesn't mean that there aren't early

8  precursors.  I don't think the distinction is quite as clear as

9  that.

10  Q.  Okay.  But you would agree with me that someone can report

11  things in their thought content, in other words, report what

12  they're thinking that are illogical or bizarre and not have

13  illogical or bizarre thought processes to go along with it?

14  A.  It is certainly possible, yes.

15  Q.  Okay.  For example, if you and I were having a conversation

16  like we are right now, asking questions, responding, answering,

17  et cetera, and I were to just tell you that I think someone put

18  a radio chip in my head and it transmits my thoughts to the

19  CIA, would you call that disoriented?

20  A.  I wouldn't call it disoriented.  That's a different term.

21  Q.  Would you call it an illogical thought process?

22  A.  Again, we run to the issue, it's illogical content.  It's

23  likely that your thought process is also illogical, but that

24  would be an inference on my part.

25  Q.  Okay.  Can we hypothecate -- I know that's not really a

1    word.  Can we create a hypothesis that Mr. Eldridge is

2    competent to be executed and he believes that the guards are

3    poisoning his food?

4    A.  That is a possibility, yes.

5    Q.  Okay.  Can we hypothesize that Mr. Eldridge is competent to

6    stand execution -- I keep saying stand execution -- that he's

7    competent to be executed, and he believes that during day he

8    goes home and he works with his brother?

9    A.  It is certainly possible that that could be the case, that

10   one could postulate that.

11   Q.  Okay.  And could Mr. Eldridge report that he thinks Cynthia

12   is alive and yet understand that he has been sentenced to death

13   for murdering her?

14   A.  That's a harder one for me.

15   Q.  That's the delusion that seems completely inconsistent with

16   being competent to be executed?

17   A.  That is the one that creates the greatest difficulty with a

18   rational understanding, in my opinion, yes.

19   Q.  Okay.  Can a person have schizophrenia in the morning and

20   not have it in the evening?

21   A.  The answer to that is, yes, of course, they can, but not

22   quite in that specific a manner.  Schizophrenia is certainly a

23   waxing and waning thing, as is every mental illness.  Even

24   crazy people aren't crazy 24/7, but, indeed, if they are always

25   crazy in the morning and not in the evening, that would not

1    make sense.

2    Q.   I think you were just talking about there being potentially

3    biological causes for schizophrenia, either a visible

4    neurological deficit, like a parietal lobe dysfunction, or

5    something at the molecular level.  So, with those thoughts in

6    mind, you're saying that it's possible for them to have that in

7    the morning and then not have that in the evening?

8    A.   Again, it wouldn't be consistent if they had it every

9    morning and they didn't have it every evening.  But, yes, of

10   course, it is.  There are many conditions that people have.

11   People who have diabetes aren't always symptomatic.  People who

12   have allergies --

13        THE COURT:  Well, before we get too deep into some

14   semantic weeds, if the question is, is someone schizophrenic

15   morning and evening, but it waxes or wanes in severity, your

16   answer is yes.

17        THE WITNESS:  Yes.

18        THE COURT:  But that's different from saying, they can

19   be schizophrenic in the morning and not schizophrenic in the

20   afternoon.  I think the question is:  At some point are they

21   so -- have they so declined to the symptoms that they are, in

22   fact, not schizophrenic at all, or is it your position that

23   once they are diagnosed as schizophrenic and it's a valid

24   diagnosis, they are schizophrenic and it's just a question of

25   the severity of the symptomatology?

1          *THE WITNESS:*  That does seem to be what the literature

2    says, that while we can improve symptomatology substantially,

3    even some evidence that suggests that cognitive behavioral

4    therapy can go a long way towards some delusional symptoms,

5    that schizophrenia probably cannot be cured.

6          *THE COURT:*  So, what you're saying is that you think

7    that someone once diagnosed properly is schizophrenic and it's

8    just a question of how bad the symptoms are?

9          *THE WITNESS:*  Right.  Symptoms can certainly improve.

10   They're unlikely to go away.

11   BY MS. ODEN

12   *Q.*  Thank you.  How do you tell if a person is having an active

13   psychotic episode right then?

14   *A.*  Obviously based on what you see or hear, you have to

15   observe what's happening and make an inference that it's

16   consistent with those findings.

17   *Q.*  There isn't a test that will tell you that the person is

18   actively psychotic?

19   *A.*  There really isn't.

20   *Q.*  Okay.  How long do active phases usually last?

21   *A.*  Active phases can be highly variable, and I know that there

22   is a specific answer.  I don't know that I know it, in terms of

23   what the mean rate is.  Any answer I give would be a guess.

24   *Q.*  Would you agree with me that if a person is in a facility

25   where they're being diagnosed for mental illness and they're

1  not permitted to leave that facility, that that is an inpatient
2  facility?
3  A.  I would agree with that, certainly.
4  Q.  When did you begin your work on this case?
5  A.  I don't --
6  Q.  Roughly.
7  A.  I don't know the answer to that, I'm sorry to say.
8  Obviously sometime before that first evaluation, perhaps by as
9  much as a month, but I would have to look at the date, which
10 I'm happy to do if you need to me to.
11 Q.  So, your first interaction with Mr. Eldridge was
12 February 9th, 2010.  So, you started work on this case sometime
13 in early 2010?
14 A.  I don't know for certain.  Obviously that's in my records
15 somewhere.  I don't know the date, but that sounds about right.
16 Q.  Okay.  And you reviewed -- the records that you write, the
17 list in your report, you reviewed those before you saw
18 Mr. Eldridge?
19 A.  I reviewed at least a portion of them.  It would be
20 difficult for me to know whether I had reviewed all of them
21 before I saw him the first time or not.
22 Q.  It would be difficult for you to know whether you had
23 reviewed them all before you saw them?
24 A.  Because many of them came to me at different points in
25 time; and exactly the date at which I received a particular set

1   of documents, I don't have that information.

2   Q.  Okay.

3   A.  So, they were reviewed when I got them, but I don't know

4   which ones were reviewed on which date.

5   Q.  Okay.  When did you write your first report?

6   A.  So, I finished the evaluation on May 17th.  Again, this

7   would be in the records.  I don't have it, but I'm -- you know,

8   I really couldn't even guess.  They're in the records.  Those

9   are not records that I have.  They will be in the billing

10  records.

11  Q.  The billing records?

12  A.  Yes.

13  Q.  Okay.  On the second page of your first report, you list

14  all of the records that you reviewed and you said that they

15  were selected records, like selected TDCJ records, selected

16  prior incarceration --

17  A.  Right.

18  Q.  -- mental health, MHMR.  Those records were given to you by

19  defense counsel; is that right?

20  A.  Yes, ma'am, they were.

21  Q.  And those are records that appear in six, seven, and eight

22  of that binder?

23  A.  You know, I didn't create the binder, and I'm not totally

24  sure.

25  Q.  Okay.

1  A.  I have no reason to disagree with your representation, but

2  I don't know for certain.

3  Q.  Okay.  Does that look like about the right quantity of --

4  A.  No.  It's hard for me to know, but it certainly seems like

5  I reviewed many more records than that.

6  Q.  Okay.

7  A.  There were transcripts and -- I mean, you can see the

8  enumeration of the list.  There were other things that I know

9  are not part of the exhibits, because I didn't see them listed.

10  Q.  Okay.  Do you think that the defense counsel sent you a box

11  like that with -- see down next to -- you probably had to step

12  over it?

13  A.  I do.

14  Q.  Do you think they sent you a box with four binders full of

15  paper?

16  A.  Virtually everything that I got prior to the documents, the

17  exhibits for this trial -- for this hearing, came via PDF and

18  even though I'm a technological guy, it's hard for me to make

19  that transfer.

20  Q.  Okay.  So, at this point you can't say for sure whether you

21  reviewed everything that appears in those four binders that are

22  the respondent's exhibits?

23  A.  I don't know all of which is in those four binders, and I

24  have not seen all four binders, short of stepping over them.

25  Q.  Right, gotcha.  All right.  You reviewed also some other

1    documents that were supplied by the defense counsel, like the

2    memorandum of Jester IV staff interviews and Mr. Lee Wilson's

3    notes, some handwritten notes in the case; is that right?  If

4    you listed it in your record --

5    A.   They were things that I reviewed, yes, ma'am.  Obviously

6    some of these have been quite some time ago and it's difficult

7    to think of a particular document in isolation.  There are

8    things I would undoubtedly recognize but wouldn't necessarily

9    recall.

10   Q.   Okay.  Well, I'm going to put a document up on the Elmo.

11   Jester IV interviews with Gwendolyn Bundy, Alan Evans, and Dr.

12   Patel.  Does that look like the summary of Jester IV staff

13   interviews that you reviewed?

14   A.   Ma'am, are you suggesting that this is a document that I've

15   seen before or --

16   Q.   Well, perhaps it was in a different typeface or different

17   organization.  Does that look familiar?

18   A.   But this actual page is what you're saying is something

19   that you believe that I've seen before?

20   Q.   Does that look familiar?

21   A.   I don't recall having seen it.  It is possible that I have.

22   It's not one that jumps out at me.

23   Q.   So, it doesn't stick out in your mind as being something

24   important that you considered?

25   A.   In terms of this particular page is what I'm saying.  I've

1  not read the page.

2  Q.  Okay.

3  A.  It is entirely conceivable that I have knowledge of what's

4  written there.  I'll be happy to read it if you would like me

5  to.

6  Q.  No, that's okay, because this is going to be a long day.

7       MS. ODEN:  I'm just going to mark this as Respondent's

8  Exhibit 70, and offer it for introduction.  Any objection,

9  Laura?

10      MS. FERRY:  Your Honor, I do object to the admission

11  of this document, which obviously contains hearsay.  I mean, I

12  don't dispute for identification purposes that this is a

13  document that was provided to Dr. Roman, but I object to the

14  admission of this document in evidence.

15      MS. ODEN:  I can establish some foundation.

16      THE COURT:  All right.

17  BY MS. ODEN

18  Q.  Doctor, would interviews conducted by someone with staff at

19  Jester IV, staff like Gwendolyn Bundy -- do you recognize that

20  name from the records?

21  A.  I do.

22  Q.  Okay.  Alan Evans, do you recognize?

23  A.  That one, I'm embarrassed to say, does not jump out at me,

24  but it's not always easy to decipher.

25  Q.  Yeah.  Dr. Patel?

1  *A.* Certainly.

2  *Q.* Those names appear to be treatment professionals that

3  appear in Mr. Eldridge's records?

4  *A.* Indeed.

5  *Q.* And would that be the kind of information that a

6  professional in your position would rely on in evaluating the

7  case?

8  *A.* Insofar as there are records from those individuals, of

9  course, it would, yes.

10       *MS. ODEN:* Your Honor, even if this isn't introduced

11  into evidence, I would like it marked and made a part of the

12  record since it is something that he thinks that he may have

13  considered.

14       *THE COURT:* Why can't it be admitted for a limited

15  purpose, that is, to show what this witness included in what he

16  considered as opposed to being admitted for the truth of the

17  statements in it?

18       *MS. FERRY:* For that limited purpose, I don't object.

19       *THE COURT:* All right.  It's admitted for that limited

20  purpose.  What's the exhibit number again?

21       *MS. ODEN:* It's 70, Your Honor.

22       *THE COURT:* Thank you.

23  BY MS. ODEN

24  *Q.* Let me see if I can unzoom this.  That's as unzoomed as

25  it's going to get.  So, does this look familiar to you?  I can

1  turn the page if you want me to, and I have a paper copy if

2  that's easier.

3  A.  No, no, you're fine.  Let me just put on my spectacles.

4              It does not look familiar to me.  Again, I've

5  reviewed so many pages of documents.  This does not look

6  familiar to me.

7  Q.  Okay.  I'm going to give you this just because it's just so

8  awkward to turn pages on the Elmo.  If you want to look through

9  that and see if it jogs your memory -- if I represented to you

10  that these were Lee Wilson's notes provided to me by

11  Mr. Eldridge's attorneys as what was provided to you to review,

12  do you think maybe you didn't review it, maybe it was, you

13  know, in the stack and --

14  A.  I honestly have no recollection of having seen this

15  document ever.

16  Q.  So, if you listed it in your report as something that you

17  reviewed, that may have been a mistake?

18  A.  I don't know that I made a reference to reviewing this

19  particular document.  I don't know what I would have called it.

20  I have no idea what this document is.

21  Q.  Okay.  You know, I could have sworn that it said that you

22  reviewed Lee Wilson's notes.

23  A.  I saw -- I'm sorry, I saw something about an affidavit from

24  Mr. Wilson.  I don't believe I have ever seen this document.

25  Q.  Okay.  Hang on one second.  Okay.  So, I am looking at

1    Petitioner's Exhibit 4 right now.

2    A.   Okay.

3    Q.   And this is included in the binders and has already been

4    introduced into evidence and it purports to be a list of

5    records reviewed by you and right here it says "a memorandum of

6    Jester IV unit staff interviews."

7    A.   Okay.

8    Q.   And then right down here, it says, "notes provided by Lee

9    Wilson."  So, you're saying you might have reviewed the Jester

10   IV interviews that we just introduced as 70?

11   A.   I did not recognize that document either.

12   Q.   You didn't recognize it?

13   A.   I didn't.  But this one I'm -- I'm quite sure I haven't

14   seen.  It's hard to know for sure, obviously, but it -- nothing

15   about it jogs my memory.  I don't understand why another

16   inmate's name is here.  I don't understand these various

17   markings or distinctions.  It jogs no memory whatsoever.  The

18   other, at least I recognized those names.

19   Q.   Okay.

20          MS. ODEN:  Well, just for the record then, Your Honor,

21   I'm going to move to introduce for the limited purpose the Lee

22   Wilson notes as Respondent's 71, for the limited purpose just

23   so the record is complete, what he did not look at.

24          THE COURT:  All right.  Any objection to introducing

25   Exhibit 71 for that limited purpose?

1        *MS. FERRY:*  I don't object to that, Your Honor.

2        *THE COURT:*  All right.

3   BY MS. ODEN

4   *Q.*  So, you said you remembered an affidavit by Mr. Wilson.

5   Does that look like the affidavit that you reviewed?

6   *A.*  Can I see a different page of it?

7   *Q.*  Yeah, absolutely.

8   *A.*  I think I would recognize it better from perhaps not the

9   first and standard page.

10  *Q.*  Sometimes the Elmo is better for the audience than it is

11  for the witness.

12  *A.*  Yes.  I believe it was a very long time ago, but this looks

13  familiar as something I've reviewed.

14  *Q.*  Okay.  And that list that we talked about as Respondent's

15  Exhibit 4 also talks about a declaration of Benjamin Smiley.

16  Does that jog --

17  *A.*  It does.  I can't recall exactly what it was, but, yes, I

18  remember having reviewed one.

19  *Q.*  Does that look like the declaration?

20  *A.*  Yes, that does look like the declaration.

21  *Q.*  Okay.  But if you don't mention it in your report, it's

22  probably not something that was a big deal to you, is that

23  right, not something you relied on as additional data to

24  support the --

25  *A.*  I would say this particular document is not something that

1   I relied on in any specific way.

2   Q.  Okay.

3       MS. ODEN:  Your Honor, I would mark this 72 and move

4   to introduce it for the same limited purpose.

5       MS. FERRY:  No objection.

6       THE COURT:  Admitted for that limited purpose.

7       MS. ODEN:  Yes, Your Honor.

8   BY MS. ODEN

9   Q.  And the last document that I wanted to ask you about was

10  the declaration of Lee Wilson.  Do you remember reviewing that?

11  A.  You know, interestingly, I don't specifically remember

12  reviewing this, but I believe that I have.

13  Q.  Okay.

14  A.  I certainly -- I'm familiar with the content of it.  I --

15  Q.  Okay.

16  A.  The document isn't jumping out to me, but I believe it's

17  something that I reviewed.

18  Q.  Okay.

19      MS. ODEN:  We would offer the Lee Wilson declaration

20  as well, Your Honor.

21      MS. FERRY:  No objection for the same limited purpose,

22  Your Honor.

23      THE COURT:  Admitted for that limited purpose.

24  BY MS. ODEN

25  Q.  Do you recall looking at the actual exhibits that were

1  introduced during the Atkins hearing, the mental retardation

2  hearing in this Court from 2007?  Did you ever see those?

3  A.  I recall reading transcripts.  I don't believe I reviewed

4  exhibits.  I'll go further.  If I was supposed to review the

5  exhibits, I'm sorry to say, I did not, because I saw no

6  exhibits.

7  Q.  Okay.  And if they don't appear in any list of records that

8  you reviewed, I'm not trying to trip you up, I'm just asking,

9  you don't think you saw those?

10 A.  I'm quite sure I didn't see them.  I just didn't want to

11 get in trouble with Ms. Ferry for something I perhaps was

12 supposed to have reviewed.  I have not seen them.

13 Q.  Okay.  Did you have access to the complete medical and

14 psychological records from Mr. Eldridge's incarceration in the

15 Harris County Jail?

16 A.  I don't know.  I saw records.  I don't know what was

17 provided to me.

18 Q.  Okay.  At the time that you wrote your first report, you

19 hadn't read any of his mail; is that right?

20 A.  Again, it's the issue of timing.  Although I suspect that I

21 had read some of his mail, it's so difficult going back, you

22 know, nearly a couple of years.  I don't recall the dates at

23 which I received particular documents.

24 Q.  If you had read his mail when you wrote your first report,

25 would you have said that that was one of the documents that you

1  reviewed?

2  A.  It would have been listed in the documents.  Well, I don't

3  always -- I don't always know when documents are provided,

4  especially if they're provided in a somewhat more selected or

5  piecemeal in terms of how they come in fashion, if I have

6  accounted for everything I have looked at.  It is certainly my

7  intent to do so.  But, yes, it is my belief that if it wasn't

8  listed, I hadn't reviewed it.

9  Q.  Okay.

10  A.  Although I certainly had thought that I had seen some of

11  his correspondence before the first report.  That may be an

12  omission on my part.

13  Q.  So, you think that you did review some of his mail when you

14  wrote your first report?

15  A.  As we sit here now, I know that I've reviewed his mail, and

16  I'm simply guessing that it is extremely likely that I had

17  reviewed it when I wrote my first report.  I just don't

18  remember for sure.

19  Q.  Okay.  So, we have here the first page of your report, with

20  a -- the first page only has a partial list of the records that

21  you reviewed and the second page continues.  And if it doesn't

22  list that you had reviewed his mail, you may have just left

23  that off?

24  A.  It is a possibility that I may have omitted that.

25  Q.  Okay.  You would agree with me that there's no history of

1  psychiatric problems like hallucinations or delusions or any

2  diagnoses of schizophrenia in Mr. Eldridge's past prior to his

3  arrest for capital murder?

4  A.   There certainly is no documented history of any prior

5  issues of that nature.

6  Q.   Okay.   How old was Mr. Eldridge when he reportedly first

7  had his hallucinations or delusions?

8  A.   Well, he gives a report of potentially having had

9  hallucination as a child.   He's very vague about that.   But in

10  terms of something documented within the record, I believe the

11  first hallucinations were reported -- they would have been

12  what, January -- I'm sorry, January of 1993, I believe was the

13  offense.

14  Q.   I'm talking about Mr. Eldridge's report.

15  A.   Yes.

16  Q.   Mr. Eldridge reporting, whether he reported it in a --

17  A.   I'm sorry.   Not necessarily documented, but his report?

18  Q.   Yes.

19  A.   He has never, in my understanding, given a very specific

20  statement about a date or an age.

21  Q.   Hasn't he said that he was having hallucinations when he

22  was seven or eight?

23  A.   He has.   He has been very inconsistent.   I think at one

24  point he said something about ten, but he has suggested that it

25  goes back to childhood.   He never reported that to me in a

1  definitive way, by his own report.

2  Q.  Do you believe that he had childhood onset schizophrenia?

3  A.  I do not believe that he had childhood onset schizophrenia.

4  Q.  And why are you not comfortable making that diagnosis?

5  A.  Obviously it's impossible to say that he didn't, but the

6  way that I understand his history, his progress through school,

7  the things that he did, it seems highly inconsistent with the

8  idea that he would have had childhood onset schizophrenia.

9  Q.  So, he was having hallucinations but wasn't schizophrenic?

10  A.  He was reporting that he had hallucinations

11  retrospectively.  I have no idea whether he was having

12  hallucinations or not.

13  Q.  In your report on page 3, you note that Mr. Eldridge had

14  no --

15  A.  First report?

16  Q.  Yes.  And then -- I'm sorry.  If I'm talking about your

17  report, unless I say your second report, I'm always

18  instinctively meaning your first report.

19            I'm going to zoom this a little bit bigger.

20            Pretty much the first complete sentence of page 3

21  of your report, you note that Mr. Eldridge has no history of

22  special education involvement; is that right?

23  A.  That is my understanding, that it does not appear in his

24  record.

25  Q.  And why was that important?  Was that important because if

1    he had had special education involvement, he would have maybe

2    come to the attention of more psychological professionals and

3    maybe there would be more documentation of his problems?

4    A.   I don't think about it as important other than the fact

5    that it's something that we document, whether someone did or

6    didn't have special education involvement.   I don't necessarily

7    attach any particular significance to it.

8    Q.   Okay.   But as a licensed school psychologist, licensed

9    specialized --

10   A.   Specialist in school psychology.

11   Q.   Specialist in school psychology.   Thank you.   You know what

12   an IEP is?

13   A.   I do.

14   Q.   And that is something that you only get when you are in the

15   special ed system?

16   A.   That is true.

17   Q.   Okay.   So, you didn't notice in reading the testimony from

18   the Atkins hearing that Mr. Eldridge actually was in the

19   special ed radar and had an IEP; is that right?

20   A.   I do not recall seeing that he had an IEP.

21   Q.   Okay.   And then you don't remember reading Dr. Richard

22   Hughes' testimony, he's another LSSP, and you don't remember

23   reading about his conversations with Ms. Lawson, who was

24   Mr. Eldridge's special ed teacher in third grade?

25   A.   You know, I actually do remember reading that early on.   I

1  don't remember the length of the IEP, but I don't remember the
2  specifics of that, but I do recall the testimony.
3  Q.  Okay.  Do you recall that Mr. Eldridge had an IEP for an
4  auditory processing disorder and a speech problem?
5  A.  I recall the speech problem.  I don't recall the auditory
6  thing certainly as we sit here today.
7  Q.  Sure.  Well, if I told you that that testimony happened on
8  June 27th, 2007, at pages 669 to 670, you wouldn't disagree
9  with me?
10  A.  I would assume you're representing that correctly.
11  Q.  Okay.  So, if that's all true, then we know that from an
12  early age specialists, mental health professionals were
13  actually paying attention to Mr. Eldridge?
14  A.  Well, respectfully, we do not.
15  Q.  So, at least we know that his school's special ed program
16  was paying attention?
17  A.  Respectfully, we do not.
18  Q.  Okay.  So, we can assume that he was in the special ed
19  program and nobody was paying any attention to him at all?
20  A.  We can't assume it either.  We can simply assume that he
21  was receiving special education services based on an IEP.
22  Q.  Okay.  There's no mention in any records prior to his
23  arrest, say, his prior incarceration for the attempted murder
24  or his prior incarceration for child abuse, there's no mention
25  of him having any hallucinations or delusions in those prison

1  incarcerations?

2  A.  I'm not aware of anything in those records.

3  Q.  Okay.  So, basically the first time -- and I think you

4  already said this, the first time that there's documentation of

5  Mr. Eldridge complaining about hallucinations occurred shortly

6  after he is arrested for the capital murder?

7  A.  I believe it was the day following the murder.

8  Q.  Okay.  And you kind of loosely refer to that time period in

9  your first report as early competency concerns, but really

10 those were his first attempts to malinger psychosis, right?

11 A.  When I say early competency concerns, I mean the fact that

12 a competency evaluation was conducted, was ordered by the

13 Court.

14 Q.  Okay.  But you would agree with me that he was not

15 genuinely psychotic while he was awaiting for trial; he was

16 malingering?

17 A.  I didn't know him then.  I have no idea.  I know that that

18 is the decision the Court made.

19 Q.  And you also know that's the decision that 17 out of 18

20 mental health professionals made?

21 A.  I do.

22 Q.  Okay.  All right.  You only mentioned three of those

23 doctors in your report, your first report?

24 A.  Yes.

25 Q.  You mentioned Dr. Austin, Dr. Brown, and Dr. Silverman; is

1   that right?

2   A.   That is correct.

3   Q.   Okay.   In your opinion, whose diagnosis was more credible

4   or more worthy of belief?

5   A.   The one that I thought did the most appropriate, balanced,

6   thoughtful work was Dr. Silverman, hands down.

7   Q.   Okay.

8   A.   Everybody went off the same data set, such as it was.

9   Q.   Okay.   So, based on the date that you had available to you,

10   you agree, then, with Dr. Silverman, that Mr. Eldridge was

11   malingering psychosis while he was waiting for his capital

12   murder trial?

13   A.   Respectfully, I was not there to draw my own opinion.   I

14   have no fundamental reason to disagree with the conclusions

15   that Dr. Silverman was drawing.

16   Q.   Okay.

17   A.   But I have no way of knowing that that is an accurate

18   determination ultimately.

19   Q.   Okay.   Is it relevant to your consideration in this case

20   that during the time period prior to his capital murder trial,

21   he was malingering or presenting with the same kinds of

22   symptoms that he's presenting now, such as his belief that

23   Cynthia and Chirrsa are alive and well?

24   A.   And your question was, is it what to me?

25   Q.   Relevant.

1  A.  All data are relevant, yes.

2  Q.  Okay.  He's also presenting the same kinds of symptoms of

3  paranoia?

4  A.  I believe that's generally true, yes.

5  Q.  Auditory and visual hallucinations coming together?

6  A.  Yes, ma'am.

7  Q.  Hearing relatives talking to him?

8  A.  Yes.

9  Q.  Being at his brother's house yesterday when actually he was

10  in jail?

11  A.  Correct.

12  Q.  Even though he then denies that they are hallucinations

13  when asked?  He says, "No, I don't have hallucinations, but I

14  was at my brother's house yesterday"?

15  A.  Yes, the statement that you made is accurately reflecting

16  the record.

17  Q.  And he was complaining of hearing voices?

18  A.  Yes.

19  Q.  In response to lots of questions, he'll say things like, "I

20  don't know.  You have to ask Barry.  Barry knows"?

21  A.  Yes, that's correct.

22  Q.  He gets mad when he's asked to explain things?

23  A.  Yes.

24  Q.  Or when he's pressed for details?

25  A.  Yes.  And we're talking about back at the time of his

1  initial arrest and the competency phase during these
2  evaluations.
3  Q.  Yeah, but you're --
4  A.  Yes.
5  Q.  -- recognizing that those are the same things that he's
6  saying now, right?
7  A.  With the exception of some of those last things that you
8  mentioned, the idea of him getting angry, I think that was much
9  more prominent in the early record.
10  Q.  More prominent, but it still occurs in present --
11  A.  It has occasionally, yes.
12  Q.  Uh-huh.  Like it occurred when he was being evaluated by
13  Dr. Moeller, when he had first raised competency for execution
14  in the state courts, November of 2009?
15  A.  Yes.
16  Q.  I may have misspoken.  That was September of 2009.
17  A.  But that time frame.
18  Q.  That time frame.
19  A.  I wouldn't have made the distinction one way or the another
20  without the record.
21  Q.  Okay.  He also has a selective memory, right?  He can
22  remember his father, but he can't remember who his brothers
23  are?
24  A.  He has at least a spotty memory.  Whether it's selective or
25  not is a matter of opinion.

1   Q.  Okay.  Okay.  For example, do you recall reading in

2   Dr. Moeller's report, which, again, is the one filed in 2009,

3   that he remembers -- he can't remember if he has brothers or

4   sisters or what their names are?

5   A.  Yes.

6   Q.  And then moments later he says that he goes to work with

7   his brother Barry?

8   A.  I do recall seeing that, yes.

9   Q.  Okay.  You would agree that looking at inconsistencies is a

10  very important part of determining whether a diagnosis is

11  correct, any kind of diagnosis really?

12  A.  I would agree with that statement, yes.

13  Q.  Okay.  Just as an example, I'm going look at Respondent's

14  Exhibit 23, page 4, and I'm putting it up here on the Elmo.

15  Shrink it back down a little bit.

16              These are clinic notes from TDCJ, and this is

17  dated June 27th, 1994.  This is the initial death row

18  assessment.

19  A.  Yes.

20  Q.  And read along with me.  You my might be better at reading

21  doctor handwriting than I am.  But the highlighted portion

22  said, "Subject" -- an S with a line underneath it probably

23  means subject, right?

24  A.  Right.

25  Q.  "Subject was received from Harris County for capital murder

1  of his 10-year-old daughter and, quote, 'the woman that was his
2  little girl's mother,' end quote.  He has -- something -- no
3  documented or reported psychiatric history."
4                  And then I go down to "objective."  "Rational,
5  logical, and appropriate" --
6  A.  That's a hard one.  I think that's "the," but I don't know
7  the next word.
8  Q.  It's something -- his mannerisms are devoid of bizarre
9  features, does that --
10 A.  That seems like that's a correct decipherment.
11 Q.  Okay.  His thoughts well organized and expressed.  No
12 hallucinations, a -- something delusions -- or clear delusions.
13 Does that look like --
14 A.  I'm not sure if that's right, but I think that's the gist
15 of the sentence.
16 Q.  Some religious obsessive quality.  I can't understand
17 what -- something, something likely.  Will schedule WAIS-R.
18 And then three assessment.  No Axis I.  Defer Axis II.  And
19 then at the bottom under recommendation and plan, under C, no
20 something -- and that symbol means psychiatric or
21 psychological, right?
22 A.  Exactly, yes, it does.
23 Q.  No psych needs indicated.  I'm guessing at that.
24 A.  Right.  It's pretty scribbly but --
25 Q.  That's pretty reasonable, right?

1   A.  I think that's a reasonable translation of that note.

2   Q.  Okay.  So, you would agree with me that this appears to

3   indicate that this is an assessment of Mr. Eldridge when he

4   entered death row?

5   A.  Well, if we're going to use my earlier word, it's at least

6   a diagnostic interview.  It may not be even an evaluation.

7   Q.  They call it an assessment, but it's some kind of

8   interview?

9   A.  It is some kind of interview.

10  Q.  And it appears to be with Mr. Eldridge, because his name is

11  at the top?

12  A.  Absolutely.

13  Q.  And there's part in here where there's no quotes.  So, you

14  assume that that's a paraphrase by the person writing the

15  document?

16  A.  Indeed.

17  Q.  And then there are some places that have quotes, and that

18  logically would be something that Mr. Eldridge said?

19  A.  Verbatim one would assume, yes.

20  Q.  And, so, his report when he gets to death row, is that he's

21  here because of the capital murder of his 10-year-old daughter

22  and the woman that was his little girl's mother?

23  A.  Uh-huh.

24  Q.  It's kind of an unusual phrasing.  It's not "my wife" or

25  "my baby momma."  It's a specific phrasing, and that's why they

1   put it in quotes, I would guess.  So, you would agree that

2   that's inconsistent with what Mr. Eldridge was reporting right

3   before his capital murder trial, which is he has no idea why

4   he's there, because, of course, Cynthia is still alive, right?

5   A.  Well, I don't know if I would agree with that.  I don't

6   know the context of the question.  It is conceivable that they

7   were asking who was Cynthia or some such thing, and his quoted

8   response may be related to explaining who she was.

9   Q.  Okay.

10  A.  I totally see your point, but I have no idea if that's an

11  admission that he knew that it was the mother of his little

12  girl --

13  Q.  Okay.

14  A.  -- nor was she his little girl.

15          THE COURT:  We'll break in just a few minutes for

16  lunch, as I explained yesterday, as soon as you get to a

17  convenient stopping point.

18          MS. ODEN:  We can stop right now, Your Honor.

19          THE COURT:  All right.

20          MS. ODEN:  That's fine.

21          THE COURT:  Very good.  We'll resume at 1:00 o'clock.

22          MS. ODEN:  Yes, ma'am.

23          THE COURT:  All right.  Anything we need to take up

24  between now and then?

25          MS. FERRY:  Not right now, Your Honor.  I will tell

1  the Court that Mr. Wiercioch and I had some additional

2  representations to make about scheduling, but we can do that at

3  the end of the day, if the Court would prefer.

4       *THE COURT:*  That's fine.  Do we have any additional

5  problems for next week or the week after next beyond what

6  we don't know about yet?

7       *MS. FERRY:*  So, Mr. Wiercioch has representations

8  about his flight.  To the -- about his ability to fly here.  To

9  the extent that we're still going to begin on the 30th, I

10 actually spoke to my husband and rearranged things and can come

11 on the night of the 29th, to start on the morning of the 30th,

12 but Mr. Wiercioch has his flight representations to make.

13      *THE COURT:*  All right.  Mr. Wiercioch?

14      *MR. WIERCIOCH:*  Yes, I checked some flights yesterday,

15 Your Honor.  To arrive on the 29th, it's going to cost $626

16 with the check-in baggage fees, another $50, $676.  We're also

17 going to -- I'm also going to be paying another $100 to change

18 my flight this week to get back.  As the Court's aware, our

19 organization has had a lot of financial difficulties

20 representing Mr. Eldridge over the last two and a half years,

21 and I would ask the Court to take that into account.

22      *THE COURT:*  What is it you would like to me to do to

23 take it into account?

24      *MR. WIERCIOCH:*  To take it into account, Your Honor, I

25 checked some flights that are later in May, May 20th, in

1   particular, and we can save roughly almost $200 by scheduling

2   it later rather than in about two weeks.

3        *THE COURT:*  Why don't you confer with the other side

4   in terms of availability of the lawyers and witnesses.  I'm

5   perfectly happy to work with both sides on scheduling to serve

6   as many purposes at possible.

7        *MR. WIERCIOCH:*  Thank you.

8        *THE COURT:*  All right.  Thank you very much.

9      *(Lunch recess from 11:50 a.m. to 1:00 p.m.)*

10       *THE COURT:*  All right.  I think we're ready.  Sorry

11  for the delay.  Go ahead and take the witness stand, please,

12  Dr. Roman.

13            Go ahead, please.

14            **CROSS-EXAMINATION CONTINUED**

15  BY MS. ODEN

16  *Q.*  Doctor, when we left before lunch, we were talking about

17  how inconsistencies are something any diagnosis requires an

18  evaluation of, I believe.  One of the things you noted in your

19  first report was that MHMRA, which is the Mental Health and

20  Mental Retardation Affiliates, the people that do the mental

21  health care for Harris County in the jails, did not conduct

22  formal or objective testing of Mr. Eldridge while he was

23  awaiting trial.  Do you recall why they did not conduct such

24  testing?

25  *A.*  I do.

1   *Q.*  And why did they not conduct that testing?

2   *A.*  Based on my review of the records, he was not cooperative

3   with the testing.

4   *Q.*  Right.  He first said that he couldn't read; is that right?

5   *A.*  I believe that's correct.

6   *Q.*  Then they tried to administer a test called the

7   Bender-Gestalt.  And you don't have to be able to read to do a

8   Bender-Gestalt?

9   *A.*  You do not.

10  *Q.*  You basically just look at a figure and then draw it out?

11  *A.*  That's correct.

12  *Q.*  And, so, he did the first item just fine, right?

13  *A.*  That's what I recall from the records.

14  *Q.*  And then he said that he needed his glasses?

15  *A.*  Yes, ma'am.

16  *Q.*  And then he said he couldn't continue?

17  *A.*  That's what I recall.

18  *Q.*  He said you have to talk to Barry, because Barry has all of

19  the good answers?

20  *A.*  I think I recall that.

21  *Q.*  Okay.  They tried to administer the MMPI-2 a second time,

22  and he again said he couldn't read?

23  *A.*  Yes, ma'am.

24  *Q.*  And when they tried to do it orally, the third

25  administration, he responded to every one of the questions with

1  a question of his own.  Do you remember that?

2  A.  I don't specifically recall that he responded with a

3  question of his own, but I have no reason to dispute that.  He

4  was not cooperative with the evaluation.

5  Q.  Okay.  During the intake onto death row in June 1994, he is

6  asked a question that I wonder if you will agree with me that

7  is leading.  He is asked, if you've ever seen things that other

8  people can't see or heard things other people can't hear.

9  You'd agree that that's a leading question?

10  A.  It's leading.  It's common that it's asked that way, but

11  it's leading.

12  Q.  Sure.  It kind of suggests that maybe they could answer

13  along those lines?

14  A.  It certainly has that possibility.

15  Q.  Okay.  And he says that he has visions of God and heaven?

16  A.  I recall that.

17  Q.  Now, those are not uncommon things for churchgoing people

18  to imagine or envision in their minds?

19  A.  I'm not sure if I would agree with that statement.

20  Q.  Okay.  Well, when we read in the DSM, it was stated as an

21  example of a nonbizarre delusion, that many people in that

22  culture might have, if they are religious, visions of religious

23  things would not be considered bizarre?

24  A.  Well, I don't believe that's what the DSM said.  It talked

25  about delusions, not about visions, which would be

1  hallucinations.

2  Q.  Ah.  Okay.  Okay.  Well, if you're having a religious

3  vision, it's not really clear from that wording whether that's

4  a delusion or a hallucination, is it?

5  A.  If it's reported as a vision, I think it's very clear that

6  it's a hallucination.

7  Q.  Okay.

8  A.  That's how I would understand that question and that

9  response.

10  Q.  Okay.  All right.  Well, aside from that response, that he

11  has visions of God in heaven, we don't have anything in the

12  records from 1994 that indicates he's having either delusions

13  or hallucinations, do we?

14  A.  I don't know if I can speak to the totality of the records

15  from 1994, but I think what you said is substantively correct.

16  Q.  Okay.  Well, at least speaking to the totality of the

17  records that you've reviewed in this case?

18  A.  My ability to cull out exactly what was in exactly 1994,

19  I'm not sure I could do that as I sit here, but, again, I agree

20  with the premise that you're raising.

21  Q.  Okay.  Okay.  And then there's basically nothing in the

22  records about him experiencing delusions or hallucinations from

23  1994 until 2001?

24  A.  From what I've seen -- I'm not sure if that was a question.

25  From what I've seen, I believe that's correct.  Again, as I've

1  testified, I don't know that I have seen all the records that

2  exist on this case.

3  Q.  Of course.  And I certainly wouldn't pretend to ask you

4  what is in records that you don't know about.  So, any time

5  that I'm referring to records, of course, I'm only talking

6  about records that you personally have seen and have relied on

7  in making your opinion in this case.  Okay?

8            So, if we were going to make a list from 1994 to

9  2000, to the best of your knowledge, he's not making any outcry

10 of symptoms; is that right?

11 A.  Again, I'm a bit uncomfortable saying that, in the absence

12 of having an opportunity to look through those records.

13 Q.  Well, do you feel like you had an adequate opportunity to

14 look through those records to prepare to testify --

15 A.  I do.

16 Q.  -- in this case?

17 A.  I do.

18 Q.  Okay.

19 A.  You're asking about a specific set of dates.  And you're

20 asking that I recall particularly things -- particular things

21 within the record and tag them to particular dates.  And now

22 you're taking a six -- potentially seven-year period, and I'm

23 just trying to be careful and correct in my answer.

24 Q.  Well, would it be fair to say that nothing jumps out to

25 your mind as important in terms of your diagnosis and your

1  opinion in this case for that time period?

2  A.  With the exception that during the competency -- the

3  pretrial competency hearings, there were a number of things in

4  the record that talked about hallucinatory and/or delusional

5  phenomenon.  I believe those are all in 1994.

6  Q.  Let's be specific.  I'm obviously not meaning that.

7  Post-death row entry, 1994, through the end of 2000, don't you

8  find it significant that there are no outcries of symptoms

9  during that time period?

10  A.  Again, I don't know that I have seen all those records.  I

11  don't know if other records exist or why there might not be

12  other records.  But, indeed, if that were accurate, that over

13  seven years there were no outcries, that would be significant

14  that indeed there were no records or reports.

15  Q.  So, let's talk about 2001.  In 2001 he starts having some

16  complaints, and he's briefly admitted to Jester IV because he's

17  presenting as psychotic with multiple personality disorder; is

18  that right?

19  A.  You removed your dates.  I'm sorry.  You're talking about

20  2004, is that what I'm understanding, or 2001?

21  Q.  2001.  There's really nothing on this sheet here.

22  A.  Yes, that's correct.

23  Q.  Okay.  And there is an exhibit in Petitioner's Exhibit 6 --

24  I'm sorry, Petitioner's Exhibit -- this is Exhibit 10, page 6,

25  there's a table summarizing, it says, "TDCJ records relevant to

1    food delusions."

2               And I don't know why this is suddenly so blurry.

3    I must have -- I don't know where the auto focus is.

4          MS. ODEN:  May I approach, Your Honor?

5          THE COURT:  You may.

6    BY MS. ODEN

7    Q.  This is Petitioner's Exhibit 10, page 6.

8    A.  Yes.

9    Q.  And this is a chart that talks about the weights, the date

10   the weight was taken and where within Exhibit 6 one can find

11   that?

12   A.  I've seen that.

13   Q.  Okay.  And did you prepare this chart?

14   A.  I did not.

15   Q.  Are you familiar with the data that goes into this?

16   A.  I'm familiar with the data.  I don't know if I have looked

17   at every piece of data or I've identified every one of those

18   numbers personally in the record, but, yes, I believe that that

19   is culled out of the records and is an accurate appraisal of

20   what's in those records.

21   Q.  Okay.  I would like to talk a little bit about some of the

22   date ranges that are in this and some things that happened

23   during those dates, if we could.

24   A.  Certainly.

25   Q.  Right here in between the second line, which talks about

1    March 26th, 2001, the next line is October 19th, 2001.  That's

2    a pretty big time span.  And his weight goes down from 233 to

3    178.

4    A.   Yes, ma'am.

5    Q.   And, so, I would like to talk about what happens during

6    that time frame from, more or less, April to October of 2001.

7    I am now looking at Respondent's Exhibit 24, at page 104.

8    These are clinic notes, and it's dated 4-29-01.  It says "S" --

9    I assume that's subject?

10   A.   Yes.

11   Q.   "Security reports offender has refused nine meals.

12   Offender states he is on a hunger strike due to problems with

13   SSI and security."

14             Do you know what SSI stands for?

15   A.   I assume that's within the prison context.  I --

16   Q.   Or roughly what it means?

17   A.   I'm not sure that I do.

18   Q.   Okay.  So, when you -- did you read this document when you

19   were reviewing?

20   A.   I suspect that I did.  Again, there were so many documents.

21   Q.   Sure.  You think you probably did?

22   A.   I think I probably did.

23   Q.   So, how did you interpret SSI?  Did you do anything, like

24   call the attorneys or call the prison or do --

25   A.   Well, candidly, as I went through the record, of course,

1    there are a bunch of acronyms that are used, as you know.   In

2    different populations and settings, we use different acronyms.

3    And as I went through, if there was an acronym that I didn't

4    know, I had a tendency to segregate it or it would often become

5    clear from the record what it meant.   Candidly, as you pull it

6    out and I sit here and you give me that acronym, of course, I

7    think about SSI, meaning social security income as in

8    disability benefits --

9    Q.   Right.

10    A.   -- which I suspect is not at all what it means within this

11    context.

12    Q.   Well, and that's why I said not necessarily what it stands

13    for, but what it means.   In this context do you kind of know

14    what an SSI is, without guessing, with just, you know, what did

15    you interpret it as you were forming your opinion based on this

16    document?

17    A.   Well, here's the problem:   I need context.   And as I'm

18    looking at what you just read, SSI and security, I'm having

19    trouble with the stuff that has pink over it.   So, I'm having

20    trouble just seeing the context.   If you wouldn't mind reading

21    it again, I'll be happy to respond.

22    Q.   I believe that it says, "Offender states he is on a hunger

23    strike due to problems with SSI and security.   OA and OS

24    three" -- so I assume that means alert oriented times three?

25    A.   Right.   Right.

1  Q.  "Ambulatory with steady gait, temperature 98."

2  A.  Right.

3  Q.  "Heart rate 66, respiration 20" --

4  A.  Yes.

5  Q.  -- "blood pressure" -- all the -- you know, the vitals.

6  So, does that help you?

7  A.  So, I take it to mean that he's having problems with the

8  people that are in a position of authority within the prison.

9  Q.  Ah, okay.  So, it notes that his weight is 221, over here.

10  You may not be able to read it.  It's a little fuzzy.

11  A.  I see that.

12  Q.  "P encouraged offender" -- that might be "psychologist" or

13  whatever -- "encouraged offender to talk with security to

14  resolve issues.  Encouraged fluid intake and consumption of

15  commissary items in cell."

16  A.  Well, in this case I think that "P" is probably "plan."  I

17  think this may be what's called a "SOAP note."

18  Q.  Okay.  Which makes sense, because we have S and O?

19  A.  Right.  Subjective, objective, assessment, and plan.

20  Q.  There you go.  Okay.  So, that's the plan, what they

21  encourage the person to do, to drink fluids, talk out your

22  issues with security, and eat the commissary items you have in

23  your cell.

24          April 30th, the record indicates, "11:55, checked

25  with Sergeant Hutto, who verified offender ate lunch, last meal

1  noon on the 29th.  So far has missed six meals."

2              I don't know what "will FU" means.

3  A.  Will follow-up.

4  Q.  Follow-up, there we go.  And then at the bottom here,

5  "May 1st, 2011, 11:30, ate breakfast this morning."

6              So, we at least know that towards the latter part

7  of April and the beginning of May, he weighs 221 pounds, he

8  says he's on a hunger strike because of problems with what you

9  interpret to be people in a position of authority, and they

10  checked, he ate lunch and he ate breakfast.  So, even though he

11  says he's having problems, he is eating some of his meals,

12  right?

13  A.  It certainly says that, and I would presume he's eating

14  some of his meals.

15  Q.  Right.  So, now we move to June 26th, 2001.  And the

16  document that I'm looking at is Respondent's Exhibit 24, at

17  page 105.  These are clinic notes, again, from TDCJ.  It's

18  another SOAP note.  Thank God it's typed.

19              "O:  Patient is requesting HIV test.  Patient

20  gives history of unprotected sex with multiple partners, use of

21  IV drugs.  A:  Requesting HIV testing to alleviate fears due to

22  current unknown HIV status."

23              So, he's continuing to interact in a goal

24  directed, logical normal way, pursuing medical care or testing

25  through the prison system on June 26th; is that right?

1   A.   I don't know, ma'am.

2   Q.   But that's what it -- that's what this document seems to

3   reflect?

4   A.   I'm not sure it does.

5   Q.   Okay.   So, maybe that person wasn't accurately recording

6   what was going on?

7   A.   That's not what I'm saying.   He's been in prison some eight

8   years.   He's talking about multiple sexual partners.   I don't

9   know if he thinks this is when he travels back outside of the

10  prison or if he's talking about a prior history.   I have no

11  reference as to what that -- I don't know if he's had sex with

12  multiple partners.   I don't know if he's talking about

13  something prior to 1993.   I don't know if that's accurate

14  interfacing or if that's an indication of a manifestation of

15  his delusional system.   I have no clue.

16  Q.   But he doesn't -- to your knowledge, in 2001, he is not

17  talking about leaving the prison.   Right here all we know is

18  that he's asking for HIV testing?

19  A.   Yes.   That's all we know, yes.

20  Q.   Okay.   Now I'm looking at Respondent's Exhibit 23, page 57.

21  These are more clinic notes, dated July 9th, 2001.   The portion

22  that I'm reading is towards the bottom.   "No thought disorder

23  or psychosis noted or reported.   A V 7109."

24              Does that "A" refer to axis?

25  A.   I don't know what the A refers to.   That obviously is a V

1    code, which means no diagnosis.

2    Q.  No diagnosis.  Okay.  The P, the plan, is see PRN.  So, see

3    him as needed?

4    A.  Correct.

5    Q.  And this was written by someone that looks like MSSP.  Do

6    you know what an MSSP is?

7    A.  I don't.  I imagine that that is a master's level

8    psychologist, but that is not a designation that I'm familiar

9    with within my profession.

10   Q.  Okay.

11   A.  It may be a title within the prison system.

12   Q.  Okay.  So, we look a little further down the page to

13   August 28th, 2001, security referral.  And the part that I'm

14   reading and it's highlighted, "It was reported that patient

15   might be throwed off.  Patient indicated he is having some

16   stress on his pod but is thus far handling it effectively."

17           The part that's not highlighted, looks like,

18   patient -- something -- reflects a euthymic mood and congruent

19   affect.  He denies SIHI.  That refers to suicidal ideation and

20   homicidal ideation?

21   A.  That's correct.

22   Q.  Okay.  And is oriented.  A:  No diagnosis, V 7109.  Plan:

23   See patient privately.

24           And this one's typed.  This is from a master's

25   level staff psychotherapist, right?

1  A.   Right, LCDC.

2  Q.   And what does LCDC stand for?

3  A.   Licensed chemical dependency counselor.

4  Q.   Okay.  Now I'm looking at -- what exhibit is this?  This is

5  from Respondent's Exhibit 23, page 11.  And I guess I should go

6  back to the chart really quickly, because that pretty much

7  takes us up to October 2001, which was that time gap that we

8  had originally talked about.

9  A.   Well, if I may, as you saw within the last note, a

10  difficulty with the records, there is a substantial gap even on

11  that one piece of paper between one note and the next note.

12  Weeks go by.  So, when you say takes us up to, that may be true

13  in terms of the available records indeed.

14  Q.   Well, you also noticed when you were going through the

15  records, that there were notes that were on clinic notepaper

16  and then there were notes in the computer system.  There were

17  notes from the medical people.  There were notes from cell side

18  visits.  There were notes from other mental health

19  professionals.  And different exhibits represent different

20  types of records.

21  A.   Indeed.

22  Q.   And, so, that doesn't mean that that one piece of paper was

23  the entirety of the record from August to October, does it?

24  A.   I agree that it certainly was likely not the entire record.

25  Q.   And to keep us from being here for many, many days, we're

1  not going to put every single piece of paper that covers those

2  date spans.  We're just going to try to keep this --

3  A.  Of course.  You simply said that brings us up to --

4  Q.  Right.

5  A.  -- and I just wasn't sure if I agree with that premise,

6  that it has brought us up to or not.

7  Q.  Okay.  Fair enough.  So, the next big gap that I would like

8  to address, it's not really a big gap, but there's a little

9  time lag between October and December.  And I'm not going to go

10  through every single gap on here.  But this two-month gap, he

11  loses about 13 pounds.  So, October 19th, 2001, is when he was

12  admitted to Jester; is that right?  Does that sound right to

13  you?

14  A.  I would have to check the date, but it sounds right, yes.

15  Q.  Okay.  So, the --

16  A.  Yes.

17  Q.  -- document that I want to look at next is Respondent's

18  Exhibit 23, page 11.  And that's up here on the screen.  These

19  are another form of notes, integrated progress notes at Jester

20  IV.  This is dated October 24th, 2011.  And it notes that he's

21  180 pounds?

22  A.  I'm sorry, 2001.

23  Q.  Thank you.  2001.

24  A.  You're welcome.

25  Q.  2001.  And it notes that he's 180 pounds.  He's

1  complaining, "I have poison in me.  Some people put some poison
2  in me, but they don't believe me at the unit."
3        He's asked if he has any chronic illnesses or
4  past injuries, and he talks about injury and surgical repair to
5  the left knee, dislocated right fifth finger, PIP joint, KU
6  fixation.  I'm sure that's some kind of arthroscopic thing that
7  we don't need to get into.  But he has this discussion.
8        He's oriented at time, place, and he's oriented
9  by nurse.  Do we have any idea what that means?  Does that
10  maybe mean that the nurse had to tell him, you're in Jester IV?
11  A.  It might.  It might mean that he understands that he's at
12  the nurse.  It could mean a number of things.
13  Q.  Okay.  He's alert, happy, and depressed.  He denies having
14  hallucinations and he denies having delusions; is that right?
15  A.  I see that, yes.
16  Q.  Okay.  All right.  So, we also know by looking at
17  Respondent's Exhibit 23, page -- oh, I don't even know if I
18  have that up here.  Well, if we were going to put every single
19  page of the records up here, which we won't, we would see that
20  there are many events that happen and see that his weight is
21  measured pretty carefully over this time and that he continues
22  to be interviewed by the psychological staff.  Would you agree
23  with that?
24  A.  Well, respectfully, I don't know if I can agree with that
25  without seeing the records.

1   Q.   Okay.  Well --

2   A.   But I have no reason to believe that you're telling me an

3   untruth.

4   Q.   Okay.  Well, let's be precise then.  We're looking at

5   Respondent's Exhibit 23, page 13, October 31st, more integrated

6   progress notes here.  And I'm looking at the notes that were

7   taken at 3:00 in the afternoon.  Seen for psychosocial eval.

8   Subject, quote, "I can't see.  My head hurts bad.  I know

9   they're going to attack," end quote.  Says COs at unit of

10  assignation, I assume, "UOA," that's his original unit, took

11  his mail, threw urine at him, and put poison in his food.

12  Quote, "Then Eldridge woke up.  All the weight fell on him.  I

13  need to go back to Terrell.  It's time for Michael to take

14  over.  He protects Eldridge," end quote.

15          Next quote, "I'm Gerald.  I protect Eldridge.  I

16  have to go back and stop inmates from hurting his family.  I

17  got to kill them," end quote.

18          Says he threw out his food.  Complains of getting

19  less sleep.  Hallucination --

20  A.   Headaches.

21  Q.   I'm sorry?

22  A.   Headaches.  "HA" is headaches.

23  Q.   Headaches all the time.  Says where he talks about we,

24  quote, "we," end quote, he means himself, Gerald, Barry,

25  Eldridge, and Michael.

1          So, continued -- and I'm sorry I don't have the

2    next page.

3          So, October 31st, there at Jester, these are some

4    of the complaints that he's making?

5    A.  Yes, I see that.

6    Q.  Okay.  And did you consider these records?  Does this look

7    familiar to you?

8    A.  You know, I have seen that reference before in some of the

9    earlier records.  That coming up again in 2001 -- and, again,

10   it's often hard to tag retrospectively where these things came

11   from.  I don't recall having seen that same multiple

12   personality thing on this particular document.  But I certainly

13   have seen that wording in that complaint --

14   Q.  Okay.

15   A.  -- perhaps from that very record.

16   Q.  So, I'm intrigued.  When you are doing a forensic analysis

17   of basically not only Mr. Eldridge as a person that you talk to

18   but also looking at all these records over this huge length of

19   time, isn't it important to your diagnosis to pay attention to

20   when symptoms come up and how often and what context?

21   A.  It is.  And nearly two years ago when I prepared my report,

22   that was something very much in the forefront of my mind.

23   Q.  Did you, like, make charts to keep track of when symptoms

24   came up and when he complained about poisoning and what his

25   weight was?  How did you -- you did something to correlate all

1  this information, right?

2  A.  Sure.

3  Q.  It's just that you don't have those notes with you?

4  A.  Well, I think as you'll see within my report -- you have

5  all of my notes.  So, if there is another note that exists, you

6  would have it.  It would be in the record.  But as I think you

7  can see on my page 5 of the report, for example, I have listed

8  that in a tabular format --

9  Q.  Sure.

10  A.  -- which is typically how I will do this.  I will keep

11  track of it on the computer or in some fashion.  But right now

12  you're presenting me with documents and you're asking me, as

13  you show each one, if I've seen it, and I'm trying to give you

14  an honest answer.  You've asked if I know that particular sheet

15  of paper, and I'm trying to give you as honest answer as I can

16  about that.  I don't know what else to do other than that.

17  Q.  Did you think it was suspicious -- did you think it seemed

18  unusual, the array of symptoms and the description of his

19  delusions that he's giving in this?

20  A.  This one, absolutely so, yes.

21  Q.  Why?

22  A.  Because it's bizarre.  It's crazy stuff.  This is not how

23  people present.

24  Q.  Okay.  I know that "bizarre" is a term of art when we talk

25  about psychotic disorders.

1   *A.*  It can be, yes.

2   *Q.*  So --

3   *A.*  It's bizarre even for psychosis.

4   *Q.*  Okay.  So, when you say it's bizarre, you don't mean that

5   it's bizarre according to the DSM.  You mean it's what?

6   *A.*  This is crazy stuff that is not consistent with the way

7   that mentally ill people present.

8   *Q.*  Okay.  So, does this raise a red flag of malingering for

9   you?

10  *A.*  This particular incident would certainly raise a red flag

11  and if one were to categorize confirming and disconfirming

12  evidence in terms of malingering, this would certainly go into

13  the, boy, this has got to be a malingering event type of

14  column, absolutely.

15  *Q.*  Okay.  Do you reference this event, these comments, this

16  complaint in your report?

17  *A.*  Obviously if I reread my report, I would be in a much

18  better position to say whether I did that or not.  You're

19  asking me to do that off memory.  But this is consistent with

20  the idea that he had alleged that there was a multiple

21  personality disorder from earlier in the record, which didn't

22  seem like a credible allegation.  I don't believe that I have

23  referenced this particular note connected to 2001 in the

24  record -- in my report.

25  *Q.*  If you didn't reference it in your report, does that mean

1    that you didn't take it into consideration as you were deciding
2    whether or not he was actively psychotic in the October
3    31st, 2001, time frame?
4    A.   There are many old records that have significance in
5    understanding his history and his overall pathology in making
6    those determinations.  This is something that would merit a
7    greater degree of consideration if it were more contemporaneous
8    with the time of the evaluation.  So, is it something that I
9    was aware of?  Yes, I knew about these symptoms.  Did I think
10   that these kinds of things made sense or were consistent with
11   pathology?  No, I did not.
12   Q.   Well, I guess what I'm not understanding is Plaintiff's
13   Exhibit 10, page 6, is a table of hard data, his weight, which
14   supposedly is falling because he is supposedly suffering this
15   delusion that he's being poisoned.  So, at what point do we
16   look at this table and say this data going backwards is too
17   remote in time; he was probably malingering; we're not going
18   look at it; it's not relevant to considerations for right now?
19   A.   As you presented earlier in some of your questioning, the
20   way that I attempted to conceptualize the question I was being
21   asked to answer, each of those components has relevance and
22   that first part about whether he shows evidence of a psychotic
23   disorder, even old stuff would have merit and be of some
24   relevance.  Obviously whether he has it in the here and now is
25   more directly relevant.  So, all of the records are relevant.

1    *Q.*   Okay.

2    *A.*   But would I think that it is a tremendously significant

3    omission, that I was aware of it but might not have

4    specifically made reference to it?  I do not.  As you yourself

5    have said, for us to go through every document and indicate

6    everything that was in the record would be a truly laborious

7    task.

8    *Q.*   So, right now I'm not talking about whether or not you

9    mentioned the document that was Respondent's Exhibit 23, page

10   13 in your report.

11   *A.*   Yes.

12   *Q.*   What I'm talking about is, I asked you, well, this looks

13   like he's malingering, so maybe he wasn't really psychotic in

14   2001 when he was allegedly losing weight because he's being

15   poisoned.  And you said, "But that's too remote."  So, which is

16   it?

17   *A.*   I believe we've gotten off task here a little bit.  Because

18   I thought that you were asking specifically about me

19   referencing the content of that note, as you were taking issue

20   with why I didn't make reference to it.  You then later tagged

21   it to the fact that it is contemporaneous with the period

22   during which he had what has been referred to as a

23   delusional -- a delusion about food and poisoning.  So, I think

24   somehow we have crossed two questions here.

25   *Q.*   Was he delusional on October 31st, 2001, looking at the

1  data in this note?

2  A.  If I look at this note, this is not consistent with

3  delusions.

4  Q.  Okay.

5  A.  That does not necessarily mean that he was not delusional

6  on October 31st.  But what is depicted here is not consistent

7  with a delusion.

8  Q.  Is it consistent with malingering or feigning?

9  A.  It could potentially be.

10  Q.  So, when we look at the chart on page 6, when it talks

11  about his weight falling, we have questions at least as far as

12  if we can talk about weight changing on one day, which I know

13  we can't, but at least we have questions about the data

14  affiliated around that time period, don't we?

15  A.  I'm not sure how you mean that, about having questions.

16  Q.  Okay.  I'm looking at Respondent's Exhibit 48, page 52.

17  These are more progress notes on Mr. Eldridge in Jester IV.

18  The date that I'm looking at is at the bottom of the page,

19  November 1st, 2001.  He's complaining of a headache.  No

20  auditory or visual hallucinations.  Speech normal and goal

21  directed.  No Axis I diagnosis.

22  A.  Yes, I see that.

23  Q.  So, at least from this document we know on November 1st,

24  2001, he was not psychotic to that person at that time?

25  A.  Okay.  I will give you that, yes.

1    *Q.*   Yes.   Because he might have been psychotic later on that
2    day or earlier that day to somebody else?
3    *A.*   Well, and I have a notation that one week before, he was
4    diagnosed with a psychotic disorder within the prison records,
5    so.
6    *Q.*   Right.   So, maybe he was psychotic to somebody else at
7    another time, but he certainly wasn't psychotic to that person
8    at that time?
9    *A.*   Or that person wasn't paying attention to the existing
10   record.
11   *Q.*   Or that person wasn't paying attention to the record.   They
12   were only paying attention to the person that was in front of
13   them at that time and were only documenting what they saw in
14   that person, right?
15   *A.*   Understandable, yes.
16   *Q.*   So, now I'm looking at Respondent's Exhibit 23, page 51,
17   more clinic notes, November 9th, 2001.   Seen on -- something --
18   rounds.   "S" would be again the subject, right?
19   *A.*   Subjective.
20   *Q.*   No problems or complaints.   That's "complaints of," but
21   that's probably an abbreviation for complaints reported,
22   correct?
23   *A.*   Right.   Exactly.
24   *Q.*   Denies suicidal ideation intent.   Contract safety.   Alert
25   and oriented times three.   Cooperative.   Speech clear,

1  relevant, coherent.  "NAD," you familiar with that?

2  A.  You know, it's a term that I have seen before, but, no, it

3  is not coming to me.

4  Q.  Okay.  "Thoughts LLGD," that would be logical, linear, goal

5  directed?

6  A.  Right.

7  Q.  "No signs of mania, depression, or psychosis"?

8  A.  Exactly.

9  Q.  ADLs would be activities of daily living?

10 A.  Indeed.

11 Q.  Adequate?

12 A.  Yes.

13 Q.  No Axis I diagnosis?

14 A.  That is what it says yes.

15 Q.  November 16th, from the same person, a Ph.D. level

16 psychologist.  Denies psychiatric problems or complaints at

17 present.  Contract safety.  Alert and oriented times three.

18 Cooperative.  Speech clear, relevant, coherent.  Thoughts

19 logical, linear, goal directed.  NAD.  No signs of mania,

20 psychosis or depression.

21          Basically the same thing one week later?

22 A.  Yes.

23 Q.  Okay.  Now, I'm looking at the same exhibit, Respondent's

24 Exhibit 23, page 50, November 27th.  If I represented to you

25 that this was another similar entry, maybe he's making

1   complaints, a similar story as recorded in chart of officers
2   poisoning his food and other inmates out to get him.  He also
3   spoke of "we" as if we were more than one person.  Patients --
4   something -- reflects a euthymic mood with congruent affect.
5   Denies suicidal ideation and homicidal intent, is oriented.  He
6   appears to be feigning MI -- metal illness?
7   A.  Probably so.
8   Q.  -- for secondary gain.  No DX, no diagnosis V 7109.
9                   Does that sound familiar?
10  A.  That has certainly been the theme that has appeared in a
11  number of these notes.
12  Q.  Right.  December 3rd, he was seen in Jester IV on 10-19-01
13  and received back 11-27-01 due to not eating and claiming
14  audiovisual hallucinations.  Complains today that the SSIs are
15  messing with my food.  He went into a long drawn-out
16  explanation over it, that it's -- how it's been going on a long
17  time.
18                   He said he gets upset with security when they try
19  to say that I ate and I didn't.  I ask them if they write down
20  that I VR, verbally refused, and they say, no, you ate.  He was
21  quite adamant about wanting someone to write it down -- and I'm
22  turning to the next side of the page, page 49 -- but that he
23  didn't eat.  He also is accused -- sorry.  He also is accused
24  of showing -- of sharing food and getting food from other
25  inmates, and he claims it's not true.

1          Chart review shows he was claiming a split

2    personality of four different people at Jester IV for secondary

3    gain.  He mentioned none of this here today and contrary to the

4    Jester IV and IC notes -- maybe institutional clinic.  I don't

5    know.  Do you know what that is?

6    A.  I'm not even sure if it's an "I."  It's hard to tell.

7    Q.  Okay.  Contrary to the Jester IV and something notes --

8    A.  Right.

9    Q.  -- he said he did well there and they listened to me and

10   helped me a lot.

11         Then I go down a little bit:  Subject went into

12   great detail of how he determines if his food has been tampered

13   with, but it again appears to be for secondary gain.  Due to

14   weight loss will need an eval by Dr. Anderson.  O -- what does

15   "O" stand for again?

16   A.  Well, again, "S" may be subjective or statement.  "O" is

17   typically objective.  So, it has to do with what they've

18   actually seen is the way that's typically goes.

19   Q.  Okay.  "Agitated over security messing with food.

20   Delusional content noted, but secondary gain issues noted,

21   also.  Alert -- sorry.  Oriented times three.  Denied SIHI.

22   Appears stable at present.  Due to not eating and losing weight

23   adds credibility to possible delusions, but it could be a

24   well-rehearsed dialogue, too.  The plan" -- oh, I'm sorry.  A

25   is no diagnosis.  "Rule out" --

1   A.   Delusional disorder.

2   Q.   -- "delusional disorder.  Plan:  Further client review

3   shows J4, Jester IV, addressed the weight loss concern by

4   noting subject tells some staff that he is losing weight, then

5   telling other staff he is still" -- and now we're looking at

6   the next page, page 48 -- "he is still hungry and wants more

7   food to eat."

8               This is from Mr. Hindman, a master's level

9   psychotherapist.  Do you remember reading that?

10  A.   I remember this note well.

11  Q.   Okay.

12  A.   Quite vividly.

13  Q.   Okay.  December 20th, 2001, this is the follow-up.  "He

14  continues to maintain that security is messing with his food.

15  Patient's MS" --

16  A.   Mental status.

17  Q.   I'm sorry.

18  A.   Mental status.

19  Q.   -- "mental status, reflects a paranoid mood with congruent

20  affect.  Denies SIHI.  Is oriented times three.  He does not

21  appear weak and shows no symptoms of mental illness with the

22  exception of paranoia over food issues, which may be for

23  secondary gain."

24              December 31, a referral from nursing about

25  talking about FBI, et cetera.  "When patient was seen on death

1   row, he continued to report that COs are putting poison in his

2   food.  Because he knows some things" -- flipping the page --

3   "about security and has reported some of these things;

4   therefore, security is trying to harm him."

5            Sorry, I have it too high up.

6   A.  No, it's okay.  It was only one line.

7   Q.  Okay.  "Trying to harm him by putting poison in all his

8   food.  He claims he is eating food that other offenders give

9   him that come from the commissary.  He stated that he is not

10  going to eat TDC food.

11           "He denied complaints of audio or visual

12  hallucinations.  This patient was seen on 12-20-01 by a psych

13  therapist and questions of secondary gain were raised.  Denies

14  SIHI.  Alert" -- it looks like "awake."  "Alert, O times four.

15  Good eye contact noted.  No diagnosis, V 7109."

16           You remember all of this, I assume?

17  A.  Yes, I do.

18  Q.  Okay.  So, when we're looking again at the Plaintiff's

19  Exhibit 10, page 6, we see that a lot of these notes, these

20  dates in December, with his weight going down, appear to

21  correlate to a time when he was sharing food with other

22  inmates, eating the food that they gave him, eating commissary

23  food, and saying he just wasn't going to eat TDC food; is that

24  right?

25  A.  Well, it corresponds to a time where the record makes

1  reference that some of these things were noted.  I don't know
2  how carefully it was tracked.  I don't know how accurate that
3  was.  I don't know if those were third-hand reports.  But,
4  indeed, you have accurately related that some of that language
5  occurs in the notes.
6  Q.  And some of the psychologists and psychotherapists who were
7  taken those notes were noting, if you would agree with me, a
8  lack of disorganized thought process.  We never see a comment
9  about a flat affect?  And I'm sorry, when you nod, she can't
10 write that down, so.
11 A.  Well, you hadn't asked the question yet.  I was simply
12 being polite and agreeing with the fact that I'm processing
13 what you said.
14 Q.  So, would you agree with me that those records do not show
15 any notes about disorganized thought process?
16 A.  I would agree that within these notes, they do not reflect
17 that these individuals thought that he had a disorganized
18 thought process or any other type of aberrant behavior, short
19 of what they have described as delusions, paranoia, and
20 suspiciousness.
21 Q.  Uh-huh.  So, what we have in those particular records is
22 Mr. Eldridge outwardly saying that he's have these delusions
23 and he's outwardly reporting that he has these thoughts, but
24 his visible demeanor does not appear to be a flat affect,
25 avolitional schizophrenic presentation, does it?

A.  Well, here's where we get into difficulty again.  The first
part of that, I totally agree with.  Indeed, it does not appear
to be avolitional.  He is not showing alogia.  He is not
showing disorganized behavior or necessarily disorganized
thought processes.  Although, frankly, that very bizarre note
that you had of the multiple personality disorder that I
remember, but not necessarily in that particular page, is
certainly an example of disorganized speech.  Do I find it
suspicious?  Of course, I do, but it is certainly an example of
disorganized speech, whether it's legitimate or not.

Q.  Let me explore that concept a little more.  So, you sounded
pretty vehement when you said, of course, you're suspicious?

A.  Right.

Q.  But it sounded like disorganized or illogical thought?

A.  The data are, and we need to interpret the data.

Q.  Well, wait a minute.  Let me separate this.  The data that
we have is the words that he used --

A.  Yes.

Q.  -- or at least as they were recorded?

A.  Absolutely.

Q.  And the impressions by the clinical therapist?

A.  Yes.

Q.  And the data that they recorded, they didn't record that
they thought it was disorganized or illogical?

A.  Of course, they did not.

1  *Q.*  That's your interpretation?

2  *A.*  I wasn't saying that was my interpretation either.

3  Objectively you made the comment about this being not

4  consistent with schizophrenia.  If one were to assume that he

5  is schizophrenic -- because we can't read minds, as you pointed

6  out, if one were to assume, which is not an assumption I'm

7  necessarily making in this case, that were consistent with a

8  legitimate presentation, it is on the face of it an example of

9  disorganized speech.  If you say to me is that typically what

10  disorganized speech looks like?  No.  The content is troubling.

11  The process is consistent with a great degree of confusion and

12  disorganization.  The content about all of these different

13  people and different names is very suspicious.

14  *Q.*  Originally what you said was that it was suspicious of

15  malingering?

16  *A.*  Yes, and I hold to that.

17  *Q.*  Okay.  So, you're not saying it's now also suspicious of

18  schizophrenia?

19  *A.*  I'm not.

20  *Q.*  Okay.  I just wanted to make sure I understood that.

21  *A.*  You were making the point that as we reviewed these

22  records, that we are seeing no evidence of disorganized thought

23  or behavior or schizophrenia, and I was pointing out that there

24  is evidence of potential delusions, which is potentially

25  consistent with schizophrenia and that that one note talks

1  about what is clearly disorganized patterns of speech.  I am

2  not saying that I believe that it is consistent with what we

3  normally see in schizophrenia.  There's no question that it is

4  disorganized speech.  It may be concocted, it may be real, but

5  the speech patterns are indisputably disorganized and

6  incoherent.

7  *Q.*  So, you would agree with me, then, that someone who is

8  potentially malingering psychosis can concoct disorganized

9  speech?

10  *A.*  Of course they can.

11  *Q.*  Of course.  Well, so, I think we've talked a little bit

12  about what goes on in 2001.  Again, he was admitted.  He

13  presents as psychotic.  He says he has multiple personality

14  disorder.  And we know that they didn't buy that at Jester IV,

15  and he was dismissed as flagrantly presenting feigned symptoms,

16  right?

17  *A.*  I agree with all of that except for the fact that I have

18  never been of the opinion that he is attempting to present

19  multiple personality disorder.

20  *Q.*  So, you don't think that that record we just read

21  represents an attempt by Mr. Eldridge to present as a multiple

22  personality?

23  *A.*  I have no idea whether that's what it means or not.  In

24  fact, there's already been prior testimony in this court

25  indicating the fact that there aren't sufficient features that

1  would draw that kind of a conclusion.  If it was malingered, I

2  have no idea what his intention was.

3  Q.  Right.  We can't go inside his head and get into what his

4  intention is.  All we can do is look at his words, right?

5  A.  Right.  And if it was legitimate, it is much more

6  consistent with the pattern of disorganized speech than it is

7  with what you see in multiple personality disorder.  That is

8  not what dissociative identity disorder presents like.

9       THE COURT:  I think her point is not that that was

10  multiple disorder.  It was an attempt to portray it.

11       THE WITNESS:  Right.  And obviously I can't know what

12  his intent was.

13  BY MS. FERRY

14  Q.  Right.

15  A.  Yes.

16  Q.  Would you agree that the most simple understanding is that

17  he was saying, I'm a multiple personality and he clearly

18  wasn't, therefore, he was malingering a multiple personality

19  disorder, or do you think there is a simpler explanation?

20  A.  If we take the premise that that was clearly an intended

21  feigned malingered presentation, then, yes, indeed, it would

22  appear that the person was attempting to present having

23  multiple personalities.  But you're asking me to draw a

24  conclusion about a single instance in the record that you

25  brought up in a particular context.  We came into this in the

1   context of looking at this weight loss and the predicate of
2   this --
3   Q.  Okay.  If somebody came into your private practice one day
4   and says those kinds of things to you, you would be forced to,
5   if not conduct an assessment, at least to evaluate what they
6   were doing?
7   A.  Yes.
8   Q.  And, so, absent all this other, you know, hundreds of pages
9   of records --
10  A.  Yes.
11  Q.  -- you would be able to evaluate that event and come up
12  with a conclusion, I think that the person may be malingering,
13  correct?
14  A.  Yes.
15  Q.  Okay.
16  A.  But my suspicion would be a thought disorder, rather than
17  dissociative identity disorder.
18  Q.  Well, your suspicions of the actual diagnosis is one thing,
19  but you would consider that he was malingering?
20  A.  Yes, absolutely.
21  Q.  Absolutely.  In 2002, would you agree with me that he made
22  four complaints about being poisoned, or do you know?
23  A.  I don't know.  We have a long period of time where I saw no
24  records, and I've asked about this.  It was 2006 to 2009.
25  Offhand, I don't know.

1  Q.  Okay.

2  A.  I mean, I have no reason to believe you would misrepresent

3  that obviously, but directly, I don't know.

4  Q.  Well, if I just quickly discussed it so we don't have to go

5  through hundreds of pages --

6  A.  Yes.

7  Q.  -- if I told you that on January 17th, 2002, he wrote a

8  letter complaining about a conspiracy to poison him, would that

9  sound --

10  A.  Yes.

11  Q.  -- approximately right?

12  A.  Yes, I recall seeing such document.

13  Q.  And if we were going to be turning to the records, we would

14  know that that's at Respondent's Exhibit 7, page 14 to 24, but

15  we're not going through all that.

16  A.  Yes.  Thank you.

17  Q.  Would you agree with me maybe that January 26th, 2002, he

18  complains again about poisoning, and that would be in

19  Respondent's Exhibit 24, page 134?

20  A.  Again, I have no reason to disagree with that.

21  Q.  Okay.  January 28th, 2002, he filed a grievance saying that

22  the inmates are out to get him.  He said he's flushing the food

23  in the toilet to avoid poison by the officers and the gang

24  members that were in on the conspiracy.  And he says that he's

25  eating commissary food.  That would be in Respondent's Exhibit

1  7, page 6 through 9.  Does that sound about right?

2  *A.*  Again, I wouldn't know about the dates or the particular

3  exhibits, but, yes, I remember all of that verbiage in those

4  records.

5  *Q.*  Okay.  March 29th, 2002, he makes some more poisoning

6  complaints which result in two inmates being moved to another

7  pod.

8  *A.*  I recall that as well.

9  *Q.*  Okay.  That would be Respondent's Exhibit 7, page 30 to 31.

10                    Then we go to April 3rd, 2002, that would be

11  Respondent's Exhibit 24, page 134.  The unit psychotherapist

12  said that there's no symptoms presented and to monitor him on

13  an as-needed basis.  Does that sound right?

14  *A.*  I mean, obviously there are many records that say that.  I

15  couldn't cull that one out specifically, but I'm sure you're

16  presenting it accurately.

17  *Q.*  Okay.  May 2nd, 2002, he's not given an Axis I or Axis II

18  diagnosis on his regular mental health assessment?  Do you

19  remember that he wasn't?

20  *A.*  I have no idea about what happened on a particular date.

21  *Q.*  Okay.

22  *A.*  But, again, I suspect that you're saying that correctly.

23  *Q.*  Okay.  Well, that would be something you would take into

24  account as you were forming your opinion looking at the

25  records?

1   A.  Of course I would.

2   Q.  If a psychotherapist or psychologist had seen him and

3   decided on that date that he didn't merit an Axis I diagnosis,

4   that would mean that on that date in that person's opinion he

5   was not schizophrenic?

6   A.  Yes, that is exactly what that would mean.

7   Q.  Okay.  And that would be Respondent's 23 at page 58.  Same

8   thing, basically, July,29th, 2002, no Axis I, no Axis II

9   diagnosis, Respondent's 23, page 59.

10              So, unless you want to correct me because you are

11  thinking of some other date or some other event in 2002, in

12  2002 we have four complaints in that year that he's being

13  poisoned and we have no notations of the negative symptoms that

14  we've talked about, such as flat affect, avolition, alogia, et

15  cetera.  Would you agree with that?

16  A.  Again, you're asking me to make a specific statement about

17  essentially an entire year's worth of records.

18  Q.  Well, I am asking you because you are coming to this Court

19  and saying that you believe he suffers from schizophrenia and

20  one of the reasons that he is said to suffer from schizophrenia

21  is that he has a delusion that he's being poisoned.  And one of

22  the exhibits that is attached to this case shows a chart of

23  dates from 2001 to 2011 that the purports to recount his weight

24  loss which is said to fluctuate with his belief that he's being

25  poisoned.

1            So, as you evaluate that hypothesis, that

2  conclusion for whether or not it's true, surely you're ready to

3  say whether or not in 2002 he ever complained to anybody

4  about -- not that he would complain about negative symptoms,

5  but he ever presented any negative symptoms of schizophrenia?

6  A.  Well, here's the issue with which I struggle.  My report,

7  as we've established is thorough and complete, and I stand by

8  it.  To the extent that you want to pull up documents and say

9  here is a document that we believe suggests something different

10  than what your report says, I'm happy to look at that and make

11  a statement about that, absolutely.  When you ask me in a

12  global way to recall whether any particular year or any

13  particular date that something did or did not occur, records

14  that are voluminous, that's a very difficult thing for me to

15  give the truth, the whole truth, and nothing but the truth

16  about.  So, I am happy to look at any document that you present

17  and speak to it within the context of anything that you think

18  is inconsistent.  If it's in my report, sure, let's go to that

19  section and I'm happy to speak to that as well.

20  Q.  Okay.  Do you ever write down in your report any negative

21  symptoms that were noted for Mr. Eldridge in the year 2002?

22  A.  I'm sorry.  And when you say "negative symptoms," we're

23  talking of schizophrenia?

24  Q.  Yes, negative symptoms of schizophrenia.

25  A.  I can look at my report and answer that question.

1  *Q.* Great.  Thank you.

2  *A.* No, indeed, it appears that I do not list any negative

3  symptoms of schizophrenia from records in 2002.

4  *Q.* Okay.  And before we move on to 2003, I just want to check,

5  one of the things that it says in the DSM is that we have to

6  interpret delusions and people's beliefs and their reactions

7  according to the culture that they come from.  And you would

8  agree with that, of course?

9  *A.* I would agree with that.  The question of what constitutes

10 the culture is the issue at hand.

11 *Q.* Right.  And I didn't ask that.  You would agree with me

12 that Mr. Eldridge's feeling or belief that maybe the guards are

13 messing with his food might have a rational origin?  I mean,

14 can you imagine if the guard is pushing, I imagine, a cart full

15 of trays of food and he's picking up the trays and putting them

16 in the slots in the doors, that his thumb goes in the food and

17 Eldridge says, hypothetically speaking, "Hey, quit messing with

18 my food."  That's a rational concept, right?

19 *A.* That would be a rational observation, yes.

20 *Q.* And you can imagine, no offense to correctional officers,

21 that maybe one of them goes (coughs), "Sorry, I coughed on your

22 food, and you could imagine that maybe that becomes a way that

23 they taunt him, right?

24 *A.* Those things are certainly possible, yes.

25 *Q.* Okay.  To evaluate that, as you said, it would come down to

1   understanding what the culture was that he came from, if there

2   was a culture, right?

3   A.  Let's review that question.  The culture is important.  The

4   context of the culture does matter, yes.

5   Q.  Okay.  And in order to interpret the data as DSM wants you

6   to through the lens of what is appropriate for that culture,

7   you have to know what that culture is?

8   A.  Is that a question?

9   Q.  Yes.

10  A.  This is the part that is unclear and vague.  In DSM-III was

11  listed as an i.e.  In DSM-IV as an -- in effect, a religious

12  culture or belief system.  In DSM-IV it comes by way of

13  example.  It is unclear to what extent they're talking about a

14  culture as in the group in which you interact.  I'm a member of

15  Scouts.  I play tennis.  Those are not cultures; although, we

16  may refer to them as such.

17  Q.  Let's not talk about your culture.  Let's talk about

18  whatever the relevant culture is in this case.  That would be

19  the culture of Mr. Eldridge coming from death row, right?

20  A.  I'm sorry.  You asked about DSM, and that's the context in

21  which I was responding.

22  Q.  Okay.  So, let's talk about 2003.  Maybe we can hasten this

23  along by saying, would you agree with me that, again,

24  Mr. Eldridge reports only sporadic accounts of only the

25  positive symptoms of schizophrenia in 2003?  And if you need to

1  refer to your report, feel free.

2  A.  I will agree with you that within the record, there are

3  many fewer reports of negative symptoms of schizophrenia

4  throughout the record.  As to being specific about 2003, sure,

5  I'll be happy to review the section again.

6  Q.  Okay.

7  A.  Yes, there are very few indications of specific negative

8  symptoms of schizophrenia that are indicated within my report.

9  Q.  And refresh my recollection, what exactly negative symptoms

10  of schizophrenia do you report in your report for 2003?

11          THE COURT:  For 2003 --

12          MS. ODEN:  Yes.

13          THE COURT:  -- or general?

14          MS. ODEN:  2003.

15  A.  I have no specific references to negative symptoms of

16  schizophrenia for 2003.

17  Q.  Okay.  So, when you said there are many fewer, you were

18  referring to fewer than ones in the future, not --

19  A.  I'm sorry.  Compared to positive symptoms, yes.

20  Q.  Right.  There were no reports of negative symptoms for

21  2003?

22  A.  There were no reports of negative symptoms from 2003

23  contained within my report.

24  Q.  Okay.

25  A.  Again, if you ask me about the totality of the record, I

1   don't know if I've seen all of the records for sure.  I don't

2   know if I may have missed something.  But, yes, it is not

3   something that I have culled out.

4   Q.  Everything you thought was important for your diagnosis is

5   in your report?

6   A.  Yes, it is.

7   Q.  Okay.  So, 2004, same thing?

8   A.  Same answer, yes.

9   Q.  Same answer.  Only sporadic outcries, if you'll call it

10  that, from Mr. Eldridge, and there are only positive symptoms,

11  right?

12  A.  Primarily positive symptoms, yes, ma'am.

13  Q.  You would agree with me, if I represented to you, that

14  there were only three complaints made in 2004 by Mr. Eldridge

15  that he was being poisoned or that someone was tampering with

16  his food?

17  A.  I certainly would have no reason to disagree with that

18  representation.

19  Q.  And you would agree with me that the records reflect a

20  number of times one, two, three, four, five, six, at least six

21  times in 2004 when the psychologists and psychotherapists said

22  that he had no Axis I diagnosis?

23  A.  I certainly would say that that is true.  I couldn't give

24  you the number, but, yes, that seems to comport with what I

25  recall.

1   *Q.   Okay.  2005, he doesn't make any complaints of food*

2   *poisoning at all in 2005?*

3   *A.   You know, I don't recall offhand at what point he had begun*

4   *B-12 treatment for the pernicious anemia, but certainly things*

5   *changed dramatically after then.*

6   *Q.   You have your report in front of you, right?*

7   *A.   I do.  And I'm digging for where that section is.  I*

8   *obviously don't want to read all of the pages.  Long report.*

9   *April of 2006, I have it.*

10  *Q.   Okay.  I'm talking about 2005.*

11  *A.   Yes, I would agree with your statement.  Well --*

12  *Q.   So, for the whole year of 2005, if Mr. Eldridge had been*

13  *exhibiting a delusion about food poisoning that was related to*

14  *schizophrenia, at least in 2005 he had none of that?*

15  *A.   Indeed, I see no reference that I made to anything from the*

16  *records in 2005 regarding that.  I agree with that.*

17  *Q.   Okay.  So, in 2006 we have sporadic positive reports of*

18  *symptoms, if I'm correct.  I believe that March 10th, 2006, was*

19  *when Mr. Eldridge had his visit with Dr. Patricia Averill.  Do*

20  *you recall that she's the psychologist that evaluated him for*

21  *the mental retardation claim?*

22  *A.   Yes, I do.*

23  *Q.   Okay.  And you read her report?*

24  *A.   I did.*

25  *Q.   Okay.  And she noted some unusual things in her report.*

1   She said that he had good grooming and hygiene, that he had

2   poor eye contact.  He was slouched and turned away from the

3   door where the guards could be walking by.  He was alert and

4   oriented times two.  He didn't know what day of the week it was

5   or what time it was.  And he had a labile affect -- is that

6   pronounced correctly --

7   A.   That's correct.

8   Q.   -- a labile affect.  Tell us what a labile affect means.

9   A.   It typically means that it's fluctuating and relatively

10   inconsistent.

11   Q.   Okay.  Displaying a range of emotional, you know, crying,

12   happy, sad, angry?

13   A.   Typically when we say range, we talk about that being sort

14   of more normal.  When we talk about it being labile, we talk

15   about it being more discontrolled, but, yes, indeed, it is a

16   range of different types of emotions.

17   Q.   At the end of the testing while she's waiting to send him

18   back to his cell, he turns to her and says, "I can talk right

19   now, but not when they're all yelling at me."  You remember

20   that right?

21   A.   I do.

22   Q.   And he said that he used to take care of Barry, his

23   brother.  And he says some other odd things about Barry.

24   Whatever happened to him, would happen to Barry.  If he burned

25   his arm, Barry would burn his arm.  And that Michael is the one

1  to watch out for, because Michael is really violent, right?

2  A.  Right.

3  Q.  Okay.  In April -- in April of 2006 you mentioned he's

4  admitted to the clinic because of the pernicious anemia.  And

5  I'm wondering if you can tell me what negative symptoms of

6  schizophrenia you note in 2006?

7  A.  I -- in looking at my report, I am not aware that I have

8  any specific negative symptom tied to any particular date.

9  Q.  Okay.  And how about any negative symptoms in general in

10 2006?

11 A.  Not in 2006, no.  More positive symptoms, I have --

12 Q.  Wait.  Hold on one second.

13 A.  Sorry.

14 Q.  We're going to have to do question and answer.

15 A.  Please.

16 Q.  Okay.  While he was in the hospital on April 20th, he gets

17 a psych consult.  That is Respondent's Exhibit 25, page 145.

18 Do you remember looking at this psychiatry consult?

19 A.  I do.

20 Q.  Okay.  "Patient is paranoid, says that people mess with his

21 food.  Talks about God.  That he is Jesus Christ brother."

22          I assume that means Jesus Christ's brother.

23          "That he can fight the devil.  Patient says that

24 people are watching him all the time.  Says he can fight devil.

25 He did it before.  Where he talks about God, devil, and people,

1  he cries.  Tears fall down.  When patient was asked about

2  mother and father, he said that they beat him up.  He couldn't

3  do anything without their permission.  And he was crying.

4  Patient denied audio or visual hallucinations.  Denies SIHI.

5  He denies symptoms of depression.  He was very focused on mini

6  mental exam and did it well, 23/30.  Appearance, cooperative.

7  Cried when talked about God, devil, people messing with his

8  food.  Speech, normal rate and volume.  Affect, depressed.

9  Mood, okay, labile."

10          Do you find that there is anything suspicious

11  about this presentation?

12  A.   Suspicious in what sense?

13  Q.   Suspicious of malingering?

14  A.   Obviously the things that he reports in terms of this whole

15  deal of the devil and Jesus Christ and so on, that's an unusual

16  symptom presentation.  So, certainly it's the kind of thing

17  that would be a red flag for malingering.

18  Q.   Did you note that in your report anywhere?

19  A.   I do not believe I did.

20  Q.   Okay.  If I remember correctly, in your report you state

21  that the fact that he had pernicious anemia is tangible

22  medical evidence of the consequences of his delusional belief

23  system; is that right?

24  A.   I think I did say that.

25  Q.   So, do you still believe, having heard all the testimony

1  before you from Dr. Nathan, do you still believe that

2  pernicious anemia was caused by his delusional belief system?

3  *A.*  So, we have a couple of things there.  We cannot rule out

4  that the pernicious anemia was caused by changes in his food

5  intake.  It may not be that, but it cannot be ruled out.

6  Obviously I've made the presumption that the changes in his

7  food intake were because of his delusions about food.

8  Therefore, if we tie those together, then, yes, I still believe

9  what you said.

10  *Q.*  So, it's your understanding, basically, that pernicious

11  anemia is a synonym for Vitamin B-12 deficiency?

12  *A.*  It is.  It is a very severe form of Vitamin B-12

13  deficiency.

14  *Q.*  Okay.  After he was discharged from the hospital, was

15  Mr. Eldridge taking any psychotropic medications in 2006?

16  *A.*  He did take risperidone briefly, as I recall.  I think he

17  had 1 milligram, if I recall.  And it was discontinued shortly

18  thereafter.

19  *Q.*  So, after he was discharged from the hospital, which

20  occurred on April 26th -- I'm sorry, April 29th, 2006, as

21  reflected in Respondent's Exhibit 24, page 182, after he was

22  discharged, for the rest of 2006 he was not on any psychotropic

23  medication?

24  *A.*  This is the difficulty with two reports.

25  *Q.*  When you wrote your first report, did you think that was

1  going to be the first of more than one report, or did you

2  intend that to be the whole opinion in the case?

3  A.  I had no idea whether I would be seeing him again.  There

4  was discussion that I was likely to have that opportunity, but

5  it was unclear whether it would occur or not.

6  Q.  And, I'm sorry, I didn't mean to interrupt you.  Please

7  continue.

8  A.  Certainly.  No, what you said is correct.  It appears

9  that -- it wasn't clear to me how long that he took it, but it

10  was short-lived.  And, indeed, for the remainder of 2006,

11  according to what I understand in the record, he was not on

12  other psychoactive medications.

13  Q.  And I know I've already asked you about whether there were

14  any negative symptoms of schizophrenia reported in your report

15  for the --

16  A.  Right.

17  Q.  -- whole of 2006.  But I want to be very clear that after

18  he stopped taking psychotropic medication in 2006, did he

19  continue to make positive complaints or complain of the

20  positive symptoms of schizophrenia?

21  A.  In 2006?

22  Q.  In 2006.

23  A.  Yes, it appears that he did.

24  Q.  Okay.  And for the remainder of 2006, so we're talking

25  about after he's been discharged from the hospital and after he

1   is no longer taking any psychotropic medication, in 2006 he

2   received several psychiatric or psychological assessments or

3   evaluations at Polunsky and he was not given any Axis I

4   diagnoses?

5   A.   I'm sorry, meaning that people had met with him and

6   discussed things with him?

7   Q.   Yes.

8   A.   That does appear accurate, yes.

9   Q.   Okay.   If I were to represent to you that on April 23rd,

10   2006; June 21st, 2006; July 12th 2006; August 28th, 2006, all

11   of those times he was actually diagnosed as not having an Axis

12   I diagnosis, you would have no reason --

13   A.   No, that sounds accurate.

14   Q.   -- to disagree with me?   Okay.

15          You said in your report that there were only 18

16   entries from August 26 to January 2009 -- I said August 26 --

17   A.   August 2006.

18   Q.   -- 2006 to January 2009, and they provided no new

19   information; is that right?

20   A.   That is what I said, yes.

21   Q.   But didn't they, in fact, affirm that for that whole

22   stretch of time, Eldridge was not viewed as having any Axis I

23   diagnosis by anybody in that system?

24   A.   I don't know.   It wasn't clear to me if no records exist,

25   if records were lost, if they weren't provided to me, and I had

1    asked about that, but I was told that those were simply records
2    that did not exist.
3    Q.   So, I'm actually not talking about all of the records that
4    could possibly exist for Mr. Eldridge.   I am talking about the
5    18 entries that you refer to in your report from August 2006 to
6    January 2009.   You said that those 18 entries provide no new
7    information.   And I'm asking you if that's true, because those
8    18 entries actually indicate that psychologists or
9    psychotherapists thought he did not merit an Axis I diagnosis
10   in that time frame.
11   A.   I'm not sure I agree with that.   Seven of them were nothing
12   more than documenting to get his B-12 injections, and I list
13   that the other ten were routine 90-day administrative mental
14   health assessments and I --
15   Q.   Those 90-day mental health assessments were actually
16   psychologists talking to him and deciding that he didn't merit
17   an Axis I diagnosis, weren't they?
18   A.   In reviewing those notes, it was not clear to me how much
19   of an investigation was done within the 90-day assessment.
20   But, indeed, there were -- it appears ten of those over that
21   period of time, and what you stated is correct, they did not
22   provide positive evidence of any diagnoseable or suspected
23   mental illness.
24   Q.   Let's talk about 2007.   In 2007 he continues to present
25   with sporadic and positive symptoms; is that right?

1   *A.*  As I've just said, I have no records between 2006 and 2009
2   to be able to speak to.  Literally there are those 18 entries.
3   *Q.*  I know that you don't and I know that the Judge doesn't
4   want me to put up all the documents that are in the records
5   from 2007.  So, I'm just going to say this:  Are you telling me
6   that the only records you reviewed from August 2006 to
7   January 2009 are the, quote, "18 entries" that you're referring
8   to in your report?
9   *A.*  That's exactly what I'm telling you.  Those are the only
10  records I saw during that time frame.
11  *Q.*  So, would it change your mind about anything in this case
12  if you knew that in the fall of 2006 and the winter of 2007,
13  Eldridge occasionally presented with some positive symptoms of
14  schizophrenia, but was never given an Axis I diagnosis?
15  *A.*  I don't know if that would change my mind or not.
16  *Q.*  Okay.
17  *A.*  I mean --
18  *Q.*  Would it change your mind if you knew that -- well, surely
19  you know that Dr. Allen evaluated Mr. Eldridge on May 20th,
20  2007?
21  *A.*  Yes.
22  *Q.*  I'm sorry.  May 9th.  I lied.  And you read Dr. Allen's
23  report, correct?
24  *A.*  Yes.
25  *Q.*  So, it's not the case that you only had records from those

1  18 entries to review?

2  A.   There were other records that existed during that period of

3  time in terms of those evaluations, of course --

4  Q.   Okay.  So --

5  A.   -- but within the prison records, yes.

6  Q.   Okay.  I'm talking about the records in the case --

7  A.   Okay.

8  Q.   -- that you base your opinion on.

9  A.   Yes.

10  Q.   So, May 9th, 2007, Dr. Allen notes that Eldridge can engage

11  in goal-directed, correct, purposeful, logical, and oriented

12  conversation?  You would agree with that?

13  A.   That that's what the report says?

14  Q.   Yes.

15  A.   I would agree that that's what the report says.

16  Q.   And you don't have any reason just reading the face of the

17  report to think that Dr. Allen is lying?

18  A.   Of course not.

19  Q.   Or making it up?

20  A.   Of course not.

21  Q.   It's a data point?

22  A.   Yes.

23  Q.   It's a vector to be considered, if you would?

24  A.   Absolutely.

25  Q.   Okay.  And it's not just a random report from the guy

1  walking down street.  It's a report from another mental health
2  professional?
3  A.  Indeed.
4  Q.  Based on an examination that took some hours?
5  A.  Absolutely.
6  Q.  So, it's a report that you would give some credibility to?
7  A.  Absolutely.
8  Q.  Okay.  And Dr. Allen noted that Eldridge can engage in that
9  kind of goal-directed, logical, purposeful conversation when he
10 wants to make a point or make sure that data that's helpful to
11 him is considered?
12 A.  I recall him making that point in his report, yes.
13 Q.  And he also noted that Mr. Eldridge did not display any
14 negative symptoms, like a flat affect or autism, et cetera?
15 A.  Yes, I recall that.
16 Q.  Okay.  Would it change your opinion if you thought back to
17 those mere 90-day assessments and saw that they had noted, for
18 example, on May 22nd, 2007 -- this is Respondent's Exhibit 23,
19 page 114 -- "Patient is neat, clean, orderly, not delusional,
20 no hallucinations, speech clear and goal directed, insight and
21 judgment good," and then, "no Axis I diagnosis"?
22 A.  No, it would not change my opinion.
23 Q.  Okay.  But you did take that into account?
24 A.  Of course.
25 Q.  Because that's one of those 18 entries?

1   *A.* Of course.

2   *Q.* Okay.  So, when we talk about those 18 entries, it's not

3   just like scribble in the margin, no Axis I?  They actually go

4   through the checklist?

5   *A.* They do.

6   *Q.* Okay.  Same thing on June 15th, 2007.  And then did you

7   find it relevant that June 25th, 2007, is when the Atkins

8   hearing began in this court?

9   *A.* Obviously it was a big date.  So, certainly it was

10  relevant.

11  *Q.* Sure.  Okay.  There's a mention in Petitioner's Exhibit A,

12  page 50, that Mr. Eldridge gets a disciplinary for having a

13  bottle of urine in his cell because the devil is attacking him.

14  Do you remember that?

15  *A.* I do.

16  *Q.* I don't actually have a copy of that, but do you remember

17  looking at that?

18  *A.* I do.  I don't remember the report well.  I don't have a

19  visual image of it, but, yes, I recall seeing that.

20  *Q.* Okay.  Well, then we don't get into too much detail in

21  there.  But having this little discussion of what happened in

22  2007 with me, would you agree that in 2007 there's really only

23  sporadic reports from Mr. Eldridge of any positive symptoms at

24  all?  It's not like on a daily or weekly basis he's having

25  issues?

1    A.  I don't know if I can agree with it or not, in that in some
2    of the prior and in some of the subsequent records, he was
3    having relatively frequent contact.  And as you pointed out,
4    many of those documented there wasn't a lot going on.  There
5    isn't as frequent a set of reports.  So, I do agree that those
6    things do not appear in the record.
7    Q.  Okay.
8    A.  But obviously I can't make a statement about whether that's
9    the totality of his functioning over the course of that year.
10   Q.  I recognize that you may wish that the record was more
11   complete and, of course, we all do, because we would love to
12   have more records in this case, but based on the record that we
13   do have --
14   A.  Yes.
15   Q.  -- in 2007, you would agree with me, that Mr. Allen -- I'm
16   sorry, Mr. Eldridge only made sporadic complaints of the
17   positive symptoms of schizophrenia?
18   A.  You change the predicate again.  I would agree with you
19   that within the record there is only sporadic evidence to
20   suggest that there are complaints of schizophrenia.  I have no
21   idea what Mr. Eldridge did or didn't do over the totality of
22   that year.
23   Q.  Are you trying to distinguish between what really happened
24   and what's reflected in the record?
25   A.  I think you asked me a question about what really happened.

1    I can only speak to the record.

2              *THE COURT:*  I think the question was based on the

3    record.

4    A.  Based on the record, I agree, yes.

5    Q.  So, based on the record, in 2007, Mr. Eldridge only made

6    sporadic complaints of the positive symptoms?

7    A.  I'm sorry.  I see the disconnect.  I was not sure whether

8    other records existed that were not provided to me or whether

9    that was the totality of the record is why I was confused about

10   that.  My apologies.  If, indeed, you're saying that the

11   records I have seen represent the totality over that period of

12   time then, yes, I agree with what you stated.

13   Q.  Okay.  And I'm not trying to be difficult.  I don't know

14   what records you've seen and I think you don't know what

15   records you've seen.  So, when I ask you about the records, I'm

16   not trying to trick you.  I'm only asking about the records you

17   remember looking at, even though we really don't know what

18   those were and whether you saw all the records.  So, I'm just

19   asking about what you know.

20   A.  Yes, within the records I've examined, the statement you

21   made is accurate, yes.

22   Q.  So, let's talk about 2008.  Would you agree with me that

23   Mr. Eldridge made one outcry of a positive symptom of

24   schizophrenia and no outcry of negative symptoms of

25   schizophrenia for the whole year 2008?

1   A.   Well, we're going to have the same issue that we had with

2   2007.

3   Q.   Based on the record.

4   A.   So, yes, I would agree with that statement.

5   Q.   Okay.

6   A.   It's a similar discussion to what we had for 2007.

7   Q.   Yes.  Do you think Mr. Eldridge was genuinely schizophrenic

8   in the 1994 period before his trial, '93, '94, before his

9   trial?

10  A.   I can't know for sure whether he was legitimately

11  schizophrenic, but I do agree that the record is very

12  suspicious, that it was clear evidence of schizophrenia.

13  Q.   You are suspicious of what?

14       THE COURT:  Are you saying that the record suggests

15  feigning?

16       THE WITNESS:  That the record suggests, as the Court

17  had decided, that the record suggested he was feigning, that

18  there was evidence that he was engaging in dissimulation and

19  reporting more symptoms.  It's hard for me to know whether he

20  might also have had some evidence of true schizophrenia or not.

21  BY MS. ODEN

22  Q.   Of course.  And let me clarify, that any time I'm asking

23  you about your opinion, I am expecting that your opinion is

24  based only on the data that you have and I, of course, don't

25  expect you to imagine what other data might exist.

1              So, for the time period after he entered death
2    row in 1994 through 2000, do you think Mr. Eldridge was
3    schizophrenic?
4    A.   Based on what I've seen, no, it is not my opinion that he
5    was schizophrenic.
6    Q.   Okay.  How about in 2001?
7    A.   In light of later data, no, I think it's unlikely that he
8    had an active episode of schizophrenia in 2001.
9    Q.   Okay.  So, you're adding something in there.
10   A.   Well, because if you look at 2001, he showed a number of
11   symptoms, but the reality, of course, is the fact that over the
12   course of time, I mean, those things suddenly seem to improve.
13   So, no, I do not believe that schizophrenia was an accurate
14   diagnosis to be assigned to him in 2001.
15   Q.   How about 2002?
16   A.   I would make the same statement, that it would not be a
17   valid diagnosis.
18   Q.   How about 2003?
19   A.   Same statement.
20   Q.   2004?
21   A.   Again, concern certainly about the delusion, and I do
22   believe that there is reason to believe that he may have had
23   some type of psychotic process that was occurring.
24   Q.   Okay.  Now, I can see that we're going to have to go back
25   and start again.  Any time up to and including 2000, if he was

1   not schizophrenic, do you think he was having some other

2   psychotic disorder?

3   *A.*   He certainly had delusions.   It is conceivable that he

4   would have had evidence of a delusional disorder.

5   *Q.*   Okay.   I'm asking you for your opinion.   Can you diagnose

6   him with a delusional disorder for any point in time up through

7   and including the year 2000?

8   *A.*   Based on the record, with the issues that he had during the

9   eating episodes, yes, I believe that what he showed --

10  *Q.*   What eating episodes up through the year 2000?

11  *A.*   Oh, I'm sorry.   I thought we were up to 2001.   My

12  apologies.

13  *Q.*   I went back.

14  *A.*   Okay.

15  *Q.*   Up to and including the year 2000 --

16  *A.*   No, I have no reason to diagnose him with any psychotic

17  disorder or major mental illness.

18  *Q.*   So, if I ask you if someone has a psychotic disorder, does

19  that include both schizophrenia and delusional disorder?

20  *A.*   Yes, it does.

21  *Q.*   Is that the biggest, best umbrella term to get at the

22  relevant mental illness in question for competency?

23  *A.*   Yes, it is.

24  *Q.*   Okay.   So, that's how I'm going to phrase it.   In 2001, do

25  you find that he was -- would I correctly say that he was

1  psychotic?

2  A.  Yes.

3  Q.  And does that mean the same thing as being diagnosed with a

4  delusion -- with a psychotic disorder?

5  A.  Yes.

6  Q.  Okay.  In 2001, was Mr. Eldridge psychotic?

7  A.  I believe he was.

8  Q.  Okay.  And you believe that because?

9  A.  I believe that because he had prominent evidence of a

10  delusion, that delusion -- so, with a diagnosable mental

11  disorder.  That delusion affected him in a practical way in

12  day-to-day life.

13  Q.  And which psychotic disorder are you diagnosing him with in

14  2001?

15  A.  Based on the record and the way that things are reported

16  and all that's been described, I think it is probably most

17  appropriate to conclude that what he had was a delusional

18  disorder rather than a full-blown schizophrenia.

19  Q.  Okay.  What is -- what are the diagnostic criteria for a

20  delusional disorder?

21  A.  The definition that you've given for a delusion is the same

22  thing that applies to a delusional disorder.  A delusional

23  disorder -- and there are several subtypes within it, but --

24  and I hesitate to say among the most common, because the

25  literature doesn't necessarily show that, but a persecutory

1   delusion is certainly one of the subtypes, and it involves this

2   idea of a fixed false belief that is persistent over time and

3   causes bona fide impairments in functioning.

4   Q.  And you believe that despite your suspicions that he was

5   malingering?

6   A.  I do.  Looking at the weight of the data, based on a

7   retrospective review of what I've looked at, obviously not

8   having had a chance to examine him, I believe it's most

9   consistent with him showing evidence of a delusional disorder.

10  Q.  So, let me just make sure I understand.  In 2001, you do

11  not believe that he was schizophrenic, but you do think that he

12  was suffering from a delusional disorder?

13  A.  Yes.  Because I don't think that there is adequate evidence

14  in the record to comfortably assign a diagnosis of

15  schizophrenia based on the number of symptoms that are

16  required.  So, I do believe he had a psychotic disorder, but I

17  don't think we had adequate evidence to call it schizophrenia.

18  Q.  And I'm putting on the screen here, this is page 329 from

19  DSM, delusional disorder.

20  A.  Yes.

21  Q.  (A) It requires a nonbizarre delusion of at least a month's

22  duration?

23  A.  Right.

24  Q.  Where does he have a month of suspecting that his food is

25  poisoned?

1  A.  My understanding is that over a protracted period, he was
2  having issues with food and was making complaints about it.
3  Q.  A protracted period of a month?  He was in Jester IV for a
4  week, and he was kicked out for feigning.
5  A.  Go back to the food delusion thing.  As best I can tell
6  from the record, beginning on February 22nd, 2001, complaints
7  about someone putting meds in the food.
8  Q.  I'm sorry, you said February --
9  A.  22nd of 2001.
10 Q.  Uh-huh.
11 A.  There's an extended period going through that period of
12 time where this is a recurring complaint.
13 Q.  And tell me what that period of time is.  You said
14 February 22nd, 2001.  When is the next time that he complains
15 about his food being poisoned?
16 A.  What I have from the records, the next specific indication
17 that I have is on June 13th of 2001.
18 Q.  So, from February to June, he makes no complaints about his
19 food being poisoned?
20 A.  Well, again, we go into difficulty.  I do not have
21 indication of other complaints that were listed.  So, yes, that
22 may be the case.  There are no other recorded complaints that
23 I'm aware of regarding his food being poisoned.
24 Q.  So, we have two complaints in the year 2001, and they're
25 months apart --

1    A.   They are.

2    Q.   -- and you're telling me that that meets Diagnostic

3    Criteria A for delusional disorder?

4    A.   You asked me my opinion of what I thought he had, and I

5    gave you my opinion.  I didn't see him at that period in time.

6    Q.   And you did not put that opinion in your report?

7    A.   I didn't.  I wasn't asked to diagnose him back in 2001.

8    Q.   Okay.  So, in 2002, did he have a psychotic disorder?

9    A.   I'm going to make the same statement that I made for 2001.

10   I believe that he had ongoing evidence of delusions affecting

11   his ability to eat.

12   Q.   So, we're going to go through the same thing again.  He was

13   not schizophrenic?

14   A.   Right.

15   Q.   He had a delusional disorder, correct?

16   A.   Again, I didn't see him and I wasn't asked to evaluate him.

17   But, yes -- well, as you pointed, we're going to go through the

18   same thing again.  It's substantively what I've already said

19   about this.

20   Q.   And you're basing your diagnosis of a delusional disorder

21   on four complaints about being poisoned, two of which took

22   place in January.  So, I guess complaints two days apart, but

23   they happened to take place in the same month counts as a

24   month-long complaint?

25   A.   You've asked me to render an opinion based on whether or

```
 1  not I thought he had a psychotic process.  For me to go back
 2  and retrospectively diagnose someone --
 3           THE COURT:  Okay.  Hang on, guys.  You don't need to
 4  repeat your qualifiers every time.  Okay?
 5           THE WITNESS:  Okay.
 6           THE COURT:  It's taking a long time.  Same point --
 7           MS. ODEN:  Okay.
 8           THE COURT:  -- the flip side of it, if you can frame
 9  the questions in a way that takes into account --
10           MS. ODEN:  I will do my best.
11           THE COURT:  -- the limits that he has identified on
12  his ability to answer, that would also be helpful.
13           MS. ODEN:  Okay.
14  BY MS. ODEN
15  Q.  And please forgive me if I don't specify that I'm asking
16  you to base your opinion on only the information that you had
17  available to you, but that is only my intent.  I'm only asking
18  you based on the information that was made available to you
19  that you considered.
20               Your opinion is that he had a delusional
21  disorder, which requires a month-long span of having the
22  delusions, and he had the delusion about being poisoned
23  January 26th and January 28th?
24  A.  Uh-huh.  That's right.
25  Q.  So, I'm struggling to understand how that qualifies as a
```

1    month-long period, except insofar as both complaints occurred

2    in the same month.

3    A.   I understand your struggle.

4    Q.   But you don't find that to be a struggle?

5    A.   I don't know how else to convey this.  You asked me my

6    opinion of what was happening then, and I've given you my

7    opinion of what was happening.  I have not attempted to assign

8    some definitive diagnosis based on the records to the extent

9    that I've looked at them, the very predicate that you put with

10   the questions.

11   Q.   Okay.  In 2003, was Mr. Eldridge schizophrenic?

12   A.   No.

13   Q.   Okay.  Did he have delusional disorder?

14   A.   Yes, consistent with our discussion.

15   Q.   Yes.  Is that your opinion about Mr. Eldridge in 2004,

16   based on the records that you reviewed?

17   A.   I know the question becomes if not, what happened to it.

18   However, I don't know if I can make that same argument for

19   2004.  My apologies.  I also cannot make that argument for

20   2003.  I misspoke.

21   Q.   Okay.  So, which argument did you not want to make for

22   2003, the delusional --

23   A.   The delusional disorder.  My apologies.  I became confused

24   about the dates.

25   Q.   Okay.  So, in 2004, based on the records you reviewed, you

1  believe that Mr. Eldridge was neither schizophrenic nor

2  suffering from a delusional disorder?

3  A.  There was not evidence for me to support those, yes.

4  Q.  And would you then say that based on the records, he did

5  not suffer a psychotic disorder in 2004?

6  A.  Based on the records, I would say that.

7  Q.  How about 2005, based on the records that you reviewed?

8  A.  I would make the same substantive argument, that he did not

9  show evidence of a psychotic disorder.

10  Q.  How about 2006, based on the records that you reviewed?

11  A.  Right.  2006 becomes a little bit more difficult, because

12  there was a period of time where there was some suspicion that

13  he had it.  But overall I do not think there is sufficient

14  evidence to support a diagnosis of a psychotic disorder in

15  2006, '7, or '8.

16  Q.  Thank you.  Is it common for someone with delusional

17  disorder to just get over it?

18  A.  It isn't.

19  Q.  That's pretty rare, right?

20  A.  It is.

21  Q.  Would you agree that in terms of diagnosing psychotic

22  disorders, generally a person's delusions and their behavior

23  operate in concert?

24  A.  They often do.  There are times that there can be

25  discrepancies, but, yes, there's typically some concert to

1   their actions, yes.

2   Q.   Would you agree that, generally speaking, delusions are in

3   concert with each other?

4   A.   I'm not sure how you mean that.

5   Q.   And I'm not a psychologist, so my example may not be very

6   good, but maybe it will help get the picture across.   If a

7   person has a delusion that they are a secret CIA spy, they may

8   also have a delusion that they can read other people's

9   thoughts, and so they use their thought-reading abilities as

10  being a secret spy, or something like that.

11  A.   Right.   No, I understand, and I think that's a good

12  example.   Generally I think that delusions tend to be much more

13  circumscribed than that.   They tend to be more fixed than that.

14  When you get into more major psychotic disorders, I think you

15  can have more spillover of those symptoms.   So, I would

16  generally not make that argument for a delusion per se or a

17  delusional disorder.

18  Q.   Well, how about at least that delusions aren't usually

19  actively contradicting each other, like, a person wouldn't have

20  a delusion that they are the president of the United States and

21  have a delusion that they are one of the untouchable castes

22  from India --

23  A.   Right.

24  Q.   -- because that -- I mean, I don't know that that --

25  A.   No, that's fine.   Delusions typically do not contradict

1  each other.  Reality and delusions certainly can.  But two

2  separate delusions do not unusually contradict each other.

3  Q.  Okay.  If somebody was complaining to you, hypothetically

4  speaking, they were making complaints of delusions that were

5  logically inconsistent, two things that couldn't exist at the

6  same time, would that be suspicious to you?

7  A.  If they were each delusional representations, yes, that

8  would be suspicious.

9  Q.  And what would that be suspicious of?

10 A.  Well, again, you would think about the person fabricating

11 symptoms or malingering.

12 Q.  Now, we get into 2009.  2009 is a big year for Mr.

13 Eldridge, right?

14 A.  2009 is a big year.

15 Q.  Are you familiar with when Mr. Eldridge's case had big

16 dates, for example, like when his execution was supposed to

17 happen?

18 A.  I do know, not off the top of my head.  I can certainly

19 look that up.

20 Q.  But that was something that you took into account?

21 A.  Yes.

22 Q.  Okay.  So, let's kind of back up and talk about the time

23 period at the beginning of 2009.  At the beginning part -- and

24 this is all based on the records that you've reviewed.

25 A.  Yes.

1    *Q.* Okay. January 9th, 2009, Mr. Eldridge complains of hearing

2    voices all my life. Does that sound like something you've read

3    before?

4    *A.* Yes.

5    *Q.* And I can get out the records if you need me to.

6    *A.* No, that's fine.

7    *Q.* And you also have copies there if you need them.

8             But the hallucinations didn't seem to be a

9    significant problem for him, according to the therapist he

10   talked to on that date. Do you remember that?

11   *A.* The date that you gave again was?

12   *Q.* January 9th, 2009.

13   *A.* That's not actually one of the specific dates that I have

14   here.

15   *Q.* Okay.

16   *A.* The date that I have for 2009, I only have one from

17   January 1st.

18   *Q.* Okay. So, I'm referring to Respondent's Exhibit 23, page

19   129, and I'm putting this up on the Elmo. This is the -- can

20   you read that?

21   *A.* Yes.

22   *Q.* It's from January 9th, 2009.

23   *A.* I see that.

24   *Q.* I see that they weren't really taking his weight, at least

25   not in these assessments, because these are cell side

1  assessments, right?

2  A.  Right.

3  Q.  So, his most recent vitals were from July 6th, 2006?

4  A.  Right, there's often a long period where they have not

5  updated the vitals.

6  Q.  Because they're not going to open a death row guy's cell

7  and put a scale on the floor and ask him to step on it?

8  A.  I suspect they're not going to take a blood pressure cuff

9  in either.

10  Q.  Right.  You've never actually seen them do these cell side

11  assessments?

12  A.  I've not been on death row.  So, no, I haven't.

13  Q.  Have you talked to any of the people that do the cell side

14  assessments?

15  A.  I have not.

16  Q.  Do you know anything about the physical restrictions in

17  terms of how big the window in the cell door is?

18  A.  I've seen it, so I appreciate that it would be quite a

19  difficult task, yes.

20  Q.  Okay.

21       THE COURT:  We'll take an afternoon break in just a

22  few minutes when you get to a --

23       MS. ODEN:  Yes, I'll finish this document, and then we

24  can go.

25       THE COURT:  All right.

1   BY MS. ODEN

2   Q.   I'm flipping it over just so we can see who wrote this.

3   This is from Julia Roy, who's a master's level psychologist.

4   She notes that Mr. Eldridge reports a difficult time sleeping,

5   hearing voices.  He says he's losing weight along with a

6   healthy appetite.  He's hungry shortly after he eats.  He said

7   that he's on pork-free diet and often has only beans or peanut

8   butter for dinner.  He does appear to be thin, I believe.  Upon

9   entry patient reported he has -- experiences audio

10  hallucinations all my life.  This does not seem to be a

11  significant problem for the patient.  The patient was -- let me

12  see if I can zoom in a little bit.

13  A.   I see it.

14  Q.   The patient was encouraged to send an SCR to medical to

15  assess his qualification for a snack due to possible low BMI

16  ratio.  No mental illness noted at this time.  His last

17  clinical -- something.  Relates that he has a history of

18  paranoid personality traits.

19            And then I turn it over.  It says he was alert --

20  sorry.  Oriented times four; cooperative; normal speech; lucid,

21  organized thought process; no delusions; appropriate thought

22  content, free of hallucinations while reported; euthymic mood,

23  congruent affect, good impulse control; fair insight and

24  judgment.  She concludes with no Axis I diagnosis.

25  A.   Yes.

1   *Q.*   You're familiar with that --

2   *A.*   Yes.

3   *Q.*   -- representation?   February --

4           *MS. ODEN:*   If you want to take a break, Judge.

5           *THE COURT:*   No, go ahead --

6           *MS. ODEN:*   Okay.

7           *THE COURT:*   -- finish this document.

8   BY MS. ODEN

9   *Q.*   February 2nd, 2009, he is complaining of losing weight and

10  as we all know, his last vitals haven't been taken since 2006?

11          *THE COURT:*   Is this the same document?

12          *MS. ODEN:*   No, it's a different --

13          *THE COURT:*   Okay.   I thought you were still on the

14  same document, and I thought you said you wanted to finish that

15  document.   So, we will begin as soon as -- in about 15 minutes.

16  All right.   Thank you.

17      *(Recess from 3:00 p.m. to 3:15 p.m.)*

18          *THE COURT:*   All right.   I think we're ready to resume.

19          *MS. ODEN:*   Yes, ma'am.

20          *THE COURT:*   Please be seated.   Go ahead.

21                  **CROSS-EXAMINATION CONTINUED**

22  BY MS. ODEN

23  *Q.*   So, Dr. Roman, we were talking about 2009.   We had

24  discussed January 9th, 2009, where Julia Roy, the psychologist,

25  noted that he had normal speech, was oriented, organized, all

1    that.

2              February 2nd, 2009, would you disagree that there

3    are notes indicating that he's more or less doing fine, no Axis

4    I diagnosis, the same kind of 90-day mental health assessment

5    that we've talked about in other years?

6    A.   I know those notes exist.  Whether there's a note on that

7    specific date, again, obviously without looking at the date, I

8    trust you represent that correctly, but I don't know.

9    Q.   Okay.  Would you disagree, then, that the critical time

10   period in 2009 appears to occur after around August 19th?

11   A.   I would agree with that.

12   Q.   Okay.  And you would agree with me about that, because

13   before August 19th, 2009, there's really not a whole lot of big

14   complaints coming from Mr. Eldridge about his mental health?

15   A.   There are not many things documented in the record, yes.

16   Q.   Right.  And, of course, all my questions are only referring

17   to the records that are available.  August 19th, 2009, happens

18   to be the date that Mr. Eldridge's attorneys file his

19   competency claim in the state courts.  Are you aware of that?

20   A.   I'm sure I was.  I wouldn't have recalled the date offhand.

21   Q.   Okay.  You read their motion?

22   A.   I did.

23   Q.   Okay.  And in that motion one of the bases that they claim

24   that he is not competent was that multiple personality

25   disorder?

1    *A.*  I recall seeing that.

2    *Q.*  Okay.  But we know that that's most likely false?

3    *A.*  Yes.

4    *Q.*  Okay.  Mr. Eldridge was evaluated on September 21st, 2009,

5    by Dr. Mark Moeller, a psychiatrist for the state?

6    *A.*  Yes.

7    *Q.*  And that evaluation took place in the Harris County Jail?

8    *A.*  Yes, I believe I recall that.

9    *Q.*  Okay.  And that was in part because on July 24th, 2009,

10   Mr. Eldridge was bench warranted from Polunsky back to Houston

11   so that he could appear in state court and receive his death

12   warrant?

13   *A.*  Yes.

14   *Q.*  And August 5th, 2009, is when he got his -- he doesn't get

15   it, but he was given his execution date, which was set for

16   November 17th, 2009?

17   *A.*  Yes.

18   *Q.*  Okay.  So, he's still here in Harris County.  He's in the

19   jail.  He gets evaluated by Dr. Moeller.  And you would agree

20   with me that one of the unusual things that Mr. Eldridge says

21   to Dr. Moeller is that he doesn't know if he has brothers or

22   sisters?

23   *A.*  That was an unusual statement.

24   *Q.*  You would agree that most of the time when Mr. Eldridge is

25   speaking with you, he doesn't have a stuttering problem?

1  A.  That's true.

2  Q.  Has he ever had a stuttering problem when speaking with

3  you?

4  A.  He sometimes has stopped and started as he said something,

5  perhaps looking for a word, but he has not stuttered no.

6  Q.  Okay.  But Dr. Moeller did report that Eldridge stuttered

7  for the first few moments or minutes?

8  A.  I recall that.

9  Q.  And suspiciously stopped stuttering, correct?

10  A.  I do recall that, yes.

11  Q.  And do you recall that Dr. Moeller noticed that when he

12  asked Mr. Eldridge why he stopped stuttering, he got mad?

13  A.  I recall something to that effect in the record, yes.

14  Q.  Okay.  After he was challenged about not stuttering, Dr.

15  Moeller reports that Eldridge started stuttering again and then

16  forgot apparently and didn't stutter for the rest of the

17  evaluation.  Would you agree that was suspicious as well?

18  A.  It certainly is odd behavior, yes.

19  Q.  Okay.  You would not agree that it's suspicious for

20  feigning or malingering?

21  A.  Any time we see inconsistent evidence, as I think you've

22  suggested before, it becomes a potential red flag in the column

23  of, wow, I wonder if this might be malingering, I would agree

24  with that.

25  Q.  Okay.

1   A.  But, again, extending from any particular example as

2   opposed to the totality of the data set, but, yes, it's one of

3   those let's put it in that column types of findings.

4   Q.  Okay.  Dr. Moeller noticed that Mr. Eldridge engaged in

5   goal-directed, logical, oriented speech when it was to

6   Mr. Eldridge's benefit, but would repeatedly say, "I don't

7   know" or, "I don't understand" when it wasn't to his benefit.

8   Do you remember that?

9   A.  I do remember that statement, yes.

10  Q.  Okay.  And you know, of course, that Dr. Moeller concluded

11  that these were gross inconsistencies, bizarre, and not

12  congruent symptoms with known medical disorders or mental

13  disorders, theatrical and contrived demeanor, and basically he

14  concluded that Eldridge was malingering?

15  A.  Yes, he did.

16  Q.  Okay.  So, I guess I should catch up on my little diagram

17  here.  I don't have my pen.  So, I'll just say that

18  October 14th, 2009, the state court denied Eldridge's

19  competency for execution claim?

20  A.  I recall that.

21  Q.  Do you know that it found that Dr. Austin and Dr. Conroy's

22  report failed to make -- thank you -- fail to make a

23  substantial showing of Eldridge not having competency?

24  A.  Yes.

25  Q.  Okay.  November 2nd, 2009, the U.S. Supreme Court denies

1  cert in the case.  Are you aware of that?

2  A.  I think I knew the fact.  I certainly didn't know the date.

3  Q.  Okay.  And November 5th, 2009, Mr. Eldridge starts to

4  display some symptoms.  I'm specifically referring to a report

5  from Dr. Estes.  And that's in Respondent's Exhibit 23, page

6  134 to 135, which I will put up here.

7          So, this is November 5th, 2009.  Once again, the

8  weight is terribly dated.  It's from 2006.  "But Eldridge

9  reported with some evidence of delusional/disorganized

10  thinking.  Nothing consistent or pervasive.  Patient reports

11  attempting self-harm on occasions in the past, but patient is a

12  poor historian and reports he cannot remember when.  Nothing in

13  the notes suggests any attempts while in TDCJ.  No mental

14  health complaints.  'I already told them people in court.'"

15          And on the next page:  Sloppily dressed, slightly

16  dirty, hair messy.  Easily distracted, inattentive.  Normal in

17  volume and rate of speech, conversational.  Answers questions

18  appropriately.  Normal emotional expression, expresses self

19  appropriately.

20          And the conclusion or the diagnosis down here on

21  Axis I, diagnosis deferred.  Disposition:  No evidence of

22  mental illness or need for mental health treatment at this

23  time.

24          So, at this point even though there are some

25  symptoms of disorganization, there are some symptoms of

1  nondisorganization, and the treatment provider decides I'm not
2  going to make a diagnosis on Axis I at this point; is that fair
3  to say?
4  A.  That is how the record reads, yes.
5  Q.  Okay.  So, also on November 5th, 2009, and this is
6  Respondent's Exhibit 21, Mr. Eldridge fills out his -- what
7  they call "death packet."  Are you familiar with death packets?
8  A.  I have seen his death packet, yes.
9  Q.  Okay.  So, the first page of Respondent's Exhibit 21 is
10 what they call an execution summary.  And Mr. Eldridge has
11 initialed that he has no witnesses.  That his attorney handling
12 his stay or appeal is Lee Wilson.  And down here at the bottom
13 it says he does not desire a will.
14              He made his -- I'm looking at the next page.  He
15 made his last meal request.  He dictates that the money in his
16 trust fund account will go to Mr. Wilson.  His personal
17 property will go to Mr. Wilson.  And his remains will be
18 handled by Mr. Wilson.
19              So, that's all taking place on November 5th,
20 2009?
21 A.  Yes.
22 Q.  So, at least as far as those documents seem to reflect, on
23 November 5th, 2009, Mr. Eldridge is participating in the
24 process of getting ready for his death?
25 A.  At a minimum he's completing that form, yes.

1  Q.  At a minimum he's completing that form, and he's not

2  drawing pictures on it.  He's not scribbling on it.  He's not

3  handing it back saying, "I don't understand what this is."  He

4  appears to be completing that form in a logical, goal-directed

5  fashion, right?

6  A.  Well, I don't know.  Certainly some parts are typed.  I

7  assume he didn't type them.  So, some things were prepared, it

8  seems.  Pretty much what he did was put his initials by certain

9  choices.  I don't know how much he was guided or directed or

10 assisted, but, yes, indeed, he appears to have cooperated with

11 the process however it was ultimately carried out.

12 Q.  And when we talk about, you know, initialing choices,

13 surely the last meal choices that are here, it's not as though

14 every person on death row before they're executed is offered

15 only pancakes, chocolate milk, peanut butter, apple, oatmeal

16 cookies, and baked potato.  Because we all know that some other

17 inmates get moon pies or Big Red sodas or whatever, right?

18 A.  Yes.

19 Q.  So, these appear to be choices made by Mr. Eldridge, even

20 if he didn't type them out?

21 A.  Yes.

22 Q.  Okay.  And the last page of that document is the religious

23 orientation statement.  And it appears to indicate that

24 Mr. Eldridge identified his religious beliefs as Muslim and

25 said that he did not have a spiritual adviser or that he needed

1  to take, you know, whatever his final statement?

2  A.  Yes.

3  Q.  Okay.  So, then we move forward to November 12th, 2009.  He

4  gets a visit from his attorney, Mr. Wiercioch.  And November

5  16th, the Court of Criminal Appeals dismissed his competency

6  claim.  So, that brings us up to execution day.  And are you

7  familiar with the records indicating how Mr. Eldridge handled

8  execution day?

9  A.  I don't recall --

10  Q.  Okay.

11  A.  -- being familiar those records.

12  Q.  Okay.  Would you agree with me that in determining whether

13  or not someone is competent to be executed, it's important to

14  see what their mental status is leading up to and on the day of

15  their execution?

16  A.  I agree that would be salient information.

17  Q.  Sure.  So, I'm going to put up here Respondent's Exhibit

18  23.  This is page 137.  And I'm going to apologize, because I'm

19  showing you my working copy of this.  Maybe you can look under

20  the scribble and see here that the date that was written on --

21  or typed out on the form is 11-19-2009.

22  A.  I do see that.

23  Q.  Okay.  And the time that was typed was 16:18.  So, that

24  would be 4:18 p.m.; is that right?

25  A.  Yes.

1   *Q.* Moving a little further, we still see that we have dated

2   vitals from 2006.  And then right here it says, "Seen this date

3   at time.  This is a late entry note.  Patient seen cell side on

4   12 building at 15:35" -- or 3:35 -- "on 11-17-09"?

5   *A.* Yes.

6   *Q.* Okay.  So, that explains why there's this scribble in the

7   date and time?

8   *A.* I see, yes.

9   *Q.* So, this assessment or whatever you want to call it, took

10  place at 3:35 on the day of Eldridge's scheduled execution?

11  *A.* Yes.

12  *Q.* Okay.  So, I'm turning over to the backside of the page and

13  it says that -- here the chart starts with a mental status

14  exam?

15  *A.* Right.

16  *Q.* Appearance:  Clothing, careless; grooming, normal.  Motor

17  activity, unremarkable; affect, appropriate; mood, euthymic;

18  speech flow, normal; thought content, appropriate to mood and

19  circumstances; though organization, logical and goal directed.

20  Follow up in 90 days or upon request referral.  And diagnosis

21  or condition deferred on Axis I.

22              And that's from Julia Roy, the master's level

23  psychologist --

24  *A.* Yes.

25  *Q.* -- is that right?  Okay.

- 3

1  A.  And I have seen this record.

2  Q.  Are you aware or have you seen any other records that

3  document anything about Mr. Eldridge's mental status, mental

4  state, et cetera, leading up to immediately before or on the

5  day of his execution?

6  A.  I may have.  As you raise that with me, I can't come up

7  with a specific memory of what I may have seen in that regard.

8  Q.  Did you write anything in your report about any documents

9  or records that you saw about Eldridge's status on or about the

10  date of his execution?

11  A.  Obviously I could look, but as I think about it, I don't

12  recall having made any specific statements in my report --

13  Q.  Okay.

14  A.  -- at the time of execution.

15  Q.  And if there had been other records as you went through

16  them preparing for your report, you would have noticed them and

17  you would have noted this is how Eldridge was on the day of his

18  execution?  You would have put that in your report, right?

19  A.  Obviously I didn't put it in my report.  So, it would

20  certainly be my hope that I would put it in the report.  But

21  clearly if I had such records, I did not put it in the report.

22  Q.  Okay.  So, then it's safe to say that this is the only

23  thing we know about how Mr. Eldridge was on the day of his

24  execution, based on the records and the data?

25  A.  Yes.  As we sit here, I don't know if there are other

1  records and if I've seen them.

2  Q.  Right.

3  A.  But, yes, indeed, the statement you made is accurate.

4  Q.  Okay.  So, he doesn't seem to be having any kind of

5  psychotic break with reality on the day of his execution, based

6  on the documents and the data that we have?

7  A.  That is accurate, based on this, absolutely.

8  Q.  Two days after the execution is stayed, because it was

9  stayed on November 17th, 2009, two days later, November 19th,

10  2009, at 3:11 p.m., he is seen by Dr. Estes and he presented as

11  cordial and verbal, but he had some mental confusion.  He can't

12  recall some recent events.  He reports hearing voices that

13  won't let him finish what he's saying, voices that told him not

14  to talk to the psych staff, voices and his brother, Barry, were

15  so hateful and abusive towards him.

16          You remember that?

17  A.  Yes.

18  Q.  Okay.  Then the next day at 8:30 in the morning, there's

19  another record that indicates that he's a poor historian

20  without reliable recall past 72 hours.  He thinks he lives with

21  his brothers, although there's some evidence that this might be

22  a dissociative -- there might be dissociative properties around

23  the brothers?

24  A.  I recall that.

25  Q.  Michael and Barry constantly berate him, cursing.  They

1    don't let him finish.  They tell him he's stupid.  The brothers

2    and the mother appear in his cell.

3                I'm going to stop there and say, what we have is

4    apparently an account of an auditory hallucination and a visual

5    hallucination; is that right?

6    A.  That seems like that would be accurate based on that

7    report.  Yes, I think that's true.

8    Q.  Okay.  So, I'll continue.  He questions whether they're

9    there or not and whether the interviewer is really there.  He

10   was observed eating from his food tray yesterday.  He's going

11   to go to Jester tomorrow.

12               Clothing, neat and clean.  Grooming, normal.

13   Attention, confused and variable concentration.  Normal eye

14   contact, responsive facial expression, restricted affect.

15               I'm going to stop there and say, so we seem to

16   have some blend of positive and negative symptoms.  Would you

17   agree?

18   A.  I think that seems like a reasonable statement.

19   Q.  Okay.  I'll continue:  Normal speech flow.  Exhibits

20   free-flowing goal-oriented speech concerning present activities

21   of daily living.

22               I'm going to stop there.  You remember that part,

23   right?

24   A.  I don't know that I specifically recall that part.

25   Q.  Okay.  But you would agree that if one has normal eye

1    contact, a responsive facial expression, normal speech flow,

2    free-flowing, goal-oriented speech about the present

3    activities, those are kind of indications that a person is not

4    currently psychotic?  Wouldn't you agree?

5    A.  Unfortunately, I wouldn't necessarily agree.

6    Q.  Because someone could possibly be psychotic even though

7    they have goal-directed, logical thought, good eye contact,

8    normal, responsive facial expression?

9    A.  As I've testified before, even people with psychosis are

10   not psychotic 24/7.  So, the fact that he has periods of normal

11   functioning does not preclude the fact.

12   Q.  Oh, in general he might be diagnosed as a schizophrenic but

13   in that moment?

14   A.  It would suggest that he was not having an active psychotic

15   episode at that moment.

16   Q.  Okay.  I'll try to be more careful with my phrasing.  Thank

17   you.

18              So, if I can go back to my little chart here.

19   When we're talking about 2009, so far up to the day of

20   execution, which was November 17th, 2009, you would agree with

21   me that he seemed to be doing mentally okay?

22   A.  That would be a difficult question to agree with.  There's

23   a lot of evidence in the record to suggest that there were

24   difficulties.  I don't know in what context you mean doing

25   mentally okay.

1  *Q.*  Okay.  I'll try to make it a little tighter.  There was

2  evidence that he had some complaints, but there was a spike

3  upwards in the presentation of symptoms after the date of his

4  execution?

5  *A.*  That sounds like an accurate statement, yes.

6  *Q.*  Okay.  So, you're familiar with some records from when he

7  was admitted into Jester IV on November -- I believe it was

8  November -- well, he wasn't admitted to Jester IV, but they

9  decided to admit him on November 20th, 2009, where they weighed

10  him and he was only 139 pounds?  You're familiar with those

11  records?

12  *A.*  I remember those records generally, yes.

13  *Q.*  Okay.  You're familiar about some records where he said to

14  occupy himself, he claims he works with his brothers in a

15  chemical plant?

16  *A.*  Yes.

17  *Q.*  Okay.  Do you remember that that particular date, he said

18  he was on death row, had an execution date recently and was

19  given a delay?  Do you remember that?

20  *A.*  I remember those records.  I don't recall whether he said

21  that or whether that was a report of what was discussed, but,

22  yes, I remember that being within the report.

23  *Q.*  Okay.  Okay.  So, November 24th, 2009, he is admitted to

24  Jester IV.  And he's started on Risperdal, 1 milligram twice a

25  day; is that right?

1   A.   That is correct.

2   Q.   Okay.

3   A.   I'm sorry.  What date again?

4   Q.   November 24th --

5   A.   Yes, that's what I have.

6   Q.   -- 2009.

7                Upon admission, you would agree with me that his

8   emotional state was described as social and he was described as

9   having organized logical thought processes?

10  A.   Well, obviously I could agree with you more directly if

11  you're looking at that record that you're reading.

12  Q.   Oh, okay.

13  A.   But, again, I have no reason to believe you're

14  misrepresenting it.

15  Q.   So, I'm looking at Respondent's Exhibit 23, pages 164 to

16  166.  So, this is January -- sorry, November 24th, 2009.  This

17  150 pounds, this weight was measured on November 24th, 2009?

18  A.   Right.

19  Q.   Okay.  I turn the page over, and it says that he complains

20  of hearing voices and depressed.  So, the mental health

21  inpatient nursing assessment on page 165 says, "He's oriented

22  to person, place, and situation.  His behavior is alert and

23  depressed.  His emotional state is social.  His thought

24  processes are organized, logical, and delusional.  His thought

25  content is coherent.  He reports hallucinations of hearing

1  voices and delusions."  But there's no explanation there; is

2  that right?

3  A.  That's correct.

4  Q.  Okay.  Having organized, logical, delusional thought

5  processes seems to be a contradiction, but you probably can't

6  speak to what this person meant, if I'm going to understand

7  correctly, because you weren't part of this?

8  A.  Well, I can't.  And, again, the difference between what

9  he's reporting and what he's demonstrating at the moment, there

10  can potentially be differences and that might be why the record

11  reads that way.

12  Q.  So, maybe the organized and logical refers to how he's

13  speaking?

14  A.  I would assume it is how he is speaking at that moment in

15  time, yes.

16  Q.  And maybe the delusional refers to what he's talking about?

17  A.  That's a possibility or something they had observed prior

18  to sitting with him at that moment.  It's hard to know for

19  sure.

20  Q.  Okay.  They would observe his thought process how?

21  A.  Primarily we observe thought propose through speech.

22  Q.  Okay.  So, his thought process appears to be organized,

23  logical, and delusional, but the thought content is coherent.

24  That all seems to be kind of inconsistent, right?

25  A.  The idea that it's -- that delusion is thrown within that

1   is what you mean?

2   Q.  Well, the thought content --

3   A.  Right.

4   Q.  -- is distinguished from the thought process?

5   A.  Yes.

6   Q.  So, the content of his thought is coherent?

7   A.  Yes.

8   Q.  But the process is organized, logical, and delusional.

9   That's hard to make sense out of that, isn't it?

10  A.  It may be with the exception that, again, most delusions

11  are not bizarre delusions.  So, they may be things that are

12  plausible, and that's the whole idea about them.  So, it may

13  sound very coherent, very logical, but clearly untrue.  One

14  could have a very coherent, logical discussion about being

15  pursued by the CIA.  We might disagree with that.  We might

16  think that was a very unusual thing that could not possibly be

17  true, but it might be very organized, logical, and goal

18  directed.  There's no bizarreness in one's ability to

19  communicate that.  So, it could be that.

20  Q.  Okay.

21  A.  You would normally think they wouldn't put the content as

22  coherent, but they may well have been suggesting it had that

23  feeling like he knew what he was talking about even though it

24  seemed totally deluded.

25  Q.  Okay.  But, unfortunately, this particular document doesn't

1  share anything about what it was that he said?

2  A.  It really does not.

3  Q.  Other than he was hearing voices?

4  A.  Yes, and being delusional.

5  Q.  Yeah.  We don't know what he was having a delusion about?

6  A.  We don't.

7  Q.  Do you remember some other records that talked about once

8  he was in Jester IV, complaining that everyone is thinking that

9  I am lying and acting?  Do you recall those?

10  A.  I do recall those statements.

11  Q.  Okay.  Do you recall him reporting auditory and visual

12  hallucinations, that people were attacking him outside his

13  door?

14  A.  I do recall that, yes.

15  Q.  Do you recall that in December -- on December 3rd, he said

16  that he knows that he's been in prison for 20 years for

17  shooting someone?

18  A.  There are a couple of places where there's come up,

19  including in my report and Dr. Allen's report, so

20  differentiating that specifically from the record, but, yes.

21  Q.  He at least may have been factually aware of his situation,

22  if not understanding?

23  A.  Well, again, I'd probably need to see the document to know

24  more specifically, but your question was whether I recall

25  seeing that in the document, and I do recall seeing it.  I

1  don't remember the document or the context well enough without

2  looking at it.

3  Q.  Okay.  To summarize these things and speed things along

4  because of the voluminous nature of the documents, let me see

5  if I can summarize and tell me if you disagree with what my

6  summary says.

7               Basically in December of 2009 he complains

8  that -- or says that he's been talking to his brother.  He's

9  hearing voices.  He claims symptoms that are in the domain of

10 psychosis.  Sometimes he complains of positive symptoms of

11 schizophrenia and sometimes he doesn't.  But generally he

12 continues the pattern that we saw beginning after his execution

13 date of an uptick in mental health symptoms?

14 A.  I think that's adequately summarized, yes.

15 Q.  Okay.  So, in 2010, after his execution is stayed

16 obviously, he complains of voices once or twice a month and the

17 negative symptoms are also still kind of inconsistent.  Would

18 you agree?

19 A.  I think that's an accurate statement, yes.  I don't know

20 about the once or twice a month per se --

21 Q.  Okay.

22 A.  -- but there are periodic records.  I mean, as I look here

23 at the dates that I have, it looks like they range from one to

24 perhaps approximately three episodes where symptoms are

25 documented within the record.

1  *Q.*  And you're talking about per month?

2  *A.*  Per month across 2010.

3  *Q.*  Okay.  So, it would be fair to say he complains of voices

4  one to three times a month?

5  *A.*  Again, the same thing we've talked about.  I can't speak to

6  what he complains about.  I can speak to --

7  *Q.*  What's in the records?

8  *A.*  Exactly.  And that much of it is documented one to three

9  times a month.

10  *Q.*  And, once again, I'm only talking about the records that

11  you reviewed.

12  *A.*  And I want to make sure I'm clear as well in my answer.

13  Thank you.

14  *Q.*  You have a section in your report titled "Food Delusions."

15  I think it starts on page 4.  And the next section is other

16  notations about mental health issues.

17        *THE COURT:*  Are you talking about the original or

18  supplemental report?

19        *MS. ODEN:*  The original report.

20        *THE COURT:*  All right.  Thank you.

21  *A.*  Yes, I have.

22  *Q.*  Could you please point us to any negative symptomatology

23  that you document in your report coming from the records?  And

24  I'm talking about those two sections, either dealing with food

25  delusions or other notions about mental health issues.

1    A.   Again, in the food delusion section, and I'm looking at it,

2    I wouldn't anticipate that I'm likely to focus on negative

3    issues.   I was specifically looking at delusions which is a

4    positive symptom.

5                   Let's see, in other notations -- I mean, there's

6    a lot of stuff here.   I'm happy to go through it if you want me

7    to take the time to see what I can point to.

8    Q.   Yes, I would like you to look and point out any negative

9    symptoms --

10   A.   Yes.

11   Q.   -- in that section.

12   A.   Fine.   So, on page 5, the paragraph that starts on 1-27-04,

13   there is a boldface section that says, "On 8-24-04, a mental

14   health note indicated that he was experiencing increased

15   depression but gave no diagnosis."

16                   Now, that's not necessarily a negative symptom,

17   but it is potentially consistent with negative symptoms.

18   Q.   Okay.

19   A.   I see no other instances that I specifically documented.

20   Q.   Okay.

21   A.   I know that there are some records that exist in terms of

22   sleep issues and so on, and I'm not aware that I documented any

23   of those things.   I see no specific documentation of any other

24   negative symptoms within my report.

25   Q.   Okay.

1  *A.*  Particularly in those two sections.

2  *Q.*  Okay.  Let's talk a little bit about the medications that

3  Mr. Eldridge is on.  Page 6 of your first report stated that

4  risperidone is good for treating the negative symptoms of

5  psychosis, like those related to anxiety and depression.

6          So, tell me what negative symptoms of psychosis

7  are related to anxiety and depression, just so I'm clear.

8  *A.*  The point being that when people have schizophrenia, often

9  there are other symptoms that are not the positive symptoms and

10  those are the kinds of things that are not usually treated by

11  the so-called typical antipsychotic medications.  So, when we

12  talk about things like difficulty with sleep, when we talk

13  about things like general affect, has an affect of flattening,

14  when we talk about unusual aspects of their speech, those are

15  things that can appear to be relatively more consistent with an

16  anxiety or a depressed state.  I don't mean to suggest that in

17  a diagnostic sense, anxiety and depression.  I mean that more

18  as a general descriptor of somebody feeling more down or lower

19  energy or feeling more agitated or irritable, those kinds of

20  things.

21  *Q.*  Okay.  I want to talk specifically about something I see in

22  the records and it comes from -- I'm trying to -- I believe

23  that this is Exhibit 8 from the petitioner's exhibit binder.

24  It's page 86.  And if I'm wrong about that exhibit number, I

25  apologize.  But this is a record from the correctional managed

1  care, Jester IV, that's dated January 5th, 2010.

2  A.  I see it.

3  Q.  And it's got a relatively current weight from December

4  31st, 2009, of 170 pounds.  And you remember looking at this

5  record while you were making your diagnosis?  Can you read it?

6  Should I make it bigger?

7  A.  You know, I'm actually focusing primarily on your

8  highlights.  They seem to stand out a little better.

9  Q.  Okay.  Well, the part that I have highlighted says, "He

10  reported he opened a piece of meat and found pills in the

11  meat."

12          This was a document that was put up on the Elmo

13  yesterday during your direct examination for something else

14  that had been highlighted earlier --

15  A.  Right.

16  Q.  -- which was, "He discussed problems at his unit with

17  officers putting battery acid in his food."

18  A.  Yes.

19  Q.  "He accused them of trying to make him kill himself."

20  A.  Yes.

21  Q.  And the argument -- or the position that I understood you

22  to take was that he was distinguishing between the guards at

23  his old unit and the guards at Jester IV, in terms of

24  suspecting the Polunsky guards and not suspecting Jester IV

25  guards; is that correct?

1   A.   I don't know if I made that specific to this particular

2   note, but, yes, indeed, that was a statement that I made --

3   Q.   Okay.

4   A.   -- that he did see a distinction.

5   Q.   And here in the document, what I had already read, is his

6   statement that he opened a peace of piece of meat and found

7   pills in the meat, that's in the current tense, isn't it?

8   A.   It is, yes.

9   Q.   Present tense?

10  A.   Yes.

11  Q.   Okay.  So, later on, down here in the OA -- which I assume

12  is some kind of observation and assessment?

13  A.   I would suspect that's what it is.

14  Q.   Okay.  "Denies audiovisual hallucinations, no suicidal,

15  homicidal ideation.  Hygiene adequate.  Speech coherent, within

16  normal limits for rate and volume.

17           "The patient appears to deny the fact that he is

18  on death row; and whenever the discussion goes that way, he

19  becomes vague and distracted."

20           I'm going to stop there and ask you, that seems

21  to say that when the conversation isn't going that way, he's

22  less vague and less distracted.  Does that sound like what that

23  means?

24  A.   That is what one would infer from that language.

25  Q.   Okay.  And I'll continue:  "The symptoms reported during

1   the social history report do not jibe what patient reports

2   today."

3              Did I read that correctly?

4   A.  Yes, that is a correct rendition.

5   Q.  And I'm turning it over just to note that this was written

6   apparently by Dr. Hemant Patel, who's a psychiatrist there at

7   Jester; is that right?

8   A.  It's been signed by so many people.  I'm not sure that I'm

9   aware of their system to know exactly who it was that actually

10  electronically signed it.  But, yes, I see that his name is

11  there.

12  Q.  Okay.  So, as you were looking at these records, you didn't

13  perform any additional investigation so that you could

14  understand the system by which when you see some important

15  document like this, you know who wrote it and who just signed

16  off on it later as having received it?

17  A.  Well, I think that, generally speaking, we -- the answer to

18  your question is no, I did not perform any additional

19  investigation of that matter.

20  Q.  If I represented to you that the first line or the first

21  name is the person who wrote it and the remaining names are

22  ones who were in a distribution list of some sort, would that

23  surprise you?

24  A.  No.  It's what I've assumed is the case with the way that I

25  understand electronic things occur.

1    Q.  Okay.  Okay.  I want to talk a little bit about the
2    medications that Mr. Eldridge has been on, and I want to focus
3    on the first basic two months that he was getting medicated.
4    Obviously he had been medicated for a week or so back in 2006,
5    but I'm talking about when he was admitted to Jester IV in
6    November of 2009 --
7    A.  Yes.
8    Q.  -- for about the next two months.  And if we need to, we
9    can pull all the individual pages that track all of his
10   different clinic notes.  But what I would like to do for a
11   short version is read this to you and have you tell me if you
12   think it sounds like what you read.  If we need to go through
13   it document by document, we can.  But I'm hoping that it will
14   sound familiar from your review of the records.  Because you
15   did have an opinion about how he reacted to the medication he
16   was on, correct?
17   A.  Of course.  Of course, the great difficulty I have with
18   what you're proposing is that in agreeing with an excerpt, it
19   doesn't speak to the totality of the record.
20   Q.  Of course.
21   A.  So, I don't know if you're asking me to simply to say do I
22   remember reviewing that.  If you're asking me to draw a
23   conclusion, that's a more difficult thing to do.
24   Q.  I'm going to just ask if you remember reviewing it.
25   A.  Sounds fine.

1   *Q.* And if I miss something or portray something in the wrong

2   light, Ms. Ferry can definitely point out that mistake on my

3   part.

4           So, would you agree that he started getting

5   risperidone or Risperdal on November 24th, 2009?

6   *A.* That is correct, twice daily.

7   *Q.* I'm sorry?

8   *A.* Twice daily.

9   *Q.* Twice daily.  And Risperdal and risperidone are the same

10  drug?

11  *A.* Generic versus -- I'm sorry, brand versus generic name,

12  yes.

13  *Q.* Okay.  So, yesterday you were referring to the Rogers book,

14  *Clinical Assessment*.  This is a reliable book that other

15  professionals like you rely on; is that right?

16  *A.* Yes, it is.

17  *Q.* Okay.  So, would you agree if Dr. Resnick reported in this

18  book that the median period of time from when you start taking

19  medication to having a successful elimination of the symptoms

20  that the medication is for, specifically antipsychotic

21  medication, is 73 days?

22  *A.* I do know that citation in the book.  And, yes, I have no

23  reason to dispute that that is an adequate representation of a

24  median benefit.

25  *Q.* Okay.

1   A.   Yes.

2   Q.   Okay.  So, the meds start on November 24th, 2009.  And then

3   December 10th, 2009, do you recall reading that he claimed he

4   hadn't slept for four days, but the nurse notes that he seems

5   to have plenty of energy, had a full range of affect, good eye

6   contact, and no distress, even though he's repeating that

7   nobody believes him?

8   A.   I recall that note.  I also have the additional note here

9   that the note stated that he was illogical and had tangential

10  thinking.

11  Q.   Illogical and tangential thinking?

12  A.   That's the notation I have regarding that particular entry.

13  Q.   Okay.  So, let's make a chart.  We've got the medication

14  starting on November 24th, 2009, and we're looking at a

15  period -- I kind of arbitrarily picked about two months later,

16  to February 9th, 2010.  So, obviously we know the medication

17  isn't going to be able to start working on the day that it

18  starts being given, right?

19  A.   It certainly will not resolve symptoms in a rapid fashion.

20  Q.   Thank you.  And that's what I meant by the medication is

21  working.  It's biologically in there, though, but it's not

22  changing your symptoms that fast?

23  A.   Well, the point I was trying to draw is that there are

24  certainly medications where people will sometimes show a rapid

25  immediate response that we think may not be pharmacological.

1  The well-known placebo effect, which many people taking

2  medication will report, we sometimes see the same thing for

3  things like therapy with waiting list controls, who are not

4  getting any treatment.

5  Q.  Okay.  I don't want to talk about the world of

6  psychopharmacology.  I want to limit it to talking about

7  antipsychotic medications.  So, Risperdal would not be expected

8  to have a successful antipsychotic effect?

9  A.  Immediately.

10  Q.  Immediately?

11  A.  That is a correct statement.

12  Q.  Okay.  So, he starts on 11-24.  On 12-10 he has illogical

13  and tangential as a negative symptom, but he has full range of

14  affect and good eye contact and no distress.  So, there's some

15  inconsistency there, right?

16  A.  I don't know if it's inconsistency or not.

17  Q.  Okay.

18  A.  As you, yourself, have pointed to, shortly before the date

19  of his execution, he was reported to be -- I think you used the

20  word in fairly good health -- fairly good mental health.

21  There's certainly all sorts of indications within the record

22  where he wasn't necessarily showing, for example, as we've

23  discussed, negative symptoms.

24  Q.  Okay.

25  A.  So, I don't know if that's an improvement or not.

1   Q.  I'm not talking about it being an improvement.  I'm talking

2   about the one day, December 10th.  On one hand, he is recorded

3   as having illogical and tangential thoughts?

4   A.  Yes.

5   Q.  On the other hand, he has a full range of affect, good eye

6   contact, and no distress?

7   A.  I do believe that's what the record says.

8   Q.  And those two sets of symptoms are in some kind of

9   inconsistency?

10  A.  I don't know why you presume that they're inconsistent.

11  Q.  Well, if somebody is having illogical and tangential

12  thoughts, that implies that they are actively experiencing some

13  kind of psychotic thought disorder, right?

14  A.  I think there's a misrepresentation of the way that these

15  things can present.  One can certainly have a discussion with

16  somebody who isn't having an active full-blown psychotic

17  episode, and one can see evidence of illogical and tangential

18  thinking in the course of sitting down and having what is

19  otherwise a coherent logical discussion with them.  So, those

20  are not necessarily inconsistent with each other.

21  Q.  Oh, okay.  So, just because a person is noted as having

22  illogical and tangential thoughts doesn't mean they're

23  necessarily having an active psychotic event?

24  A.  It doesn't mean that their sensorium is completely taken

25  over by their psychotic symptomatology.

1  Q.  Okay.  December 14th, 2009, he reports being attacked, but

2  the counselor or psychologist person says that he seemed

3  undistressed by that.  Do you recall that?

4  A.  I do.

5  Q.  And I assume that you're going to say that there does not

6  seem to be an inconsistency between being attacked and being

7  undistressed by that?

8  A.  No, there's definitely an inconsistency there.  It seems

9  odd that somebody would report being attacked and not seem

10 distressed by it.

11 Q.  Okay.

12 A.  That would seem to be a disconnect between affect in one's

13 report.

14 Q.  Okay.

15 A.  But such a disconnect is not necessarily inconsistent with

16 people with a major mental illness.

17 Q.  Okay.  December 23rd, 2009, he doesn't have any audio

18 hallucinations.  He doesn't have any visual hallucinations.  He

19 doesn't have any delusions, and he's not experiencing any

20 distress.

21 A.  I'm sorry.  The date again?

22 Q.  December 23rd, 2009.

23 A.  The notation that I have indicates that he's reporting

24 hearing voices for December 23rd.

25 Q.  So, the document that I'm specifically looking at for

1  December 23rd is Respondent's Exhibit 24, page 334, and I'll

2  put that up.

3              So, this is December 23rd.  His vitals are

4  154 pounds, about two weeks old -- a week old.  "Seen for

5  staffing along with psych doctor.  No distress noted.  Responds

6  to verbal stimuli.  Patient is alert and gives eye contact.

7  Breathing is unlabored.  Denied suicide and homicidal

8  ideation."

9  A.  I see that.

10  Q.  Okay.  So, you must be looking at some other document or

11  had been looking at some other document that reported that he

12  was hearing voices?

13  A.  I take it there must be another note --

14  Q.  Sure.

15  A.  -- relevant to that date.

16  Q.  Okay.  So, we have documents that report that on the same

17  day to one person he says, "I'm hearing voices."  If you're

18  hearing voices, that means you are actively psychotic, right?

19  A.  If you're reporting that you're hearing voices at that

20  moment in time, yes, indeed.

21  Q.  Right.

22  A.  But, again, I really worry about the characterization of

23  this.  I mean --

24  Q.  Sometimes these notes may be when they say patient reports

25  or patient complains that he is hearing voices, the person

1   that's writing that down might not be very accurate?

2   A.  They might not be.  But it's almost as if there's a

3   presumption that if one is hearing voices, that it's an

4   hourlong or a daylong episode during which voices are

5   occurring.  It is not unheard of that one could have a

6   momentarily moment of seconds or minutes to which they might

7   even be attending to said voices and return immediately to the

8   conversation that occurred.  This is not unheard of in people

9   with a psychotic disorder of schizophrenia.  In fact, with an

10  outpatient population, it's a very fairly common presentation

11  that occurs.

12  Q.  Right.  But we're talking about somebody who is so

13  seriously psychotic, allegedly, that the people that are in

14  charge of him decide to put him in an inpatient facility,

15  right?

16  A.  Well, as I understand it, partly --

17  Q.  That's a higher level of disorder, right?

18  A.  Well, we have to be careful here, because you, yourself,

19  have pointed out multiple evidence in the record that suggests

20  that he's not having full-blown symptoms all the time.  So, the

21  premise that he is so actively psychotic they've decided to do

22  that, how much of that is for treatment and further

23  observation, I don't know.  I just don't believe that we can

24  make the characterization that he is having a full-blown

25  psychotic break with reality in the way that, for example,

1  would that he were in the free world when manifesting those

2  symptoms would necessarily warrant the psychiatric

3  hospitalization.

4  Q.  Okay.  So, let me see if I can understand this from this

5  perspective.  If a person has a psychotic -- has a psychotic,

6  an active psychotic moment --

7  A.  Yes.

8  Q.  -- hallucination, they're hearing voices sometime in the

9  day --

10  A.  Yes.

11  Q.  -- aren't there -- isn't there a period of time before,

12  leading up to that psychotic active moment and a period after

13  where they still have disorganized thinking and problems

14  related to the active psychotic episode?

15  A.  It can be.  And, indeed, for a major manifestation of a

16  psychotic episode, what you just described is not only classic

17  but absolutely accurate.

18  Q.  So, if a person is hearing voices, that's a major psychotic

19  episode, right?

20  A.  This is the difficulty:  It's not necessarily so.  I mean,

21  I've treated many patients on an outpatient basis who are

22  hearing voices as they sit there in the room with me.  They

23  have driven there.  They are driving back home.

24  Q.  And it's not uncommon, I take it, that a person would be

25  having an active audio hallucination while they're talking to

1  you right then and there?

2  A.  Well, of course, it's uncommon.  Schizophrenia and

3  psychotic disorders do not commonly manifest.  I mean, they're

4  a relatively rare thing.  But there are people who have

5  psychotic presentations that are -- there's no suspicion of

6  malingering, no reason to believe that there is a malinger

7  presentation, who are still -- we can't say they're functioning

8  normal lives, because it does affect their quality of life, but

9  they are certainly living and navigating through their

10  environment.

11       THE COURT:  I think the only question is whether that

12  person was having an active psychotic episode --

13       THE WITNESS:  Right.

14       THE COURT:  -- at that time --

15       THE WITNESS:  Right.

16       THE COURT:  -- because they're hearing voices.

17       THE WITNESS:  Right.  And I guess I'm just trying -- I

18  mean, I thought the characterization was that if that's the

19  case, are they going to be out for the count, like someone

20  who's had a seizure might be.

21  BY MS. ODEN

22  Q.  Okay.  Please don't try to anticipate where I'm going with

23  the question or the argument that I'm going to make.

24  A.  Okay.

25  Q.  Please only focus on the question that I ask.

1  A.  I'm trying.  Okay.  Very well.

2  Q.  So, on a given day, a person has an active psychotic

3  episode of hearing voices, on that day wouldn't you expect that

4  leading up to that active episode and after the active episode

5  is completed, that they would still suffer from disorganized

6  thoughts and other negative symptoms of that psychosis?

7  A.  That is the most typical presentation, yes.

8  Q.  Okay.  And, so, on December 23rd, given this document

9  that's up here, page 334, at least for this person in this

10  document, whether it's before he had the active episode you

11  mentioned or after, he does not appear to behave in a way that

12  is consistent with leading up to an active episode or having

13  just finished an active episode.  I think those are called the

14  prodromal or residual phases; am I right?

15  A.  They are called that.

16  Q.  And he is not behaving in a manner in this document that is

17  consistent with either the prodromal or the residual phase?

18  A.  Prodromal active and residual do not typically occur in the

19  space of the same day.  But, yes, in the reality -- based on

20  what you're saying, yes, there does seem to be a difference in

21  this report and the other report.

22  Q.  Okay.  Prodromal, residual, and active phases don't usually

23  take place in one day, because they're usually longer than a

24  day, right?

25  A.  Right.  They're part of the schizophrenic symptom

1   presentation over periods of time, yes.

2   Q.  Okay.  So, at least as far as this particular document is

3   concerned, on December 23rd, 2009, he appears to be

4   experiencing a reduction in the symptoms of his psychosis?

5   A.  Based on this document, I could see where you draw that

6   conclusion, yes.

7   Q.  Okay.  And yet there is some other document out there,

8   which I don't know what that citation is and I'm not going to

9   tear through the binders to find it, but there is some other

10   document in the records that indicates to the contrary, that on

11   that date, he was experiencing an active hallucination, if the

12   person that wrote the record was accurate in the way that they

13   wrote it?

14   A.  And what I don't know is the notation I have is "reported

15   hearing voices."  I don't know if that was a, "I heard voices

16   yesterday," or if that's saying, "I'm hearing voices right

17   now."

18   Q.  Okay.  But at least insofar as the document that we're

19   looking at, we know it appears that that medication is working

20   on December 23rd?

21   A.  I don't think we can draw the conclusion the medication is

22   working.

23   Q.  Okay.  How about instead of concluding that the medicine is

24   working, let's instead say whether there is no symptoms or

25   whether there are symptoms?

1    A.   I'm okay with that.

2    Q.   Okay.   So, December 23rd, 2009, the document that we saw,

3    there were no symptoms?

4    A.   If we are restricting it to that document, yes, there were

5    no symptoms.

6    Q.   Okay.   Because the note that you have doesn't indicate

7    whether it's that day he's hearing voices or had heard voices

8    in the past?

9    A.   Well, the note probably does, but my shorthand listing in

10   the report doesn't specify the details of that note.

11   Q.   Okay.   All right.   So, then we move on to -- you know, I

12   bet I do know.   I bet I do know where that is.   That's Exhibit

13   23, page 214 to 217.

14   A.   Do you want me to just pull the binder?

15   Q.   I'm sorry?

16   A.   Do you want me to pull the binder?

17   Q.   No, no, no, that's okay.   I've got it.   I've gotten to the

18   point I don't even open the binder anymore.   I just tear it

19   out.

20             So, this is Respondent's 23.   I'm starting at

21   page 212.   This is a different record from what we were just

22   looking at, but it's still December 23rd, 2009.   This one is

23   made at 4:33 in the afternoon, correct?

24   A.   Yes.

25   Q.   And the other document was made at 10:55 in the morning,

1  correct?

2  A.  Yes.

3  Q.  So, going back to page 212, which was the one you were

4  referring to -- page 214, today he reports, "I'm hearing voices

5  of my brother Michael who has been telling me to watch out for

6  everyone."  He states that everyone is out to get me.

7                  I'm hearing voices of my brother Michael.  That

8  seems to indicate that he is currently hearing the voice of his

9  brother Michael; is that right?

10  A.  That's not how I read it.  He's reporting today that he has

11  been hearing him.  I don't know if he's saying that that's

12  today or in the recent past.

13  Q.  Okay.  Just follow along with me.  Let's look.  "I'm

14  hearing," that's the gerund form of the verb, right?  I'm

15  busting out my English here.

16  A.  I appreciate your English.  That doesn't make it so though.

17  Q.  Okay.  So, at least what this person wrote is that he said,

18  "I'm hearing voices"?

19  A.  It says that today he reported that he's hearing voices.

20  It didn't say that he's reporting hearing voices today.  I

21  don't know.  I mean, in fairness, I don't know.

22  Q.  Okay.  So, we don't know.  So, is all of this irrelevant?

23  This is something that apparently was not very important to you

24  as you were deciding whether or not Mr. Eldridge was

25  malingering, because it doesn't seem to me like you decided to

1  parse whether on a particular day he was or was not having an

2  active psychotic moment or whether he was or was not

3  experiencing a reduction in symptoms?

4  A.  I'm not sure what the question was.

5  Q.  This doesn't appear to be something that was very important

6  to you as you were coming up with your opinion, because here I

7  have two documents from the same day a couple of hours apart

8  and you're not sure whether it meant that he was currently

9  hearing voices or had heard them in the past or wasn't hearing

10  them at all and it doesn't seem like you have resolved this,

11  but it doesn't seem like you're bothered by the inconsistency

12  either.

13  A.  None of those are questions.  I'm not sure what you want me

14  to respond to in that regard.  Are you --

15  Q.  Are you bothered by this?  Does this seem inconsistent to

16  you?

17  A.  I don't think it necessarily seems inconsistent, because I

18  can't tell from the record what it's referring to other than

19  the fact that he has made a report of hearing voices.

20  Q.  Okay.  So, basically we can't -- what's going to happen is

21  we're going to look at all these different documents from all

22  these different days and what's going to happen is that we're

23  never going to know whether the person meant that he was

24  actually hearing that voice on that day or maybe they meant

25  that he's reporting that he had heard the voices in the past?

1  A.  Well, we may not, but I can't be responsible for how

2  another professional documents.  If they said he was observed

3  to be or during our meeting he reported, then it becomes very

4  clear.  I can't be responsible for the ambiguity of the note.

5  I understand that that was reported at some point.  I don't

6  know at what point in time.

7  Q.  But don't you think it's important to track his symptoms?

8  Don't you think it's important that if you can't account for

9  the way that these documents are kept, doesn't that present to

10  you substantial problems with diagnosing this person?

11  A.  Well, of course, it does, which is one of the reasons that

12  tracking was done of when symptoms were reported and how much

13  of that was in the record.  The specificity of does this record

14  speak to something that happened today or at this particular

15  time is much more difficult.  I have nothing to go on other

16  than what the person reported and wrote.

17  Q.  So, don't we want to take what they wrote at face value?

18  A.  Sure, I'm willing to take it at face value.  The difficulty

19  is you're parsing the language and suggesting that because of

20  the particular part of speech, but I'm just looking at the

21  plain understanding of that phrase.  And all I know is that

22  today -- that's what it says, "today he reports."

23  Q.  Today he reports I'm hearing voices of my brother Michael?

24  A.  Right.

25  Q.  And to you that does not mean that he is saying that on

1  that day he is hearing voices?

2  A.  I don't know if he heard them the night before and he's

3  seeing this person and saying, "Hey, you know, since I've last

4  saw you, here's what's going on."  I have no context for that

5  in terms of when that phenomenon occurred for Mr. Eldridge.

6  Q.  Okay.  So, I'm going to skip going through all these

7  documents, because it's my understanding that it will be too

8  difficult to base any kind of chronological understanding of

9  when he seems to be experiencing a diminishment of his symptoms

10  and when he's experiencing more symptoms, because we're not

11  going to be able to rely on the wording in the documents; is

12  that right?

13          Did you do a chronological evaluation of when his

14  symptoms went up and down and up and down?

15  A.  I have a chronological.

16  Q.  Okay.  And that's what pages of your first report, or is

17  that the second report?

18  A.  That's always the big bugaboo.  They actually appear in

19  both places, but probably the more concise delineation is the

20  second report, on page 5, 6, and 7.

21  Q.  So, we were talking about the time period starting

22  November 24th, 2009?

23  A.  Yes.

24  Q.  And I'm looking at page 6 of your second report.  The

25  specific date we were talking about just now was December 23rd.

1   A.   Yes.

2   Q.   So, your way of phrasing this is "reported hearing voices."

3   But I don't see anything about the other page that we had just

4   looked at from 10:55 on December 23rd, where he doesn't say

5   anything about hearing voices, and there's no distress noted.

6   So, how did you decide to only write down the positive symptom

7   and decided not to write down the inconsistency with his

8   presentation on the same day?

9   A.   Well, in terms of that correlation, I wonder how many times

10  there are multiple records from a certain day, but it could be

11  easily argued that I have many more examples of where symptoms

12  were not reported within the record.   For example, symptoms

13  were not reported for whatever reason on 12-24 or 12-25, all

14  the way through January 6th.   So, whether there's a specific

15  report that wasn't there or not, I don't know.   But to write

16  every indication of every report and whether they said yes or

17  no to symptoms --

18  Q.   It gets tiring, doesn't it?

19  A.   It gets exhausting and probably unproductive.

20  Q.   Does this pattern of inconsistency in his symptoms play any

21  role in your evaluation of whether he was actually psychotic

22  and actually responding to the medication?

23  A.   It's very clear based on -- in my opinion, based on the

24  changes that were made in the medication, that his response was

25  inadequate.   It is very waxing and waning.   And to be able to

1  track whether he showed a specific response is difficult.  The

2  treatment team themselves not only increased dosage at several

3  points, but even changed from an atypical to a typical

4  antipsychotic, presumably -- now, again, the treating

5  psychiatrists would have to speak to this, in my estimation,

6  based on what I saw in the record, I assumed it was because of

7  the prominent existence of positive symptoms, such as delusions

8  and hallucinations that were continuing.

9          So, as I looked at the record, it appeared to me

10  that while he had some amelioration of symptoms over time, that

11  the positive symptoms were continuing, which was one of the

12  reasons for the change to chlorpromazine and ultimately to --

13  and I'll say Navane, because it's hard to pronounce the other

14  name.

15  Q.  So, if I understand you correctly, the varying pattern of

16  his symptoms, you find it more easily explained as waxing and

17  waning.  How did you decide that it was waxing and waning

18  versus the fatigue that a person who is malingering experiences

19  with the effort of trying to make up symptoms all the time and,

20  therefore, sometimes they just don't make up symptoms?

21  A.  Obviously that's a competing hypothesis.  In terms of what

22  was happening, this seemed completely consistent with what was

23  reported, the way he was being treated, the notations in the

24  record, including notations in the record that seemed to lead

25  to changes from the treatment team.  Again, we have only the

1  record to go on.  I didn't get to observe him throughout these
2  days.  So, within the available record, there was a significant
3  indication, based on the chronology I have here, of him
4  continuing to have active symptomatology.
5  Q.  And, again, that active symptomatology and the changes in
6  the medication that was prescribed seems to have been driven by
7  Mr. Eldridge's reports of positive symptoms?
8  A.  There are some reports where people talked about him
9  exhibiting behavior that might have been consistent with
10 observing a delusion or -- I'm sorry, observing a
11 hallucination, but, yes, primarily these were based on reports.
12 Q.  Okay.  I would like to change gears a little bit and talk
13 to you about the detection and documentation of malingering by
14 staff at TDCJ.  A couple of times in your report and just now,
15 it seems as though you are saying, look, these professionals
16 already diagnosed him as a schizophrenic.  And they're treating
17 him with medication as a schizophrenic.  So, he's a
18 schizophrenic and why are we arguing about this?
19          And I know that that's not a very fair
20 characterization, because I know you understand why we're here.
21 But it seems that a lot of your opinion relies on the fact that
22 somebody has already done this work and has already formed this
23 conclusion.  Is that fair to say?
24 A.  So, there are two things.  That is a part of it, that
25 people who are with him every day, people who are involved in

1   his care have formed that opinion based on a more direct and
2   more immediate feedback mechanism than I have available to me.
3   But in addition, there is evidence within the chart that is
4   consistent with the documentation of those things.  So, I think
5   there's great correspondence between the fact that they have
6   diagnosed him and are treating him and the things that I see
7   within the clinical record.  If they were treating him and all
8   of this stuff goes away, I wouldn't draw the same kinds of
9   conclusions.
10  Q.  Let's talk about the time period after Mr. Eldridge was
11  kicked out of Jester IV for malingering in 2006 --
12  A.  Yes.
13  Q.  -- 2001, I apologize.  What indication do you ever get from
14  the records that you reviewed that the staff ever considered
15  malingering as an option?  Was there anything ever written
16  anywhere about rule out malingering?
17  A.  Malingering is not a diagnosis per se.  So, I wouldn't
18  necessarily expect that they were going to be saying that.  I
19  don't recall that in the record.  I recall that they were
20  evaluating him because of the concerns of symptoms that he
21  presented.
22  Q.  So, leaving aside the issue of whether or not malingering
23  is a diagnosis, because it does have a diagnostic code in the
24  DSM --
25  A.  Well, it has a V code, and V codes are not diagnostic

1   codes.

2   Q.   Oh.   Basically what you're saying is that the staff that

3   treated him wasn't considering malingering, because they were

4   trying to treat him for symptoms that he had been reported as

5   having?

6   A.   I'm sorry.   You asked me if I recall anything in the record

7   that said, "Rule out malingering."   I'm saying that I didn't

8   recall it.   It may be there.   I don't recall it as I sit here.

9   There's no doubt in my mind that they were looking at the

10   question of whether he had bona fide symptoms or they felt the

11   symptoms didn't make sense.

12   Q.   And you base the lack of that, the fact that there's no

13   doubt in your mind that they did this on what?

14   A.   On the fact that as I understand it, he was put in there in

15   order to perform additional observation on him.

16   Q.   And what do you see in the records that indicates that they

17   even considered malingering as a possible explanation?

18   A.   There are a number of notes where they describe that he had

19   certain symptoms that they thought were not believable and that

20   ultimately they didn't think there was evidence of a mental

21   illness and that he didn't belong in that unit.

22   Q.   Okay.   That's from Dr. Woodrick and Dr. Joseph back in

23   2001.

24   A.   Right.

25   Q.   And, once again, I'm referring to his stay in Jester IV in

1  2009 and his more current presentation.

2  A.  I'm sorry.  I heard you say you were going back to Jester

3  in 2001.

4  Q.  Okay.  And maybe you misheard me.  I am not talking about

5  when he got kicked out of Jester for malingering.

6  A.  I'm sorry.  I thought that's what you specifically said you

7  were going back to.

8  Q.  Because obviously that would be what you would look at.

9  A.  Okay.

10  Q.  Talking about only the records that you reviewed --

11  A.  Yes.

12  Q.  -- from the time period after that, from when he was

13  admitted to Jester IV in 2009 --

14  A.  Yes.

15  Q.  -- and his mental health care afterwards --

16  A.  Yes.

17  Q.  -- even in Polunsky.  Where in the records do you see that

18  anybody considered malingering as a possible explanation for

19  his symptoms?

20  A.  Now, again, I'm struggling with dates.  We've looked at

21  some records where people have come up with malingering, but I

22  will admit that it was not an active phrase that was used

23  frequently throughout the records.

24  Q.  And I will encourage you, if you do think of a place or a

25  time when you think there might have been malingering

1   considered, I would love to hear it.  But if I represent to you

2   that it is not documented as something that they considered,

3   would that surprise you?

4   A.   There was testimony given to this effect in terms of the

5   issue of treatment.  I guess I make the presumption that if one

6   is going to treat an individual, that they presume that there

7   is some legitimacy to the complaints.  But in terms of formally

8   considering this to be malingering and doing formal evaluations

9   for malingering, yes, indeed, it appears to me that that wasn't

10  done.  But rarely has there been formal evaluation over that

11  period of time on this individual.

12  Q.   Would it be something you would take into account in your

13  forensic assessment to know whether or not the culture for

14  staff involved in Mr. Eldridge's treatment was -- whether or

15  not the staff was encouraged to consider malingering if facts

16  supported it?

17  A.   Yes, in the same way that I would take into account whether

18  I thought that they would find evidence of psychopathology to

19  be meaningful and worth considering, yes.

20  Q.   And yesterday you were here for Dr. Nathan's testimony,

21  that in previous years there was pressure on the staff to not

22  diagnose malingering out of concern that people that needed

23  treatment might not get the treatment they needed if

24  malingering was considered?

25  A.   I did hear the testimony, yes.

1  *Q.*  Okay.  Would it surprise you to know that there are some

2  staff members who still feel that malingering is not

3  appropriate for them to consider?

4  *A.*  It wouldn't surprise me to know that.

5  *Q.*  Okay.  Could that maybe be an explanation of why in some of

6  these records we're not seeing rule out malingering or even a

7  consideration that these inconsistent symptoms might be because

8  he's malingering?

9  *A.*  Well, it could be.  But, again, it becomes difficult,

10  because, there are earlier records prior to this period where

11  some of those things are indicated and even Dr. Nathan gave

12  evidence that that's no longer a concern that's being raised in

13  terms of not looking at that.  So, it's not like the records

14  have not had indications of malingering.  It's certainly

15  something that -- for which there is precedent.

16  *Q.*  Did you talk to any of the staff that was involved in

17  Mr. Eldridge's treatment or diagnosis?

18  *A.*  I did not.

19  *Q.*  Okay.  Would it surprise you to know that the staff,

20  meaning nurses and not necessarily the psychologists and the

21  psychiatrists, because, of course, they know what malingering

22  is, but staff, like, nurses or the med techs and the people

23  that make sure that they're staying in their cells, are not

24  trained about what malingering is?

25  *A.*  It wouldn't surprise me that they wouldn't necessarily know

1  what that word meant or what to do with it, but I suspect if

2  you said, you know, like if he's faking it, I suspect they

3  would know exactly what that means.

4  Q.  Okay.  Sure.  Because everybody knows what faking is?

5  Sure.  I mean --

6  A.  I suspect.

7  Q.  You would hope.  What about whether or not they're

8  encouraged to follow up on suspicions of faking or even if

9  they're encouraged to document it, would it surprise you if

10 they said, no, we're not encouraged, we're not supposed to

11 document it?

12 A.  It would surprise me, I think, if they said, no, we're not

13 supposed to document it.  The fact that they might say they're

14 not encouraged to document it, I wouldn't think they would be

15 necessarily encouraged to document something one way or

16 another.

17 Q.  Okay.  So, the fact that Mr. Eldridge was treated by Jester

18 IV and Polunsky doesn't necessarily mean that they decided he

19 wasn't malingering.  It couldn't have been because some of the

20 people that were on the front line, so to speak, who were

21 observing him in a day-to-day fashion, we don't know, but they

22 might not have been documenting things like that, right?

23 A.  That is certainly a possibility.

24 Q.  Okay.  One of the things that you said -- and I think I'm

25 going back to something we talked about a little earlier, but

1  one of the things that you said on direct examination was that

2  you were comparing his delusions when he changed location from

3  Jester to Polunsky and you said you would be more suspicious if

4  he had the same belief about the correctional officers

5  poisoning his food in both places.  Do you remember saying

6  that?

7  A.  I do remember saying that, yes.

8  Q.  Because if it is a fixed, circumscribed, specific delusion,

9  it couldn't be about the guards in general.  It would have to

10  be -- it would be too vague to be a true delusion.  Do you

11  remember saying that?

12  A.  I don't know if I said it couldn't be about the guards in

13  general.  It sort of could be, but the way that I've understood

14  his delusion to be, it wasn't about the guards.  It was about

15  that atmosphere, because it wasn't just the guards.

16  Q.  It was about who else?

17  A.  It was about inmates and gang members and there's this

18  entire conspiracy at the Polunsky unit.  So, because of the

19  specificity of that in terms of the actors and the location,

20  within the way that I conceptualize and think about delusions,

21  the way that I think that the literature supports looking at

22  delusions, yes, I maintain what I said, that it would be

23  suspicious if he went to Jester and was not feeling better

24  about eating.

25  Q.  Even though the document that we showed earlier, page 86

1  of, again, I believe it's Petitioner's Exhibit 8, that same

2  document said that he looked through his meat and found pills

3  in his meat in Jester IV?

4  A.  Right.  Well, it doesn't necessarily mean that one no

5  longer has it on their mind, the idea that it completely goes

6  away.  I mean, that would be an odd sort of thing.  It isn't

7  like slamming on the brakes.  But it is my understanding that

8  he wasn't having the same complaints.  Indeed, he was eating

9  when the transfer was made.

10  Q.  Is it culturally abnormal for an inmate on death row to

11  feel that guards and inmates and gang members communicate with

12  each other and work in concert to foster their goals?

13  A.  No, that's not an unusual belief.

14  Q.  Okay.  Because that's true, right?

15  A.  Certainly.

16  Q.  And we've all heard about gangs still existing in prison.

17  Just because they were arrested on the street doesn't mean they

18  abandon their gang membership?

19  A.  Yes.

20  Q.  And we talked earlier this morning about how it's

21  completely conceivable that a guard puts his thumb in the guy's

22  food by accident and then it snowballs into a taunting kind of

23  thing?

24  A.  Indeed.

25  Q.  So, there's plenty of logical, rational reasons that could

1  underlay Mr. Eldridge's irritation about his food being messed
2  with?
3  A.  There are certainly dimensions that could account for it,
4  yes, that's true.
5  Q.  Okay.  I want to talk about Respondent's Exhibit 29.  And
6  I'm specifically looking at pages 93 and 94.  This is a letter
7  from Mr. Eldridge, and it was written on May 3rd, 2010.  This
8  is a letter that you talked about during direct examination.  I
9  said May 3rd, but that's the date at the top.  This is --
10  A.  May 6th?
11  Q.  Yeah, I was talking about May 6th.  That's the letter where
12  he says, "Things are running through my mind.  I don't know if
13  I'm coming or going.  I'll tell you a little of what I see.  I
14  talk to you and let you see the nightmares."
15          You read that letter on the Elmo yesterday,
16  remember?
17  A.  If I recall correctly, that was in response to Jennifer?
18  Q.  Let me look.  It might be.  No, this is a letter to
19  Beatrice.  He writes the same letters to many different people?
20  A.  Yes, he does.  Yes, about going home.  Yes, I recall.
21  Q.  So, I'm looking at the top of that page, up here where it
22  says 5-3-2010.
23  A.  Yes.
24  Q.  "Today is just a day like all the other days.  Sitting here
25  looking out the window as time goes by.  As I look at the sun

1  run by, I do not let time do me.  I do time.  I am said

2  time" -- and maybe he means sad -- "I am sad time can run you

3  down.  I looking crazy just looking up one wall and down the

4  other wall.  Looking at bugs outside my cell window.  What a

5  bug's life.

6              "Also today I see a doctor, a good doctor.  He

7  said I am 200 pounds now, and this is a good thing.  All my

8  blood work came back okay."

9              This is, I think, the letter or one of the copies

10  of the letter where it was described as kind of a journal

11  thing?

12  A.  Yes.

13  Q.  He's describing what is going on for him on whatever day

14  presumably?

15  A.  Yes.

16  Q.  At the top of the letter, it says, "Inmates C. Ben, Jr.,

17  and Riles spelled words throughout this letter."  And you'd

18  agree with me that we see stuff like that at the top of so many

19  of his letters?

20  A.  Virtually all of them.

21  Q.  Yeah.  He always seems to give credit if somebody else

22  helped him with spelling.  Are you familiar with who Inmate

23  Riles is?

24  A.  I am not.

25  Q.  Would it surprise you to know that Riles -- obviously he's

1   another death row inmate?

2   A.   Yes.

3   Q.   Do you remember another letter by Mr. Eldridge in which he

4   references his attorney wanting to make sure that he doesn't

5   spend years here like Riles going through hell for 36 years on

6   death row?

7   A.   Yes, I do.   And now that you say that, I know who Riles is

8   in that context.

9   Q.   Okay.   I'm sure that we're going to look at that letter

10   later on.   But I'm wondering if you're also familiar because of

11   your forensic experience, if you're familiar with Riles' claim

12   about competency to be executed?

13   A.   I am not familiar with Riles' claim about competency to be

14   executed.

15   Q.   Well, then I'm going to describe a little bit about it and

16   you can tell me if it changes any of your perspective.   It

17   probably may not change it right now, but I'll ask you again at

18   the end when we've added a bunch of new things.

19            I would like you to take into consideration,

20   hypothetically speaking, that Inmate Riles has been on death

21   row for many, many years and is one of those people that is

22   alleged to be chemically competent and that every couple years

23   when he is due again for another psychological evaluation, he

24   stops taking his medication for a couple of weeks before the

25   evaluation and descends into madness and he is evaluated and

1  they decide he's not competent and then he starts taking his

2  medication again and goes along fine.

3               Would that be something you would want to know,

4  considering that apparently Mr. Eldridge has contact with him

5  and communication with him on death row?

6  A.  Do you mean would I want to know that with regard to

7  Eldridge's situation?

8  Q.  Uh-huh.

9  A.  I don't know how to respond to that.  Now that I know that,

10  I'm happy to know the fact.

11  Q.  It's kind of interesting, right?  Because it means that

12  Eldridge is having some kind of communication with a person who

13  may know something more than the average bear about the issue

14  of competency to be executed, right?

15  A.  Yes.

16  Q.  Okay.  Now, you remember that a lot of other mail refers to

17  Mr. Eldridge getting help from Inmate Jeff Wood?

18  A.  That I do recall, yes.

19  Q.  And I know you know who Jeff Wood is.

20  A.  I do know Jeff Wood, yes.

21  Q.  Jeff Wood knows more than the average bear or more than the

22  average death row bear about competency to be executed as well,

23  right?

24  A.  I don't know that I have an opinion on that.

25  Q.  Okay.

1   *A.*  But I will take your representation.

2   *Q.*  Okay.  But he at least knows what competency for execution

3   is all about?

4   *A.*  Certainly.

5   *Q.*  Okay.  So, one of the things that was interesting to me

6   about that letter that was talked about yesterday -- and this

7   is the one to Beatrice, but it's that same content.  This is

8   the next page.  "I do all kinds of things.  I have a good life,

9   and then the nightmares begin.  By some kind of way I'm here at

10  TDC Jester IV unit.  How did TDCJ get me here from my family?"

11              That theme happens a couple of times in his

12  letters, doesn't it?

13  *A.*  It does.

14  *Q.*  And you would agree with me that one of the issues that

15  came up in Mr. Wood's case, one of the issues the court focused

16  on -- let me ask, did you read the Court's opinion?

17  *A.*  I did read the Court's opinion.

18  *Q.*  Okay.  So, you know that Judge Garcia focused on his

19  opinion and Dr. Conroy's opinion about the believability of

20  Jeff Wood's delusions, because Jeff Wood's delusions did not

21  have any action that was in concert with them.  He didn't act,

22  to use contract terms, in reliance on his delusions.  You

23  understood that from that opinion, right?

24  *A.*  I understood this was a point that was made in the opinion,

25  yes.

1 *Q.* Yes. And, so, in fact, Judge Garcia mentions in his

2 opinion, based on Dr. Conroy's testimony in that case -- and

3 you heard Dr. Conroy's testimony?

4 *A.* I did.

5 *Q.* Okay. So, an important sticking point was Jeff Wood never

6 acted in reliance on his delusions. In fact, the judge says,

7 he didn't even write to his family. He had 1100 pages of

8 letters with his family and not once did Jeff Wood say, "And

9 there's this conspiracy between the judge and the district

10 attorney to see that I am put to death, because they're

11 correct," and that was a big deal in Jeff Wood's case, right?

12 *A.* That was a big deal in Jeff Wood's case.

13 *Q.* In the opinion, that there was no action in concert with

14 Jeff Wood's delusion?

15 *A.* I don't know how much you want me to speak to the Wood case

16 and my idea about the opinion, I mean.

17 *Q.* I just want you to answer that question. Do you understand

18 from that opinion and from Dr. Conroy's testimony in that case

19 and from your own knowledge, that there was no action by Jeff

20 Wood in concert with his delusion about this conspiracy, to the

21 point that there was nothing even mentioned in his letters?

22 *A.* This is the difficulty: From what I know about that case,

23 I don't think it's clear that there was no action in concert

24 with that opinion. But, yes, I completely agree, that this is

25 what was in Yogi's write-up of the case, yes, indeed.

1   *Q.*  Actually in Judge Orlando Garcia's write-up of the case,

2   right?  The opinion was by Judge Orlando Garcia?

3   *A.*  Yes, Judge Garcia signed the report, yes, indeed.  It was

4   issued by his court.

5   *Q.*  Okay.  So, the fact that -- so, now we do have references

6   to the delusions in the letters, don't we?

7   *A.*  Yes.

8   *Q.*  Okay.  One of the documents that was referenced during your

9   direct examination was Petitioner's Exhibit 8 at page 286.  And

10  that is dated December 12th, 2011.  It's from the Outpatient

11  Mental Health Services.  Does that look familiar?

12  *A.*  Yes.

13  *Q.*  I know it's kind of hard when it's just the basic detail of

14  it.

15  *A.*  There are so many documents.  Yes, it looks familiar.

16           *THE COURT:*  What page is this?

17           *MS. ODEN:*  This is Plaintiff's 8, page 286.

18           *THE COURT:*  2-8-6?

19           *MS. ODEN:*  2-8-6.

20           *THE COURT:*  Thank you.

21  BY MS. ODEN

22  *Q.*  So, I'm looking towards the bottom of the page and I notice

23  that at least on this date, this examiner said that he was

24  intact to person, place, time, and situation.  His appearance

25  was appropriate.  Hygiene well-kept.  Behavior cooperative.

1  Good eye contact.  Spontaneous, within normal limits rate and

2  volume of speech.

3              Then the next page, 287, his mood was dysphoric

4  and affect constricted, but sensorium was clear and his thought

5  process was coherent, logical, and goal directed.

6              So, on one hand, we have this letter that was

7  referred to -- I have the Beatrice copy, but during the direct

8  examination, it was to Jennifer, right, about sitting at the

9  table -- or it wasn't to Jennifer.  It was sitting at the table

10 with my wife and I was pulled from one setting to the other.

11 And here you have a mental health professional evaluating him

12 on the same day and aside from the dysphoric mood and the

13 constricted affect, everything else -- he's oriented; his

14 hygiene is good; his eye contact is good; his thought process

15 is coherent, logical, and goal directed.  That's an

16 inconsistency, right?

17 A.  That's an inconsistency.

18 Q.  Okay.  Is that a suspicious inconsistency for you?

19 A.  Again, if one is going to tabulate columns, it's something

20 where one might put in the column of saying, huh, that's

21 interesting.

22 Q.  Okay.  I want to ask you a hypothetical and help me,

23 because I'm not going to get it worded just right.  I want you

24 to imagine a hypothetical person who duplicates the content of

25 Mr. Eldridge's complaints.  And by content what I mean is the

1   things that he says he's experiencing.  So, this person

2   complains about hearing voices.  This person is on death row,

3   but they say that they're leaving death row to go home.  They

4   say that they're being poisoned by guards.

5   *A.*  Yes, I understand.

6   *Q.*  Okay.  How would that person present differently in a way

7   that made you know that they were malingering?  Same content,

8   but talk to me about the noncontent stuff.

9   *A.*  Obviously there are a number of ways one could answer that.

10  Among the things that would come to mind for me is that they

11  would be very invested in letting as many people as possible

12  know about that symptomatology as frequently as possible.

13  *Q.*  Okay.

14  *A.*  As we look at the circumstances in this case, timing, it

15  seems to me, would make a difference.  You mentioned the spike

16  after his stay of execution.  I would think it would be

17  relevant to have a spike before the stay of his execution,

18  would be something that I would look at and I would say, Wow,

19  that's interesting.  Suddenly he has all of these symptoms to

20  allow his lawyers to presumably make that argument.

21           I would expect that -- again, this is an

22  individual who's on very high doses of antipsychotic

23  medication, where we understand he's taking it with presumably

24  as much as 80 percent compliance, from yesterday's testimony.

25  This is some pretty powerful stuff.  I would expect that this

1   is an individual who would have far more negative affects on

2   that medication in terms of sedation or other kinds of things.

3   Q.  Let me stop you there and just inquire.  Why would a

4   malingerer be more physically affected by the medication than a

5   nonmalingerer?

6   A.  Because when we look at these psychoactive agents, the

7   whole premise of giving them is that there is an impairment in

8   the underlying neurochemical processes.  And by targeting these

9   medications, what we're doing is we're affecting particular

10  receptor sites.

11           So, in the same way that if you gave -- I mean,

12  if you will permit this, if you gave insulin to somebody who

13  isn't diabetic, this could have adverse consequences.  So, with

14  most medications, if a person does not actually have that

15  condition, if their underlying neurochemistry is normal and you

16  give them particularly the kinds of doses that Dr. Nathan

17  himself described as high dose medication, they typically would

18  show a greater degree of side effects, because it's, frankly,

19  too much of an impact on the system.

20  Q.  Because they weren't imbalanced to begin with?

21  A.  Right, that would be the presumption.  So, those are some

22  things that I would think about.  The idea that somebody is

23  taking this medication, maybe there's some evidence that

24  they're actually getting worse.  I mean, if you will -- and I

25  don't mean to do this as a direct point, counterpoint by any

1   means, but presumably having more negative symptoms than the

2   individual is showing, the idea being that all of a sudden

3   there are lots of indications of negative symptoms because they

4   are overmedicated, because obviously they didn't have the

5   condition to begin with.

6   Q.  So, you would expect more negative symptoms because they

7   are side effects of the medications?

8   A.  I would think that that would -- your question was what

9   would make me suspicious.  That would be something that I would

10  see that would make me think that that's an unusual finding.

11  Q.  Okay.  So, is that the list?  That's it?  That's --

12  A.  Well there are probably more things that I could add to

13  that list, but I don't know how much you want me to speculate

14  in a hypothetical.

15  Q.  Well, I mean, I'm just trying to get a picture so that I

16  can work backwards from that, the reason that Mr. Eldridge does

17  not appear to be a malingerer to you is the contrary of those

18  four things.  So, if I'm missing something, I want to know.

19  A.  But I'm not sure it's the contrary of those four things.

20  Because one also has to look at the data set in an active way.

21  You know, the great consistency or inconsistency trap is the

22  idea that if you're too consistent, obviously you've got to be

23  malingering presumably, because you've remembered your story.

24  And if you're too inconsistent, well, obviously that's an

25  unusual thing, too.  If the symptoms are too significant,

1   that's an indication of feigning.  If there aren't enough

2   symptoms, clearly one isn't feigning.

3   Q.  Well, let me ask about the inconsistency trap since we're

4   talking about it.  And I don't have that page out and I'm not

5   going to go through the book.  But that one sentence from that

6   one article, that doesn't mean that that particular chapter of

7   the book concludes that we're not supposed to address

8   inconsistency as a major element of diagnosing malingering?

9   A.  No, it doesn't conclude that at all.

10  Q.  In fact, that chapter and the whole book is pretty much

11  geared towards the opposite.  You do have to look at

12  inconsistency in presentation to evaluate malingering?

13  A.  That inconsistency is very important, yes, indeed.

14  Q.  Okay.  So, it is not the case that any time you appeal to

15  an inconsistency, you're setting up this no-win situation for

16  the poor inmate and you shouldn't look at inconsistency at all?

17  A.  No, I understand it is presented as a caution for the

18  evaluator rather than as a guideline that says inconsistency

19  should be ignored.

20  Q.  Okay.

21          THE COURT:  Before you launch into the rest of this

22  part of your examination, how much more do you think you

23  will -- how much longer do you think you will be?

24          MS. ODEN:  I could lie and say that I will get through

25  this in the next half an hour.

1    *THE COURT:*  How much longer --

2         *MS. ODEN:*  I didn't realize it was already 6:00.

3         *THE COURT:*  It's 5:00.

4         *MS. ODEN:*  Oh, it is?  Oh, I'm sorry.  I can't read

5    your clock.  I can probably finish in an hour and a half.  I'm

6    sorry.

7         *THE COURT:*  No, you're not.  It's pretty repetitious

8    for both of you.  You keep -- in the way the questions are

9    asked and the way the questions are answered, there's a lot of

10   repetition.  So, I think we could go a little bit faster, if at

11   all possible, in both question and answer.  Let's go till 5:35

12   and see where we are.

13        *MS. ODEN:*  Yes, ma'am.  Okay.

14   BY MS. ODEN

15   *Q.*  Let's talk about what happened during the week after you

16   showed Mr. Eldridge the photographs of Cynthia and Chirrsa.

17   *A.*  Yes.

18   *Q.*  This is -- so, you saw him February 9th, 2010, and again

19   sometime in the early part of May 2010; is that right?

20   *A.*  February 9th and May 7th of 2010.

21   *Q.*  May 7th.  Okay.

22   *A.*  I'm sorry.  May 17th.  I misspoke.

23   *Q.*  May 17th.  Okay.  So, what I'm looking at is

24   Petitioner's -- I believe it's Petitioner's Exhibit 8, page

25   131, and it's a document from the day after your evaluation,

1  May 18th, 2010?

2  *A.*  That's correct.

3  *Q.*  And this is the document that you talked about on direct,

4  where he says he keeps thinking about the pictures.  He doesn't

5  think he's been incarcerated for 20 years.  He's just been

6  going about his life.

7  *A.*  Yes.

8  *Q.*  But at that point in time, at least according to this

9  observer, it does not appear that he was going through an

10  active psychotic episode in that moment, does it?

11  *A.*  No, it does not.

12  *Q.*  Okay.  Page 133 from the same record, the same date,

13  May 18th, again, he's talking about, to a different person, he

14  had the visit from the lawyer, doctor.  He spent hours with

15  him.  "Something's messed up my head.  I didn't get any sleep

16  on it last night."

17            Wouldn't it seem that someone who dismisses these

18  photographs as just obviously not real, because I know that

19  Cynthia is alive, wouldn't they not be disturbed about the

20  pictures?

21  *A.*  I'm sorry.  Wouldn't they not be disturbed?  Do you mean

22  they would not be disturbed?  Is that how I understand that?

23            *THE COURT:*  Can you ask it so it's not a double

24  negative?

25            *MS. ODEN:*  I'm sorry.

1   BY MS. ODEN

2   *Q.*   If they were convinced that the person was alive, they

3   wouldn't have this reaction?

4   *A.*   I think they would have the reaction.   There's no reason to

5   believe that when you confront a delusion that they will

6   dismiss the evidence.   The evidence is that the delusion will

7   not go away.

8   *Q.*   So, the fact that he is upset by the content of the

9   pictures, what do you attribute that upsetness to, if anything?

10   *A.*   Well, I don't know for sure and I don't know how much to

11   gauge his upset, but they were very disturbing photographs.

12   *Q.*   And your position is he couldn't be upset by seeing them --

13   that upsetness could not be because he realizes I killed this

14   woman and her child and I caused this loss of life?

15   *A.*   No, it could be.

16   *Q.*   Okay.   We don't know?

17   *A.*   We don't know for sure.   My point about the delusion is, I

18   wouldn't expect it to stick if it's a true delusion.

19   *Q.*   You wouldn't except his upsetness to stick?

20   *A.*   His realization that, whoa, this is real, these people are

21   really dead, and obviously it had something to do with me, or

22   even these people are really dead.

23   *Q.*   Okay.

24         *THE COURT:*   Did he have doubts as to whether his

25   daughter was dead?   I don't recall that in the records.

1          THE WITNESS:  I only know of two places in the record

2     where he ever even makes a reference to the fact that he

3     acknowledges that somebody says that she's dead.  One occurs in

4     the competency hearing.  One is in Dr. Allen's evaluation.  I

5     don't know if he told Dr. Allen directly or not.  So, no, he

6     has never acknowledged that as far as I know outside of that.

7          THE COURT:  Does he visit his daughter or have her

8     visit him?

9          THE WITNESS:  No.  And his daughter is not biological.

10          THE COURT:  When he sees the pictures of the child,

11     the dead child --

12          THE WITNESS:  Right.

13          THE COURT:  -- that you showed him --

14          THE WITNESS:  Yes.

15          THE COURT:  -- was there a denial of her being dead?

16          THE WITNESS:  No, there wasn't.  And he said nothing

17     other than looking and suddenly passing them back, he spoke no

18     words regarding her specifically.

19          THE COURT:  All right.

20     BY MS. ODEN

21     Q.  I'm sorry.  He didn't say, "I guess it's true.  I guess I

22     must have did this"?

23     A.  No, he did.  He absolutely said that.  But with regard to

24     making a specific statement about Chirrsa, he did not say

25     anything about her specifically.

1          THE COURT:  That's pretty specific, isn't it.

2          THE WITNESS:  It is pretty specific.

3  BY MS. ODEN

4  Q.  You talked about whether delusions are typically

5  self-serving.  And I'm just wondering if we could talk again,

6  the three delusions that we're talking about in this case are

7  Cynthia is alive, I have a normal life outside the prison

8  walls, and the guards are poisoning me.  So, you said that the

9  guards are poisoning me delusion is not self-serving, because

10 it makes him lose weight?

11 A.  And not eat food.

12 Q.  Or it could make him not eat food?

13 A.  Right, absolutely.

14 Q.  Or it could just make him eat commissary food and share

15 food with other inmates, but that's aside from the point.

16          The other two delusions, Cynthia being alive is

17 pretty self-serving, wouldn't you agree?

18 A.  I don't dispute that.

19 Q.  It helps him on a legal basis and in a real life basis?

20 A.  And it seems to me that even if we presume that he has no

21 knowledge of the fact that it's helping him on that basis,

22 sure, the fact that somebody he knows is alive is more

23 consistent with something that is self-serving than something

24 that works against him, like a troubling delusion, yes.

25 Q.  Yeah.  Like, I believe the some of the questions that we

1  heard yesterday indicated, it could be a way to go to your
2  happy place and think about a better time in your life where
3  you had a relationship and you had a normal life and things
4  were good, and so that's much more pleasant than looking at the
5  wall and not letting time do you, you do time, right?
6  A.  Or thinking the CIA is out to get you or what have you,
7  yes.
8  Q.  Sure.  And the same thing could be said for his other
9  delusion, about living outside the prison walls?  It would
10  certainly be a much more pleasant way to spend your day --
11  A.  Certainly.
12  Q.  -- daydreaming about working as a pipefitter?
13  A.  Certainly.
14  Q.  Okay.  Does the concept -- the question originally was why
15  does he meekly accept prison, and your response was, you can't
16  use rational thought to understand an irrational thought
17  process.  But doesn't that just preclude any review whatsoever
18  of any hypothesis about whether or not he is malingering,
19  whether or nor he's schizophrenic?
20  A.  I mean, obviously one can't overly generalize that
21  position, because you're right.  If I were to stand on that
22  position alone, then we could never speculate on anything.  But
23  the point still has merit.  And we interpret pathological
24  phenomenon within a normal context, and that's fine.  That's
25  how we determine it's pathological.  But the minute we try to

1  get inside the head or the motivations of the person with the
2  pathology, that becomes a very slippery slope.
3  *Q.*  If he meekly accepts prison, doesn't that kind of undo the
4  idea that he would be acting in concert with his delusions?  I
5  mean, if he has a delusion that he is working as a welder, why
6  isn't he standing at the wall with his toothbrush and welding
7  the gap in the wall between the bricks?
8  *A.*  I think part of the issue is that one doesn't typically act
9  out -- actively act out their delusions or hallucinations.  I
10  don't think they -- I don't think they're necessarily going to
11  be actively engaged in that behavior.  But, yes, the issue of
12  why he isn't jumping up and down and raising more of a concern
13  about it, I don't have a great answer for that.  On the other
14  hand, how do you do that over 20 years?
15  *Q.*  What do you -- how do you deal with that time period of
16  transition maybe at the start of the day or at the end of the
17  day or whenever it happens, where he finds himself snatched
18  from his kitchen table and deposited, surely that time period
19  has to be one of great disorganization and confusion?
20  *A.*  One would assume so.  It's really difficult for me to know,
21  in interviewing him and looking through the record, is whether
22  it's like that, as if I'm sitting here and then suddenly I
23  experience myself to be somewhere else or whether it's more
24  like he wakes up and realizes that he's in prison and thinks,
25  again, not because he was dreaming, as I understand it, but

1  thinks, well, how did I get back to this place?  So, I don't

2  think how the logistics of that presumably work.  But, yeah, it

3  would seem like he would be disoriented.

4  *Q.*  We've talked about schizophrenia being a waxing and waning

5  illness, but doesn't it progressively get worse over time?

6  *A.*  It does tend to get worse over time, particularly without

7  treatment, yes.  I know of no research to suggest that it

8  simply goes into remission and abates.

9  *Q.*  Okay.  Kind of like when we were discussing earlier about

10  the delusional disorder, it doesn't usually just disappear on

11  its own?

12  *A.*  Right.

13  *Q.*  Back to talking about that actual report of his delusion,

14  about being at home and then suddenly moving to the prison, you

15  had said that it's not a combination of hallucinations, like a

16  tactile hallucination, a visual, and an audio, because it's

17  really just a delusion.  It's not an event that happens for

18  him.  It is a belief that this is how he's living?

19  *A.*  I don't think that he is having, as I understand it, that

20  he is having a perceptual phenomenon as he sits within that

21  room.  I believe that it is, if you will, a fantasy in his

22  head, as it were.

23  *Q.*  If it was a perceptual phenomenon, if you take him at his

24  word and he's describing suddenly being dragged or pulled, I

25  think are the verbs that he's used, that would be a combination

1   hallucination of tactile and visual events?

2   *A.*  The tactile would come in if he literally is reporting

3   feeling being dragged.  You know, I can feel them squeezing my

4   arms or something.  Because, again, if the sensory receptors

5   aren't activated, one presumably could deal with the idea of

6   being dragged because they see it or they've heard something

7   about it, but you would actually have to talk about the

8   feeling.  When people talk about tactile hallucinations, they

9   report physical sensations in their body.

10  *Q.*  And, so, tell me what it would sound like if he was

11  describing the physical sensation in his body of that change in

12  location against his will?

13  *A.*  For example, he might say something like, you know, and,

14  you know, they squeeze me so tight or, you know, I try to pull

15  away and they just, you know, they squeeze harder or, you know,

16  they're leaving bruises or something like this, that would

17  suggest that he is aware of activation of sensory receptors.

18  *Q.*  They're leaving bruises, wouldn't that be more of a visual

19  hallucination?

20  *A.*  Well, presumably one wouldn't actually see some sort of a

21  bruise there.  It would be more of an idea that he was

22  recognizing that there was some pain associated with it.  It

23  could be visual, absolutely.  The idea that here, look, see my

24  bruise and there is no bruise, it could be.  But I'm trying to

25  respond to your question about how he might experience it.

1  *Q.*  If he was experiencing it as being dragged or pulled and

2  seeing it and hearing it, that would be a very unusual

3  combination of hallucinations?

4  *A.*  Exceedingly unusual and potentially unheard of.

5  *Q.*  Okay.  And that would be very suspicious of malingering?

6  *A.*  Extremely suspicious because of it being a rare symptom

7  combination.

8  *Q.*  What does Mr. Eldridge's getting access to cocaine while he

9  is on death row, if that, in fact, is what the records

10 indicate, tell you about his understanding of the constraints

11 on his environment and his ability to, quote, "accurately

12 perceive, interpret, and/or respond appropriately to his

13 environment"?

14 *A.*  I'm not sure I understand the question with regard to him

15 getting cocaine, if that's what occurred.

16 *Q.*  Tell me if you agree with this:  If he is able to get an

17 illegal drug that's illegal outside of the prison system and

18 certainly difficult to get, one would hope, inside death row,

19 if he is able to negotiate whatever economic transaction as

20 well as security transaction, keeping it away from the guards

21 that are going to report you, finding which guard will sell it

22 or which inmate and actually conducting the physical exchange

23 without getting caught, what does that combination of things

24 tell you about his understanding of where he is and what is his

25 environment?

1  *A.*  So, we're speaking of a hypothetical, I trust?

2  *Q.*  Yeah.

3  *A.*  Sure.  So, again, people who are crazy aren't crazy 24/7,

4  but, indeed, that would be a very suspicious thing.  It would

5  suggest a much better ability to navigate the social and

6  physical environment and consider all sorts of things that we

7  would typically apply to somebody with a severe psychotic

8  disorder.  That would be highly suspicious behavior.

9  *Q.*  I don't know that we've ever really said this.  You've said

10  that a person's active psychotic episode can last for a very

11  wide-ranging amount of time.  Can you tell me again, like, for

12  example, what is the shortest active psychotic episode?

13  *A.*  Well, we recognize that in conditions, like, brief

14  psychotic disorders, for example, that one can have a psychotic

15  episode that typically can last a matter of days.  We know that

16  in people who are diagnosed with schizophrenia -- for example,

17  people I've treated in my own outpatient office, which might be

18  some of the more briefer experiences, it may literally be

19  something that's occurred over the space of a number of

20  seconds.  They may appear to be attending to internal stimuli,

21  as we describe it.  And you say to them, you know, "What's

22  going on" or, "What just happened," and they may do a double

23  take or a momentary pause and say "nothing" or they might say,

24  "I was talking to Fred," or whatever they might say about it.

25  *Q.*  So, the actual active psychotic episode is basically

1   defined by the length of time that the voice is speaking in
2   that example, Fred, whatever?
3   A.  Well, and, again, I'm assuming it's based on what I've
4   understood you to be saying in your questioning of me, in terms
5   of why are they not reporting more bizarre disorganized
6   nonintact behaviors with him.  And, yes, in that context, I
7   would say that's active.
8                    If you look at it from a diagnostic period, they
9   may have several weeks during which they're having active
10  symptoms.  They may have hour after hour after hour and more
11  severe presentations of hallucinations.  But it's also
12  conceivable that they're having, you know, a few episodes every
13  hour, they're lasting an hour, and they're not having them
14  during certain hours.  They can certainly be a lot more
15  inconsistent depending on the particular presentation.  It's
16  really quite heterogeneous depending on the type and the
17  severity of the symptomatology.
18  Q.  And how long would you say the longest reasonable -- and I
19  understand it's not going to be an exact number, but --
20  A.  Right.
21  Q.  -- the longest reasonably determined and genuine
22  hallucination would last?
23  A.  Right.  And, again, you know, I don't know for sure and, of
24  course, since when we see that, people are usually getting
25  medicated or whatever.  I think that a person might be having a

1  fairly active, fairly ongoing much more out of touch than in

2  touch maybe for a couple of weeks.

3  Q.  Okay.  So, you're talking that the hallucination lasts a

4  couple of weeks?

5  A.  A hallucination won't last that long, but the entire

6  constellation of disorganization and they may not be seeing or

7  hearing anything at that time, but they're certainly not

8  conducting affairs well and they're not necessarily taking care

9  of activities of daily living well, they're having trouble

10  negotiating their daily routines, that could last over the

11  space of a longer period of time.

12  Q.  Okay.  Then I'm not being clear.  What would you say is the

13  longest reasonable length that a genuine hallucination would

14  last?

15  A.  In that case, if I'm understanding that question, I would

16  say probably a matter of some hours.

17  Q.  Okay.  So, someone could hallucinate for a couple of hours

18  at a stretch?

19  A.  And I think that would be an outside measure, for a

20  continuous hallucination over a space of some hours.

21  Q.  Okay.  I have a couple of questions for you about the

22  specific things you did in your evaluation of Mr. Eldridge for

23  your first report.  In your first report you mentioned in the

24  list of tests that you administered or the measures that you

25  administered the SIRS-2?

1  A.   Yes.

2  Q.   Did you -- you never report the results of the SIRS-2 in

3  your first report.

4  A.   I did not.

5  Q.   Did you consider the results unimportant?

6  A.   No, I considered the results important.   One of the reasons

7  that I didn't include the SIRS-2 initially was because of some

8  of the concerns that I had raised about some of the language

9  and I wasn't sure whether I should put a lot of stock in the

10  results.   I will point out that the results were not consistent

11  with malingering.   And I thought that in being balanced, since

12  I had some concerns about the validity of the measure for him,

13  I reported it so that it was known that I gave it.   It didn't

14  make sense to spend a lot of time discussing a measure that I

15  thought was invalid.

16  Q.   Okay.   You didn't measure his effort with any formal test;

17  is that right?

18  A.   You mean in terms of cognitive?

19  Q.   No.   I'm just talking about effort.

20  A.   We measure effort all the time with every measure we give

21  neuropsychologically.

22  Q.   Okay.   But you didn't administer a specific test that

23  itself was designed to measure effort?

24  A.   Are you talking about a test of malingering that looks at

25  cognitive effort, is that what you're saying?

1   *Q.*  If that's how you're interpreting a test of effort, then,

2   yes.

3   *A.*  Okay.  No, I did not.

4   *Q.*  Okay.  You did subjectively assess his effort by saying

5   that he appeared to give his best effort and you believe that

6   the results are accurate?

7   *A.*  But it's more than that.  I did say that, yes.

8   *Q.*  Does that kind of assessment of effort give you an accurate

9   result, a subjective assessment, a visual, he looks like he's

10  trying, he seems like he's trying?  Does that give you --

11  *A.*  No.  No, that's not sufficient for guaranteeing adequate

12  effort or honest effort.

13  *Q.*  Okay.  Have you ever administered a formal assessment of

14  effort prior to this?

15  *A.*  There have been some occasions where I have, yes.

16  *Q.*  About how many times would you say you've administered a

17  formal assessment of effort?

18  *A.*  Probably not more than half a dozen where I've relied on a

19  formal effort assessment.

20  *Q.*  Okay.

21  *A.*  I'm not fond of formal effort assessments.

22  *Q.*  Okay.  When you administer a formal assessment of effort,

23  what do you use?  What do you think is up to the task of

24  assessing effort?

25  *A.*  Well, obviously there are some things currently that are

1  much more up to the task.  Most of the things that I've done

2  were quite some time ago and they involve things like the Rey

3  15-Item, which is not a good measure by any means.  Certainly

4  measures like the Test of Memory Malingering is a

5  well-respected measure.  A measure like the Victoria Symptom

6  Validity Test is a potentially respective measure.

7  Q.  Are you taking that the Victoria Symptom Validity Test is a

8  test of effort?

9  A.  No, it's not a test of effort.  I'm sorry.

10  Q.  Okay.  So, I just want to talk about tests of effort.

11  A.  All right.  Things like the Word Memory Test would be a

12  measure that could be a test of effort.

13  Q.  And have you ever used the Word Memory Test?

14  A.  I have not.

15  Q.  Do you use a test of effort currently?  I know you said

16  that in the past, a long time ago you had used a test of

17  effort, but --

18  A.  So, the neuropsychological literature has -- and I think

19  even in Rogers' book, talks about ways of using

20  neuropsychological test measures in order to look at aspects of

21  effort.  And this is a technology that is rather more applied

22  to neuropsychological measures than I've seen for any other

23  types of general cognitive measures.

24  Q.  So, you were relying on the -- what you believe to be the

25  effort scales or -- I might not be using the word correctly,

1  but --

2  A.   In essence, yes.

3  Q.   The tests that you had administered in your battery

4  contained effort measures?

5  A.   There are ways of interpreting the results in terms of

6  looking at whether there is a reason to suspect that you would

7  have to look in more detail at whether effort was an issue,

8  yes.

9  Q.   And which of the measures that you administered are

10  discussed in the literature and evaluated or assessed, whatever

11  word you want to use, for their accuracy in assessing effort in

12  a forensic context?

13  A.   Again, we're talking about the effort thing on the

14  cognitive side?

15  Q.   We're talking about the tests that you administered to

16  Mr. Eldridge in your first report.

17  A.   So, there -- often these things are things that are done in

18  combination, looking at different types of processes.  But one

19  thing that's discussed in the literature is repetitive response

20  in the Wisconsin Car Sorting Test.  There is some specific

21  literature speaking to that.

22  Q.   Literature speaking to the patterns of answers on that

23  test --

24  A.   Yes.

25  Q.   -- in a forensic setting?

1  A.   Yes.

2  Q.   What is the rate of sensitivity for the pattern that you're

3  discussing in the Wisconsin Card Sorting Test?

4  A.   Again, as I point to, the issue has to do with the question

5  much like with a screening measure, it has to do with the idea

6  of whether a red flag is seen and then looking at -- looking in

7  more detail to see whether there is evidence that there was an

8  effort-related issue, whether somebody is feigning or

9  malingering.

10           I am not aware of there being a specific

11  specificity, sensitivity, or hit rate that's discussed

12  within --

13  Q.   For the Wisconsin --

14  A.   -- within any of this particular -- any of these

15  methodologies.  They don't come up with a cut score.  It

16  doesn't use those types of techniques.  It is a different type

17  of measure for determining response set.

18  Q.   Okay.  The first time that you visited with Mr. Eldridge,

19  your report -- your first report mentions that Mr. Wilson came

20  with you to assist with rapport building?

21  A.   Yes.

22  Q.   And he stayed for some portions of your first meeting

23  together?

24  A.   Yes, he did.

25  Q.   About how long was he there with you?

1  *A.*  I don't remember what I said about how long my first
2  meeting was.
3  *Q.*  And I'm sorry, I don't either.  I believe on page 7 in your
4  third paragraph --
5  *A.*  I think that's exactly right.
6  *Q.*  -- it says you were there for two and a half hours?
7  *A.*  Right.
8  *Q.*  About how long was Mr. Wilson there for?
9  *A.*  So, of that two and a half hours -- and I don't remember if
10  he left the prison or not.  He may have.  But I would say that
11  he was probably there for maybe 45 minutes initially and then
12  he stepped away and I brought him back at another portion of
13  the interview.
14  *Q.*  And about how long for the second portion do you think he
15  was there?
16  *A.*  As best as I recall, he was probably sitting there for
17  about 30 minutes, maybe 20 minutes.  Again, my interaction was
18  primarily almost exclusively with Mr. Eldridge, but
19  occasionally I used that as an opportunity to engage with
20  Mr. Wilson in terms of maintaining rapport and getting some
21  information.
22  *Q.*  And to your understanding, Mr. Wilson has been on
23  Mr. Eldridge's case for many years and they have, I don't know
24  if you want to call it a friendship, but they have established
25  a comfortable, trusting relationship?

A.   Yes.   I don't know what to call it either, but, yes, I
think that's a good characterization.
Q.   Okay.   And, so, you would agree with me that this might be
the only time that Mr. Eldridge has had someone with whom he
has that kind of comfortable, trusting relationship introduce
him to a psychological professional and spend that kind of time
encouraging that kind of rapport?
A.   I don't know if it's the only time or not.
Q.   Okay.   To your knowledge, there hasn't been that kind of
interaction, for example, with any of the psychologists in
TDCJ?
A.   Certainly not to my knowledge, no.
Q.   Okay.   You're aware -- obviously you're aware that rapport
is important.   Are you aware of any ethical standards that talk
about things that outside parties can do to influence the
rapport in a negative way?   For example, are there any
standards for psychologists saying, "Don't poison the well for
the next psychologist that comes along," or anything like that?
I'm not saying that you did.
A.   Right.   Sure, there are.   And, you know, when it comes to
evaluations in particular, we look at that with regard to test
data and particular test measures, but it is something we want
to be sensitive to.   And, for example, having another
individual present during test administration, which sometimes
will occur, but it's something that is generally frowned upon

1    and we attempt to not do that.

2    Q.  Sure.  I would like to show you Respondent's Exhibit 47,

3    page 291, which is a letter from Mr. Eldridge dated June 6th,

4    2011.  And I'm sorry, when I was pulling this document out of

5    my binders, I didn't pull the first page of the letter.  So, I

6    don't know who this letter is to.

7                But do you recall the letter says, "The officers

8    came to my cell and asked me did I want a legal visit.  I'm

9    going to see Mr. Lee, but it is not Mr. Lee.  I see two women

10   attorney today 6-6-11 from Texas Defender Service outside of

11   Houston.  They talked to me about my case and told me the

12   doctor who worked for the State of Texas sent in his paperwork

13   on me.  The paperwork was very bad and in all, he said the

14   State of Texas can go ahead and kill me.  This is the same

15   doctor who do not like me and he had some bad things to said

16   about my family.  He do not know my family and my family have

17   not did anything to this doctor.  I will see Mr. Lee soon, and

18   I think I have to see a doctor again for my attorney."

19                You're familiar with that letter?

20   A.  I am familiar with that letter, yes.

21   Q.  Okay.  You can understand why getting news like that from

22   your attorneys, that a particular doctor has gone ahead and

23   said, "Go ahead and kill this person," can be exceptionally

24   damaging to any possible rapport that that doctor might have

25   with Mr. Eldridge again?

1  *A.*  Indeed, if that is something that is said, of course, that
2  would have damaging rapport.
3  *Q.*  Sure.  And, of course, we're not for sure that this letter
4  is accurate, right?  Mr. Eldridge could be deluded about this
5  event?
6  *A.*  Or lying or misunderstanding or any of a host of things,
7  certainly.
8  *Q.*  Right.  But based on what we see here, there obviously was
9  some kind of interaction that may have negatively affected his
10  willingness and, in fact, did negatively affect his willingness
11  to ever speak to that doctor again, right?
12  *A.*  There certainly is a concern sometime between these people
13  appearing and his belief that the attorney for the -- I'm
14  sorry, the psychologist for the State is not friendly to his
15  cause, yes.
16  *Q.*  And then he refused to see Dr. Allen?
17  *A.*  That is my understanding, yes, indeed.
18  *Q.*  Okay.
19  *A.*  Indeed, as I think you know, he made several comments
20  during my second evaluation regarding the visit and things that
21  he thought did or didn't happen.
22  *Q.*  I'm sorry.  You're talking about whether or not Dr. Allen
23  read --
24  *A.*  Right, comments that he made about Dr. Allen either did or
25  didn't do or said or didn't say and obviously one doesn't

1  respond to those things, because you don't want to poison the

2  well, exactly as you say --

3  Q.  Okay.

4  A.  -- you know.

5  Q.  Right.  Because that would be inappropriate?

6  A.  It would be totally inappropriate.

7  Q.  Of course.  And I didn't mean to imply --

8  A.  And nor did you.

9  Q.  Okay.  When you decided to do your limit testing on the

10  SIMS and the M-FAST that were administered, I believe you said

11  that you tried to ask the SIMS questions or the M-FAST

12  questions with exactly the same wording.  So, did you have the

13  word -- the questions written out?

14  A.  I did.  I did this before -- in fact, even before leaving

15  for my trip to -- yes, I saw him at Polunsky that last time,

16  because I wanted to be as comprehensive, objective, but also

17  aboveboard with him as possible.

18  Q.  And I believe you said that if it appeared that he didn't

19  understand the question only then would you rephrase or reword

20  it to try to get him to understand; is that right?

21  A.  Right.  And, again, it wasn't necessarily that I was

22  looking to explore the question.  I wanted to explore whether a

23  change in wording would make a difference.

24  Q.  Okay.  So, and I know we don't want to recite the entire

25  question, but can you look at your notes or at your report or

1  whatever document would have this --

2  A.  Sure.

3  Q.  -- and tell us what term or terms that Mr. Eldridge failed

4  to understand.

5  A.  I'm happy to do that.  I will tell you, it will take a bit,

6  because as I said, this was in the context of an interview, so

7  these things are truly embedded within and there are several

8  pages.

9  Q.  If you will tell me where you're looking --

10  A.  Sure.  It is Petitioner's 5.  The notes actually begin on

11  page 131, but the substantive portions of it are pages 134

12  through 152.

13  Q.  Did you circle the words that he didn't understand or --

14  A.  I didn't.

15  Q.  -- just rewrote the question as you rephrased it or --

16  A.  Well, to some degree it depends.  I mean, what I did is I

17  wrote out the questions in advance and then would fill in

18  answers as we went through.  And as much possible -- I mean,

19  obviously writing and trying to keep up with what he said

20  verbatim could be difficult, but as much as possible, I

21  attempted to give his response verbatim.  So, in a couple of

22  cases I might add something or I might have left out a question

23  that was initially on there, because it was no longer relevant.

24  So, I literally have to look through all of these notes to give

25  you the specific answer to those words.

1   *Q.*  I think that that might take a little while, so I'm not
2   going to ask you to do that right now.
3   *A.*  One example I can give, that it came up again yesterday,
4   was the idea of vision versus visual hallucination, that that
5   was an example --
6   *Q.*  Okay.
7   *A.*  -- of something that was difficult.  I think you know from
8   my testimony yesterday, that another thing that I'm worried
9   about is -- I'm sorry, it's on the SIRS.  I'm drawing a total
10  blank.
11  *Q.*  Unbearable?
12  *A.*  Unbearable.  Thank you very much.  I don't know why I
13  couldn't think of that word at this point in time, as I'm
14  undergoing cross-examination.
15  *Q.*  I would like to talk to you a little bit about your
16  reliance on the SIRS-2.  Are you familiar with the norming
17  studies that were done supporting the SIRS-2?
18  *A.*  Yes.  I'm not sure that I could quote them off the top of
19  my head, but, yes, I've --
20  *Q.*  All right.  Are you -- have you ever looked at the data
21  supporting the SIRS-2?
22  *A.*  Yes.
23  *Q.*  Okay.  Are you familiar with an article by a gentleman
24  named Gregory Declue?  He's a Ph.D. out of Sarasota, Florida,
25  and he wrote this article that's on the screen right now,

1  "Harry Potter and the Structured Interview of Reported

2  Symptoms" in the *Open Access Journal of Forensic Psychology*?

3  *A.*  I do not know this article, but it sounds like a wonderful

4  title.

5  *Q.*  So, I'm going to read some things from this article and ask

6  you if you knew of these arguments.

7            "Although prominent researchers generously made

8  SIRS data available for this SIRS-2 professional manual" -- and

9  then he's quoting Rogers -- "the test publisher has refused to

10  allow analysis of the data by independent professionals citing

11  trade secrets."

12            And then I move down.  "Prospective users of the

13  SIRS-2 might wish to know for the same sample how the SIRS-2

14  compares to the original SIRS regarding accuracy of

15  distinguishing between feigned versus genuine response patterns

16  and then regarding the number of protocols classified versus

17  deemed indeterminate.  That information is being withheld from

18  the public.  Unfortunately the SIRS-2 author's and publisher's

19  decision to hold data proprietary makes testimony based on the

20  SIRS-2 vulnerable to being ruled inadmissible in court.  That

21  problem could be remedied easily and promptly."

22            Were you aware of this argument against the

23  SIRS-2?

24  *A.*  I understand that there have been concerns about the fact

25  that in the revision that disclosure may not have been as

1  complete as certainly it is for most measures, yes.

2  Q.  I mean, it sounds like disclosure has not happened because

3  it's deemed proprietary data?

4  A.  Right, which is always troubling.  Test publishers very

5  commonly will provide their data sets.

6  Q.  So, basically there has been no peer review of the claims

7  to sensitivity and specificity made on behalf of the SIRS-2

8  because the data hasn't been retested independently?

9  A.  Well, at least not on the original data set, yes.  I mean,

10  there's certainly -- it hasn't been out all that long, but

11  there has been studies using the SIRS-2.  But, yes, indeed, in

12  terms of being able to reanalyze that original data, this is my

13  understanding, that as we speak, that hasn't been released.

14  Q.  Okay.  Well, not only has the data not been released, but

15  the studies that Rogers uses and that Pars, the publisher,

16  uses --

17  A.  Right.

18  Q.  -- to support using the SIRS-2, that data hasn't been

19  checked by anybody else?

20  A.  Right, exactly.  Yes.

21  Q.  Okay.  And if you can't cross validate or peer review

22  something, that's a problem in your profession, right?

23  A.  As you know, the manual includes information about those

24  findings, but, yes, it is typically the case that test

25  publishers will make that available in order for additional

1    analysis to be made and so forth.

2    Q.  You mentioned that the SIRS-2, it's obviously a revision

3    from the SIRS-1.

4    A.  Yes.

5    Q.  The SIRS-1 was based on a group of subjects, most of whom

6    came from a hospital, a private mental health hospital in the

7    Dallas area, right?  And the SIRS was having complaints -- or

8    there were complaints made about the SIRS not having accurate

9    sensitivity and specificity in certain contexts?

10   A.  Yes.

11   Q.  And, so, the publishers and Rogers decided to add new data

12   to the old data and basically retabulate it; is that right?

13   A.  As I understand the process, yes.

14   Q.  And part of the complaint that a lot of people in your

15   profession have with the SIRS-2, is that now instead of having

16   a certain number of known malingerers out of a data set, you

17   have that number out of a much greater data set?

18   A.  In a combined data set.

19   Q.  In a combined data set.  There were only, I think, 36

20   malingerers out of a total data set of 520 people; is that

21   right?

22   A.  I don't recall those numbers offhand.

23   Q.  Okay.  So, that didn't seem to bother you in your choice of

24   the SIRS-2 in this context?

25   A.  Well, one of the issues that you run into is that the

1  SIRS-2 is the type of measure that allows for a more direct
2  structured interview approach for being able to elicit data.
3  As you know, I had some other issues with the SIRS-2; and as
4  you've already pointed to, in my first report, I indicated that
5  I gave it, but I did not rely on it.  It's not something I
6  discussed.  I had a number of issues with the SIRS-2.
7  Q.  So, I guess what my question is, your issues with the
8  SIRS-2 were not related to it as an instrument, they were
9  related to wondering whether Mr. Eldridge performed accurately
10 on it in a way that revealed something about him?
11 A.  Right.  And those were my initial concerns about it, yes,
12 and the initial reason that I didn't include it.
13 Q.  And my question is, should you have used this at all to
14 begin with, because it has some other significant problems?
15 A.  I understand.  Right.  And I was not aware of the concerns
16 that we've just discussed at the time that I had initially
17 purchased the SIRS-2 and at the time I had initially seen him.
18 Q.  When did you purchase the SIRS-2 in relationship to this
19 case?  Was it before -- right before this case started?
20 A.  It was not long before, yes.
21 Q.  Okay.  And how many people have you used the SIRS-2 on?
22 A.  I have not used the SIRS-2 since that initial
23 administration.
24 Q.  So, when you used it on Mr. Eldridge, it was the first time
25 you had administered it?

1  *A.*  The first time that I had administered the SIRS-2; that is
2  correct.
3  *Q.*  I hope you didn't pay a lot of money for it.
4  *A.*  I hope I didn't pay a lot of money for it as well.  But I
5  always hope I don't pay a lot of money for things.
6  *Q.*  Did you see anything in Dr. Allen's report to indicate that
7  he was using the M-FAST or the SIMS or the TOMM as a
8  definitive, I'm hanging my hat on this test and this score
9  alone, or instead did you see them as data points that he
10  considered?
11  *A.*  No, I saw them as data points that he considered.
12  *Q.*  And, so, do you feel that that is an appropriate use of
13  screening tests and things like that?
14  *A.*  In terms of the way that he presented and administered and
15  interpreted those results, I felt that that was reasonably
16  portrayed.
17  *Q.*  But I understand that you think that Mr. Eldridge's
18  language difficulties are a primary problem with basically
19  administering any kind of testing, testing that isn't drawing
20  or mathematical in nature; is that right?
21  *A.*  That language-based concern could potentially invalidate
22  the understanding of some of those measures, yes.
23  *Q.*  If language is a problem for Mr. Eldridge, how can we ever
24  use anything that he says, take it at face value as data?
25  *A.*  Well, there are a lot of measures that we can give where

1  either language is not going to be a fundamental issue or where

2  you have the latitude to be able to translate or change the

3  wording.

4  Q.  Okay.  I'm not talking about administration of an

5  assessment device.

6  A.  Okay.

7  Q.  I'm just talking about if language for Eldridge is such a

8  problem, how can we ever use the things that he says, the

9  things that -- the things that he has said as data?  How can we

10 rely on or take it at face value what he says?

11 A.  Well, one could always question whether we can take

12 something somebody says at face value, but I think in terms of

13 his language ability, his expressive availability may not be

14 great, but it certainly is adequate for being able to function

15 and pragmatically get his points across.  He also understands

16 and comprehends people talking with him.  The issue has to do

17 more with his ability to deal with vocabulary, larger words, is

18 where I draw the distinction.

19 Q.  Well, but yesterday you talked about a situation in which

20 you decided to interpret his words differently than how he said

21 them.  He said something like I have -- I hear voices all the

22 time, and you decided that in that context, all the time must

23 mean the same thing as I got whoopins all the time.  Now,

24 logically we know his parents were not beating him 24 hours a

25 day, 7 days a week all his life.  So, we know that all the time

1  is an exaggeration.  It means frequently, as you said, correct?

2  A.  I believe that's right, yes.

3  Q.  And you decided, based on a number of examples that you

4  gave, that when Eldridge reports hearing voices all the time,

5  he has to mean frequently and not all the time?

6  A.  I don't know if he has to mean that.  I take it that that's

7  what he means, that he does not continually hear voices, nor is

8  that what the records suggests.

9  Q.  And you take it that way, because if he meant it genuinely,

10  that he -- if he really did say, "I hear voices all the time"

11  and meant to communicate that he is always hearing voices, that

12  would be completely ridiculous given --

13  A.  Yes, that's a blatant overreported symptom.  That would be

14  very ridiculous.

15  Q.  Okay.  And that would be inconsistent with what you see the

16  records revealing?

17  A.  And even with sitting with him for a few minutes and

18  interacting would be inconsistent, yes.

19  Q.  Okay.

20           THE COURT:  Is this a good time to see where we are?

21           MS. ODEN:  Yes, Your Honor.

22           THE COURT:  Where are we?

23           MS. ODEN:  I probably have another half an hour of

24  questions.  The last section that needs to be addressed is the

25  rational understanding, and that's it.  Do you have any

1    estimate as to the length of your redirect?

2              MS. FERRY:  I mean, I'm working here with sort of

3    scribbled notes, but I actually don't anticipate that it will

4    be terribly long.  I think --

5              THE COURT:  Can you be a little more precise?

6              MS. FERRY:  Well, let's say I'm thinking probably an

7    hour to hour and a half is my guess.  I mean, relatively long

8    obviously was relative.  But that's what I'm guessing, about an

9    hour to an hour and a half.

10             THE COURT:  Let's take about five to ten minutes.  I

11   would really like to finish your examination of Dr. Roman.  I'm

12   afraid that if we start fresh in the morning --

13             MS. ODEN:  It will go longer.

14             THE COURT:  Yeah, exactly.  And I do want to find out

15   a little bit more about -- were you able to confer about

16   scheduling?

17             MS. FERRY:  We were.  And May 20 and 21 is available

18   for all the parties.

19             MS. ODEN:  I believe May 20th is a Sunday.

20             MS. FERRY:  I'm sorry.  20th would be the travel day.

21   So, the 21st and 22nd.  You're exactly right.

22             THE COURT:  Okay.  I've got bad news.  I'm not

23   available.  So, let's try it again.  How about the 29th, the

24   following week, the 29th and 30th?

25             MS. ODEN:  That's fine with us.

1          MR. WIERCIOCH:  Is that the Memorial Day weekend, Your
2   Honor?

3          THE COURT:  It's the Tuesday afternoon.

4          MR. WIERCIOCH:  Okay.  I'm just anticipating flights
5   may be difficult at that time.  I don't know.  I'm just saying.

6          THE COURT:  They might be.

7          MS. ODEN:  And, Your Honor, I'm not trying to be
8   difficult, but my only concern is that the longer that we wait,
9   the more there may be any concern on the part of the petitioner
10  that the data on his mental status is stale.

11         THE COURT:  I appreciate the problem.  But check on
12  the flights, that's the best I can --

13         MR. WIERCIOCH:  Okay, Your Honor.

14         THE COURT:  -- to accommodate your travel needs,
15  that's the best I can do.  If the week of April 30 is not going
16  to work, that would be the alternative.

17         MS. FERRY:  So, May 29th.

18         THE COURT:  All right.  Very good.  Okay.  Thank you
19  very much.  We'll resume in about ten minutes.

20         (Recess from 5:54 p.m. to 6:04 p.m.)

21         THE COURT:  All right.  Are we ready?

22         MS. ODEN:  Yes, ma'am.

23         THE COURT:  Be seated.

24             Go ahead.

25                        CROSS-EXAMINATION

BY MS. ODEN

Q.  Part of the problem that you believe with Mr. Eldridge taking the SIMS is that if he took -- if he read the test himself or if one expects him to have read the test himself, his reading level is below fifth grade and so he can't be expected to have taken the test validly?

A.  Correct.

Q.  But you know from looking through the records, at least through reading the testimony at the Atkins hearing, that his reading level was actually measured at least 5.6 grade level, that was Dr. Hughes's report and the TDCJ records that were introduced at that hearing and were represented in that transcript.  Do you remember that, right?

A.  I've seen those records, yes.

Q.  Okay.  And you know Dr. Hughes testified that as a pipefitter's helper, he had to have a passive vocabulary of something like five to 6,000 words, based on the Department of Labor's dictionary of occupational titles?

A.  Yes.

Q.  You remember that.  And do you remember that even Dr. Averill in her testing said that he had at least a sixth grade reading level?

A.  Actually I don't recall that.

Q.  Okay.  So, if I told you that she testified to that effect on June 25th, 2007, page 130 and June 28, 2007, page 881, if

1  you wanted to or if we wanted to, we could go back and see that
2  that was her testimony?
3  A.  Yes.  I didn't disbelieve you.  I just did not recall that.
4  Q.  Okay.  So, do you disbelieve Dr. Averill then?
5  A.  No, I don't disbelieve Dr. Averill.
6  Q.  Okay.  So, at least we know he has a sixth grade reading
7  level and that should be enough?
8  A.  No, I disagree.
9  Q.  Okay.
10 A.  That's not the standard.
11 Q.  But I thought you said that you had to have a fifth grade
12 reading level to do the SIMS?
13 A.  The standard for evaluating an individual's reading level,
14 for better or worse, is based on their reading decoding and we
15 have multiple measures of reading decoding using, for example,
16 the Wide Range Achievement Test that scored him at a much lower
17 reading level.
18 Q.  And those test results are not valid, because we don't know
19 that he was exerting full effort when he did the test, right?
20 A.  It is a possibility that they could lack validity, but it
21 is still the standard that is used within the profession for
22 determining reading level.
23 Q.  Okay.  So, if other psychologists said that he read at an
24 eighth grade level or a sixth grade level based on their
25 evaluations, we would discount that because we have to look at

1    the WRAT score?

2    A.  No, it would depend on your measure of course.  We have to

3    look at a naturally normed standardized measure of word

4    recognition.

5    Q.  Okay.  So, the fact that he was reading the newspaper,

6    which according to Dr. Averill is written at at least a sixth

7    grade level, and was actually reading it, doesn't really

8    matter, because he could have been faking reading it?

9    A.  I guess it's possible he could have been faking reading it.

10   But, no, of course, those kinds of things matter.  If he is

11   actually reading the newspaper, that would be a data point.

12   Q.  Okay.  All right.  So, we've talked a little bit about data

13   points and vectors and evaluating consistency of evidence.

14   What criteria did you apply, if any, to evaluate these data

15   points in terms of malingering?  Are there criteria that you

16   use to determine if someone is malingering?

17   A.  Sure.

18   Q.  And what criteria are those?

19   A.  Well, there's a number of different criteria that have been

20   used overall.  Obviously in addition to the evaluation that I

21   conducted, I've had the opportunity of looking at the records

22   and have had the opportunity of looking at Dr. Allen's reports

23   and his own evaluations.  So, there is a wide range of

24   information that's been available in the final analysis.

25   Q.  But I'm talking about a criteria that tells you how to

1  interpret the data.

2  A.  The criteria in terms of how to interpret the data deals

3  with a number of these factors we've talked about.

4  Consistency, the question of whether the results appear to be

5  believable, the question of whether the weight of the data

6  suggests that there is validity to the symptoms and complaints

7  that are reported.

8  Q.  Do you apply Dr. Phillip Resnick's criteria on malingering?

9  A.  I do not necessarily specifically apply.

10  Q.  But you recognize that Dr. Phillip Resnick and his criteria

11  on malingering is pretty much the profession's gold standard?

12  A.  Very well respected.

13  Q.  And for reference, that criteria appears on page 64 of that

14  book?

15  A.  Yes.

16  Q.  But you did not apply this particular set of criteria?

17  A.  Well, in terms of the idea of this being a general set of

18  criteria that applies, I mean, I wouldn't say that I didn't

19  apply it here.  If you're saying did I specifically apply that

20  as my basis for interpreting the entire data set, no, I would

21  not say that I specifically applied that.

22  Q.  Okay.  Okay.  Your diagnosis in your first report was that

23  Mr. Eldridge has on Axis I, paranoid schizophrenia?

24  A.  Yes.

25  Q.  And, so, can we determine when that paranoid schizophrenia

1  began, when is the earliest time that he can be diagnosed as a

2  paranoid schizophrenic?

3  A.  Well, again, based on the existing documents, as we

4  discussed, in terms of looking at it at a point where I can say

5  with a reasonable degree of certainty based on the totality of

6  the results, I would put it back, understanding it may be

7  earlier, I would put it back to some period in 2009, the point

8  at which at a minimum there is also corroboration from the

9  people who work with him on a daily basis and are treating him,

10  that they saw sufficient evidence to warrant the diagnosis and

11  treatment.

12  Q.  Okay.

13  A.  I think there's evidence before that, but that's the

14  comfortable point to make the determination.

15  Q.  So, you think there's evidence before that, but you

16  testified earlier when we did that little chart that --

17  A.  Right.

18  Q.  -- you were comfortable diagnosing him in 2009 and not

19  before?

20  A.  Yes, that's accurate, absolutely.

21  Q.  Okay.  You also on Axis I diagnose him with a collection of

22  reading and written expression disorders.  They aren't really

23  relevant to his competency per se?

24  A.  No, I would agree with, that they are not directly relevant

25  to his competency.

Q.   Okay.   In your first report you diagnose him as having no
diagnosis on Axis II?

A.   That's correct.

Q.   And that is where in your second report, you give him a
diagnosis of antisocial personality?

A.   Yes, which should have also appeared in the first report.

Q.   Why did you omit that diagnosis in your first report?

A.   Two primary reasons.   In part, it was an oversight and when
I realized it, I corrected it.   But the other thing is actually
relatively consistent with the testimony we've already heard.
It isn't directly related to the question that was at hand, and
in terms of independently evaluating whether he met the
criteria for antisocial personality disorder, I didn't really
consider that.   Given the fact that he's an offender on death
row, it seems like a no-brainer that he has antisocial
personality disorder features, and I should have included it.
It just did not even occur to me.

          Frankly, my template that I use lists no
diagnosis on Axis II, because that's what's normally assigned
to most people; and, frankly, I never changed it in the
template as I wrote it.   I just did not think to make that
addition.   Obviously an oversight on my part.

Q.   The fact that he has antisocial personality disorder was
not something in the forefront of your mind as you considered
the data and weighed it in this case?

1   A.   It was not in the forefront of my mind for diagnostic

2   consideration.

3   Q.   Okay.

4   A.   I certainly agree and assume that he has an antisocial

5   personality disorder.

6   Q.   And would it be fair to say that even though you changed

7   your second report to include that diagnosis, it's still not in

8   the forefront of your mind as you sift through the data and

9   evaluate your opinion?

10  A.   Well, it has some relevance to the opinion, but in terms of

11  looking at it in terms of the final determination for this

12  Court, no, it's not in the forefront of my mind.

13  Q.   Okay.   I want to talk about -- so, we've talked about the

14  first prong of competency for execution, which is whether or

15  not he has schizophrenia?

16  A.   Yes.

17  Q.   And the second and third prong, whether it prevents him

18  from interfacing with reality and prevents him from connecting

19  the reason for crime and punishment, once again, I understand

20  that we can't really be inside his head, so we have to look at

21  his actions and his words and to some extent our understanding

22  of any biological or medical conditions that he has.   You know,

23  if someone's deaf, you know that they can't hear you, so you

24  know that it's not getting in?

25  A.   Yes.

1  *Q.*  Okay.  But you do concede that he is aware that he is in
2  prison for shooting and killing Cynthia?
3  *A.*  I concede that he has awareness he's in prison.  I concede
4  that he has an awareness that they tell him, as he says over
5  and over again, that this is why he's here.  So, he recognizes
6  it.  I don't know for certain that it's an awareness, an
7  independent awareness that he has.
8  *Q.*  He has a factual awareness, you said, based on -- because
9  of your personal evaluation with him -- sorry, your personal
10 assessment, some of his pen pal letters, and the medical
11 records, all those things together do reflect that he has this
12 factual awareness?
13 *A.*  Awareness of what exactly?
14 *Q.*  Awareness that he is in prison --
15 *A.*  Yes.
16 *Q.*  -- because of the capital murder conviction?
17 *A.*  Yes, I have no reason to dispute that.
18 *Q.*  Okay.  But you believe he does not have a rational
19 understanding of these facts, because when you asked him -- for
20 example, asked him about his trial, he seemed to have no
21 recollection of it?  He told you that he didn't remember that?
22 *A.*  He did say that, yes.
23 *Q.*  Okay.  He agreed with you that he must have had a trial?
24 *A.*  Yes, he did.
25 *Q.*  Because that's what made sense, because he's in prison?

1  *A.*  That's correct.

2  *Q.*  He seemed confused, but he explicitly told you that it does

3  make sense?

4  *A.*  Yes, he did.

5  *Q.*  So, I want to go through just a couple of his letters with

6  you that seem to me to talk about his awareness of the

7  situation.  And, again, what he says doesn't necessarily

8  correspond to what he thinks, but it's some window in there,

9  right?

10  *A.*  Yes.

11  *Q.*  So, I'm showing you -- first of all, do you remember we

12  just looked at a letter in which he said something like, "I do

13  time.  I don't let time do me"?

14  *A.*  I recall that, yes.

15  *Q.*  Okay.  In your forensic experience, have you had much

16  occasion to read much prisoner mail or is this the first time?

17  *A.*  No, I've actually read a significant amount of prisoner

18  mail.

19  *Q.*  So, have you heard phrases kind of like, "I do time.  I

20  don't let time do me," that kind of verbiage before?

21  *A.*  Things to that effect, yes.

22  *Q.*  Okay.  I'm looking at Respondent's Exhibit 27.  This is

23  page 34, just to show that this is a letter from Gerald to

24  Sophie.  And page 36 is dated --

25            *THE COURT:*  Is this petitioner's exhibit?

1          *MS. ODEN:*  No, I'm sorry.  This is respondent's

2     exhibit, Your Honor.

3          *THE COURT:*  Okay.  Thank you.

4          *MS. ODEN:*  Respondent's Exhibit 27.

5     BY MS. ODEN

6     *Q.*  So, this is page 36, and the letter is dated

7     April 21st, 2010.  I'm going to read from this and it's not --

8     I don't think I'm just reading the highlighted part.  Maybe I

9     am.

10              "I will get with my lawyer and see what I can do

11    on my end with the money to help us get ready for court.

12    Sophie asks can I receive photos.  Yes, I can receive photos.

13    This unit is not like that hellhole Polunsky unit."

14              So, obviously while he's writing this, he's in

15    Jester?

16    *A.*  Yes.

17    *Q.*  And then I am going to skip down.  "Inmate Riles is in the

18    cell next from me" -- I'm sorry -- "he's in the next cell from

19    me.  He have been going through hell here on death row for 36

20    years now.  36 years is a long time, and my lawyer is trying to

21    ask the courts now what to do with me and not years go by."

22              You're familiar with that letter, right?

23    *A.*  I am familiar with that letter.

24    *Q.*  Okay.  The next letter that I want to look at is

25    Respondent's Exhibit 33, and it starts on page 164.  And this

1  is a letter that Gerald writes to Barry Eldridge, to Mattie.

2  That's his mother.

3  A.  Yes.

4  Q.  Page 165.  It's very short.  It's dated 11-11-10.  It's cut

5  off at the top, but it says, "Mom, you're not on my inmate

6  visiting list.  You need to give me your address and you needs

7  a photo ID.  I have your address at Andrea and Dewberry."

8           And I flip it over, this is page 166, at the top

9  it says, "For your birthday I like to send you a little poem

10  that I have found for you.  From Gerald with a big hug."  The

11  poem is titled "Always Have a Dream."  And at the end, he

12  writes, "I have a dream to come home and give my lovely mother

13  a hug.  Happy birthday a lot more."

14           Doesn't that seem strange to send your mother a

15  card if you think that you are at home, to tell her that you're

16  dreaming or have a dream about coming home?

17  A.  Well, the dream part certainly comes off the title of the

18  poem that he's ostensibly selected to send to her.

19  Q.  Sure.

20  A.  I certainly agree that it's a concerning thing and short of

21  the double bookkeeping concept, which we've described, it's a

22  difficult thing to understand, if we presume that this is a

23  legitimate characterization that both things are true.

24  Q.  Okay.  So, we would have to assume that this card was

25  written when he was in the part of bookkeeping that had him

1   living on death row?

2   A.  By definition we would have to make that assumption.

3   Q.  Okay.

4   A.  Or the assumption you were attempting to make.

5   Q.  I'm looking at Respondent's Exhibit 34, page 189 and 190.

6   It's a letter to Beatrice, dated January 4th, 2011.  And like

7   you said, most of his letters start with, "Inmates J.W. and

8   others help spelled words throughout this letter"?

9   A.  Yes.

10  Q.  J.W. is probably Jeff Wood?

11  A.  I believe it probably is.

12  Q.  So, it's a long letter, but I did -- "I was not able to get

13  writing stuff, because I was heavily medicated.  I think so.

14  These people will not tell anyone about me going to another

15  place for security reasons."

16                We've read this letter before, right?

17  A.  We have.

18  Q.  This is the letter where he talks about I had problems, I

19  was in Jester IV, they drugged me up, et cetera.  At the bottom

20  is the part that I really want to focus on.  He says, "I never

21  snapped that I had" -- I'm turning over -- "a date of

22  execution.  I just went off and could not find my way back for

23  a while.  I am still here.  I would love to write you, also see

24  you, so we can catch up.  As to how you react, I cannot say.

25  People act different.  Some it makes them realize what life

1    really means.  Some they do not really care and go on to the

2    next man.  I hope it was not too much strain on you.  It's a

3    fact of where I am."

4                    So, if we're buying into the double bookkeeping

5    thing, at least on January 4th, 2011, he acknowledges that he's

6    on death row.

7    A.  He does seem to acknowledge that.

8    Q.  This letter, if you remember it, is talking about the

9    strain that it put on their relationship when she came to visit

10   him and he was actually in Jester IV, couldn't have told her

11   that he was going there, missed a visit, and it talks about

12   that change in a relationship when you realize this person is

13   going to die, it's a fact of where I am.  And some of these pen

14   pal ladies just go on to have the next pen pal, the next man?

15   A.  Yes.

16   Q.  But he hopes that she will continue her friendship with him

17   even though it's leading towards that strain of his death?

18                    There's another person that he writes -- and now

19   I'm looking at Respondent's Exhibit 35, page 221 and 222.  We

20   don't often see him writing to this gentleman from France,

21   Jean-Claude Sabatier?

22   A.  Right.

23   Q.  But this particular letter, dated February 1st, 2011 -- I

24   might be looking at the wrong letter.  Oh, I am.  I think I

25   am --

1  A.  This looks like it's to Beatrice.

2  Q.  Yeah, I'm sorry.  That was just for the envelope.  The next

3  page is 222.  It's dated February 10th, 2011.  And this is

4  different handwriting than we're used to seeing, isn't it?

5  A.  It is.

6  Q.  The letter reads:  "Greetings, I am writing this on behalf

7  of Michael.  My name is Jeff Wood, 999256."

8            And I'll stop there.  "999" is the start of any

9  death row inmate's number, right?

10  A.  Yes.

11  Q.  So, this appears to be from the Jeff Wood that's on death

12  row?

13  A.  I don't know if his number is 256, but...

14  Q.  It could be?

15  A.  Could be.

16  Q.  Okay.  I'll continue.  "I have known him for a while.  So

17  for as long as they leave us beside each other, I will help him

18  with his letters and questions."

19            So, there's a couple of weird things about this.

20  Number one, we have another inmate's handwriting.  So, it

21  actually is somebody else writing for Mr. Eldridge, right?

22  A.  It certainly does appear that way, yes.

23  Q.  And he's not writing it on behalf of Mr. Eldridge, is he?

24  A.  Right.

25  Q.  He's writing it on behalf of one of Mr. Eldridge's voices?

1   A.   Right.

2   Q.   Michael?

3   A.   That certainly is the name that goes with the voice he's

4   given, yes.

5   Q.   And we know that Jeff Wood has presumably a friendship in

6   which he helps him with his letters and he answers Eldridge's

7   questions?   Is that what you reasonably interpret from that

8   sentence?

9   A.   Yes.   I don't know how much he answers his questions, but,

10  yes, I understand they have that sort of a relationship.

11  Q.   They're next to each other and he's willing to help him

12  with letters and questions?

13  A.   At this point they were next to each other at least, yes.

14  Q.   Okay.   All right.   It's interesting that on the backside of

15  the letter, the same letter, page 223, Gerald finishes the

16  letter in his own handwriting, asks her for her phone number so

17  his sister can call her and says he's mailing the letter on

18  February 10th.   We have no idea why Jeff Wood was writing a

19  letter, do we?

20  A.   I have no idea whatsoever.

21  Q.   Okay.   But it's kind of interesting that we have Jeff Wood

22  suddenly jumping in the picture and writing a letter for one of

23  Mr. Eldridge voices?

24  A.   It was a very weird letter.

25  Q.   Uh-huh.   Would you consider that that might be actions in

1  concert with a delusion if your delusion was that you have

2  these voices that sometimes maybe take over your body or maybe

3  you have a multiple personality going on?

4  A.  No, the difficulty I have is he isn't writing it as another

5  person.

6  Q.  Right.

7  A.  Somebody is writing it for him.  So, it's difficult to know

8  what to do with that.

9  Q.  Yeah.  That's weird, right?

10 A.  It's very weird.

11 Q.  Maybe if Michael was a disembodied voice, he wouldn't have

12 hands to write and so Michael convinces somehow Jeff Wood to

13 get involved, but you would have to come up with some pretty

14 reaching explanation for this, right?

15 A.  It would be a very bizarre reaching explanation.

16 Q.  Right.  But at some level, it is an action that might be

17 considered consistent with a delusion?

18 A.  I mean, I guess it could be.  I didn't think about it that

19 way.

20 Q.  Okay.  Okay.  I want to talk about a letter that he wrote

21 on May 11th.  This is Respondent's Exhibit 46, page 272.  It's

22 to Sophie.  And in that letter, on page 272, he says, "Being in

23 this cell is not living.  It is like being a dog.  You come

24 into my life and you take me outside these walls, so I can be a

25 man, a person, so I can have a life, so I can be free.  I just

1  wish these voices would get out of my head."

2          It seems like he is acknowledging at the same

3  time, assuming that he wrote these sentences close in time

4  together, that he is in a cell, that he can leave the cell by

5  having this communication with Sophie, by going into another

6  place in his mind, so that he can be free, and he knows that he

7  has voices inside his head.  Isn't that what this seems to say?

8  A.  I certainly agree with that first and second part.  I don't

9  know about that second part about this place that he goes in

10 his mind.  But I certainly see a reference to that.  Yes, I

11 understand why you draw the conclusion.

12 Q.  Okay.  Otherwise, we've never heard any reference anywhere

13 at any time that Mr. Eldridge has a delusion that a woman named

14 Sophie in Switzerland actually takes him physically outside of

15 this --

16 A.  No, we've never heard that.  That's never appeared.

17 Q.  Right.  So, in this letter that does seem to be

18 allegorical?

19 A.  Certainly.

20 Q.  Okay.

21 A.  And it's also somewhat different language in many of his

22 other letters.

23 Q.  Right.  Right.  So, did it matter to your opinion that he

24 got the disciplinary for climbing up the bars in the day room

25 and passing a letter?  There was some conversation about that

1  yesterday, whether he acknowledged that that was him

2  personally, right?

3  A.  Right.

4  Q.  What effect do you think prison procedures, like getting a

5  disciplinary for violating a rule, mean about his connection to

6  reality?

7  A.  The fact that he got the disciplinary action or his

8  response to having gotten it?  I don't know how you mean that.

9  Q.  What did he get to the disciplinary.  In this case I'm

10  looking at Respondent's Exhibit 43, page 2.  This is his

11  disciplinary for June 18th, 2011.  He made an unauthorized

12  transfer to Offender Rocha, Felix by climbing day room bars and

13  passing a letter on a string to 42 cell.

14              So, I'm asking, does the nature of what he's

15  getting the disciplinary for tell you anything about his

16  rational understanding of where he is?

17  A.  I understand the question.  I'm not sure what to do with

18  it.

19  Q.  You do understand the question?  Does he rationally

20  understand --

21  A.  That he's in prison.

22  Q.  -- where he is if he's claiming bars in a day room and

23  taking a string and tossing a note to another cell?

24  A.  He obviously has an awareness of the fact that he's in

25  prison.  I have no idea what the predicate is of how he's

passing notes or what the note is about or what sort of thing
is going on or if this was some bizarre kind of thing that he
did, although, frankly, there's nothing else in the record to
suggest this kind of bizarre behavior.

I don't know what to do with it.  On the face of
it, it certainly does seem like he's trying to pass notes in
class, as it were, but I'm also not aware of other indications
that he's engaged in this kind of behavior.  It's anomalous.

Q.  Okay.  He had a hearing -- if you look further down on the
page, he had a hearing about this on June 26, 2011.  And the
offender's statement that he made was, "That since I didn't get
a case in a couple of years and nobody verbally told me not to,
I wouldn't have done it."

And you see that the only punishment he got was a
verbal reprimand?

A.  Uh-huh.

Q.  So, this wasn't a really serious deal, but at least as far
as this document goes, he acknowledges that he's been there for
a couple of years?

A.  Right.

Q.  And there's rules, but there's ways to get around the rules
and that's what he did.  It's just a data point.  You can't do
anything with it is what I understood.

A.  Or it is possible that this demonstrates that he has some
degree of rational understanding that he is in a prison unit.

1    *Q.*   Okay.

2    *A.*   I mean, I see your point about that.  I don't know what to

3    make of the offense specifically in climbing the bars.  It's

4    weird and anomalous behavior, but --

5    *Q.*   But it's the kind of thing that indicates I'm in prison?

6    *A.*   Yeah.

7    *Q.*   So, maybe he doesn't have a rational understanding of why

8    he's in prison, but he rationally understands that he's in

9    prison?

10   *A.*   He certainly seems to have an appreciation of the fact that

11   he's in prison.

12   *Q.*   Okay.

13   *A.*   Yes.

14   *Q.*   Okay.  Does the fact that he writes about, I don't know,

15   other activities that he does in prison, like working out or

16   developing friendships or getting out of his cell, is that

17   relevant to your consideration?

18   *A.*   It is relevant.  He doesn't seem to say as much about that.

19   *Q.*   Okay.  I'm looking at Respondent's Exhibit 59, page 307.

20   This is a letter to Beatrice.

21   *A.*   Uh-huh.

22   *Q.*   And it's dated September 16th, 2011, and September 17th.

23   First, he talks about how Jeff Wood used to help him with his

24   letters --

25   *A.*   Right.

1   *Q.*   -- but he just got moved to another pod.  So, this guy

2   named Ross is going to help him with his letters?

3   *A.*   Right.

4   *Q.*   And then the next section, I don't get out of my cell, but

5   Ross talked him into going and working out in the day room.

6   So, he does jumping jacks and push-ups, and working out makes

7   him feel better?

8   *A.*   I hadn't recalled any of the references to that other than

9   that one, which I certainly do recall this letter, yes.

10  *Q.*   So, at least in some respects, he understands that he

11  doesn't get outside of his cell and he's developing this

12  friendship, and at least it's moderately interesting that Jeff

13  Wood is no longer next to him after September 16th?

14  *A.*   Yes.

15  *Q.*   But none of this indicates to you that he rationally

16  understands his place in the world?  He may be factually aware

17  of it, but he doesn't understand it?

18  *A.*   I can't exclude the fact that he may have a rational

19  awareness to the fact that he's in prison.  I mean, again, it's

20  clear that there are times that I believe that he does not have

21  that rational understanding, because by definition he has a

22  delusion that he travels outside the prison system.  The fact

23  that, you know, how one survives all these years in prisons and

24  has meals and all these other things without having some degree

25  of a rational understanding and ability to interface with that

1  environment.  So, I do believe that it is entirely conceivable

2  that he is aware of and can rationally understand at times,

3  maybe even a majority of the time.  I don't know.

4  Q.  Okay.  So, let me ask you this then:  If what we're talking

5  about here is that for this section of time, whatever that

6  is --

7  A.  Yes.

8  Q.  -- he does have a rational understanding of who he is,

9  where he is, and then at other times when his disease is

10  active, he does not have a rational understanding, would you

11  then agree that it maybe is the case that when he rationally

12  understands where he is, he rationally understands why he's

13  there, and then maybe the argument is that at other times it's

14  spotty, he doesn't?

15  A.  It wouldn't be my explanation, no.  We know that he has

16  generally been oriented to place.  It's orientation to time

17  that people have questioned.  He generally will report

18  accurately where he is.  It's an assumption on my part, of

19  course, but given that he knows where he is, I suspect that he

20  has a rational understanding of at least the basic rules, the

21  basic way that one navigates that environment.  We've seen that

22  in some of the forms that he's filled out and so on.  I don't

23  know that that translates to a rational -- a rational

24  understanding of why he's there.

25  Q.  So, that's the link that he doesn't have?  He knows where

1  he is.  He just apparently does not understand why he's there?

2  A.  It's the link that I infer that he doesn't have, yes, based

3  on my examination of the records and the evaluation and so

4  forth, yes.

5  Q.  So, when we talk about his three original delusions --

6  well, I say original --

7  A.  I understand.

8  Q.  -- but the three delusions relevant here, Cynthia is alive,

9  I live outside the prison, and my food is being poisoned, the

10  food is being poisoned, we understand doesn't really have any

11  relationship to the understanding of why he is in prison,

12  correct?

13  A.  Right.  I think that's stated correctly, yes.

14  Q.  It's only the Cynthia is alive and I can live outside the

15  prison things that interfere with his ability to understand why

16  he's in prison?

17  A.  That are manifestations of my conclusion that he doesn't

18  have an understanding of why he's in prison.

19  Q.  So, those are the self-serving delusions, those are the

20  ones that -- those are the ones that advance his goal of

21  continuing to live, if you want to think of it that way?

22  A.  To the extent that we look at them as self-serving in that

23  capacity, yes, that's accurately stated.

24  Q.  Okay.  So, if I understand the summary correctly --

25  A.  If I may?  I'm not purporting that the delusions cause him

1    to not have an understanding.  I'm purporting that his lack of

2    a rational understanding is what triggers and creates the

3    delusional system.

4    Q.  I'm sorry.  Say that again.

5    A.  If a person has delusions and those delusions indicate a

6    lack of understanding, that smacks a great deal of the idea of

7    somebody who might be malingering.  You concoct this story.

8    You have these symptoms.  These symptoms give you a proverbial

9    get-out-of-jail-free card.  What I'm suggesting is that his

10   psychopathology, his lack of awareness, his internal mental

11   state, the very thing that causes the lack of rational

12   understanding and that lack of rational link is the very thing

13   that creates and drives the delusions.  It doesn't go in the

14   other direction.  The core of it is the pathology, the lack of

15   rational understanding.

16   Q.  Okay.  So, what I understand that to mean is, it would not

17   be possible for him to be both, have this pathology and be

18   competent for execution, because with this pathology, he would

19   not be capable of understanding the link between crime and

20   punishment?

21   A.  With the way that his pathology manifests, I would agree

22   with that statement.

23   Q.  Okay.

24   A.  Obviously one could have the same diagnosis manifesting in

25   a different way and still get the criteria for competence, yes.

1   Yes.

2   Q.   Okay.   In Mr. Eldridge's case, they are mutually exclusive?

3   He cannot be both his kind of schizophrenic and competent to be

4   executed?

5   A.   This is my contention, yes.

6   Q.   Okay.   So, basically what we have here is Mr. Eldridge is

7   an antisocial personality and -- I guess I'm still not clear,

8   does he know that he killed Cynthia?   We don't know what he

9   knows?

10   A.   We don't know what he knows.   We know that he knows that

11   people say that he's there because he killed Cynthia, and

12   that's been a consistent statement he's made over the years.

13   One can make of that what they will, but that's been a very

14   consistent report.

15        THE COURT:   Is it fair to say that he understands the

16   meaning of those words?

17        THE WITNESS:   He does understand the meaning of those

18   words, Your Honor.

19        THE COURT:   He has at least from time to time a belief

20   that Cynthia is still alive?

21        THE WITNESS:   Yes.

22        THE COURT:   Okay.   But he doesn't attempt to reconcile

23   that with the fact that he knows and understands that people

24   are telling him that he's in prison because he killed Cynthia?

25        THE WITNESS:   With the one single exception that he

1  has made some statements of, I don't know why they don't call

2  her, I can give them her number, those kinds of things, yes, he

3  does not attempt to reconcile that.

4          THE COURT:  And there's no evidence of a similar

5  denial of killing the daughter?

6          THE WITNESS:  Right, I think that's accurately stated.

7          THE COURT:  So, he acknowledges that?

8          THE WITNESS:  No, he, to my understanding, has never,

9  other than that one statement, has ever acknowledged that he

10 has killed her or that he believes that she's dead.

11         THE COURT:  He acknowledged that in that one statement

12 at least?

13         THE WITNESS:  Yes, I forget how the statement was

14 written.  I don't know if he agreed with it -- yes, he

15 acknowledged it by way of agreement, yes.

16 BY MS. ODEN

17 Q.  And we've agreed he knows he's on death row, not just in

18 prison, but he's specifically on death row?

19 A.  He certainly has that awareness.  That certainly comes up

20 in his writings.

21 Q.  And he knows that this particular proceeding determines

22 basically whether he lives or dies?

23 A.  I don't know if he knows that.

24 Q.  Okay.  He writes in a letter that he was told that the

25 State's expert said the State of Texas can go ahead and kill

1   him?

2   A.   Right.   He himself has said that when pressed on it, that

3   the State can do what it wants to do.

4   Q.   Right.   But specifically talking about this about this

5   proceeding --

6   A.   Yes.

7   Q.   -- he wrote in that letter, that Dr. Allen told the State

8   that it could go ahead and kill Mr. Eldridge?

9   A.   Right.   Yes, I know he wrote that.   I just don't know if he

10  understands that this proceeding, the thing that we're doing

11  today, this whole event --

12  Q.   Okay.

13  A.   -- I just don't know one way or another.

14  Q.   He knows that cooperating with you is helpful for him?

15  A.   I don't know if he does or not.   I don't know if he has any

16  idea what my opinion is.   I don't know that I've ever shared it

17  with him at any point.   What I know he knows is that his prior

18  attorney, current attorney, friend, Mr. Lee Wilson, has said,

19  "Do what this guy says."

20  Q.   And you know that Mr. Eldridge knows that because you were

21  there when Lee Wilson told him that?

22  A.   Yes.   I was there when Lee Wilson introduced us and said,

23  "He's going to ask you some questions, and I want you to do

24  your best," yes.

25  Q.   And presumably Mr. Eldridge understands what Mr. Wilson

1  said to him?

2  A.  I presume that he did, yes.

3  Q.  He's not just factually aware of it, he understands it?

4  A.  Insofar as that I'm there and going to ask questions and he

5  should answer those questions, yes, I think he understands

6  that.  I don't know if he understands the significance or my

7  purpose in being there.

8  Q.  And he acted as though he understood Mr. Wilson's words,

9  because he proceeded to engage with you over many hours that

10 day and other days of testing and of assessment?

11 A.  He did.  Of course, it's very structured time by and large

12 and he was through, but, yes, yes, he did.

13 Q.  Mr. Eldridge was present during the competency hearings

14 that were held before his trial on capital murder --

15 A.  Yes.

16 Q.  -- except for the portion of time when he was made to leave

17 because he was acting out?

18 A.  Right.

19 Q.  And Mr. Eldridge was present during the mental retardation

20 hearing in this court years ago?

21 A.  That's my understanding, yes.  The Atkins hearing?

22 Q.  Yes.

23 A.  Yes.

24 Q.  And Mr. Eldridge is neighbors or was neighbors with Inmates

25 Riles and Jeff Wood?

1   A.   Yes, that's my understanding.

2   Q.   And had some kind of communication with both of them?

3   A.   It appears that way, yes, indeed.

4   Q.   And I guess I just want to finish up with asking you about

5   Mr. Wood again just real quickly.  Mr. Wood's case is the case

6   where you learned -- or it was part of the case, that kind of

7   like Mr. Eldridge, an inmate who has factual awareness but who

8   doesn't appear to willingly understand what they're aware of or

9   doesn't accept what facts they're made aware of, was found

10  competent to be executed, in part because he failed to act on

11  the alleged delusions that he had, right?

12  A.   I'm not sure I understand what the question is.

13  Q.   Wood versus -- I'm going slowly, partly to try to make sure

14  you understand.

15  A.   No, I appreciate that.  I just don't understand what your

16  question to me is about that.

17  Q.   Yes Wood's case --

18  A.   Yes.

19  Q.   -- was the case that helped you to see -- it was your first

20  competency to be executed case.  So, it was a case that helped

21  instruct you that a similar inmate, an inmate who had a factual

22  awareness of where he was and why he was there -- you would

23  agree with me Jeff Wood had a factual awareness, because people

24  told him you are on death row and you are going to be executed

25  for this crime?

1  A.  I would agree with you that Jeff Wood had a factual

2  awareness.

3  Q.  Okay.  So, in that respect, Mr. Eldridge and Mr. Wood are

4  similar?  They both have a factual awareness?

5  A.  They both have a factual awareness, yes.

6  Q.  Okay.  And Mr. Wood was found to be competent to be

7  executed even though, in your opinion, he did not have a

8  rational understanding of that factual awareness; is that

9  right?

10  A.  That is a true statement, yes.

11  Q.  And, so, even though he didn't willingly accept the facts

12  that he was aware of, Mr. Wood said, "That's what everybody

13  says I'm here for, but I don't buy it," he was still competent

14  to be executed, correct, the court said?

15  A.  Yes, that's correct.

16  Q.  And one of the reasons that they found a link between his

17  factual awareness and his rational understanding was that there

18  were no actions on the part of Mr. Wood in concert with or to

19  demonstrate his delusion.  You understood that --

20  A.  Yes.

21  Q.  -- was important to the court, correct?

22  A.  Yes.  One of the reasons that they concluded that was

23  because they believed that there was no relationship between

24  his actions and his delusional system, yes.

25  Q.  Right.

1  A.  That was the conclusion the court drew, yes.

2  Q.  The court drew this conclusion that there had to be -- I

3  think you said it was a relation between the delusion and the

4  actions, a connection?

5  A.  Right.  I think you used the word "in concert," is the

6  phrase I think you used earlier.

7  Q.  Okay.

8  A.  This was what the court said in the decision.

9  Q.  Okay.  If you were going to point this Court to conclusive

10 or persuasive evidence that there is a connection between

11 Mr. Eldridge's delusion that he lives outside of prison, that

12 he doesn't stay on death row all the time and some actions that

13 he took, would you point to the fact that he tells other

14 people, "I'm not always here.  I go home"?

15 A.  That would be an indication.  Based on the predicate that

16 you stated, however, that wouldn't indicate a behavior, as you

17 laid out the argument, that suggests that he's behaving in

18 concert with that.

19 Q.  So, for example, like the court said in Wood, a behavior

20 would be something more than just saying it.  It would also be

21 revealed in his letters, like he would write to his family and

22 complain about the conspiracy?

23 A.  This was one of the things that you had indicated as you

24 were presenting the Wood case.

25 Q.  Okay.  Has any court, to your knowledge, found your opinion

1  or your conclusion on competency for execution to be credible?
2  A.  Which opinion are we referring to?
3  Q.  Any court opinion.
4  A.  Has there been a court opinion that has agreed with my
5  take?
6  Q.  Yes.
7  A.  Given that I have had one competency to be executed
8  decision come down, I believe the answer is no.
9  Q.  Okay.   Thank you.
10        THE COURT:  Passing the witness?
11        MS. ODEN:  Yes, ma'am.
12        THE COURT:  All right.  So, we'll pick up in the
13  morning at 9:00 o'clock with redirect and hopefully finish this
14  witness tomorrow.  All right.  We'll go till a little before
15  noon.
16        MS. FERRY:  I will be done with Dr. Roman midmorning.
17        THE COURT:  Great.  And you have -- that's your last
18  witness, right?
19        MS. FERRY:  That's right.
20        THE COURT:  Okay.
21        MS. ODEN:  Did you say 9:00 o'clock, Your Honor?
22        THE COURT:  Yes.  Who will you have in the morning?
23        MS. ODEN:  Can I consult with co-counsel and call my
24  witnesses -- call my witness to see, because I thought we were
25  starting at 10:00 and ending at noon and so I wasn't sure, so I

1    have to call.

2          THE COURT:  Okay.  Well, your witness doesn't have to

3    be here before 10:00, because we'll finish with this witness.

4          MS. ODEN:  I just want to make sure with travel time,

5    that they can be here.

6          THE COURT:  All right.  Good.  And were you able to

7    check with the airlines, or you'll check tonight and let me

8    know about --

9          MR. WIERCIOCH:  I will check tonight.

10         THE COURT:  That will be great.  Okay.  Thank you very

11   much.

12         MS. FERRY:  Your Honor, when are we breaking tomorrow?

13   Does the Court know yet?

14         THE COURT:  I think probably around 11:30ish.  Thank

15   you.  That's my best guess.  All right.  Thank you very much.

16      (Concluded at 7:00 p.m.)

17                           * * *

18   I certify that the foregoing is a correct transcript from the

19   record of proceedings in the above-entitled cause, to the best

20   of my ability.

21

22   /s/ _Kathy L. Metzger_____          __5-23-12___
     Kathy L. Metzger                      Date
23   Official Court Reporter

24

25