1
                        UNITED STATES DISTRICT COURT
                       SOUTHERN DISTRICT OF TEXAS

2
                           HOUSTON DIVISION

3
GERALD CORNELIUS ELDRIDGE       .  C.A. NO. H-05-1847
                             .  HOUSTON, TEXAS

4
VS.                          .
                             .  APRIL 18, 2012

5
RICK THALER                 .  9:00 A.M. to 11:30 A.M.

6

7
                           DAY 3 of 3
               TRANSCRIPT of EVIDENTIARY HEARING

8
          BEFORE THE HONORABLE LEE H. ROSENTHAL
             UNITED STATES DISTRICT JUDGE

9

10
APPEARANCES:

11

12
FOR PETITIONER GERALD
CORNELIUS ELDRIDGE:            MR. LEE H. WILSON
                         Attorney at Law

13
                          P.O. Box 52447
                         Houston, Texas   77052-2411

14

15
                         MS. LAURA WARRENE FERRY
                         Texas Defender Service

16
                         510 S Congress Avenue
                         Suite 304

17
                         Austin, Texas   78704

18
                         MR. GREGORY W. WIERCIOCH
                         Texas Defender Service

19
                         430 Jersey Street
                         San Francisco, CA   94114

20

21
THIS TRANSCRIPT HAS BEEN FURNISHED AT PUBLIC EXPENSE UNDER THE
CRIMINAL JUSTICE ACT AND MAY BE USED ONLY AS AUTHORIZED BY

22
COURT ORDER.  UNAUTHORIZED REPRODUCTION WILL RESULT IN AN
ASSESSMENT AGAINST COUNSEL FOR THE COST OF AN ORIGINAL AND ONE

23
COPY AT THE OFFICIAL RATE.  General Order 94-15, United States
District Court, Southern District of Texas.

24

25
Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

```
 1                        APPEARANCES CONTINUED

 2
    FOR RESPONDENT RICK THALER:      MS. GEORGETTE P. ODEN
 3                                   MR. JOSEPH P. CORCORAN
                                     MR. STEPHEN M. HOFFMAN
 4                                   Office of the Attorney
                                       General
 5                                   P.O. Box 12548
                                     Austin, Texas  78711-2548
 6
 7  ALSO PRESENT:                    MR. GERALD CORNELIUS ELDRIDGE
                                     DR. MICHAEL A. ROMAN
 8                                   DR. THOMAS ALLEN

 9
10  OFFICIAL COURT REPORTER:         MS. KATHY L. METZGER
                                     U.S. Courthouse
11                                   515 Rusk
                                     Room 8004
12                                   Houston, Texas  77002
                                     713-250-5208
13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                                    <u>INDEX</u>

2                                                                      PAGE

3    <u>PETITIONER'S WITNESS</u>

4    Michael A. Roman
          Redirect Examination by Ms. Ferry                           572
5         Recross-examination by Ms. Oden                             594
          Further Redirect Examination by Ms. Ferry                   603
6         Further Recross-examination by Ms. Oden                     604

7

8    <u>RESPONDENT'S WITNESS</u>

9    Thomas Allen
          Direct Examination by Ms. Oden                              606
10

11

12

13

14                                  *  *  *

15

16

17

18

19

20

21

22

23

24

25

```
1                        P R O C E E D I N G S
2              THE COURT:  I think we're ready.  Dr. Roman.  I think
3   we're ready on the redirect.
4              THE WITNESS:  Good morning, Your Honor.
5              MS. FERRY:  I think they're bringing in Mr. Eldridge.
6              THE COURT:  All right.
7              MS. FERRY:  And I just wanted to alert the Court that
8   at the conclusion of today's hearing, Mr. Wiercioch would like
9   to make a few, again very brief, ex parte representations about
10  the matter we discussed.
11             THE COURT:  We'll either do it now or in advance --
12  while we're waiting for Mr. Eldridge, let's talk just about the
13  plane matters that we were talking about.  Did you have a
14  chance to check on the availability of flights?
15             MR. WIERCIOCH:  Yes, I did, Your Honor.  And the
16  ticket prices are substantially lower for the May 29th setting.
17             THE COURT:  Were you able to get a seat, that was the
18  main thing you were looking at, because of the Memorial Day
19  weekend?
20             MR. WIERCIOCH:  Yes, I will be able to get a seat.
21             THE COURT:  All right.  Great.  So, we're on for the
22  29th.  We'll start at -- let me check.  So, we'll start on the
23  29th at 9:00 o'clock, and hopefully we will be able to finish
24  in the -- by the end of the day on the 30th.  Does that make
25  sense?
```

Roman - Direct by Ms. Ferry

1        *MS. FERRY:*  Yes, Your Honor.

2        *THE COURT:*  All right.  I think we're ready.  The

3   Court notes Mr. Eldridge has been brought into the courtroom,

4   and we're ready to proceed.

5        *(Michael A. Roman, petitioner's witness, previously sworn.)*

6                           **REDIRECT EXAMINATION**

7   BY MS. FERRY

8   *Q.*  Now, Dr. Roman, you were asked a number of questions by

9   Ms. Oden yesterday about the records you reviewed in this case

10  and whether you reviewed every page of the respondent's

11  exhibits for this hearing and every page of the respondent's

12  exhibits for the Atkins hearing.  Do you have unlimited funding

13  in this case?

14  *A.*  No, ma'am, I do not.

15  *Q.*  The funding that we discussed during your direct

16  examination, does that include the entirety of funding that's

17  been approved for your work, including all document review,

18  writing your reports, seeing Mr. Eldridge, preparing for this

19  hearing, and testifying in this case?

20  *A.*  Yes, ma'am.

21  *Q.*  Now, you also were asked a number of questions about which

22  exhibits -- excuse me, which pages of the TDCJ mental health

23  and other records you specifically referenced in your report

24  and which ones you didn't.  Were your reports intended to be an

25  exhaustive summary of all of the TDCJ mental health records in

Roman - Direct by Ms. Ferry

1  this case?

2  A.  No, ma'am, they were not.

3  Q.  Would it have been realistic for you to attempt to write a

4  report like that?

5  A.  I never have and don't think it's realistic or productive.

6  Q.  Now, I would like to go through with you the records that

7  document Mr. Eldridge's food delusions over the years and talk

8  with you about some records that weren't brought out yesterday.

9  And for efficiency sake, rather than pulling out each record

10 that you discussed with Ms. Oden and then each record that you

11 didn't, we're going to do this looking at respondent -- excuse

12 me, Petitioner's Exhibit 10, which is the table summarizing

13 records related to food delusions in the TDCJ records and

14 includes dates and reference to the exhibit and page number.

15         And, so, let's start with looking at page 1 of

16 Exhibit 10 here.  And is -- yes.  So, you see that page 1

17 includes reference to food delusions documented in 2001 in the

18 TDCJ records; is that right?

19 A.  Yes, I see that.

20 Q.  And I'm correct that there are more than two references

21 here to Mr. Eldridge reporting his food delusion in 2001,

22 correct?

23 A.  There are more than two references.

24 Q.  In fact, there are ten references here in 2001; is that

25 right?

Roman - Direct by Ms. Ferry

1  A.  I may have made it as many as 12.  Two, four, six, eight,
2  ten -- I believe I count 12.
3  Q.  Well, I'm excluding --
4  A.  Yes.
5  Q.  -- this third entry here, "So far has missed six meals," as
6  well as the second entry, "States he is on hunger strike,"
7  because that doesn't specifically reference a food delusion.
8  That can mean any number of things, right?
9  A.  Exactly, yes, that's true.
10 Q.  Okay.  So, now let's look at the complaints for 2002, which
11 begins on page 2 and continues over -- excuse me, begins on
12 page 1 and continues to page 2 of this exhibit.  Here at the
13 bottom of page 1, we see a report made on January 17th of 2002,
14 correct?
15 A.  Yes.
16 Q.  And then looking over on page 2, we see an additional one
17 here at the bottom of page 1, one, two, three, four, five, for
18 a total of six; is that right?
19 A.  Yes, that's correct.
20 Q.  And here on page 3 of that same exhibit, let's do the same
21 thing for the food delusions documented for the year 2004.  And
22 am I correct that there are four here that specifically
23 reference his food delusion?
24 A.  Again, I see five entries.  Without reading the text,
25 certainly there are at least four.

Roman - Direct by Ms. Ferry

1   Q.  Okay.  And then there's also, is there not, an entry of

2   documentation of Mr. Eldridge complaining in 2005, "Patient

3   only complaining about how he believes security is tampering

4   with his food and his mail"?

5   A.  Yes, ma'am, there is.

6   Q.  And that was made on December 8th, 2005, right?

7   A.  That's correct.

8   Q.  And, now, page -- excuse me.  Complaints for the year 2006,

9   which begin here on page 3, and here on page 3 we have one,

10  two, three, four -- I'm looking at the back here on page 4,

11  four -- oh, excuse me, five, six.  So, there are a total of six

12  separate occasions in 2006 that Mr. Eldridge complained about

13  his food being poisoned, correct?

14  A.  I believe there's seven.  There's one you passed over that

15  I think is an indication of food, but there are at least six,

16  yes.

17  Q.  Okay.  So, possibly seven.  All right.  And now that

18  we've established that, let me ask you about the discussion

19  that you had with Ms. Oden yesterday about the possibility of

20  Mr. Eldridge having delusional disorder.  When you were

21  discussing that with Ms. Oden yesterday, were you purporting to

22  definitively diagnose Mr. Eldridge with a delusional disorder

23  for the years 2001 and 2002?

24  A.  No, ma'am, I was not.

25  Q.  And was it your intent to definitively rule out the

Roman - Direct by Ms. Ferry

1  possibility of delusional disorder for the years 2003 to 2008?
2  A.  No, ma'am, I was not.
3  Q.  So, explain for us what it is that you're saying about the
4  possibility of Mr. Eldridge having a delusional disorder during
5  the period of time from 2001 to 2008.
6  A.  As I understood the questioning, at that point we were
7  talking about specific periods of time in the records and what
8  they seem to suggest in terms of symptomatology and diagnostic
9  significance.  Obviously going back in records retrospectively
10 can be difficult without seeing the patient.
11             In looking at that and attempting to characterize
12 the extent of evidence that I thought was present within a
13 particular year and whether it rose to a significant level,
14 this was the basis on which I suggested that if we looked at
15 the record in isolation in that year as it exists, whether or
16 not I believe that it rose to a level that might potentially
17 merit a diagnosis, obviously that we were back in that time and
18 could establish that the diagnosis was accurate.  It's
19 difficult to do retrospectively.
20 Q.  Now, along the same lines let me ask you, Ms. Oden was
21 asking you questions about whether or not a person can be
22 schizophrenic in the morning but not at night and vice versa
23 and you two had an exchange about that and I think there was
24 possibly a disconnect between you two.  When you answered those
25 questions in the affirmative, am I correct that what you --

Roman - Direct by Ms. Ferry

1  tell me if this is right.  My understanding is that what -- is
2  that your intent was to say that the symptomatology of
3  schizophrenia could be present in the morning, could not be
4  documented in the evening and vice versa, or were you saying
5  that a person could have schizophrenia in the morning and could
6  not have schizophrenia at night?
7  A.  No, I was not saying the latter.  If a person is
8  schizophrenic, they are schizophrenic 24/7.  Whether they
9  manifest symptomatology that an observer would say clearly I
10 see evidence that supports that I know this person is
11 schizophrenic, that could occur in the morning.  It could occur
12 in the afternoon.  It could occur in the evening.  By the same
13 token, it could occur in one part of the day and potentially
14 not be obvious to an observer in another part of the day, but
15 they are still schizophrenic.  It's a significant and serious
16 condition.
17 Q.  Now, let me ask you about Respondent's Exhibit 23 at page
18 13.  Do you recall discussing this record with Ms. Oden
19 yesterday?  And this is an integrated progress note, dated
20 October 31st, 2001.  And if we look here on page 14 of that, we
21 see that it was -- that these are notes made by C. Woodrick,
22 Ph.D.
23 A.  Yes, I remember discussing it.  I looked at so many
24 documents yesterday, I can't recall whether this is one that
25 was put up on the Elmo or not, offhand.  But, yes, I certainly

Roman - Direct by Ms. Ferry

1   remember discussing this.

2   Q.  Okay.  And as I recall it, you and Ms. Oden were talking

3   about whether you saw this record, whether you considered it,

4   and then she was asking you the questions about why this

5   particular record isn't documented in your report.

6           Now, let me ask you to look with me here at page

7   5 of your initial report, which is Petitioner's Exhibit 1, the

8   second full paragraph here.  That's the paragraph in your

9   report where you discuss Mr. Eldridge's admission to Jester IV

10  in 2001, some observations that were made, and his ultimate

11  discharge, with the conclusion that he was, quote, "rather

12  flagrantly attempting to present symptoms of multiple

13  personality disorder, slash, dissociative identity disorder by

14  claiming four different personalities.  He gives the impression

15  of a well-rehearsed act designed to obtain a mental health

16  jacket for secondary gain."

17          Am I correct in characterizing that paragraph of

18  your report?

19  A.  Yes, that's an accurate characterization.

20  Q.  So, no question that you reviewed, considered, and

21  documented in your report Mr. Eldridge's 2001 admission and

22  ultimate discharge from Jester IV, right?

23  A.  Yes, ma'am, that's correct.

24  Q.  And with respect to this particular record that Ms. Oden

25  was asking you about, Respondent's Tab 23, page 13, as I said,

Roman - Direct by Ms. Ferry

1    it's a record from -- created by Dr. Woodrick dated

2    October 31st, 2001.  And now I'm going to put here on the

3    screen Respondent's Tab 23, page 18, and you see here that's a

4    psychosocial report based on an evaluation conducted on

5    October 31st, 2001, by Charles P. Woodrick, Ph.D., right?

6    A.  Yes, I do see that.

7    Q.  And this record goes through page 22 of Respondent's Tab

8    23, and this is the record -- this certainly is one of the

9    records that you reviewed to write your report -- this

10   paragraph in your report dealing with Jester IV?

11   A.  It is, I recall reviewing it.

12   Q.  And, in fact, this record is the ultimate report that was

13   created by Dr. Woodrick based on these notes that are here on

14   page 13.  That's what that appears to be, correct?

15   A.  That is what it appears to be, yes.

16   Q.  Now, you were also asked a number of questions yesterday

17   about whether you would be surprised to learn about various

18   possibilities about TDCJ mental health staff's knowledge of

19   malingering, their approach to malingering -- their approach to

20   determining whether an inmate is malingering.  Do you recall

21   that questioning?

22   A.  I recall that line of questioning, yes.

23   Q.  So, I want to ask you some questions about what we know

24   about TDCJ's approach to malingering.  Based on Dr. Nathan's

25   testimony, is there any question in your mind that from the

Roman - Direct by Ms. Ferry

1   period of 2009 up to the present, that TDCJ mental health staff
2   are permitted to use the malingering label?
3   A.   There's no question in my mind that that's an accurate
4   statement, that they are permitted to use it.
5   Q.   And is there any question in your mind about whether
6   Dr. Nathan himself always considers the possibility of
7   malingering, based on his testimony?
8   A.   Based on his testimony, I was given the firm impression
9   that he always considers malingering within his treatment
10  considerations.
11  Q.   Now, Dr. Roman, you're aware that in the psychosocial
12  evaluation conducted by Dr. Woodrick in 2001, that we were just
13  discussing on the Elmo, as well as the ultimate discharge
14  report from 2001, that the specific term "malingering," that
15  term wasn't used in either the psychosocial evaluation or the
16  ultimate discharge paperwork; is that right?
17  A.   As I recall the records, I believe that's an accurate
18  statement, that it was not used.
19  Q.   But do those 2001 Jester IV records, both Dr. Woodrick's
20  psychosocial and the ultimate discharge report, in your
21  opinion, do those records make clear that TDCJ mental health
22  staff were looking at the possibility of inmates feigning
23  symptoms?
24  A.   Furthermore, it suggests that they felt that he was doing
25  exactly that and that his symptoms were not consistent with

Roman - Direct by Ms. Ferry

1  anything real, yes.

2  Q.  And, so, is there any question in your mind that TDCJ staff

3  have proven themselves perfectly capable of determining if an

4  inmate is putting on an act?

5        THE COURT:  During what period?  Because the testimony

6  was that there was a change in TDCJ's approach towards the

7  consideration of malingering over a period of time.

8        MS. FERRY:  And, Your Honor, I'm asking --

9        THE COURT:  So, perhaps if you could tie it to

10  particular periods, that would be helpful.

11        MS. FERRY:  Certainly.

12  BY MS. FERRY

13  Q.  So, we've already discussed the fact that based on

14  Dr. Nathan's testimony, from 2009 to the present, no question

15  about the permissibility of using the term "malingering"?

16  A.  This is my belief, yes.

17  Q.  And I'm now asking you about based on the 2001 Jester IV

18  records --

19  A.  Yes.

20  Q.  -- based on those records, even when the specific term

21  "malingering" was not used, based on those 2001 records, is

22  there any question in your mind about whether TDCJ mental

23  health staff were capable of determining whether an inmate --

24  A.  Right.

25  Q.  -- was putting on an act?

Roman - Direct by Ms. Ferry

1  A.  No.  It seems to correspond to the time that Dr. Nathan
2  said that they perhaps were not using the word "malingering,"
3  but the records suggested to me that the conclusions they drew
4  were consistent with the label of malingering even though it
5  was not applied as a specific word.
6  Q.  And even though that specific word wasn't used, this
7  summary that you have here of that record on page 5 of Exhibit
8  1, where they write things like, "He gives the impression of a
9  well-rehearsed act designed to obtain a mental health jacket
10  for secondary gain," this 2001 record indicates that even
11  without using the label "malingering," certainly in 2001 they
12  were capable of getting across the idea that an inmate was not
13  genuinely reporting symptoms of psychosis, right?
14  A.  Yes, ma'am.  It is an operational definition for
15  malingering or feigning of symptoms.
16  Q.  Now, I would like to talk with you about the TDCJ mental
17  health record found at Respondent's Tab 23, page 214.  And if
18  you look with me, that record begins on page 212 of that
19  exhibit and on that page we see this is a record from
20  December 23rd, 2009, created by the Jester IV unit; is that
21  right?
22  A.  I see that.  That's correct.
23  Q.  And, so, now let's look at page 214 of that same exhibit.
24  And under subjective, here it states, "Today he reports I'm
25  hearing voices of my brother Michael who has been telling me to

Roman - Direct by Ms. Ferry

1  watch out for everyone.  He states that everyone is out to get

2  me."

3              Now, do you recall discussing this record with

4  Ms. Oden yesterday?

5  A.  I do recall discussing that record.

6  Q.  And you two had a discussion about why, in your opinion,

7  you could not precisely resolve the time frame in which

8  Mr. Eldridge's reporting here's when I heard voices, and I'd

9  just like you to explain to us why it is, based on the language

10 that's here in this report, "Today he reports I'm hearing

11 voices of my brother," why can you not resolve the precise time

12 frame that that audio hallucination is being reported?

13 A.  Certainly.  So, when we review a record, it's our intent to

14 attempt to not read things into it and be as objective in the

15 review as possible.  There are a couple things that I see.

16 When the heading under subjective states "today he reports,"

17 what I know definitively or can at least definitively assume

18 that I know is that this is a report that he made today.  So, I

19 totally concur with the fact that what follows is something

20 that was told to this examiner on this particular day.

21             When it says, "I'm hearing voices of my brother"

22 and some of those other things, I don't know if when that

23 examiner sat with him, if that examiner was saying, "So,

24 Mr. Eldridge, you know, how are you doing today?  You know,

25 what's been going on?  It's been a couple of days since we

Roman - Direct by Ms. Ferry

1   met," or whatever that may be and perhaps he says, "Well, I'm
2   hearing voices of my brother," which could suggest that that's
3   happened two days ago or a week ago or ten minutes ago.  I have
4   no idea.
5            If the record said, "This morning I heard voices
6   of my brother" or, "I'm hearing my brother talking to me right
7   now," it's obvious to me that it's here and now.  That may be
8   what's happening.  But for me to conclude that requires an
9   inference on my part.  I don't know when he was hearing voices.
10  Q.  And let me ask you this:  Based on both your
11  neuropsychological testing of Mr. Eldridge as well as the three
12  different times that you have evaluated him in person,
13  including two quite lengthy clinical interviews -- excuse me,
14  not clinical, but two lengthy interviews, structured
15  interviews, do you have concerns about the precision with which
16  Mr. Eldridge uses language and that he reports various events
17  occurring?
18  A.  I believe I've given that testimony before, yes, I do have
19  that concern.
20  Q.  So, in other words, just -- are you being difficult about
21  this record?
22  A.  I am sincerely hoping not to be difficult.  I would also
23  add that at certain places in the record, things that
24  Mr. Eldridge has said has been included in quotes.  One of the
25  things that we look at is that if somebody includes quotes, we

Roman - Direct by Ms. Ferry

1   assume that that is a verbatim or as close to verbatim as one
2   was able to keep up with in their note-taking rendition.  If
3   there aren't quotes, that typically is an indication that we're
4   paraphrasing or somehow indicating what was said.  So, we have
5   that as an additional consideration here.  So, not only is it
6   not being sure about how he used the language, but I have
7   reason to believe that ultimately it's that observer or
8   evaluator, if you will, paraphrasing the take that they had
9   from whatever he shared.
10  Q.  Now, let me ask you this:  There was discussion yesterday
11  about the crime scene photographs that you showed to
12  Mr. Eldridge during -- I believe it was during your initial
13  evaluation -- excuse me, I suppose it was in May of 2010.
14  A.  The second date that I saw him, which was my initial
15  testing evaluation, yes, ma'am.
16  Q.  So, May of 2010 when you showed him those photographs.  And
17  during the course of that discussion you were having, there was
18  some discussion about at what points in the record there is
19  documentation of Mr. Eldridge making reference to Chirrsa.  And
20  am I correct that it's your testimony that there was this
21  discussion that he had with Dr. Silverman, in Dr. Silverman's
22  pretrial competency report, where Chirrsa is discussed; is that
23  correct?
24  A.  Yes, ma'am, that's correct.
25  Q.  And that --

Roman - Direct by Ms. Ferry

1          *MS. FERRY:* Excuse me, Your Honor.  I just realized I
2    don't have that.
3    BY MS. FERRY
4    Q.  And that would be Tab -- excuse me, page 14 of Respondent's
5    exhibit -- I believe it is 55.
6          *THE COURT:* 55?
7          *MS. FERRY:* 55, yes.
8          *THE COURT:* Thank you.
9    BY MS. FERRY
10   Q.  And that's here on page 15.  And this is a document that we
11   discussed during your direct examination, correct?
12   A.  Yes, it is.
13   Q.  And here there are references to both Cynthia and Chirrsa,
14   in response to doctor -- in response to what appears to be
15   Dr. Silverman directly raising the capital murder charge with
16   Mr. Eldridge?
17   A.  That's how I understood that section of the document, yes.
18   Q.  Which wouldn't be surprising, because Dr. Silverman is
19   specifically there pretrial to discuss his competency to stand
20   trial on those charges, correct?
21   A.  That's correct, yes.
22   Q.  And you also mentioned that, of course, in Dr. Allen's
23   report there's discussion of -- well, there's documentation of
24   questioning of Mr. Eldridge about Cynthia and Chirrsa, right?
25   A.  Yes, ma'am, that's correct.

Roman - Direct by Ms. Ferry

1  *Q.* And then, of course, in your report, you discuss showing

2  Mr. Eldridge those crime scene photographs?

3  *A.* Yes.

4  *Q.* And in response to you showing Mr. Eldridge the bloodied,

5  rather gruesome photographs of both Cynthia and Chirrsa,

6  Mr. Eldridge's response was, "So, it must be true.  I must have

7  did this," right?

8  *A.* He said that at the end, after returning the photographs,

9  yes.

10  *Q.* Now, explain for us, Dr. Roman, why it is in light of

11  Mr. Eldridge making that statement, "So, it must be true.  I

12  must have did this," that you can nevertheless conclude that

13  Mr. Eldridge does not, as he sits here today, have a rational

14  understanding of the fact that he is responsible for murdering

15  Cynthia and Chirrsa Bogany?

16  *A.* There are probably several elements, but the most direct

17  one that comes to mind is, as I review the record, as I have

18  suggested, I know of only those two places, the one that was

19  put up on the Elmo from Dr. Silverman's report and the later

20  reference that exists in Dr. Allen's report.  I don't recall

21  that I saw a specific mention from Mr. Eldridge in Dr. Allen's

22  notes, but I simply may not recall that.  Those are the only

23  two times that there is an indication that he has made a

24  specific reference to Chirrsa.  Every other time that he is

25  asked about the capital crime in some fashion, the question of

Roman - Direct by Ms. Ferry

1   why he's in prison, he has responded with, "I shot someone --

2   they say I shot someone."  Almost every time.  I can't say with

3   a certainty that it's every time.

4          You then have to prompt him with, "Who do they

5   say you shot," and then he will say, "They say I shot Cynthia."

6   Sometimes he will spontaneously add, "You know, but I see her.

7   But she's alive."  Many times he doesn't and you have to ask

8   him something about that and then he'll look at you and say,

9   "But, you know, I've seen her.  She's alive."

10         I know of no other time that he has ever stated

11  that he has even an awareness that he has shot or been accused

12  of shooting, other than those two references that I've

13  mentioned, Chirrsa.  Indeed, even when I showed him the

14  photographs and he looked at Cynthia's picture, he said -- and

15  I have to look at my report to get the quote and I can do that

16  if you would like, but he acknowledged that he understood that

17  to be Cynthia.  He said nothing one way or another about

18  looking at Chirrsa at that time.  He did not acknowledge it was

19  her.  He didn't refute it.  He spoke no words regarding her or

20  her name.

21  *Q.*  And, again, based on your subsequent interaction with

22  Mr. Eldridge during your December 2011 structured interview of

23  him, why does it appear to you that whatever -- to the extent

24  that some reality briefly sort of came to Mr. Eldridge when you

25  showed him those photographs, why is it your belief that that

Roman - Direct by Ms. Ferry

1  certainly has not stayed with him?

2  A.  Several things.  Again, in interviewing him on that final

3  date in 2011, we went through the same kinds of things in terms

4  of why he was there in prison and, again, he responded in the

5  same basic way.  Chirrsa certainly did not come up again.  He

6  had the same degree of uncertainty or denial or whatever we

7  want to call that dimension where he certainly appeared to not

8  be in sync with what he was able to report as something other

9  people have stated he did.

10             He seemed to recall seeing the photographs in the

11  most vague of terms, the fact that he saw some bad pictures or

12  bad photos, but said nothing about the content of them and did

13  not seem to recall anything about the content.

14  Q.  Now, I would like to turn with you to the discussion that

15  you had with Ms. Oden yesterday about Mr. Eldridge's jail mail.

16  And as far as you know, have you reviewed every piece of

17  personal correspondence that's been collected for Mr. Eldridge?

18  A.  I don't know, because I don't know how much he's done.  I

19  mean, he's been there a long time and I'm going to assume that

20  there are probably some letters that I haven't seen, but I

21  don't know for sure what the totality of the documents is.  It

22  hasn't been represented to me whether or not I've seen every

23  piece of mail.

24  Q.  Well, let me ask you this, then, because I take your point,

25  that Mr. Eldridge has been on death row for quite some time and

Roman - Direct by Ms. Ferry

1   you have not reviewed mail going back to his incarceration in

2   1993.  Have you reviewed mail from the point of 2010 up to the

3   present?  Does that sound correct, about the date of mail that

4   you began to review?

5   A.  Yes, I think it's possible that I've reviewed everything

6   that exists perhaps going as far as back as 2009.

7   Q.  Now, are there -- you just said to Ms. Oden that you're

8   aware that Mr. Eldridge was scheduled for execution on

9   November 17th, 2009, right?

10  A.  I do know that, yes, ma'am.

11  Q.  And in the days and weeks leading up to November 17th,

12  2009, are there any letters in Mr. Eldridge's personal

13  correspondence in which he writes to family members to say

14  good-bye?

15  A.  There are none.

16  Q.  Are there any letters in which he writes to any of his

17  various pen pals to say good-bye in the days and weeks leading

18  up to that execution date?

19  A.  There are none.

20  Q.  And now I want to look with you at page -- Respondent's Tab

21  23, pages 137 through 138, which is a TDCJ mental health record

22  from the Polunsky unit that up here at the top is dated

23  November 19th, 2009, but looking down -- midway down the page

24  we see the notation, "This is a late-entry note.  Patient seen

25  cell side on 12 building at 15:35 on 11-17-09."

Roman - Direct by Ms. Ferry

1    A.   Yes, I recall that document.

2    Q.   Okay.  And as we just discussed, that would be the

3    afternoon -- this is a notation of observations made on the

4    afternoon of Mr. Eldridge's scheduled execution, right?

5    A.   Yes, ma'am, that's correct.

6    Q.   And looking at page 138 of this note, as you discussed with

7    Ms. Eldridge -- excuse me, Ms. Oden yesterday, we see here that

8    Mr. Eldridge's grooming is reported to be normal; his motor

9    activity is reported as unremarkable; affect, appropriate;

10   mood, euthymic -- is that how to pronounce that?

11   A.   Yes.  Yes, it is.

12   Q.   And what does "euthymic" mean?

13   A.   Euthymic means that it was fairly neutral.  It was neither

14   happy nor sad.  It was just sort of normal.

15   Q.   Speech flow is normal.  Thought content is appropriate to

16   mood circumstances.  Thought organization is logical and goal

17   directed.  Self harm, none reported or noted.  Harm to others,

18   none reported or noted.

19              Essentially this record says -- this record

20   indicates that it appeared to this mental health clinician that

21   Mr. Eldridge seemed sort of generally fine, right?

22   A.   I think that's an accurate appraisal of what's listed, yes.

23   Q.   If you were to look solely at this record and were asked to

24   determine whether the person described here is mentally ill, am

25   I correct that you would say there's no evidence here that this

Roman - Direct by Ms. Ferry

1    person suffers from schizophrenia, right?

2    A.   If this was the sole record, no, I wouldn't think of any

3    type of mental illness based on this report.

4    Q.   Certainly no evidence here that on the afternoon of his

5    scheduled execution, Mr. Eldridge was calling attention to

6    himself, saying, "Hey, I'm hearing voices.  Hey, I need mental

7    health treatment," right?

8    A.   Based on this record, that certainly is an accurate

9    appraisal.

10   Q.   Now, Dr. Roman, let's -- I want to ask you a hypothetical

11   question.  Let's assume for a moment that it's your conclusion

12   in this case that Mr. Eldridge is malingering -- okay? -- that

13   he does not suffer from schizophrenia, that all the complaints

14   and signs of psychosis documented from 2009 to 2012 are all

15   malingered.  Okay?

16   A.   Okay.

17   Q.   Let's assume that it's your conclusion that he's pulled the

18   wool over the eyes of all of the treating mental health staff

19   at TDCJ during that time and that doctor -- excuse me, that

20   Mr. Eldridge is doing this based on what he learned during his

21   pretrial competency hearing, what he's learned from various

22   other inmates who have gone through the competency process.

23   Let's assume that.  Okay?  That your assumption is Mr. Eldridge

24   has been able to gather information about what he needs to do

25   to prevent himself from being executed and that he is able to

Roman - Direct by Ms. Ferry

1  execute that plan extremely well so that he's pulling it --

2  he's pulling it over on all those TDCJ mental health

3  professionals.   Okay?

4  A.   Okay.

5  Q.   Now, if they were your assumption, if that were your

6  conclusion in this case, let me ask you this:   Would this

7  record from the very afternoon of Mr. Eldridge's execution,

8  would this record seem odd to you?

9  A.   That hypothesis would lead me to believe that he knew that

10  this was his execution day.   This would be a date that

11  essentially he had scored a particular victory in having pulled

12  the wool over people's eyes.   It would seem to me that it would

13  be a day where he would be most likely to want to show evidence

14  of the very things that, in your hypothetical example, he has

15  concocted to impress people or that he might seem somewhat

16  happier about his victory.   But generally I would expect that

17  he would have evidence of some degree of positive symptoms of

18  schizophrenia that would help to punctuate the fact that he is

19  schizophrenic.

20         MS. FERRY:   And that's actually all I have right now,

21  Judge.

22         THE COURT:   All right.   Thank you.   Anything further?

23         MS. ODEN:   Just briefly, Your Honor.   If I may

24  question from here, Your Honor?

25         THE COURT:   That's fine.

Roman - Recross by Ms. Oden

1                    **RECROSS-EXAMINATION**

2   BY MS. ODEN

3   Q.  Dr. Roman, you would agree that the DSM does establish

4   criteria for the mental illnesses or disorders contained within

5   that book?

6   A.  Yes, of course.

7   Q.  And professionals in your field rely on that book and rely

8   on the diagnostic criteria to give some uniformity across the

9   profession in terms of diagnoses?

10  A.  That is correct.

11  Q.  And, so, a doctor in California that diagnosis someone with

12  schizophrenia, although the actual symptoms will potentially

13  vary, that diagnosis would be as reliable as a doctor in New

14  York, because they would both theoretically be applying the

15  same diagnostic criteria?

16  A.  Assuming that, indeed, they've applied the same diagnostic

17  criteria, yes, indeed, it would.

18  Q.  Right.  And you would probably also agree with me that it's

19  important that doctors apply the same diagnostic criteria?

20  A.  Yes, I would agree with that.

21  Q.  Do you apply the diagnostic criteria that are found in the

22  DSM?

23  A.  Yes, I do.

24  Q.  And that's important that you do that, because it means

25  that you are adhering to the standards of your profession?

Roman - Recross by Ms. Oden

1   *A.*  And it's important that you do that because it's a way of
2   appropriately characterizing the symptomatology that's
3   presented, yes, ma'am.
4   *Q.*  And that helps you as a clinician to give the appropriate
5   treatment based on the appropriate -- whatever the disorder
6   really is?
7   *A.*  Well, rarely does anybody treat the diagnosis.  We treat
8   symptomatology.  So, the question of whether diagnosis is
9   directly relevant to treatment, in some cases it is, but most
10  frequently symptoms direct treatment.  So, diagnosis is
11  important for communication.
12  *Q.*  Well, it's also important because you don't want to treat
13  someone for a symptom, if they only have the symptom one time.
14  *A.*  That's definitely --
15  *Q.*  You want to make sure that it is a symptom based on a
16  disorder and, therefore, the symptom probably will appear more
17  than once?
18  *A.*  That definitely is an accurate statement, yes, ma'am.
19  *Q.*  But it's also important to you when you are performing your
20  role as a forensic psychologist -- which in this case you are a
21  forensic psychologist, correct?
22  *A.*  In the way that you define that, yes, that is an accurate
23  statement.
24  *Q.*  Okay.  How about the way that you define it?  Did you view
25  your role in this case as a forensic psychologist?

Roman - Recross by Ms. Oden

1   A.  Certainly.  It's a forensic case.  I think when we talk

2   about forensic psychologists, as I think you pointed out, we

3   talk about a certain degree of education, a way of coming at

4   something.  I'm always a neuropsychologist.  So, if you want to

5   talk about me as a forensic neuropsychologist, I would be

6   wholly comfortable with that label.

7   Q.  And, so, when you approached this case, you were trying, I

8   would imagine, very hard to stick to the professional standards

9   and the diagnostic criteria that would be appropriate not just

10  from a clinical standpoint but from a forensic standpoint?

11  A.  Yes, ma'am.

12  Q.  So that you could best aid the Court?

13  A.  Yes, ma'am.

14  Q.  Okay.  You made your diagnoses based on the criteria in the

15  DSM?

16  A.  Yes, ma'am.

17  Q.  Now, when we were talking about the Woodrick reports versus

18  the Woodrick notes, specifically dealing with those records on

19  October 31st, 2001, the multiple personality --

20  A.  I know which ones you mean, yes, ma'am.

21  Q.  -- event -- I understand there is a lot of data in this

22  case, right?

23  A.  There is a lot of data in this case.

24  Q.  And it's hard to keep it all straight?

25  A.  It's hard to keep it all straight when you're being asked

Roman - Recross by Ms. Oden

1  about specific records without the benefit of being able to
2  review those records.
3  Q.  That's very understandable.  It's hard to remember without
4  having them in front of you exactly what you've seen and what
5  you haven't seen?
6  A.  If one assumes that one hasn't seen everything, then, yes,
7  your statement is true.  If --
8  Q.  And it's possible that you haven't seen all of the records
9  in this case?
10  A.  Given the number of years that he's been on death row and
11  given that you have described to me there are some documents
12  that I haven't seen, some exhibits and so forth, yes, I believe
13  that that's probably accurate.
14  Q.  And we discussed yesterday that because you reviewed the
15  respondent's exhibits that were sent to you in pdf format, it's
16  difficult for you -- I don't know if the box is still there,
17  but it's difficult for you to know if you reviewed a box of
18  four binders' worth of paper, because you were looking at it on
19  the computer?
20  A.  Right, it's a different metric.  I would almost have to do
21  a page count, which I guess would be doable, but, yes, it's
22  hard to simply look and say this pdf is as thick as this
23  binder.
24  Q.  But you would agree that the wording of Dr. Woodrick's
25  notes presumably taken at or near the time that he was

Roman - Recross by Ms. Oden

1  interviewing Mr. Eldridge, did describe some things

2  differently, did use different wording than what was actually

3  in his report?

4  A.  Yes.

5  Q.  And would you agree with me that reading Dr. Woodrick's in

6  the moment notes seem to give a fuller flavor to what

7  Mr. Eldridge had reported at that time than you got from

8  actually the psychosocial report?

9  A.  I don't know if I would agree with that or not.

10  Q.  Okay.  When we talk about TDCJ's approach to malingering,

11  you do remember Dr. Nathan testifying that with further review

12  of the records, he saw serious signs of malingering?

13  A.  I recall him indicating that as particular records were

14  presented, that he felt that those aspects and certain

15  hypotheticals that were raised he thought were suspicious or

16  suggestive of malingering, yes, ma'am.

17  Q.  And you recall Dr. Nathan testifying that he had actually

18  only seen Mr. Eldridge four times?

19  A.  I didn't remember the number, but, yes, that seems to

20  comport with his testimony.

21  Q.  And he never actually interviewed him in person?

22  A.  That is what I understand, yes.

23  Q.  And in 2001 you would agree with me that Mr. Eldridge's

24  presentation was much more dramatic than it was --

25  A.  I'm sorry.  In what year again?

Roman - Recross by Ms. Oden

1  Q.  2001.

2  A.  Yes.

3  Q.  So, we're talking still about the records in 2001 where

4  Mr. Eldridge was feigning the multiple personality disorder, et

5  cetera?

6  A.  Well, as you know, I don't believe he was ever feigning a

7  multiple personality disorder, but I understand the records

8  you're referring to.

9  Q.  So, you disagree with Dr. Woodrick's conclusion that he was

10 feigning multiple personality disorder, but you understand that

11 those are the symptoms that Mr. Eldridge was presenting, those

12 are the statements he was making?

13 A.  I understand those are the statements that he was making,

14 yes, ma'am.

15 Q.  Okay.  So, you just disagree with Dr. Woodrick's conclusion

16 that those statements were an attempt to feign multiple

17 personality disorder?

18 A.  Right.  And respectfully, Dr. Nathan himself said that

19 those are not all of the diagnostic criteria that one would see

20 in a multiple personality disorder, so.

21 Q.  So, basically you agree that Dr. Woodrick was correct in

22 not diagnosing Mr. Eldridge with multiple personality disorder?

23 A.  I absolutely agree he was correct in not making that

24 diagnosis.

25 Q.  Okay.  But that is a separate question from whether or not

Roman - Recross by Ms. Oden

1  Mr. Eldridge was attempting to feign the multiple personality
2  disorder?
3  *A.*  Yes, that would be a separate question, absolutely.
4  *Q.*  And you would agree that if that is what he was doing, he
5  was not doing a good job of it?
6  *A.*  I would definitely agree with that, yes.
7  *Q.*  Okay.  Mr. Eldridge's symptoms after 2001 did not appear to
8  be especially noticeable or significant or serious until 2006
9  when he was hospitalized in Jester IV in part for the psychosis
10  that everybody seemed to associate with his pernicious anemia,
11  right?
12  *A.*  Well, again, this is difficult.  As I think it's been
13  pointed out, there are a number of indications in the record of
14  some continuing symptomatology.  So, I know that there is a
15  decrease in the frequency of records that speak to this.
16  Again, when you go back to the question of applying that to
17  what I know about what was happening with Mr. Eldridge, given
18  that, as we've established, I can only get it from the record,
19  I'm more comfortable answering that in the affirmative, if you
20  talk about the record rather than make Mr. Eldridge the direct
21  subject of that question.
22  *Q.*  Okay.  So, instead of talking about Mr. Eldridge's
23  symptoms, we will just limit the conversation for right now to
24  talking about what's in the records.
25  *A.*  That's fine.

Roman - Recross by Ms. Oden

1   *Q.* Okay.  So, you would agree with me that after 2001, when

2   Mr. Eldridge's records indicated the presentation of multiple

3   personality-type symptoms, after 2001 until 2006, the records

4   don't show an extensive, significant, dramatic amount of

5   symptoms until Mr. Eldridge's records indicate he was

6   hospitalized in part for pernicious anemia and in part for the

7   psychosis associated?

8   *A.* It did appear that there were relatively fewer records

9   indicating significant psychopathology between those time

10  frames, yes.

11  *Q.* Okay.  And then in 2006, the symptoms that are reflected in

12  the records kind of peak while he is experiencing that

13  pernicious anemia episode?

14  *A.* We're talking about prior to his treatment, is that --

15  *Q.* In 2006, you would agree with me that the records reflect a

16  peak or a rise of symptomatology around the time period that he

17  is hospitalized for pernicious anemia?

18  *A.* Well, again, I think we keep getting into this.  I will

19  agree that there are more obvious records documenting aspects

20  of reported psychopathology --

21  *Q.* Okay.

22  *A.* -- during that 2006 period.

23  *Q.* Okay.  And those symptoms appeared to be connected to a

24  medical cause that nobody doubted in the medical field,

25  correct?

Roman - Recross by Ms. Oden

1   A.   I don't know whether those symptoms were necessarily

2   connected to a medical cause.   I do know that there was a

3   concomitant medical cause not necessarily of the symptoms but

4   that was identified for him.

5   Q.   Okay.   When we talk about things appearing in quotes in the

6   records and things not appearing in quotes in the records, all

7   we can know is that at some point in time some observer felt it

8   appropriate to put statements within quotes?

9   A.   Correct.

10   Q.   That doesn't necessarily mean that all observers all the

11   time will always put all quotes within quotes --

12   A.   I think that --

13   Q.   -- right?

14   A.   -- was well stated, yes.

15   Q.   Okay.   Would it be fair to say when we're speaking about

16   the day of Mr. Eldridge's scheduled execution, which is

17   November 17th, 2009, would it be fair to say that if the

18   records reflected a number of positive and negative symptoms of

19   schizophrenia, that the records would reflect a theatrical

20   presentation, a dramatic presentation?   I understand theatrical

21   has a connotation of feigning, and I'm not trying to --

22   A.   No, I understand.   I understand.

23   Q.   -- imply intent, but you would agree with me that if there

24   were a number of symptoms on that day, that that would be a

25   noticeable and dramatic thing?

Roman - Further Redirect by Ms. Ferry

1    A.  That would be noticeable, noteworthy certainly, and
2    potentially dramatic, yes.
3    Q.  Okay.
4         MS. ODEN:  No other questions, Your Honor.
5         THE COURT:  All right.  Thank you.  Anything further?
6         MS. FERRY:  Literally two questions.

**FURTHER REDIRECT EXAMINATION**

8    BY MS. FERRY
9    Q.  Dr. Roman, I just want to clear up when you were talking
10   with Ms. Oden just now about the 2001 Jester IV multiple
11   personality issue and just so we're clear, you agree that
12   Mr. Eldridge should not have been diagnosed with multiple
13   personality disorder in 2001?
14   A.  Or at any other point, yes, I do agree.
15   Q.  Now, explain to us what you mean when you say that you
16   don't necessarily agree that Mr. Eldridge was attempting to
17   portray multiple personalities?  What do you mean when you say
18   that?
19   A.  Any time we look at symptoms or we look at a person's
20   statement, you know, we are cautioned in the field and I would
21   argue we are particularly cautioned when we are looking with a
22   forensic application about making determinations about a
23   person's motivation.  We can't know what their motivations are.
24   We can decide that they might have reasons to be motivated one
25   way or another, but we don't ultimately know -- assuming that

Roman - Further Recross by Ms. Oden

1   it's not real, we don't ultimately know what they're trying to

2   do or why they might be trying to do it.  We infer that.

3            And I have no idea what to make of that.  That

4   was a bizarre record with very bizarre statements.  I don't

5   know what it means.  I certainly can't conclude it was as

6   specific as him attempting to sell somebody on a multiple

7   personality.

8            MS. FERRY:  That's all I have, Your Honor.

9            THE COURT:  All right.  Thank you.

10           Anything further?

11                    **FURTHER RECROSS-EXAMINATION**

12  BY MS. ODEN

13  Q.  Dr. Roman, if we're not here to determine Mr. Eldridge's

14  motivation, why are we here?

15  A.  The issue that we run into and the point that I'm making is

16  that when we look at any particular observation and we ask the

17  question what was the person's motivation for saying this or

18  for doing this particular thing at any given point in time, we

19  can't ultimately know that motivation.  This is one of the

20  reasons we look at the totality of the record and one of the

21  reasons we may do, if you will, a tally count of some sort in

22  terms of whether we think that there is a preponderance of the

23  evidence suggesting that their motivation might be one way or

24  their motivation may be another way.  It always becomes an

25  inference, but the inference has much more merit when we make

Roman - Further Recross by Ms. Oden

1   it across a data set than when we attempt to abstract some

2   particular observation or particular symptom and make some

3   determination that we know what their motives were at that

4   moment in time.

5   Q.  Thank you.

6           MS. ODEN:  No other questions.

7           MS. FERRY:  I don't see the need to ask any more

8   questions, Your Honor.

9           THE COURT:  All right.  Thank you.

10              You may step down, sir.

11          THE WITNESS:  Thank you Your Honor.

12          THE COURT:  Does that conclude your witness evidence?

13          MS. FERRY:  Yes, Your Honor.

14          THE COURT:  All right.  Does the petitioner rest?

15          MS. FERRY:  Yes.  Yes, we do.

16          MS. ODEN:  Your Honor, we're ready to call Dr. Allen.

17  Could we have just a five-minute break?

18          THE COURT:  Sure.

19    (Recess from 10:19 a.m. to 10:24 a.m.)

20          THE COURT:  All right.  Dr. Allen.  I think you were

21  previously sworn, correct?

22          THE WITNESS:  I was, Your Honor.  Thank you.

23          THE COURT:  Very good.  Thank you.

24                        **DIRECT EXAMINATION**

25  BY MS. ODEN

Allen - Direct by Ms. Oden

1    Q.  Good morning, Dr. Allen.

2    A.  Good morning.

3    Q.  I would like to start with talking about your

4    qualifications and your educational background, if I may.

5    A.  Yes, ma'am.

6    Q.  What do you do for a living?

7    A.  I'm a psychologist in private practice.

8    Q.  Okay.  And do you distinguish between clinical psychology

9    and forensic psychology?

10   A.  Yes, ma'am.

11   Q.  Are you a clinical psychologist or a forensic psychologist?

12   A.  My practice revolves around forensic psychology.  I haven't

13   done any counseling since about '02.  I began winding that part

14   of my practice down.

15   Q.  Okay.  Tell us about your educational background as it

16   applies to your profession.

17   A.  I have a bachelor's degree in psychology from Western New

18   Mexico University.  My master's degree is in psychology from

19   Texas A & M University.

20   Q.  From?

21   A.  Texas A & M University.  My Ph.D. is in psychology from

22   Texas A & M at Commerce.

23   Q.  And was that a Master of Arts degree?

24   A.  No.  It's an M.S. in experimental psych at A & M.

25   Q.  And an M.S. stands for?

Allen - Direct by Ms. Oden

1  A.  Master of Science.

2  Q.  And what's the difference between a Master's of Arts in

3  psychology and a Master's of Science in psychology?

4  A.  Well, you can have departments in universities that -- a

5  major university will have a College of Science, a College of

6  Art, a College of Medicine or a law school, and some psychology

7  programs are in the College of Arts.  That tends to be things

8  like educational psychology, school psychology maybe.

9          At A & M, when I was there, they didn't have a

10 Ph.D. program in the science department.  They had a Ph.D.

11 program in the College of Education, which was in educational

12 psychology.

13 Q.  And, so, tell us a little bit more of the Master of Science

14 degree in experimental psychology.

15 A.  Well, it's general experimental psychology and when you

16 have that kind of a program, it usually involves a little

17 neuroanatomy and, you know, putting electrodes in rat brains

18 and things like that.

19 Q.  Okay.  Do you have a doctoral degree in psychology?

20 A.  Yes, ma'am.

21 Q.  And where did you get that degree?

22 A.  That was Texas A & M at Commerce.

23 Q.  Okay.  What was your minor when you were doing your --

24 A.  Statistics.

25 Q.  Let's talk about a little bit about your professional

Allen - Direct by Ms. Oden

1   experience.  Where did you start out working when you were

2   finished with your education?

3   A.  After I got my master's degree, I went to work at Rusk

4   State Hospital.

5   Q.  And what is Rusk State Hospital?

6   A.  It's, you know, a large state mental health facility,

7   inpatient psychiatric facility.  At the time it had two

8   sections.  One was for the civilly committed and one was for

9   the -- what we call the criminally insane, the maximum security

10  unit.

11  Q.  And was that where you were working?

12  A.  Ultimately.  My first position, I hadn't quite completed my

13  master's degree.  I was still running data for my thesis or

14  writing on my thesis, but I worked as a treatment coordinator,

15  which was a day treatment program for the chronic psychiatric

16  patients.

17  Q.  And when you say a day treatment program, does that mean

18  that it was not inpatient?

19  A.  No, it was inpatient, but patients would be referred from

20  other units in the hospital.  We might have patients from the

21  mental retardation unit, the chronic psychiatric unit.  They

22  would come to us during the day, where we would manage them

23  during the day and try to teach them things.

24  Q.  Okay.  And was your role as a treatment coordinator a

25  clinical role, a treating role?

Allen - Direct by Ms. Oden

1  *A.*  Well, yes, in that I was responsible for designing and
2  implementing the BMOD program.  We had a system of, you know,
3  reinforcements and they could earn points and trade them in
4  when they had good performance, and so I supervised the staff,
5  with people teaching them all kinds of things, from pictures,
6  colors, math.  And, so, I was responsible for supervising that
7  staff and making sure that they were applying principles of
8  behavior modification appropriately.
9  *Q.*  Okay.  And that's what "BMOD" stands for?
10 *A.*  Yes, ma'am.
11 *Q.*  Okay.  You said that that was your first position at Rusk
12 State Hospital.  What was your next position at Rusk?
13 *A.*  Actually that's when I did my predoctoral internship.  I
14 worked for about a year in the maximum security unit.  And, you
15 know, it's very much a rookie role.  I was supervised by the
16 director of psychology for the maximum security unit.  And
17 there were several other master's level people there, but I
18 also had to report to the medical director, who was a
19 psychiatrist.
20 *Q.*  And when you say it was a maximum security unit, tell us
21 what kind of offenses would have resulted in someone being
22 assigned to the maximum security unit.
23 *A.*  Well, parallel to what we do today up at Vernon State
24 Hospital, you had people who were criminally committed.  That
25 means they had charges and they were sent there for maybe

Allen - Direct by Ms. Oden

1  pretrial evaluations, competency to stand trial, sanity

2  determinations, things such as that.  Some of them then were

3  not there for very long.  They might be under observation, and

4  we do an evaluation within a week or two.  But others were

5  there under long-term commitments and we couldn't put them in

6  the civil section because of their violence levels, for

7  example.

8  Q.  Okay.

9  A.  And, so, I was, you know, a rookie.  I was learning.  But I

10  was a part of the treatment team and we would do weekly

11  staffings on patients, to make various decisions regarding

12  competency, sanity, risk for violence, can we move them to the

13  civil section, things like that.

14  Q.  Okay.  Were you working with any patients that had any

15  psychotic disorders in the maximum security unit?

16  A.  Yes, ma'am.  We saw the entire spectrum of psychotic

17  disturbances.  We saw people who were mentally retarded.  We

18  saw people who were mentally retarded and mentally ill.  We saw

19  people who were mentally ill.  And the criminal charges could

20  vary.  I mean, they're almost always felonies, but they could

21  vary from, you know, burglary of a habitation to serial

22  killing, mass murder, bank robberies, things like that.

23  Q.  So, I see on your CV, which is Respondent's Exhibit 51,

24  that you were the staff psychologist in the maximum security

25  unit for a year.  After you were a staff psychologist, did you

Allen - Direct by Ms. Oden

1  stay at Rusk State Hospital?

2  A.  Yes, ma'am.

3  Q.  And what did you do next at Rusk?

4  A.  I think the next thing I did was, they actually kind of

5  promoted me into -- not kind of.  I got a promotion.  They

6  wanted me to run a unit for the chronic psychiatric patients

7  and set up a behavior modification program there.  We had -- of

8  course, the population in the state hospital then was huge.

9  It's been reduced now with budget cuts and everything.  But

10  there was a chronic psychiatric unit with -- I mean, it had two

11  or 300 patients on it.  So, a big staff of what we call psych

12  techs, psychiatric nurses, various levels of therapists.  We

13  had a psychiatrist.  And, so, my job was to set up and run a

14  behavior modification program on that unit.

15  Q.  Now, you said there were about two to 300 patients.  Is

16  that two to 300 at any given time or a total of two to 300 for

17  the entire year?

18  A.  Well, two to 300 in a given time, although at that point

19  most of that two or 300, most of them had been there a long

20  time and were going to be there probably until they passed.

21  So, it was a pretty stable population, but, yeah, there was

22  some turnover.

23  Q.  Okay.  I would assume that some of the people there had

24  schizophrenia or other psychotic disorders?

25  A.  Yeah, virtually all of them were chronic schizophrenics.

Allen - Direct by Ms. Oden

1    Q.  What was your next position at Rusk?

2    A.  Well, somewhere in there I worked on -- we had what we call

3    a dual diagnosis unit for mentally retarded persons who were

4    also mentally ill.  And we had a master's level psychologist.

5    He got pretty sick and so Dr. Thompson moved me over there to

6    fill in his role for, I forget, six months or so.  And, of

7    course, I did the things you do with mentally retarded persons.

8    We had admits and I did the IQ testing and we did usually the

9    violent to excessive adaptive behaviors and I helped -- we

10   didn't have a formal BMOD program there at that time, but I did

11   help the nursing staff kind of apply those principles to manage

12   some of the mentally retarded clients.

13   Q.  So, the discussion that we've had so far, does that pretty

14   well cover the length of time that you were employed at Rusk

15   State Hospital?

16   A.  No, actually I think one of the most important experiences,

17   aside from the maximum security unit, was when I was a

18   psychologist on the admissions and diagnostic unit.

19   Q.  And tell us about that.

20   A.  That is civilly committed patients would be brought from

21   various counties depending on what your catchment area is

22   pretty much on a weekly basis and they would go through a

23   process of first going to the unit nurse where they would do

24   initial screenings, take their weight, blood pressure, et

25   cetera, and then they would get a screening evaluation by the

Allen - Direct by Ms. Oden

1   psychologist, which was me.  Later they added another one,

2   because it was just too big of a workload for one person.  And

3   we would do an initial screening and then take that to the

4   psychiatrist, which would shorten his time that he had to spend

5   with them.  And then based on that, he would write initial

6   orders for whatever was needed, medications or lockup or

7   whatever.

8              So, I basically screened all the civilly

9   committed patients at Rusk State Hospital for around three

10  years.  And, of course, I saw the entire spectrum of, you know,

11  affective disorders, thought disorders, even some mentally

12  retarded people were admitted that way.

13  Q.  Okay.  What does it take to be civilly committed?

14  A.  At the time -- and I don't think that statute has changed

15  or has changed much at this point, but basically it involves

16  demonstrating a risk of harm to yourself or others.

17  Q.  And is that different from what it takes to be criminally

18  committed?  I would imagine criminal commitment means you

19  already hurt yourself or others?

20  A.  Yeah, and you've got a charge pending and you're committed

21  because the judge sends you there.

22  Q.  So, in your three years in the diagnostic admissions

23  portion of Rusk State Hospital, about how many patients do you

24  think that you saw?

25  A.  At Rusk?

Allen - Direct by Ms. Oden

1   Q.   Yes.  And not in your entire time at Rusk.  I'm talking
2   about that three-year period where you were doing the
3   diagnostics upon their admission civilly.
4   A.   In that three-year period?  I mean, a thousand wouldn't
5   surprise me in that time frame.
6   Q.   Okay.  And do you have any idea about over your time
7   entirely at Rusk about how many patients you saw?
8   A.   Maybe 5,000.  I mean, we dealt with in maximum security
9   alone about 800 per year.
10  Q.   Okay.
11  A.   And that was high turnover there.  But there were a few
12  that were there permanently because of the violence issue, but
13  in a year you're going to see 800 just there alone.
14  Q.   And is there any way that you can approximate of the number
15  of patients that you saw about how many would have had
16  psychotic disorders?
17  A.   Well, when I was on -- they all did.  I mean, when I was on
18  the admissions unit, they were basically being admitted because
19  they were psychotic --
20  Q.   Okay.
21  A.   -- and a danger to themselves and others, and then all the
22  other ones, especially on the chronic psychiatric unit, even in
23  day treatment, they were all psychotic.  In maximum security, I
24  mean, a lot of them were psychotic, but then in that setting,
25  there was a much more prominent issue of malingering.  That was

Allen - Direct by Ms. Oden

1  an issue, too, on the admissions and diagnostic issue, but the

2  motive for malingering there was a little different.

3  *Q.*  Well, we'll get to that in just a second.  I want to

4  retreat just a little bit and ask, you mentioned that you

5  administered IQ tests and other tests.  Would you say that you

6  had few or many occasions to administer psychological

7  assessments using formal testing measures?

8  *A.*  Many.

9  *Q.*  Okay.  And what kind of tests did you administer in

10 general?

11 *A.*  There were individual intelligence tests, like the Wechsler

12 or the Stanford-Binet.  In maximum security you use group

13 testing a lot, such as the Beta, the Beta IQ, because it's

14 nonverbal.  You give it to a bunch of people, and we used it as

15 a screening device.  Tons of personality testing, like the good

16 old, you know, MMPI or similar kinds of things.

17 *Q.*  Did you have any occasion to administer neuropsychological

18 tests, like the Wisconsin Card Sorting Test or the naming

19 tests?

20 *A.*  I did some of that.  When I was there, Dr. Thompson always

21 made us go to continuing education.  So, I got trained early on

22 on using the Halstead-Reitan Battery, although since then I've

23 never used the battery.  But, yeah, you would do things like

24 the Wisconsin Card Sort Test, the Boston Naming Test.  Trail

25 Making A and B is a nice way to assess some cognitive

Allen - Direct by Ms. Oden

1   functioning-type issues.  Parts of the Halstead, like finger

2   tapping, to assist different, you know, brain behavior

3   relationships or functioning.  Of course, IQ testing was always

4   part of a neuropsych evaluation.

5   Q.  Are you familiar with the tests that Dr. Roman administered

6   to Mr. Eldridge in this case?

7   A.  Yes, ma'am.

8   Q.  Have you administered those tests yourself to other

9   patients?

10  A.  Yes, ma'am.

11  Q.  So, I would like to talk a little bit about while you were

12  at Rusk, your working with psychiatrists and your knowledge of

13  psychological treatments involving medication.  Did you have

14  few or many occasions to work with a psychiatrist and observe

15  their treatment regimen of medications?

16  A.  Yes, ma'am.

17  Q.  Few or many?

18  A.  Many.

19  Q.  And would you work in -- tell me about the relationship

20  that you would have with a psychiatrist and their treatment

21  protocols.

22  A.  Well, it was always a team approach.  The psychiatrist

23  typically ran the team.  On admissions and diagnostic, it was

24  just a three-person team.  It would be the psychiatrist, the

25  unit nurse, and then myself.

Allen - Direct by Ms. Oden

1              Get them started on medications.  The nurse would

2   come back with feedback -- usually the nurse, about how they're

3   doing on those medications.  And then when I interacted with

4   them, if I saw anything that I felt like I needed to report,

5   then I would bring it up.  You know, if he started them on

6   800 milligrams of Thorazine, are they showing extrapyramidal

7   symptoms, are they getting too uncomfortable --

8   Q.  What's extrapyramidal?

9   A.  Just -- call it just a side effect of the antipsychotics.

10  And with the older antipsychotics, they were truly common.

11  Q.  So, specifically when you were at Rusk State Hospital,

12  we're talking about a time period in the 1970s, correct?

13  A.  Yes, ma'am.  I was there '74 to '81.

14  Q.  Okay.  So, were you familiar with the medication Thorazine?

15  A.  Yes, ma'am.

16  Q.  Was that used on few or many of the patients that you

17  treated?

18  A.  Many.

19  Q.  Was Risperdal or risperidone a medication that was used at

20  Rusk?

21  A.  No, it hadn't been developed yet.  Thorazine, Navane,

22  Stelazine, Mellaril were the big four of the old school

23  antipsychotics.

24  Q.  Okay.  One of the medications that you mentioned was

25  Navane?

Allen - Direct by Ms. Oden

1  A.  Yes, ma'am.

2  Q.  And that's the same Navane that we talked about in

3  Mr. Eldridge's case?

4  A.  Yes, ma'am.

5  Q.  Did you have few or more occasions to observe the effect of

6  Navane on patients that were under your care?

7  A.  Yes, ma'am.

8  Q.  One of the things that you mentioned was malingering in the

9  patients that came to Rusk.  What does malingering mean in that

10  context?

11  A.  Simply the false production of symptoms for some sort of

12  gain.

13  Q.  And when you mentioned a few minutes ago, you said that

14  they had a different motive, tell us more about that.

15  A.  Well, in a criminal setting, the typical motivation can be

16  identified with an external goal, you know, avoiding criminal

17  prosecution, things like that.  In the civil section, what we

18  dealt with a lot was other external motives, such as looking

19  for, you know, three squares and a bed.  And, you know, as the

20  weather changed, we get more people seeking admission to the

21  hospital to get out of the weather.

22  Q.  Okay.

23  A.  And, so, you know, the superintendent -- and we were

24  beginning to really face budget issues then -- said, you know,

25  as much as we want to help them, we've got budget limitations

Allen - Direct by Ms. Oden

1  and you guys have got to do a better job of screening those

2  people that are just looking for three squares and a cot.

3                   But also in the civil section you're more likely

4  to see malingering for internal motivations, what we call some

5  kind of somatoform disorder or factitious disorder, where they

6  want to assume the sick role.  It's a psychological goal, they

7  like it.

8  Q.  Okay.  Would you say then that in the criminal portion --

9  the criminal commitment section of Rusk and in the civil

10 commitment section of Rusk, that in both cases the malingering

11 would be an attempt to display more symptoms or be sicker than

12 they really were?

13 A.  Correct.  Let's assume that their actual sickness is zero.

14 They could be making up symptoms going, we'll say zero to ten,

15 or they could actually have some illness, but they're

16 exaggerating it because of some motive, but both are

17 malingering.

18 Q.  Would you say you have a small amount or a large amount of

19 experience in distinguishing between people that start out at

20 zero, they're not at all ill and they're malingering versus

21 people that do have illness and they're exaggerating or making

22 up an entirely separate disorder?

23 A.  Yes, ma'am, I've seen both quite a bit.

24 Q.  So, were you -- did you administer -- what did you do when

25 you were at Rusk to determine the presence of malingered

Allen - Direct by Ms. Oden

1  symptoms?

2  A.  We did not have the methodologies that we have today.  If

3  you could give them an MMPI, for example, that could help you

4  assess malingering, because it's got some scales on it that

5  measure exaggeration.  Other than that, it was all about

6  clinical judgment and assessing the core issue of malingering,

7  which is always about consistency issues in one form or

8  another.  You know, is what they're claiming consistent with

9  what we know about mental illness; is it consistent with what

10  we know about delusions; is it consistent with what we know

11  about hallucinations; is it consistent with what we know about

12  not just primary but the secondary symptoms or the negative

13  symptoms of schizophrenia, for example; is what they're

14  claiming consistent or inconsistent with their behavior; you

15  know, if they have such and such a delusion, is their behavior

16  consistent with that delusion.

17            So, it was much more clinical and we didn't

18  have -- like on cognitive malingering, we didn't have the Word

19  Memory Test.  We didn't have the Test of Memory Malingering.

20  We didn't have the SIRS back then or the M-FAST or the SIMS or

21  those kinds of devices.

22  Q.  When you were using clinical judgment to assess whether a

23  person was malingering, was that an accurate way of assessing

24  their effort?

25  A.  Well, I mean, in a word yes, if you do it systematically,

Allen - Direct by Ms. Oden

 1   if you go by what's laid out, you know, in the research
 2   literature that's been proven effective.  It just -- being able
 3   to add objective measures, you know, can really be helpful in
 4   confirming.  Because even now it's all about clinical judgment
 5   and assessing them clinically regarding the quality of the
 6   symptoms they're claiming and comparing that to external
 7   sources of information.  And it's sort of like if you're
 8   claiming a back injury but competing every weekend in jujitsu,
 9   then your personal jury claim may not have some validity to it,
10   that kind of thing.
11   Q.  What about using clinical judgment to evaluate your
12   subjective impression, for example, watching someone perform
13   certain tests and saying that they appeared to do their best,
14   they appeared to give good effort, is that an accurate method
15   of assessing their effort?
16   A.  It's really not.  And I'm as guilty as a lot of
17   psychologists.  For years that's what we did.  You give someone
18   an IQ test and he appeared to be making good effort, so you put
19   that in your report, that he appeared to be making good effort;
20   therefore, I consider the results of the IQ test to be
21   accurate, when, in fact, research later showed us that those
22   kind of off-the-cuff clinical judgments were inaccurate.
23               And it was later demonstrated that with all
24   neuropsych measures, half the variance is due to effort.
25   People who make good effort have higher scores.  People who

Allen - Direct by Ms. Oden

1   make poor effort have lower scores, regardless of their actual
2   neuropsychological status.  And, you know, when that's
3   demonstrated to you with research, it's pretty shocking.  But
4   you, you know, all these years, say, well, yeah, he's making a
5   good effort, so his IQ of 100 must be accurate.  But it turns
6   out, you know, it could very well be that his IQ should have
7   been 115.
8   Q.  I would like to go back to your professional experience.
9   You said you were at Rusk until, I believe you said 1981?
10  A.  Yes, ma'am.
11  Q.  What kind of experience professionally did you have after
12  that?
13  A.  Well, after I got out of graduate school, I went to work at
14  Mother Frances Hospital in Tyler.  And I was director of the
15  psychiatric unit there.  It was a 30-bed inpatient psychiatric
16  unit.  There were -- I forget now, four or five psychiatrists
17  in private practice who admitted patients there.  And then we
18  had a therapy staff of four or five or six people, somewhere in
19  there, that I supervised.
20  Q.  About how many patients do you remember seeing -- or how
21  many patients do you think you saw while you were at Mother
22  Frances?
23  A.  Well, it was a 30-bed inpatient unit.  The average length
24  of stay was about three weeks.  I can't do that math in my
25  head.

Allen - Direct by Ms. Oden

1   Q.  Did you usually have all the beds full?

2   A.  Yes, ma'am.

3   Q.  Okay.  And what kind of disorders would cause someone to

4   come to Mother Frances?

5   A.  Psychotic states.  It might be psychotic mood states and

6   they were, you know, really suicidal or something like that,

7   severely depressed, bipolar disorders, or manic phases.

8   Schizophrenia was pretty commonly seen as well.

9   Q.  And did you have to be considered --

10  A.  Well, I should point out, we also saw a lot of substance

11  abuse patients.

12  Q.  Okay.  Did you need to be concerned about malingering of

13  the disorders at Mother Frances in the same way that you had to

14  worry about it at Rusk?

15  A.  No, ma'am.  I don't remember us ever addressing the issue

16  of malingering at Mother Frances.

17  Q.  And was that simply because the patients were different and

18  this group of patients weren't malingerers or was that more of

19  an institutional culture?

20  A.  One, it's rarely an issue when people are either

21  voluntarily or civilly committed to a private facility.

22  Q.  Why is that?

23  A.  Why am I going to fake my symptoms if it's going cost me

24  money, at least an insurance claim, and their copays and

25  deductibles.  So, that motive just typically isn't there in a

Allen - Direct by Ms. Oden

 1  private facility.  I do remember a case, but it was at
 2  University Park Hospital.  They built the hospital and moved
 3  the unit there and the 30-bed unit became a 90-bed inpatient
 4  psych hospital.
 5  Q.  Was that the next place that you worked after Mother
 6  Frances?
 7  A.  Yes, ma'am.  I became a -- of course, the staff expanded,
 8  but I became what was called the clinical director there.  And
 9  we had an adult unit, a substance abuse unit and later a
10  pediatric unit.
11  Q.  And were you working in the adult unit at University Park
12  Hospital?
13  A.  Yes, ma'am.
14  Q.  And --
15  A.  Well, I mean, I designed the programs for all three of
16  them.
17  Q.  Okay.  And were they the same type of patient as you saw at
18  Mother Frances?
19  A.  Yes, ma'am.
20  Q.  And would you say that they have the same disincentive for
21  malingering?
22  A.  Yes, ma'am.  I mean, I can remember one case, a young man
23  who was admitted, and I later found out, like within 48 hours,
24  that he was in criminal trouble, that a murder had been
25  committed, and there was later questions about the veracity of

Allen - Direct by Ms. Oden

1   his presentation.

2   Q.   Okay.   And did you develop your doubts about his

3   presentation because of his presentation or because somebody

4   else told you that he was probably malingering?

5   A.   Nobody told me he was probably malingering, but I was at

6   the front door when the police showed up.   The psychiatrist

7   insisted that he wasn't malingering.   I didn't assess him.   So,

8   I don't know.

9   Q.   Okay.   All right.   So, how long were you the director of

10  clinical services either at Mother of Frances or at University

11  Park Hospital?

12  A.   That whole total time I think was maybe two years.

13  Q.   Okay.   You mentioned that you were the director.   Were you

14  creating any directives for the staff to watch out for things

15  like malingering?

16  A.   No, we never did any formal discussions of malingering for

17  the staff.

18  Q.   Okay.   To your knowledge, if you have personal knowledge,

19  is that common among other private mental health institutions,

20  like hospitals?

21  A.   Yes, ma'am.   It's just rarely considered as an issue.   To

22  demonstrate it, there's a rather classic study called the

23  Rosenhan study that received a lot of attention.   And in the

24  Rosenhan study what happened is they took normal people, I

25  think 8, 10, 12 of them and had them go to -- I forget how

Allen - Direct by Ms. Oden

1  many, 6, 8, 10, 12 mental hospitals and present with either no
2  or very minimal odd hallucinations.  For example, why are you
3  here today?  Well, I keep hearing this clicking sound in my
4  mind.

5            They were all admitted.  They all got diagnosed,
6  most of them with psychotic diagnoses, even though after
7  admission they never said another thing about symptoms.  There
8  was no effort to rule out malingering.

9            And it doesn't mean that all the psychiatrists
10 and psychologists and psychiatric nurses are stupid idiots.  It
11 simply means it's not an issue in that kind of a setting.  It
12 just rarely comes up as an issue.

13 Q.  And when you say an odd hallucination, do you mean that's
14 really crazy or do you mean it's atypical?
15 A.  Atypical.  Not typical.
16 Q.  Okay.  Going back to your personal experience, after you
17 left University Park Hospital, what did you do professionally?
18 A.  I went into private practice.  Initially I started working
19 with a psychiatrist, but basically we developed an inpatient
20 chronic benign pain program at East Texas Medical Center and
21 began seeing patients with chronic benign pain, spine pain,
22 generally.  And I began working with a lot of physicians.  I
23 worked with a lot of the neurosurgeons and orthopedic surgeons
24 who did elective spine surgery, to help sort out patients who
25 might be engaged in malingering for external goals, like

Allen - Direct by Ms. Oden

1  winning a lawsuit or malingering because they like the sick

2  role and would subject themselves to multiple surgeries.  But I

3  also consulted for, you know, internists, oncologists.  General

4  practitioners might have a patient admitted to the hospital who

5  was depressed or something.

6  Q.  During this time that you were in private practice, how

7  many years was that, or from when to when?

8  A.  Well, I started private practice, like, in around '85 to

9  '86, somewhere in there, until now.  The chronic pain stuff, I

10  got involved with -- or what we call behavioral medicine, I was

11  engaged in that for about ten years through the chronic benign

12  spine pain program and then I was director of the preoperative

13  evaluation program and that's where I helped the spine surgeons

14  rule out patients they didn't really want to cut on, because

15  they were extremely reluctant to use the word "malingering" in

16  a medical setting, because you're actually more likely to get

17  sued for not giving treatment than if you give treatment.  But

18  if you give treatment and they're not going to respond because

19  of malingering issues, you've got to have a hat to hang your

20  hat on.  And, so, I was sort of their scapegoat, you know,

21  because they could say, well, the shrink said, you know, that

22  this was a factitious disorder.

23  Q.  Okay.  During the time that you've been in private

24  practice, did you ever have occasion to treat someone with a

25  psychotic disorder?

Allen - Direct by Ms. Oden

1   A.   In my counseling practice I didn't see people who were

2   actively psychotic.   There were occasions I saw some who were

3   on medication and they had the history, but they weren't

4   actively hallucinating.   It was well controlled with

5   medications.

6   Q.   Okay.

7   A.   The only time I really was involved in treatment directly

8   was on an inpatient basis.

9   Q.   Okay.   And speaking specifically about your private

10  practice, your counseling practice, the patients that you saw

11  with controlled psychotic disorders, about how many would you

12  say you saw?

13  A.   Not that many.   I'm not sure I could count them.   I mean,

14  it was an issue that came up.   Now, this is the counseling

15  practice.   I mean, when I do -- when they're in jail, I mean, I

16  run into psychotic disorders.   That's a different deal.

17  Q.   Yeah, I'm leaving that aside.

18  A.   Right.

19  Q.   I'm just talking about your clinical, therapeutic

20  experience with people with controlled psychotic disorders.

21  A.   It wasn't that frequent in my counseling practice.

22  Q.   Okay.   Would you say less than 50?

23  A.   Yeah, it would be less than 50 probably in those years.

24  Q.   Okay.   And then at some point did you kind of cease being

25  in this behavioral medicine role dealing with the people with

Allen - Direct by Ms. Oden

1  benign pain or are you still doing that practice now?

2  A.  No, I'm not doing that.  I mean, I started getting out of

3  that, well, for personal reasons, in '96.  I changed my whole

4  practice.  In '97 my wife got sick, and so I totally changed my

5  practice.

6  Q.  And what direction did your professional practice take at

7  that point?

8  A.  Well, I actually started to get more involved in forensic

9  psychology in '87.

10 Q.  Okay.

11 A.  Because of my background -- with my predoctoral internship,

12 my strength was actually forensic psychology, you know, and

13 then in '87 I started to get a smattering of requests to do

14 competency to stand trial examinations, but because I saw so

15 many medical patients, too, I started getting involved in civil

16 litigation, you know, medical malpractice, personal injury

17 claims, and I did some of that, but I haven't done any civil

18 stuff now.  I turn those cases away now.

19 Q.  Okay.  So, in the civil forensic work that you did, did you

20 have few or many occasions to be asked to address issues of

21 malingering?

22 A.  It was a common issue in any kind of -- yeah, there's often

23 external goals, financial gain.

24 Q.  And when would you say you started really developing your

25 criminal forensic psychology practice?

Allen - Direct by Ms. Oden

1   A.  Well, in terms of practice, that actually began around '87,

2   '89, in that time frame.  I was just so busy with other things

3   I couldn't -- I couldn't take just those kind of criminal

4   cases.  But my work in criminal cases just gradually escalated

5   in the, you know, early and mid-Nineties and I began doing

6   capital cases and competency to stand trial and sanity and risk

7   assessments and things like that.  And then it just became

8   almost totally criminal work by 2002.

9   Q.  And in your criminal forensic practice, about what

10  proportion or if you would rather say it in terms of numbers,

11  about how many inmates or offenders, whatever, would you say

12  had a psychotic disorder?  Let me back up.  Let me ask, how

13  many presented as having a psychotic disorder?

14  A.  Well, it's not -- I'm not sure if I could give you a

15  number.  It's not at all uncommon, and actually I think the

16  frequency is increasing as, you know, state hospital budgets

17  are shrinking and more people are on the streets and a lot of

18  them are chronically psychotic and they're showing up in our

19  jails.  Some weeks if I do, say, three, four, or five exams,

20  none of them may be psychotic.  I think last week I did four,

21  and three of them were actively psychotic.

22  Q.  And what kind of exam are you talking about?

23  A.  Competency to stand trial -- well, some of them are sanity.

24  Q.  Okay.  And of the patients who are presenting as having a

25  psychotic disorder, how many would you say you have determined

Allen - Direct by Ms. Oden

1  to be malingering?

2  A.  I don't know that I can give you a number.  The incidence

3  of malingering in these criminal cases, when you're dealing

4  with someone who's in jail is pretty high.  I run into it

5  often.  I have to screen for it routinely.  You have to.  And

6  there are studies on it, you know, whether it's cognitive

7  malingering or psychiatric malingering, as to the, you know,

8  the incidence, the frequency of it, because there's a lot of

9  variability in the studies.  I mean, some have reported an

10 incidence rate as high of 70 percent of malingering, others as

11 low as 8 percent malingering and everywhere in between.

12 Q.  And as you've worked on these criminal forensic cases, have

13 you had the opportunity to observe people with psychotic

14 disorders that are being treated with psychotropic medications?

15 A.  Yes, ma'am.

16 Q.  And would you say that you're familiar with how people

17 react to medication and how it changes their symptoms?

18 A.  Yes, ma'am.

19 Q.  Okay.  I see on your CV that you have taught psychology at

20 universities.  Have you ever, as part of your teaching, taught

21 about psychotic disorders?

22 A.  Well, sure.  I mean, I've taught introductory psych, social

23 psych, applied psych, history of psych.  And certainly you're

24 going to touch on that in introductory psych and more so in

25 applied psychology.

Allen - Direct by Ms. Oden

1   *Q.*  You've never taught a class specifically about psychotic
2   disorders?
3   *A.*  I've never taught --
4             *THE COURT:*  You mean wholly devoted to?
5             *MS. ODEN:*  Yes, ma'am.
6   *A.*  I've never taught abnormal psychology, and I don't even
7   know of a course that would be devoted totally to psychotic
8   disorders.
9   *Q.*  Okay.  Have you also taught your students about the
10  detection of malingering?
11  *A.*  No, I never taught that in school.
12  *Q.*  Do you currently participate in any professional
13  organizations that focus on forensic psychology or the issues
14  that we've talked about in this case?
15  *A.*  Well, I mean, I'm a member of the American Psychological
16  Association and then I'm a member of the chapter on law and
17  psychology.
18  *Q.*  And does that have a regular participation or focus on
19  issues like malingering of --
20  *A.*  Oh, yeah, it comes up.  It gives you access to their
21  journal.  You get their journal.  You join, so you get the
22  quarterly journal on *Law and Human Behavior*.  And, of course,
23  malingering shows up as a topic and then competency shows up,
24  all of those kinds of issues.
25  *Q.*  And do you regularly read the literature from your

Allen - Direct by Ms. Oden

1  profession that deal with the issues that came up in

2  Mr. Eldridge's case?

3  A.  You're going to have to restate that one.

4  Q.  Do you regularly read the literature from your profession

5  that deals with issues that like malingering or psychotic

6  disorders?

7  A.  Well, I mean, yeah, I do my best to keep up, you know, with

8  what I think is relevant.

9  Q.  Okay.  And tell me about any continuing education that

10  you've participated in that you feel is particularly important

11  for the Court to consider.

12  A.  Well, I mean, the Board requires us to go to continuing

13  education every year.  I think now we're required to get 12

14  direct hours a year.  So, I've been to a lot of different ones.

15  Most of them, the ones I prefer going to are put on by the

16  American Board of Forensic Psychologists.  And they do a really

17  good job of focusing in on and providing ongoing training

18  related to topics relevant to forensic psychology, whether it's

19  assessing child sex abuse allegations or competency, insanity,

20  various psychological tests that are used in the field.

21  Q.  I'm looking at page 2 of your CV under continuing

22  education, and I'm wondering if I mistakenly gave an old

23  version of your CV as an exhibit, but I see that there is not a

24  class listed for 2012 or 2011.

25  A.  Well, I've got continuing education for 2011.  This would

Allen - Direct by Ms. Oden

1   be an older one.

2   Q.  Okay.

3   A.  I haven't gone yet in 2012.  If you can give me a moment.

4   I just don't remember.  In 20 -- last year, in 2011, I got 14

5   hours of continuing education.  It was with the American Board

6   of Forensic Psychology.  Let's see, seven of the hours were

7   ethical issues in forensic practice.  There was another seven,

8   and I'm not sure what it was in.

9   Q.  If you don't remember right now, that's fine.  I'm sure

10  that we'll have another chance another day to talk about it.

11  Do you see any other recent continuing education that you

12  participated in that was especially important for the Court to

13  consider?

14  A.  Yeah, I went to Richard Rogers' seminar in February of 2010

15  in New Orleans.  It was his seminar on the SIRS-2.

16  Q.  Okay.  And how long was that seminar?

17  A.  I got seven hours of credit for that.

18  Q.  Okay.  And was the whole thing just about the SIRS-2?

19  A.  Primarily about the SIRS-2.  He got into topics about

20  malingering in general, but then it was all about the

21  development of the SIRS-2, how it compares to the SIRS-1, you

22  know, it's different, things like that.

23  Q.  Prior to that seminar, had you administered the SIRS-1 to

24  other patients -- to patients in general, I should say?

25  A.  Yeah, I'd used it in some criminal cases, of course, yeah.

Allen - Direct by Ms. Oden

1  *Q.* And did you already have the SIRS-2 when you went to this
2  seminar in 2010?
3  *A.* No.
4  *Q.* And after the seminar, did you decide to buy the SIRS-2?
5  *A.* Well, actually going to the seminar, I got a bunch of free
6  pamphlets, which was pretty nice of him to hand out, and then I
7  just bought the manual that goes to the SIRS.
8  *Q.* Okay.  Did you buy the actual test itself?
9  *A.* No, I got freebies from him.  I think he gave us about half
10 a dozen.
11 *Q.* Okay.  Have you ever administered the SIRS-2?
12 *A.* No, ma'am.
13 *Q.* Do you find it a persuasive or compelling test for
14 assessing malingering?
15 *A.* No, ma'am.  I'm having some real problems applying the --
16 using the SIRS-2, actually especially after attending his
17 seminar.
18 *Q.* Okay.  We'll talk about that more in detail when we talk
19 about the actual SIRS-2 in this case.  Were there any other
20 recent continuing education sessions that you think are
21 particularly important?
22 *A.* Well, I did ethics again last -- or in 2010.  You know,
23 they're all relevant to what I do, including this case.  I go
24 to some kind of ethical thing every year.  It's required by the
25 Board, if nothing else.  But, you know, assessment of

Allen - Direct by Ms. Oden

1   malingering, assessment of psychopathology are all seminar-type

2   things that I've attended.

3   *Q.* About how many times would you say you've done an

4   assessment of someone's competency to stand trial?

5   *A.* Oh, man, a bunch.  Hundreds, thousands.

6   *Q.* Okay.  When you say thousands, do you mean maybe just one

7   or two thousand?  Let's try to narrow it down just a little

8   bit.

9   *A.* At least a thousand, I'll say, surely.

10  *Q.* Okay.  And how many times have you evaluated someone for

11  competency to be executed?

12  *A.* I was only involved prior to this in one case, and that was

13  *Panetti*.

14  *Q.* Okay.  Would you say that your experience in evaluating

15  someone's competence to stand trial is applicable to your

16  experience in a competency for execution assessment?

17  *A.* First thing, the legal background is different.  There's a

18  specific statute in Texas outlining the criteria they want you

19  to follow for a competency to stand trial.  In that sense, the

20  competency to stand trial statute is pretty specific.

21              On the competency to be executed, you know, from

22  my point of view and discussing this with my colleagues, it's

23  actually a pretty low threshold, I'll call it, and is simply

24  rational understanding.  It's essentially based on the *Ford v.*

25  *Wainwright* -- did I say that right? -- ruling and *Panetti*, a

Allen - Direct by Ms. Oden

1  rational understanding, and that's about it.

2  Q.  Do you do the same kind of things to assess someone's

3  competence to stand trial that you would do to assess their

4  competence for execution?

5  A.  Not exactly, in that competency to stand trial, in my

6  opinion, and most of my colleagues, the way they do it, the way

7  I've been trained to do it, is you use a real structured format

8  and you ask really specific questions that help determine if

9  someone is competent to stand trial.  You know, have you got a

10 lawyer?  What's your lawyer's name?  Those kinds of things are

11 real specific.  You will ask questions that are very specific

12 to competency that cover the areas about factual and rational

13 understanding, capacity to cooperate and collaborate with their

14 attorney rationally and so on.

15            With competency to be executed, no such format

16 exists.  There's no tests.  There are tests for competency to

17 stand trial.  There are no tests for competency to be executed,

18 or none that I know of.  So, it's in a sense much more

19 clinical.  Both have the same issue of external motives related

20 to malingering issues.  Both have the same potentials for

21 having to reconcile symptoms, psychotic symptoms, thought

22 disorder versus mood disorder, how does that impact competency.

23 Both issues can involve, well, the person is schizophrenic, but

24 they're still competent to stand trial.  The person is mentally

25 retarded, but they're still competent to stand trial.  You have

Allen - Direct by Ms. Oden

1  the same issue with competency to be executed.

2  *Q.*  Do you have to do similar kinds of record reviews in both

3  cases?

4  *A.*  No, ma'am.  Competency to stand trial is a very routine

5  issue for -- usually a district court issue.  Competency to be

6  executed is much more rare.  You just -- you know, you can't

7  make a living if that's what you're going to do, only

8  competency to be executed.

9           *THE COURT:*  When you get to a convenient stopping

10 point, we will stop.

11          *MS. ODEN:*  I think this is probably a good time.  I

12 was just about to get into the next section.

13          *THE COURT:*  Okay.  I thought that might be true.

14              All right.  So, we have a date to resume.  The

15 Rule has been invoked, but not as to experts.  So, I think that

16 will make that easier.

17              Anything else we need to take up between now and

18 then?

19          *MS. FERRY:*  Your Honor, it just occurred to me that

20 neither petitioner nor respondent offered any of our exhibits

21 under seal, including the raw data.  But I imagine that

22 Ms. Oden and I can speak and submit something in writing about

23 which exhibits.

24          *MS. ODEN:*  I thought we already had an order in place

25 about the raw data and the notes being -- that they would be

1    admitted under seal.

2          THE COURT:  Okay.  What I need you to do is get me a

3    list of the exhibits that need to be treated in that fashion

4    and a list that can be admitted without having to worry about

5    the sealing.

6          MS. ODEN:  No problem.

7          MS. FERRY:  We'll do that, Your Honor.

8          MS. ODEN:  We'll do that.

9          THE COURT:  All right.  Good.  Thank you very much.

10               You may step down, sir.

11         THE WITNESS:  Thank you.

12         THE COURT:  I know that there's a statement, but

13   probably if it's going to take more than five minutes, you'll

14   need to submit it in writing.

15         MR. WIERCIOCH:  It shouldn't take more than five

16   minutes, Your Honor.

17         THE COURT:  Okay.  Do it as quickly as you can,

18   please.  Thank you.

19         MS. ODEN:  So, can you just let us know when we can

20   come back in?

21         THE COURT:  Yes.  Not yet.  Thank you.

22      (The respondent's attorneys and parties left the

23   courtroom.)

24      (Ex parte part sealed, not transcribed.)

25      (Concluded at 11:30 a.m.)

```
1                              * * *

2    I certify that the foregoing is a correct transcript from the

3    record of proceedings in the above-entitled cause, to the best

4    of my ability.

5

6    /s/ Kathy L. Metzger                    5-25-12
     Kathy L. Metzger                        Date
7    Official Court Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```