**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **GERALD CORNELIUS ELDRIDGE,** | § | |
| **Petitioner** | § | |
| | § | |
| **V.** | § | **CIVIL ACTION NO. H-05-1847** |
| | § | |
| **RICK THALER, Director,** | § | |
| **Texas Department of Criminal** | § | |
| **Justice, Correctional Institutions Division,** | § | |
| **Respondent.** | § | |

**PETITIONER'S POST-HEARING BRIEF**

During the evidentiary hearing held by this Court on April 16-18 and May 29-30, 2012, Petitioner Gerald Cornelius Eldridge proved by a preponderance of the evidence that he is not competent for execution under *Panetti v. Quarterman*, 551 U.S. 930 (2007). Specifically, Mr. Eldridge has shown that he lacks the necessary rational understanding of his impending execution because he suffers from a "mental condition [that] precludes him from perceiving accurately, interpreting, and/or responding appropriately to the world around him." *Lafferty v. Cook*, 949 F.2d 1546, 1551 (10th Cir. 1991).[1] Accordingly, this Court should issue the writ of habeas corpus.

**I.     MR. ELDRIDGE SUFFERS FROM SCHIZOPHRENIA.**

As documented in over two and a half years of mental health records from the Texas Department of Criminal Justice (TDCJ), Mr. Eldridge suffers from Schizophrenia.[2] These

---

[1] The Amended Petition for Writ of Habeas Corpus sets out in detail support for the legal standard Mr. Eldridge has proposed. DE 132 at 3-13.

[2] Mr. Eldridge was given a provisional diagnosis of "rule-out schizophrenia undifferentiated type, rule out dementia with psychotic features due to pernicious anemia" on November 20, 2009. Pet. Ex. 8 at 9. He

mental health records—all of which were created by mental health professionals employed by the State of Texas, many of whom possess advanced degrees in psychology and psychiatry[3]—document the symptoms that led his treatment team to diagnose him with Schizophrenia and treat him with powerful antipsychotic medications.  Based on these records, in addition to the testimony of Mr. Eldridge's treating psychiatrist, Dr. Pradan Nathan, and the testimony of Mr. Eldridge's expert, Dr. Michael Roman, this Court should find that Mr. Eldridge is, in fact, severely mentally ill.  The contrary opinions by Respondent's experts, Dr. Mark Moeller and Dr. Thomas Allen, should not be credited.

A.   **THIS COURT SHOULD FIND THAT MR. ELDRIDGE SUFFERS FROM SCHIZOPHRENIA BASED ON HIS DIAGNOSIS AND TREATMENT BY TDCJ MENTAL HEALTH STAFF.**

Dr. Nathan is a psychiatrist with nearly thirty years of forensic psychiatric experience, which includes nineteen years of providing mental health services to inmates at TDCJ.  Hrg. Tr. (4/16/12) at 12, 14.  He completed a fellowship in forensic psychiatry with Dr. Phillip Resnick, who specializes in the detection of malingering, *id.* at 13, and whom Dr. Allen described as his "hero" in assessing psychiatric malingering.  Hrg. Tr. (5/29/12) at 138, 180.  Dr. Nathan testified that he has experience identifying patients who feign symptoms of mental illness, Hrg. Tr. (4/16/12) at 41-42, and that given the prison setting in which he is treating patients, he suspects malingering and determines whether it can be ruled out in every inmate he evaluates.  *Id.* at 58.[4]

---

began receiving antipsychotic medication on November 24, 2009.  *Id.* at 25.  His treatment team ultimately settled on a diagnosis of Schizophrenia.  *Id.* at 162.  Since that time, Mr. Eldridge has consistently received this diagnosis and been medicated with powerful antipsychotics.  *See* Pet. Ex. 9 (table summarizing diagnoses and medications).

[3] *See* Pet. Ex. 9 and 9A (summary exhibit documenting each time a mental health record was electronically signed by a mental health staff member holding either an M.D. or a Ph.D.).

[4] During the evidentiary hearing, there was a great deal of discussion about whether and to what extent it is TDCJ policy to avoid using the term "malingering."  Dr. Nathan provided the most credible and comprehensive evidence regarding this policy, testifying that such a policy did exist at TDCJ

Dr. Nathan further testified that he assumes all of the inmates at TDCJ have antisocial personality disorder (ASPD), or at the very least antisocial traits. *Id.* at 41, 58. In short, Dr. Nathan approaches each patient with skepticism, always considering the possibility of malingering, and does not play the advocacy-centered role that may be true of psychiatrists in a private, clinical setting. *Id.* at 112-13.

Dr. Nathan testified that he is particularly vigilant in ruling out malingering before he prescribes antipsychotic medications. *Id.* at 61. This is not, moreover, a level of caution limited to Dr. Nathan's personal practice. Rather, Dr. Nathan testified that at both the Polunsky and Jester IV Units, antipsychotic medication is not prescribed if there are concerns that the inmate is malingering. *Id.* at 122. Asked what level of certainty he and the other staff psychiatrists must possess about the genuine nature of an inmate's reported symptoms before prescribing antipsychotics, Dr. Nathan testified that "at least a high probability" was necessary. *Id.* This testimony is particularly significant in light of the fact that it includes the psychiatrists at the Jester IV Unit, where Mr. Eldridge received inpatient treatment from November 24, 2009, through June 2, 2010. Pet. Ex. 8 at 19, 152.[5] Inmates transferred to Jester IV for inpatient treatment are subject to close, face-to-face observation from psychologists, psychiatrists, nurses, and medication aides. Hrg. Tr. (4/16/12) at 23-24, 112.[6] Although during his cross-examination Dr. Nathan identified some "red flags" for malingering in various mental health records,

---

approximately seven to eight year ago but that there was no such policy or pressure to avoid the label during his treatment of Mr. Eldridge from 2009 through 2011. Hrg. Tr. (4/16/12) at 69-70, 110-11.

[5] The length of time that Mr. Eldridge was treated at Jester IV is itself probative of the seriousness of Mr. Eldridge's mental illness. As Dr. Nathan testified, there are significant space limitations at Jester IV. Hrg. Tr. (4/16/12) at 24.

[6] Although Dr. Nathan's interactions with Mr. Eldridge took place via the telemed videoconferencing system, every other member of the mental health staff at the Polunsky Unit interacted with Mr. Eldridge face-to-face. Hrg. Tr. (4/16/12) at 111-12. Dr. Nathan testified during the hearing that he saw Mr. Eldridge approximately "four times in my entire nine months." *Id.* at 113. This estimate appears to be in error. Dr. Nathan was Mr. Eldridge's treating psychiatrist at the Polunsky Unit from November of 2009

it is significant that there is not a single notation in any of Mr. Eldridge's mental health records

from November of 2009 forward that document concerns by any of the TDCJ treatment

professionals that Mr. Eldridge may be feigning his symptoms of psychosis. This absence of

documented concerns about malingering from the professionals who were treating Mr. Eldridge

on a regular basis becomes all the more compelling in light of the length of time that Mr.

Eldridge has been treated by TDCJ mental health staff. As Dr. Nathan testified, it would be

"very difficult" to consistently feign symptoms of psychosis during a six month period of

inpatient observation, much less over a two and a half year period of treatment. *Id.* at 130.[7]

Dr. Nathan identified numerous, concrete reasons he believed Mr. Eldridge's symptoms

of psychosis to be genuine. First, Dr. Nathan testified that he personally observed Mr. Eldridge

demonstrate looseness of association, which is one of the most difficult symptoms of psychosis

to feign. *Id.* at 20, 96, 114. Indeed, Dr. Nathan testified that this symptom is "never almost

present with malingering." *Id.* at 42. Dr. Nathan is not the only mental health professional to

have documented looseness of association, moreover. During his 2001 admission to Jester IV,

Dr. Dominic Joseph noted that Mr. Eldridge demonstrated looseness of association. Pet. Ex. 6 at

11. Significantly, Dr. Nathan testified that he was personally familiar with Dr. Joseph and his

---

through August of 2011. *Id.* at 14. Mr. Eldridge was at the Jester IV Unit for only six months of that 21-month period; Dr. Nathan therefore treated Mr. Eldridge for more than nine months. Moreover, Dr. Nathan's electronic signature is the first signature on seven different mental health records created during the treatment period that document evaluations of Mr. Eldridge. *See* Pet. Ex. 8 at 10, 164, 181, 195, 199, 227, 254; Hrg. Tr. (4/17/12) at 460 (testimony of Dr. Roman discussing the fact that it is common practice with electronic records for the first signature to be left by the person who created the record).

[7] *See Clinical Assessment of Malingering and Deception* 62 (Richard Rogers ed.) (3d ed. 2008). This text was acknowledged by both Dr. Roman and Dr. Allen to be authoritative. Hrg. Tr. (4/16/12) at 22-23; Hrg. Tr. (5/29/12) at 176-77. According to a passage authored by Dr. Resnick, "[i]n very difficult cases, inpatient assessment should be considered, because feigned psychotic symptoms are *extremely difficult to maintain 24 hours a day*." *Id.* (emphasis added). Similarly, during Mr. Eldridge's pre-trial competency hearing, Dr. Edward Silverman testified that he referred Mr. Eldridge to the inpatient wing of the Harris County Jail because long-term, inpatient observation is particularly useful when attempting to detect feigning. Resp. Ex. 57 at 164-5 ("Well, the longer you have an opportunity to observe a patient, the more likely it is you will catch them faking, if they are . . . .").

credentials and that Dr. Joseph would be "unlikely to make a diagnosis of looseness of association unless it was fairly prominent."  Hrg. Tr. (4/16/12) at 46-47.  In addition, Dr. Mary Alice Conroy evaluated Mr. Eldridge on September 4, 2009.  Her report stated that her "most significant observation is the pattern of [Mr. Eldridge's] thinking.  Throughout the entire interview, he spoke rapidly and his train of thought was confused, disorganized, and *replete with loose associations typical of an individual who is psychotic*."  Pet. Ex. 13 at 3 (emphasis added). Dr. Allen testified that he is familiar with Dr. Conroy and that she is an experienced forensic practitioner with close to twenty years of experience directing forensic services in three federal prisons.  Hrg. Tr. (5/29/12) at 195-96.

Second, Dr. Nathan testified that it is extremely important that Mr. Eldridge never took steps to call attention to himself.  Dr. Nathan testified that "[m]alingerers usually want to bring attention to themselves."  Hrg. Tr. (4/16/12) at 42.  In contrast, Mr. Eldridge did not submit a request for an evaluation from mental health staff that initiated his contact with them, nor did he otherwise engage in attention-seeking behavior.  *Id.* at 16, 42.  Once mental health staff began evaluating Mr. Eldridge, moreover, he did not volunteer information about his symptoms; rather, Dr. Nathan noted that "[y]ou had to ask specific questions to get any information from Mr. Eldridge."  *Id.* at 19.  The TDCJ mental health records leading up to Mr. Eldridge's scheduled execution date of November 17, 2009, are particularly enlightening on these points.  On November 5, 2009—less than two weeks before his execution date—Mr. Eldridge was seen by mental health staff.  Pet. Ex. 8 at 1.  David Estes, Ph.D., noted "some evidence of delusional/disorganized thinking," as well as problems with hygiene, including sloppy dress and dirty hair.  *Id.* at 1-2.  Mr. Eldridge did not volunteer that he was hearing voices, that he believed his victims to be alive, or that he periodically left the prison—precisely the behavior one would

5

expect of an inmate determined to derail his execution by feigning psychosis.  Perhaps even

more significant is a mental health record from the very day of Mr. Eldridge's scheduled

execution.  Mr. Eldridge was scheduled to be executed at 6:00 p.m. on November 17, 2009.  A

mental health staff member conducted a cell-side interview of Mr. Eldridge at 3:35 p.m. that

afternoon.  Resp. Ex. 23 at 137.[8]  Aside from a notation that Mr. Eldridge's clothing was

"careless," absolutely nothing out of the ordinary is noted.  *Id.* at 137-38.  It is counsel's

recollection that this Court did not grant its stay until approximately 4:00 p.m.—meaning that

Mr. Eldridge was facing imminent execution when that cell-side interview took place.  Again, it

is difficult to understand why a man intent on feigning psychosis would fail to volunteer

symptoms mere hours before he was scheduled to be put to death.[9]

Similarly, Mr. Eldridge did not ask for medication to be prescribed.  Dr. Nathan testified

that fact is significant because "[g]enerally patients who are malingering mental illness want

medications for various purposes."  Hrg. Tr. (4/16/12) at 36.[10]  Along the same lines, it is

noteworthy that the mail room at TDCJ intercepted a letter written by Mr. Eldridge in which he

expressed suicidal ideation.  Pet. Ex. 8 at 173.  Mr. Eldridge did not, however, report suicidal

ideation to his treating mental health staff, Hrg. Tr. (4/16/12) at 44, and when asked about that

---

[8] The date at the top of that record is November 19, 2009.  Midway down the page, however, it is noted that "[t]his is a late-entry note. Pt. seen cell-side on 12 bldg. at 15:35 on 11/17/09."  Resp. Ex. 23 at 137.

[9] Respondent has argued that Mr. Eldridge's strategy was to wait until he received a stay and then to begin feigning symptoms of psychosis in earnest.  *See* Respondent's Answer, DE 151 at 10-11.  This argument makes little sense, as it hinges on the idea that a man desperate to avoid his execution would be content simply to wait and see whether he was granted a stay before beginning his concerted campaign to convince the TDCJ mental health staff that he is psychotic.

[10] Dr. Allen distorted Dr. Nathan's testimony on these points.  Dr. Allen asserted that Dr. Nathan limited his consideration of whether Mr. Eldridge was malingering to the facts that he did not seek attention or medication prescriptions, and that Dr. Nathan did not consider the possibility that Mr. Eldridge could have been malingering psychosis to avoid execution.  Hrg. Tr. (5/29/12) at 106.  Dr. Nathan's testimony was clear that he did not limit his consideration of the possibility of malingering to those two factors alone.  Dr. Nathan was equally clear that during the entire period of his treatment of Mr. Eldridge, Dr. Nathan was aware that Mr. Eldridge was a death row inmate and that Mr. Eldridge could therefore have an external incentive to feign symptoms of psychosis.  Hrg. Tr. (4/16/12) at 110, 62.

letter by mental health staff after its interception, Mr. Eldridge denied any thoughts of harming himself.  Pet. Ex. 8 at 173.  Dr. Nathan testified that "[m]alingerers generally like to bring attention to their suicidal thoughts to the mental health staff.  They want some attention, something to be done.  That he did not express it did not raise the index of suspicion for malingering.  On the contrary, I took his symptoms to be more genuine."  Hrg. Tr. (4/16/12) at 44-45.

Third, Dr. Nathan found it significant that Mr. Eldridge's symptomatology followed a pattern of waxing and waning typical of Schizophrenia.  *Id.* at 37, 47.  Specifically, Dr. Nathan noted that after Mr. Eldridge was prescribed antipsychotic medication, Mr. Eldridge would report some relief from his symptoms for a period of time and then again report symptoms of psychosis.[11]  Dr. Nathan testified that such waxing and waning is part of the mental illness itself and that, in addition, patients can build up a tolerance to psychotropic medication.  *Id.* at 37.  Moreover, Dr. Nathan testified that "[g]enerally malingerers keep up their symptom complaints till they get some attention.  They don't wax and wane necessarily."  *Id.* at 47.[12]  Along the same

---

[11] During his cross examination, Dr. Nathan was asked whether it would be suspicious for a patient to report no symptoms within two days of a change to his Thorazine dosage.  Dr. Nathan responded that such a reaction would suggest that "we are not dealing with a genuine schizophrenia."  *Id.* at 95.  To the extent the question was meant to imply that that pattern is evident in Mr. Eldridge's records, it was misleading.  Mr. Eldridge was initially prescribed Thorazine on September 10, 2010.  Pet. Ex. 8 at 194.  He did report hearing no voices in his next mental health record, but that record is dated September 28, 2010—over two weeks later, and within the two- to four-week time-frame that Dr. Nathan identified as typical of the period that is required for therapeutic effects to be seen with Thorazine.  *Id.* at 197; Hrg. Tr. (4/16/12) at 95-96.  Mr. Eldridge's dosage was increased on February 1, 2011.  Pet. Ex. 8 at 226.  Mr. Eldridge reported continuing to hearing voices on February 11, and February 21, 2011, and his dosage was increased again on February 21, 2011.  *Id.* at 229, 232-33.  Though he reported that he was hearing the voices less on March 23, 2011, *id.* at 236, Mr. Eldridge continued to report hearing voices through June 8, 2011, leading to another increase in his dosage on June 10, 2011.  *Id.* at 240, 244, 247, 253.  The next record, dated June 21, 2011, documents only chart review after Mr. Eldridge received a disciplinary case.  *Id.* at 255.  It is only the following record, dated June 29, 2011, that notes no problems on the mental status exam.  *Id.* at 257.  None of these records documents the rapid cessation of symptoms that Respondent implied was the case.
[12] This common-sense proposition points up another flaw in Respondent's position.  There is no question that it is not terribly difficult for a malingerer to offer false reports of hearing voices.  *See, e.g.*, Hrg. Tr.

lines, Dr. Nathan testified that, in contrast to behavior typical of malingerers, Mr. Eldridge "did not present inconsistent symptoms at a short stretch of time. The symptoms were the same." *Id.* at 63.

Fourth, Dr. Nathan noted that there was no disconnect between Mr. Eldridge's behavior and his reported symptoms. Mr. Eldridge lost a significant amount of weight in conjunction with poor personal grooming. *Id.* at 42.[13] Dr. Nathan also considered it significant that after Mr. Eldridge was released from the hospital in 2006, he began refusing his Vitamin B-12 injections, consistent with his concerns about being poisoned at the Polunsky Unit. *Id.* at 42; *see* Pet. Ex. 6 at 68, 74, 75, 78, 79; Pet. Ex. 8 at 12, 23. As previously noted, Dr. Nathan testified that it would be highly unusual for a malingerer to "seclude" or "refuse any care or follow-up." Hrg. Tr. (4/16/12) at 42.

## B.   THIS COURT SHOULD CREDIT THE TESTIMONY OF DR. ROMAN SUPPORTING THE DIAGNOSIS OF TDCJ MENTAL HEALTH STAFF AND DISCREDIT THE CONCLUSIONS OF DR. ALLEN AND DR. MOELLER THAT MR. ELDRIDGE IS MALINGERING.

### 1.   Dr. Roman

---

(4/16/12) at 57 (Dr. Nathan's testimony that "anybody can produce voices, but [Mr. Eldridge's] perplexity and seeming inability to reconcile that he's in prison, but he's saying that he's going out to work and was oblivious to the contradiction, that, in my opinion, was more suggestive of mental illness than malingering."). In light of the ease with which such reports can be feigned, a malingering inmate would have little incentive to report any relief from his symptoms at all.

[13] Dr. Nathan acknowledged, of course, that anemia can cause weight loss and that he could not definitively determine the cause of Mr. Eldridge's weight loss. Dr. Nathan went on to testify that he did not consider any one factor in isolation and instead looked at the totality of the circumstances. Hrg. Tr. (4/16/12) at 43-44. It should be noted, however, that there is documentation in the TDCJ records that Mr. Eldridge did, in fact, refuse meals. *See* Pet. Ex. 6 at 3 ("Security reports offender has refused nine meals."). Subsequently, a TDCJ Inter-Office Communication was completed documenting a conversation in which Mr. Eldridge was told that if he was not going to eat his food, he should refuse his trays. Mr. Eldridge responded that he needed to continue flushing the food down the toilet because if he did not, the poisoned tray intended for him would be passed along to another inmate and that inmate would become ill. *Id.* at 18. The TDCJ records thereafter document multiple disciplinary charges lodged against Mr. Eldridge for refusing to comply with orders to accept or return food trays that Mr. Eldridge alleged had been poisoned. *Id.* at 23, 31-32, 76-77, 81.

Dr. Roman provided credible, scientifically sound testimony that Mr. Eldridge suffers

from Schizophrenia, just as his TDCJ treatment team has concluded.[14]   At the outset, it should be

noted that Dr. Roman, as a neuropsychologist, is particularly well suited to render an opinion on

Mr. Eldridge's competence for execution.   As Dr. Roman testified, neuropsychologists specialize

in examining an individual's functional capacity and cognitive processes—areas that directly

implicate an individual's capacity for rational understanding and aid in assessing whether

someone suffers from a psychotic disorder.   Hrg. Tr. (4/16/12) at 134-35; Hrg. Tr. (4/17/12) at

310-12.

In his testimony and his reports, Dr. Roman provided extensive evidence as to why both

his own interviews and the TDCJ mental health records support the conclusion of the mental

health professionals at TDCJ that Mr. Eldridge suffers from Schizophrenia.   *See*, *e.g.*, Pet. Ex. 2

at 3-10; Hrg. Tr. (4/16/12) at 151-52 (explaining importance of TDCJ mental health records in

determining consistency of symptoms over long period of treatment).[15]   In addition to his

reliance on his interviews of Mr. Eldridge and his review of the TDCJ records, Dr. Roman

administered a number of objective measures to Mr. Eldridge.   These included the

neuropsychological measures detailed in Dr. Roman's initial report.   Pet. Ex. 1 at 8-11.   As Dr.

---

[14] In addition to his testimony, Dr. Roman submitted two reports, totaling 31 pages.  Pet. Ex. 1-2.  Both because of page limit constraints imposed by the Court for this briefing and because those reports document the bases for his conclusions so thoroughly, this section of the brief will highlight only a few of the key portions of Dr. Roman's testimony before discussing the reasons that this Court should not credit the conclusion of either Dr. Allen or Dr. Moeller that Mr. Eldridge is malingering.

[15] Respondent's position with respect to the TDCJ mental health records is hopelessly convoluted.  When it suits his purposes, Respondent attacks the records as untrustworthy.  *See*, *e.g.*, Hrg. Tr. (5/29/12) at 80-82 (testimony of Dr. Allen asserting that documentation of looseness of association in the TDCJ records is questionable because quotations are lacking due to the computerized nature of the records and the credentials of the mental health professional completing the record are not known).  At other points, Respondent points to these very records, completed by the same TDCJ mental health staff on the same computerized system, to assert that they document "red flags" for malingering.  *See*, *e.g.*, Hrg. Tr. (4/16/12) at 97-99.  It cannot be that the TDCJ mental health records are worthy of belief only when they support Respondent's position.

Roman explained both in that report and in his testimony, these instruments shed considerable light on the legitimacy of TDCJ's diagnosis. Pet. Ex. 1 at 14-15; Hrg. Tr. (5/30/12) at 282-83. First, the results of these instruments satisfy the exclusionary criterion for a general medical condition that must be met to diagnose Schizophrenia. Hrg. Tr. (4/16/12) at 216-20; *id.* (5/30/12) at 283; *see* DSM-IV-TR at 312. This is particularly important in Mr. Eldridge's case because the TDCJ mental health records at various points included a "rule out" of "dementia with psychotic features due to pernicious anemia." *See, e.g.*, Pet. Ex. 8 at 9, 167.

Second, Mr. Eldridge's performance on these measures constitutes a significant data set that supports the conclusion that Mr. Eldridge is not feigning. As discussed in more detail below, Dr. Allen has opined that Mr. Eldridge is feigning symptoms of psychosis as well as cognitive deficits. As Dr. Roman explained, when looking at this data set as a whole, Mr. Eldridge performed relatively well, belying the contention that he is feigning cognitive deficits. Hrg. Tr. (5/30/12) at 284-86;[16] Pet. Ex. 1 at 15 ("In effect, if Mr. Eldridge were inclined to make himself look bad for purposes of personal gain, he would be expected to show a more significant pattern of deficits on the neuropsychological measures."). Particularly enlightening are the results of the IQ test that Dr. Roman obtained during his May 2010 evaluation as compared to the results Dr. Allen obtained during his May 2007 evaluation for the *Atkins* litigation. As detailed in the chart in Dr. Roman's initial report, Mr. Eldridge's full scale IQ scores on these instruments, which were administered almost exactly three years apart, were within a single point of each other. Pet. Ex. 1 at 8-9.[17] Dr. Roman explained that while of course one could

---

[16] This portion of Dr. Roman's testimony includes reference to some of the psychological literature supporting the use of neuropsychological measures to assess cognitive feigning.

[17] These IQs scores are significant for another reason, as well. Mr. Eldridge's full scale IQ scores were 84 and 85 on these two administrations. Pet. Ex. 1 at 8. As Dr. Roman reported, the score of 85 that Mr. Eldridge obtained on his administration placed him within the Low Average range, at the 16th percentile for his age. *Id.* During the hearing, Respondent repeatedly suggested that Mr. Eldridge's success in

deliberately perform poorly on an IQ test with relative ease, it would be extremely difficult to deliberately perform poorly in such a consistent manner across two IQ tests given nearly three years apart.  Hrg. Tr. (4/16/12) at 262; Hrg. Tr. (5/30/12) at 291-96.[18]

Dr. Roman also administered the second edition of the Structured Interview of Reported Symptoms (SIRS-2).  As detailed in Dr. Roman's supplemental report, Pet. Ex. 2 at 11-12, and in his testimony, Hrg. Tr. (4/16/12) at 231-34, this is a measure that assesses feigning of psychiatric symptoms and is the only full-scale measure of psychiatric feigning that was administered to Mr. Eldridge.  *See* Hrg. Tr. (5/29/12) at 235-36, 238 (testimony of Dr. Allen that both the Structured Inventory of Malingered Symptomatology (SIMS) and the Miller Forensic Assessment of Symptoms Test (M-FAST) are mere screening devices for psychiatric feigning and that the Test of Memory Malingering (TOMM) assesses feigning of a memory impairment).  Dr. Roman explained that he has concerns about the validity of Mr. Eldridge's score on this and the instruments administered by Dr. Allen because of Mr. Eldridge's long-documented language deficits.  Pet. Ex. 2 at 10-11; Hrg. Tr. (4/16/12) at 225-30.[19]  Even setting those concerns to the side, it is clear that Mr. Eldridge's results on the SIRS-2 did not indicate definite feigning.

---

obtaining a diagnosis of Schizophrenia from TDCJ mental health staff could be the result of his learning successful feigning strategies from his failed attempt to malinger psychosis pre-trial and from the competency litigation of fellow death row inmates Jeffery Wood and Raymond Riles.  *See* Hrg. Tr. (4/16/12) at 91-92; Hrg. Tr. (4/17/12) at 491-95.  It is simply not credible to argue that Mr. Eldridge is sufficiently cunning and sophisticated to successfully implement a strategy that he learned nearly two decades ago during his own pre-trial litigation or that he gleaned from other inmates' cases.

[18] During this portion of his testimony, Dr. Roman also refuted the inaccurate assertion made by Dr. Allen that it is inappropriate to compare the two IQ scores because the two administrations did not include the exact same subtests.  Hrg. Tr. (5/29/12) at 143.  As Dr. Roman testified, the manual for the Weschler Adult Intelligence Scale – Third Edition provides for a process known as prorating, which allows comparisons of test results utilizing different subtests.  Hrg. Tr. (5/30/12) at 292.

[19] In his supplemental report, Dr. Roman also included a discussion of the criticisms of feigning measures in general.  Pet. Ex. 2 at 11.  It should be noted that Dr. Moeller has, in the past, given sworn testimony that "[t]he scientific literature and data on test[s] for malingering shows [*sic*] that frequently they are not very good."  Hrg. Tr. (5/29/12) at 56 (quoting above passage of prior testimony during impeachment of Dr. Moeller with prior sworn testimony that he has reached a conclusion of malingering based on "subjective feel").

Rather, Mr. Eldridge's score was in the range of "indeterminate-evaluate."  Pet. Ex. 5 at 116; Pet.

Ex. 2 at 12; Hrg. Tr. (4/16/12) at 234.  Dr. Allen testified that Dr. Roman mischaracterized these

results.  Hrg. Tr. (5/29/12) at 112-13.  Dr. Allen acknowledged, however, that Dr. Roman

accurately reported that none of Mr. Eldridge's scores on the primary scales fell into the category

of "definite feigning" and that his overall score, applying the decision model, fell into the

"indeterminate-evaluate" category, rather than either of the two "feigning" categories.  *Id.* at

234-35.  Moreover, Dr. Allen conceded that an overall score in the "indeterminate-evaluate"

range calls for "further evaluation, which means clinical observation on whether or not someone

is malingering."  *Id.* at 113.  Because Dr. Roman administered the SIRS-2 on May 17, 2010, Pet.

Ex. 2 at 11, Dr. Roman had the benefit of records documenting nearly two years of clinical

observation by TDCJ mental health staff by the time he provided his testimony at the hearing.

Pet. Ex. 8 at 319 (final mental health record in evidence dated March 15, 2012).  Those records,

of course, document Mr. Eldridge's continued diagnosis and treatment with powerful

antipsychotic medications and include no indications that his treatment team was concerned that

he was malingering.

### 2.    Dr. Allen

Dr. Allen's testimony that Mr. Eldridge is malingering should be rejected.  First, Dr.

Allen was misleading in his report of Mr. Eldridge's performance on the feigning measures he

administered.  In his initial report, Dr. Allen wrote that "[a] definite negative response bias, as

outlined above, is evident in his current presentation based on the M-FAST, SIMS and TOMM."

Resp. Ex. 49 at 17.  Both the M-FAST and the SIMS are screening devices.  Hrg. Tr. (5/29/12) at

236.  As Dr. Allen was forced to agree on cross examination, neither of these screens is actually

capable of providing "definite" evidence of malingering.  *Id.*  Similarly, Dr. Allen acknowledged

that he misapplied the so-called "Slick criteria" in reaching his conclusion that Mr. Eldridge's score on the TOMM met the criteria for a definite negative response bias. *Id.* at 237-43. In sum, Dr. Allen's assertion that the objective measures he administered provided "definite" evidence of malingering is incorrect.

The second overarching flaw in Dr. Allen's analysis concerns the way in which he relied upon inconsistency as a detection strategy. It is not Petitioner's position that an examination of inconsistencies has no place in an evaluation of feigning; as both Dr. Nathan and Dr. Roman acknowledged, inconsistencies are important to consider. Hrg. Tr. (4/16/12) at 62; Hrg. Tr. (4/17/12) at 358. The problem arises when an expert relies on inconsistency of presentation as his or her dominant detection strategy without demonstrating the caution that the literature mandates:

> Some practitioners mistakenly assume that all inconsistencies are evidence of malingering or manipulation. They make two implicit assumptions: (1) examinees deliberately distorted their presentations and (2) they were 'tripped up' in attempting to keep their 'stories' consistent. These assumptions are completely untenable. ***First, inconsistencies can reflect the imprecision of the assessment process. Second, persons with mental disorders often have poor insight, which leads to inconsistencies. Third, unimpaired individuals often show some inconsistencies. Fourth, the use of inconsistencies is an ineffective detection strategy for feigning***.

Hrg. Tr. (5/29/12) at 178-79 (referencing Hrg. Tr. (4/16/12) at 223-24, which quotes page 303 of the third edition of *Clinical Assessment of Malingering and Deception*) (emphasis added).

An examination of Dr. Allen's reports and his testimony make clear that Dr. Allen has engaged in precisely the undisciplined practice against which the above-quoted passage cautioned. In his initial report to the Court, for instance, Dr. Allen devoted nearly two full pages to discussing Mr. Eldridge's pre-trial mental health records, writing that "[t]he delusions reported in the current time frame are different from those documented by psychologists and psychiatrists a[t] HCJ in 1993-1994." Resp. Ex. 49 at 17-19; Hrg. Tr. (5/29/12) at 176 (affirming reliance on

inconsistencies between Harris County Jail and more current records).  In other words, Dr. Allen relied on inconsistency of presentation in records nearly two decades old.[20]  Perhaps the most egregious example of Dr. Allen's reliance on even the most minute inconsistency was his agreement that it was an "important" inconsistency that Mr. Eldridge told Dr. Allen that he was Baptist yet indicated on his "death packet" that he was Muslim.  Hrg. Tr. (5/29/12) at 167.  *See also* Resp. Ex. 49 at 17 (discussing Mr. Eldridge's reports of having no friends as a teenager yet having friends on the football team, as well as girlfriends, as being among the "inconsistencies in the examinee's report that reflect Negative Response Bias (malingering)"); Hrg. Tr. (5/29/12) at 93-94 (same).

Relatedly, and the third of the major flaws in Dr. Allen's analysis, Dr. Allen exhibited a confirmation bias in his interpretation of the data.  *See* Hrg. Tr. (5/30/12) at 299-300 (Dr. Roman's explanation that a confirmation bias involves interpreting data in a way that fits one's preconceived notions).  The most striking example of this was Dr. Allen's testimony  of how he interprets the facts that Mr. Eldridge has written letters to his fictional wife, Jennifer Lewis, but not to the victim of his crime, Cynthia Bogany, whom Mr. Eldridge reports is alive and well.  Dr. Allen pointed to the absence of letters to Cynthia Bogany as evidence that Mr. Eldridge does not genuinely believe her to be alive.  Hrg. Tr. (5/29/12) at 158.  Yet when asked about Mr. Eldridge's letter to Jennifer Lewis, Dr. Allen did not concede that those letters are evidence that Mr. Eldridge truly believes that they are married and have children together; rather, he testified that "to me he's trying to build a case." *Id.* at 89.  In other words, Dr. Allen interpreted both actions—writing no letters on the one hand and writing letters on the other—as evidence of

---

[20] It should be noted that, even if one were to conclude that Mr. Eldridge were malingering during his pre-trial proceedings, it would be inappropriate to conclude "once a malingerer, always a malingerer."  Hrg. Tr. (4/16/12) at 119-20 (testimony of Dr. Nathan that even a person who malingered in the past can develop genuine symptoms at a later point); Hrg. Tr. (5/29/12) at 231-32 (same testimony from Dr. Allen).

malingering.  *See* Hrg. Tr. (5/30/12) at 301-02 (Dr. Roman's explanation of why this is an example of a confirmatory bias).

Finally, both Dr. Allen's reports and testimony were brimming with examples of scientifically unsound assertions.  Because of space constraints, only three illustrative examples will be discussed.  First, Dr. Allen testified on direct examination that authentic delusions must be "genuinely bizarre."  *Id.* at 83.  Shortly thereafter, Dr. Allen gave an example of a man who held a genuine delusion that he was a U.S. Marshal.  *Id.* at 85.  The DSM-IV-TR defines bizarre delusions as follows:

> Delusions are deemed bizarre if they are clearly implausible and not understandable and do not derive from ordinary life experiences.  An example of a bizarre delusion is a person's belief that a stranger has removed his or her internal organs and has replaced them with someone else's organs without leaving any wounds or scars.  An example of a nonbizarre delusion is a person's false belief that he or she is under surveillance by the police.

DSM-IV-TR at 299.  Dr. Allen's own example, therefore, flatly contradicted his inaccurate testimony that genuine delusions must be bizarre.  *See* Hrg. Tr. (5/30/12) at 278-79 (testimony of Dr. Roman that delusions need not be bizarre).[21]

Second, Dr. Allen asserted that Mr. Eldridge's "hostility and reported paranoia" with respect to TDCJ guards poisoning and harassing him is "a function not only of his personality disorder but is a justified and rational response to his environment as well as being self-serving."  Resp. Ex. 49 at 13.  With regard to Mr. Eldridge's paranoia being justified and rational, Dr. Roman was asked a series of questions on cross examination about whether it is possible that a guard might cough on an inmate's food or put a thumb in his food, leading to a complaint that his

---

[21] In addition, the first diagnostic criterion for Schizophrenia in the DSM-IV-TR requires the presence of two or more of five characteristic symptoms of Schizophrenia for a prescribed duration of time.  The text goes on to note, however, that "[o]nly one [characteristic] symptom is required *if delusions are bizarre*. . . ."  DSM-IV-TR at 312 (emphasis added).  It would make little sense for the DSM-IV-TR to include this qualification if *all* genuine Schizophrenic delusions are necessarily bizarre, as Dr. Allen claimed.

food is being tampered with.  As Dr. Allen acknowledged, the specific complaints lodged by Mr. Eldridge about his food being poisoned with such substances as human excrement, battery acid, and Clorox are far more extreme—and far-fetched—than the perfectly plausible hypotheticals posed by Respondent's counsel.  Hrg. Tr. (5/29/12) at 194-95.[22]  Moreover, as Dr. Allen agreed on cross examination—and contrary to the assertion made in his report—Mr. Eldridge's ASPD cannot be an explanation for this paranoia, as paranoia is among neither the diagnostic criteria nor the associated features and disorders of ASPD.  Hrg. Tr. (5/29/12) at 192-93.

Third, as in the passage of his report quoted above, Dr. Allen repeatedly asserted that "genuine" symptoms of psychosis are not "self-serving."  Resp. Ex. 49 at 13 (asserting that authentic delusions and thought disorders are not self-serving); *id.* at 19 (same for hallucinations).  After a great deal of discussion on cross examination, Dr. Allen agreed that genuine symptoms of psychosis and "self-serving" symptoms are not, in fact, mutually exclusive.  Hrg. Tr. (5/29/12) at 185-86 ("It is not always black and white either/or.").

### 3.    Dr. Moeller

This Court should likewise reject the testimony of Dr. Moeller as incredible.  Dr. Moeller repeatedly questioned testimony provided by both Dr. Nathan and Dr. Roman because Dr. Moeller testified he was not aware of any peer-reviewed, scientific literature supporting their assertions.  For instance, Dr. Moeller cast doubt on the validity of Dr. Nathan's testimony that patients on antipsychotic medications can develop a tolerance to those drugs over time, Hrg. Tr. (5/29/12) at 31-32; on Dr. Roman's testimony that the phenomenon known as double bookkeeping explains why Mr. Eldridge can simultaneously interact with prison personnel yet believe he lives a parallel life in the free world, *id.* at 22; and on Dr. Roman's testimony that Mr.

---

[22] *See* Pet. Ex. 13 at 3 (report of Dr. Conroy concluding that Mr. Eldridge's "paranoid delusions" regarding TDCJ guards "reached well beyond the often heard complaint that staff are harassing inmates").

Eldridge's delusion about being poisoned would be suspicious if it encompassed the guards at both the Polunsky and Jester IV Units, *id.* at 20-21.  When it was helpful to Respondent's position, however, Dr. Moeller showed no compunction about offering testimony based on his own clinical experience—in other words, testimony for which he offered no grounding in peer-reviewed, scientific literature.  *See*, *e.g.*, *id.* at 12-13 (testimony that, based on his experience prescribing antipsychotic medications to persons who are not psychotic, people with psychosis and people without psychosis exhibit similar side effects); *id.* at 52 (testimony that Mr. Eldridge's medications do not cause false positives on drug screens based on clinical experience).

Indeed, during his cross examination, Dr. Moeller was questioned about testimony he provided on direct regarding the supposed link between ASPD and malingering.  Specifically, Dr. Moeller was confronted with a passage from the third edition of *Clinical Assessment of Malingering and Deception* stating unequivocally that studies have failed to show a relationship between ASPD and malingering.  *Id.* at 53.  Incredibly, Dr. Moeller's prior insistence on the paramount importance of studies fell to the wayside, as he went on to reaffirm his belief in a link between ASPD and malingering based on his experience and education.  *Id.* at 63.

Dr. Moeller's credibility was further damaged when he was impeached on a number of statements made in his report.  For instance, in his report, Dr. Moeller wrote that " '[n]ormals' and people with schizophrenia have unintended side effects with anti-psychotic medications because they both have intact 'side-effect' receptors." Resp. Ex. 82 at 2 (quotation marks and emphasis in original).  On cross examination, however, Dr. Moeller acknowledged that there is actually no such thing as a "side-effect receptor" in the human brain.  Hrg. Tr. (5/29/12) at 48.[23]

---

[23] Moreover, Dr. Moeller acknowledged that the way that typical antipsychotics, such as Thorazine, work is by blocking Dopamine 2 (D2) receptors in the brain. Malfunctioning D2 receptors are believed to cause

Similarly, Dr. Moeller wrote in his report that "Schizophrenia is a progressive, degenerative neurological disease . . . . The progress of the disease is relatively linear and steady and results from structural changes to the brain which are permanent and progressive." Resp. Ex. 82 at 2. During cross examination, Dr. Moeller was confronted with a learned treatise that documents "dynamic maps of schizophrenia progression that reveal alterations in the disease trajectory depending on treatment." Hrg. Tr. (5/29/12) at 60. That same treatise concluded that the changes in the brain that occur with Schizophrenia are not, in fact, linear. *Id.* Dr. Moeller was also impeached with a transcript of his own prior sworn testimony that Schizophrenia is not always degenerative in nature. *Id.* at 61-62.

## II.  MR. ELDRIDGE'S SCHIZOPHRENIA PRECLUDES HIM FROM ACCURATELY INTERFACING WITH REALITY AND, IN TURN, FROM HAVING A RATIONAL UNDERSTANDING OF THE REASON FOR HIS CONVICTION AND EXECUTION.

### A.  MR. ELDRIDGE DOES NOT ACCURATELY INTERFACE WITH REALITY.

There is no question that Mr. Eldridge's Schizophrenia prevents him from accurately interfacing with reality. As documented in the TDCJ mental health records and in Dr. Roman's reports and testimony, Mr. Eldridge's symptomatology includes both visual and auditory hallucinations, which necessarily indicate a distorted perception of reality. Mr. Eldridge's delusional beliefs—that TDCJ guards have been attempting to poison him for over a decade; that he leads a parallel life outside the prison in which he goes to work as a pipefitter and lives with

---

the positive symptoms of Schizophrenia. These drugs, however, are not sufficiently fine-tuned to block *only* the malfunctioning D2 receptors. Side effects occur when non-malfunctioning D2 receptors are blocked. In persons without Schizophrenia, however, there are no malfunctioning D2 receptors, meaning that the antipsychotic is blocking D2 receptors that were, presumably, functioning properly. Hrg. Tr. (5/29/12) at 46-49. This explanation of the way that typical antipsychotics work and how they cause side effects leads credence to Dr. Roman's testimony that side effects would be more prominent if a malingerer were on the type of powerful dose of Thorazine that Mr. Eldridge was prescribed. Hrg. Tr. (4/17/12) at 497-99.

his fictitious wife Jennifer Lewis and their eight children; and that the victims of his capital murder are alive and well—likewise prevent him from accurately interfacing with reality.

During the evidentiary hearing, there was a great deal of discussion about how Mr. Eldridge can simultaneously function in his prison environment and yet genuinely believe that his victims are alive and that he leads a parallel life in the free world.  As Dr. Roman explained, the phenomenon known as double bookkeeping accounts for this seemingly irreconcilable set of circumstances.  Double bookkeeping refers to the fact that persons suffering from Schizophrenia may "have two separate realities in which they exist, and they basically keep them as if a person kept two sets of books, each book having a different set of figures, each book represent[ing] a different reality system."  Hrg. Tr. (4/16/12) at 177-78.  As Dr. Allen acknowledged, the phenomenon of double bookkeeping was first identified by Dr. Eugen Blueler, whose insights into Schizophrenia continue to be respected and viewed as useful in understanding the disease. Hrg. Tr. (5/29/12) at 211.  Indeed, one of Respondent's own exhibits explicitly endorses the concept of double bookkeeping and gives the example of "[t]he grandiose patient who fully believed that a coronation was imminent who yet continued to work at a janitor's job and goes on doing so, living in two worlds and feeling little, if any, conflict between them."  *Id.* at 211-12; Resp. Ex. 61 at 4-5.[24]

As Dr. Roman testified, moreover, Mr. Eldridge's reaction when he is questioned about the disconnect between the parallel worlds in which he claims to live—the world of prison on the one hand and the free world on the other—lends credence to the veracity of his beliefs.  When directly confronted, Mr. Eldridge does not dismiss the discrepancy out of hand or try to explain it

---

[24] During the hearing, Respondent repeatedly attempted to cast doubt on the validity of his own exhibit when this endorsement of double bookkeeping proved inconvenient.  Hrg. Tr. (5/29/12) at 62-63, 252.  It is difficult to understand why Respondent would have included this reference article in his exhibits if it were truly as unreliable as he attempted to claim at the hearing.

away; rather, he expresses puzzlement about it but is unable to reconcile the discrepant facts. Hrg. Tr. (4/16/12) at 176-79; *see id.* at 170-71.  Mr. Eldridge had the same reaction when Dr. Roman asked him how he is able to enter and exit the prison with ease when visitors such as Dr. Roman are subjected to stringent security measures.  *Id.* at 179.  As Dr. Roman noted, Mr. Eldridge's reaction of confusion yet steadfast belief in his delusions is consistent with that of a person genuinely suffering from Schizophrenia.  *Id.* at 178; *see also id.* at 57 (Dr. Nathan's testimony that Mr. Eldridge's "perplexity and seeming inability to reconcile that he's in prison, but he's saying that he's going out to work and was oblivious to the contradiction, that, in my opinion, was more suggestive of mental illness than malingering."); Pet. Ex. 8 at 131 (TDCJ mental health record noting that, when confronted, Mr. Eldridge "could not explain how he is able to function with staff and other offenders when he is in this other world").

### B.  MR. ELDRIDGE DOES NOT POSSESS A RATIONAL UNDERSTANDING OF THE REASON FOR HIS CONVICTION AND EXECUTION.

Mr. Eldridge's mental illness and its impact on his perception of reality prevent him from possessing a rational understanding of the reason for his conviction and execution.  As Dr. Roman summarized in his supplemental report:

> Mr. Eldridge understands that he is in prison because he has been told that he shot someone and that the victim is Cynthia.  He does not believe that he shot Ch[i]rissa or his son Terrell and denies shooting Cynthia.  He claims to have seen Cynthia and that she is well.  He believes he travels between the prison and his home and job in the free world. He does not recall being tried and convicted and does not appreciate that he is sentenced to death.

> When shown crime scene photographs during the neuropsychological evaluation, Mr. Eldridge was visibly upset and seemed to appreciate that there might be more to the story than he has been told about his crimes.  He did not dismiss the photographs out of hand. However, he has not continued to believe the truth shown in the photographs—a reaction consistent with a delusional belief system.

Pet. Ex. 2 at 14-15.

As noted above, during his May 17, 2010, evaluation of Mr. Eldridge, Dr. Roman confronted Mr. Eldridge with crime scene photographs showing his victims bloodied and dead, as well as with portions of the offense report.  Pet. Ex. 1 at 13.  Mr. Eldridge's reaction—both immediately upon being shown the photographs and after the passage of time—is significant.  During the interview, Mr. Eldridge did not attempt to avoid that confrontation; rather, Mr. Eldridge agreed to listen as Dr. Roman read portions of the offense report and stated that he "*need[ed]* to see" the photographs.  *Id.* (emphasis in original).  Upon viewing them, Mr. Eldridge became emotional and appeared shaken.  *Id.*  Dr. Roman testified that this emotional response appeared genuine.  Hrg. Tr. (4/16/12) at 268.  After viewing the photos, Mr. Eldridge stated, "I keep thinking about Chirissa.  So it must be true.  I must have did this," even as he said he did not remember the murders.  Pet. Ex. 1 at 13.  In other words, just as when confronted with the discrepancy between his status as an incarcerated inmate and his belief that he leads a parallel life in the free world, Mr. Eldridge did not dismiss the photographs out of hand or attempt to explain them away as forgeries.  Rather, he acknowledged the graphic violence depicted in the photographs—hardly the reaction one would expect of an inmate feigning a belief that his victims are alive.  *See* Hrg. Tr. (4/16/12) at 269 (Dr. Roman's testimony that Mr. Eldridge's response was not consistent with someone feigning a delusional belief).

Mr. Eldridge's subsequent reaction, in which he struggled to resolve the reality of the photographs with his delusional belief before rejecting reality in favor of his delusion, is equally significant.  Mr. Eldridge repeatedly raised the subject of the distressing photographs to TDCJ mental health staff in the days following his interview with Dr. Roman.  Pet. Ex. 8 at 131, 133-35.  As documented in those records, Mr. Eldridge described the photographs as "mess[ing his] head up," *id.* at 133, and giving him "bad thoughts" that he "see[s] every night," *id.* at 135.  Mr.

Eldridge's struggle to make sense of the photographs he had been shown did not, however, ultimately shake his conviction that his victims are alive—consistent with the fixed nature of a genuine delusional belief. *See* Pet. Ex. 2 at 14 (during Dr. Roman's November 15, 2011, interview of Mr. Eldridge, Mr. Eldridge responded to a query about the photographs by stating that Dr. Roman showed him "bad pictures" but that he remembered nothing about them other than the fact that they were upsetting); Hrg. Tr. (4/16/12) at 270-71 (testimony that this reaction is consistent with a true delusion).

Mr. Eldridge likewise holds a delusional belief that he has not been held in continual custody for the past two decades—a critical gap in understanding for someone who will leave TDCJ custody only when he is executed. As Dr. Roman explained, this failure to rationally understand the length of his incarceration is intertwined with his delusional belief that he leads a parallel life outside the prison. Mr. Eldridge is out of touch with reality when he is involved in his psychotic processes, particularly his delusional thinking. *Id.* at 173-74. This does not, of course, lead Mr. Eldridge to strictly account for every moment that he claims to spend outside the prison. Rather, it leads to a general disorientation about the passage of time. *Id.*

The fact that Mr. Eldridge possesses some bare factual awareness of his circumstances, *see* Hrg. Tr. (4/16/12) at 264-65, and is able to parrot information others have given him— particularly in relation to the reason for and length of his incarceration—does not alter the analysis that Mr. Eldridge lacks the rational understanding required by the Eighth and Fourteenth Amendments. When asked why he is in prison, for instance, Mr. Eldridge makes statements along the lines of "they said I shot someone" and acknowledges that the victim is alleged to be Cynthia Bogany. *See, e.g.*, Pet. Ex. 2 at 14. Similarly, when pressed about whether he was convicted of capital murder after a trial, Mr. Eldridge expresses confusion and states he cannot

remember his trial, yet agrees that he must have had one.  *Id.*; *see* Hrg. Tr. (4/17/12) at 542.  He

likewise answers questions about the length of his incarceration with such statements as "they

say I been here 20 years, so 20 years."  *See, e.g.*, Pet. Ex. 2 at 3.  The ability to repeat factual

information that he has heard from others, however, does not indicate a *rational* understanding of

those facts. [25]  As Dr. Roman explained, statements such as "they said I shot someone" are

passive acknowledgements of information Mr. Eldridge has heard from others.  Hrg. Tr.

(4/16/12) at 266-67.[26]  Such repetitions do not indicate that Mr. Eldridge himself is able to

rationally engage with and comprehend those facts.  *Id.*; *see Panetti*, 551 U.S. at 959 ("A

prisoner's awareness of the State's rationale for an execution is not the same as a rational

understanding of it.").  To the contrary, Mr. Eldridge's inability to rationally understand his

---

[25] This argument applies equally to the responses Mr. Eldridge gave during his death row intake mental health assessment in June of 1994.  *See* Resp. Ex. 23 at 3-4.  During Dr. Allen's testimony, Respondent made much of the following statements in those records: "The S[ubject] was received from Harris County for Capital Murder of his 10 year old daughter and 'the woman that was his little girl's mother'" and "D[eath]/R[ow] for reportedly killing 10 yr old daughter and the 'little girl's mother.'"  *Id.*  Dr. Allen contacted the TDCJ mental health staff member who supervised those intake interviews, Dr. Gilliland, and, based on that conversation, testified that "Gilliland recalled that Eldridge was aware that he was on Death Row for killing the little girl's mother."  Hrg. Tr. (5/29/12) at 151-52.  Three points should be made with respect to Respondent's apparent contention that these records demonstrate that Mr. Eldridge possessed a rational understanding of his conviction at the time of that interview.  First, Dr. Allen's notes of his conversation with Dr. Gilliland include the following: "Who is it *they said you killed*: quoted in record!"  *Id.* (emphasis added).  The statements made by Mr. Eldridge in the 1994 records—particularly in combination with that notation—do not demonstrate a rational understanding.  Rather, they show the sort of parroting of information in which Mr. Eldridge frequently engages.  Second, these intake records are from June 27-29, 1994.  As Dr. Allen conceded, to the extent these records do demonstrate an understanding of his conviction, "there is no guarantee that he knows it now" based on those records.  *Id.* at 153.  Third, it is somewhat suspicious that Dr. Gilliland claims to have a clear memory of an intake assessment conducted nearly twenty years ago, particularly given that Dr. Gilliland was responsible for all such death row mental health screenings.  Resp. Ex. 85.

[26] The same is true for Mr. Eldridge's ability to write his initials and his full name on the paperwork loosely referred to at the hearing as the "death packet."  *See* Resp. Ex. 21.  Dr. Allen testified that this paperwork shows that "he knows what the whole last meal thing is about."  Hrg. Tr. (5/29/12) at 168.  There is no basis for this conclusion in the record.  All that is known with respect to Mr. Eldridge's last meal is that he wrote his initials next to the listed items of pancakes, peanut butter, oatmeal cookies, and baked potato, in addition to initialing other portions of the form.  Rather than showing  that Mr. Eldridge "knows what the whole last meal thing is about," these records could just as easily be the result of TDCJ staff placing papers before Mr. Eldridge, pointing to various portions, and telling him to write his initials or his name.

conviction and incarceration preclude a rational appreciation of his death sentence.  *See*, *e.g.*, *Pennsylvania v. Banks*, 29 A.3d 1129, 1145 (Pa. 2011) (finding petitioner incompetent for execution based on conclusion of defense experts that his "factual awareness [of the death penalty] was so intertwined with his delusional belief that the link between his crime and punishment was irrational and illogical"); *Billiot v. Epps*, 671 F. Supp. 2d 840, 869 (S.D. Miss. 2009) (finding petitioner incompetent for execution after noting defense expert's conclusion that petitioner does not have a rational understanding of his conviction because, although he admitted committing the murders immediately after their commission, "[a] few years later, Billiot would only admit that 'they say' that he committed the crimes"); *see also* DE 132 at 41-43 (discussing in detail similarities between Mr. Eldridge's symptoms of psychosis and Billiot's).

III.   **TO THE EXTENT THAT THIS COURT DETERMINES THAT MR. ELDRIDGE CURRENTLY POSSESSES THE NECESSARY RATIONAL UNDERSTANDING, IT MUST FIND THAT HIS SYNTHETIC COMPETENCE IS NOT SUFFICIENT TO CIRCUMVENT THE EIGHTH AMENDMENT'S PROHIBITION ON EXECUTING THE INSANE.**

If this Court should find that Mr. Eldridge, while medicated, satisfies the rational understanding standard, this Court should hold that such synthetic competence cannot circumvent the Eighth Amendment's prohibition on executing the insane.  Petitioner's Amended Petition details the legal bases for the argument that an incompetent defendant must be cured of his disease to become eligible for execution.  DE 132 at 43-46; *see Ford v. Powell*, 477 U.S. 399, 425 n.5 (1986) (Powell, J., concurring) ("[I]f petitioner is *cured of his disease*, the State is free to execute him.") (emphasis added).  This argument, of course, implicates a question of fact: whether antipsychotic medications, such as those Mr. Eldridge has been prescribed since November 24, 2009, Pet. Ex. 8 at 25, are capable of curing a person of Schizophrenia.  The evidence adduced at the evidentiary hearing clearly establishes that they do not.

24

Dr. Nathan testified that the antipsychotic medications that have been prescribed to Mr. Eldridge are not capable of curing him of his mental illness.  Hrg. Tr. (4/16/12) at 36.  Similarly, Dr. Roman testified that while symptomatology can improve with medication, the underlying disease is not cured.  Hrg. Tr. (4/17/12) at 337.  This testimony was not disputed by either Dr. Moeller or Dr. Allen.  This Court should, therefore, find that Mr. Eldridge's medications have not cured him of his mental illness and, as argued in the Amended Petition, that synthetic competence does not satisfy the strictures of the Eighth Amendment; that medical ethics prohibit Mr. Eldridge's treating TDCJ physicians from facilitating a medication protocol that would lead to his execution; and that it would be cruel and unusual to force Mr. Eldridge to choose between medication and execution or psychosis and life.  DE 132 at 43-53.

## IV.   CONCLUSION

Based on the evidence presented at the evidentiary hearing and for the reasons set out in the Amended Petition and this brief, this Court should find that Mr. Eldridge's execution would violate the Eighth and Fourteenth Amendments and issue the writ of habeas corpus.

Respectfully Submitted,


/ s /  Laura Ferry

Gregory W. Wiercioch
Texas Bar No. 00791925
University of Wisconsin Law School
975 Bascom Mall
Madison, Wisconsin 93706
(Tel) 608-263-1388
(Fax) 608-262-5485

Lee Wilson
Texas Bar No. 21704200
P.O. Box 52447
1314 Texas Avenue, Suite 610
Houston, Texas 77052-2447
(Tel) 713-223-6870
(Fax) 713-223-9248

Laura Ferry
Texas Bar No. 24069715
Texas Defender Service
510 S. Congress Avenue, Suite 304
Austin, Texas 78704
(Tel) 512-320-8300
(Fax) 512-477-2153

**CERTIFICATE OF SERVICE**

I, Laura Ferry, certify that on October 12, 2012, I electronically filed the foregoing pleading with the clerk of the court for the U.S. District Court, Southern District of Texas, using the electronic case filing system. A "Notice of Electronic Filing" was sent to Counsel for Respondent at the following e-mail address:

Georgette P. Oden
Georgette.Oden@oag.state.tx.us

/ s / Laura Ferry