IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| GERALD CORNELIUS ELDRIDGE, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | No. H-05-1847 |
| | § | **CAPITAL LITIGANT** |
| RICK THALER, | § | Hon. Lee H. Rosenthal |
| Director, Texas Department of | § | |
| Criminal Justice, Correctional | § | |
| Institutions Division, | § | |
| Respondent. | § | |

## RESPONDENT THALER'S POST-HEARING BRIEF

Eldridge failed to demonstrate that he has a psychotic disorder precluding his rational understanding of the reason for his execution. He is not incompetent and exempt from execution under *Ford v. Wainwright,* 477 U.S. 399 (1986) or *Panetti v. Quarterman,* 551 U.S. 930 (2007).

## STANDARD OF REVIEW

Whether a petitioner is competent to be executed is a finding of fact. *Patterson v. Dretke*, 370 F.3d 480, 484 (5th Cir. 2004). Under 28 U.S.C. § 2254(d), a federal court may not grant habeas relief unless the state court adjudication "was contrary to federal law then clearly established in the holdings of" the Supreme Court; or "involved an unreasonable application of" clearly established Supreme Court precedent; or "was based on an unreasonable determination of the facts in light of the record before the state court." *Harrington v. Richter*, 131 S. Ct. 770, 785 (2011) (quoting 28 U.S.C. § 2254(d)(1)-(2); *(Terry) Williams v. Taylor,* 529 U.S. 362, 412 (2000)). Federal review "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398-99 (2011).

A state court decision is "contrary" to clearly established federal law if the state court "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or confronts facts that are "materially indistinguishable" from relevant Supreme Court precedent, yet reaches an opposite result. *Williams*, 529 U.S. at 405-06. A state court decision is an "unreasonable application" of Supreme Court precedent only if the state court correctly identifies the governing precedent but unreasonably applies it to the facts of a particular case. *Id.* at 407-09. This Court "must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Richter*, 131 S. Ct. at 786.

In *Ford*, the Supreme Court held that the Eighth Amendment prohibits the execution of a prisoner who is incompetent. 477 U.S. at 409-410. Justice Powell's concurrence in the *Ford* plurality opinion, which is the "clearly established" Supreme Court law regarding 28 U.S.C. § 2254, *Panetti*, 551 U.S. at 949, stated that to be competent for execution, a prisoner must "know the fact of [his] impending execution and the reason for it." *Ford,* 477 U.S. at 422 (Powell, J., concurring). We know what could negate such a rational understanding: "[g]ross delusions stemming from a severe mental disorder may put an awareness of a link between the crime and its punishment in a context so far removed from reality that the punishment can serve no proper purpose." *Id.* at 960; *Wood v. Thaler*, 787 F.Supp.2d 458, 486 (W.D. Tex. 2011); *see State v. Irick*, 320 S.W.3d 284, 295 (Tenn. 2010) ("Stated differently, under *Panetti*, execution is not forbidden so long as the evidence shows that the prisoner does not question the reality of the crime or the reality of his punishment by the State for the crime committed."). Under *Panetti*, to even implicate a lack of rational understanding, a prisoner must first show a severe psychotic disorder. *Id.*; *see Overstreet v. State*, 877 N.E.2d

144, 172-73 (Ind. 2007).  This requirement naturally follows from the fact that competency is typically measured in terms of capacity to understand, not one's willingness to engage in such understanding.  *Godinez v. Moran*, 509 U.S. 389, 401 n.12 (1993).  Indeed, the *Panetti* Court acknowledged the difference between capacity and willingness when it stated that an antisocial personality's apparent unwillingness to face reality does not constitute incompetence.  *Panetti*, 551 U.S. at 959-60.

It is clear that Eldridge had counsel and had access to an expert for purposes of a competency-to-be-executed claim.  In granting a stay and then determining that AEDPA deference was unwarranted, this Court found that due process was violated under *Panetti* because: (1) Eldridge was not provided sufficient expert assistance to aid him in making a substantial threshold showing of incompetency; (2) the state court accepted the State's expert's opinion, and (3) the state court did not give Eldridge the opportunity to challenge the State's expert's opinion.  *Eldridge v. Thaler*, 2009 WL 3856672 at *5.  *Panetti*, however, does not go so far, and clearly established Supreme Court precedent simply does not support the interpretation of this Court.  *Panetti*'s holding is clearly confined to the due process protections which attach *after* a substantial threshold showing of incompetence is made.  *E.g., Panetti*, 551 U.S. at 949 ("Once a prisoner seeking a stay of execution has made a substantial threshold showing of insanity,' the protection afforded by procedural due process includes a 'fair hearing' in accord with fundamental fairness.").  Justice Powell's concurrence does not require the states to provide inmates with counsel and an expert *before* a substantial threshold showing of insanity is made.  Due process does not require that states provide an inmate with an attorney post-conviction, even in capital cases.  *Murray v. Giarratano*, 492 U.S. 1, 10 (1989).  In fact, the conclusion that death-sentenced inmates are not constitutionally entitled to postconviction counsel is largely based on *Ford* and its rejection of the assertion "that 'the ascertainment of a prisoner's sanity as a predicate to

lawful execution calls for no less stringent standards than those demanded in any other aspect of a capital proceeding.'" *Id.* at 9-10.

It follows that if an attorney is not constitutionally required, nor is an expert, and there is no Supreme Court precedent suggesting otherwise. Accordingly, clearly established federal law runs counter to this Court's finding. There is nothing in the record to suggest that the state court refused to consider the evidence Eldridge presented; rather, the state court found that Eldridge's evidence did not create a substantial threshold showing of incompetency. *Eldridge v. State*, found as Exhibit 1 to Motion, ECF No. 78. Clearly established Supreme Court precedent requires nothing more. *See Bedford v. Bobby*, 645 F.3d 372, 380 (6th Cir. 2011) (state's competency-to-be-executed procedures comported with the *Ford* standard when the state court considered the death-sentenced inmate's pleadings and attached evidence and found that a threshold showing of incompetence had not been met).

The Fifth Circuit recently decided *Simon v. Epps*, 463 Fed. Appx. 339 (5th Cir. 2012) (unpublished) which also concerned an inmate's competency to be executed. *Simon* confirms that the due process protections afforded in competency hearings, as described in *Ford* and *Panetti* and relied upon by this Court, are not triggered *until* the inmate makes a substantial threshold showing of incompetence. *Simon* makes clear that when a state court concludes that an inmate has failed to make a threshold showing of incompetence—a permissible burden under *Ford*—that determination is the relevant state court decision for purposes of AEDPA review. 463 Fed. Appx. at 345. Although *Simon* involved certain irregularities not involved in this case, *Simon* clarifies "that prisoners are [not] entitled to experts in order to make a threshold showing of incompetence." *Id.* at 347. This confirms that this Court's ruling concerning the constitutionality of the procedure utilized in Eldridge's case was erroneous, and that the state court's decision was not contrary to or an unreasonable application of Supreme Court precedent.

Accordingly, the state court decision should be upheld under AEDPA making this Court's independent competency hearing superfluous. This Court should, under AEDPA, resolve this case by considering the objective reasonableness of the state court's decision. *See Bedford*, 645 F.3d at 377-80 (reviewing a finding that a death row inmate did not make a substantial threshold showing of incompetence under AEDPA); *Patterson*, 370 F.3d at 483-86 (same).[1]

## ARGUMENT

Eldridge has somewhat improved his portrayal of mental illness, benefitting from professional and legal critiques in prior legal proceedings; mostly he succeeds in hoodwinking clinicians who lack forensic training. He escaped detection by Dr. Nathan who did not have adequate access to either Eldridge himself or his full record of feigning. Yet every forensic specialist agrees that Eldridge's presentation is too variable and inconsistent—over time, across evaluations, within evaluations, and as compared to what is known about real mental illness—to be anything but malingered.

### I. Dr. Nathan's Opinion is Well-Intentioned But Flawed.

Dr. Nathan's opinions reflect the institutional pressures and limitations under which he labored. According to Dr. Nathan, Eldridge came to the attention of the mental health staff in 2009 because of his attorneys' requests. Evid. Hrg. 4/16/12[2] at 17. Dr. Nathan functioned at all times as

---

[1] In reviewing the evidence before the state court, this Court must first determine whether, by a preponderance of the evidence, Eldridge suffers from a psychotic disorder. Tex. Code Crim. Proc. art. 46.05(k). Under Texas law, preponderance is defined as the "greater weight and degree of the credible evidence in the case." *Rickels v. State*, 202 S.W.3d 759, 763–64 (Tex. Crim. App. 2006). Eldridge bears the burden of proof in this matter. *Cooper v. Oklahoma*, 517 U.S. 348, 355 (1996). If Eldridge fails in his proof of a psychotic disorder, *Panetti* is not implicated and the question is simply whether, from a preponderance of the evidence, Eldridge knows that he has been convicted of capital murder, and that he will die for his actions. Tex. Code Crim. Proc. art. 46.05(k); *cf. Rumbaugh v. Procunier*, 753 F.2d 395, 398-99 (5th Cir. 1985) (if, in a competency-to-abandon-litigation case, the petitioner is not suffering from a mental disease or defect "the court need go no further, the person is competent").

[2] Hereinafter, hearing transcripts will be cited by date and page number(s) only.

Eldridge's clinical psychiatrist, not a forensic professional. *Id.* at 53. Because Dr. Nathan never saw Eldridge in person, and only four times through a remote video link which he agreed was inadequate to evaluate malingering, he was dependent on reading notes from personnel who lacked forensic expertise. Dr. Nathan relied on notations of loosened associations, but Dr. Roman said that concocting disorganized speech is relatively easy, and Dr. Allen demonstrated it in court. 4/17/12 at 395; 5/29/12 at 126. 4/16/12 at 54-55.

Nurses and doctors were discouraged from diagnosing malingering for liability reasons. 4/16/12 at 69. Dr. Woodrick said the staff was not even allowed to use the word malingering, which became "verboten" when UTMB took over the mental health services. 5/29/12 at 121. The staff unquestioningly documented observations without analysis or investigation, leading to contradictory entries such as "Believes mother/brothers present in cell . . . clear coherent speech. . . thoughts are organized but appear reflective of paranoid delusions, denies aud/vis hallucinations, Pt in minimal distress." RX[3] 23 at 154. Dr. Nathan estimated the possibility that Eldridge was malingering, but he initially assumed Eldridge was mentally ill and set a very high bar to reverse course; he required "overwhelming evidence this person is constantly malingering," *id.* at 61, "then eventually those facts will come out and then I will revise the diagnosis and change my treatment." 4/16/12 at 62. Dr. Nathan would require unrealistic proof: "Unless I knew [Eldridge] was saying I'm not going to take a shower because then they'll think of me as more mentally ill, then that would be different."

Once he considered the many inconsistencies, however, Dr. Nathan found red flags in Eldridge's presentation. After learning of Eldridge's substantial malingering history, Dr. Nathan conceded that Eldridge learned how to make his presentation in 2009-2011 more believable. 4/16/12 at 84,

---

[3] "RX" stands for Respondent's Exhibits followed by exhibit number, and page number(s) where appropriate.

92.[4]  Dr. Nathan agreed Eldridge's hybrid delusion/hallucination about being dragged from home back to prison was atypical and inconsistent with psychosis.  4/16/12 at 94.  He also noted the disconnect between Eldridge's simultaneous complaints of hallucinations and his organized speech, behavior and demeanor.  4/16/12 at 97-98, 100-102, 106.  Even Dr. Roman agreed that organized thoughts and behavior combined with complaints of hallucinations and delusions are highly suspicious of malingering.  4/17/12 at 329-30.  Likewise, Eldridge's accusations of staff not believing him were a red flag for malingering in Dr. Nathan's mind.  4/16/12 at 103.

When Eldridge complained of problems sleeping, Dr. Nathan switched from a modern, atypical antipsychotic to a much older, typical antipsychotic that has a side effect of producing sleep, noting "in the prison system, we cannot order sleep medications."  4/16/12 at 27-28.  Dr. Moeller, a board-certified forensic psychiatrist, testified that this drug progression made sense if your goal was to sedate the patient.  5/29/12 at 26, 28.  Ultimately and understandably, Dr. Nathan insisted that in 2009 they no longer felt pressured to avoid a malingering diagnosis, and maintained that medications would not have been prescribed if there was a concern of malingering.  4/16/12 at 122.  Nonetheless, the simple fact that a psychiatrist prescribed antipsychotic medications to a death row inmate without seeing him face-to-face even once is hardly proof positive that the inmate was actually psychotic.

## II.  Eldridge Fails to Prove He Suffers From a Severe Psychotic Disorder.

Experts for both sides analyzed inconsistencies in the data as a detection strategy to diagnose psychosis, malingering or both.  This is an appropriate approach.  Petitioner's Brief at 13; 5/29/12 at 247.  Also, all experts had explanations to some degree for the data which was apparently

---

[4] Brilliance is not required to do a bad job of malingering and get better at it.  *See* Petitioner's Brief at 10 n. 17.  Eldridge's obtained IQ of 85 is invalid because he did not exert full effort during the testing; his real IQ is higher and his observed capacity for learning is sufficient to at least attempt to be less dramatic, as Dr. Roman and Dr. Nathan consistently complain.  Petitioner's Brief at 5, 6, 10, et al. For Dr. Roman to say he did well on the IQ test is to reveal his bias—how can you know if an 85 is "well" without assessing effort?

in conflict with their opinion.  However, Dr. Allen's and Dr. Moeller's opinions are more reliable because they waited to form their conclusions until after reviewing all the available data, whereas Dr. Roman and Dr. Nathan revealed subtle a priori biases which were protected and propagated by the nature of their approaches to the evidence. Dr. Nathan also did not have access to as much information, as discussed above. And, Dr. Roman's lack of forensic experience limits the utility of his opinion.

Dr. Roman began by admitting he conducted just one other competency-for-execution examination, in the Jeff Wood case, and only one evaluation of an adult for competency to stand trial.  4/16/12 at 136; 4/17/12 at 298-99.  He has no recent case experience where malingering was an issue. 4/17/12 at 303.  He has had concerns about feigning in fewer than fifty cases total.  4/17/12 at 308. Twenty-five years ago, he may have interacted in a clinical, inpatient setting with up to one hundred schizophrenics as a psych tech.  4/17/12 at 304-05.  But he has only conducted one hundred neuropsychological assessments on schizophrenics, and this is the first time Dr. Roman has diagnosed an adult as schizophrenic in the forensic context. 4/17/12 at 306, 308.  He has conducted not more than six formal assessments of effort, all some time ago.  4/17/12 at 515.  He agreed that effort scales in his neuropsychology batteries have no specificity, sensitivity, or hit rate studies in the literature.  4/17/12 at 518.  By comparison, both Dr. Allen and Dr. Moeller are expert forensic professionals with greater experience dealing with schizophrenics and malingerers.  4/18/12 at 606-638; RX 78, 79, 80.

Further, Dr. Roman allowed Eldridge's attorney to remain for over an hour during Roman's first meeting with Eldridge, in violation of applicable ethical standards.  4/17/12 519, 521.  He also noted that allegations about conduct by some of Eldridge's attorneys, if true, would be "poisoning the well," damaging Dr. Allen's rapport in a manner that would be "totally inappropriate."  4/17/12 at 521-23; *see also* RX 47 at 291.

8

Dr. Roman's reports contained some errors, including his failure to discuss the Rey Fifteen Item and SIRS-II test results, omission of Eldridge's special education history and his antisocial personality disorder, and he did not review all the records provided by the attorneys.  4/17/12 at 514; 4/17/12 at 340-351; 4/17/12 at 540-41.  Dr. Roman also administered an effort test that he has never used previously; he was unaware of the problems with its supporting research and misinterpreted the score obtained as evidence that Eldridge was not malingering.  4/17/12 at 526-29.  Last, he diagnosed Eldridge with delusional disorder even though the DSM diagnostic criteria were not met.  4/17/12 at 423-28; 5/29/12 at 34.  This alone reveals some indication of his bias in the case.

When asked whether Eldridge was indulging in daydreams as a coping mechanism or was experiencing delusions, Dr. Roman hedged, "That's the sixty-four thousand dollar question."  4/16/12 at 181.  When asked why these fantasies were not instead a sign of mental health, Dr. Roman candidly conceded he did not know for certain.  4/16/12 at 181; 4/17/12 at 507.  He agreed that in acknowledging the discrepancy between being locked up and having a life in the free world, Eldridge recognized the lack of reality of his fantasies.  4/16/12 at 183.  Dr. Roman hypothesized that Eldridge did not connect his sense of identity with his environment, but admitted he was only speculating.  4/16/12 at 274.  He conceded not "hav[ing] a great answer" for why Eldridge was not "jumping up and down and raising more concern" about being incarcerated for a murder that had not happened.  4/17/12 at 507.  When Dr. Roman was pressed for an explanation of Eldridge's acquiescence to his "wrongful" incarceration, he straightforwardly admitted his logic was unpersuasive, but opined that it was difficult to use rational thought to understand an irrational thought process; he conceded it was impossible to rule out that Eldridge knows his victims are dead.  *Id.* at 187.  Dr. Roman even conceded that this is the more simple explanation.  *Id.* at 188.  In conclusion, he admitted he could not know Eldridge's motivations

and had no idea what to make of "a bizarre record with very bizarre statements. I don't know what it means." 4/18/12 at 604.

### A.   Dr. Roman should have taken Eldridge's words at face value rather than reinterpreting them to support predetermined conclusions.

Inadvertently, Dr. Roman explained the plight of the malingerer very well: when pressed for detail, Eldridge gets "muddy"—because the stories are not true, there is no factual memory to pull from so he confabulates when pressed for detail. 4/16/12 at 170-72. But Dr. Roman reinterpreted Eldridge's plain words about his reported symptoms to suit what Dr. Roman knew about real mental illness, instead of accepting that Eldridge's accounts do not fit because they are concocted.

Dr. Roman "[did not] dispute . . . at all" that Eldridge's evasive and inconsistent memory problems were incredible, but when he "believe[s] the person has this deficit, as a neuropsychologist, [he] would argue the next test is not let's see if they're malingering. The next test is let's evaluate their memory." 4/16/12 at 239-240. To assist the Court, Dr. Roman's job is not to accept without challenge that there is a deficit, but to always consider malingering as a possible cause. This reinterpretation also happened in Dr. Roman's analysis of the life-in-the-free-world hybrid, in which Eldridge confuses delusion and hallucination.

> In order for that to be a hallucination, he would have to essentially have to imagine that while remaining within the confines of death row and within his pod, that he is actually observing these things to happen, that these people—and he does make some reference to this, but specifically within the idea of leaving the prison, that somehow the prison has transformed itself to his home or to his work environment. It would have to be a perceptual phenomenon, and it's absolutely nonsensical to believe that that's what he's reporting or that that's what he believes.

4/16/12 at 146-47; *see also* 4/16/12 at 193, 5/29/12 at 85. And it happened again in discussing the purported multiple-personality-disorder presentation

in 2001.  4/17/12 at 395-96.  Dr. Roman was unwilling to admit Eldridge was malingering: "I have never been of the opinion that he is attempting to present multiple personality disorder. . . obviously I can't know what his intent was."  4/17/12 at 395-96.  This would seem to prevent Dr. Roman from *ever* diagnosing someone as malingering; if he cannot perform this role, then his opinion in this case is entirely irrelevant.

When the inconsistencies fail to fit into a known pattern of mental illness, Dr. Roman reinterpreted Eldridge's words—such as "not that I know of" or "all the time" or "I am hearing voices"—in a way which eliminated the inconsistency.  4/16/12 at 184, 199, 226-27; 4/17/12 at 467-69; *see also* RX 23 at 212, 214.  When Eldridge saysid "all the time," Dr. Roman refused to take his statement literally, because then Eldridge would be blatantly overreporting in a "very ridiculous" fashion.  4/17/12 at 532.

To assert that we cannot trust Eldridge's answers because he did not understand the questions is to ignore that Eldridge's own life experience and documented comprehension, described as sixth-grade level by his expert in the *Atkins*[5] hearing, was adequate for those assessment devices and structured interviews.  4/17/12 at 535; *see also Atkins* hearing transcript, 6/25/07 at 130 and 6/28/07 at 881.  To accept that Eldridge does not know what a hallucination is, after all these years of contested competency hearings, was naïve on Dr. Roman's part.

At some point, "double bookkeeping" became Dr. Roman's rationale when no other plausible explanation appeared.[6]  Dr. Moeller, board certified in forensic psychiatry, called it a "nice theory" to explain away inconsistencies but that it lacked any scientific basis explaining how it works.  5/29/12 at 22.

---

[5] *Atkins v. Virginia*, 536 U.S. 304 (2002).

[6] The article which referenced it was included with several others in the materials for the Court some years before the hearing actually took place and was not intended to be a comprehensive statement on reliable research.  Ironically, this handout of unknown authorship or scholarship is the only support or literature Eldridge can find for his double bookkeeping theory.

He did not know if it was volitional or not and did not believe in it. *Id.* Dr. Moeller did note that the most common reaction when a psychotic is confronted with evidence contradicting his delusion is denial, anger, and/or defensiveness. He expected Eldridge would have claimed the evidence was manipulated, the photographs faked, and the questioner must be part of the scheme. 5/19/12 at 23.

### B. Dr. Roman misunderstands the medical issues.

Dr. Roman is not a medical doctor and was confused by the medical issues in this case. First, the neuropsychological tests he administered are only useful if some other medical cause for the symptoms was in question. However, it is clear from the record alone that Eldridge did not have dementia related to pernicious anemia, because his outcries continued after his B12 levels were normalized. Thus, the exclusionary criterion is a straw-man argument. The only relevant diagnoses were schizophrenia and malingering.

Second, Dr. Roman claimed that Eldridge's pernicious anemia was proof of his food tampering delusion, because it *results from* a vitamin B12 deficiency caused by Eldridge's refusal to eat. 4/16/12 at 156-57. Actually, pernicious anemia results from an autoimmune disorder affecting the absorption of food, according to Dr. Moeller. 5/29/12 at 13. Pernicious anemia in turn *causes* B12 deficiency, and the deficiency would have taken four to five years of consistently inadequate food intake before displaying symptoms. 5/29/12 at 13-15. Even dietary restrictions for that number of years would still not cause pernicious anemia, only the vitamin deficiency. 5/29/12 at 16. Dr. Moeller opined that Eldridge's weight loss was more likely a result of the pernicious anemia and concomitant diarrhea and loss of appetite. 5/29/12 at 18; *see also* 4/16/12 at 185-86. Weight loss could have later been caused by Eldridge's dental problems,[7] lack of commissary funds,

---

[7] In July 2009 he appeared underweight and complained that the dentist failed to fix his cracked tooth. RX 23 at 132-33.

or intentional self-restriction to bolster the claim of paranoia about the food. 5/29/12 at 18, 136, 162-63, 207.

Dr. Roman explained away the conflict between purported food paranoia and observably healthy appetite as being indicators of a "true" delusion, because to fear a conspiracy in prison generally, not just in Polunsky, "would be way too vague in order for it to be a true delusion." 4/16/12 at 162. But Eldridge did not know he was supposed to be that precise and complained about finding pills in his food in Jester IV too. 4/17/12 at 458-59. Additionally, Dr. Moeller explained that there is insufficient scientific basis to assert that "true" delusions are only tied to the guards in one place and not in another. 5/29/12 at 21.

Further, Dr. Roman asserted that, like a nondiabetic taking insulin, malingerers would have more negative side effects from the antipsychotic medications because they upset the normal chemical balance. 4/17/12 at 498-99. This claim is wholly unsupported by science and clinical experience according to Dr. Moeller. 5/29/12 at 11. Dr. Moeller has prescribed antipsychotics to patients with and without psychotic disorders, and the presence or absence of side effects has nothing to do with malingering or verifiable psychosis. *Id.* at 12-13. Whether the brain's receptors are technically termed "side effect receptors" is irrelevant.

Dr. Moeller further described his review of the records and resulting opinion that Eldridge's responses to the medications were both inconsistent and atypical. *Id.* at 12. The inconsistency of Eldridge's symptoms are not explained by the waxing and waning of a true psychotic disorder—waxing and waning takes weeks, not days, for symptoms to accelerate and to diminish. 5/19/12 at 29. The records and timeline reveal such a rapid fluctuation in his mental state that Dr. Allen described it as "flicker[ing] on and off like a lightbulb" which is inconsistent with what he and Dr. Moeller know about how these medications work and with how the psychotic mental process works. *Id.* at 21, 157. The fluctuation is so great, their only

13

explanation was Eldridge was feigning his symptoms. *Id.* at 22, 157. This is because Dr. Moeller observed shifts from symptomatic to asymptomatic and back again, not even waxing and waning. 5/29/12 at 29. Proper analysis looks not just at the time periods with symptoms, but also at the severity of the onset and remission. 5/29/12 at 30. Further, these sudden shifts are not attributable to the time period it takes to get a therapeutic dose into the blood. 5/29/12 at 22, 30. The totality of the records reveals a wholly atypical presentation of adult-onset schizophrenia because his delusions are atypical, the timeframe of their presentation is atypical, and his response to the medications does not make sense. 5/29/12 at 35.

Dr. Roman also could not explain the positive urinalysis for cocaine. None of the experts believed that Eldridge's medications caused a false positive. 5/29/12 at 32. Dr. Moeller believed the most likely explanation was Eldridge actually obtaining cocaine while incarcerated. 5/29/12 at 33. Dr. Roman and Dr. Moeller agreed that if Eldridge did successfully obtain cocaine on death row, then it suggested a much better ability to navigate the social and physical environment and was highly suspicious of malingering. 4/17/12 at 511; 5/29/12 at 34.

## C. Roman's malingering assessment strategy was inadequate.

Lacking in forensic experience, Dr. Roman relied on predominantly subjective means of assessing Eldridge's honesty and failed to take into account his antisocial personality. He was persuaded in part because TDCJ doctors had medicated Eldridge. This is hardly reliable proof of psychosis. Eldridge takes an all-or-nothing approach, insisting that if he were malingering, surely he would have done a worse job (i.e. malingered more dramatically.) 5/29/12 at 284-86, PX[8] 1 at 15. This ignores the fact that Eldridge has benefitted from years of legal experience, critiques from forensic psychologists, and advice from fellow inmates on how to malinger.

---

[8] "PX" refers to the Petitioner's Exhibits, followed by exhibit number and page number(s).

To assert that something "does not have the feel of a rehearsed story" and is therefore trustworthy is an inadequate means of assessing malingering, especially in a practiced liar. 4/16/12 at 175; RX 55 at 14-16. Dr. Roman stated that in order to merit a diagnosis of malingering, Eldridge would have had to seek as much attention as possible, as frequently as possible, and prior to the execution date, not after. 4/17/12 at 497. Of course, Eldridge did seek attention frequently, and well before his execution date, but not dramatically enough to suit Dr. Roman. Because Dr. Roman found Eldridge's presentation to be neither extreme nor transparent malingering, he discounted it as malingering entirely. Dr. Roman's approach would only catch the most inept of malingerers.

Dr. Roman opined that similar scores on different IQ tests indicate full effort, completely ignoring the extensive testimony regarding Eldridge's failure of the effort testing in the *Atkins* assessment. 4/16/12 at 262. Aside from Dr. Roman's questionable use of the SIRS II and the Rey Fifteen Item Test, he utilized no standardized formal effort assessments. The only properly-administered and reliable assessments of effort were given by Dr. Allen. Dr. Roman agreed Dr. Allen reasonably presented, administered, and interpreted the results. 4/17/12 at 530.

Dr. Roman resisted acknowledging Eldridge's lengthy history of malingering at every turn. Dr. Roman refused to admit Eldridge feigned mental illness while awaiting trial for capital murder, despite seventeen mental health professionals concluding otherwise. 4/17/12 at 354-55. He also denied that Eldridge was malingering multiple personality disorder in 2001. 4/17/12 at 395-96. This indicates how difficult it would be to convince Dr. Roman that Eldridge is now malingering.

### D.   The inconsistency "trap."

While some inconsistencies can be expected from the genuinely mentally ill, even Dr. Roman agreed that a certain level of inconsistency is a sign of malingering. 4/16/12 at 224. Yet Dr. Roman incorrectly believed that

Eldridge's lengthy history of malingering was irrelevant to the question before the Court. Only professionals like Dr. Allen and Dr. Moeller, with training, experience and expertise in forensic psychology, can exercise adequate clinical judgment to filter out the commonplace inconsistencies present in mental illness, and see the exceptional patterns of variation that are at odds with genuine psychosis. Dr. Roman does not have the requisite forensic experience with antisocial personalities, schizophrenics, or malingerers to inform his clinical judgment for such a task.

Eldridge's history of feigning is relevant to assessing his current mental status. For example, before trial and in the 2009-present timeframe, he had similar symptoms—he contends his victims are alive; displays paranoid ideation; complains of auditory, visual and tactile hallucinations in rare combinations; hears relatives' voices; reports spending time outside of prison working with his brother; repeats "I don't know, ask Barry, I don't remember"; resists testing by complaining of eye problems; gets angry when challenged; and does not recall whether he has siblings or their names. 4/17/12 at 356-58; RX 81. The likelihood that Eldridge would have chosen to malinger a distinctive set of symptoms over many years, and then coincidentally fall victim to a valid illness and experience them authentically, albeit still atypically, is indescribably low, especially considering the continued existence of a substantial external incentive to feign psychosis.

Dr. Allen explained that Eldridge does not know the difference between a delusion and a hallucination, so he confuses his contrived descriptions, and manifests mostly the positive symptoms of psychosis instead of the negative symptoms. 5/29/12 at 85, 87-89. As Dr. Allen put it, when analyzing this much data, you should not get caught up in illusory correlations and backward reasoning. Just because Eldridge has claimed delusions about imaginary people does not mean he has psychosis. 5/29/12 at 90. A delusion is a *fixed* false belief, but most of Eldridge's complaints about the conspiracy against him are far from fixed—the only consistent allegation

deals with food tampering, and other accusations (urine thrown on him, headphones broken, possessions stolen, photographs defaced, mail withheld, relatives threatened, addresses publicized, incorrect shoe size provided, delays in receiving glasses, forging his name to confession, etc.) and actors surface and disappear without any permanence. 5/29/12 at 250-51. Likewise, his alleged belief that Cynthia and Chrissa are alive is far from fixed—they do not appear on any visitor lists, he does not write to them, he never plays tea party with Chrissa in his cell. 5/29/12 at 156-159. He does not refer to them in letters or conversation, except with Dr. Roman. Eldridge cites his two letters to Jennifer as proof of his delusion, but Dr. Allen believed he was just trying to build a case. 5/29/12 at 158-59. We cannot get inside Eldridge's head, but based on just two letters we can hardly conclude that he has a fixed belief that *she* exists, much less that he believes Cynthia and Chrissa are still alive. 5/29/12 at 174. Antisocial personality disorder provides an alternative, nondelusional rationale for Eldridge's purported symptoms. Of course antisocial personality disorder did not cause Eldridge to imagine Clorox in his food; it fostered his disrespect for authority, hostility towards control figures, and the lying inherent in his malingered psychosis.

Dr. Roman maintains that "the minute we try to get inside the head or the motivations of the person with the pathology, that becomes a very slippery slope." 4/17/12 at 507. Yet, just as Dr. Allen did, when Dr. Roman wants to explain how Eldridge would act hypothetically, he does not hesitate to "get inside Eldridge's head." For example, Dr. Roman maintained Eldridge is not malingering because he did not act "the craziest" on the day of the execution. 4/18/12 at 591-93. This only proves that Eldridge could have done a more convincing portrayal of mental illness (and could have therefore made it easier to point out feigning as well.) 4/18/12 at 602. But Dr. Allen has superior experience and training in the forensic field, and his clinical judgment is more worthy of reliance than Dr. Roman's.

### F.     The chronology indicates Eldridge is malingering.

Eldridge's presentation is atypical.  As soon as he entered death row, Eldridge's symptoms disappeared, until 2001 when Eldridge briefly attempted to present as a multiple personality.  4/17/12 at 368.  Dr. Roman agreed that his 2001 act was "absolutely suspicious, bizarre, crazy stuff . . . bizarre even for psychosis. . ." 4/17/12 at 381-82.  But Dr. Roman had no explanation why Eldridge's weight was falling during this timeframe, supposedly due to the "food delusion," while conceding Eldridge was malingering, except to prevaricate that perhaps he really was psychotic and the staff person was not paying attention, or the records were not accurate.  4/17/12 at 383-86, 392.  Thus Dr. Roman revealed his confirmation bias—once he concluded Eldridge is truly mentally ill, he adjusted his explanations to the degree necessary to preserve his conclusions.

Then from 2002 through 2006, Eldridge spent years without a psychiatric diagnosis, years with only the briefest complaints of food poisoning, years without any negative symptoms of a psychotic disorder.  4/17/12 at 400-06.  Suddenly, Eldridge's multiple-personality act surfaced again during his March 2006 evaluation by defense expert Dr. Averill.  4/17/12 at 407.    Even Dr. Roman agreed that his complaints, while hospitalized for pernicious anemia-related dementia in April 2006, were suspicious of malingering because of the unusual symptom presentation.  *Id.* at 409.    Once discharged without any psychiatric diagnosis, Eldridge experienced none of the negative symptoms of psychosis despite being without any psychotropic medications.  Dr. Roman would not agree that the records reflected no diagnosis because other records may have been lost or were not provided to him; clearly he was troubled that Eldridge was essentially asymptomatic.  4/17/12 at 410-13.  But Dr. Roman agreed that from 2003 to 2009, there were only sporadic and occasional complaints from Eldridge.  4/17/12 at 428-29.  Eldridge still had no diagnosis.  4/17/12 at 434; *see also* RX 23 at 129-130.

In July 2009, Eldridge was bench-warranted to Houston to get his November 17, 2009, execution date in open court, and in August his attorneys filed a competency claim in the state trial court.   4/17/12 at 436-38. According to Dr. Nathan, Eldridge came to the attention of the mental health staff in 2009 because of his attorneys' requests.   4/16/12 at 17.   Eldridge's expert Dr. Conroy concluded he *may be* psychotic.   During Dr. Moeller's evaluation, Eldridge returned to his old tricks;[9] Dr. Moeller noted his theatrical, contrived presentation with "gross inconsistencies" and concluded Eldridge is malingering.   4/17/12 at 437-439.   The Supreme Court denied certiorari on his *Atkins* claim on November 2, 2009 and three days later, Eldridge began displaying "inconsistent" and "nonpervasive" delusional and disorganized thinking, and obtained a nonurgent mental health referral.   RX 23 at 134-35.   Eldridge also completed his last-meal request and spiritual-advisor forms as part of the "death packet."   RX 21 at 1-4.   Two days after his execution was stayed, he complained about voices, hallucinations and delusions in "free-flowing, goal-oriented speech," and despite fears of poison, was observed eating from his food tray—and he acknowledged having had an execution date and receiving a stay.   RX 23 at 147-49, 140-45.   Four days later, on November 24, 2009, he was prescribed antipsychotics.   4/17/12 at 449.   On that same day, his presentation was still wildly inconsistent—his thought process was described as organized and logical and his thought content was coherent despite his reports of delusions and voices.   4/17/12 at 450; *see also* RX 23 at 154, 164-66.   On November 30, 2009 his speech was again clear and coherent.   RX 23 at 170.   This was far too soon to be a response to the risperidone.   4/17/12 at 462; 5/29/12 at 29-30.

These inconsistencies just do not comport with valid, real mental illness.   5/29/12 at 27-30.   Even though TDCJ staff declined to call it

---

[9] Eldridge did not recall if he had siblings, he claimed to work every day with his brother Barry, he stuttered, but stopped and got angry when challenged; he displayed goal-directed, logical speech when it was self-serving but replied "I don't know" and "I don't remember" when it was to his benefit.   4/17/12 at 437-439.

"malingering," occasionally notes revealed their confusion: "his symptoms do not jibe with the day's reports." 4/17/12 at 459; *see also* RX 23 at 226. Eldridge complained everyone was playing games with him and thought he was lying and acting. RX 23 at 154, 157-58. He reported being attacked but displayed no distress; he claimed he had not slept in four days, but the nurse noted he was not tired; he complained that no one believed him. 4/17/12 at 466, 463. Dr. Patel noted "Pt has claimed symptoms in the domain of psychosis. . . mental status normal. . ." RX 23 at 183-85. Staff may not have used the words malingering or feigning, but inconsistencies were observed and documented.

From Christmas 2011 forwards, Dr. Moeller agreed Eldridge was behaving almost normally, whether sedated by the high doses he was taking, or volitionally choosing not to act out. 5/29/12 at 31. But in his opinion, based on his experience, the most likely explanation is that Eldridge was not schizophrenic and was malingering. 5/29/12 at 34-35.

## III. Eldridge Rationally Understands the Link Between His Crime and Punishment.

Whether in terms of "awareness" of an execution or "why" it is to occur, prisoners must have a "rational understanding of the reason for the execution." *Panetti*, 551 U.S. at 958. This does not mean recall, nor willingness to admit something, but capacity for understanding. *Godinez*, 509 U.S. at 401 n.12; *Panetti*, 551 U.S. at 959-60. But Dr. Roman conflates the terms awareness, recognition, memory and understanding to the point where his opinion is quite unhelpful.

Dr. Roman conceded that Eldridge has factual awareness of his situation—that he is on death row, sentenced to death for the murder of Cynthia and Chrissa. 4/16/12 at 143, 198, 273. Before trial, Eldridge told Dr. Silverman he was accused of hurting his little girl Chrissa and her mother Cynthia, but that it was not true, because Cynthia visited him and brought Chrissa with her. RX 55 at 14-16. During death row intake, Eldridge

admitted several times to groups of mental health professionals including Dr. Gilliland, that he was convicted of killing both his 'daughter' Chrissa and "the woman who was his little girl's mother." 4/17/12 at 358-61; *see also* RX 23 at 4. (Dr. Roman postulated that perhaps Eldridge was simply asked to identify Cynthia, a hypothesis disproven by Dr. Gilliland. 4/17/12 at 361; 5/29/12 at 151-53.) Eldridge agreed the jury decided that he shot and killed more than one person, and did not react with perplexity, confusion or the like. 5/29/12 at 125. This, according to Dr. Allen, is consistent with rational understanding. *Id.*

Dr. Roman even said Eldridge *recognizes* that he is on death row for these murders, but Dr. Roman "[does not] know it's an awareness, an independent awareness," which he clarified somewhat as Eldridge lacking rational understanding, *because he denied remembering it.* 4/17/12 at 542-43. This combobulation of different terms muddles any distinctions Dr. Roman tries to draw between factual awareness, independent awareness, understanding, memory, recognition, and the like. Dr. Roman concluded "I do believe that it is entirely conceivable that is he aware of [sic] and can rationally understand at times, maybe even a majority of the time. I don't know. . . I don't know that that translates to a rational—a rational understanding of why he's there." 4/17/12 at 556. And according to Dr. Roman, Eldridge's lack of understanding creates the delusions that his victims are alive and that he lives outside the prison, because otherwise, "if a person has delusions and those delusions indicate a lack of understanding, that smacks a great deal of the idea of somebody who might be malingering. You concoct this story. You have these symptoms. These symptoms give you a proverbial get out of jail free card." 4/17/12 at 558. Yet Dr. Roman never explained why this is not precisely the case here.

According to Dr. Roman, Eldridge understands the meaning of the words he uses when he says he is on death row because he killed Cynthia. 4/17/12 at 559. Eldridge has previously said the State of Texas can go ahead

and kill him, and that Dr. Allen told the State to kill him; so, he understands that this is a life or death matter.  4/17/12 at 561.

Part of Dr. Roman's problem is that he fails to take antisocial personality disorder into account when evaluating Eldridge's competence.  A disorder characterized by manipulativeness, dishonesty, and a lack of respect for rules was at first entirely omitted, and later merely "not in the forefront" of Dr. Roman's mind as he evaluated the data.  4/17/12 at 541.  But if it had been, Dr. Roman may have taken Eldridge's reports with a grain of salt, appropriately so.  Dr. Moeller explained that, because antisocial personality disorder is a risk factor for malingering—not proof of it—it must be taken into consideration.  5/29/12 at 19-20, 53-54, 63.

In May 2010, Eldridge recalled to Dr. Roman that he had been found guilty of murder, but Dr. Roman felt he "could not relate" to it.  RX 53.  Then Eldridge backtracked and explained that Cynthia and Chrissa were actually alive and he saw them recently.  *Id.*  Eldridge implausibly claimed he cannot recall the capital murder trial, despite detailed recollection of his childhood, adolescence, and two prior convictions for child abuse and attempted murder.  4/16/12 at 266, 5/19/12 at 91.  But Eldridge also stated that it makes sense he had a trial and was found guilty for killing Cynthia, because after all, he is on death row—a concession Dr. Roman distinguished as "passive" and therefore not indicative of rationality.  As Dr. Roman illogically explained, "[t]hat something makes sense does not necessarily suggest that somebody has understood it."  *Id.* at 266-67.   Actually, because we cannot read Eldridge's mind, we are limited to interpreting his actions and words, and his statement that it makes sense *necessarily* indicates that he understands.

However, another psychiatrist, Dr. Patel, opined in 2010 that Eldridge had at the time a "global understanding" of his situation, that he is on death row and that he is at Jester for treatment.  RX 70, 5/18/10.  Although Eldridge agreed that he must have killed Chrissa, Dr. Roman refused to accept this as proof of rational understanding, because on later visits

Eldridge did not repeat the statement.  A simpler explanation might be that Eldridge, not the brightest of individuals, failed to consider his words before he spoke.  Eldridge was improvising his interaction with Dr. Roman, acting out his idea of a psychotic who does not understand he has killed his victims, and decided later not to repeat the same damning admission.  Indeed, a few months later, Eldridge told his attorney that the doctor showed him bad pictures and spontaneously stated "Cynthia and Chrissa are not dead."  RX 72, 7/12/10.

That Eldridge became upset when viewing the crime scene photographs affirms his understanding.  While Dr. Roman did not know what that emotional reaction meant, intuitively it may indicate guilt or remorse, especially when considering Eldridge's statements in the moment: "I guess this is true, I guess I must have did this."  4/17/12 at 503, 505.  Logically, if Eldridge does feel any regret for his crime, imagining a world in which his victims are alive and in which he plays a fatherly role could be a rational and functional way to cope with the guilt and the stress of incarceration, not just a selfish means of evading punishment.  4/17/12 at 506.  But when asked about this, Dr. Roman was unable to answer, indicating only that "the minute we try to get inside the head or the motivations of the person with the pathology, that becomes a very slippery slope."  4/17/12 at 507.  If Dr. Roman cannot "get inside" Eldridge's head, then the value of his expert opinion is severely limited.

Eldridge's communications indicate more than just an awareness of where he is in a geographical sense; he *understands* he is on death row.  He conversed with other inmates who have also raised claims of incompetence to be executed, like Raymond Riles and Jeff Wood, Dr. Roman's other competency-for-execution client.  4/17/12 at 299.  In fact, Eldridge received particular help from Wood, who even wrote a letter on behalf of one of Eldridge's multiple personalities.  4/17/12 at 547; *see also* RX 35 at 221-22.  Eldridge discussed Riles with his attorney and Eldridge understood that his

attorney wanted to make sure he does not spend thirty years on death row as Riles has.  4/17/12 at 490; *see also* RX 27 at 35-36.

Eldridge understands where he is chronologically as well.  In April 2006, when he was in the hospital for pernicious anemia, he told the hematologist that he had been in TDCJ for over ten years.  RX 25 at 139.  In December 2009, he knew he had been in prison for over twenty years for shooting "someone."  RX 23 at 183.  And in 2011 he wrote to Beatrice regarding his execution and his stay.  Apologizing that the sedative effects of his medications prevented him from writing to her sooner, he referred to having an execution date as being a "fact of where I am" and hoped that "it was not too much strain on you."  RX 34 at 189-91.

One way in which his rational understanding of his situation can be inferred is that Eldridge's writings began to reflect actions in concert with his delusions—as the *Wood*[10] court indicated was lacking in Roman's other case, 4/17/12 at 563-64—as Eldridge started writing to penpals about working outside the prison building boats and being dragged from home to Polunsky.  But a week after Eldridge told a penpal about suddenly appearing in prison from home, Dr. Patel noted that his weight and appetite was substantial, his speech was goal directed, clear and logical, his thought content was appropriate, and he denied hearing voices or being harassed.  RX 23 at 266, 268, *cf.* RX 29 at 93-94.  The same day that Eldridge wrote a similar account, Dr. Patel's notes described Eldridge as appearing "well kept, normal psychomotor, cooperative behavior, good eye contact, spontaneous rate and volume of speech, dysphoric mood and constricted affect, coherent, logical, goal directed thought process, appropriate thought content, no hallucinations/delusions."  RX 40 at 55-63; *cf.* PX 8 at 286.  Dr. Roman agreed this was a suspicious inconsistency.  4/17/12 at 496.

---

10 *Wood v. Thaler*, 787 F.Supp.2d 458, 473-75 (W.D. Tex. 2011).

Finally, a brief note on Eldridge's contention that he is only chemically competent.  Aside from the fact that he does not have schizophrenia to begin with, there is no reliable proof that he is actually taking his medication, except for one blood test indicating a Navane level in April 2012.  RX 76; 5/29/12 at 130.  He did not appear to be under the influence of medication during his interviews with Dr. Allen, and "probably on a pretty regular basis" he cheeks his medications.  5/29/12 at 120, 130.  Medication compliance notes are useless because the staff cannot actually monitor whether you swallow them; even in prison, these medications can be sold or traded.  *Id.* at 131.

## CONCLUSION

Because Eldridge cannot establish that he is incompetent, this Court should deny relief.

Respectfully submitted,

GREG ABBOTT
Attorney General of Texas

DANIEL HODGE
First Assistant Attorney General

DON CLEMMER
Deputy Attorney General for Criminal Justice

EDWARD MARSHALL
Chief, Postconviction Litigation Division

  /s/ Georgette P. Oden
GEORGETTE P. ODEN
Assistant Attorney General
Texas Bar No. 24029752
P. O. Box 12548, Capitol Station
Austin, Texas  78711
(512) 936-1400
Fax No. (512) 320-8132

ATTORNEYS FOR RESPONDENT

## CERTIFICATE OF SERVICE

I, Georgette P. Oden, Assistant Attorney General of Texas, do hereby certify that a copy of this Post-Hearing Brief was electronically mailed to counsel for petitioner at leewilson1@peoplepc.com and gwooch@texasdefender.org today, November 9, 2012.


  /s/ Georgette P. Oden
GEORGETTE P. ODEN
Postconviction Litigation Division