# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **GERALD CORNELIUS ELDRIDGE,** | § | |
| **Petitioner** | § | |
| | § | |
| **V.** | § | **CIVIL ACTION NO. H-05-1847** |
| | § | |
| **RICK THALER, Director,** | § | |
| **Texas Department of Criminal** | § | |
| **Justice, Correctional Institutions Division,** | § | |
| **Respondent.** | § | |

## PETITIONER'S POST-HEARING REPLY BRIEF

> There was only one catch and that was Catch-22, which specified that a concern for one's safety in the face of dangers that were real and immediate was the process of a rational mind.  Orr was crazy and could be grounded.  All he had to do was ask; and as soon as he did, he would no longer be crazy and would have to fly more missions.  Orr would be crazy to fly more missions and sane if he didn't, but if he was sane he had to fly them.  If he flew them he was crazy and didn't have to; but if he didn't want to he was sane and had to.  Yossarian was moved very deeply by the absolute simplicity of this clause of Catch-22 and let out a respectful whistle.

> – Joseph Heller, *Catch-22*

Like Heller's Yossarian, Petitioner Gerald Cornelius Eldridge is trapped in an exquisite Catch-22 of the State's devising.  The State whipsaws him: If he acts inconsistently with his delusions, he's malingering.  If he acts in conformity with his delusions, he's malingering.  If he exhibits positive symptoms, he's malingering.  If he exhibits negative symptoms, he's malingering.  If he seeks attention, he's malingering.  If he doesn't seek attention, he's

1

malingering.  At bottom, what the State's Catch-22 approach really reveals is its own experts' confirmatory bias that Mr. Eldridge is malingering.

## I.    THE STATE'S CATCH-22 CLAUSES

### A.    Mr. Eldridge's symptoms are too exaggerated.

### Mr. Eldridge's symptoms are too subtle.

Dr. Allen found Mr. Eldridge's insistence that correctional officers record his complaints about his food being poisoned as "building a case," 5/29/12 at 159, and a "pitch for attention."  *Id.* at 160.  Although this attention-getting behavior is common for malingerers, Dr. Allen testified, persons truly suffering from Schizophrenia do not need their delusions to be documented.  *Id.* at 159.  Similarly, Dr. Moeller found Mr. Eldridge's presentation of symptoms "theatrical and contrived."  Respondent's Ex. 81 at 3.  However, the State explains away the more extensive evidence that Mr. Eldridge does not draw attention to himself by pointing to his uncanny shrewdness: Mr. Eldridge deliberately "opt[s] to be not forthcoming," a negative symptom of psychosis, because such negative symptoms (*i.e.*, alogia, avolition, and flattened affect) are harder to malinger.  4/16/12 at 66; *see* 4/16/12 at 65, 114; State's Response at 20.[1]

The State implies that by exhibiting such hard-to-pull-off symptoms, Mr. Eldridge is more likely to convince mental health treatment staff that his symptoms are genuine.  Dr. Moeller was not so easily fooled.  He testified that periods when Mr. Eldridge's psychotic symptoms were "quiescent" showed not that the medication was working but that Mr. Eldridge had "volitionally . . . chosen to not be acting out."  5/29/12 at 31.[2]  Dr. Moeller speculated that

---

[1] Similarly, the State argues that Mr. Eldridge's failure to act "the craziest" on the day of his scheduled execution merely underscores his sophisticated understanding of malingering mental illness: Less conspicuous evidence of psychosis is less likely to be categorized as feigning. State's Response at 17.

[2] In contrast to Dr. Moeller, Dr. Allen testified that Mr. Eldridge "doesn't really know what the

Mr. Eldridge had concluded that "there [was] no reason right now to be acting out." *Id.* Of course, this conclusion flies in the face of testimony from both Dr. Moeller and Dr. Allen emphasizing that a death row inmate like Mr. Eldridge ***always*** has a reason to act out: the "potential for substantial secondary gain" – "avoid[ing] the death penalty." *Id.* at 63, 106. More important, Dr. Moeller failed to consider the glaringly obvious concerns raised when a supposedly malingering inmate, who has little incentive to report any relief from his symptoms, reports relief from his symptoms. Confirmatory bias caused him to ignore this red flag.

**B.** **The absence of letters demonstrates inconsistency between delusion and conduct.**
   **The existence of letters shows that Mr. Eldridge is "trying to build a case."**

The State excoriates Mr. Eldridge for both failing to act in reliance on his delusions and acting in reliance on them. Dr. Allen found evidence of malingering because Mr. Eldridge had not written to or put his murder victim, whom he believes is still alive, on his visitation list. 5/29/12 at 157-58. On the other hand, Dr. Allen dismissed Mr. Eldridge's letters to his non-existent free-world wife Jennifer, as "trying to build a case." 5/29/12 at 89; *see* 5/29/12 at 158; State's Response at 17. This sort of reasoning provides a perfect example of Dr. Allen's

---

secondary or negative symptoms" of Schizophrenia are. 5/29/12 at 87. Moreover, Dr. Allen testified that Mr. Eldridge's presentation that focused on delusions and hallucinations, the positive symptoms of Schizophrenia, "[t]o the exclusion of the negative symptoms" was "pretty typical." *Id.* at 104. Dr. Allen explained:

> It is that most people in this situation don't understand mental illness. So, they just kind of have a TV or Hollywood version or a version they learned from other inmates about what mental illness looks like. And the delusions and hallucinations are the most bizarre aspects of it very often to the lay person . . . . So, that's what the malingerer tends to focus on is either delusions or hallucinations or some combination of, absent a genuine pattern of negative symptomatology.

*Id.* Dr. Allen was blithely dismissive of another sign of negative symptomatology: Mr. Eldridge's failure to maintain his personal hygiene. *Id.* at 166. Revealing his confirmatory bias, Dr. Allen testified, "[T]hat's pretty common in TDCJ." *Id.*

confirmatory bias, interpreting evidence to support his preconceptions and ignoring or discounting evidence that undermines it.[3]

**C.      Double bookkeeping is a valid phenomenon.**

        **Double bookkeeping should be repudiated.**

      Only by repudiating the concept of "double bookkeeping" that the State introduced in its own exhibit could Dr. Allen use the so-called "inconsistency" between Mr. Eldridge's delusions and his behavior as evidence of malingering.  The State criticizes Dr. Roman for using double bookkeeping to explain Mr. Eldridge's delusion that he routinely leaves the prison and has a job and family outside its confines.  State's Response at 11-12.  According to Dr. Roman, Mr. Eldridge "recognizes at some level they can't both be true[.]"  4/16/12 at 176.  This recognition does not make Mr. Eldridge a malingerer; it confirms that he is behaving as Schizophrenics do.  *See* Eugen Bleuler, *Textbook of Psychiatry* 383 (1976) ("Although they imagine themselves in a prison or in hell or in a church, they nevertheless know in some other connection that they are in the ward of the insane asylum[.]").  As Dr. Roman testified, "[I]f a person is going to be malingering a delusional state, it behooves them to sell a particular story.  It behooves them to be able to answer the discrepancies that come up or have some way of being able to effectively sidetrack them."  4/16/12 at 178.  Unlike a malingerer, Mr. Eldridge does not attempt to

---

[3] For other egregious examples of Dr. Allen's confirmatory bias, *see* 5/29/12 at 130-31 (testifying that Mr. Eldridge "cheeks" his medication despite no evidence to support this conclusion and undisputed evidence to the contrary from Dr. Nathan, *see* 4/16/12 at 122-24); 5/29/12 at 86, 98 (testifying that Mr. Eldridge "doesn't really know what . . . a hallucination is" and then, 12 pages later, testifying that Mr. Eldridge "has been hearing that word for at least 18 years.  He began hearing that word in 1993 in Harris County.  He heard it in Jester twice on those two admissions.  He knows what a hallucination is."); *id.* at 168-69 (testifying that it was not suspicious that Mr. Eldridge exhibited no signs of incompetence on the day of his scheduled execution: "[M]alingerers use different strategies, but the spike occurred after he got the stay.  And to me it is simple reward and punishment.  You know, my strategy worked.  So, now I might as well pour it on because it's working.").

reconcile the discrepancies between his life in prison and his life in the free world.  He can provide no explanation.  *See*, *e.g.*, 4/16/12 at 179 ("'How is it that you get in and out of the prison?'  [Mr. Eldridge] looks at me, he looks puzzled for a minute, and he says, 'I don't know. I just do.'").

The State now asserts that the article mentioning double bookkeeping, Respondent's Exhibit 61, was "not intended to be a comprehensive statement on reliable research."  State's Response at 11 n.6; *see* 5/29/12 at 62-63, 251-52.  Such a disclaimer raises serious concerns about why the State ever introduced the article for the Court's consideration in the first place without properly vetting it.  Not until counsel for Mr. Eldridge mentioned double bookkeeping did the State voice its concern about the article's reliability and provenance.  The State asserts that this "handout" of "unknown authorship or scholarship" is "the ***only*** support or literature Eldridge can find for his double bookkeeping theory."  *Id.* (emphasis added).[4]  The State's assertion cannot but leave the Court with the impression that a single, questionable article – fortuitously brought to Mr. Eldridge's attention by the State – discusses the phenomenon known

---

[4] For the record, the author of the article is Robert Boland, M.D., Professor of Psychiatry at the Warren Alpert Medical School at Brown University.  Dr. Boland is the Associate Training Director for the Brown General Psychiatry Residency.  He has taught at all levels of training in the University.  Most significantly, he directs the Introductory Psychiatry Course given to all students at the Medical School and is a primary lecturer in that course.  In addition, he is the director of the Clerkship in Psychiatry.  He has published more than 40 peer reviewed articles and more than 30 book chapters.  Dr. Boland is currently on the editorial boards for Academic Psychiatry, Psychosomatics, and FOCUS (the APA's journal of continuing education) and was appointed by the American College of Psychiatry to be the Assistant Editor for the Psychiatry Residents in Training Examination.  He has been active in a number of organizations relevant to academic psychiatry, is a Past President for the Association for Academic Psychiatry, was recently elected to the steering committee of American Association of Directors of Residency Training and is the Program Chair for 2013.  *See* http://research.brown.edu/research/profile.php?id=1100923745 (last viewed Nov. 19, 2012). Dr. Boland's curriculum vitae can be found at http://research.brown.edu/pdf/1100923745.pdf?nocache=2144773472 (last viewed Nov. 19, 2012).

as "double bookkeeping."

Double bookkeeping has more than one adherent.  In fact, the concept of double bookkeeping dates back to the 1920's.  Eugen Bleuler, who coined the term "schizophrenia," used the phrase "double awareness."  Bleuler noted that "[n]ot only do delusion and reality exist consecutively, but they can also exist simultaneously in conditions of full consciousness where one would expect they would be mutually exclusive."  Bleuler, *Dementia Praecox or the Group of Schizophrenias* 126 (1950).[5]  More recently, Louis Sass described the phenomenon as "double bookkeeping," writing that:

> It is remarkable to what extent even the most disturbed schizophrenics may retain, even at the height of their psychotic periods, a quite accurate sense of what would generally be considered to be their objective or actual circumstances. Rather than mistaking the imaginary for the real, they often seem to live in two parallel but separate worlds: consensual reality and the realm of their hallucinations and delusions.

*The Paradoxes of Delusion: Wittgenstein, Schreber, and the Schizophrenic Mind* 21 (1994).  Of his own patients, Bleuler wrote:

> Kings and Emperors, Popes and Redeemers engage, for the most part, in quite banal work, provided they still have any energy at all for activity.  This is true not only of patients in institutions, but also of those that are completely free.  ***None of our generals has ever attempted to act in accordance with his imaginary rank and station.***

*Id.* at 129 (emphasis added).  By failing to recognize the concept of double bookkeeping, Dr. Allen fell victim to the "inconsistency" trap that Bleuler noted nearly one hundred years ago.

Such is the heavy price one pays for confirmatory bias.

---

[5] Dr. Allen spoke glowingly of Bleuler: "[H]is insights then were amazing, and he has been regarded very highly ever since then . . . ."  5/29/12 at 82.

**D.     Mr. Eldridge is clever, cunning, and sophisticated.**

 **Mr. Eldridge is not very smart.**

The State asserts that Mr. Eldridge cleverly solicited advice and implemented the

lessons he learned from savvy death-cheating malingerers like Raymond Riles and Jeff Wood.

State's Response at 14, 23-24; 4/17/12 at 490-95.  According to the State, Mr. Eldridge learned

from Riles to avoid execution by refusing to take his antipsychotic medication whenever he is

scheduled for a psychological evaluation.  4/17/12 at 491-92.[6]  The State asserts that Mr.

Eldridge learned from Wood to "act . . . in reliance on his delusions," 4/17/12 at 493, by writing

letters to pen pals that set out his delusional beliefs.  4/17/12 at 493-95.  According to the State,

Wood passed along this advice after reading Judge Orlando Garcia's opinion denying Wood's

*Ford* claim, in part, for Wood's failure to write a single letter detailing his delusion about the

conspiracy between the trial judge and the district attorney.  4/17/12 at 493-95; State's

Response at 24; *see Wood v. Thaler*, 787 F. Supp.2d 458, 475, 488 (W.D. Tex. 2011) ("[T]here

is no mention by petitioner in his . . . correspondence of the Freemasons, the Masons, or any

other overarching conspiracy to deprive petitioner of his life . . . .").[7]

---

[6] Leaving aside the fact that there is absolutely no evidence for this allegation, and that Mr. Eldridge was not even prescribed antipsychotic medication until after his execution was stayed, the State's assertion is ridiculous.  In 1992, the Texas Court of Criminal Appeals found Riles incompetent for execution.  *Ex parte Riles*, WR-11,312-03 (Tex. Crim. App. Nov. 18, 1992) (unpublished) (attached as App. A).  The CCA based its decision on the evaluation of Dr. Jerome Brown, *see* App. B, the very same mental health expert who found Mr. Eldridge to be malingering mental illness in 1993-94.  In the twenty years since the CCA's decision, 93 inmates from Harris County, Texas, where Riles was convicted and sentenced, have been executed.  *See* http://www.tdcj.state.tx.us/death_row/dr_executed_offenders.html (last viewed Nov. 28, 2012).  That Harris County has not found a single expert in all that time to declare that Riles has been restored to competence undercuts the State's assertion that Riles has bamboozled the experts, TDCJ, and the Harris County District Attorney's Office.  Riles has not been executed for the simple reason that he is unequivocally insane.

[7] The gaping hole in the State's theory is that Judge Garcia issued his decision in *Wood* one year *after* Mr. Eldridge wrote the letter the State points to as the product of Wood's advice.  *Cf.*

In addition to learning from other death row inmates, the State alleges that Mr. Eldridge "has benefitted from years of legal experience [and] critiques from forensic psychologists . . . on how to malinger."  State's Response at 14.  According to the State, Mr. Eldridge learned from his early miscues in presenting symptoms of psychosis to mental health professionals shortly before his capital murder trial.  In particular, the State focuses on the testimony of Dr. Jerome Brown at the 1994 competency-to-stand-trial proceeding as providing Mr. Eldridge with the critical information he used 15 years later to appear genuinely mentally ill and dupe Jester IV and Polunsky treatment professionals.  Dr. Brown testified that:

> Mr. Eldridge has also – has also around the time I saw him consistently refused psychological testing.  This is another hallmark of malingering, I would say.  It's rare to see mentally ill people who really don't want to do the psychological testing.  Now, if they're really paranoid, really suspicious, they would sometimes refuse, but Mr. Eldridge does not really exhibit any paranoid traits, at least in terms of feeling that the staff or someone like that was going to harm him or that the other inmates around him were going to harm him, which is what you typically see.  He would make general statements about don't let them kill me, things like that, but he never indicated that he was threatened by any of the staff or any of the other inmates, which is again inconsistent.

4/16/12 at 90-91 (quoting from State's Ex. 57 at 274).  From this specific passage, according to the State, Mr. Eldridge learned that he would in the future need to exhibit paranoid delusions that the staff was trying to harm him.  *See* 4/16/12 at 92.  Beginning in 2001, he did just that, according to the State, complaining that TDCJ correctional officers were poisoning his food.[8]

---

*Wood v. Thaler*, 787 F. Supp.2d 458 (W.D. Tex. May 10, 2011), *with* State's Exhibit 29 at 93-94 (letter from Mr. Eldridge to pen pal, dated May 6, 2010).

[8] The State failed to mention a second lesson that Mr. Eldridge apparently learned from that very same passage (and the sentences that followed) of Dr. Brown's testimony: Cooperate with psychological testing.  Following the passage quoted by the State, Dr. Brown testified:

> So, anyway, the refusal of psychological testing is often taken as an indication that they don't want to put themselves in the position of having to do the test themselves because, of course, they don't know how to look bad on a psychological test or what might be a bad response, and he consistently refused throughout his stay on both times on the psychiatric unit.

In 2006, Mr. Eldridge again demonstrated his caginess when he used his weight loss (that he knew was caused by pernicious anemia, according to Dr. Allen) as an opportunity to "conveniently" announce his delusion that correctional officers were poisoning his food. 5/29/12 at 207.  As Dr. Allen put it, "Eldridge is not as dumb as he wants you to believe he is. Eldridge understands a lot more than he claims to understand . . . ."  *Id.* at 93.

The State unwittingly juxtaposes Mr. Eldridge's sophistication with his inexplicable stupidity.  Despite implementing the advice he received from death row malingerers or modifying his presentation of symptoms based on his uncanny recall of a snippet of expert testimony a generation ago, Mr. Eldridge nevertheless falters over much less onerous obstacles. Dr. Allen testified that it is "not that difficult to . . . look crazy.  It is not that hard."  5/29/12 at 135.[9]  He explained that a malingerer need not act mentally ill "24/7": "All you have to do is exhibit symptoms at the right time and in the right place."  *Id.*  Mr. Eldridge "didn't do a better job" of malingering, according to Dr. Allen, "[b]ecause he is not that smart."  *Id.* at 136.[10]

State's Ex. 57 at 275.  Dr. Allen administered three psychological tests to Mr. Eldridge, Respondent's Ex. 49; Dr. Roman administered sixteen, Petitioner's Ex. 1.  Apparently, Mr. Eldridge is so adept now at manipulating the results of psychological measures that his full scale I.Q. scores on two separate administrations of the WAIS-III given three years apart were within a single point of each other.  Pet. Ex. 1 at 8.

[9] On cross-examination, Dr. Allen contradicted himself and said that he agreed with Dr. Resnick's statement that: "In very difficult cases, inpatient assessment should be considered because feign[ed] psychotic symptoms are ***extremely difficult*** to maintain 24 hours a day." 5/29/12 at 225-26 (emphasis added).

[10] The State provides abundant examples of Mr. Eldridge's inability to "keep[] up the appearance of crazy."  5/29/12 at 135.  After Dr. Roman showed him crime scene photographs, Mr. Eldridge responded that he must have killed Chirissa.  4/16/12 at 267-68.  Forced to contend with a reaction that one would least expect from a person who is malingering a delusion that his murder victims are alive, *see* 4/16/12 at 269, the State argues that Mr. Eldridge, "not the brightest of individuals, failed to consider his words before he spoke."  State's Response at 22. Dr. Allen and Dr. Moeller repeatedly noted that Mr. Eldridge was incapable of maintaining a consistent presentation even within a single evaluation.  *See, e.g.*, 5/29/12 at 93-94; Respondent's Ex. 49 at 17; Respondent's Ex. 81 at 3.  Dr. Allen testified that Mr. Eldridge failed miserably in his attempt to speak with loosened associations, 5/29/12 at 125-26, a type of

II.     **THE STATE DISTORTS AND MISCHARACTERIZES DR. NATHAN'S AND DR. ROMAN'S TESTIMONY IN AN EFFORT TO DISCREDIT THEM.**

In its attempt to undermine Dr. Nathan and Dr. Roman, the State repeatedly mischaracterizes their testimony.  In the interest of concision, Mr. Eldridge notes only a few of the most egregious examples of the State's conduct.  After reviewing these, the Court should examine every assertion and accompanying citation in the State's Response to ensure that the record says what the State says it says.

A.     **Dr. Nathan**

The State erroneously equates the term "disorganized speech" with "loosened associations," State's Response at 6, in an attempt to discredit Dr. Nathan's testimony that loosened associations are one of the most difficult symptoms of psychosis to fake.  4/16/12 at 114.  Disorganized speech in persons suffering from Schizophrenia can manifest itself in a variety of ways:

> The person may "slip off the track" from one topic to another ("derailment" or "loose associations"); answers to questions may be obliquely related or completely unrelated ("tangentiality"); and, rarely, speech may be so severely disorganized that it is nearly incomprehensible and resembles receptive aphasia in its linguistic disorganization ("incoherence" or "word salad").

DSM-IV-TR at 300.  One manifestation of disorganized speech, "loosening of associations," has a precise definition.  According to the DSM, it is:

> A pattern of speech in which a person's ideas slip off one track onto another that is completely unrelated or only obliquely related.  In moving from one sentence or clause to another, the person shifts the topic idiosyncratically from one frame of reference to another and things may be said in juxtaposition that lack a meaningful relationship.  This disturbance occurs *between* clauses, in contrast to incoherence, in which the disturbance is *within* clauses.

DSM-IV at 822 (emphases in original).

_____

disorganized speech that is "relatively easy" to concoct.  State's Response at 6; *but see* Part II-A, *infra* (arguing that loosened associations are not easy to feign).

Dr. Allen's recounting of an example of Mr. Eldridge's speech falls squarely within the definition of loosened associations.  According to Dr. Allen, Mr. Eldridge mentioned "guys trying to break into a house," "get[ting] a big dog," and hearing a voice in his sleep.  5/29/12 at 125.  Mr. Eldridge shifted the topic idiosyncratically from one frame of reference to another *between* sentences or clauses.  Dr. Allen mistakenly categorized this speech as incoherence ("babbling nonsense").  It clearly was not.  "Incoherence" is speech that is "essentially incomprehensible to others because words and phrases are joined together without a logical or meaningful connection," and "[t]his disturbance occurs *within* clauses."  DSM-IV-TR at 824 (emphasis in original).  Dr. Allen then attempted to demonstrate loosened associations with an example involving a person who claimed to have met Adolph Hitler and the Queen of England.  5/29/12 at 126.  Dr. Allen's example clearly did not depict loosened associations, because the person answered the questions posed, and the content of each clause was related to the one preceding it.  The State cites these portions of the record in its post-hearing brief to illustrate how "relatively easy," State's Response at 6, it was for Mr. Eldridge to bamboozle Dr. Joseph and, in turn, Dr. Nathan, who relied on Joseph's report about Mr. Eldridge's loosened associations.  4/16/12 at 46-47.[11]  However, Dr. Allen concluded that Mr. Eldridge was unable to feign loosened associations.  5/29/12 at 125-26.

**B.**    **Dr. Roman**

The State asserts that Dr. Roman "misinterpreted the score obtained [on the SIRS-II] as evidence that Eldridge was not malingering."  State's Response at 9.  This statement is incorrect.  Dr. Allen himself testified that Dr. Roman accurately reported that none of Mr.

---

[11] Contrary to the State's assertion, Dr. Nathan did not rely solely on "notations of loosened associations," State's Response at 6, but on his own personal observations of Mr. Eldridge's speech.  4/16/12 at 20, 96, 114.  Dr. Nathan also correctly defined "loosened associations," *id.*, unlike Dr. Allen.

Eldridge's scores on the primary scales fell within the "definite-feigning" category and that his overall score fell into the "indeterminate-evaluate" category.  5/29/12 at 112-13; *see* Petitioner's Post-Hearing Brief at 11-12.  Dr. Roman accurately reported the statistical significance of Mr. Eldridge's overall score but concluded, based on nearly two more years' worth of further evaluation, that "there is insufficient clinical or statistical evidence to conclude that the interview results are consistent with malingering."  Petitioner's Ex. 2 at 12.

Nor did Dr. Roman "straightforwardly admit[]" that Mr. Eldridge's logic was "unpersuasive" regarding his apparent acceptance of his wrongful conviction.  State's Response at 9.  No such statement approaching the State's assertion appears in the record.  The State then contends that Dr. Roman "conceded" that the "more simple explanation" is that Mr. Eldridge really knows that his victims are dead.  *Id.*  Once again, the State is irresponsible with the record, omitting the material qualifier in Dr. Roman's testimony.  In response to the Court's question, Dr. Roman admitted that that is the simpler explanation ***"based on simply this one fact."***  4/16/12 at 188 (emphasis added).  However, Dr. Roman emphasized that the simpler explanation is "inconsistent with . . . the larger data set."  *Id.*  The State distorts the record by then asserting that Dr. Roman, "[i]n conclusion . . . admitted he could not know Eldridge's motivations and had no idea what to make of 'a bizarre record with very bizarre statements.  I don't know what it means.'"  State's Response at 10 (quoting 4/18/12 at 604).  Dr. Roman made this statement ***solely*** in response to specific questions about whether the 2001 Jester IV records indicated that Mr. Eldridge was attempting to portray dissociative identity disorder.  4/18/12 at 603-04.  The State leaves the Court with the impression that Dr. Roman made this statement about the ***entirety*** of the TDCJ record of Mr. Eldridge's mental health treatment.

The State materially misquotes the record.  When recounting Dr. Roman's testimony

that Mr. Eldridge did not act bizarrely hours before his scheduled execution, the State said that Dr. Roman maintained that, if Mr. Eldridge were malingering, he should have acted "'the craziest'" on that day.  State's Response at 17.  The State places quotation marks around the phrase "the craziest" and cites to three pages of Dr. Roman's testimony.  *Id.*  The phrase does not appear in the three cited pages, nor can Dr. Roman's testimony there be artfully interpreted as having implied that Mr. Eldridge should have acted "the craziest" on the day of his execution.  *See*, *e.g.*, 4/18/12 at 593 ("[G]enerally I would expect that he would have evidence of some degree of positive symptoms of schizophrenia that would help punctuate the fact that he is schizophrenic.").[12]

With the improper use of an ellipsis, the State distorts the testimony of Dr. Roman.  In its Response, the State quotes Dr. Roman: "I do believe that it is entirely conceivable that he is aware of [*sic*] and can rationally understand at times, maybe even a majority of the time.  I don't know. . . I don't know that that translates to a rational – a rational understanding of why he's there."  State's Response at 21.  To place the testimony of Dr. Roman in context, it is necessary to set out the portion of the transcript the State omits with the ellipsis:

> [Dr. Roman]: ***I do believe that it is entirely conceivable that he is aware of and can rationally understand at times, maybe even a majority of the time.  I don't know.***
>
> Q: Okay.  So, let me ask you this then: If what we're talking about here is that for this section of time, whatever that is –
>
> A: Yes.
>
> Q:  – he does have a rational understanding of who he is, where he is, and then at other times when his disease is active, he does not have a rational understanding, would you then agree that it maybe is the case that when he rationally

---

[12] Dr. Roman does not utter the phrase "the craziest" once during his entire testimony at the evidentiary hearing.  In fact, the phrase never appears in the nearly 1,000 pages of hearing transcripts.

understands where he is, he rationally understands why he's there, and then maybe the argument is that at other times it's spotty, he doesn't?

A: It wouldn't be my explanation, no. We know that he has generally been oriented to place. It's orientation to time that people have questioned. He generally will report accurately where he is. It's an assumption on my part, of course, but given that he knows where he is, I suspect that he has a rational understanding of at least the basic rules, the basic way that one navigates that environment. We've seen that in some of the forms that he's filled out and so on. ***I don't know that that translates to a rational – a rational understanding of why he's there.***

4/17/12 at 556 (sentences quoted in State's Response emphasized).

Using an ellipsis without retaining the punctuation at the end of a quoted sentence indicates to the reader that the language following the ellipsis occurred ***within the same sentence***. *See The Bluebook: A Uniform System of Citation*, Rule 5.3(b)(v) (18th ed. 2005) ("Where language after the end of a quoted sentence is deleted and is followed by further quotation, retain the punctuation at the end of the quoted sentence and insert an ellipsis before the remainder of the quotation."). Even if the State's failure to use the ellipsis correctly was inadvertent, the State's use here to combine two sentences separated by a lengthy cross-examination question and six additional sentences of testimony is improper and misleading. That the record as it actually stands is not sufficient for the State to support its assertions raises serious questions about the strength of its case.

Finally, the State uses Respondent's Exhibit 70 in its post-hearing brief as substantive evidence, State's Response at 22, ***even though the Court explicitly ruled that the exhibit was not to be admitted for the truth of the statements contained within it***. 4/17/12 at 342-43. The Court admitted the exhibit for the limited purpose of showing what Dr. Roman may have considered in evaluating Mr. Eldridge. *Id.* at 343. That the State concluded it could ignore the Court's ruling in an attempt to refute Dr. Roman's testimony is inappropriate.

14

## CONCLUSION

The State's repeated use of Catch-22 arguments reveals the confirmatory bias of its experts.  The State's repeated mischaracterization of the record reveals the lack of support for its arguments.  This Court should find that Mr. Eldridge is incompetent to be executed.

Respectfully Submitted,


/ s /  Gregory W. Wiercioch

Gregory W. Wiercioch
Texas Bar No. 00791925
University of Wisconsin Law School
975 Bascom Mall
Madison, Wisconsin 93706
(Tel) 608-263-1388
(Fax) 608-263-3380

Lee Wilson
Texas Bar No. 21704200
P.O. Box 52447
1314 Texas Avenue, Suite 610
Houston, Texas 77052-2447
(Tel) 713-223-6870
(Fax) 713-223-9248

Counsel for Mr. Eldridge


## CERTIFICATE OF SERVICE

I, Gregory W. Wiercioch, certify that on November 28, 2012, I electronically filed the foregoing brief with the clerk of the court for the U.S. District Court, Southern District of Texas, using the electronic case filing system.  A "Notice of Electronic Filing" was sent to Counsel for Respondent at the following e-mail address:

Georgette P. Oden
Georgette.Oden@oag.state.tx.us

/ s / Gregory W. Wiercioch

# APPENDIX  A

EX PARTE RAYMOND G. RILES

NO.   71,542

Habeas Corpus Application
From HARRIS County

## O P I N I O N

This is a post conviction application for writ of habeas corpus filed pursuant to the provisions of Art. 11.07, V.A.C.C.P.

On December 10, 1975, a jury found applicant guilty of capital murder. After returning affirmative answers to the special issues submitted under Art. 37.071, V.A.C.C.P., punishment was assessed at death.   This Court affirmed applicant's conviction on direct appeal.  Riles v. State, 595 S.W.2d 858 (Tex.Cr.App. 1980).

In the instant cause, applicant maintains he is presently incompetent to be executed and therefore his execution would violate the Eighth and Fourteenth Amendments of the United States Constitution.  See Ford v. Wainwright, 477 U.S. 399 (1986).  The trial court has entered findings of fact and conclusions of law. The trial court concludes applicant is currently incompetent to be executed based upon an October 28, 1991, competency evaluation. We find the trial court's findings and conclusions are supported by the record.

The relief prayed for is granted only to the extent that applicant's execution is stayed until the trial court finds him competent for execution.[1]

PER CURIAM

En banc
Do Not Publish
Delivered:  November 18, 1992

_____

[1]Such competency is to be evaluated in accordance with the procedures approved by this Court in Ex parte Jordan, 758 S.W.2d 250 (Tex.Cr.App. 1988).

# APPENDIX  B

**The Mental Health and Mental Retardation Authority for Harris County**

# FORENSIC PSYCHIATRIC SERVICES
### 3rd Floor, Harris County Jail * 1301 Franklin
### Houston, Texas * 77002

**Administration:**
(713) 221-7241

**Forensic Service:**
(713) 221-6904

October 28, 1991

Honorable Mike Wilkinson
Judge, 179th District Court
Harris County, Texas

Re:  Raymond G. Riles (Cause #224779-C) - Competency Evaluation
     (Special)

Dear Judge Wilkinson:

The defendant is a 41 year old black male who was interviewed and
examined most recently on October 25, 1991 pursuant to an order
from your court.   The defendant has been seen a number  of times
in the past  by  this  examiner as well  as other  members of the
Harris  County  Forensic  Psychiatry Unit  (September  4,  1986;
December 30,  1987).  It is known that the defendant suffers from
a chronic mental illness and has been  considered  incompetent to
be executed under state law because of this mental  illness.  On
this occasion the defendant barely remembered  this examiner from
the prior contacts with him.   He was once again told the purpose
of the evaluation and he agreed to cooperate.

The defendant was seen for evaluation on  the third floor  of the
Central Jail building.  On this occasion the evaluation consisted
of   a   clinical  interview,   mental  status  examination,   and
administration  of  a  psychological  test   battery  (Rorschach
Technique,  Ammons  Test,  Mental Illness Deception Test).  The
defendant was  presented  as  a  well-groomed  and well-nourished
individual  appropriately  dressed  in  a  standard  jail uniform.
Throughout the contact with  him he was  pleasant, agreeable, and
responsive to all evaluation requirements.

The defendant was   able  to  provide   relevant  and  coherent
background information,  but would quickly insert references to a
number of  delusional ideas,  mainly of  a  grandious nature.  For
example,  he stated that he was born Raymond G.  Riles on June 1,
1950  in Houston,  but came to know  himself by  a different name
"over a certain period of time."   In this respect he referred to
himself as the "Divine Imam Abdul Rahman."  He stated that he was
given this title by the "Holy Father...King Moto."  He went on to
state  "I  am  the exaulted  Messiah and enforcer  of divine holy
law."   The  defendant  continued  to  make  these  delusional
references throughout the interview.

14-998

5/ 09-11

Re: Raymond G. Riles                Competency Evaluation (Special)

With regard to the special questions concerning his execution and
the reasons for it, the defendant reported that he is aware that
he has been placed on the Ellis I Unit and has been in prison
for the past seventeen years because he was given the death
penalty in a court trial.   The defendant now states that he did
not commit the offense and was wrongly accused of something he
did not do.  He does know, however, that he was "sentenced to two
death sentences."   He estimated that he has been in prison on
this conviction for approximately seventeen years.   The
defendant, however, believes that he has been given this sentence
"because of my holy father...I'm here to do divine work."  He
stated that he knew that he was on "death row" with other
inmates, but also referred to it as "the headquarters of Moorish
National Security Headquarters."  He acknowledged that he has
been receiving psychiatric treatment for many years including
medication (lithium) which he believes helps him.   However, he
seems to continue to firmly believe the delusional ideas in spite
of this treatment.

The defendant was able to discuss some aspects of his legal
representation, but noted that he has not talked with his
attorney "in a long time."   He remembered the last attorney he
worked with as "Carolyn Garcia."   However, he also admitted
that he only received a letter from her two to three years ago
and has not seen her in a longer time than that.   When asked how
he occupies his time in the Ellis Unit death row, he stated
"studying, writing, and doing spiritual work."   He stated that
recently his sister asked him if he would have preferred to be
born dead instead of having the life he has had, and he denied
that this was true.   Instead, he stated that he was glad "about
what I was born to do."

Although the defendant could make rational responses to certain
questions, he was unable to refrain from inserting his peculiar
ideas into the conversation if it lasted any time at all.
When asked how he sees his overall situation, he stated "King
Moto says you're blessed."

The psychological tests administered reveal the defendant to be
functioning in the average range of intelligence and to be giving
answers in a non-deceptive way.   The projective technique
administered reveals generally good form and an absense of acute
psychotic thinking.   Nevertheless it also contains a number of
peculiar and arbitrary responses suggestive of a thought disorder
or some other process that significantly distorts his perception
of reality, at least on a periodic basis.

Re: Raymond G. Riles                    Competency Eval .tion (Special)

Based upon the current information available, it does appear that the defendant continues to suffer from a severe mental illness and that this mental illness renders him unable to adequately appreciate the seriousness of his current legal situation and what this implies for his immediate future.   In this examiner's opinion the defendant is NOT COMPETENT to be executed under the Ford V. Wainwright standard.

Jerome B. Brown, Ph.D.
Clinical Psychologist

JBB/ln

F I L E D
KATHERINE TYRA
District Clerk

NOV - 6 1991

Time: _____
Harris County, Texas

By _____
                    Deputy

3