IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| GERALD CORNELIUS ELDRIDGE, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CIVIL NO. H-05-1847 |
| | § | |
| RICK THALER, Director, | § | |
| Texas Department of Criminal | § | |
| Justice-Correctional Institutions | § | |
| Division, | § | |
| | § | |
| Respondent. | § | |

## MEMORANDUM AND ORDER

Gerald Cornelius Eldridge is a Texas death-row inmate who has challenged his conviction and his sentence for years. His earlier challenges to his death sentence, based on arguments that he is mentally retarded and could not be constitutionally convicted under *Atkins v. Virginia*, 536 U.S. 304 (2002), failed. His present challenge is that he is mentally ill and therefore cannot be constitutionally executed under *Ford v. Wainwright,* 477 U.S. 399 (1986), and *Panetti v. Quarterman,* 551 U.S. 930, 948 (2007). Although this case arises out of murders committed years ago and follows other arguments about his death-eligibility, it is undisputed that Eldridge raised this claim at the earliest opportunity under the Supreme Court's case law.

Both sides filed extensive briefs and exhibits. The record includes medical and mental-health records, psychological testing performed by the State of Texas after Eldridge was arrested and during his long imprisonment, and testing performed by experts retained for this litigation. This court held a five-day evidentiary hearing at which Eldridge presented testimony from mental-health experts and his treating psychiatrist, and the respondent presented similar testimony.

Having carefully considered the petition, the parties' submissions, the evidence presented, and the applicable law, this court finds that Eldridge fails to prove by a preponderance of the evidence that he is incompetent to be executed. The stay of execution is lifted, the petition for a writ of habeas corpus is denied, and final judgment is entered by separate order. The reasons for this ruling are set out in detail below.

## I.      The Legal Standards

"'The Eighth Amendment prohibits a State from carrying out a sentence of death upon a prisoner who is insane.'" *Panetti v. Quarterman,* 551 U.S. 930, 934 (2007); *Ford v. Wainwright*, 477 U.S. 399, 410 (1986). This prohibition applies even if a prisoner was earlier found competent to be tried and convicted for the crime that resulted in the death sentence. Once a prisoner makes a "preliminary showing that his current mental state would bar his execution, the Eighth Amendment . . . entitles him to an adjudication to determine his condition." *Panetti,* 551 U.S. at 934-35.

A prisoner is incompetent to be executed when his "mental illness prevents him from comprehending the reasons for the penalty or its implications." *Ford,* 477 U.S. at 417. A prisoner must be able to understand "the fact of his impending execution and the factual predicate for the execution." *Panetti,* 551 U.S. at 942, 954-55 (internal quotation marks and citations omitted). "Gross delusions stemming from a severe mental disorder may put an awareness of a link between a crime and its punishment in a context so far removed from reality that the punishment can serve no proper purpose." *Id.* at 960. The prisoner bears the burden of proving by a preponderance of the evidence that he is incompetent to be executed. *Cooper v. Oklahoma*, 517 U.S. 348, 355 (1996); *Medina v. California*, 505 U.S. 437, 449 (1992).

II.     **Background**

On January 4, 1993, Eldridge went to the apartment of his former girlfriend, Cynthia Bogany. Ms. Bogany lived in the apartment with her daughter, Chirissa, age nine, and the son she had borne Eldridge, Terrell, age seven. Eldridge kicked in the door of the apartment and shot Chirissa between the eyes at point-blank range. He shot a man in the apartment, Wayne Dotson. He shot his son, Terrell. Eldridge then pursued Bogany, who had fled the apartment. Eldridge caught her when she tripped and fell on the stairs. Despite her pleas for her life, Eldridge shot her twice in the side of the head. Cynthia Bogany and Chirissa died instantly. Dotson and Terrell Eldridge survived. *See Eldridge v. State*, 940 S.W.2d 646, 649 (Tex.Crim.App. 1996). Eldridge was then 28 years old.

A jury convicted Eldridge of capital murder on April 14, 1994. The Texas Court of Criminal Appeals affirmed Eldridge's conviction and sentence. *Id.* On March 30, 1998, Eldridge filed an application for a writ of habeas corpus in state court. That application was pending when the Supreme Court of the United States decided *Atkins v. Virginia*, 536 U.S. 304 (2002), holding that the Eighth Amendment prohibits the execution of mentally retarded offenders. On June 20, 2003, while his first habeas application was still pending, Eldridge filed a second state habeas corpus petition raising the claim that he could not be executed under *Atkins* because he is mentally retarded. The Texas Court of Criminal Appeals denied Eldridge's initial habeas application on February 9, 2005. *Ex Parte Eldridge*, No.60,478-02 (Tex. Crim. App. Feb, 9, 2005). On the same day, the Court of Criminal Appeals dismissed Eldridge's second application as an abuse of the writ. *Ex Parte Eldridge*, No. 60,478-01 (Tex. Crim. App. Feb. 9, 2005).

Eldridge filed a skeletal petition for a writ of habeas corpus in this court on May 23, 2005 and filed an amended petition on May 26, 2006. The amended petition raised only one claim for

relief: that the Eighth Amendment prohibits Eldridge's execution because he is mentally retarded under the *Atkins* standard.

This court held an extended evidentiary hearing and issued a detailed opinion denying the relief Eldridge sought. In that opinion, issued on March 13, 2008, this court made extensive findings that Eldridge was not mentally retarded as he claimed and instead was competent to be sentenced to death. The Fifth Circuit denied Eldridge's request for a certificate of appealability. *Eldridge v. Quarterman*, No. 08-70012 (5th Cir. April 28, 2009), *cert. denied*, 130 S.Ct. 536(2009). On August 5, 2009, the State of Texas set an execution date of November 17, 2009.

Although there is some overlap between questions of mental retardation and questions of mental illness, a claim of incompetency to be executed does not become ripe until execution is imminent. *See Stewart v. Martinez-Villareal*, 523 U.S. 637, 644-645 (1998); *see also Herrera v. Collins*, 506 U.S. 390, 406 (1993) ("[T]he issue of sanity is properly considered in proximity to the execution."). The *Atkins* hearing did not focus on Eldridge's sanity. Instead, the focus was on mental retardation, not mental illness.

On August 19, 2009, Eldridge filed a motion in the state trial court for appointment of a mental-health expert to make a preliminary evaluation of his competence to be executed. Eldridge sought the expert in preparation for moving under Article 46.05 of the Texas Code of Criminal Procedure for a determination of whether he is competent to be executed. The state trial court granted funding for Dr. Mary Alice Conroy to conduct a preliminary competency evaluation. On September 4, 2009, Dr. Conroy interviewed Eldridge for two hours. She found that he appeared to suffer from a psychotic disorder marked by hallucinations and delusions.

On September 17, 2009, the trial court granted the State's motion to have its expert, Dr. Mark S. Moeller, evaluate Eldridge. Dr. Moeller conducted an evaluation and filed a written report on October 8, 2009. Dr. Moeller concluded that Eldridge was feigning mental illness to avoid execution.

Eldridge requested funding to retain a mental-health expert to conduct a comprehensive competency evaluation. He also sought an evidentiary hearing. The trial court denied these requests and denied relief, signing the proposed findings of fact prepared and submitted by the State. Under those findings, Eldridge was competent to be executed. On November 16, 2009, a majority of the Texas Court of Criminal Appeals adopted the trial court's findings and denied relief in a two-page *per curiam* opinion. *Eldridge v. Texas*, No. AP-76,256 (Tex.Crim.App. Nov. 16, 2009). One member of the court dissented without written opinion. This federal petition followed.

This court stayed Eldridge's execution to allow both sides to develop the necessary evidence to permit a reasoned and fact-based determination of whether his mental illness made him incompetent to be executed. Eldridge has since been evaluated by experts for both sides. He has been subjected to a variety of tests. The information about Eldridge includes those test results, observations about him over the years, and opinions based on those results and observations. The information also includes the records of his years in prison as well as records of his education, work, and social history.

In the memorandum and order denying relief on Eldridge's *Atkins* claim, this court discussed Eldridge's background in detail. *See Eldridge v. Quarterman*, H-cv-1847 (S.D. Tex. March 13, 2008). Eldridge graduated from high school in the seventieth percentile of his class. After graduation, he joined the pipefitters' union, which required him to pass a written test that included

math problems described as being at a sixth-grade level of difficulty.  He had a driver's license and regularly drove.  He repaired automobiles.  He had a bank account that he used when he was working, and he performed well at his job as a pipefitters' apprentice.  Despite his claims of low IQ, functional illiteracy,  and an inability to carry out many functions of daily living, this court found that he functioned normally and had the intellectual ability to graduate from high school, pass the pipefitters' union exam, and perform ably as a pipefitters' apprentice.  Evidence presented in the *Atkins* proceeding also showed that, while in pretrial detention, Eldridge played chess, read the Bible, and wrote letters.

The parties presented extensive additional evidence in a five-day evidentiary hearing on Eldridge's competency to be executed.  Counsel submitted pre- and post-hearing briefs and argument.  Based on the entire record, analyzed under the applicable law, this court concludes that Eldridge has failed to prove that he is incompetent to be executed.

## III.    Competency To Be Executed

### A.    The Evidence as to Whether Eldridge Is Insane

At the time of the evidentiary hearing, Eldridge was 48 years old.  He had been incarcerated in the Texas Department of Criminal Justice for over 18 years.  TDCJ records contain a large number of documents tracing his treatment for symptoms of mental illness.  Eldridge called two witnesses, Dr. Pradan A. Nathan, a psychiatrist who treated Eldridge at TDCJ, and Dr. Michael Roman, an expert retained for this case.  The respondent also called two witnesses, Dr. Thomas Allen and Dr. Mark S. Moeller.  The testimony of each, and the documents, are described below.

6

### 1.     Dr. Pradan Nathan

Dr. Pradan Nathan, a psychiatrist, testified that he treated Eldridge from approximately November 2009 to August 2011.  He first saw Eldridge via video in November 2009.  The evaluation was requested by the TDCJ director of mental health, who was responding to concerns raised by Eldridge's lawyers.  Dr. Nathan testified that Eldridge did not volunteer information but responded to specific questions.  Apr. EH at 14-19.[1]

Eldridge expressed some delusional beliefs.[2]  For example, when Dr. Nathan asked Eldridge how he kept himself occupied on death row, Eldridge responded that he went to work with his brothers at a chemical plant.  *Id.* at 19.  Dr. Nathan observed that Eldridge exhibited "looseness of association," meaning that his thoughts were disconnected, and that his affect was blunted.  *Id.* at 20.  Dr. Nathan stated that looseness of association is not suggestive of malingering.  *Id.*  Dr. Nathan also observed that Eldridge was significantly underweight.  At the time of their first meeting, Eldridge, who is 5 feet and 10 inches tall, weighed 139 pounds.  A normal weight for a man of Eldridge's height is between 175 and 190 pounds.  *Id.* at 21.  Dr. Nathan was aware that Eldridge had been treated for pernicious anemia, a condition in which the patient fails to absorb vitamin B-12 through the stomach, which can account for significant weight loss.

Eldridge also expressed delusional beliefs that prison guards were poisoning his food and

---

[1]  "EH" refers to the transcript of the evidentiary hearing conducted by this Court from April 16-18 and May 29-30, 2012.  "Apr." refers to the transcript of the April hearing dates and "May" refers to the transcript of the May hearing dates.

[2]  The DSM-IV-TR defines a delusion as "a false belief based on incorrect inference about external reality that is firmly sustained despite what almost everyone else believes and despite what constitutes incontrovertible and obvious proof or evidence to the contrary."  PX2 at 3.

claimed that he was not eating because he feared the poison.  Dr. Nathan testified that he saw this as evidence that Eldridge was losing touch with reality.  He did not know, however, whether the psychosis was caused by the pernicious anemia or by schizophrenia.  *Id.* at 22.

Based on this initial evaluation, Dr. Nathan ordered that Eldridge be transferred to the TDCJ's Jester IV unit for inpatient psychiatric treatment.  Dr. Nathan explained that he was concerned that, if left on death row, Eldridge might not take prescribed medications.  *Id.* at 23.  When Eldridge returned from Jester IV, he was taking an antipsychotic drug, Risperidone; an antidepressant, Prozac; and iron pills for anemia.  *Id.* at 26.  He was also taking acetaminophen and medication for side effects from the Risperidone.

In September 2010, Dr. Nathan stopped the Risperidone and prescribed Thorazine because Eldridge complained that he was not sleeping.  A side effect of Thorazine is drowsiness.  *Id.* at 27-28.  In February, 2011, Dr. Nathan increased the Thorazine from 300 to 400 milligrams, and increased the Prozac from 20 to 40 milligrams, based on Eldridge's continued expressions of delusional beliefs and other symptoms of psychosis and depression.  *Id.* at 28-29.  Later that month, Dr. Nathan increased the dose of Thorazine to 500 milligrams and reduced the Prozac to 20 milligrams.  *Id.* at 29-30.  In June 2011, Dr. Nathan increased the daily dose of Thorazine to 600 milligrams based on Eldridge's continuing claims that his food was being poisoned.  *Id.* at 31-32.  In July, Dr. Nathan changed Eldridge's prescription from Thorazine to Navane, another antipsychotic medication.  When asked about indications in the medical records that Eldridge reported periods of relief from symptoms, followed by periods in which the symptoms reappeared or became more intense, Dr. Nathan testified that such "waxing and waning" is common.  *Id.* at 37.

Dr. Nathan testified that Eldridge did not ask for medication.  Dr. Nathan thought that this

was significant because, in his experience, patients who are malingering often want medications. *Id.* at 36.  Dr. Nathan testified that he had experience with malingering patients and did not believe Eldridge was malingering.  He based this conclusion on the duration of Eldridge's symptoms, including his weight loss, his looseness of association, the fact that Eldridge did not seek out medical attention or medications, and that Eldridge did not report suicidal ideations.  Dr. Nathan testified that malingerers usually try to call attention to themselves.  *Id.* at 42-44.  Dr. Nathan acknowledged that the weight loss could have been caused by Eldridge's pernicious anemia.  *Id.* at 43.  Based on Eldridge's symptoms, Dr. Nathan discounted the conclusions of two other TDCJ psychiatrists, Drs. Charles P. Woodrick and Dominic Joseph, that Eldridge was malingering during his stay at Jester IV in 2001.  *Id.* at 46-48.  Drs. Woodrick and Joseph noted that Eldridge claimed that he was not eating and was flushing his food down the toilet, yet he gained weight during his stay at Jester IV in 2001.  They also concluded that "he made a very unsophisticated attempt to present symptoms of a multiple personality disorder . . . ."  RX 23 at 33.

On cross examination, Dr. Nathan acknowledged that he was acting as a clinical, not a forensic, psychiatrist.  He did not specifically evaluate Eldridge to determine whether he was malingering.  *Id.* at 53-54.  He also acknowledged that at least two indicators of malingering, as set forth in the DSM-IV, were present.  Those indicators are an antisocial personality disorder and a strong motivation to malinger.  *Id.* at 60-62.  Dr. Nathan testified that he did not make a differential diagnosis to rule out malingering.  He acknowledged that there has, at times, been pressure from the mental-health profession on TDCJ mental-health professionals to not label inmate patients as malingerers.  *Id.* at 69.  Dr. Nathan testified that before he would label Eldridge as a malingerer, he would require "overwhelming evidence."  *Id.* at 61-62.

9

Dr. Nathan acknowledged that records about Eldridge's stay at the Harris County Jail, before he was sent to death row, included evidence of atypical hallucinations. These are, as Dr. Nathan recognized, a "red flag" for malingering. *Id.* at 78. Dr. Nathan also acknowledged that when he concluded that Eldridge was not malingering, he did not know that between 1993 and 2009, ten mental-health professionals had reached the opposite diagnosis. Dr. Nathan testified that had he known of these diagnoses of malingering, he would have made a greater effort to determine whether Eldridge was malingering. *Id.* at 79-80. Finally, Dr. Nathan testified that answers Eldridge had given to an examiner conducting a competency evaluation at the time of his trial supported an inference of malingering, and that Eldridge's mental-health records describe numerous incidents that suggest malingering. *Id.* at 81-108.

### 2.    Dr. Michael Roman

Dr. Michael Roman, a clinical psychologist retained by Eldridge for his *Panetti* challenge, submitted an expert report and testified. Dr. Roman's report lays out Eldridge's mental-health history as well as academic and social history. PX 1 at 1-11. Dr. Roman met with Eldridge over two days at Jester IV. He found Eldridge generally responsive, but often rambling and sometimes tangential. At one point, Eldridge claimed a belief that the human race was created by extraterrestrial aliens. *Id.* at 11.

Eldridge stated that he did not know his own criminal history, though he gave a "very disjointed" description of an attempted murder for which he previously served time. *Id.* Eldridge claimed to be married to a woman named Jennifer Lewis. There is no record of such a marriage or relationship. Dr. Roman noted that Eldridge's story about his marriage to Lewis "morphed significantly as he was asked to clarify such things as why he did not live in his home with her."

10

*Id.* at 12.   Dr. Roman described Eldridge's thought patterns as "confused, rambling" and "characteristic of schizophrenics."  *Id.*

Eldridge also claimed that he and Cynthia Bogany see each other often and get along well. When asked if he was aware that Cynthia Bogany is dead and that he had killed her, Eldridge answered that he knew he had been accused of the killing but it made no sense to him because he had seen her recently.  *Id.*  When asked where he was, Eldridge said he was in a hospital named Jester IV, but he was confused by his handcuffs and the presence of guards.

Dr. Roman showed Eldridge crime-scene photos that showed Cynthia Bogany's body. Eldridge became quiet and told Dr. Roman that "it must be true.  I must have did this."  *Id.* at 13. When told that he had been in custody for the previous 17 years, Eldridge replied, "[w]here have I been all these years?"

Dr. Roman noted that Eldridge's neuropsychological test results are "relatively normal." That led Dr. Roman to conclude that Eldridge's symptoms are not due to an organic brain deficit. *Id.* at 14-15.  He also concluded that Eldridge is not malingering.  He based this in part on prison mental-health records diagnosing Eldridge as suffering from a psychotic disorder.  Dr. Roman was apparently unaware of, or ignored, the extensive prison and Harris County records indicating that the mental-health staff suspected or found that Eldridge was malingering.  *See*, *e.g.*, RX 23 at 21; RX 55.  Dr. Roman concluded that, if Eldridge were malingering, he would show more exaggerated symptoms.  Rejecting malingering as a diagnosis, Dr. Roman instead found that Eldridge has an Axis I diagnosis of schizophrenia, paranoid type.  Dr. Roman concluded that Eldridge lacks a rational understanding of the connection between his conviction and punishment.  *Id.* at 16.

Dr. Roman conducted a second evaluation on November 15, 2011 and issued a supplementary report.  PX 2.  Dr. Roman stated that Eldridge clearly demonstrates that he suffers from at least three delusions:  1) that his victims are alive and that he has friendly contact with at least one of them; 2) that his food is or was being poisoned or otherwise tampered with; and 3) that he travels outside the prison on a regular basis.  PX2 at 3.  Dr. Roman detailed written complaints of food tampering that Eldridge made in 2001 and 2002.  He also cited TDCJ mental-health records from 2009-2011 supporting the other delusions.  *Id.* at 4.

Dr. Roman also documented Eldridge's claimed hallucinations.[3]  The first indication of hallucinations was in an affidavit from Eldridge's mother dated February 6, 1993.  The affidavit stated that when she visited her son at the Harris County Jail, he was complaining of voices in his head.  Dr. Roman also noted one 1994 complaint of a visual hallucination; several mental-health notes from 2001-2006 indicating possible delusions, paranoia, and depression; and extensive notes recording claims of visual and auditory hallucinations, religious hallucinations, paranoid and hostile behavior, and other unusual behavior from January 2009 to the time of Dr. Roman's examination. *Id.* at 4-7.  Dr. Roman stated that Eldridge reported specific auditory hallucinations during his conversation with Dr. Roman, most prominently of discussions with a friend named Michael.  *Id.* at 7.  Dr. Roman also cited TDCJ mental-health records noting the presence of negative symptoms of schizophrenia, including low energy level and flat affect, and Eldridge's complaints at different times of insomnia, depression, and low energy.  *Id.* at 8.  Dr. Roman ruled out alternative diagnoses,

---

[3]  The DSM-IV-TR defines a hallucination as "a sensory perception that has the compelling sense of reality of a true perception but that occurs without external stimulation of the relevant sensory organ."  PX2 at 4.

such as schizoaffective disorder.  He responded to anticipated accusations of cherry-picking data, noting that the record is largely limited to the periodic TDCJ mental-health records.  *Id.* at 8-9.

Dr. Roman also administered several tests designed to detect malingering.  On the Structured Inventory of Reported Symptoms, 2d edition ("SIRS-2"), Eldridge scored in the probable range for malingering on two of eight primary scales, though Dr. Roman attributed one of the scores to Eldridge's difficulty with language.  *Id.* at 11.  Dr. Roman also questioned the accuracy of Eldridge's "failing" score on the other scale, based on Eldridge's difficulty in describing the intensity of his symptoms.  Eldridge's overall score on the SIRS-2 was "indeterminate," which Dr. Roman notes is not a positive result for feigning.  *Id.* at 12.  Dr. Roman concludes that Eldridge has schizophrenia and lacks a rational understanding of his crime and pending execution.  *Id.* at 14-15.

Dr. Roman testified as an expert witness on Eldridge's behalf at the hearing.  Dr. Roman acknowledged that Eldridge has some factual understanding of his situation, but agreed with the TDCJ diagnosis of Eldridge as schizophrenic.  Apr. EH. at 143.  Dr. Roman opined that the TDCJ records indicated that Eldridge met the diagnostic criteria for schizophrenia, specifically the presence of delusions, hallucinations, and negative symptoms over a period of a month or more.  *Id.* at 151-52.  He also contended that Eldridge would have suffered severe side effects from the psychotropic medications he was prescribed if he did not actually suffer from mental illness.  He analogized the effect of such medications on a mentally healthy patient to the effect of insulin on one who is not diabetic.  *Id.* at 497-99.  As discussed below, Dr. Moeller sharply disagreed with this analogy.

Dr. Roman found Eldridge's severe weight loss attributable to mental illness and not to pernicious anemia.  He cited records showing that Eldridge complained that guards at the Polunsky

Unit were poisoning his food, and contrasted this with evidence showing that Eldridge asked for more food when he was at Jester IV.  Dr. Roman concluded that Eldridge's delusion that his food was being poisoned was specific to the guards at Polunsky.  *Id.* at 159-62.

Dr. Roman also testified about Eldridge's statements to him about being married to Jennifer Lewis and having eight children with her.  *Id.* at 162-69.  Dr. Roman noted that Eldridge was very consistent in the details of this delusion, including the names and ages of his nonexistent children. Dr. Roman did not find it suspicious that Eldridge reported the names to Dr. Roman and the State's expert, Dr. Thomas Allen, but that the names appear nowhere in TDCJ records.  Dr. Roman attributes this to Eldridge not being forthcoming with details unless pressed.  *Id.* at 169.  He also opined that Eldridge's lack of clarity about how long he has been in prison, and his inability to reconcile this with his claims of the time he has spent with his nonexistent wife and children, or working with his brother, is attributable to psychosis.  *Id.* at 173-74.

Dr. Roman attributed the inconsistency of Eldridge's belief that his victims are alive, and his meek acceptance of the fact that he is incarcerated for their murders, to "double bookkeeping," meaning that Eldridge is maintaining parallel realities in his mind.  *Id.* at 188-89.  When asked if the inconsistency could also be explained by Eldridge knowing that his victims are, in fact, dead, Dr. Roman acknowledged that this was also a possibility.  *Id.*  Dr. Roman also testified about TDCJ records showing that Eldridge engages in certain behaviors, including pacing and turning up the volume on his radio, when he claims to be hearing voices.  Dr. Roman testified that this is a common response among schizophrenics.  *Id.* at 201-02.

Dr. Roman also acknowledged that Eldridge tested positive for cocaine in 2011.  He concluded that Eldridge's symptoms are not drug-related because continuous access to drugs would

14

be necessary for drug-related symptoms to last as long as Eldridge claims to have experienced symptoms. *Id.* at 212-14.

Dr. Roman disagreed with the opinion of the respondent's expert, Dr. Thomas Allen, that the inconsistency of symptoms was evidence of malingering. *Id.* at 222. Dr. Roman administered a number of tests to determine if Eldridge was malingering and concluded that he was not. Dr. Roman's disagreements with Dr. Allen were based largely on how Dr. Roman interpreted Eldridge's responses to the test questions and on the validity of the various tests administered. *Id.* at 225-63. Dr. Roman criticized Dr. Allen's use of the Test of Memory Malingering ("TOMM") as irrelevant because memory is not at issue,[4] and opined that Dr. Allen's administration of the Structured Interview of Mental Symptoms ("SIMS") was unreliable because it is written at a level beyond Eldridge's reading ability. PX2 at 12-13. Dr. Roman dismissed the Miller Forensic Assessment of Symptoms Test ("M-FAST") as unreliable because it lacks the precision necessary to distinguish between genuine and feigned response patterns. *Id.* at 13. The M-FAST tests for malingering of psychiatric symptoms, and Eldridge's score indicated psychiatric malingering. RX 49 at 16.

Having opined that Eldridge is not malingering, Dr. Roman concluded that Eldridge's mental illness precludes him from interfacing with reality. *Id.* at 263-64. Dr. Roman acknowledged that Eldridge has a factual awareness of ongoing legal proceedings, of the fact that he is in prison, and of the reasons for his imprisonment. *Id.* at 264-65. According to Dr. Roman, however, this factual understanding is not a rational understanding of his position. Eldridge acknowledges that "it makes sense" that he was found guilty; he is in prison. Dr. Roman opined that the fact that it makes sense to Eldridge does not mean that he truly understands it, or understands that he actually committed the

---

[4] As noted, Dr. Allen explained that the TOMM is a test of effort, not memory.

crimes.  Dr. Roman concluded that Eldridge lacks a rational understanding of his crime or of the basis for his execution.  *Id.* at 265-67, 273-79.

On cross-examination, Dr. Roman testified that he has conducted approximately 2,500-3,000 psychological assessments — in which he suspected malingering in approximately 50 — but only about 100 of the assessments involved schizophrenia.  Dr. Roman has published articles and presented at conferences, but not on forensics, schizophrenia, antisocial personality disorder, or malingering.  *Id.* at 308-10.

Dr. Roman agreed with respondent's counsel that schizophrenics are more likely to have problems with working memory than with long-term memory.  *Id.* at 326-27.  He also testified that it is possible to be schizophrenic, to hear voices, and to be delusional, and still be competent to be executed.  *Id.* at 331.  He conceded that Eldridge could be competent to be executed despite his stated beliefs that he leaves the prison to go to work with his brother and that guards are poisoning his food.  *Id.* at 335.  Dr. Roman stated that the delusion that is problematic is Eldridge's belief that his victims are still alive, because that raises questions about Eldridge's ability to understand the reasons for his execution.  *Id.*  He also acknowledged that Eldridge has been very inconsistent in reporting the onset of his alleged hallucinations.  *Id.* at 350.  Eldridge retrospectively reported having hallucinations in childhood.  Dr. Roman does not, however, believe that Eldridge had schizophrenia as a child.  There is substantial evidence that Eldridge functioned well in his early life, precluding a diagnosis of early-onset schizophrenia.  *Id.* at 351.  Dr. Roman also found it significant that TDCJ records contain no evidence of delusions or hallucinations between 1994, when Eldridge was convicted and was sent to death row, and 2000.  *Id.* at 368.

Dr. Roman reviewed a document from Eldridge's arrival at Jester.  In this document, Eldridge reports severe delusions.  Dr. Roman found these self-reported delusions to be suspect.  *Id.* at 379-81.  Dr. Roman testified that Eldridge's claim to have suffered delusions is "crazy stuff that is not consistent with the way mentally ill people present."  This episode raised a significant suspicion of malingering.  *Id.* at 382.  Staff at Jester concluded that Eldridge was malingering.  *Id.* at 388.  Dr. Roman also conceded that TDCJ records from 2002 to 2004 list contain a number of self-reported delusions with no other symptoms of schizophrenia, again raising suspicion of malingering.  *Id.* at 400-05.  A report of religious delusions from 2006 also raised red flags for malingering.  Dr. Roman acknowledged that Eldridge received no diagnosis of schizophrenia in 2006 despite several visits with mental-health professionals.  *Id.* at 409-13.  TDCJ records also show that Eldridge made only very sporadic complaints of any symptoms that correspond to schizophrenia in 2007 and 2008.  *Id.* at 418-20.

Dr. Roman concluded that Eldridge was not schizophrenic from the time he entered death row in 1994 through 2008.  *Id.* at 421, 428-29.  Dr. Roman noted that in 2001, Eldridge reported delusions, consistent with psychosis, or a delusional disorder.  *Id.* at 423-24.  Dr. Roman acknowledged, however, that it is highly unusual for someone with a delusional disorder to "just get over it," *id.* at 429, though he did not definitively rule out the possibility that Eldridge had a delusional disorder during this time, *id.* at 575-76.

In January 2009, Eldridge began complaining that he had been hearing voices "all my life." TDCJ mental-health staff did not find significant symptoms or mental illness at that time.  *Id.* at 432-34.  Dr. Roman conceded that the record showed no major mental-health complaints before August 19, 2009.  That was a few days after Eldridge had received his first execution date and the same day

that Eldridge's attorneys filed motions asking the state court to find him incompetent.  *Id.* at 436–437.  While in the Harris County Jail on a bench warrant in September 2009, Eldridge made statements and exhibited behaviors to Dr. Mark Moeller, a psychiatrist retained by the State, that Dr. Roman conceded were inconsistent with schizophrenia.  Dr. Roman testified that these statements and behaviors were consistent with malingering.  *Id.* at 437-39.

On October 14, 2009, the Texas court denied Eldridge's claim that he was incompetent to be executed.  On November 2, 2009, the Supreme Court of the United States denied *certiorari* on the Fifth Circuit's denial of a certificate of appealability from this court's decision denying Eldridge's claim that he is ineligible for execution under *Atkins v. Virginia*, 536 U.S. 304 (2002). *Id.* at 439-40.  Three days later, on November 5, 2009, Eldridge again exhibited symptoms of mental illness.  *Id.* at 440-41.  On the same day, he completed his "death packet" instructions to prison officials on how to dispose of his personal property and remains after his execution.  *Id.* at 441.

Eldridge was scheduled for execution on November 17, 2009.  *Id.* at 443.  TDCJ records contain notes of a cell-side visit from a mental health professional at 3:35 p.m. that day.  No symptoms of mental illness were noted.  *Id.* at 444-45.

This court stayed the execution on November 17.  Two days later, Eldridge reported auditory and visual hallucinations and appeared to be "confused."  *Id.* at 446-47.  On November 24, 2009, Eldridge was admitted to the Jester IV unit and started on antipsychotic medication.  *Id.* at 449-50. Dr. Roman had earlier testified that Eldridge distinguished between the guards at the Polunsky unit and the guards at the Jester unit with respect to his belief that the Polunsky guards — and not the Jester guards — were poisoning his food.  But a treatment note from Jester notes a comment by Eldridge that he found pills hidden in his food at Jester.  *Id.* at 458-59.

18

The treatment notes from Jester show that Eldridge began taking antipsychotic drugs on November 24, 2009. Dr. Roman acknowledged that a reliable treatise states that, on average, it takes 73 days for such medication to successfully eliminate psychotic symptoms. By December 10, 2009, he was showing improvement, though he still reported delusional beliefs. *Id.* at 462-65. On December 10, 2009, Eldridge reported that he had not slept in four days, but a nurse observed that he had energy, a full range of affect, good eye contact and no distress. On December 14, 2009, Eldridge reported being attacked, but a counselor noted that Eldridge was not distressed. Dr. Roman acknowledged the inconsistencies. *Id.* at 462-66. He further acknowledged that Eldridge's behavior immediately before and after his alleged psychotic episodes were inconsistent with the typical behavior of patients experiencing such episodes. *Id.* at 469-71. Dr. Roman explained the inconsistent reports of symptoms and of relatively normal behavior and thought processes as the waxing and waning of schizophrenia symptoms. Dr. Roman conceded, however, that inconsistencies could also be explained as malingering. *Id.* at 479.

Dr. Roman also conceded that Eldridge's meek accepance of his imprisonment is inconsistent with his claimed belief that his victims are still alive. If Eldridge in fact believed that Cynthia Bogany and Chirissa were alive, he would protest being in prison for killing them. *Id.* at 505-07. Dr. Roman also acknowledged that Eldridge had tested positive for cocaine and agreed that obtaining cocaine in prison is inconsistent with the symptoms of mental illness Eldridge reported and exhibited. The logistics involved in securing, paying for, and concealing such contraband in prison "would suggest a much better ability to navigate the social and physical environment and consider all sorts of things that we would typically apply to somebody with a severe psychotic disorder. That would be highly suspicious behavior." *Id.* at 511.

19

Dr. Roman conceded that he permitted Eldridge's lawyer to remain in the room for over an hour during their first meeting, in violation of ethical standards, and that Eldridge's lawyers may have made comments making Eldridge hostile to, or wary of, Dr. Allen. *Id.* at 519-23. He also conceded that Eldridge acknowledged that he must have shot his victims when he was shown crime-scene photographs. He nonetheless concluded that Eldridge lacks a rational understanding of the crime because he also insists that he continues to see and interact with one of the victims who is, Eldridge says, alive. *Id.* at 587-89. Dr. Roman also noted that Eldridge's correspondence in the weeks before his original execution date did not include any farewell letters to family members or to his penpals. *Id.* at 590. TDCJ records were consistent in indicating that Eldridge behaved normally on the day of his scheduled execution. But Dr. Roman explained that this supported his conclusions, because he would expect a malingerer to act out symptoms at that time. *Id.* at 592-93.

### 3.    Dr. Mark Moeller

Dr. Mark Moeller, a board certified psychiatrist, testified for the respondent. Dr. Moeller criticized Dr. Roman's approach and conclusions on several grounds. Dr. Moeller testified that, contrary to Dr. Roman's testimony, it is simply not possible to determine if a patient is malingering based on his reaction to psychotropic medications. May EH at 10-11. Noting that Dr. Roman lacks a medical degree, Dr. Moeller rejected the analogy Dr. Roman drew between the effect of psychotropic drugs on one feigning mental illness to the effect of insulin on one who is not diabetic. Dr. Roman claimed that the adverse effects from giving psychotropic drugs to one who was not mentally ill would be as obvious as the adverse effects of giving insulin to one who was not diabetic. Dr. Moeller criticized the analogy as uninformed and incorrect, noting that psychotropic drugs impact a more complex system than does insulin and that there would be no obvious or immediate

adverse effect from giving psychotropic drugs to someone feigning symptoms of mental illness. Dr. Moeller concluded that Eldridge's responses to his medications were inconsistent and atypical of someone who did in fact suffer from severe mental illness. *Id.* at 11-13.

Dr. Moeller agreed that Eldridge suffered from pernicious anemia, but he emphatically rejected Dr. Roman's opinion that the condition was caused by Eldridge's refusal to eat. Dr. Moeller noted that the opinion ignored medical literature stating that it would take four to five years of dietary deficiency to deplete the body's store of vitamin B12. Dr. Moeller further noted that even such a lengthy period of inadequate diet would not cause pernicious anemia, which is an autoimmune disease, but would instead result in a vitamin B12 deficiency. Dr. Moeller criticized Dr. Roman for confusing the effect of pernicious anemia — a vitamin B12 deficiency — with the cause of pernicious anemia. Dr. Moeller testified that vitamin B12 deficiencies are fairly common, while pernicious anemia is uncommon. *Id.* at 13-18.

Dr. Moeller also rejected Dr. Roman's theory that the inconsistency of Eldridge's symptoms could be explained by waxing and waning. Dr. Moeller found that the fluctuations in the symptoms were too extensive, frequent, and severe to be waxing and waning. *Id.* at 21. Waxing and waning occurs gradually, not abruptly. Eldridge went from symptomatic to nonsymptomatic from one mental status examination to the next, in ways that were too dramatic and sudden to be explained as waxing and waning. *Id.* at 29-30.

Dr. Moeller also testified that someone genuinely suffering from schizophrenia would react to the crime-scene photos of the victims by claiming that the photos had been manipulated and were fake. *Id.* at 23. Eldridge's response was to become emotional and acknowledge that he must have committed the crime — that he must have shot Cynthia Bogany and Chirissa.

Based on the overall record, Dr. Moeller concluded that malingering was clearly the most likely explanation for Eldridge's behavior. *Id.* at 31. Dr. Moeller did not believe that Eldridge was psychotic at any time from 2001 to the present. Dr. Moeller specifically concluded that Eldridge is not schizophrenic. He based the conclusion on the atypical nature of the delusions Eldridge reported, the time frame in which he allegedly became ill, and the inconsistency of the symptoms Eldridge exhibited and described. *Id.* at 34-35. Dr. Moeller explained that schizophrenia generally has a linear progression. If Eldridge was schizophrenic in 1993 or 1994, as he claimed, or even when he first went to Jester IV in 2001, his symptoms would be much worse by 2012, when the evidentiary hearing was held. *Id.* at 66-67.

### 4.    Dr. Thomas Allen

The State retained Dr. Thomas Allen, a forensic psychologist. He submitted an expert report (RX 49) and testified at the hearing. His expert report states that he met with Eldridge on April 7, 2011 for about four hours. *Id.* at 1. He conducted a forensic interview that included administering the M-FAST, the SIMS, and the TOMM. *Id.* at 2. He also reviewed numerous documents, including the results of the psychological assessments by Eldridge's expert, Dr. Roman.

Dr. Allen has far more extensive relevant experience than Dr. Roman. He began performing criminal evaluations, competency, sanity, and risk assessments in about 1989 and has done thousands of such evaluations. Unlike Dr. Roman, Dr. Allen has significant experience with capital murder and other violent crime cases. *Id.* at 4-6. As a result of his experience and training, Dr. Allen recognizes that "in capital murder cases . . . it is critically important to assess malingering and deception, or Negative Response Bias (NRB)." *Id.* at 6-7. Avoiding execution is an obvious incentive to malinger. Eldridge had no history of mental illness before his arrest for capital murder,

and has an extensive history since.  Harris County and TDCJ mental health personnel documented an extensive history of malingering.

`Dr. Allen described Eldridge as "at least superficially cooperative," though he complained about Dr. Allen's use "of what he considered to be 'big words.'"  *Id.* at 7.  Dr. Allen noted that in discussing his background, Eldridge claimed to have contact with family members "all the time." He reported seeing them in his cell and when "going to work."  *Id.* at 7.  He also reported being married to Jennifer Lewis for over 10 years and having 10 children with different mothers.  *Id.* at 9.

Dr. Allen noted the absence of any psychiatric history before Eldridge's arrest for capital murder.  It was only after the arrest that Eldridge reported hallucinations and delusions.  Dr. Allen noted that the record of Eldridge's symptoms, many of which were self-reported, contained many inconsistencies.  Between April and May 2010, while at the Jester IV psychiatric unit and taking medication prescribed by TDCJ psychiatric staff, Eldridge inconsistently reported hearing voices, being at home with his "wife," and having his food poisoned.  On May 14, 2010, Eldridge reported that he no longer heard voices, was not being harassed or threatened, and was ready to return to death row.  Dr. Allen found Eldridge's claimed symptoms inconsistent in ways that the psychotropic medications could not explain, but malingering could.  *Id.* at 10.

Dr. Allen also noted that Eldridge decreased his food intake, reportedly related to a delusion that prison staff were poisoning his food.  The decreased food intake coincided with Eldridge's diagnosis of pernicious anemia.  Dr. Allen consulted with a medical doctor and confirmed that even a starvation diet over an extended period would not cause pernicious anemia.  Dr. Allen also confirmed that while pernicious anemia can cause neuropsychological symptoms, the symptoms

disappear once the patient's vitamin B12 levels are restored.  *Id.* at 10-11.  The pernicious anemia, not a delusion-based refusal to eat, caused Eldridge's weight loss.  Dr. Allen dismissed Eldridge's claimed delusion that his food was being poisoned because "[a]uthentic delusions are not self-serving, which is characteristic of what [Eldridge] is reporting and how he is reporting it."  *Id.* at 13.

During the mental-status examination, Eldridge told Dr. Allen he understood that he was in prison and never claimed that he was wrongly or unjustly imprisoned.  *Id.* at 11.  Asked if anyone was out to harm him, Eldridge gave a somewhat rambling answer, but not a delusional one.  Dr. Allen found "[n]o pattern of characteristic magical thinking. . . ."  Dr. Allen noted that Eldridge's history solidly establishes that he has Antisocial Personality Disorder, and that he is hostile, as are many with this disorder.  Dr. Allen found that Eldridge's "hostility and purported paranoia is a function not only of his personality disorder, but is a justified and rational response to his environment as well as being self-serving."  *Id.* at 13.

Eldridge showed no loosening of associations, tangentiality, or circumstantiality, or other indications of schizophrenia.  He did report having conversations with his brother Barry, having family members with him in prison, and going to work.  But Dr. Allen found "[t]he veracity of this report . . . highly questionable in that it appears very self-serving rather than a genuine symptom of psychotic thought disorder."  *Id.* at 13.  Dr. Allen found that Eldridge's reports of a combination of auditory, tactile, and visual hallucinations were inconsistent with genuine mental illness.  Eldridge reported lengthy, coherent statements from his "voices"; Dr. Allen noted that "[g]enuinely mentally ill patients generally hear only short phrases, perhaps single words."  *Id.* at 14.  Eldridge expressed awareness that a jury found that he shot and killed more than one person and that he had been sentenced to death and was in prison.  *Id.* at 15.

24

Dr. Allen also analyzed the results of the tests he gave Eldridge.  The TOMM is presented to subjects as a memory test, but it is actually a test of effort.  Eldridge scored 27/50 on the first trial and 37/50 on both the second and the retention trials.  Scores below 45 on trial two or the retention trial are recognized indicators of cognitive malingering.  *Id.* at 15-16.  Dr. Allen reviewed Eldridge's scores on the SIMS tests for malingering.  The test examines five dimensions of exaggerated presentation often seen in forensic settings.  Eldridge's scores on all five were highly suggestive of malingering.  *Id.* at 16.  Eldridge's scores on the M-FAST also indicated psychiatric malingering. *Id.*

Dr. Allen summarized Eldridge's clinical presentation as not typical of psychotic disorders. Eldridge claimed to have positive symptoms of schizophrenia, but he exhibited no negative symptoms, such as apathy and lack of emotion.  *Id.* at 17.  Dr. Allen also found many of Eldridge's self-reported descriptions as inconsistent with other statements and not credible.

Putting together Eldridge's extensively documented history, the observations of numerous mental-health professionals, the test results, and his own observations and assessment of Eldridge, Dr. Allen concluded that Eldridge is not mentally ill, but is malingering his symptoms.  His claimed paranoia is a function of his antisocial personality disorder and a rational response to his prison environment.  He has the capability to, and does, comprehend cause and effect and make moral judgments.  He has the capability to, and does, understand that he is facing execution for capital murder.  In his report, Dr. Allen found "no doubt" that Eldridge is malingering and that he is competent to be executed.

Dr. Allen also testified for the State at the hearing.  Dr. Allen testified that, in his first meeting with Eldridge, he found a man who was rational and coherent, showing no indication of side

25

effects from psychotropic drugs.  May EH at 74-75.  Dr. Allen was asked about Eldridge's statements that family members visit him in his cell and that he leaves the prison to go to work with his brother.  Dr. Allen described these as more fantasies than delusions.  They are devices for coping with isolation rather than symptoms of a psychotic disorder.  Dr. Allen noted that it is atypical for hallucinations to be inconsistent with the underlying delusion.  He gave as an example a person who has a delusion that he is an FBI agent having a hallucination in which he hears the voice of a KGB agent.  Eldridge, in contrast, seems to confuse and conflate delusions and hallucinations.  For example, he claims to travel outside the prison but then to be suddenly "pulled back" into the prison. Dr. Allen observed that this is atypical.  Dr. Allen also noted that delusional people usually act in accordance with their delusions, but Eldridge has done nothing to give life to his.  Dr. Allen gave as an example someone who believes he is a United States Marshal acting as a law enforcement officer would act, such as trying to arrest someone.  Eldridge, in contrast, claimed to have delusions of family visiting him, going to work with his brother, and having a marriage and many children, but never acted in accordance with any of those claimed delusions.  *Id.* at 83-87.

Dr. Allen also found that Eldridge's demeanor was not consistent with the disturbing delusions he described.  *Id.* at 95.  Dr. Allen described Eldridge's discussion of his symptoms as "third person like," as if he were describing another person's symptoms instead of his own experience.  Dr. Allen also testified that the combination of symptoms Eldridge claims, including delusions, auditory, visual, and tactile hallucinations is "incredibly rare."  *Id.* at 88-89.  The combination of symptoms Eldridge described Dr. Allen found both highly unusual and more like a "Hollywood" version of mental illness.  *Id.* at 104.  For example, Dr. Allen described Eldridge's

description of a nightmare as "a coherent effort to look incoherent . . . ." *Id.* at 127.  Dr. Allen contrasted this with examples of genuine "loose association."

Dr. Allen also found that some of Eldridge's answers to questions raised credibility issues. For example, Eldridge claimed that he had no friends when he was growing up.  Eldridge also claimed that as a teenager, he played "cowboys and Indians" with his brother; this is unusual behavior for a teenager.  The record instead shows that Eldridge played football in high school, had a circle of friends, and had girlfriends.  *Id.* at 94.  Dr. Allen noted inconsistencies between what Eldridge said to him and what he had told Dr. Roman.  When speaking to Dr. Roman, Eldridge claimed not to know what a hallucination is, but he did know when he spoke to Dr. Allen.  *Id.* at 98-99.  In response to questions about his current situation, Eldridge responded that he knew that he lived on death row because "they say I shot somebody."  But he claimed not to know who he shot or how long he had been on death row.  *Id.* at 132-33.  Dr. Allen found Eldridge's memory gaps highly selective and atypical of mental illness.

Dr. Allen testified that Eldridge's overly inclusive descriptions of his symptoms — he heard voices "all the time" — are not consistent with genuine schizophrenia.  *Id.* at 100.  Dr. Allen also found that Eldridge's answers to questions were extremely vague.  Both of these are signs of malingering.  *Id.* at 102-06.

Dr. Allen criticized Dr. Roman's analysis and methodology, pointing out that Dr. Roman had not conducted any tests for effort and contending that Dr. Roman analyzed the tests he did administer incorrectly.  Dr. Allen noted that Eldridge has a history of thwarting tests that were inconvenient for him, claiming, for example, that he could not read questions written at a rudimentary level, making it critical to assess effort.  *Id.* at 139-42.  Dr. Allen was also sharply

27

critical of Dr. Roman's failure to consider antisocial personality disorder and the relationship of this disorder to malingering. Dr. Allen noted that a large percentage of the prison population is antisocial, and that antisocial personalities are manipulative and willing to lie. *Id.* at 144-46.

Dr. Allen disputed Dr. Roman's effort to explain away parts of Eldridge's record. For example, Dr. Roman did not accept a TDCJ report assessing Eldridge when he first entered death row. The assessment contains a statement in quotes that Eldridge was there for murdering his daughter and her mother. Dr. Roman dismissed the report on the basis that the quotation marks did not necessarily mean that those were Eldridge's words. Dr. Allen called the doctor who performed the assessment and learned that the words inside the quotation marks were in fact Eldridge's words. Dr. Allen concluded from this that Eldridge knew when he arrived on death row why he was there, disputing Dr. Roman's conclusion that Eldridge was already mentally ill before then. *Id.* at 150-52.

Dr. Allen disputed Dr. Roman's assessment of Eldridge's stated belief that prison officials were trying to poison him. Dr. Allen testified that the timing of Eldridge's accusations about food tampering raised questions about malingering. Dr. Allen pointed out that TDCJ records show that Eldridge insisted that TDCJ personnel record his food intake after he was removed from the Jester IV unit for feigning multiple-personality disorder. Dr. Allen found that this was consistent with an effort by Eldridge to support his claimed delusion that guards were poisoning his food. *Id.* at 158-59.

Dr. Allen disputed Dr. Roman's conclusion that the record showed no spike in Eldridge's symptoms before the scheduled execution, which would support malingering. Dr. Allen noted Eldridge's weight loss in early 2009, and his descriptions of exaggerated symptoms to Dr. Moeller in the fall of 2009. *Id.* at 160. Looking at the death packet Eldridge filled out in 2009, Dr. Allen

28

opined that it indicated that Eldridge was competent.  Eldridge listed specific foods he wanted for his last meal, undercutting his claimed food delusion and showing that he understood what was going to happen.  *Id.* at 167-68.

On cross-examination, Dr. Allen agreed with Dr. Roman that Eldridge knows he is in prison for killing his victims, but disagrees with Dr. Roman about whether Eldridge has a rational understanding of his crime and punishment.  Dr. Allen found Eldridge's claimed lack of memory of the crime to be very selective in ways not typical of mental illness, but consistent with malingering.  *Id.* at 173-75.

On cross-examination, Dr. Allen acknowledged research identifying SHU syndrome, found in prisoners kept in isolated conditions, such as death row.  Individuals with SHU syndrome may exhibit a variety of symptoms that "may look like a picture of atypical psychosis."  *Id.* at 221.  On redirect, Dr. Allen emphasized the importance of delusions being fixed as evidence of genuine schizophrenia.  Some of Eldridge's claimed delusions appeared and then disappeared, inconsistent with both SHU syndrome and with psychosis.  *Id.* at 251-52.

Counsel for Eldridge recalled Dr. Roman in rebuttal.  Dr. Roman disagreed with Dr. Allen's testimony that Eldridge's calm demeanor in describing disturbing delusions was evidence of malingering.  Dr. Roman testified about his experience with patients who are upset in close proximity to such delusions, but are calm when describing them retrospectively.  *Id.* at 281-82.  He also pointed to results of some of Eldridge's past tests  evidence that he was not malingering.  *Id.* at 293-95.

## IV.    Analysis

### A.    Mental Illness

The critical issue is whether Eldridge has a present rational understanding of the fact of his

29

crime, of his death sentence, and of the connection between his crime and his death sentence. With the help of able and dedicated counsel, Eldridge has presented evidence supporting his claim that he is mentally ill. But the record also includes extensive evidence inconsistent with his claim. That evidence has led a number of mental-health professionals to find that Eldridge has, over the years, feigned or malingered symptoms. These professionals include Dr. Edward Silverman, who evaluated Eldridge and concluded that he was competent to stand trial for capital murder; a number of TDCJ mental-health professionals who raised questions about the Eldridge's credibility and the veracity of his claimed symptoms; in particular, the TDCJ mental-health professionals who sent Eldridge back to death row from the Jester IV mental-health unit because they found he was feigning symptoms; and the courts, which have rejected Eldridge's claims that he is mentally retarded in part based on findings that his claimed cognitive and intellectual limits were not credible or accurate. Prior court proceedings produced specific findings that Eldridge's poor performance on IQ tests was inconsistent with his educational and employment history and that his claim of functional illiteracy was inconsistent with evidence of an ability to read (including religious texts) and maintain a significant correspondence. *See*, *e.g.*, RX 11 (TDCJ library records); RX 26-36 (prison correspondence).

The witnesses Eldridge presented during the evidentiary hearing do not support a showing of incompetence to be executed. Although this court finds that Dr. Nathan was sincere and credible, he acknowledged that most of his contact with Eldridge was through videoconference. Dr. Nathan testified that while he generally considered the possibility that an inmate was malingering, and did not believe that Eldridge was malingering, he did not specifically test for malingering and set the bar very high before he would recognize it. When confronted with evidence about Eldridge that

he acknowledged raised red flags for malingering, Dr. Nathan became far less certain that Eldridge was not malingering.

Dr. Roman's testimony was neither reliable nor credible.  He lacked the experience and expertise to provide reliable evidence.  He had only conducted one previous evaluation for competency to be executed and in that case, the court found that he was not credible.  *See Wood v. Thaler*, 787 F.Supp.2d 458 (W.D. Tex. 2011).  Dr. Roman also acknowledged numerous red flags indicating malingering throughout Eldridge's record.  His response, however, was to ignore the evidence or to provide unpersuasive explanations to discount or dismiss it.  Dr. Roman selectively identified and emphasized data that supported a finding of incompetence, even after acknowledging a strong likelihood that Eldridge was feigning at least some of his symptoms, including false retrospective reporting of childhood hallucinations.  Dr. Roman maintained his position that Eldridge lacks a rational understanding of the connection between his crime and punishment in significant part because of the self-reported belief that Eldridge frequently communicated and interacted with one of his victims, Cynthia Bogany.  Dr. Roman failed to account for evidence that individuals with genuine delusions generally do something to act in accordance with the belief, but Eldridge never did.  If the delusion was genuine, there would be some indication beyond Eldridge's own statements that he believed it to be true, such as listing Cynthia Bogany on the visitor list or writing her letters.

Dr. Allen and Dr. Moeller, both of whom have considerably more forensic experience than Dr. Roman, found Eldridge's claimed delusion not credible — and Dr. Roman's assessment unreliable — in part because Eldridge did not exhibit any behaviors consistent with his delusions.  Dr. Moeller also rejected Dr. Roman's "double bookkeeping" theory as lacking any scientific

support.  Dr. Allen credibly testified that Dr. Roman relied on test results that were either incomplete because they failed to test for effort or inappropriately analyzed.  Dr. Allen noted that Dr. Roman failed to discuss some test results in his original report and misrepresented the SIRS-II manual in characterizing Eldridge's "indeterminate" score as not indicative of malingering.  Dr. Allen testified that the SIRS-II manual describes Eldridge's score as one requiring further examination.  May EH at 112-13.  Dr. Roman's opinion that Eldridge believes the woman and child he shot are alive also ignores Eldridge's failure to object to his imprisonment, despite his clear understanding that he is in jail for having killed them.  Dr. Roman's conclusion is significantly based on his belief that Eldridge's claimed delusion that his victims are still alive is a genuine delusion, despite all the symptoms that Dr. Roman acknowledges are likely feigned and all the indications of malingering.

Dr. Roman was credible when he acknowledged that he could not be certain whether Eldridge was delusional or using fantasies as a mechanism to cope with his death sentence and long confinement.  Dr. Roman otherwise lacked credibility in his opinions and gave this court little reliable guidance or information.

Dr. Allen acknowledged that there is some evidence that Eldridge is mentally ill.  But he was able to marshal far more evidence in support of his position that Eldridge has a far greater understanding of the reality he faces than Eldridge admits or describes.  This evidence included years of inconsistencies in the symptoms Eldridge described and the behavior he exhibited; years of mental health professional assessments; test results showing malingering; and Dr. Allen's own observations of the numerous and substantial inconsistencies between Eldridge's claimed symptoms and his behavior.  Dr. Moeller also presented compelling evidence that Eldridge is malingering, noting the atypical presentation of Eldridge's symptoms.

Perhaps the most superficially compelling piece of evidence in support of Eldridge's claim of incompetence is his significant weight loss, which he ties to a belief that prison guards are poisoning his food.  Upon closer examination, however, it becomes clear that the weight loss was caused by pernicious anemia, a physical ailment.  The more reliable explanation for Eldridge's weight loss is a physical, not a psychiatric, illness.

### B.      Applying the Precedents

"'The Eighth Amendment prohibits a State from carrying out a sentence of death upon a prisoner who is insane.'"  *Panetti v. Quarterman*, 551 U.S. at 934; *Ford v. Wainwright*, 477 U.S. at 410.  A prisoner is incompetent to be executed when his "mental illness prevents him from comprehending the reasons for the penalty or its implications."  *Ford*, 477 U.S. at 417.  A prisoner must be able to understand "the fact of his impending execution and the factual predicate for the execution."  *Panetti*, 551 U.S. at 942, 954-55 (internal quotation marks and citations omitted).  "Gross delusions stemming from a severe mental disorder may put an awareness of a link between a crime and its punishment in a context so far removed from reality that the punishment can serve no proper purpose."  *Id.* at 960.

While the ultimate question concerns the petitioner's current mental state, his mental-health history may be relevant.  *See, e.g., Thompson v. Bell*, 580 F.3d 423, 436 (6th Cir. 2009), *cert. denied*, ___ U.S. ___, 131 S.Ct. 102 (2010).  A comparison to the case of Scott Panetti is instructive.  After the Supreme Court remanded Panetti's case for review in accordance with its opinion, the United States District Court for the Western District of Texas conducted an evidentiary hearing to determine Panetti's competency to be executed.  In a detailed opinion, the court found that Panetti had a long history of mental-health issues and treatment dating to before the double murder that put him on

33

death row.  Evaluations and diagnoses included sociopathic personality disorder, schizophrenia, dependent personality disorder, and schizoaffective disorder.  *Panetti v. Quarterman*, No. A-04-CA-042-SS, 2008 WL 2338498 at *3-*8  (W.D. Tex. Mar. 26, 2008).  Panetti also had a long history of abusing alcohol and other substances, and this substance abuse aggravated his underlying mental illness.  *Id.*  After his arrest for capital murder, Panetti began claiming that he suffered from multiple personality disorder.  *Id.* at *11.  He also began describing extreme religious delusions and practices, such as shaving his head because he believed he was a biblical Nazirite.  One mental-health professional noted that "[i]t seems like Mr. Panetti may have wanted to impress me with how mentally disturbed he is, perhaps in an exaggerated way."  *Id.*

Panetti continued to express other delusional beliefs and described hallucinations. Eventually, Panetti "claims to have experienced an 'April Fool's Day conversion' wherein he was healed of his schizophrenia, stopped taking all medication, and began preaching the word of God." *Id.* at *12.

In 1995, after his conviction, Panetti, like Eldridge, was sent to the Jester IV Unit when he "appeared to be delusional and verbalized auditory and visual hallucinations."  *Id.* at *13.  At Jester IV, Panetti was "very circumstantial and evasive . . . ."  *Id.*  Some staff thought this was contrived. Panetti talked about his other personalities, "but was unable to be consistent about when the alters showed up and who they were."  *Id.*  Panetti was returned to Jester IV in 1997, because he complained of auditory and visual hallucinations and "exhibited religious preoccupations."  Again, staff found his claimed hallucinations vague and his complaints "inconsistent with his clinical presentation."  *Id.*

Expert witnesses for both sides agreed that Panetti was mentally ill, though they disagreed about the specific diagnosis and the extent to which his mental illness interfered with his understanding of his execution. *Id.* at *16. Panetti's experts believed that his stated belief that he was to be executed for preaching the gospel demonstrated a genuine delusional belief that he was to be a martyr of spiritual warfare. No expert seemed to believe Panetti's claim of multiple personalities. *Id.*

The court noted that Panetti was cooperative with his experts but not the State's. *Id.* at *17, *23-*24. Panetti, like Eldridge, appeared to understand what he was doing when he filled out his death packet. *Id.* He also expressed a fairly sophisticated understanding of his legal situation in recorded conversations with his parents. *Id.* at *28-*29. Noting Panetti's interactions with his parents, expert witnesses, and considering the entire record, the court found that Panetti was seriously mentally ill but was nonetheless competent to be executed because he had a rational understanding of his execution and the reasons for it. *Id.* at *35-*37.

Panetti's case for incompetency was significantly more compelling that Eldridge's. Panetti had a long documented history of mental illness that predated his crime; Eldridge does not. Experts for both sides agreed that Panetti was genuinely and severely mentally ill, though they disagreed as to the extent, severity, and specific diagnosis. In Eldridge's case, the State's experts are of the opinion that Eldridge is not mentally ill, but is feigning his symptoms. Eldridge's expert and his treating psychiatrist disagree but, as noted above, Dr. Roman's opinion is neither credible nor reliable, and Dr. Nathan did not look for evidence of malingering. When confronted with Eldridge's entire record, Dr. Nathan acknowledged many warning signs for malingering and became far less certain of his opinion.

In *Wood v. Thaler*, 787 F.Supp.2d 458 (W.D. Tex. 2011), the Court found that the petitioner's claim of severe mental illness not credible.  In that case, the court also found that the petitioner did not act in accordance with his claimed delusions.  *Id.* at 473.  Wood, like Eldridge, raised suspicions of feigning by TDCJ mental health staff.  *Id.* at 473-74.  In *Wood*, as in this case, Dr. Roman testified as the petitioner's expert.  Like this court, the *Wood* court found that Dr. Roman's opinion that the petitioner was incompetent was contradicted by substantial evidence that the petitioner was feigning his symptoms.  The *Wood* court also credited the testimony of the State's expert that a genuinely delusional person would act in accordance with his delusions.  Wood, like Eldridge, did not do so.  The court therefore found that Wood was competent to be executed.

The evidence in this case is far less compelling than Panetti's, and in many important ways similar to Wood's.  Unlike Panetti, Eldridge lacks a record of mental-health problems predating his crime.  While he has reported symptoms since his arrest for capital murder, the veracity of his reporting is called into doubt by the inconsistency of his symptoms, the self-serving nature of his complaints, past findings of malingering by this court and suspicions of malingering by treating professionals and expert witnesses, and a lack of credible expert testimony in support of his claims.  The case law further supports the conclusion that Eldridge has failed to prove by a preponderance of the evidence that he suffers from a delusional disorder, or that he in any way lacks a rational understanding of his execution, the reasons for it, or the connection between the two.

## V.    Conclusion and Order

The evidence shows that Eldridge is feigning many of his symptoms in an effort to avoid execution.  His reaction when shown crime-scene photos and his competence in filling out his "death

packet," RX 21, indicate that he rationally understands his crime, his punishment, and the connection between the two.  He is competent to be executed.  His petition for a writ of habeas corpus is denied.

Eldridge does not request a certificate of appealability ("COA"), but this court may determine whether one should issue.  *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000) ("It is perfectly lawful for district court's [sic] to deny COA *sua sponte*.  The statute does not require that a petitioner move for a COA; it merely states that an appeal may not be taken without a certificate of appealability having been issued.").  A petitioner may obtain a COA either from the district court or an appellate court, but an appellate court will not consider a petitioner's request for a COA until the district court has denied such a request.  *See Whitehead v. Johnson*, 157 F.3d 384, 388 (5th Cir. 1988); *see also Hill v. Johnson*, 114 F.3d 78, 82 (5th Cir. 1997) ("[T]he district court should continue to review COA requests before the court of appeals does.").  "A plain reading of the AEDPA compels the conclusion that COAs are granted on an issue-by-issue basis, thereby limiting appellate review to those issues alone."  *Lackey v. Johnson*, 116 F.3d 149, 151 (5th Cir. 1997).

A COA may issue only if the petitioner has made a "substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2); *see also United States v. Kimler*, 150 F.3d 429, 431 (5th Cir. 1998).  A petitioner "makes a substantial showing when he demonstrates that his application involves issues that are debatable among jurists of reason, that another court could resolve the issues differently, or that the issues are suitable enough to deserve encouragement to proceed further."  *Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir.), *cert. denied*, 531 U.S. 966 (2000); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  "The nature of the penalty in a capital case

is a 'proper consideration in determining whether to issue a [COA], but the severity of the penalty does not in itself suffice to warrant the automatic issuing of a certificate.'" *Washington v. Johnson*, 90 F.3d 945, 949 (5th Cir. 1996) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 (1983)), *cert. denied*, 520 U.S. 1122 (1997).

This court has carefully considered Eldridge's claim.  While the issue Eldridge raises is clearly important and deserving of the closest scrutiny, this court finds that the evidence does not support the claim.  This court therefore concludes that Eldridge has failed to make a "substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  Eldridge's Amended Petition For Writ of Habeas Corpus (Docket Entry 132) is dismissed, with prejudice.  A certificate of appealability is not issued.

SIGNED on January 31, 2013, at Houston, Texas.

Lee H. Rosenthal
United States District Judge