UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| GERALD CORNELIUS ELDRIDGE, § | | |
| Petitioner § | | |
| § | | |
| V. § | CIVIL ACTION NO. H-05-1847 | |
| § | | |
| RICK THALER, Director, § | | |
| Texas Department of Criminal § | | |
| Justice, Correctional Institutions Division, § | | |
| Respondent. § | | |

**PETITIONER'S MOTION TO ALTER OR AMEND THE JUDGMENT**

Imagine a case in which a death row inmate: (1) is admitted to a psychiatric hospital unit reserved for the most mentally disturbed prisoners; (2) spends over six months in that psychiatric hospital; (3) remains under close observation by highly-trained mental health treatment professionals for the entire six-month period; (4) is diagnosed with a severe mental illness; (5) is prescribed powerful antipsychotic medications; (6) is taking the antipsychotic medications beginning over two-and-a-half years ago and remains on them to the present day; and (7) is not once suspected of feigning symptoms of psychosis during the entire time. Now imagine that these facts are undisputed. This scenario precisely describes Petitioner Gerald Cornelius Eldridge's case. Yet, this Court did not see fit to grant relief – let alone issue a certificate of appealability – on his *Ford* claim.

Based on the evidence presented at the hearing, the reasons for this result are baffling. Based on the Court's recitation of the evidence in its Memorandum Opinion, the reasons become clearer. The Court's recounting of the evidence is striking: Mr. Eldridge subjected the State's experts to lengthy and effective cross-examination, yet the Court devotes a mere ***two***

1

*sentences* to Dr. Allen's testimony on cross-examination, *see* Memorandum Op. at 29, and devotes ***not a single word*** to Dr. Moeller's cross-examination testimony. *See id.* at 20-22.[1] Based solely on the Court's recitation of the evidence, an uninformed reader would logically conclude that the State's experts emerged from the crucible of cross-examination unscathed, their testimony unblemished. The Court's failure to recognize that crediting the direct testimony of the State's experts without acknowledging the significance of their concessions on cross-examination has resulted in manifest errors of fact. Accordingly, Petitioner Gerald Cornelius Eldridge asks the Court, pursuant to Rule 59(e) of the Federal Rules of Civil Procedure, to amend the judgment and grant relief. At the very least, the Court should grant him a certificate of appealability on his *Ford* claim and vacate the order lifting the stay of execution.

### A. The Credibility of Dr. Moeller

1. Dr. Moeller repeatedly questioned testimony provided by both Dr. Nathan and Dr. Roman because Dr. Moeller testified he was not aware of any peer-reviewed, scientific literature supporting their assertions. For example, Dr. Moeller cast doubt on the validity of Dr. Roman's testimony that the phenomenon known as double bookkeeping explains why Mr. Eldridge can simultaneously interact with prison personnel yet believe he lives a parallel life in the free world. 5/29/12 at 22. However, Dr. Moeller showed no compunction about offering testimony based on his own clinical experience – in other words, testimony for which he offered no grounding in peer-reviewed, scientific literature. *See*, *e.g.*, 5/29/12 at 12-13 (finding no difference in medication's side effects between psychotic and non-psychotic individuals); *id.* at 63 (finding link between antisocial personality disorder and malingering).

---

[1] In contrast, the Court devotes nearly half of its ten-page recitation of Dr. Roman's testimony to the State's cross-examination of him. Memorandum Op. at 10-20. Similarly, using three-and-a-half pages to recite Dr. Nathan's testimony, the Court devotes an entire page to recounting the State's cross-examination of him. *Id.* at 9-10.

2. The Court credits, without qualification, Dr. Moeller's criticism of Dr. Roman's testimony that giving psychotropic medication to a person who is not psychotic would result in obvious side effects. Memorandum Op. at 20-21; *see id.* at 13. However, the Court ignores Dr. Moeller's cross-examination testimony in which he admitted that antipsychotic medications must be prescribed and regulated by a doctor because the medications can be "dangerous" to a person who does not have any symptoms of mental illness. 5/29/12 at 40-41. Dr. Moeller conceded that typical antipsychotic medications like Thorazine cause side effects because they bind to all D2 receptors in the brain, including those that are working normally. *Id.* at 48. Giving Thorazine to a person who is not schizophrenic, Dr. Moeller, admitted, results in blocking only normally functioning D2 receptors. *Id.* at 49. This explanation leads credence to Dr. Roman's testimony that side effects would be more prominent if a malingerer were taking the powerful dose of Thorazine that Mr. Eldridge was prescribed. 4/17/12 at 497-99.[2]

3. Without qualification, the Court credits Dr. Moeller's conclusion that Mr. Eldridge is malingering, because if he was schizophrenic in 1993 or 1994, then his symptoms would be much worse today because "schizophrenia generally has a linear progression." Memorandum Op. at 22. The Court ignores Dr. Moeller's admission on cross-examination that a reliable authority concluded that changes in the brain's gray matter that occur over time in persons with schizophrenia are not, in fact, linear. 5/29/12 at 57-60. Moreover, the Court fails to consider that Dr. Moeller was impeached with his statement in another case in which he testified that schizophrenia is not always degenerative in nature. *Id.* at 62. Finally, the Court does not mention Dr. Moeller's testimony on cross-examination in which he was forced to

---

[2] Dr. Moeller's credibility was further damaged when he was impeached on a statement in his report. Dr. Moeller wrote that "'[n]ormals' *and* people with schizophrenia have unintended side effects with anti-psychotic medications because they both have intact 'side-effect' receptors." Resp. Ex. 82 at 2 (emphasis in original). On cross-examination, however, Dr. Moeller acknowledged that there is actually no such thing as a "side-effect receptor" in the human brain. 5/29/12 at 48.

3

concede that he had testified in another case that "[t]he scientific literature and data on tests for malingering shows [*sic*] that frequently they are not very good," and that, instead, he relies solely on his "subjective feel." *Id.* at 56.

### B. The Credibility of Dr. Allen

1. The Court accepts, without qualification, Dr. Allen's reliance on inconsistency as an acceptable strategy for detecting malingering. *See* Memorandum Op. at 23, 36. On cross-examination, however, Dr. Allen was confronted with an authoritative text that criticized the use of inconsistency of presentation as a primary detection strategy:

> Some practitioners mistakenly assume that all inconsistencies are evidence of malingering or manipulation. They make two implicit assumptions: (1) examinees deliberately distorted their presentations and (2) they were 'tripped up' in attempting to keep their 'stories' consistent. These assumptions are completely untenable. First, inconsistencies can reflect the imprecision of the assessment process. Second, persons with mental disorders often have poor insight, which leads to inconsistencies. Third, unimpaired individuals often show some inconsistencies. Fourth, the use of inconsistencies is an ineffective detection strategy for feigning.

5/29/12 at 178-79 (referencing *Clinical Assessment of Malingering and Deception* 303 (Rogers ed.) (3d ed.)); *see id.* at 178 ("Based on empirical studies, [inconsistency of presentation] is not an acceptable detection strategy. Inconsistency of presentation does not reliably differentiate malingerers and genuine patients. Although some malingerers are inconsistent, a substantial minority of genuine patients are also highly variable in their clinical presentation and symptom endorsements.") (quoting *Clinical Assessment* at 96).

2. The Court credits Dr. Allen's testimony that "genuine" delusions are not "self-serving." Memorandum Op. at 24, 36. Genuine delusions, he explained, "get you in trouble, not out of it." 5/29/12 at 181. Dr. Allen characterized Mr. Eldridge's delusion about food-tampering as "self-serving" and, therefore, inauthentic. Memorandum Op. at 24 (citing Resp.

4

Ex. 49 at 13). Applying Dr. Allen's own definition, however, the food delusion appears genuine. It got Mr. Eldridge "into trouble, not out of it." Moreover, according to Dr. Allen, such a delusion – unattached to an inmate's ability to understand the connection between his crime and his punishment – would not allow Mr. Eldridge to avoid execution. *See*, *e.g.*, *Overstreet v. Indiana*, 877 N.E.2d 144, 173-74 (Ind. 2007) (holding that, although a death row inmate diagnosed as a paranoid schizophrenic who suffers from hallucinations and delusions in which he believes that demons and angels talk to him, tell him what to do, and can disguise themselves as corrections officers, family members, and visitors, no evidence indicates that he questions the reality of the crime occurring or the reality of his punishment by the State for the crime committed).

Under Dr. Allen's logic, no death row inmate suffering from delusions could – ***by definition*** – ever succeed on a *Ford* claim because, "[a]voiding execution is an obvious incentive to malinger." Memorandum Op. at 22. In other words, if an inmate's delusion interferes with his ability to rationally understand the connection between his crime and his punishment, then the delusion is self-serving and, therefore, not genuine; the State can proceed with the execution. This conclusion flies in the face of Supreme Court precedent. *See Panetti v. Quarterman*, 551 U.S. 930, 960 (2007) (recognizing that "[g]ross delusions stemming from a severe mental disorder may put an awareness of a link between a crime and its punishment in a context so far removed from reality that the punishment can serve no proper purpose"). It also flies in the face of cases that have found inmates incompetent for execution post-*Panetti*. *See*, *e.g.*, *Billiot v. Epps*, 671 F. Supp.2d 840, 881 (S.D. Miss. 2010) (finding that an inmate diagnosed with schizophrenia who is aware that he is on death row for murder but has a delusional belief "that he will be sent to a mental institution, rehabilitated, and ultimately set

5

free as long as he takes his medication" simply does not have the rational understanding of his impending execution under the standard enunciated in *Panetti*); *Pennsylvania v. Banks*, 29 A.3d 1129, 1136, 1146 (Penn. 2011) (holding that an inmate who suffers from a psychotic disorder with symptoms that include delusional beliefs that a police conspiracy resulted in at least two of the victims' deaths, that he is currently incarcerated as part of a government conspiracy, and that he is supposed to be exempt from the sentence of death or that his sentence of death has been vacated by God, the Governor, or the President does not have a rational understanding of the death penalty or the reasons for it, as required by *Panetti*).

      3.     Relying on Dr. Allen's testimony, *see* Memorandum Op. at 22, 23, the Court finds that Mr. Eldridge had no history of mental illness or reports of hallucinations or delusions before his arrest for capital murder. *Id.* at 35, 36. This finding is a manifest error of fact. Testimony from the capital murder trial and the *Atkins* evidentiary hearing reveals that evidence of Mr. Eldridge's mental health problems predates the crime. At the *Atkins* hearing, Mr. Eldridge's mother testified that, on two separate occasions, she "begged" him to see a psychiatrist. 2 AH 382.[3] Significantly, one of these occasions occurred shortly before the capital offense, after Mr. Eldridge had complained to his mother of "a noise in his hearing that wouldn't go away day or night." *Id.* at 382-83. His mother's testimony, thirteen years earlier at the capital murder trial, is consistent. She recalled that, after Mr. Eldridge returned from prison several months before the commission of the capital crime, he complained of a "noise [that] would not go away." 34 RR 309. His father, also testifying during the capital murder trial, said that his wife (Mr. Eldridge's stepmother), observing Mr. Eldridge as a child, feared that he was "disturbed in some way." *Id.* at 378. Although she was unable to pinpoint the nature of the

---

[3] The reporter's record of the *Atkins* evidentiary hearing is cited as "[vol.] AH [page]." The reporter's record of the capital murder trial is cited as "[vol.] RR [page]."

6

disturbance, "she kept bringing it up." *Id.* Moreover, it is noteworthy that Mr. Eldridge's mother was prescribed Librium approximately a year before Mr. Eldridge was born. 2 AH 350. She continued to take the medication for three years, including during the time she was breast-feeding Mr. Eldridge. *Id.* at 350-51. Librium is a therapeutic agent prescribed for "the management of anxiety disorders or for the short term relief of symptoms of anxiety." Physician's Desk Reference (2004 ed.) 1713. Studies have suggested that the use of Librium during the first trimester can increase the risk of congenital malformations. *Id.* Dr. Patricia Averill testified at the *Atkins* hearing that ingestion of Librium during the first trimester of pregnancy "can impact the brain" of the developing fetus. 1 AH 68-69.

  4. The Court credits, without qualification, Dr. Allen's testimony that Mr. Eldridge's hostility and paranoia are a "justified and rational response" to being in prison. Memorandum Op. at 24. On cross-examination, however, Dr. Allen was confronted with Dr. Conroy's 2009 evaluation of Mr. Eldridge that stated:

> There were indications of the presence of paranoid delusions. For example, he said his food was often tainted with battery acid, bleach, and excrement. TDCJ records note that he has on occasion refused food for this reason. The defendant went on to describe concerns that correctional officers were showing pictures and videos of his family to other inmates. He expressed the belief that officers were forging letters on his behalf. ***These ideas reached well beyond the often heard complaints that staff are harassing inmates.***

5/29/12 at 196 (quoting Pet. Ex. 13 at 3) (emphasis added).

  5. The Court credits Dr. Allen's report that Mr. Eldridge's weight loss was caused by pernicious anemia, not a delusion that correctional officers were tampering with his food. Memorandum Op. at 23-24. However, on cross-examination, Dr. Allen asserted that he was "not comfortable" answering "medical questions" about vitamin B12 deficiency or testifying beyond what he had written in his report and testified to on direct examination. 5/29/12 at 209-

7

10.[4]

      6.        The Court credits Dr. Allen's testimony that Mr. Eldridge exhibited no negative symptoms of schizophrenia, indicating an atypical presentation of psychosis. Memorandum Op. at 25. However, on cross-examination, Dr. Allen was dismissive of compelling signs of negative symptomatology: Mr. Eldridge's failure to shower regularly, dress neatly, and maintain his personal hygiene. 5/29/12 at 166. Revealing his confirmatory bias, Dr. Allen testified, "[T]hat's pretty common in TDCJ." *Id.*[5]

      7.        The Court credits Dr. Allen's report that he found Mr. Eldridge to be definitely

---

[4] Dr. Allen's reluctance to answer questions about pernicious anemia and vitamin B12 deficiency on cross-examination may have been a consequence of his experience in *Green v. State*, 55 S.W.3d 633 (Tex. App. – Tyler 2001), where the Court of Appeals found that the trial court did not abuse its discretion in refusing to allow him to testify as a "false confession" expert:

> [O]ur review of the record reveals that when Allen was questioned by Appellant's counsel, he testified that research on the phenomenon of false confessions had spanned many years, but he did not name any authorities in the field. Though Allen testified there had been books and articles published in the field, he did not name any book, article, or publication of any type. Without further explanation, Allen then launched into a discussion of the principles of the field and how they applied, in his opinion, to Appellant. Given the fact that Allen did not provide the trial court with any actual publications and authorities supporting his analysis, the trial court would have had to assume that the subject matter of Allen's testimony was within the scope of the field to so find. When he was cross-examined by the prosecutor, Allen did provide the names of three "authorities" in the field of false confessions. However, Allen did not testify at any time that he had relied upon or utilized the research or techniques of those same "authorities" when drawing his conclusions about Appellant's confession. After the court's ruling, Appellant offered four documents involving interrogation and interviewing and their application to statement analysis. It appears from the record that the trial court did not consider these articles. The documents appear to be photocopies of pages of some textbook or treatise, but no author, title of the publication, or date of the publication is provided in the record. Furthermore, there was no indication that Allen had relied upon or utilized the research or techniques described in these documents when drawing his conclusions about Appellant's confession.

*Id.* at 640.

[5] Similarly, Dr. Moeller dismissed evidence of negative symptoms by explaining that Mr. Eldridge had "volitionally . . . chosen to not be acting out." 5/29/12 at 31. Dr. Moeller speculated that Mr. Eldridge had concluded that "there [was] no reason right now to be acting out." *Id.* Of course, this conclusion is at odds with testimony from both Dr. Moeller and Dr. Allen emphasizing that a death row inmate like Mr. Eldridge *always* has a reason to act out: the "potential for substantial secondary gain" – "avoid[ing] the death penalty." *Id.* at 63, 106.

malingering. Memorandum Op. at 25. However, on cross-examination, Dr. Allen conceded that he did not properly apply the "Slick" criteria for determining the presence and probability of malingering. Because Mr. Eldridge did not perform "below chance" on the Test of Memory Malingering or Green's Word Memory Test, Dr. Allen admitted that Mr. Eldridge did not actually meet the criteria for "definite" neurocognitive malingering. 5/29/240-43.

8. The Court credits Dr. Allen's testimony that Mr. Eldridge appeared to "confuse and conflate delusions and hallucinations." Memorandum Op. at 26. However, the Court fails to note that Dr. Allen contradicted himself on ***direct*** examination on this very point. Initially, Dr. Allen testified that Mr. Eldridge "doesn't really know what a delusion or a hallucination is." 5/29/12 at 86. A dozen pages later, Dr. Allen reached the opposite conclusion when an opportunity to attack Dr. Roman's credibility arose:

> Q: Mr. Eldridge apparently didn't know what a hallucination was when he was speaking with Dr. Roman. Did he know what a hallucination was when he spoke with you?
>
> A: Yes, ma'am. That just was not a credible report. He has been hearing that word for at least 18 years. He began hearing that word in 1993 in Harris County. He heard it in Jester twice on those two admissions. He knows what a hallucination is.

*Id.* at 98.

9. The Court credits Dr. Allen's testimony that Mr. Eldridge failed in his attempt to appear psychotic by imitating "loosening of associations." Memorandum Op. at 27. Dr. Allen characterized Mr. Eldridge's speech as "a coherent effort to look incoherent." 5/29/12 at 127. The DSM-IV defines "loosening of associations" as:

> A pattern of speech in which a person's ideas slip off one track onto another that is completely unrelated or only obliquely related. In moving from one sentence or clause to another, the person shifts the topic idiosyncratically from one frame of reference to another and things may be said in juxtaposition that lack a meaningful relationship. This disturbance occurs ***between*** clauses, in contrast to

9

incoherence, in which the disturbance is *within* clauses.

DSM-IV at 822 (emphases in original). Notably, Dr. Allen's recounting of an example of Mr. Eldridge's speech falls squarely within the definition of loosened associations. According to Dr. Allen, Mr. Eldridge mentioned "guys trying to break into a house," "get[ting] a big dog," and hearing a voice in his sleep. 5/29/12 at 125. Mr. Eldridge shifted the topic idiosyncratically from one frame of reference to another *between* sentences or clauses. Instead of labeling this speech "loosened associations," Dr. Allen erroneously categorized it as incoherence ("babbling nonsense"). It clearly was not. "Incoherence" is speech that is "essentially incomprehensible to others because words and phrases are joined together without a logical or meaningful connection," and "[t]his disturbance occurs *within* clauses." DSM-IV-TR at 824 (emphasis in original).

Dr. Allen attempted to demonstrate loosened associations with an example involving a person who claimed to have met Adolph Hitler and the Queen of England. 5/29/12 at 126. Dr. Allen's example did not depict loosened associations, because the person answered the questions posed, and the content of each clause was related to the one preceding it. Unlike Dr. Allen, Dr. Nathan correctly defined "loosened associations." 4/16/12 at 20. Dr. Nathan also testified that it was one of the most difficult psychotic symptoms to feign. *Id.* at 114.

10. Based on Dr. Allen's testimony, the Court finds that Mr. Eldridge's "death packet" shows that he has a rational understanding of the connection between his crime and his punishment. Memorandum Op. at 36-37. Specifically, Dr. Allen testified that the list of foods Mr. Eldridge wanted for his last meal undercut his "food delusion." 5/29/12 at 167; *see* Resp. Ex. 21 (death packet). This finding is a manifest error of fact. Mr. Eldridge's delusion about food involved only the correctional officers at the Polunsky Unit in Livingston, Texas. 4/16/12

at 160-62; *see* Part D(7), *infra*. The death packet explicitly states that the inmate's choices for his last meal "are restricted to what is available from the Huntsville Unit kitchen." *Id.* at 3.

### C. The Double Bookkeeping Phenomenon

Crediting the testimony of Dr. Allen and Dr. Moeller, the Court repeatedly finds that Mr. Eldridge failed to act in conformity with his claimed delusions. *See*, *e.g.*, Memorandum Op. at 31-32. This finding is a manifest error of fact. Mr. Eldridge often acted in conformity with his delusions: He carefully inspected his food at the Polunsky Unit, refused to eat meals that he believed were poisoned, and notified TDCJ administrative and mental health treatment staff of his concerns about the tampering. He wrote letters to his non-existent free-world wife Jennifer Lewis. Resp. Ex. 27 at 25-27; Resp. Ex. 46 at 260-62; *see* 4/16/12 at 169-70.[6] He wrote letters to pen pals about going to work and being with his family. Resp. Ex. 29 at 93-94. He mentioned to treatment staff that he lives in the free world with his wife and has eight children. Pet. Ex. 8 at 112, 286; *see* 4/16/12 at 165-67. Mr. Eldridge stands in stark contrast to Jeff Wood. In that case, the district court rejected Wood's claim that he was incompetent to be executed, finding that:

> [N]owhere in [the petitioner's TDCJ/UTMB medical records, correspondence, and audio recordings] did petitioner ever complain with any intelligible specificity about an alleged malevolent conspiracy between his prosecutor and trial judge. To be sure, in his conversations with family members, petitioner expressed disdain for his prosecutor . . . . Still, there is no mention by petitioner in his recorded conversations, medical records, or correspondence of the Freemasons, the Masons, or any overarching conspiracy to deprive petitioner of his life[.]

*Wood v. Thaler*, 787 F. Supp.2d 458, 488 (W.D. Tex. 2011); *see id.* at 475 ("Nothing in any of petitioner's voluminous correspondence suggests petitioner has ever communicated to any of those with whom he has corresponded the beliefs that (1) he is the victim of a malevolent

---

[6] His confirmatory bias showing, Dr. Allen dismissed the letters as Mr. Eldridge's attempts "to build a case." 5/29/12 at 89; *see id.* at 158.

11

conspiracy between his prosecutor and state trial judge or (2) the Freemasons could help him gain his release from prison or a new trial.").

Second, neither Dr. Allen nor Dr. Moeller referred to any learned treatise, peer-reviewed articles, or scientific evidence to support their opinion that Schizophrenics must act in conformity with their delusions. They appeared to rely solely on their clinical observation and experience. However, in doing so, they (as well as the Court) had to repudiate the long-recognized phenomenon known as "double bookkeeping." Only by repudiating it could Dr. Allen and Dr. Moeller use the supposed "inconsistency" between Mr. Eldridge's delusions and his behavior as evidence of malingering. For example, the State criticizes Dr. Roman for using double bookkeeping to explain Mr. Eldridge's delusion that he routinely leaves the prison and has a job and family outside its confines. State's Response at 11-12. According to Dr. Roman, Mr. Eldridge "recognizes at some level they can't both be true[.]" 4/16/12 at 176. This recognition does not make Mr. Eldridge a malingerer; it confirms that he is behaving as some Schizophrenics do. *See* Eugen Bleuler, *Textbook of Psychiatry* 383 (1976) ("Although they imagine themselves in a prison or in hell or in a church, they nevertheless know in some other connection that they are in the ward of the insane asylum[.]"). As Dr. Roman testified, "[I]f a person is going to be malingering a delusional state, it behooves them to sell a particular story. It behooves them to be able to answer the discrepancies that come up or have some way of being able to effectively sidetrack them." 4/16/12 at 178. Unlike a malingerer, Mr. Eldridge does not attempt to reconcile the discrepancies between his life in prison and his life in the free world. He can provide no explanation. *See*, *e.g.*, *id.* at 179 ("'How is it that you get in and out of the prison?' [Mr. Eldridge] looks at me, he looks puzzled for a minute, and he says, 'I don't know. I just do.'").

The State now asserts that the article mentioning double bookkeeping, *see* Resp. Ex. 61, was "not intended to be a comprehensive statement on reliable research." State's Response at 11 n.6; *see* 5/29/12 at 62-63, 251-52. Such a disclaimer raises serious concerns about why the State ever introduced the article for the Court's consideration in the first place without properly vetting it. Not until counsel for Mr. Eldridge mentioned double bookkeeping did the State voice its concerns about the article's reliability and provenance. The State asserts that this "handout" of "unknown authorship or scholarship" is "the *only* support or literature Eldridge can find for his double bookkeeping theory." State's Response at 11 n.6 (emphasis added). The State's assertion cannot but leave one with the impression that a single, questionable article – fortuitously brought to Mr. Eldridge's attention by the State – discusses the phenomenon known as "double bookkeeping." Ironically, although Dr. Allen and Dr. Moeller never hesitated to rely on their clinical experience in support of their conclusions, both based their skepticism about double bookkeeping on the lack of scientific explanation for it and the fact that the article discussing it was not "peer-reviewed." 5/29/12 at 22, 252.

For the record, the author of the article is Robert Boland, M.D., Professor of Psychiatry at the Warren Alpert Medical School at Brown University. Dr. Boland is the Associate Training Director for the Brown General Psychiatry Residency. He has taught at all levels of training in the University. Most significantly, he directs the Introductory Psychiatry Course given to all students at the Medical School and is a primary lecturer in that course. In addition, he is the director of the Clerkship in Psychiatry. He has published more than 40 peer-reviewed articles and more than 30 book chapters. Dr. Boland is currently on the editorial boards for Academic Psychiatry, Psychosomatics, and FOCUS (the APA's journal of continuing education) and was appointed by the American College of Psychiatry to be the Assistant Editor

13

for the Psychiatry Residents in Training Examination. He has been active in a number of organizations relevant to academic psychiatry, is a Past President for the Association for Academic Psychiatry, was recently elected to the steering committee of American Association of Directors of Residency Training, and is the Program Chair for 2013.[7]

Dr. Boland did not develop the concept of double bookkeeping nor is he (or Dr. Roman) its only proponent. In fact, the concept of double bookkeeping dates back to the 1920's. Eugen Bleuler, who coined the term "schizophrenia," used the phrase "double awareness." Bleuler noted that "[n]ot only do delusion and reality exist consecutively, but they can also exist simultaneously in conditions of full consciousness where one would expect they would be mutually exclusive." Bleuler, *Dementia Praecox or the Group of Schizophrenias* 126 (1950).[8] More recently, Louis Sass described the phenomenon as "double bookkeeping," writing that:

> It is remarkable to what extent even the most disturbed schizophrenics may retain, even at the height of their psychotic periods, a quite accurate sense of what would generally be considered to be their objective or actual circumstances. Rather than mistaking the imaginary for the real, they often seem to live in two parallel but separate worlds: consensual reality and the realm of their hallucinations and delusions.

*The Paradoxes of Delusion: Wittgenstein, Schreber, and the Schizophrenic Mind* 21 (1994). Of his own patients, Bleuler wrote:

> Kings and Emperors, Popes and Redeemers engage, for the most part, in quite banal work, provided they still have any energy at all for activity. This is true not only of patients in institutions, but also of those that are completely free. ***None of our generals has ever attempted to act in accordance with his imaginary rank and station.***

*Dementia Praecox* at 129 (emphasis added). By failing to recognize the phenomenon of double

---

[7] *See* http://research.brown.edu/research/profile.php?id=1100923745 (last viewed Feb. 23, 2013). Dr. Boland's curriculum vitae can be found at http://research.brown.edu/pdf/1100923745.pdf?nocache=1940942181 (last viewed Feb. 23, 2013).

[8] Dr. Allen spoke glowingly of Bleuler: "[H]is insights then were amazing, and he has been regarded very highly ever since then . . . ." 5/29/12 at 82.

bookkeeping, Dr. Allen and Dr. Moeller (as well as the Court) demonstrate the limits of the "inconsistency of presentation" strategy for detecting malingering.

   D. **The Credibility of Dr. Roman**

   1.   Dr. Roman's testimony is suspect, the Court finds, because he "lacked the experience and expertise to provide reliable evidence." Memorandum Op. at 31. The Court notes that Dr. Roman has conducted only one other competency-for-execution examination. *Id.* However, Dr. Allen, the State's primary expert, actually has *less* relevant experience than Dr. Roman. Dr. Allen erroneously testified that he had evaluated one other death row inmate for execution competency. 4/18/12 at 636. In fact, in that one other case, Dr. Allen was hired simply to assess the inmate's psychological functioning generally – ***not*** to render an opinion on competence for execution. *Panetti v. Quarterman*, No. 1:04-cv-042-SS, slip op. at 37 (W.D. Tex. Mar. 26, 2008).

   2.   The Court finds that Dr. Roman violated ethical standards by allowing Mr. Eldridge's attorney to remain in the interview room during portions of his first visit. Memorandum Op. at 20. This finding is a manifest error of fact. First, it is important to emphasize that Dr. Roman never conceded, as the Court's finding states, that he violated any ethical standards. 4/17/12 at 520-21. Second, neither the State nor the Court can cite to any guidelines to support this professionally damaging finding. Both the American Psychological Association (APA) and the American Academy of Clinical Neuropsychology (AACN) have not adopted blanket policies prohibiting the presence of third parties during psychological assessments. The primary consideration is whether the third party's presence will facilitate or detract from the validity and fairness of testing. *See* APA, *Statement on Third Party Observers in Psychological Testing and Assessment: A Framework for Decision-Making* (2007) at 4 ("The overall goal of any situation surrounding the formal psychological evaluation of an individual is

to maximize the assessment conditions to complete the most valid and fair evaluation in order to obtain the best data possible."); *id.* at 1 ("[I]n some cases, the presence of a third party may help develop and sustain rapport in order to facilitate validity."); AACN, *Policy Statement on Presence of Third Party Observers in Neuropsychological Assessments* (2001) at 433, 434 (noting exception to general prohibition on third-party presence for persons "with extreme behavioral disturbances" like "severe mental illness" where the presence of a third party would allow the neuropsychologist to obtain more useful assessment data); *see also id.* at 434 ("[T]his policy is not intended for application to criminal forensic consultations that involve issues of criminal liability or culpability because the right to legal representation and a third party observer is absolute in criminal matters.").[9]

Dr. Roman administered ***no*** standardized tests while Mr. Eldridge's attorney was present, the primary concern of the policies. *See* Petitioner's Ex. 1 at 7; *see also* 4/17/12 at 520-21 ("[H]aving another individual present during test administration, which sometimes will occur, but it's something that is generally frowned upon and we attempt to not do that."). The Court should correct this manifest error of fact.

3. Based on Dr. Allen's testimony, the Court finds that Dr. Roman "misrepresented the SIRS-II manual in characterizing Eldridge's 'indeterminate' score as not indicative of malingering." Memorandum Op. at 32. This finding is a manifest error of fact. On direct examination, Dr. Allen did, indeed, testify that Dr. Roman mischaracterized the SIRS-II results. 5/29/12 at 112-13. On cross-examination, however, Dr. Allen admitted that Dr. Roman accurately reported that none of Mr. Eldridge's scores on the primary scales fell into the category of "definite feigning," and that his overall score fell into the "indeterminate-evaluate"

---

[9] The APA and AACN policy statements are attached as Exhibits A and B, respectively, to Petitioner's Motion for Order Allowing Counsel to Be Present During State Expert's Evaluation. Docket Entry 94.

category. *Id.* at 234-35; *cf.* 4/16/12 at 234 (testimony of Dr. Roman). Moreover, in response to the Court's question, Dr. Allen conceded that an overall score in the "indeterminate-evaluate" range calls for "further evaluation, which means clinical observation on whether or not someone is malingering." 5/29/12 at 113.

By the time he testified at the hearing, Dr. Roman had the benefit of additional clinical observation to evaluate the "indeterminate" score. Dr. Roman administered the SIRS-II in May 2010. Pet. Ex. 2 at 11. He testified at the hearing in April 2012. Nearly two additional years' worth of clinical observation by TDCJ mental health staff documented Mr. Eldridge's continued treatment with powerful antipsychotic medications and included no indications that he was malingering.

4. The Court finds that Dr. Roman is not credible because he appeared unaware of, or ignored, the Harris County Jail records indicating that Mr. Eldridge was malingering. Memorandum Op. at 11. This is a manifest error of fact. Dr. Roman's report noted that he reviewed the jail records. Pet. Ex. 1 at 2. He summarized those records, specifically mentioning the mental health treatment staff's conclusions that Mr. Eldridge was malingering. Pet. Ex. 1 at 2, 3.

5. The Court credits Dr. Allen's attack on Dr. Roman's credibility based on Dr. Roman's failure to consider the relationship between antisocial personality disorder ("ASPD") and malingering. Memorandum Op. at 28. However, during cross-examination, Dr. Moeller was confronted with a passage from an authoritative text that unequivocally stated: "The presence of antisocial personality disorder should not be used as evidence of malingering. Although the DSM-IV-TR states that the mere presence of APD should arouse suspicions of malingering, studies have failed to show this relationship." 5/29/12 at 53-54 (quoting *Clinical*

17

*Assessment of Malingering and Deception* 61 (Richard Rogers ed.) (3d ed. 2008)).

6. The Court makes a manifest error of fact in finding that Dr. Roman concluded that Mr. Eldridge "was already mentally ill" before he arrived on death row. Memorandum Op. at 28. The Court then credits Dr. Allen's opinion that Mr. Eldridge had a rational understanding of the reason he was on death row when he arrived, directly disputing Dr. Roman's conclusion. *Id.* However, Dr. Roman's testimony on this point is clear: Mr. Eldridge was not schizophrenic when he entered death row in 1994. 4/17/12 at 421.

7. The Court finds that Dr. Roman is not credible because he erred in his testimony that Mr. Eldridge's delusion about food tampering involves only the guards at the Polunsky Unit and not the guards at the Jester IV Unit. Memorandum Op. at 18. The Court refers to a treatment note that supposedly contains a comment by Mr. Eldridge that he found pills in his food at the Jester IV Unit. *Id.* This is a manifest error of fact. The comment to which the Court is referring occurs in a treatment note that reads, in pertinent part:

> The [patient] went on to complain that he is not receiving his 5000 calorie diet regularly. He did receive extra food at lunch today. He made several references to having to remind staff to bring extra food. This interview was terminated when the [patient] reached down on the floor and picked up two trays that had been left in the room by other offenders earlier in the day. He discussed problems at his unit with officers putting battery acid in his food and he accused them of "trying to make him kill himself." He reported that someone forged his name to a document in which he is supposed to be confessing to some crimes. He believes that someone is setting him up and trying to make trouble for him because he has broken up illegal activities at Polunsky. ***He reported that he opened a piece of meat and found pills in the meat.*** He denies hearing voices that he would call hallucinations. "I hear you when you are talking and then I hear you in my head." At times he made statements that did not flow properly. He did not mention any space ships as he had earlier in [Diagnostics and Evaluation] and he did not report seeing anyone in his cell. He claims that the warden at Polunsky told someone that "If he wants to snitch, keep him with highheels and a dress." He claims officers posted his family's addresses on the tv screen and that people drove by these addresses to threaten the people who

18

> lived there.  He thinks that when he is given an incorrect shoe size or there is a hold up in gaining access to his glasses, that this is a plot ag[ainst] him.

Pet. Ex. 8 at 86 (emphasis added).  The context provided by the sentences surrounding the emphasized comment makes clear that Mr. Eldridge was speaking about guards at the Polunsky Unit tampering with his food.  *See* 4/16/12 at 160-62.  Moreover, the comment is in the past tense, not the present tense.  That Dr. Roman mistakenly agreed with the State's leading question on cross-examination that the comment appears in the present tense does not make it so.  *See* 4/17/12 at 458-59.

### E. MANIFEST ERROR OF LAW

The Court compares Mr. Eldridge's case with *Panetti* and *Wood v. Thaler*, 787 F. Supp.2d 458 (W.D. Tex. 2011), and concludes that his case is far less persuasive than *Panetti* and similar to *Wood*.  Memorandum Op. at 33-36.  The Court's conclusion is a manifest error of law.  The Court ignores the most important facts that distinguish Mr. Eldridge's case and make it more compelling: Neither Panetti nor Wood were sent to the Jester IV Unit for over six months, where they were closely monitored by highly-trained mental health treatment professionals; diagnosed with a severe mental illness; prescribed powerful antipsychotic medications; took those antipsychotic medications for over two-and-a-half years and remain on them to the present day; and were not once suspected, during the entire time, of malingering.  These are the undisputed facts of Mr. Eldridge's case.  Neither Scott Panetti nor Jeff Wood can lay claim to any *one* of them.

## CONCLUSION

The Court should correct manifest errors of law and fact, amend its judgment, and find that Mr. Eldridge is incompetent to be executed. In the alternative, the Court should find that Mr. Eldridge has made a substantial showing of the denial of a constitutional right, issue a certificate of appealability, and vacate the order lifting the stay of execution.

Respectfully Submitted,

/ s / Gregory W. Wiercioch

Gregory W. Wiercioch
Texas Bar No. 00791925
University of Wisconsin Law School
975 Bascom Mall
Madison, Wisconsin 93706
(Tel) 608-263-1388
(Fax) 608-263-3380

Lee Wilson
Texas Bar No. 21704200
P.O. Box 52447
1314 Texas Avenue, Suite 610
Houston, Texas 77052-2447
(Tel) 713-223-6870
(Fax) 713-223-9248

Counsel for Mr. Eldridge

## CERTIFICATE OF SERVICE

I, Gregory W. Wiercioch, certify that on February 28, 2013, I electronically filed the foregoing brief with the clerk of the court for the U.S. District Court, Southern District of Texas, using the electronic case filing system. A "Notice of Electronic Filing" was sent to Counsel for Respondent at the following e-mail address:

Georgette P. Oden
Georgette.Oden@oag.state.tx.us

/ s / Gregory W. Wiercioch